UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

BISHME SMITH; and PARIS SMITH,

                          Plaintiffs,

v.                                                          5:22-CV-1202
                                                            (MAD/ML)
HOLLEY DAVIS; TERESA JOHNSON;
JULIE RICHARDSON; STEPHANIE
ALBERT; PRESERVATION MGMT.,
INC.; COLD BLACK RIVER L.P.; and
KELLEY CANNON,

                          Defendants.

_____

APPEARANCES:                                    OF COUNSEL:

BISHME SMITH
   Plaintiff, *Pro Se*
968 Bradley Street, Unit 159
Watertown, New York 13601

PARIS SMITH
   Plaintiff, *Pro Se*
968 Bradley Street, Unit 159
Watertown, New York 13601


MIROSLAV LOVRIC, United States Magistrate Judge

## ORDER and REPORT-RECOMMENDATION

The Clerk has sent a *pro se* complaint in the above captioned action together with applications to proceed *in forma pauperis*, filed by Bishme Smith and Paris Smith (collectively "Plaintiffs") to the Court for review.  (Dkt. Nos. 1, 2, 3.)  For the reasons discussed below, I grant Plaintiffs' *in forma pauperis* applications, and recommend that Plaintiffs' Complaint be (1) accepted in part for filing, and (2) dismissed (a) in part with leave to replead, and (b) in part without leave to replead.  (Dkt. Nos. 1, 2, 3.)

## I.    BACKGROUND

Construed as liberally[1] as possible, Plaintiffs' Complaint alleges that their rights were violated by Holley Davis, Teresa Johnson, Julie Richardson, Stephanie Albert, Preservation Management, Inc., Cold Black River L.P., and Kelley Cannon (collectively "Defendants").  (*See generally* Dkt. No. 1.)  More specifically, Plaintiffs allege that since November 30, 2021, they have rented an apartment in a complex called "Black River Apartments," which is owned by Defendant Cold Black River L.P. ("Defendant Cold Black River"), and managed by Defendant Preservation Management, Inc. ("Defendant Preservation").  (Dkt. No. 1 at 3-5.)  Plaintiffs allege that Defendants Davis, Johnson, Richardson, and Albert are employed by Defendant Preservation Management, Inc.[2]  (*Id.* at 2.)  Plaintiffs allege that as of February 28, 2022, Defendant Cannon rented another apartment in Black River Apartments.  (*Id.* at 3-4.)

---

[1]    The court must interpret *pro se* complaints to raise the strongest arguments they suggest. *Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)).

[2]    Hereinafter "Defendants PMI" refers collectively to Defendants Cold Black River, Preservation, Davis, Johnson, Richardson, and Albert.

Plaintiffs allege that Plaintiff Bishme is a Black man with a mental health diagnosis. (Dkt. No. 1 at 1.)  Plaintiffs allege that Plaintiff Paris is a white woman with a mental health diagnosis.  (*Id*. at 2.)  Plaintiffs allege that Defendants Davis, Johnson, and Cannon are white females.  (*Id*. at 2-3.)

Plaintiffs allege that on or about December 7, 2021, they realized that their rent calculation was high in proportion to their earnings because it included child support that Plaintiff Paris was not receiving.  (Dkt. No. 1 at 5.)  Plaintiffs allege that they communicated this error to Defendants PMI several times, over the course of several months, and Defendants PMI failed to timely recalculate Plaintiffs' accurate rent amount.  (*See generally* Dkt. No. 1.)

Plaintiffs allege that they encountered several other issues with their rented apartment from Defendants PMI including, *inter alia*: (1) access to the proper mailbox, (2) heating temperatures, (3) items being left in the fire escape, (4) items being placed on the back porch, and (5) bed bug inspections.  (*Id*.)

Plaintiffs allege that they attempted to communicate with Defendants PMI regarding issues they were having with Defendant Cannon who—after moving in—rescued a dog that peed in front of their door, roamed unleashed in common areas, and was loud.  (Dkt. No. 1 at 7.)  Plaintiffs allege that Defendants PMI failed to take any action to address the issues they were having with Defendant Cannon, which resulted in a "major incident" between Plaintiff Bishme and Defendant Cannon on May 30, 2022.  (*Id*. at 8.)

Plaintiffs allege that on May 30, 2022, Defendant Cannon's son stood in front of Plaintiffs' door with Defendant Cannon's dog, preventing Plaintiff Bishme from entering Plaintiffs' apartment.  (*Id*.)  Plaintiffs allege that Plaintiff Bishme politely asked that Defendant Cannon's son and the dog move, but that when he refused, Plaintiff Bishme "grabbed the leash

and politely moved the dog aside." (*Id*.)  Plaintiffs allege that Plaintiff Bishme entered the

apartment and a few moments later Defendant Cannon "pound[ed] on the door," Plaintiff Bishme

opened the door, and Defendant Cannon "aggressively scream[ed] and yell[ed] in a threatening

manner with her hand in [P]laintiff Bishme's face." (*Id*.)  Plaintiffs allege that Plaintiff Bishme

then called the police but that, due to a personal relationship between the responding officer and

Defendant Cannon, and racism, the police took a statement from Defendant Cannon and left.

(*Id*. at 8-9.)  Plaintiffs allege that approximately one week later, police charged Plaintiff Bishme

with harassment for the incident with Defendant Cannnon on May 30, 2022.  (*Id*. at 9.)

Plaintiffs allege that on June 29, 2022, during a meeting with Defendant Johnson, they

stated that they felt they were "being treated differently" because of Plaintiff Bishme's race and

that "management did not respond or deny that accusation."  (Dkt. No. 1 at 11.)

Plaintiffs allege that on July 27, 2022, they filed a complaint with FHEO HUD regarding

the racial and disability discrimination they experienced in their interactions with Defendants

PMI.  (Dkt. No. 1 at 14.)  More specifically, the Complaint alleges that Plaintiffs' FHEO HUD

complaint alleged that (1) Defendants PMI were not responding to Plaintiffs' requests to move to

another apartment because of (a) their mental health, and (b) issues with Defendant Cannon, and

(2) Defendants PMI were not properly adjusting their rent amount.  (*Id*.)

Plaintiffs allege that on September 10, 2022, they received a response to their FHEO

HUD complaint, which indicated that it had been sent to the "other parties" against whom the

discrimination was alleged.  (*Id*. at 17.)

Plaintiffs allege that on September 14, 2022, they received a notice to vacate directing

them to vacate their apartment by November 30, 2022, because their lease was up.  (Dkt. No. 1 at

17.)  Plaintiffs allege that Defendant Johnson informed them that the lease was not being

renewed "based on a police report and court records" providing "reasonable grounds to believe that [P]laintiff Bishme violated a provision of the lease during the incident on May 30[], 2022." (*Id*. at 17-18.)

Plaintiffs allege that they exchanged several e-mails with Defendants PMI and provided documentation reflecting that the criminal charge against Plaintiff Bishme (related to the incident with Defendant Cannon on May 30, 2022) was dismissed. (Dkt. No. 1 at 18-19.) Plaintiffs allege that, notwithstanding, Defendants PMI informed them that their lease would not be renewed. (*Id*. at 19.)

Plaintiffs allege that on October 26, 2022, they were served with another notice to vacate and non-renewal that was dated October 18, 2022, which stated—falsely—that the non-renewal was because Plaintiff Bishme admitted to criminal activity. (*Id*. at 21.)

Plaintiffs allege that Defendants Johnson and Davis "have used their community connections to have people at the bar across the street watch and stalk [P]laintiffs' family." (Dkt. No. 1 at 22.)

Based on these factual allegations, Plaintiffs appear to assert the following eleven causes of action: (1) a claim pursuant to 42 U.S.C. § 1981 against Defendants; (2) a claim pursuant to 42 U.S.C. § 1982 against Defendants; (3) a claim pursuant to 29 U.S.C. § 794 against Defendants PMI; (4) a claim pursuant to 42 U.S.C. § 2000d against Defendants PMI; (5) a claim pursuant to 42 U.S.C. § 3604 against Defendants PMI; (6) a claim pursuant to 42 U.S.C. § 3617 against Defendants PMI; (7) a claim pursuant to New York Executive Law § 296(5-7) against Defendants PMI; (8) a claim pursuant to New York Real Property Law § 223-b against Defendants PMI; (9) a claim pursuant to New York Real Property Law § 235-b against Defendants PMI; (10) a claim of intentional infliction of emotional distress pursuant to New

York common law against Defendants; and (11) a claim of breach of contract pursuant to New York common law against Defendants PMI.  (Dkt. No. 1 at 24-32.)  As relief, Plaintiffs seek declaratory judgment, a permanent injunction prohibiting Defendants from discriminating against them, compensatory damages in the amount of $350,000, punitive damages "in an amount that would punish Defendants . . . and . . . deter [them] from future discriminatory behavior," and attorney's fees and costs.  (*Id*. at 32-33.)

## II.      PLAINTIFFS' APPLICATIONS TO PROCEED *IN FORMA PAUPERIS*

"When a civil action is commenced in a federal district court, the statutory filing fee, currently set at $402, must ordinarily be paid.  28 U.S.C. § 1914(a).  A court is authorized, however, to permit a litigant to proceed *in forma pauperis* status if a party "is unable to pay" the standard fee for commencing an action.  28 U.S.C. § 1915(a)(1).[3]  After reviewing Plaintiffs' *in forma pauperis* applications (Dkt. Nos. 2, 3), the Court finds that Plaintiffs meet this standard. Therefore, Plaintiffs' applications to proceed *in forma pauperis* are granted.[4]

## III.     LEGAL STANDARD FOR INITIAL REVIEW OF THE COMPLAINT

"Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that . . . the action . . . (i) is

---

[3]      The language of that section is ambiguous because it suggests an intent to limit availability of *in forma pauperis* status to prison inmates.  *See* 28 U.S.C. § 1915(a)(1) (authorizing the commencement of an action without prepayment of fees "by a person who submits an affidavit that includes a statement of all assets such prisoner possesses").  The courts have construed that section, however, as making *in forma pauperis* status available to any litigant who can meet the governing financial criteria.  *Hayes v. United States*, 71 Fed. Cl. 366, 367 (Fed. Cl. 2006); *Fridman v. City of N.Y.*, 195 F. Supp. 2d 534, 536 n.1 (S.D.N.Y. 2002).

[4]      Plaintiffs are reminded that, although their applications to proceed *in forma pauperis* have been granted, they are still required to pay fees that they may incur in this action, including copying and/or witness fees.

frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks

monetary relief against a defendant who is immune from such relief."  28 U.S.C. § 1915(e)(2).

"In reviewing a complaint . . . the court must accept the material facts alleged in the

complaint as true and construe all reasonable inferences in the plaintiff's favor."  *Hernandez v.*

*Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted).  However, "the tenet that a court

must accept as true all of the allegations contained in a complaint is inapplicable to legal

conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere

conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678.

Courts are "obligated to construe a pro se complaint liberally."  *Harris v. Mills*, 572 F.3d

66, 72 (2d Cir. 2009); *see also Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir. 1990) (per curiam)

(reading the plaintiff's *pro se* complaint "broadly, as we must" and holding that the complaint

sufficiently raised a cognizable claim).  "[E]xtreme caution should be exercised in ordering sua

sponte dismissal of a pro se complaint before the adverse party has been served and [the] parties .

. . have had an opportunity to respond."  *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983).

## IV.    ANALYSIS

In addressing the sufficiency of a plaintiff's complaint, the court must construe her

pleadings liberally.  *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008).

Having reviewed Plaintiffs' Complaint with this principle in mind, I recommend that Plaintiffs'

Complaint be accepted in part for filing and dismissed in part for failure to state a claim upon

which relief may be granted.

### A.    Claims Pursuant to 42 U.S.C. §§ 1981, 1982 Against Defendants

The Second Circuit notes that, "Section 1981 provides that 'all persons have equal right

to make and enforce contracts,' and § 1982 'establishes that all persons have equal right to

purchase, lease, sell, hold, and convey real and personal property.'" *Silva v. Farrish*, 47 F.4th 78, 89-90 (2d Cir. 2022) (quoting *Costello v. Town of Huntington*, 14-CV-2061, 2015 WL 1396448, at *12 (E.D.N.Y. Mar. 25, 2015) (citing 42 U.S.C. §§ 1981, 1982)).  To state a prima facie claim under either provision, plaintiffs must prove: "(1) they are members of a racial minority; (2) an intent to discriminate on the basis of their race by defendant; and (3) the discrimination concerned one or more of the activities enumerated in the statute (i.e., make and enforce contracts, sue and be sued, give evidence, etc.)." *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1087 (2d Cir. 1993).

With respect to the second element, at the pleading stage, a plaintiff must "specifically allege the 'circumstances giving rise to a plausible inference of racially discriminatory intent.'" *Wade v. Kay Jewelers, Inc.*, 17-CV-0990, 2018 WL 4440532, at *7 (D. Conn. Sept. 17, 2018) (quoting *Yusuf v. Vassar Coll.*, 35 F.3d 709, 713 (2d Cir. 1994)).

Here, the Complaint fails to allege facts plausibly suggesting that Defendants acted with racially discriminatory intent.  (*See generally* Dkt. No. 1.)  Plaintiffs' assertions that (1) Defendants PMI failed to refute an allegation that they were treating Plaintiffs "differently" based on race (Dkt. No. 1 at 11, 17-18), (2) on July 20, 2022, Defendant Johnson "was speaking to [Plaintiff Paris and] was respectful and would listen without cutting her off, but as soon as Plaintiff Bishme, a black man went to speak, she would cut him off repeatedly and not listen to what he was trying to explain and tell him that he was wrong" (Dkt. No. 1 at 13), and (3) "any other tenant who is Caucasian does not have these same issues with having their rent at the corrected amount well before this" (Dkt. No. 1 at 14; *see also* Dkt. No. 1 at 23 [alleging that Plaintiffs "are being treated differently than any other Caucasian tenants in the building."]), are insufficient to plausibly suggest that Defendants acted with the requisite racially discriminatory

intent. Instead, "the abundance of other possible reasons for [Defendant's actions] combined with the lack of any specific factual support for [Plaintiffs'] claim of racial motivation illustrates that [their] claim[s] here are simply 'naked allegation[s]' of racial discrimination." *Yusuf v. Vassar Coll.*, 35 F.3d 709, 714 (2d Cir. 1994) (quoting *Albert v. Carovano*, 851 F.2d 561, 572 (2d Cir. 1988) (*en banc*)); *see Miller v. Bridgeport Bd. of Educ.*, 12-CV-1287, 2013 WL 3936925, at *4 (D. Conn. July 30, 2013) (holding that "the mere fact that [an] attorney was Caucasian and the Plaintiff is African American is insufficiently particularized to establish that race was a substantial factor in the Defendants' failure to pay [the Plaintiff]."); *Rivera v. Metro Transit Auth.*, 750 F. Supp. 2d 456, 461-62 (S.D.N.Y. 2010) ("The unstated premise of [plaintiff's] argument is that anything unwelcome that befalls any person who is an identifiable member of a minority group probably occurs because the individual is a member of that group. While racism and all its manifestations are deplorable, the inference that it is present whenever something unwelcome happens to a member of an identifiable minority group is not rational. There is no evidence that anything that any defendant may have done was motivated, even in part, by an intention to discriminate on the basis of race."); *Tejwani v. Untied Airlines, Inc.*, 08-CV-2966, 2009 WL 860064, at *4 (S.D.N.Y. Mar. 31, 2009) (noting, in dismissing § 1981 claim, that complaint "identifies a number of race-neutral factors that may have led" to the alleged discriminatory conduct).

As a result, I recommend that Plaintiffs' discrimination claims pursuant to 42 U.S.C. §§ 1981, 1982 against Defendants be dismissed for failure to state a claim upon which relief may be granted.

**B.    Claim Pursuant to 29 U.S.C. § 794 Against Defendants PMI**

Plaintiffs next assert discrimination in violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.  Section 504 provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a).  A prima facie violation of Section 504 requires facts sufficient to establish that "(1) plaintiff is a 'qualified individual with a disability;' (2) plaintiff was 'excluded from participation in a public entity's services, programs or activities or was otherwise discriminated against by [the] public entity;' and (3) such exclusion or discrimination was due to [plaintiff's] disability.'"  *B.C. v. Mount Vernon Sch. Dist.*, 837 F.3d 152, 158 (2d Cir. 2016) (quoting *Fulton v. Goord*, 591 F.3d 37, 43 (2d Cir. 2009)).

"[I]ndividuals cannot be held liable under the Rehabilitation Act."  *Burris v. Hous. and Servs. Inc.*, 17-CV-9289, 2019 WL 1244494, at *5 (S.D.N.Y. Mar. 18, 2019) (citing *J.L. on behalf of J.P. v. N.Y.C. Dep't of Educ.*, 324 F. Supp. 3d 455, 467 n.4 (S.D.N.Y. 2018)).  As a result, I recommend that Plaintiff's Rehabilitation Act claims against Defendants Davis, Johnson, Richardson, and Albert, be dismissed with prejudice.  *Burris*, 2019 WL 124494, at *5 (dismissing with prejudice the plaintiff's Rehabilitation Act claims against individual defendants).

With respect to Plaintiffs' Section 504 claim against Defendants Cold Black River and Preservation, I recommend that it be dismissed because the Complaint fails to allege facts plausibly suggesting that (1) Plaintiffs were disabled within the meaning of the Rehabilitation Act, or (2) Defendants discriminated against Plaintiffs because of their disability.  (*See generally* Dkt. No. 1.)

First, Section 504 expressly incorporates—with certain qualifications not applicable here—the Americans with Disabilities Act's definition of the term "disability."  29 U.S.C. § 705(20)(B); *see B.C. v. Mount Vernon Sch. Dist.*, 837 F.3d 152, 159 (2d Cir. 2016) ("Section 504 expressly incorporates . . . the ADA's definition.").  The ADA defines "disability" as a "physical or mental impairment that substantially limits one or more major life activities."  42 U.S.C. § 12102(1)(A).  The ADA defines "major life activities" as, *inter alia*, "learning, reading, concentrating, thinking, communicating, and working."  *Id*. § 12102(2)(A).  Plaintiffs do not allege any facts concerning their alleged "mental health diagnos[e]s."  (*See generally* Dkt. No. 1 at 1-2 [alleging that Plaintiffs each have a mental health diagnosis but failing to identify what those diagnoses are or how they substantially limit one or more major life activity of Plaintiffs']); *Saidin v. City of New York*, 20-CV-2851, 2020 WL 2571043, at *6 (S.D.N.Y. May 19, 2020) (dismissing the plaintiff's Rehabilitation Act claim because, *inter alia*, he did "not allege any facts concerning his mental or medical disability.").

Second, Plaintiffs fail to allege facts alleging that Defendants took any action or failed to take action because of their disability or perceived disabilities.  At one point in the Complaint, Plaintiffs alleged that they requested a transfer to a different building managed by Defendant Preservation because their strained relationship with Defendant Cannon was aggravating their disabilities.  (Dkt. No. 1 at 14.)  However, the Complaint also alleged that Plaintiffs believed that they were denied this accommodation because of racial discrimination (Dkt. No. 1 at 11) and that the accommodation request was made to protect their "safety and well-being" (Dkt. No. 1 at 16-17.)  Thus, Plaintiffs failed to allege that the rejection of the transfer request was due to Plaintiffs' disabilities.

For each of these alternative reasons, I recommend that Plaintiffs' claim pursuant to the Rehabilitation Act be dismissed.

### C.     Claim Pursuant to 42 U.S.C. § 2000d Against Defendants PMI

Section 601 of Title VI of the Civil Rights Act of 1964 provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. To state a claim under Title VI, a plaintiff must allege that (1) the defendant discriminated against him on the basis of race, color, or national origin; (2) the discrimination was intentional; and (3) the discrimination was a substantial and motivating factor for the defendant's actions. *See Tolbert v. Queens Coll.*, 242 F.3d 58, 69 (2d Cir. 2001); *Alexander v. Sandoval*, 532 U.S. 275, 281 (2001) ("Title VI itself directly reach[es] only instances of intentional discrimination," not disparate impact).

"Title VI does not provide for individual liability." *Sherman v. Yonkers Pub. Schs.*, 21-CV-7317, 2023 WL 137775, at *7 (S.D.N.Y. Jan. 9, 2023) (citing *Bayon v. State Univ. of N.Y. at Buffalo*, 98-CV-0578, 2001 WL 135817, at *2) (W.D.N.Y. Feb. 15, 2001)). As a result, I recommend that Plaintiff's Title VI claim against Defendants Davis, Johnson, Richardson, and Albert, be dismissed with prejudice.

With respect to Plaintiffs' Title VI claim against Defendants Cold Black River and Preservation, I recommend that it be dismissed for the reasons set forth above in Part IV.A. of this Order and Report-Recommendation—because the Complaint fails to allege facts plausibly suggesting that Plaintiffs were discriminated against on the basis of race. *See also Grillo v. N.Y.C. Transit Auth.*, 291 F.3d 231, 235 (2d Cir. 2002) ("Even if [plaintiff's] highly dubious claim that he was unfairly singled out for punishment by the instructors is credited, [plaintiff] has

done little more than cite to his alleged mistreatment and ask the court to conclude that it must have been related to his race."); *Varughese v. Mount Sinai Med. Ctr.*, 12-CV-8812, 2015 WL 1499618, at *42 (S.D.N.Y. Mar. 27, 2015) ("fallacy" for the plaintiff to conclude: "I belong to a protected class; something bad happened to me at work; therefore, it must have occurred because I belong to a protected class"); *Rissman v. Chertoff*, 08-CV-7352, 2008 WL 5191394, at *4 (S.D.N.Y. Dec. 12, 2008) ("In essence, plaintiff alleges that because he was yelled at [by his supervisors], this must have been because [of his protected status].  Such conclusory and speculative statements are insufficient.").

As a result, I recommend that Plaintiffs' Title VI claim be dismissed for failure to state a claim upon which relief may be granted.

### D.    Claims Pursuant to the Fair Housing Act Against Defendants PMI

The Fair Housing Act ("FHA") also provides that "it shall be unlawful . . . to discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of . . . race [or] color."  42 U.S.C. § 3604(b).  The FHA also forbids "coerc[ing], intimidat[ing], threaten[ing], or interfer[ing] with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section . . . 3604 . . . ."  42 U.S.C. § 3617.  "The FHA also prohibits retaliation against persons who have asserted their rights under the FHA."  *Bethea v. NYCHA Law Dep't*, 23-CV-0803, 2023 WL 2394116, at *2 (S.D.N.Y. Mar. 6, 2023) (citing 42 U.S.C. § 3617).

Construing the Complaint liberally, Plaintiff appears to make three separate claims pursuant to the FHA against Defendants PMI: (1) a claim of discrimination, (2) a claim of retaliation, and (3) a claim of hostile housing environment.  (*See generally* Dkt. No. 1.)

### 1.    Discrimination

To set out a prima facie case of discrimination under the FHA, the plaintiffs must show that: (1) they are members of a protected class; (2) the defendants took adverse action against them; and (3) the adverse action took place under circumstances giving rise to an inference of discrimination.  *DeSouza v. Park W. Apartments, Inc*., 15-CV-1668, 2018 WL 2990099, at *7 (D. Conn. June 14, 2018); *see McCulloch v. Town of Milan*, 559 F. App'x 96, 98 (2d Cir. 2014) ("To establish a prima facie case of discrimination under the disparate treatment theory, 'the plaintiff[ ] must present evidence that animus against the protected group was a significant factor in the position taken by the [defendants]'") (internal quotation marks and citations omitted).

Although the Complaint alleges that Plaintiffs each have a "mental health diagnosis," as set forth above in Part IV.B. of this Order and Report-Recommendation, it fails to allege facts plausibly suggesting that Plaintiffs are "disabled" within the meaning of the law such that they are members of a protected class.  Moreover, for the reasons set forth above, the Complaint fails to allege facts plausibly suggesting that Defendants PMI took an adverse action against Plaintiffs under circumstances giving ride to an inference of discrimination.  *See Dean v. Doberman*, 21-CV-8320, 2023 WL 2480012, at *9 (S.D.N.Y. Mar. 13, 2023) (citing *Tasfay v. Ramos*, 20-CV-5472, 2021 WL 4443303, at *2 (S.D.N.Y. Sept. 28, 2021); *Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 72-73 (2d Cir. 2021) (affirming dismissal of complaint that "lacks even minimal support for the proposition that [defendants] were motivated by discriminatory intent")) (holding that a "conclusory allegation that defendants made discriminatory statements during the [state

court action], which 'persuaded the judge's view of' [the] plaintiff, is conclusory and 'insufficient to state a claim of discrimination under the FHA.'").

As a result, I recommend that Plaintiffs' claims of discrimination pursuant to the FHA be dismissed for failure to state a claim upon which relief may be granted.

### 2.    Retaliation

The plaintiffs bear the initial burden to make their prima facie case by showing that: (1) they engaged in protected activity; (2) the alleged retaliators knew that the plaintiffs were involved in protected activity; (3) an adverse decision or course of action was taken against the plaintiffs; and (4) a causal connection exists between the protected activity and the adverse action. *Reg'l Econ. Cmty. Action Program, Inc*., 294 F.3d 35, 53-54 (2d Cir. 2002), *superseded by statute on other grounds*. A causal connection can be shown either "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow [individuals] who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Natofsky v. City of New York*, 921 F.3d 337, 353 (2d Cir. 2019). The "plaintiff's burden at this prima facie stage is de minimis." *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002).

Out of an abundance of caution, mindful of the Second Circuit's instruction that a *pro se* plaintiff's pleadings must be liberally construed, *see, e.g., Sealed Plaintiff*, 537 F.3d at 191, and without expressing an opinion as to whether Plaintiffs can withstand a properly filed motion to dismiss or for summary judgment, I recommend that a response be required to Plaintiffs' FHA retaliation claim against Defendants PMI. *See Burris v. Hous. and Servs. Inc.*, 17-CV-9289, 2023 WL 1966120, at *10-11 (S.D.N.Y. Feb. 13, 2023) (holding that (1) the plaintiff engaged in

protected activity by filing a "NYSDHR Complaint," (2) a reasonable jury could conclude that

an eviction constitutes an adverse action, and (3) the evidence was sufficient to establish the

required causal link for a prima facie case where the adverse action occurred less than one month

after the plaintiff's participation in a protected activity).

### 3.    Hostile Housing Environment

Courts in this Circuit have construed Section 3604(b) of the FHA to prohibit the creation

of a "hostile environment" by individuals who have control or authority over the "terms,

conditions, or privileges of sale or rental of a dwelling." *Favourite v. 55 Halley St., Inc.*, 381 F.

Supp. 3d 266, 277 (S.D.N.Y. 2019) (citations omitted).  A plaintiff asserting a hostile housing

environment claim pursuant to Section 3604(b) must establish that (1) he was subjected to

harassment that was sufficiently pervasive and severe so as to create a hostile housing

environment, (2) the harassment was because of the plaintiff's membership in a protected class,

and (3) the defendants are responsible for the allegedly harassing conduct towards the plaintiff.

*Favourite*, 381 F. Supp. 3d at 277 (citing *Cain v. Rambert*, 13-CV-5807, 2014 WL 2440596 at

*5 (E.D.N.Y. May 30, 2014)) (internal citations omitted).

Here, the Complaint appears to allege that Defendant Cannon created a "hostile living

environment" by (1) being outside when Plaintiffs arrived home at various times, and (2) telling

others about issues between Plaintiffs and Defendant Cannon.  (Dkt. No. 1 at 22-23.)  In

addition, Plaintiffs appear to allege that Defendants PMI failed to adequately ameliorate

Defendant Cannon's behavior.  (*See generally* Dkt. No. 1.)  While there can be little doubt that

relations between Plaintiffs and Defendant Cannon are antagonistic, "Congress did not intend the

FHA to provide a remedy for every squabble, even continuing squabbles, between neighbors . . .

." *Lachira v. Sutton*, 05-CV-1585, 2007 WL 1346913, at *20 (D. Conn. May 7, 2007) (internal

quotation marks omitted). "Behavior that is rude or mean-spirited, but not discriminatory, does not fall within the ambit of the FHA." *Kalashnikov v. Myfield Lane Homeowners' Assn., Inc.*, 20-CV-1018, 2023 WL 1862763, at \*15 (D. Conn. Feb. 9, 2023). Here, the Complaint fails to allege facts plausibly suggesting that Plaintiffs were harassed because of their race or any other protected status.

As a result, I recommend that Plaintiffs' claim for hostile housing environment be dismissed for failure to state a claim upon which relief may be granted.

### E.    New York State Law Claims

#### 1.    New York State Human Rights Law ("NYSHRL")

##### a.    New York Executive Law § 296(5)

The NYSHRL provides that it is unlawful discriminatory practice to refuse to (1) "sell, rent, lease or otherwise to deny . . . any person or group of persons . . . a housing accommodation because of the race . . . [or] national origin . . . of such person or persons"; (2) "discriminate against any person because of race . . . [or] national origin . . . in the terms, conditions or privileges of the sale, rental or lease of any . . . housing accommodation"; or (3) "make any record or inquiry in connection with the prospective purchase, rental or lease of . . . a housing accommodation which expresses, directly or indirectly, any limitation, specification or discrimination as to race . . . [or] national origin . . . , or any intent to make any such limitation, specification or discrimination." N.Y. Exec. Law §§ 296(5)(a)(1)-(3), 296(5)(c)(2).

"'Claims under the FHA and [NYS]HRL § 296 are evaluated under the same framework.'" *Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 80 (2d Cir. 2021) (quoting *Olsen v. Stark Homes, Inc.*, 759 F.3d 140, 153 (2d Cir. 2014)).

For the reasons set forth above in Part IV.D.1. of this Order and Report-Recommendation, I recommend that Plaintiffs' NYSHRL discrimination claims pursuant to N.Y. Exec. Law § 296(5) be dismissed because Plaintiffs failed to allege facts plausibly suggesting that they were discriminated against by Defendants PMI.

### b.    New York Executive Law § 296(7)

To state a claim for retaliation under the NYSHRL, "the plaintiff must, at the very least, allege that as a result of her engagement in protected activity, the defendant engaged in conduct that was reasonably likely to deter a person from engaging in the protected activity." *Rubin v. New York City Bd. of Educ*., 20-CV-10208, 2023 WL 1972729, at *19 (S.D.N.Y. Jan. 6, 2023) (citing *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013)).

For the reasons set forth above in Part IV.D.2. of this Order and Report-Recommendation, I recommend that a response be required to Plaintiffs' NYSHRL retaliation claims pursuant to N.Y. Exec. Law § 296(7) against Defendants PMI.

### c.    New York Executive Law § 296(6)

Claims that individual defendants aided and abetted violations of NYSHRL, in violation of N.Y. Exec. L. § 296(6), are tied to the primary NYSHRL violation.  If a plaintiff is unable to establish retaliation pursuant to NYSHRL, then he likewise cannot establish liability for aiding and abetting such retaliation. *See White v. Pacifica Found.*, 973 F. Supp. 2d 363, 378 (S.D.N.Y. 2013) (collecting cases).

Out of an abundance of caution, mindful of the Second Circuit's instruction that a *pro se* plaintiff's pleadings must be liberally construed, *see, e.g., Sealed Plaintiff*, 537 F.3d at 191, and without expressing an opinion as to whether Plaintiffs can withstand a properly filed motion to dismiss or for summary judgment, I recommend that a response be required to Plaintiffs' aiding

and abetting NYSHL retaliation claim against Defendants PMI.  However, to the extent that

Plaintiffs' claim pursuant to N.Y. Exec. Law § 296(6) is construed as alleging a claim of aiding

and abetting discrimination, I recommend that it be dismissed because I recommend that

Plaintiffs' underlying NYSHRL discrimination claim be dismissed.  *See Ndongo v. Bank of

China Ltd.*, 22-CV-5896, 2023 WL 2215261, at *9 (S.D.N.Y. Feb. 24, 2023) (dismissing the

plaintiff's aiding and abetting claims pursuant to N.Y. Exec. Law § 296(6) "[b]ecause the

Complaint fails to plead an underlying violation.").

### 2.    New York Real Prop. Law

### a.    New York Real Prop. Law § 223-b

Pursuant to New York Real Prop. Law § 223-b, a landlord shall be subject to a civil

action if the landlord retaliates against a tenant for actions that the tenant took in good faith to

secure or enforce his/her rights.  To succeed on a claim pursuant to N.Y. Real Prop. § 223-b,

Plaintiffs must establish that "(1) they exercised a protected right in her conduct; (2) they had a

serious, reasonable, bona fide grievance with a foundation in fact; (3) they did not create the

condition; (4) the grievance was present at the time Petitioner commenced the proceeding; and

(5) Petitioner's overriding reason to evict Respondents was to retaliate for exercising their

constitutional rights." *Stefanis v. Cavicchio*, 75 Misc. 3d 1225(A), at *2 (N.Y. Westchester

Cnty. Mar. 10, 2022) (citing *Toms Point Apts. v. Goudzward*, 72 Misc. 2d 629 (N.Y. Dist. Ct.

Nassau Cnty. 1972)).  In addition, N.Y. Real Prop. Law § 223-b(5) "provides for a rebuttable

presumption that a landlord is acting in retaliation if the tenant establishes that the landlord

service a notice to quit, or institutes an action or proceeding to recover possession, within one

year after a good faith complaint was made." *MKBH Mgmt. LLC v. Strachin*, 72 Misc. 3d

1211(A), at *4 (N.Y. City Ct. Mount Vernon July 13, 2021).

For the reasons set forth above in Part IV.D.2. of this Order and Report-Recommendation, I recommend that a response be required to Plaintiffs' retaliation claim pursuant to N.Y. Real Prop. Law § 223-b against Defendants PMI.

### b.    New York Real Prop. Law § 235-b

New York Real Prop. Law § 235-b provides that "in any lease agreement for residential premises there is an implied warranty of habitability under which a landlord has a nonwaivable duty to make sure that tenants are not subjected to any conditions endangering or detrimental to their life, health or safety." *Zar Realty LLC v. Xia*, 77 Misc. 3d 1225(A), at *2 (N.Y. New York Cnty. Jan. 9, 2023).  This duty is a condition to tenants' obligation to pay rent.  *See Park W. Mgmt. Corp. v Mitchell*, 47 N.Y.2d 316, 327 (N.Y. 1979).  Depending on the extent of a landlord's breach, tenants may be entitled to a full withholding of rent or "an abatement in their contracted-for rent," which is measured as "the difference between the fair market value of the premises if they had been as warranted and the value of the premises during the period of the breach."  *Park W. Mgmt. Corp.*, 47 N.Y.2d at 329.

Out of an abundance of caution, mindful of the Second Circuit's instruction that a *pro se* plaintiff's pleadings must be liberally construed, *see, e.g., Sealed Plaintiff*, 537 F.3d at 191, and without expressing an opinion as to whether Plaintiffs can withstand a properly filed motion to dismiss or for summary judgment, I recommend that a response be required to Plaintiffs' breach of the warranty of habitability claim against Defendants PMI pursuant to N.Y. Real Prop. Law § 223-b.

### 3.    Intentional Infliction of Emotional Distress ("IIED")

In New York, to state a claim for IIED, plaintiffs must plead: "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional

distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress." *Howell v. New York Post Co., Inc.*, 81 N.Y.2d 115, 121 (N.Y. 1993). "The standard for extreme and outrageous conduct is incredibly high." *Phillips v. The Fashion Institute of Tech.*, 20-CV-0221, 2023 WL 2525677, at *7 (S.D.N.Y. Mar. 15, 2023). The conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized society." *Murphy v. American Home Products Corp.*, 58 N.Y.2d 293, 303 (N.Y. 1983). Due to this very high threshold, IIED claims "generally do not survive dispositive motions." *Allam v. Meyers*, 09-CV-10580, 2011 WL 721648, at *6 (S.D.N.Y. Feb. 24, 2011). "Indeed, the New York Court of Appeals has rejected every claim for intentional infliction of emotional distress it has considered because the conduct was not sufficiently outrageous or extreme." *Phillips*, 2023 WL 2525677, at *7) (citing *Howell*, 81 N.Y.2d at 122). The few claims upheld by the Appellate Divisions have involved "longstanding campaign[s] of deliberate, systematic, and malicious harassment." *Seltzer v. Bayer*, 272 A.D.2d 263, 264 (N.Y. App. Div. 1st Dep't 2000).

The actions alleged in the Complaint do not approach the type of egregious conduct necessary to support a claim for intentional infliction of emotional distress. Courts have repeatedly declined to hold behavior such as threats to be extreme and outrageous. *See e.g., Walther v. Maricopa Int'l Inv., Corp.,* 97-CV-4816, 1998 WL 689943, at *4 (S.D.N.Y. Sept. 30, 1998) (repeated verbal threats such as "c[***]sucker you're gonna pay" fell short of "extreme and outrageous" threshold); *Torain v. Casey*, 16-CV-2682, 2016 WL 6780078, at *2 (S.D.N.Y. Sept. 16, 2016) (threat to break plaintiff's jaw insufficient to establish IIED), *report and recommendation adopted*, 2016 WL 6775440 (S.D.N.Y. Nov. 14, 2016); *Saleh v. United States*, 12-CV-4598, 2013 WL 5439140, at *11–12 (S.D.N.Y. Sept. 27, 2013) (defendant's threats and

plaintiff's resulting fear "that at any moment he could be attacked physically or harassed[,] . . . kidnapped[,] or even killed" did not rise to required level of conduct), *aff'd*, 580 F. App'x 22 (2d Cir. 2014); *Owen v. Leventritt*, 174 A.D.2d 471, 472 (N.Y. App. Div. 1st Dep't 1991) (threat to kill pregnant plaintiff insufficient to support a cause of action for IIED).  It follows that the much less heinous conduct alleged here also fails to constitute "extreme and outrageous" behavior.  As a result, I recommend that Plaintiffs' IIED claim be dismissed for failure to state a claim upon which relief may be granted.

### 4.     Breach of Contract

"[I]n order to establish a claim for breach of contract, a plaintiff must prove, by a preponderance of the evidence, (1) the existence of a contract between itself and that defendant, (2) performance of the plaintiff's obligations under the contract, (3) breach of the contract, and (4) damages to the plaintiff caused by the defendant's breach."  *OOCL (USA) Inc. v. Transco Shipping Corp.*, 13-CV-5418, 2015 WL 9460565, at *4 (S.D.N.Y. Dec. 23, 2015) (citation omitted).

Out of an abundance of caution, mindful of the Second Circuit's instruction that a *pro se* plaintiff's pleadings must be liberally construed, *see, e.g., Sealed Plaintiff*, 537 F.3d at 191, and without expressing an opinion as to whether Plaintiffs can withstand a properly filed motion to dismiss or for summary judgment, I recommend that a response be required to Plaintiffs' breach of contract claim against Defendants PMI.

## V.     OPPORTUNITY TO REPLEAD

Generally, a court should not dismiss claims contained in a complaint filed by a *pro se* litigant without granting leave to replead at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated."  *Branum v. Clark*, 927 F.2d 698, 704-05

(2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires.").  An opportunity to replead is not required, however, where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see also Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.").  Stated differently, "[w]here it appears that granting leave to amend is unlikely to be productive, . . . it is not an abuse of discretion to deny leave to amend."  *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993); *accord, Brown v. Peters*, 95-CV-1641, 1997 WL 599355, at *1 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.).[5]

It is not clear whether a better pleading would permit Plaintiffs to assert cognizable claims against (1) Defendants pursuant to 42 U.S.C. § 1981, 42 U.S.C. § 1982, and New York common law for intentional infliction of emotional distress, (2) Defendants Cold Black River and Preservation pursuant to 29 U.S.C. § 794 and 42 U.S.C. § 2000d, and (3) Defendants PMI pursuant to (a) the FHA for discrimination and hostile living environment, and (b) N.Y. Exec. Law §§ 296(5) and 296(6) (to the extent it relates to an underlying discrimination claim). Because Plaintiffs have not previously amended their Complaint, I recommend that they be granted leave to replead those claims.

---

[5]    *See also Carris v. First Student, Inc.*, 132 F. Supp. 3d 321, 340-41 n.1 (N.D.N.Y. 2015) (Suddaby, C.J.) (explaining that the standard set forth in *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 796 (2d Cir. 1999)—that the Court should grant leave to amend "unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would be successful in stating a claim"—is likely not an accurate recitation of the governing law after *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)), *rev'd on other grounds*, 682 F. App'x 30.

However, the issue with Plaintiffs' claims pursuant to 29 U.S.C. § 794 and 42 U.S.C. § 2000d against Defendants Davis, Johnson, Richardson, and Albert are substantive such that a better pleading will not cure it.  As a result, I recommend that those claims be dismissed without leave to replead.

If Plaintiffs choose to file an amended complaint, they should note that the law in this circuit clearly provides that "'complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning.'"  *Hunt v. Budd*, 895 F. Supp. 35, 38 (N.D.N.Y. 1995) (McAvoy, J.) (quoting *Barr v. Abrams*, 810 F.2d 358, 363 (2d Cir. 1987)); *accord Pourzancvakil v. Humphry*, 94-CV-1594, 1995 WL 316935, at *7 (N.D.N.Y. May 22, 1995) (Pooler, J.).  Therefore, in any amended complaint, Plaintiffs must clearly set forth facts that give rise to the claims, including the dates, times, and places of the alleged underlying acts, and each individual who committed each alleged wrongful act.  In addition, the revised pleading should allege facts demonstrating the specific involvement of any of the named defendants in the constitutional deprivations alleged in sufficient detail to establish that they were tangibly connected to those deprivations.  *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).  Finally, Plaintiffs are informed that any such amended complaint will replace the existing Complaint, and must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the Court.  *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) ("It is well established that an amended complaint ordinarily supersedes the original and renders it of no legal effect.").

**ACCORDINGLY**, it is

**ORDERED** that Plaintiffs' applications to proceed *in forma pauperis* (Dkt. Nos. 2, 3) are **GRANTED only for purposes of filing and any appeal unless the trial court certifies in writing that the appeal is not taken in good faith**; and it is further respectfully

**RECOMMENDED** that the Court **ACCEPT FOR FILING and require an answer** to Plaintiffs' Complaint (Dkt. No. 1) to the extent that it asserts the following claims: (1) a claim pursuant to the FHA alleging retaliation against Defendants PMI, (2) a claim pursuant to N.Y. Exec. Law §§ 296(6-7) alleging retaliation against Defendants PMI, (3) a claim pursuant to N.Y. Real Prop. Law § 223-b against Defendants PMI, (4) a claim pursuant to N.Y. Real Prop. Law § 235-b against Defendants PMI, and (5) a claim of breach of contract pursuant to New York common law against Defendants PMI; and it is further respectfully

**RECOMMENDED** that the Court **DISMISS WITH LEAVE TO REPLEAD** Plaintiffs' Complaint (Dkt. No. 1) to the extent that it asserts the following: (1) a claim pursuant to 42 U.S.C. § 1981 against Defendants, (2) a claim pursuant to 42 U.S.C. § 1982 against Defendants, (3) a claim pursuant to 29 U.S.C. § 794 against Defendants Cold Black River and Preservation; (4) a claim pursuant to 42 U.S.C. § 2000d against Defendants Cold Black River and Preservation; (5) claims pursuant to the FHA against Defendants PMI alleging (a) discrimination, and (b) hostile living environment; (6) a claim pursuant to N.Y. Exec. Law § 296(5-6) to the extent it alleges discrimination against Defendants PMI; and (7) a claim pursuant to New York common law alleging intentional infliction of emotional distress against Defendants, because it fails to state a claim upon which relief may be granted pursuant to 28 U.S.C. § 1915(e)(2)(B); and it is further respectfully

**RECOMMENDED** that the Court **DISMISS WITHOUT PREJUDICE BUT WITHOUT LEAVE TO REPLEAD** Plaintiff's Complaint (Dkt. No. 1) to the extent that it

alleges claims pursuant to 29 U.S.C. § 794 and 42 U.S.C. § 2000d against Defendants Davis,

Johnson, Richardson, and Albert because it fails to state a claim upon which relief may be

granted pursuant to 28 U.S.C. § 1915(e)(2)(B); and it is further

**ORDERED** that the Clerk of the Court shall file a copy of this order, report, and

recommendation on the docket of this case and serve a copy upon the parties in accordance with

the local rules.[6]

**NOTICE:** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within

which to file written objections to the foregoing report.[7]  Such objections shall be filed with the

Clerk of the Court.  **<u>FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN</u>**

**<u>DAYS WILL PRECLUDE APPELLATE REVIEW</u>**.  28 U.S.C. § 636(b)(1) (Supp. 2013);

Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v.*

*Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)).


Dated: March  28 , 2023
       Binghamton, New York

*Miroslav Lovric*

Miroslav Lovric
U.S. Magistrate Judge

---

[6]      The Clerk shall also provide Plaintiffs with copies of all unreported decisions cited herein
in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

[7]      If you are proceeding *pro se* and served with this report, recommendation, and order by
mail, three additional days will be added to the fourteen-day period, meaning that you have
seventeen days from the date that the report, recommendation, and order was mailed to you to
serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a
Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day
that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

Talley v. LoanCare Servicing, Div. of FNF, Not Reported in Fed. Supp. (2018)

Case 5:22-cv-01202-MAD-ML    Document 8    Filed 03/28/23    Page 27 of 364

2018 WL 4185705
Only the Westlaw citation is currently available.
<u>For Online Publication Only</u>
United States District Court, E.D. New York.

Nicholas TALLEY, Donna Evans Talley, Plaintiffs,
v.
LOANCARE SERVICING, DIV. OF
FNF, Selene Finance, Defendants.

15-CV-5017 (JMA) (AKT)
|
Signed 08/31/2018

**Attorneys and Law Firms**

Donna Evans Talley, Nicholas Talley, pro se.

Stuart L. Kossar, Esq., Knuckles, Komosinski & Manfro, LLP, 565 Taxter Road, Suite 590, Elmsford, New York 10523, Attorney for Defendant Selene Finance, LP.

Edward Rugino, Rosicki, Rosicki and Associates, P.C., 51 East Bethpage Road, Plainview, New York 11803, Attorney for Defendant LoanCare Servicing.

### MEMORANDUM AND ORDER

Joan M. Azrack, United States District Judge

**\*1** On August 18, 2015, Donna Evans Talley and Nicholas Talley (together "plaintiffs" or the "Talleys") filed a *pro se* complaint in this Court against Selene Financing ("Selene") and LoanCare Servicing, Division of FNF ("LoanCare") (together "defendants"). On January 21, 2016, the Court granted plaintiffs' applications to proceed *in forma pauperis*, but dismissed the complaint *sua sponte* pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii). Plaintiffs were given an opportunity to file an amended complaint. On February 16, 2016, plaintiffs filed an amended complaint, which seeks, among other things, injunctive relief to "[s]top illegal and fraudulent foreclosure." (Am. Compl. at 4.) Simultaneous with the filing of the amended complaint, plaintiffs filed an Order to Show Cause for a Preliminary Injunction and Temporary Restraining Order seeking to enjoin LoanCare from pursuing a foreclosure sale scheduled for March 3, 2016. In an Order dated February 24, 2016, this Court, *sua sponte* dismissed, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii), the prayer for injunctive relief in plaintiffs' amended complaint and denied plaintiffs' request for a preliminary injunction and temporary restraining order. Before the Court are defendants' motions to dismiss the amended complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). For the reasons stated below, the Court grants defendants' motions and dismisses plaintiffs' amended complaint in its entirety.

### I. BACKGROUND

The following facts are taken from plaintiffs' amended complaint, the record before the Court and fillings from the foreclosure action. In deciding a motion to dismiss under Rule 12(b)(6), the Court may take judicial notice of public records, including state court filings. Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc., 369 F.3d 212, 217 (2d Cir. 2004). The Court can also consider exhibits—such as copies of the mortgage and mortgage assignments—which are attached or integral to the amended complaint. Sira v. Morton, 380 F.3d 57, 67 (2d Cir. 2004).

#### A. <u>The Bay Shore Mortgage</u>
On March 7, 2009, Nicholas Talley and Donna Evans Talley executed a mortgage in favor of non-party Lend America (the lender) in the principal sum of $311,558 concerning a property located at 22 Lakeland Street, Bay Shore, New York ("the Bay Shore property"). (Am. Compl., ECF No. 7 at 15-16.) Plaintiffs claim that there was no recording of the original title or delivery of the mortgage or deed to plaintiffs. (Id. at 5.) Plaintiffs further allege that Lend America became defunct in December of 2009 and that no assignments of the mortgage occurred prior to 2012. (Id.) By way of an endorsement to the note and two assignments of the mortgage, the loan instruments were transferred to defendant LoanCare on February 27, 2012. (Id. at 5, 8-12.) The assignment to LoanCare was recorded on April 10, 2012 in the Suffolk County Clerk's Office. (Id. at 5.) On March 31, 2015, LoanCare assigned the mortgage to defendant Selene. (Id. at 24-25.)

#### B. <u>The Foreclosure Proceeding</u>
**\*2** Plaintiffs defaulted on the note and mortgage by failing to make their monthly payment due in January 2011 and

Case 5:22-cv-01202-MAD-ML   Document 8   Filed 03/28/23   Page 28 of 364

Talley v. LoanCare Servicing, Div. of FNF, Not Reported in Fed. Supp. (2018)

each month thereafter. (Kossar Decl. Ex. J, ECF No. 42-11 at 3.) As a result, LoanCare commenced an action against plaintiffs in New York State Supreme Court, Suffolk County on March 19, 2012. (Id.) In the Talleys' verified joint answer, they admitted their default in payments but requested a judicially mandated loan modification. (Id. at 8.) The state court denied the Talleys' request, noting that after numerous prior attempts the parties had not been able to reach an agreement to modify the loan or settle the action. (Id.) The Talleys also asserted fifteen affirmative defenses, alleging, among other things: lack of personal jurisdiction; lack of standing and legal capacity; fraud in connection with the origination and the servicing of the loan; lack of good faith with respect to a loan modification; and LoanCare's failure to state a cause of action, mitigate damages and comply with the provisions of Real Property Actions and Proceedings Law and Banking Law. (Id. at 3.) LoanCare moved for summary judgment against the Talleys seeking to strike their answer and dismiss their affirmative defenses amongst other relief. (Id.) The Talleys opposed the motion and cross moved for summary judgment seeking dismissal of the complaint on the grounds that LoanCare lacked standing. (Id. at 4.)

In an Order dated April 11, 2014, the state court denied the Talleys' cross motion for summary judgment in its entirety. (Id.) In response to the Talleys' lack of standing defense, the court found that, "as holder of the endorsed note and as the assignee of the mortgage, [LoanCare] ha[d] standing to commence [the foreclosure] action. (Id. at 5.) The court noted that LoanCare demonstrated that it had been in "continuous possession of the note and mortgage since February 27, 2012," concluding that LoanCare "is the transferee and holder of the original note as well as the assignee of the mortgage by virtue of the written assignments." (Id. at 6.) In sum, the court held that LoanCare satisfied its *prima facie* burden as to the merits of the foreclosure action as it produced the endorsed note, the mortgage and assignments as well as evidence of plaintiffs' nonpayment. (Id. at 5.) Further, the court noted that LoanCare submitted proof of its compliance with the notice requirements of the 🔖RPAPL § 1303 and 🔖§ 1304. (Id.) Thus, the court found that LoanCare established its entitlement to summary judgement and dismissed the Talleys' remaining affirmative defenses finding that plaintiff submitted sufficient proof to establish, *prima facie*, that such defenses were unmeritorious. (Id. at 5, 7-9) (noting that circumstances of fraud must be "stated in detail" and that a defense based upon the "doctrine of unclean hands" lacks merit where a defendant fails to come forward with admissible evidence of immoral or unconscionable behavior).

The court also noted that the Talleys "failed to demonstrate that they made a reasonable attempt to discover the facts which would give rise to a triable issue of fact or that further discovery might lead to relevant evidence." (Id. at 8.) The court further rejected the Talleys' contention that they were entitled to a judicially mandated loan modification and ordered the appointment of a referee to compute amounts due under the subject note and mortgage. (Id. at 8, 9.)

On September 29, 2014, the state court entered final judgment for foreclosure and sale of the Bay Shore property. (Kossar Decl. Ex. K, ECF No. 42-12 at 3-8.) The state court further ordered that LoanCare was entitled to judgment establishing the validity of the mortgage and to recover $390,013.50 with interest to date of the closing of time of the referee's sale of the subject property. (Id.)

## C. **The Instant Action**
Plaintiffs' amended complaint alleges fraud against defendants LoanCare and Selene along with other claims under: (1) the Real Estate Settlement Procedures Act ("RESPA"), 🔖12 U.S.C. § 2605, § 2608; (2) federal regulation 24 C.F.R. § 203.501 [1] associated with the National Housing Act, 12 U.S.C. § 1701; (3) various provisions of the Uniform Commercial Code ("UCC"); (4) the Pooling and Servicing Agreement ("PSA") that governs plaintiffs' mortgage; and (5) fraud. [2] (Amend. Compl.) Though stated somewhat differently, plaintiffs' amended complaint appears to reiterate their contentions from the prior state court foreclosure action, specifically alleging that LoanCare did not have standing to foreclose on the Bay Shore property and that the mortgage and its assignment to LoanCare, and subsequently to Selene, were invalid and therefore unenforceable. [3] (See Am. Compl.)

**\*3** Specifically, plaintiffs allege that the original deed has never been delivered since the inception of the mortgage. (Id. at 3.) Plaintiffs claim that although the original lender, Lend America ceased to exist as of December 2009, the mortgage was never assigned in the years 2009 through 2012. (Id.) Plaintiffs allege that Lend America "acquired the loan without providing principal/issuer resulting in no securitization of an FHA security instrument from 2009-2012." (Id.) Plaintiffs appear to allege that "no delivery of deed and title" concerning plaintiffs' mortgage "proves deceptive practices and fraud was the intention from the origination of the mortgage." (Id.) Plaintiffs further allege that defendants have no standing

Case 5:22-cv-01202-MAD-ML    Document 8    Filed 03/28/23    Page 29 of 364

Talley v. LoanCare Servicing, Div. of FNF, Not Reported in Fed. Supp. (2018)

under Article III of the Constitution because the original title was not recorded or delivered to plaintiffs. (Id. at 5-6.) Finally, plaintiffs allege that "even if this was a legal foreclosure, we were not given our due process because we were not notified by LoanCare or the Court of our Right to Appeal thereby denying us 'due process'." [4] (Id. at 6.) Specifically, plaintiffs allege that they did not receive the Notice of Entry of Final Judgment for Foreclosure and Sale from LoanCare until February 6, 2015 and that the September 29, 2014 judgment is in violation of the PSA, RESPA and the UCC because the mortgage and note were transferred to Selene on August 1, 2014. [5] (Id.)

Plaintiffs seek the following relief: "[d]efendants produce orig[inal] deed of mortgage, title with covenants"; "[r]eimburse[ment] [of] $4,336 for services not rendered (deed/title)"; "[p]rove securitization of mortgage from 2009 to present"; "[p]roduce chain of assignment"; "[e]xplain no recordation of closing documents"; "[r]eveal identity of principal/issuer"; "LoanCare cease and desist from harassing us and placing us under duress since the mortgage has been sold to Selene"; "[s]top illegal and fraudulent foreclosure by prior servicer, LoanCare without assignment." (Id. at 4.)

Defendants filed separate motions to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), claiming that plaintiffs' claims should be dismissed because (a) they are barred by the *Rooker-Feldman* doctrine; (b) are barred by the doctrines of *res judicata* and collateral estoppel; and (c) fail to state a claim upon which relief can be granted. [6]

## II. DISCUSSION

### A. Standard of review

The court is mindful that when considering a motion to dismiss a *pro se* complaint, the court must construe the complaint liberally and interpret the complaint "to raise the strongest arguments they suggest." Triestman v. Federal Bureau of Prisons, 470 F.3d 471, 474 (2d Cir. 2006). "However, mere conclusions of law or unwarranted deductions need not be accepted." Bobrowsky, 777 F. Supp. 2d at 703 (internal quotation marks and citations omitted).

### 1. Fed. R. Civ. P. 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) requires the dismissal of a claim when there is a "lack of subject-matter jurisdiction." Fed. R. Civ. P. 12(b)(1). A case is properly dismissed for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) "when the district court lacks the statutory or constitutional power to adjudicate it." Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000); see Fed. R. Civ. P. 12(b)(1). In reviewing a motion to dismiss under this Rule, the Court accepts all factual allegations in the complaint as true. Shipping Fin. Servs. Corp. v. Drakos, 140 F.3d 129, 131 (2d Cir. 1998). However, the Court should not draw inferences favorable to the party asserting jurisdiction. Id. In resolving a jurisdictional issue, the Court may consider affidavits and other materials beyond the pleadings, but may not rely on mere conclusions or hearsay statements contained therein. J.S. ex rel. N.S. v. Attica Cent. Sch., 386 F.3d 107, 110 (2d Cir. 2004); see also All. For Envtl. Renewal, Inc. v. Pyramid Crossgates Co., 436 F.3d 82, 89, n. 8 (2d Cir. 2006) ("The presentation of affidavits on a motion under Rule 12(b)(1) ... does not convert the motion into a motion for summary judgment under Rule 56.").

### 2. Fed. R. Civ. P. 12(b)(6)

*4  To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a plaintiff must allege sufficient facts "to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007). A claim is facially plausible only "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 556). Mere labels and legal conclusions will not suffice. Twombly, 550 U.S. at 555. In reviewing a motion to dismiss, the Court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff. Cleveland v. Caplaw Enters., 448 F.3d 518, 521 (2d Cir. 2006). Motions to dismiss invoking *res judicata* and collateral estoppel are properly brought under Rule 12(b)(6). See Hirsch v. Desmond, No. 08–CV–2660, 2010 WL 3937303, at *2 (E.D.N.Y. Sept. 30, 2010) (collateral estoppel); Wiercinski

Talley v. LoanCare Servicing, Div. of FNF, Not Reported in Fed. Supp. (2018)

Case 5:22-cv-01202-MAD-ML    Document 8    Filed 03/28/23    Page 30 of 364

v. Mangia 57, Inc., No. 09–CV–4413, 2010 WL 2681168, at *1 (E.D.N.Y. July 2, 2010) (*res judicata* ).

## B. *Rooker-Feldman* Doctrine

Defendants' initial argument is that this Court lacks jurisdiction to hear this case under the *Rooker-Feldman* doctrine. See ⚑ Rooker v. Fidelity Trust Co., 263 U.S. 413 (1923) (holding that only the Supreme Court can entertain a direct appeal from a state court judgment); ⚑ District of Columbia Court of Appeals v. Feldman, 460 U.S. 462, 483, n.3 (1983) (finding that federal courts do not have jurisdiction over claims which are "inextricably intertwined" with prior state court determinations). The *Rooker-Feldman* doctrine "recognizes that 'federal district courts lack jurisdiction over suits that are, in substance, appeals from state-court judgments.' " Alston v. Sebelius, CV 13-4537, 2014 U.S. Dist. LEXIS 123613, at *23-24 (E.D.N.Y. July 31, 2014) (report and recommendation), adopted by, 2014 U.S. Dist. LEXIS 122970, 2014 WL 4374644 (E.D.N.Y. Sept. 2, 2014) (quoting ⚑ Hoblock v. Albany Cnty. Bd. of Elections, 422 F.3d 77, 84 (2d Cir. 2005) ). "The doctrine applies when a litigant seeks to reverse or modify a state court judgment or asserts claims that are 'inextricably intertwined' with state court determinations." ⚑ ⚠ Park v. City of N.Y., No. 99–Civ–2981, 2003 WL 133232, at *7 (S.D.N.Y. Jan. 16, 2003) (citations omitted). The doctrine precludes a district court from hearing "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the federal district court proceedings commenced and inviting district court review and rejection of those judgments." ⚑ Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 284 (2005).

The Second Circuit has established four requirements that must be satisfied for the *Rooker–Feldman* doctrine to apply: (1) "the federal-court plaintiff must have lost in state court;" (2) "the plaintiff must complain of injuries caused by a state court judgment;" (3) "the plaintiff must invite district court review and rejection of the judgment;" and (4) "the state-court judgment must have been rendered before the district court proceedings commenced." ⚑ Hoblock, 422 F.3d at 85 (internal quotation marks and citations omitted). The first and fourth requirements are procedural and the second and third are substantive. Id.

Specifically, with respect to foreclosure proceedings, "courts in this Circuit have consistently held that any attack on a judgment of foreclosure is clearly barred by the *Rooker–Feldman* doctrine." Ashby v. Polinsky, No. 06–CV–6778, 2007 WL 608268, at *1 (E.D.N.Y. Feb. 22, 2007) (internal quotation marks and citation omitted), aff'd, 328 F. App'x 20 (2d Cir. 2009); see also Done v. Wells Fargo Bank, N.A., No. 08–CV–3040, 2009 WL 2959619, at *3 (E.D.N.Y. Sept. 14, 2009); Ward v. Bankers Trust Co. of California, N.A., No. 09–CV–1943, 2011 WL 1322205, at *5 (E.D.N.Y. Mar. 29, 2011). This even includes challenges to a judgment of foreclosure that was allegedly procured by fraud, as plaintiffs have alleged herein. See, e.g., ⚑ Swiatkowski v. Citibank, 745 F. Supp. 2d 150, 164–65 (E.D.N.Y. 2010) aff'd, 446 F. App'x 360, 361 (2d Cir. 2011) (finding *Rooker–Feldman* doctrine applied to allegations that defendants engaged in a pattern of submitting fraudulent and perjurious documents related to the judgment of foreclosure and sale in other courts and that the allegations and relief sought were "inextricably intertwined with the state court judgment and would require overturning the state court judgment"); ⚑ Parra v. Greenpoint Mortgage Co., No. Civ.A. 01–CV–02010, 2002 WL 32442231, at *2 (E.D.N.Y. Mar. 26, 2002) ("The fact that [a] plaintiff alleges that a state court judgment was procured by fraud does not remove [the] claims from the ambit of *Rooker–Feldman*"); ⚠ Dockery v. Cullen & Dykman, 90 F. Supp. 2d 233, 236 (E.D.N.Y. 2000) (same).

**\*5** In the instant case, *Rooker-Feldman* bars plaintiffs' claims. The procedural requirements of *Rooker–Feldman* are satisfied. First, plaintiffs lost in state court. (Kossar Decl. Exs. J, K.) Second, the state court granted LoanCare summary judgment and denied plaintiffs' cross-motion for summary judgment by Order dated April 9, 2014, and issued a foreclosure judgment on September 29, 2014. (See id.) Since those judgments predate the August 18, 2015 filing of the initial complaint in the instant action, (see Compl., ECF 1), all pertinent state-court decisions were issued before the proceedings in this Court commenced.

The substantive requirements of *Rooker–Feldman* are also satisfied because plaintiffs' amended complaint seeks review and rejection of those state court decisions. Plaintiffs' claims complain of injuries, including, "deceptive practices and fraud" at the origination of the mortgage due to no delivery or recording of closing documents and seeks to "[s]top illegal and fraudulent foreclosure," in contravention of the state court judgment of foreclosure and the state court's acceptance of

the validity of the mortgage documents that formed the basis for that judgement. (Am. Compl. at 4-6.) See 🚩Trankasook v. Astoria Fed. Sav. & Loan Ass'n, No. 06–Civ–1640, 2007 WL 1160433, at *5 (E.D.N.Y. Apr. 18, 2007), aff'd, No. 07–2224–CV, 2008 WL 4962990 (2d Cir. Nov. 21, 2008) (holding that because plaintiff's complaint asked the court "to vacate the judgment of foreclosure and sale and award her title to the property, it [was] plain that she [was] inviting [the] court to 'reject' the [state court] order."); Done v. Option One Mortgage, No. 09–civ–4770, 2011 WL 1260820, at *6 (E.D.N.Y. Mar. 30, 2011) (concluding substantive requirements of *Rooker-Feldman* met where "[a]lthough plaintiff ha[d] made a cursory reference to seeking monetary damages, it [was] abundantly clear that the whole purpose of th[e] action [was] to undo the foreclosure judgment").

In their amended complaint, plaintiffs contend that LoanCare had no standing to bring the state court foreclosure action. (See Am. Compl.) However, as plaintiffs admit, the state court rejected this exact contention in its final judgment. (Pls.' Supplemental Opp. to defendant LoanCare's Mot. to Dismiss, ECF No. 43 at 4; Kossar Decl. Ex. J at 7 ("The assertions by the defendant mortgagors as to the plaintiff's alleged lack of standing, which rest, *inter alia*, upon alleged defects in the assignments, rife with speculation, are rejected as unmeritorious ...").) In opposition to defendants' motion to dismiss, plaintiffs specifically state that they are seeking "[r]escission of [f]inal [s]ummary [j]udgment", that this Court "[r]ender the lien unenforceable due to fraudulent concealment", and seek "[d]ismissal of the [f]oreclosure due to lack of [s]tanding." (Pls.' Opp. to defendant LoanCare's Mot. to Dismiss, ECF No. 39-12.) Plaintiffs are requesting this Court to do exactly what *Rooker-Feldman* forbids— to overturn the New York Supreme Court judgment of foreclosure. See 🚩Trankasook, 2007 WL 1160433, at *5 ("Because [plaintiff's] complaint asks this court to vacate the judgment of foreclosure and sale and award her title to the property, it is plain that she is inviting this court to 'reject' the [state court order]."). A ruling in plaintiffs' favor "would effectively declare the state court judgment [of foreclosure] fraudulently procured and thus void, ... which is precisely the result that the *Rooker–Feldman* doctrine seeks to avoid." 🚩⚠Kropelnicki v. Siegel, 290 F.3d 118, 129 (2d Cir. 2002).

Moreover, plaintiffs' attempt to thwart application of *Rooker-Feldman* by labeling their claims as "fraud in the inducement" and "fraudulent concealment" rather than the "fraud" they alleged in the state action fails. Plaintiffs' claim of "newly

discovered facts of fraud in the inducement" based on the actions of third parties at the time of the loan origination fails to preclude application of *Rooker-Feldman*. [7] (Pls.' Opp. to defendant Selene's Mot. to Dismiss, ECF No. 42-26 at 1.) Plaintiffs' claims relate not to defendants' conduct in the course of the state court foreclosure action, but, rather, to the validity of the underlying mortgage documents and defendants' standing to commence the foreclosure proceeding. Thus, "the injury complained of is the judgment permitting the foreclosure, which implicitly held that the mortgage[ ] w[as] valid." Webster v. Wells Fargo Bank, N.A., No. 08–civ–10145, 2009 WL 5178654, at *8 (S.D.N.Y. Dec. 23, 2009), aff'd sub nom. as amended (Jan. 24, 2012) Webster v. Penzetta, 458 F. App'x 23 (2d Cir. 2012) (finding the Court "plainly lack[ed] subject matter jurisdiction" over plaintiff's claims "attacking the validity of the foreclosure proceedings and the validity of the underlying mortgage loan documents" pursuant to *Rooker-Feldman* because "the injury complained of is the judgment permitting foreclosure, which implicitly held that the mortgages were valid."); see also Feliciano v. U.S. Bank Nat. Ass'n, No. 13–CV–5555, 2014 WL 2945798, at *2–4 & n. 7 (S.D.N.Y. June 27, 2014) (finding that plaintiffs' claims that "[defendant] wrongfully foreclosed upon their home because it lacked the legal capacity to accept the assignment of the underlying mortgage, and therefore lacked standing in the Foreclosure Action" failed under *Rooker-Feldman* and the fraud exception did not apply because "the complaint alleges fraudulent conduct (generally) by defendant prior to the institution of the Foreclosure Action rather than on the state court itself." (internal citations and quotations omitted) ). Therefore, plaintiffs attempt to invoke a fraudulent procurement exception to the *Rooker–Feldman* doctrine fails.

**\*6** Accordingly, the Court lacks subject matter jurisdiction over plaintiffs' claims and the amended complaint should be dismissed in its entirety.

### C. *Res judicata*

Alternatively, to the extent the *Rooker-Feldman* doctrine does not deprive the Court of subject matter jurisdiction, all of plaintiffs' claims are barred by the doctrine of *res judicata*. Under the doctrine of *res judicata*, "a final judgment on the merits of an action precludes the parties or their privies from re-litigating issues that were or could have been raised in that action." 🚩Flaherty v. Lang, 199 F.3d 607, 612 (2d Cir. 1999) (quotation omitted). "In applying the doctrine of *res judicata*, [a court] must keep in mind that a state court judgment has

Talley v. LoanCare Servicing, Div. of FNP, Not Reported in Fed. Supp. (2018)

Case 5:22-cv-01202-MAD-ML    Document 8    Filed 03/28/23    Page 32 of 364

the same preclusive effect in federal court as the judgment would have had in state court." Burka v. New York City Transit Auth., 32 F.3d 654, 657 (2d Cir. 1994). Further, federal courts must apply the doctrine of *res judicata* according to the rules of the state from which the judgment is taken. See Matsushita Elec. Indus. Co. v. Epstein, 516 U.S. 367, 373 (1996); Giardina v. Nassau Cnty., No. 08–CV–2007, 2010 WL 1850793, at *3 (E.D.N.Y. May 7, 2010). New York State courts apply a transactional analysis, "barring a later claim arising out of the same factual grouping as an earlier litigated claim even if the later claim is based on different legal theories or seeks dissimilar or additional relief." Burka, 32 F.3d at 657 (quoting Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994) ); see Done, 2009 WL 2959619, at *3 (same).

*Res judicata* applies when there was: (1) a previous action that resulted in a final adjudication on the merits, (2) the party against whom *res judicata* is to be invoked was party to the previous action or in privity with a party to that action, and (3) the claims involved in the current case were, or could have been, raised in the previous action. Swiatkowski, 745 F. Supp. 2d at 171 (quoting Whelton v. Educ. Credit Mgmt. Corp., 432 F.3d 150, 155 (2d Cir. 2005) ). *Res judicata* applies to defenses that could have been raised in the prior action as well. Waldman v. Vill. of Kiryas Joel, 39 F. Supp. 2d 370, 377 (S.D.N.Y. 1999) (*res judicata* "prevents a party from litigating any issue or defense that could have been raised or decided in a previous suit, even if the issue or defense was not actually raised or decided") (quoting Woods v. Dunlop Tire Corp., 972 F.2d 36, 38 (2d Cir. 1992) ); Robbins v. Growney, 229 A.D.2d 356, 645 N.Y.S.2d 791, 792 (N.Y. App. Div. [1st] Dep't 1996) ("The doctrine of *res judicata* is applicable ... to defenses raised in the prior action or which, though not raised, could have been.") (internal citation omitted). "All litigants, including *pro se* plaintiffs, are bound by the principles of *res judicata*. Done, 2009 WL 2959619, at *3.

Here, plaintiffs' claims are barred from further adjudication by *res judicata*. First, the judgment of foreclosure entered against plaintiffs is an adjudication on the merits, which prevents reconsideration of any claim that is based on the same facts as the foreclosure judgment and which would disturb LoanCare's (or Selene's) ability to enforce rights provided pursuant to the mortgage and the note securing the Bay Shore property. See id. at *4. Second, the facts pled by plaintiffs in their amended complaint—that LoanCare brought the foreclosure suit in the Suffolk County Supreme

Court and was not the holder of a valid mortgage note at the time of assignment, (see Am. Compl.)—would have been central to deciding any entitlement to a judgment of foreclosure, and thus demonstrates that their claims in the current suit arise from the same transaction as LoanCare's claim in the previous foreclosure action. Done, 2009 WL 2959619, at *4. Plaintiffs' claims arising from the origination of the mortgage and attacking the ability of defendants to enforce it in the foreclosure proceedings, (see Am. Compl.), not only could have been raised as a defense to foreclosure in the state court, but were actually raised, (see Kossar Decl. Exs. I, J) and therefore cannot be relitigated in this Court.

See, e.g., Hinds v. Option One Mortg. Corp., No. 11–CV–6149, 2012 WL 6827477, at *5 (E.D.N.Y. Dec. 6, 2012) (report & recommendation), adopted by 2013 WL 132719 (E.D.N.Y. Jan. 10, 2013) ("Inasmuch as Plaintiff's fraud claim is premised on his allegations that Defendants obtained the underlying mortgage through predatory lending tactics and fraud, *res judicata* operates to preclude federal review of such a claim ... [since the plaintiff's claims] arise from the same factual grouping—namely the validity of Plaintiff's mortgage, and the right of Defendants to enforce that agreement in a state court foreclosure proceeding"); Solomon v. Ocwen Loan Servicing, LLC, No. 12-CV-2856, 2013 WL 1715878, at *5 (E.D.N.Y. Apr. 12, 2013) ("The state-law claims asserted by plaintiff arise from the origination of the [m]ortgage and attack the ability of defendants to enforce it in the foreclosure proceedings. These claims could have been raised as a defense to foreclosure in state court, and therefore cannot be relitigated in a subsequent suit in federal court."); Swiatkowski, 745 F. Supp. at 171 ("Many of the factual allegations plaintiff raises in opposition to the instant motion to dismiss involve issues that could have been raised as claims or defenses in the state court [foreclosure] proceedings."); Gray v. Americredit Fin. Servs., Inc., No. 07 Civ. 4039, 2009 WL 1787710, at *6 n. 2 (S.D.N.Y. June 23, 2009) ("Plaintiff's allegations of fraud regarding the underlying loan transaction do not appear to be of the type recognized by certain courts as immune from *res judicata*."); Yeiser v. GMAC Mortg. Corp., 535 F.Supp.2d 413, 421 (S.D.N.Y. 2008) ("According to New York law, ... *res judicata* ... applies to defenses that could have been litigated, including defenses to a foreclosure.").

**\*7** Whether cast as violations of RESPA, or regulations governing the National Housing Act, plaintiffs effectively allege that defendants improperly obtained the foreclosure

Case 5:22-cv-01202-MAD-ML    Document 8    Filed 03/28/23    Page 33 of 364

Talley v. LoanCare Servicing, Div. of FNF, Not Reported in Fed. Supp. (2018)

judgment due to lack of standing based on fraud or "fraud in the inducement". (*See* Am. Compl.) However, plaintiffs asserted these claims, *albeit* in different form, in the state foreclosure action as affirmative defenses in their verified answer, in their opposition to LoanCare's summary judgment motion, and in support of their own cross motion for summary judgment. (Kossar Decl. Exs. I, J.) Specifically, in the state action, plaintiffs alleged that LoanCare had no standing to bring a foreclosure action, had "unclean hands," and misled, overcharged and defrauded plaintiffs in the mortgage application, closing and servicing process. (Id., Ex. I at ¶¶ 3, 8, 14, 18) The state court considered and ultimately dismissed plaintiffs' affirmative defenses and denied plaintiffs' summary judgment; instead, granting summary judgment in LoanCare's favor. (Kossar Decl. Ex. J.) "If plaintiffs were unhappy with the result of that proceeding, the proper recourse was a state court appeal. Because plaintiffs could have presented the same claims they now assert, including the RESPA claim, as defenses or counterclaims in the action for foreclosure, the doctrine of *res judicata* bars this litigation." Yeiser, 535 F. Supp. 2d at 422 (citing 12 U.S.C. § 2614, which authorizes an action, pursuant to the provisions of RESPA, to be brought in the federal district court or in any other court of competent jurisdiction in which the property involved is located, or where the violation is alleged to have occurred); Mercado v. Playa Realty Corp., No. CV 03-3427, 2005 WL 1594306, at *7 (E.D.N.Y. July 7, 2005) (determining that because plaintiff could have asserted the new claims she was raising in her federal action during the foreclosure action as counterclaims and the relief sought by plaintiff was inconsistent with the ruling in the foreclosure action, the new claims were barred by the doctrine of *res judicata*). [8]

Lastly, the present action satisfies the privity requirement for claim preclusion since LoanCare commenced the foreclosure proceeding and is a named party to the current action. Further, Selene, a non-party to the earlier state court action may still invoke claim preclusion if it can demonstrate that it was in privity with a party to the earlier action. See Houdet v. U.S. Tennis Ass'n, No. 13-CV-5131, 2014 WL 6804109, at *4 (E.D.N.Y. Dec. 3, 2014) (finding *res judicata* to apply "not just to the parties in a prior litigation but also to those in privity with them" where the "new defendants have a sufficiently close relationship to justify [its] application" (internal quotation marks omitted) ). "A relationship of privity 'includes those who are successors to a property interest, those who control an action although not formal parties to it, [and] those whose interests are represented by a party to the action.' " Modular Devices, Inc.

v. Alcatel Alenia Space Espana, No. 08-CV-1441, 2010 WL 3236779, at *4 (E.D.N.Y. Aug. 12, 2010) (quoting Ferris v. Cuevas, 118 F.3d 122, 126 (2d Cir. 1997) ). Under New York law, both the party servicing the mortgage and the party that later acquires it (becoming a successor in interest) are considered to be in privity with the party to the original action concerning the mortgage for purposes of *res judicata*. Yeiser, 535 F. Supp. 2d at 423.

The facts alleged in the amended complaint establish privity between Selene and LoanCare, as LoanCare assigned the mortgage to Selene on March 31, 2015—after final judgment in the state foreclosure action. See Yeiser, 535 F. Supp. 2d at 423 ("[s]ince the loan was transferred to GRP in May 2005," almost one year after the state foreclosure action, "GRP is a successor to that interest and is also in privity with [the original note holder]," which was the plaintiff in the foreclosure litigation); Hinds, 2012 WL 6827477, at *4 n.8 (finding the privity requirement satisfied where Wells Fargo was not a party in the state court proceeding, but bought the subject property at a foreclosure sale, rendering it a successor in interest). Thus, the requirements of *res judicata* are satisfied here.

Therefore, to the extent *Rooker-Feldman* does not deprive this Court of subject matter jurisdiction over plaintiffs' claims, the claims are barred by the doctrine of *res judicata* and must be dismissed.

**D. Collateral Estoppel**

Plaintiffs' claims are also precluded under the narrower doctrine of collateral estoppel. "Collateral estoppel, or issue preclusion, 'precludes a party from relitigating in a subsequent action or proceeding an issue clearly raised in a prior action or proceeding and decided against that party ... whether or not the tribunals or causes of action are the same.' " Sullivan v. Gagnier, 225 F.3d 161, 166 (2d Cir. 2000). Whether relitigation of an issue is precluded is determined by the rules of the court that rendered the prior judgment. Id. "Under New York law, the doctrine of collateral estoppel requires that 'the issue in the second action [be] identical to an issue which was raised, necessarily decided and material in the first action.' " Hines v. HSBC Bank USA, No. 15-CV-3082, 2016 WL 5716749, at *9 (E.D.N.Y. Sept. 30, 2016) (quoting Parker v. Blauvelt Volunteer Fire Co., 93 N.Y.2d 343, 349 (1999) ). Thus, "[b]efore collateral estoppel can

Case 5:22-cv-01202-MAD-ML    Document 8    Filed 03/28/23    Page 34 of 364

Talley v. LoanCare Servicing, Div. of FNF, Not Reported in Fed. Supp. (2018)

be invoked, the court must find that an identical issue was necessarily decided in the prior action and is decisive of the present action, and that there was a full and fair opportunity to contest the decision now said to be controlling." *Yeiser, 535 F. Supp. 2d at 424* (internal citation omitted).

**\*8** "To determine whether the issue in the first litigation was necessarily decided, the focus is on the rights, questions or facts that underlie a judicial decision, not the legal theories underlying the complaint." *Id. at 424-25* (citing *Coveal v. Consumer Home Mortgage, Inc., 2005 WL 2708388, at \*5 (E.D.N.Y. Oct. 21, 2005)* ) "New York requires only that the issue have been properly raised by the pleadings or otherwise placed in issue and actually determined in the prior proceeding." *Id.* (finding collateral estoppel to be applicable where all the facts giving rise to the amended complaint were presented in the foreclosure proceeding even though plaintiffs did not allege all of the same causes of action).

Here, plaintiffs had a full and fair opportunity to litigate the factual issues raised in the amended complaint in the state foreclosure action. And, those issues were decided in LoanCare's favor. As discussed *supra*, plaintiffs already challenged the validity of the assignment of the mortgage to LoanCare and its standing to foreclose on the Bay Shore property in state court, and the state court necessarily rejected those arguments when it found LoanCare had a valid claim to the Bay Shore property and entered judgment of foreclosure on that property. No appeal was filed in that action. Accordingly, plaintiffs cannot relitigate these issues against defendant LoanCare in federal court. See *Graham v. Select Portfolio Servicing, Inc., 156 F. Supp. 3d 491, 505–06 (S.D.N.Y. 2016).*

Plaintiffs are also precluded from litigating these same issues against Selene, despite the fact that Selene was not a party to the initial suit in state court. See *Jasper v. Sony Music Entm't, Inc., 378 F. Supp. 2d 334, 343 (S.D.N.Y. 2005)* ("By binding the plaintiff to earlier judicial decisions in which he was a party, defensive collateral estoppel precludes a plaintiff from getting a second bite at the apple merely by choosing a new adversary."); see also *Fequiere v. Tribeca Lending, No. 14-CV-812, 2016 WL 1057000, at \*9–10 (E.D.N.Y. Mar. 11, 2016)* (applying defensive non-mutual collateral estoppel to FDCPA claim).

Accordingly, the Court grants defendants' motions to dismiss plaintiffs' claims because they are precluded pursuant to the doctrine of collateral estoppel. [9]

**E. Sanctions**

Pursuant to *Rule 11 of the Federal Rules of Civil Procedure* ("Rule 11"), defendant LoanCare seeks to impose sanctions on plaintiffs in the form of attorneys' fees incurred in defendant's defense of the instant action. (Def. LoanCare's Mot. to Dismiss, ECF No. 39-7 at 19-20.) For the reasons discussed below, defendant's motion is denied.

As an initial matter, the Court notes that LoanCare has not satisfied the procedural requirements for filing a sanctions motion. *Rule 11* requires that a motion for sanctions "be made separately from any other motion and ... describe the specific conduct that allegedly violates Rule 11(b)." *Fed. R. Civ. P. 11(c)(2).* In any event, the Court denies LoanCare's motion for sanctions. Plaintiffs' claims against defendants are plainly without merit. Nevertheless, this alone does not warrant sanctions, particularly as plaintiff is proceeding *pro se*. Although *Rule 11* does apply to *pro se* litigants, the court may take into account the "special circumstances of litigants who are untutored in the law," *Maduakolam v. Columbia Univ., 866 F.2d 53, 56 (2d Cir. 1989)*, as well as whether such a litigant has been warned of the possible imposition of sanctions. See *Kuntz v. Pardo, 160 B.R. 35, 40 (S.D.N.Y. 1993)*; see also *Fed. R. Civ. P. 11* advisory committee's note to the 1993 amendments (stating that the court should consider, *inter alia*, whether the motion was made in bad faith). There are no facts indicating that plaintiff instituted or maintained this lawsuit in bad faith or that they were warned of the imposition of sanctions. For all of the above reasons, LoanCare's request for sanctions is denied.

**F. Leave to Amend**

**\*9** *Pro se* plaintiffs are ordinarily given the opportunity "to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Shomo v. City of New York, 579 F.3d 176, 183 (2d Cir. 2009)* (internal quotation omitted). Nevertheless, "a district court may deny a *pro se* plaintiff leave to amend when amendment would be futile." *Boddie v. N.Y. State Div. of Parole, No. 08-CV-911, 2009 WL 1033786, at \*5 (E.D.N.Y. Apr. 17, 2009).*

Case 5:22-cv-01202-MAD-ML    Document 8    Filed 03/28/23    Page 35 of 364

Talley v. LoanCare Servicing, Div. of FNF, Not Reported in Fed. Supp. (2018)

Here, the Court has carefully considered whether plaintiffs should be granted leave to amend the complaint. Having decided plaintiffs' claims are barred by *Rooker-Feldman, res judicata* and collateral estoppel, the Court finds that any amendment of these claims would be futile. For these reasons, the Court declines to grant plaintiffs leave to amend.

### III. CONCLUSION

For the reasons stated above, the Court grants defendants' motions and dismisses plaintiffs' amended complaint in its entirety. The Clerk of Court is directed to close this case and send a copy of this Order to *pro se* plaintiffs.

**SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2018 WL 4185705

---

## Footnotes

1    Plaintiffs also allege a violation of 24 C.F.R. § 203.35 in their amended complaint, (Am. Compl. at 5), but note in their opposition to defendant LoanCare's motion to dismiss that this was an error. (Pls.' Opp. to LoanCare's Mot. to Dismiss, ECF No. 39-12 at 3.)

2    Though the amended complaint seeks relief from "LoanCare harassing us and placing us under duress" (Am. Compl. at 5-6), the only allegation of such harassment appears in plaintiffs' opposition to defendant LoanCare's motion to dismiss. (See Pls.' Opp. to LoanCare's Mot. to Dismiss, ECF No. 39-12 at 5-6.) A plaintiff "cannot amend [his] complaint by asserting new facts or theories for the first time in opposition to [d]efendants' motion to dismiss", K.D. ex rel. Duncan v. White Plains Sch. Dist., 921 F. Supp. 2d 197, 209 (S.D.N.Y. 2013). In any event, plaintiff's conclusory assertions of harassment are insufficient to state any plausible claims.

3    The Court notes that plaintiffs appear to use the terms "fraud", "fraudulent concealment" and "fraud in the inducement" interchangeably.

4    To the extent that plaintiffs attempt to allege a due process violation under 42 U.S.C. § 1983, such claim is unwarranted as the defendants are private parties, not state actors.

5    According to the loan transfer documents attached to plaintiffs' amended complaint, the mortgage and note were transferred to Selene on March 31, 2015. (See Am. Compl. at 23-24.) However, Selene first became involved with plaintiffs' loan when it became a servicer of the loan on August 1, 2014. (Pls.' Opp. to Def. LoanCare's Mot. to Dismiss, ECF No. 35-1, Ex. H at 17.)

6    Plaintiffs filed for Chapter 13 bankruptcy on June 5, 2017. (Pls.' Opp. to Mot. to Dismiss, Ex. J, ECF No. 35 at 37.)

7    Plaintiffs appear to allege newly discovered facts in relation to the alleged fraudulent closing of the mortgage in 2009. (Pls.' Opp to defendant Selene's Mot. to Dismiss, ECF No. 42-26 at 1.) Specifically, plaintiffs now argue, in conclusory fashion, that at the time of the closing of their mortgage in 2009, the Title Company was a "shell company" and the attorney at the closing table was fraudulent. (Id.)

8    "Although New York's permissive counterclaim rule means that res judicata generally will not necessarily bar claims that could have been counterclaims in a prior action, this exception for counterclaims does not permit

**Talley v. LoanCare Servicing, Div. of FNF, Not Reported in Fed. Supp. (2018)**

Case 5:22-cv-01202-MAD-ML    Document 8    Filed 03/28/23    Page 36 of 364

an attack on a judgment" previously issued by the state court. ⚠ Beckford v. Citibank N.A., No. 00 Civ. 205, 2000 WL 1585684, at *3 (S.D.N.Y. Oct. 24, 2000) (internal quotation omitted).

9    Because plaintiffs' claims fail under *Rooker-Feldman, res judicata* and collateral estoppel, the Court need not reach the defendants' alternative arguments in support of dismissal.

---

**End of Document**                                           © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 1396448
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

James COSTELLO and Jcrl
Development Corporation, Plaintiffs,

v.

TOWN OF HUNTINGTON, Defendant.

No. 14–CV–2061(JS)(GRB).
|
Signed March 25, 2015.

**Attorneys and Law Firms**

Steven A. Morelli, Esq., The Law Offices of Steven A.
Morelli, P.C., Garden City, NY, for Plaintiffs.

John C. Bennett, Esq., Gathman & Bennett, LLP, Huntington,
NY, for Defendant.

*MEMORANDUM & ORDER*

SEYBERT, District Judge.

 **\*1** Plaintiffs James Costello ("Costello") and JCRL
Development Corporation ("JCRL" and together with
Costello, "Plaintiffs") commenced this action on April 1,
2014 against defendant Town of Huntington ("Defendant"
or the "Town"), alleging violations of Plaintiffs' rights under
the United States Constitution, the Fair Housing Act of 1968
("FHA"), 42 U.S.C. § 3601 *et seq.,* 42 U.S.C. § 1981,
and 42 U.S.C. § 1982.

Currently before the Court are: (1) Defendant's motion to
dismiss the Complaint pursuant to Federal Rule of Civil
Procedure 12(b) (Docket Entry 7); and (2) Plaintiffs' cross-
motion to amend the Complaint pursuant to Rule 15(a)
(Docket Entry 10). For the following reasons, both motions
are GRANTED IN PART and DENIED IN PART.

*BACKGROUND*

Before discussing the factual background relevant to
Defendant's motion, the Court must first consider the effect

that Plaintiffs' cross-motion to amend the Complaint has on
Defendant's motion to dismiss.

I. *Plaintiffs' Cross–Motion to Amend*
Federal Rule of Civil Procedure 15 governs amendments
to pleadings. FED. R. CIV. P. 15. Rule 15 provides, in
pertinent part, "a party may amend its pleading only with
the opposing party's written consent or the court's leave. The
court should freely give leave when justice so requires." FED.
R. CIV. P. 15(a)(2). Notwithstanding these liberal standards,
the decision to grant or deny a party's motion for leave to
amend "is within the sound discretion of the district court."
*Zahra v. Town of Southold,* 48 F.3d 674, 685 (2d Cir.1995)
(citing *John Hancock Mut. Life Ins. Co. v. Amerford Int'l
Corp.,* 22 F.3d 458, 462 (2d Cir.1994)). A court may deny
leave to amend in circumstances of " 'undue delay, bad
faith, futility of the amendment, [or] ... prejudice.' " *Aetna
Cas. & Sur. Co. v. Aniero Concrete Co., Inc.,* 404 F.3d 566,
603–04 (2d Cir.2005) (quoting *Richardson Greenshields
Secs., Inc. v. Lau,* 825 F.2d 647, 653 n. 6 (2d Cir.1987)). A
proposed amendment is futile where the claims would not
survive a motion to dismiss. *Dougherty v. Town of
North Hempstead Bd. of Zoning Appeals,* 282 F.3d 83, 88 (2d
Cir.2002).

Though Defendant has opposed Plaintiffs' motion to amend,
(*see* Def.'s Reply Br., Docket Entry 13), the Court cannot
find in the relatively small record before it any suggestion
that granting Plaintiffs' motion would prejudice Defendant,
unduly delay the proceedings, or countenance any bad faith.
Accordingly, Plaintiff's motion to amend should be granted to
the extent that the proposed amendments are not futile.

Plaintiffs moved to amend the Complaint while Defendant's
motion to dismiss was pending, thus giving the Court "a
variety of ways in which it may deal with the pending
motion to dismiss." *Schwartzco Enters. LLC v. TMH
Mgmt., LLC,* —— F.Supp.3d ——, 2014 WL 6390299, at
\*1 (E.D.N.Y. Nov.17, 2014) (internal quotation marks and
citation omitted). Because the proposed Amended Complaint
has not added any additional parties, (*see* Am. Compl.,
Docket Entry 11–2, at ¶¶ 9–11), and because Defendant has
had an opportunity to respond to the proposed Amended
Complaint, the Court will consider the merits of Defendant's
motion in light of the allegations in the proposed Amended
Complaint. "Indeed, if the proposed amended complaint

cannot survive the motion to dismiss, then plaintiffs' cross-motion to amend will be denied as futile." *Haag v. MVP Health Care,* 866 F.Supp.2d 137, 140 (N.D.N.Y.2012) (citing *Dougherty,* 282 F.3d at 88); *Schwartzco,* 2014 WL 6390299, at *1 (considering a motion to dismiss in light of the proposed amended complaint); *Eskenazi–McGibney v. Connetquot Cent. Sch. Dist.,* No. 14–CV–1591, 2015 WL 500871, at *2 (E.D.N.Y. Feb. 6, 2015) (same).

II. *Factual Background*[1]

**\*2**  JCRL is the sole owner of the parcel of land located at 195 West Hills Road, Huntington Station (the "Property").[2] (Am.Compl.¶ 1.) Costello is JCRL's principal and sole owner. (Am.Compl.¶ 10.) As far as the Court can tell, three buildings sit on the Property. A structure on the eastern edge of the Property faces West Hills Road and contains a number of commercial rental spaces. Two other structures, one immediately behind the commercial structure and another along the western edge of the Property, are designed for residential rentals. The Property is accessible via two driveways: one leading east onto West Hills Road and the other leading north onto 11th Ave. The Property is located in Defendant Town of Huntington, a municipality organized under the laws of the State of New York. (Am. Compl. 1 11.) Barry Zippelius, at all times relevant to this litigation, was a building inspector for the Town. (Am.Compl.¶ 3.)

In 2010, Plaintiffs began renting one of the units on the premises to an African–American tenant. (Am.Compl.¶ 18.) The unit was rented pursuant Section Eight of the Housing Act of 1937 ("Section Eight"), 42 U.S.C. § 1437f *et seq.,* which provides rental housing assistance to private landlords on behalf of qualifying low-income tenants. (Am. Compl. 1 8.) According to Plaintiffs, certain neighbors were unhappy with Plaintiffs' new tenant, and they repeatedly voiced their displeasure to Costello. (Am.Compl.¶¶ 19–23.) The complaining neighbors accused Plaintiffs of diminishing their property value, and promised Costello that "the Town will get [him]." (Am.Compl.¶ 21.) At least one neighbor suggested that he "knew" Mark Cuthbertson, a Councilman on the Huntington Town Board. (Am.Compl.¶ 22.) In response, Costello insisted that he "rent[s] to everyone" and "do[es not] discriminate." (Am.Compl.¶ 20.)

Shortly after the neighbors threatened Costello, a Town building inspector visited the Property. (Am.Compl.¶ 24.) The inspector reviewed the Property and informed Costello

that the Property stood in violation of those Town code provisions that prohibited an unfenced pool, high grass, and automobiles on the property. (Am.Compl.¶ 24.) Costello remedied these violations to the satisfaction of the inspector. (Am.Compl.¶ 25.)

Three years later, in May 2013, the Town issued Plaintiffs a "complaint report," which outlined a number of Town code provisions of which the Property stood in violation. (Am.Compl.¶ 29.) Again, the alleged violations included the presence of an unfenced pool, high grass, and automobiles on the property. (Am.Compl.¶ 29.) Within one week of his receipt of this report, Costello made efforts to remedy these violations. (Am.Compl.¶ 34.)

Notwithstanding Plaintiffs' attempts to address the issues raised in the complaint report, Town Inspector Barry Zippelius sought a search warrant to inspect the Property for code violations. (Am.Compl.¶ 36.) According to Plaintiffs, Zippelius intentionally prepared a misleading affidavit in support of the search warrant. The affidavit omitted that the Property had certain certificates of occupancy, relied upon an uncertified survey of the Property that had material errors (including its description of the eastern-most residential building as a wood-framed structure rather than a cement structure), and falsely accused Plaintiffs of attempting to subdivide the property. (Am.Compl.¶¶ 37–42.) Additionally, Zippelius falsely affirmed that Costello told him five families resided in one apartment. (Am.Compl.¶ 40.)

**\*3**  On June 19, 2013, more than twelve Town officials and police officers searched the eastern-most apartments, which were rented to low-income tenants pursuant to Section Eight. (Am.Compl.¶¶ 43–44.) As a result of the search, the Town issued eight summonses, allegedly "solely [to] harass and retaliate against Plaintiffs for renting to minorities." (Am.Compl.¶ 47.) After a trial in Suffolk County District Court, JCRL was found guilty of four of the summonses and fined $4100. (Am.Compl.¶ 58.) Additionally, the court appointed a receiver to assume control of the property. (Am.Compl.¶ 58.)

As a result of this alleged targeting of the Property by Defendant, both Costello and JCRL allege separate injuries. JCRL alleges that attempts to sell the Property as a result of Defendants illegal actions have been unsuccessful. (Am.Compl.¶ 60.) Costello, for his part, claims that he now suffers from "recurring headaches, sleeplessness, stress and anxiety." (Am.Compl.¶ 59.)

As a result of the foregoing, Plaintiffs bring claims for: (1) retaliation in violation of the First Amendment, (2) violation of the Equal Protection Clause, (3) violation of Plaintiffs' Fourteenth Amendment right to due process, (4) violation of the FHA, (5) violation of the Fourth Amendment's protection against unlawful searches and seizures, (6) violation of 42 U.S.C. § 1981, and (7) violation of 42 U.S.C. § 1982. (Am.Compl.¶¶ 62–69.)

## DISCUSSION

The Court will first consider Defendant's jurisdictional challenges before discussing whether Plaintiffs have stated a claim for relief.

### I. *Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction*

#### A. *Legal Standard*
"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir.2000). In resolving a motion to dismiss for lack of subject matter jurisdiction, the Court may consider affidavits and other materials beyond the pleadings. See *Morrison v. Nat'l Austl. Bank, Ltd.,* 547 F.3d 167, 170 (2d Cir.2008). Though the Court must accept the factual allegations contained in the Amended Complaint as true, it will not draw argumentative inferences in favor of Plaintiffs; subject matter jurisdiction must be shown affirmatively. *See id.;* *Atl. Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd.,* 968 F.2d 196, 198 (2d Cir.1992); *Shipping Fin. Servs. Corp. v. Drakos,* 140 F.3d 129, 131 (2d Cir.1998). "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Makarova,* 201 F.3d at 113.

#### B. *Costello's Standing*
Defendant first challenges Costello's standing. (Def.'s Br., Docket Entry 7–15, at 7.) Because JCRL is the sole owner of the property in question, Defendant maintains that the claims asserted by Costello must be dismissed for lack of subject

matter jurisdiction. *See* *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 88–89, 118 S.Ct. 1003, 1009–10, 140 L.Ed.2d 210 (1998) (holding that a motion challenging the plaintiff's constitutional standing is properly considered as a Rule 12(b)(1) motion).

**\*4** Standing is a jurisdictional question that determines "the power of the court to entertain the suit." *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). To establish standing under Article III, a plaintiff must show:

> (1) [T]hat he suffered an injury-in-fact-an invasion of a legally protected interest which is (a) concrete and particularized ... and (b) actual or imminent, not conjectural or hypothetical; (2) that there was a causal connection between the injury and the conduct complained of; and (3) that it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Carver v. City of N.Y.,* 621 F.3d 221, 225 (2d Cir.2010) (internal quotation marks omitted); *Liberty Global Logistics LLC v. U.S. Mar. Admin.,* No. 13–CV–0399, 2014 WL 4388587, at *3 (E.D.N.Y. Sept. 5, 2014). A plaintiff suffers an injury-in-fact where he has been injured in a "personal and individual way." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 n. 1, 112 S.Ct. 2130, 2136 n. 1, 119 L.Ed.2d 351 (1992). Thus, whether a plaintiff has standing "depends considerably upon whether the plaintiff is himself an object of the action (or forgone action) at issue." *Id.* at 561, 112 S.Ct. at 2137; *Ritell v. Briarcliff Manor,* 466 F.Supp.2d 514, 519 (S.D.N.Y.2006).

All of Plaintiffs' allegations concern Town-action taken against the Property, and the Property is wholly owned by JCRL. The Amended Complaint is devoid of any allegations that the Town took action against Costello independently; the Property, not Costello, was the object of the Town's actions. Thus, the rights that the Town allegedly infringed belong to the owner of the Property. While Costello may feel aggrieved

by the actions taken against his company and although he now suffers from "recurring headaches, sleeplessness, stress and anxiety," (Am. Compl ¶ 59) Costello was only "injured only as a result of the injury to another." *Bingham v. Zolt,* 66 F.3d 553, 562 (2d Cir.1995). Costello's second-hand injury does not amount to injury in a "personal and individual way," as Article III requires. *Lujan,* 504 U.S. at 560 n. 1, 112 S.Ct. at 2136 n. 1; *see also Wright–Upshaw v. Nelson,* No. 13–CV–3367, 2014 WL 692870, at *3 (E.D.N.Y. Feb. 19, 2014) (finding that individual plaintiff could not sue for losses incurred by charitable organization); *Caravella v. City of N.Y.,* 79 F. App'x 452, 453 (2d Cir.2003) (affirming dismissal of breach of contract claim for lack of standing where corporation, not plaintiff, was party to the contract); *Dore v. Wormley,* 690 F.Supp.2d 176, 186 (S.D.N.Y.2010) (finding that individual plaintiff lacks standing to bring claims of misrepresentation and misuse of funds where alleged injuries are to congregation); *Blakely v. Cardozo,* No. 07–CV–3951, 2007 WL 2702241, at *3 (S.D.N.Y. Sept. 17, 2007) (holding that the plaintiff lacked standing to challenge foreclosure because corporation, not plaintiff, was the property's legal owner). [3]

**\*5** Accordingly, the Amended Complaint's proposed causes of action that are stated on behalf of Costello are subject to dismissal under Rule 12(b)(1). For the remainder of this Memorandum and Order, therefore, the Court considers only the claims stated on behalf of JCRL.

### C. *Rooker–Feldman*

Defendant next contends that the *Rooker–Feldman* doctrine divests the Court of subject matter jurisdiction because Plaintiffs' action is merely an attempt "to litigate a code violation case in federal district court." (Def.'s Br. at 11.) The Rooker–Feldman doctrine divests a federal district court of subject matter jurisdiction "over suits that are, in substance, appeals from state-court judgments." *Hoblock v. Albany Cnty. Bd. of Elecs.,* 422 F.3d 77, 84 (2d Cir.2005); *see also Rooker v. Fid. Trust Co.,* 263 U.S. 413, 416, 44 S.Ct. 149, 150, 68 L.Ed. 362 (1923). The doctrine precludes a district court from hearing "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the federal district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.,* 544 U.S. 280, 284, 125 S.Ct. 1517,

1521–22, 161 L.Ed.2d 454 (2005). The doctrine therefore applies where: (1) the federal-court plaintiff lost in state court; (2) the plaintiff complains of injuries caused by the state-court judgment; (3) the plaintiff invites district court review and rejection of that judgment; and (4) the state-court judgment was rendered before the district court proceedings commenced. *Murphy v. Riso,* No. 11–CV–0873, 2012 WL 94551, at *6 (E.D.N.Y. Jan. 12, 2012) (citing *Hoblock,* 422 F.3d at 85). "[A] party is not complaining of an injury 'caused by' a state-court judgment when the exact injury of which the party complains in federal court existed *prior* in time to the state-court proceedings, and so could not have been 'caused by' those proceedings." *McKithen v. Brown,* 481 F.3d 89, 98 (2d Cir.2007) (emphasis in original).

Dismissal of JCRL's claims pursuant to the *Rooker–Feldman* doctrine is inappropriate at this early stage in the litigation because the Amended Complaint may be read to allege injuries that are independent of the state-court proceedings. JCRL alleges that it has been unable to sell the Property. The Amended Complaint is unclear as to whether those sales failed due to the pending state-court-ordered receivership- a direct effect of the state-court judgment-or due to the Defendant's illegally targeting the Property for overzealous code enforcement-an independent injury. While the former is barred by *Rooker–Feldman,* the latter is not. *See Hoblock,* 422 F.3d at 85. Thus, it is plausible that the failed sales resulted from Defendant's unlawfully targeting the Property for code enforcement.

Accordingly, insofar as the Amended Complaint alleges that JCRL's injuries are caused by the Town's discriminatory pattern or practice *and not by the state-court judgment,* the *Rooker–Feldman* doctrine does not apply, and the Court has jurisdiction over those claims. *See Sykes v. Mel S. Harris & Assocs. LLC,* —— F.3d ——, 2015 WL 525904, at *5 (2d Cir., 2015) (discussing with approval district court's refusal to apply the *Rooker–Feldman* doctrine where the claims asserted were independent of any state-court judgments).

## II. Defendant's Motion to Dismiss for Failure to State a Claim

### A. *Legal Standard*

**\*6** In deciding a Rule 12(b)(6) motion to dismiss, the Court applies a "plausibility standard," which is guided by

"[t]wo working principles." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *accord Harris v. Mills,* 572 F.3d 66, 71–72 (2d Cir.2009). *First,* although the Court must accept all allegations as true, this "tenet" is "inapplicable to legal conclusions;" thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678, 129 S.Ct. at 1949–50; *accord Harris,* 572 F.3d at 72. *Second,* only complaints that state a "plausible claim for relief" can survive a Rule 12(b)(6) motion to dismiss. *Iqbal,* 556 U.S. at 679, 129 S.Ct. at 1950. Determining whether a complaint does so is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.; accord Harris,* 572 F.3d at 72.

In deciding a motion to dismiss, the Court is confined to "the allegations contained within the four corners of [the] complaint." *Pani v. Empire Blue Cross Blue Shield,* 152 F.3d 67, 71 (2d Cir.1998). However, this limitation has been interpreted broadly to include any document attached to the complaint, any statements or documents incorporated in the complaint by reference, any document on which the complaint heavily relies, and anything of which judicial notice may be taken. *See Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152–53 (2d Cir.2002) (citations omitted); *Kramer v. Time Warner Inc.,* 937 F.2d 767, 773 (2d Cir.1991).

### B. *Constitutional Claims*

The Amended Complaint attempts to state causes of action pursuant to 42 U.S.C. § 1983 for violations of the Fourteenth Amendment, the Fourth Amendment, and the First Amendment. [4] The Court discusses each in turn.

#### 1. *Liability Under Monell*

Because JCRL's constitutional claims are brought under 42 U.S.C. § 1983, and because a municipality is the only defendant, the Court first considers whether the allegations in the Amended Complaint are sufficient to satisfy *Monell's* requirements. *See Monell v. Dep't of Soc. Servs. of N.Y.C.,* 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978); *Roe v. City of Waterbury,* 542 F.3d 31, 36 (2d Cir.2008).

To prevail on a Section 1983 claim against a municipality, a plaintiff must show "that 'action pursuant to official municipal policy' caused the alleged constitutional injury." *Cash v. Cnty. of Erie,* 654 F.3d 324, 333 (2d Cir.2011) (quoting *Connick v. Thompson,* —— U.S. ——, ——, 131 S.Ct. 1350, 1359, 179 L.Ed.2d 417 (2011)). "[L]ocal governments ... may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Monell,* 436 U.S. at 690–91, 98 S.Ct. at 2036 (citation omitted).

**\*7** To establish the existence of a municipal policy or custom, the plaintiff must allege: (1) the existence of a formal policy which is officially endorsed by the municipality; (2) actions taken or decisions made by municipal officials with final decision-making authority, which caused the alleged violation of plaintiff's civil rights; (3) a practice so persistent and widespread that it constitutes a custom of which constructive knowledge and acquiescence can be implied on the part of the policy making officials; or (4) a failure by policymakers to properly train or supervise their subordinates, amounting to deliberate indifference to the rights of those who come in contact with the municipal employees. *Moray v. City of Yonkers,* 924 F.Supp. 8, 12 (S.D.N.Y.1996) (citations omitted).

The Complaint alleges concerted action taken by, among others, multiple building inspectors, the Town attorney, and Councilman Mark Cuthbertson. It may be plausibly inferred from these allegations that a municipal custom or policy caused the alleged violations. *See Jones v. Bay Shore Union Free Sch. Dist.,* 947 F.Supp.2d 270, 282 (E.D.N.Y.2013). Accordingly, JCRL has satisfied *Monell's* prerequisite to municipal liability under 42 U.S.C. § 1983.

#### 2. *Equal Protection*

JCRL first contends that Defendant has violated the Equal Protection Clause by enforcing the Town code more stringently against JCRL than against similarly situated neighbors. (Am.Compl.¶ 63.) JCRL does not allege

membership in a protected class, so its equal protection claim falls in the "class-of-one" variety.

At the outset, the Court is mindful that "[c]ourts, including the Second Circuit, have repeatedly cautioned about the danger of ordinary disputes between a citizen and a municipality-whether it be about land use, licenses, inspections, or some other regulatory or investigative function of local governments-being transformed into federal lawsuits by an incorrect, overexpansive theory of class-of-one liability." *Crippen v. Town of Hempstead,* No. 07–CV–3478, 2013 WL 1283402, at *7 (E.D.N.Y. Mar. 29, 2013) (citing *Bizzarro v. Miranda,* 394 F.3d 82, 88–89 (2d Cir.2005)); *see also* *545 Halsey Lane Props., LLC v. Town of Southampton,* No. 14–CV–0800, 2014 WL 4100952, at *13 (E.D.N.Y. Aug. 19, 2014); *Sacher v. Vill. of Old Brookville,* 967 F.Supp.2d 663, 670 (E.D.N.Y.2013) ("[A] plaintiff alleging unfair treatment in a zoning/building context, must plead specific examples of applications and hearings that were similar to plaintiff's application and demonstrative of the disparate treatment alleged.") (citation omitted).

A plaintiff states a claim for violation of the Equal Protection Clause on a class-of-one theory where the "plaintiff alleges that she has been intentionally treated differently from others similarly situated and there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech,* 528 U.S. 562, 564, 120 S.Ct. 1073, 1074, 145 L.Ed.2d 1060 (2000) (per curiam). Accordingly, JCRL must establish that:

> **\*8** [N]o rational person could regard the circumstances of [JCRL] to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and [ ] the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake.

*Camac v. Long Beach City Sch. Dist.,* No. 09–CV–5309, 2011 WL 3030345, at *16 (E.D.N.Y. July 22, 2011) (internal quotation marks and citation omitted). Regarding

the first requirement, courts require an "extremely high degree of similarity between [the plaintiffs] and the persons to whom they compare themselves." *Clubside, Inc. v. Valentin,* 468 F.3d 144, 159 (2d Cir.2006). The high degree of similarity required reflects the fact that the comparative cases are offered to "provide an inference that the plaintiff was intentionally singled out for reasons that so lack any reasonable nexus with a legitimate governmental policy that an improper purpose-whether personal or otherwise-is all but certain." *Id.* (quoting *Neilson v. D'Angelis,* 409 F.3d 100, 104 (2d Cir.2005)). While the similarity between the plaintiff and the comparators is generally an issue of fact, "this rule is not absolute." *Harlen Assocs. v. Inc. Vill. of Mineola,* 273 F.3d 494, 499 n. 2 (2d Cir.2001).

The Amended Complaint identifies two individuals with whom JCRL alleges to be similarly situated, but neither are sufficiently similar for JCRL's claim to withstand a motion to dismiss. The Amended Complaint first cites Pat McCardle, a resident of the neighboring property that was allegedly not fined for numerous Town code violations on her property. (Am.Compl.¶¶ 31–32.) Aside from the close proximity of their properties, however, JCRL and McCardle are incomparable. JCRL's property contains multiple structures, commercial spaces, dwellings, driveways, and uses; McCardle's is a single family home. As a matter of law, the two are not similarly situated. *See* *Ruston v. Town Bd. for Town of Skaneateles,* 610 F.3d 55, 60 (2d Cir.2010) (finding properties used for different purposes not similarly situated as a matter of law); *Laidlaw Energy & Envtl., Inc. v. Town of Ellicottville,* No. 08–CV–0032, 2011 WL 4954881, at *10 (W.D.N.Y. Oct. 18, 2011) (dismissing selective enforcement claim where plaintiff had vacated the property and thus triggered the applicability of zoning codes different than the comparator); *Toussie v. Town Bd. of E. Hampton,* 874 F.Supp.2d 135, 145 (E.D.N.Y.2012) (properties with different developmental histories not sufficiently similar to state a claim); *Missere v. Gross,* 826 F.Supp.2d 542, 562 (S.D.N.Y.2011) (dismissing class-of-one claim where alleged comparator was zoned differently than plaintiff). Moreover, the code violations on McCardle's property hardly compare to those on JCRL's. While McCardle allegedly had an unlicensed front and rear deck, an unheated cellar entrance, and an unfenced pool, JCRL was fined for its failure to obtain required certificates of occupancy, operating an illegal massage parlor, and making unauthorized modifications. (Am.Compl.¶¶ 47–55.) The difference in violations between McCardle and JCRL

drives the wedge between the two even deeper. *See* 🔖 *Nemeth v. Vill. of Hancock,* No. 10–CV–1161, 2011 WL 56063, at *6 (N.D.N.Y. Jan. 7, 2011)* ("Plaintiffs compare the proverbial apples with oranges, attempting to equate enforcement of a fence ordinance or a setback rule with enforcement of the Zoning Code's non-conforming use expansion regulations.").

**\*9** The second individual to whom JCRL is allegedly similarly situated is Mr. Joseph Barton, who rents approximately six apartments above two commercial units roughly one half-mile from the Property. (Am.Compl.¶ 33.) While Barton and JCRL may put their property to similar use, the Amended Complaint does not allege that Barton's property stands in violation of the Town code. This distinction vitiates JCRL's claim of similarity because the Court cannot be expected to look to Barton-who was apparently in compliance with the Town code-for the inference that Defendant illegally demanded JCRL's compliance. *See* 🔖 *Sacher,* 967 F.Supp.2d at 671 (dismissing equal protection claim that alleged only that comparator was in violation of "various" code provisions).

Accordingly, because the Amended Complaint does not adequately allege that a similarly situated individual received any more favorable treatment than JCRL, JCRL's equal protection claims are subject to dismissal under 🔖 Rule 12(b)(6). *See* 🔖 *Ruston,* 610 F.3d at 60.

### 3. *Fourth Amendment*

JCRL next attempts to assert a cause of action for violation of the Fourth Amendment's protection against unreasonable searches resulting from the Town's search of the apartments located on the eastern portion of the Property. (Am.Compl.¶ 67.)

"The touchstone of Fourth Amendment analysis is whether a person has a 'constitutionally protected reasonable expectation of privacy.' " 🔖 *California v. Ciraolo,* 476 U.S. 207, 211, 106 S.Ct. 1809, 1811, 30 L.Ed.2d 210 (1986); 🔖 *United States v. Hamilton,* 538 F.3d 162, 167 (2d Cir.2008) (requiring a "legitimate expectation of privacy"). Determining whether one has such an expectation involves a two-part inquiry: (1) whether the individual had a subjective expectation of privacy; and (2) whether that expectation of privacy is one that society accepts as reasonable. 🔖 *Ciraolo,* 476 U.S. at 211, 106 S.Ct. at 1811. Generally,

because they have turned over possession and use of an apartment to its tenants, landlords do not have a protected reasonable expectation of privacy in a rented apartment. *See* 🔖 *Mangino v. Inc. Vill. of Patchogue,* 739 F.Supp.2d 205, 234 (E.D.N.Y.2010) (collecting cases), *reversed in part on reconsideration,* 814 F.Supp.2d 242 (E.D.N.Y.2011); 🔖 *United States v. Cruz,* 475 F.Supp.2d 250, 257 (W.D.N.Y.2007) ("Ownership of premises alone does not automatically confer standing.").

The Amended Complaint does not allege that the Town searched any area where either JCRL or Costello has a reasonable expectation of privacy. The only areas that the Amended Complaint alleges the Town official searched are the apartments of the "Section 8 tenants." (Am.Compl.¶ 44.) Accordingly, JCRL lacks standing to challenge the legality of the search, and its Fourth Amendment claim is subject to dismissal. *See* 🔖 *Mangino,* 739 F.Supp.2d at 234 (finding that landlord did not have standing to bring 🔖 § 1983 claim challenging search of tenant's apartment).

### 4. *First Amendment Retaliation*

**\*10** JCRL next claims that the Town violated the First Amendment by unlawfully enforcing its code against the Property in retaliation for JCRL's renting to minority tenants. (Am.Compl.¶ 62.)

"To establish a retaliation claim under 🔖 section 1983, a plaintiff initially [must] show that [its] conduct was protected by the first amendment, and that defendants' conduct was motivated by or substantially caused by his exercise of free speech." 🔖 *Gagliardi v. Vill. of Pawling,* 18 F.3d 188, 194 (2d Cir.1994) (internal quotation marks and citation omitted) (first alteration in original). Additionally, a plaintiff must allege "some sort of harm," but-at least in this context-that harm need not be a "chilling of speech." 🔖 *Gill v. Pidlypchak,* 389 F.3d 379, 383 (2d Cir.2004).

By renting to and associating with minority tenants, JCRL has engaged in activity protected by the First Amendment. The Amended Complaint is scant, however, on allegations of the Defendant's retaliatory motive. JCRL attempts to ascribe discriminatory comments made by neighbors of the Property, such as "the Town will get you" and "your life will be hell," to the Town itself. (Am Compl. ¶ 21.) Imputing a retaliatory animus to one based on the statements of an unrelated party

is a *non sequitir*. This Courts and others have repeatedly recognized that alleging a discriminatory (or in this case, retaliatory) animus on the part of an individual who had no meaningful role in the alleged unlawful action is insufficient, as a matter of law, to establish any animus on the part of the decision-maker. See, e.g., *Hernandez v. Hampton Bays Union Free Sch.* Dist., No. 12–CV–0789, 2015 WL 667844, at *6 (E.D.N.Y. Feb. 13, 2015); *Mathirampuzha v. Potter,* 548 F.3d 70, 79 (2d Cir.2008); *Bickerstaff v. Vassar Coll.,* 196 F.3d 435, 450 (2d Cir.1999) (affirming summary judgment where record was devoid of evidence showing that the individual who allegedly harbored discriminatory animus played any "meaningful role" in the adverse-action decision). Nonetheless, the question of an actor's motive is generally a question of fact that should not be decided in the context of a motion to dismiss. *Gagliardi,* 18 F.3d 188, 195 (2d Cir.1994) ("The ultimate question of retaliation involves a defendant's motive and intent, which are difficult to plead with specificity in a complaint."); *Puckett v. Glen Cove,* 631 F.Supp.2d 226, 240 (E.D.N.Y.2009); *Jones,* 947 F.Supp.2d at 276. In light of this liberal standard, and because JCRL sets forth other, albeit thin allegations of discriminatory intent-such as the harassment curiously beginning after a resident suggested he knew a local councilman, (Am.Compl.¶¶ 22, 27), and the Town's unlawfully procuring a search warrant (Am.Compl.¶¶ 36– 47)–the Court finds JCRL's First Amendment claim sufficient proceed to discovery.

Notwithstanding the Court's conclusion that JCRL's First Amendment claim is sufficient to withstand a motion to dismiss, the Court observes that JCRL's claim is only barely saved by the liberal pleading standards for motive, and the Court's unwillingness to dismiss the claim at this early pleading stage should not be construed to indicate that the claim will ultimately succeed.

### 5. *Substantive Due Process*

**\*11** "Substantive due process protects against government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense, but not against government action that is incorrect or ill-advised." *Kaluczky v. White Plains,* 57 F.3d 202, 211 (2d Cir.1995) (internal quotation marks and citation omitted). "To plead a substantive due process claim, a plaintiff must allege facts establishing (1) a cognizable property interest (2) that was invaded in an arbitrary and

irrational manner." *Rankel v. Town of Somers,* 999 F.Supp.2d 527, 546 (S.D.N.Y.2014) (citing *O'Mara v. Town of Wappinger,* 485 F.3d 693, 700 (2d Cir.2007)).

The only potentially "conscience-shocking" allegations in the Amended Complaint are that Defendant selectively enforced the Town code against JCRL in retaliation for its renting to and associating with minority tenants. Putting aside that courts have routinely held that these "types of allegations of 'improper motives' and 'selective enforcement' on the part of municipal officials fall into the "non-conscience-shocking category[y]," *Rankel,* 999 F.Supp.2d at 547 (alteration in original) citing *Ruston,* 2008 WL 5423038, at *5, those allegations are the same ones that form the basis of the Amended Complaint's First Amendment claim. It is well-settled that where a specific constitutional provision prohibits government action, plaintiffs seeking redress for that prohibited conduct in a § 1983 suit cannot make reference to the broad notion of substantive due process. *Velez v.* Levy, 401 F.3d 75, 94 (2d Cir.2005); *Mace v. Cnty. of Sullivan,* No. 05–CV–2786, 2009 WL 413503, at *9 (S.D.N.Y. Feb. 11, 2009) (dismissing substantive due process claim where plaintiff also sought redress for conduct allegedly constituting the basis of plaintiff's claim under the First Amendment); *Cronin v. St. Lawrence,* No. 08–CV– 6346, 2009 WL 2391861, at *8 (S.D.N.Y. Aug. 5, 2009) (same); *Rankel,* 999 F.Supp.2d at 547 (same).

Accordingly, JCRL's substantive due process claim is subject to dismissal because it is duplicative of its First Amendment claims.

### C. *Fair Housing Act Claim*

The Amended Complaint invokes the [FHA] by alleging a violation of JCRL's right to be free from coercion, threats, or interference on account of its having aided or encouraged the rental of property to minority tenants.

"Although most of the FHA is designed to prevent illegal discrimination on the part of housing providers, one provision specifically prohibits unrelated third parties from interfering with anyone who is attempting to aid others protected under the Act from obtaining housing of their choice." *People Helpers,* Inc. v. *City of Richmond,* 789 F.Supp. 725, 731 (E.D.Va.1992); *Frazier v. Rominger,* 27 F.3d 828, 833 (2d Cir.1994) (holding that the FHA protects against "third

parties, not necessarily members of the protected class, who aid or encourage protected class members in the exercise or enjoyment of their Fair Housing Act rights"). Section 3617 makes it unlawful "to coerce, intimidate, threaten, or interfere with any person ... on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section [3604]." 42 U.S.C. § 3617. Section 3604, in turn, prohibits the "mak[ing] unavailable or deny[ing] a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C § 3604(a). To establish a claim under § 3617, a plaintiff must show "(1) that they aided or encouraged members of a protected class in the exercise or enjoyment of their FHA rights, and (2) that as a result of their actions, they suffered coercion, intimidation, threats, interference or retaliation." *Wentworth v. Hedson,* 493 F.Supp.2d 559, 565 (E.D.N.Y.2007); *see also Johnson v. Levy,* 812 F.Supp.2d 167, 179 (E.D.N.Y.2011); *Puglisi v. Underhill Park Taxpayer Ass'n,* 947 F.Supp. 673, 696 (S.D.N.Y.1996), *aff'd,* 125 F.3d 844 (2d Cir.1997).

**\*12** JCRL has alleged both that it "aided or encouraged" its tenants' exercise of their rights under the FHA, *Wilkey v. Pyramid Const. Co.,* 619 F.Supp. 1453, 1455 (D.Conn.1985) (holding that showing apartments and accepting applications constitutes aiding or encouraging), and that it has suffered harassment from the Town. Whether JCRL has properly alleged that the Town's harassment occurred *as a result* of its aiding minority tenants is a closer question. As with JCRL's First Amendment claim, the Court sees little relationship between the comments of JCRL's neighbors and the Town's discriminatory animus, and the Amended Complaint's remaining allegations of the Town's motive are thin at best. Nonetheless, again because allegations of motive are difficult to plead with specificity, the Court allows JCRL's FHA claim to proceed to discovery, albeit with the same diffidence that it allows JCRL's First Amendment claim to so proceed. *But see Roth v. City of Syracuse,* 96 F.Supp.2d 171, 183–84 (N.D.N.Y.2000), *aff'd,* 4 F. App'x 86 (2d Cir.2001) (dismissing FHA claim because the plaintiffs produced no evidence of any racial animus by *defendants* ).

### D. *Remaining Claims*

The Amended Complaint also states causes of action for Defendant's alleged violation of 42 U.S.C. § 1981 and § 1982. Section 1981 establishes that all persons have

equal right to make and enforce contracts, while § 1982 establishes that all persons have equal right to purchase, lease, sell, hold, and convey real and personal property. 42 U.S.C. §§ 1981, 1982. Due to their related origins and language, the two sections are generally construed *in pari materia. Choudhury v. Polytechnic Inst. of New York,* 735 F.2d 38, 43 (2d Cir.1984). Accordingly, the Court considers these purported causes of action together.

To state a claim under either provision, a plaintiff must allege "(1) they are members of a racial minority; (2) an intent to discriminate on the basis of their race by defendant; and (3) the discrimination concerned one or more activities enumerated in §§ 1981 or 1982, e.g., making contracts or the purchase of personal property." *Shen v. A & P Food Stores,* No. 93–CV–1184, 1995 WL 728416, at \*2 (E.D.N.Y. Nov. 21, 1995). The first element has been modified so that a plaintiff need not be a member of a racial minority so long as the plaintiff has alleged an injury derivaite of defendant's discriminatory actions against a racial minority. *Puglisi,* 947 F.Supp. at 700.

JCRL has alleged that the Town has interfered with its right to contract and sell its land insofar as the Amended Complaint alleges that JCRL has been unable to sell the Property because the Town has targeted it due to the presence of minority tenants.[5] Additionally, the Court has already discussed its concern with but ultimate approval of JCRL's allegations of the Town's motive. Accordingly, the Court finds that JCRL's § 1981 and § 1982 claims are sufficient to survive a motion to dismiss.

### III. *Leave to Replead*

**\*13** Given that Plaintiffs have already attempted to cure any defects in their initial complaint in response to Defendant's motion to dismiss, but have still failed to properly state certain claims, the Court declines to afford Plaintiffs the opportunity to replead these claims. *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962) (noting that denial of leave to replead is appropriate in light of "repeated failure to cure deficiencies by amendments previously allowed."); *Sanders v. Grenadier Realty, Inc.,* 367 F. App'x 173, 177 (2d Cir.2010); *Schwartzco,* 2014 WL 6390299, at \*12.

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss (Docket Entry 7), considered as directed at the proposed Amended Complaint, is GRANTED IN PART and DENIED IN PART. Specifically, Defendant's motion to dismiss is DENIED with respect to JCRL's claims arising under the First Amendment, the FHA, 🚩 42 U.S.C. § 1981, and 🚩 42 U.S.C. § 1982; Defendant's motion is otherwise GRANTED. All of the claims alleged on behalf of Costello are DISMISSED WITH PREJUDICE, and JCRL's Equal Protection, Substantive Due Process, and Fourth Amendment Claims are DISMISSED WITH PREJUDICE.

Concurrently, Plaintiffs' cross-motion for leave to file an amended complaint (Docket Entry 10) is GRANTED IN PART and DENIED IN PART. The motion is GRANTED as to JCRL's First Amendment, FHA, 🚩 42 U.S.C. § 1981, and 🚩 42 U.S.C. § 1982 claims.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 1396448

---

## Footnotes

1    The following facts are drawn from the Amended Complaint and are presumed to be true for the purposes of this Memorandum and Order.

2    The Amended Complaint frequently conflates the interests of Costello with those of JCRL. For instance, the Amended Complaint alleges that "Plaintiffs own" the parcel of land in question. (Am .Compl.¶ 1.) By deed dated March 1, 2006, however, Costello transferred his interest in the property to JCRL. (Defs.' Mot., Docket Entry 7, Ex. A.) Thus, JCRL is the sole owner of the property in question. *Awan v. Ashcroft,* No. 09–CV–1653, 2010 WL 3924849, at \*29E.D.N.Y. Sept. 28, 2010) ("On a motion to dismiss, courts may take judicial notice of public records, such as properly recorded deeds.").

3    For those claims asserted pursuant to 🚩 42 U.S.C. § 1983, Costello's bar from participation is even more well-settled, as "the federal courts consistently have held that a corporate officer or shareholder, regardless of his position or degree of share ownership, cannot prosecute his corporation's 🚩 § 1983 claims." *Sterngass v.* Bowman, 563 F.Supp. 456, 459 (S.D.N.Y.), *aff'd,* 742 F.2d 1440 (2d Cir.1983).

4    Because the Court assesses these claims only as brought on behalf of JCRL as the sole owner of the Property, the Court notes as an initial matter that corporations are entitled to the protections afforded by the First, Fourth, and Fourteenth Amendments. *See* 🚩*Citizens United v. Fed. Election Comm'n,* 558 U.S. 310, 342, 130 S.Ct. 876, 899, 175 L.Ed.2d 753 (2010) (First Amendment); 🚩 *Hale v. Henkel,* 201 U.S. 43, 76, 26 S.Ct. 370, 380, 50 L.Ed. 652 (1906) (Fourth Amendment); 🚩*Santa Clara Cnty.* v. S. Pac. R. *Co.,* 118 U.S. 394, 6 S.Ct. 1132, 30 L.Ed. 118 (1886) (Fourteenth Amendment).

5    The Court recognizes the overlap in JCRL's 🚩 § 1981 and 🚩 § 1982 claims in that both arise out of the same allegations. The Court is obliged, however, "not to forget the broad and sweeping nature of the protection meant to be afforded by these statutes." 🚩*Olzman v. Lake Hills Swim Club, Inc.,* 495 F.2d 1333, 1339–40 (2d Cir.1974).

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 5:22-cv-01202-MAD-ML   Document 8   Filed 03/28/23   Page 48 of 364

Wade v. Kay Jewelers, Inc., Not Reported in Fed. Supp. (2018)

2018 WL 4440532
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Fabian WADE, Plaintiff,
v.
KAY JEWELERS, INC., Sterling Jewelers, Inc.,
GGP, Inc., and Jane & John Does, 1–5, Defendant.

No. 3:17-cv-990 (MPS)
|
Signed September 17, 2018

**Attorneys and Law Firms**

Nitor V. Egbarin, Law Office of Nitor V. Egbarin, LLC, Hartford, CT, for Plaintiff.

Daniel I. Prywes, Morris, Manning & Martin, LLP, Washington, DC, Joshua A. Mize, Mize Law, PLLC, Jupiter, FL, Colleen J. Vellturo, Stephen P. Brown, Wilson, Elser, Moskowitz, Edelman & Dicker, LLP, Stamford, CT, Dawn M. Neborsky, Bonner Kiernan Trebach & Crociata, LLP, Boston, MA, for Defendant.

Jane Does, pro se.

John Does, pro se.

## RULING ON MOTIONS TO DISMISS

Michael P. Shea, U.S.D.J.

**\*1** Plaintiff Fabian Wade ("Wade") brings this suit based on an incident at the Buckland Hills Mall where he was identified by employees of Kay Jewelers as a suspect in a prior theft and credit card fraud and questioned by mall security personnel and police. (ECF No. 36.) Wade sued the owner of the Kay Jewelers store, defendant Sterling Jewelers, Inc. ("Sterling"),[1] the mall owner, GGP, Inc. ("GGP"), and numerous Jane and John Does, asserting six claims arising from the incident: (1) violation of 42 U.S.C. § 1981; (2) false imprisonment; (3) defamation *per se*; (4) intentional infliction of emotional distress; (5) negligent infliction of emotional distress; and (6) negligent supervision. Defendant GGP impleaded Professional Security Consultants, Inc. ("PSC") as the alleged employer of mall security personnel and asserted claims for

negligence, common law indemnification, and contractual indemnification. (ECF No. 57.) Sterling and GGP now move to dismiss Wade's amended complaint under Rule 12(b)(6) (ECF Nos. 42, 45), and PSC moves to dismiss part of GGP's third-party complaint under Rule 12(b)(6). (ECF No. 70.) For the reasons that follow, I GRANT in part and DENY in part all three motions.

## I. Factual Background

I briefly recite the relevant factual background as set forth in Wade's amended complaint. (ECF No. 36 (hereinafter "Am. Compl.").) Wade, a black, African-American male, went to the Kay Jewelers store/booth at Buckland Hills Mall in Manchester, CT on Saturday, March 18, 2017. (Am. Compl. at ¶¶ 13–15.) Wade asked an employee if he could look at some earrings, which the attending employee showed him but refused to take out of their glass case. (*Id.* at ¶¶ 16–18.) Wade decided not to buy the earrings and walked away from the Kay Jewelers store/booth. (*Id.* at ¶ 19.)

Within a few minutes, an undercover security or loss prevention officer for the mall, Jane Doe 3, stopped Wade and told him that one of the Kay Jewelers Individual Defendants[2] (either defendant Jane Doe 1 or Jane Doe 2) had identified Wade as an individual they suspected had been robbing Kay Jewelers over the past few months. (*Id.* at ¶¶ 20–22.) According to the police report of the incident, one of the Kay Jewelers Individual Defendants had called mall security, who in turn called the police, to report Wade for possible ID theft and credit card fraud. (*Id.* at ¶ 35.) Wade believed that the Kay Jewelers Individual Defendants had "identified [Wade] because of his skin color and because [he] fit their idea of a shoplifter." (*Id.* at ¶ 41.)

**\*2** Shortly after Wade was stopped, Jane Doe 3 was joined by another mall security officer, John Doe 1, and Officer Decker of the Manchester Police. (*Id.* at ¶ 23.) Jane Doe 3, John Doe 1, and Officer Decker surrounded Wade, "with Officer Decker in front facing [Wade] and Jane Doe 3 on one side of [Wade] and John Doe 1 on the other side of [Wade], confining [Wade] ... [and] forcing [Wade] to stay in the space, from where he could not leave." (*Id.* at ¶ 26.) Officer Decker told that Wade that a Kay Jewelers employee had told Officer Decker when he responded to the call that Wade was the suspect. (*Id.* at ¶ 27.) Officer Decker demanded to see Wade's ID and asked about Wade's credit cards. (*Id.* at ¶ 28.) Officer Decker radioed in Wade's ID and, while holding onto the ID, "forc[ed] [Wade] to walk downstairs with him" to the

Case 5:22-cv-01202-MAD-ML   Document 8   Filed 03/28/23   Page 49 of 364

Wade v. Kay Jewelers, Inc., Not Reported in Fed. Supp. (2018)

Kay Jewelers booth/store, despite Wade's repeated requests to return his ID. (*Id.* at ¶¶ 29–31.) At some point, Wade called his lawyer, soon after which the stop ended and Wade left. (*Id.* at ¶ 34.). Wade was shaken up by the incident, has had flashbacks, believes his reputation has been harmed, and alleges that he now has a public record as a result Officer Decker running his ID through the Manchester Police system. (*Id.* at ¶¶ 47–51.)

The amended complaint pleads on information and belief that Kay Jewelers "top management practice and believe in discrimination ... creating a corporate culture where Kay Jewelers store employees routinely and disproportionately" discriminate against African-Americans for suspicion of criminal activity. (*Id.* at ¶ 52.) The amended complaint further asserts that the Kay Jewelers' "employees and loss prevention/ security personnel were not properly trained or supervised to prevent Kay Jewelers' employees from targeting African-Americans and people of color" for suspected criminal activity, and were also not "properly trained or supervised" in connection with "accusing customers" of criminal activity and alerting law enforcement personnel of the same. (*Id.* at ¶ 53.)

Sterling deposed Wade about the incident before Wade filed the complaint; Wade was represented by his counsel at the deposition. (*See, e.g.*, ECF No. 43-1 at 2–147 ("Wade Tr.").) After Wade filed suit, Wade amended his complaint, and Sterling and GGP moved to dismiss. (ECF Nos. 36, 42, 45.) GGP filed a third party complaint against PSC, and PSC then moved to dismiss part of the GGP's third party complaint against it. (ECF No. 57, 70.)

## II. Legal Standard

On a motion to dismiss, I take the plaintiff's factual allegations in the complaint "to be true and [draw] all reasonable inferences in" his favor. *Harris v. Mills*, 572 F.3d 66, 71 (2d Cir. 2009). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009) (citation and quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A court need not accept legal conclusions as true and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* In addition, the "court need not feel constrained to accept as truth conflicting pleadings

that ... are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely." *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 405–06 (S.D.N.Y. 2001)

"In adjudicating a motion to dismiss, a court may consider only the complaint, any written instrument attached to the complaint as an exhibit, any statements or documents incorporated in it by reference, and any document upon which the complaint heavily relies." *In re Thelen LLP*, 736 F.3d 213, 219 (2d Cir. 2013) (citation omitted). In the last category, a document is deemed integral to the complaint, and thus appropriately considered on a motion to dismiss, "where the complaint relies heavily upon its terms and effect." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002); *see Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) ("Merely mentioning a document in the complaint will not satisfy this standard; indeed, even offering 'limited quotation[s]' from the document is not enough.").

## III. Discussion

**\*3**  As a threshold issue, both Sterling and GGP attach the transcript of Wade's sworn pre-suit deposition testimony to their motions to dismiss and argue that the Court should treat the transcript as incorporated because the amended complaint heavily relies on it. (ECF No. 43 at 7–19; ECF No. 45-1 at 2–3.) Wade concedes that the transcript should be incorporated for the purposes of the parties' motion to dismiss. (ECF No. 50 at 4 ("GGP correctly argues Mr. Wade's sworn deposition is proper for consideration for GGP's Motion to dismiss.").) The amended complaint does not cite or reference the deposition transcript itself; however, large portions of the complaint either quote without attribution (Am. Compl. at ¶¶ 14, 16, 17, 18, 20, 21, 22, 28, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 43, 46, 47, 48, 49, 50, 51) or paraphrase Wade's deposition testimony (*id.* at ¶¶ 13, 15, 19, 23, 27, 29, 41, 47). In other words, not only does Wade agree that he heavily relied on the transcript in drafting the complaint, but the deposition transcript supplies almost one-third of the allegations in the complaint either verbatim or in paraphrased form. Though usually incorporation of "integral" documents is applied to legal documents like contracts, I conclude that the transcript should be considered here because of Wade's extensive reliance on it in drafting the complaint. *See Washington v. Gonyea*, 538 F. App'x 23, 26 n.3 (2d Cir. 2013) ("[I]ncorporation of the transcript is proper because the complaint relies heavily on the hearing transcript."); *cf.*

Wade v. Kay Jewelers, Inc., Not Reported in Fed. Supp. (2018)

Case 5:22-cv-01202-MAD-ML     Document 8     Filed 03/28/23     Page 50 of 364

*Allstate Ins. Co. v. Rozenberg*, 771 F. Supp. 254, 268 (E.D.N.Y. 2011) (declining to consider deposition transcript because the complaint did not make any reference to it and the plaintiffs did not "purport to have relied on [the] deposition in crafting the allegations").

However, I only consider the transcript for a limited purpose: if the complaint incorrectly quotes or paraphrases the transcript, I may consider Wade's testimony for the contents of his statements, but I may not consider Wade's deposition testimony for its truth or to contravene a statement in the amended complaint. *See Roth v. Jennings*, 489 F.3d 499, 511 (2d Cir. 2007) ("[S]uch documents may properly be considered only for 'what' they contain, 'not to prove the truth' of their contents."); *see also Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 156 (2d Cir. 2006) (reversing district court's dismissal where district court considered non-integrated transcript "to make a finding of fact that *controverted* the plaintiff's own factual assertions set out in its complaint"). A lawyer is not confined to the personal knowledge of his client when he drafts a complaint. He may also rely on other sources of evidence, and he may further investigate a claim after his client testifies to correct or supplement his client's own personal knowledge of the facts. Thus, the Court is not free to disregard an allegation in a complaint simply because it contradicts the plaintiff's pre-complaint testimony. Nonetheless, because I may consider the transcript, I decline Sterling's alternative request to convert its motion into one for summary judgment. [3]

Wade's amended complaint asserts six causes of action against Sterling and GGP: (1) an "equal benefit" claim under 42 U.S.C. § 1981; (2) false imprisonment; (3) defamation *per se*; (4) intentional infliction of emotional distress ("IIED"); (5) negligent infliction of emotional distress ("NIED"); and (6) negligent supervision. (Am. Compl. at ¶¶ 54–97.) Sterling and GGP have moved to dismiss the six counts for failure to state a claim. (ECF Nos. 42, 45.) GGP also moves to dismiss on the grounds that Wade has not properly pleaded that GGP is vicariously liable for the mall security personnel, who were independent contractors and not employees of GGP. (ECF No. 45-1 at 4–6.) After GGP filed its motion to dismiss, Wade withdrew his 42 U.S.C. § 1981 and IIED claims against GGP. (*See* ECF No. 50 at 5–6, *id.* at n.1.) After addressing the issue of GGP's vicarious liability, I will address the remaining claims against each defendant.

## A. Vicarious Liability (GGP)

GGP argues that three of the state law tort claims pending against it should be dismissed because the Amended Complaint does not properly plead vicarious liability against GGP, and the only basis for liability against GGP on those counts consists of the actions of defendants John Doe 1, John Doe 2, and Jane Doe 3 as alleged mall "security/loss prevention personnel and/or agents of the Defendants Kay Jewelers and/or GGP...." (ECF No. 45-1 at 5 (citing Am. Compl. at ¶ 12).) [4] Under Connecticut law, "a master is liable for the willful torts of his servant committed within the scope of the servant's employment and in furtherance of his master's business" under the doctrine of *respondeat superior.*

*Larsen Chelsey Realty Co. v. Larsen*, 232 Conn. 480, 500 (1995). On the other hand, "an employer is not liable for the negligence of its independent contractors" as a general rule.

*See Pelletier v. Sordoni/Skanska Const. Co.*, 264 Conn. 509, 517 (2003). GGP attaches to its motion to dismiss a copy of an agreement purporting to demonstrate that defendants John Doe 1, John Doe 2, and Jane Doe 3 were independent contractors, not employees, of GGP. (ECF No. 45-1 at 5, 192–194.) This exhibit is not a document the Court may consider on a motion to dismiss, however, as the Court is limited to the well-pleaded allegations in Wade's complaint and documents incorporated or relied on therein. The Amended Complaint alleges that these defendants were "security/loss prevention personnel and/or agents" of Sterling and GGP, and asserts claims against GGP based on their role as employees or agents of GGP. (Am. Compl. at ¶ 12); *id.* at ¶¶ 65 (alleging in Count 2 that "the security/loss prevention personnel for Kay Jewelers and GGP, Jane Doe 3, who stopped Plaintiff, pulled him aside and with John Doe 1, along with Police Officer Decker, surrounded Plaintiff ..."), 73 (alleging in Count 3 that the "direct and proximate cause of the injuries and damages suffered by the Plaintiff as hereinafter described were the actions of the Defendants and their agents, servants and/or employees"). Of note, GGP does *not* argue that Wade has insufficiently pleaded the existence of an agency or employee relationship, but in effect argues that Wade's pleading must be read in light of its agreement. Since the Court may not consider the agreement, I must reject GGP's argument and assess the claims against GGP on their merits.

## B. False Imprisonment (Sterling and GGP)

Wade v. Kay Jewelers, Inc., Not Reported in Fed. Supp. (2018)

Case 5:22-cv-01202-MAD-ML    Document 8    Filed 03/28/23    Page 51 of 364

**\*4** "[F]alse imprisonment is the unlawful restraint by one person of the physical liberty of another." *Berry v. Loiseau, 223 Conn. 786, 820 (1992)* (citation omitted). "To prevail on a claim of false imprisonment, the plaintiff must prove that his physical liberty has been restrained by the defendant and that the restraint was against his will, that is, that he did not consent to the restraint or acquiesce in it willingly." *Id.* In addition, "the detention must be wholly unlawful...." *Lo Sacco v. Young, 20 Conn. App. 6, 19 (1989).* "Any period of such restraint, however brief in duration, is sufficient to constitute a basis for liability." *Green v. Donroe, 186 Conn. 265, 267 (1982)* ("The fact that there was no formal arrest of the plaintiff ... and that he remained in the custody of the police for only ten minutes would not necessarily defeat his cause of action for false imprisonment."). However, "[a] person is not liable for false imprisonment unless his act is done for the purpose of imposing a confinement, or with knowledge that such confinement will, to a substantial certainty, result from it." *Rivera v. Double A Transp., Inc., 248 Conn. 21, 31 (1999)* (citing *Donroe, 186 Conn. at 268*). "Nothing less than a rather extreme brand of recklessness will substitute for the standard requirement of intention in false imprisonment cases." *Id.*

### 1. Sterling

Sterling moves to dismiss the false imprisonment claim on the grounds that (1) the amended complaint does not allege that Sterling detained Wade, because the Kay Jewelers Individual Defendants did not call the police or themselves detain Wade; and (2) the amended complaint does not allege that the Kay Jewelers Individual Defendants acted with the requisite intent in misidentifying Wade to mall security. (ECF No. 43 at 27–31.) Wade responds that the amended complaint alleges that Sterling detained Wade because the Mall Security Individual Defendants are Sterling's employees or agents, and in any event the complaint alleges that Kay Jewelers Individual Defendants acted with the requisite intent in identifying Wade to both mall security and the police as a suspect in previous incident of attempted credit card fraud. (ECF No. 46 at 19–21 (citing Am. Compl. at ¶¶ 20–22, 27).)

First, drawing all inferences in Wade's favor, I conclude that the Amended Complaint alleges that Sterling detained Wade. Although the Amended Complaint does not affirmatively allege that the Kay Jewelers Individual Defendants detained Wade, it does allege that the Mall Security Individual

Defendants are employees or agents of Sterling. (*See* Am. Compl. at ¶ 12 (the Mall Security Individual Defendants are "security/loss prevention personnel and/or agents of the Defendants Kay Jewelers and/or GGP....."); *id.* at ¶¶ 24, 25 (identifying Jane Doe 3 and John Doe one as "providing [ ] security/loss prevention services to Kay Jewelers").)[5] The amended complaint alleges that the Mall Security Individual Defendants (specifically Jane Doe 3 and John Doe 1) detained Wade. (Am. Compl. at ¶¶ 23, 44, 49.) The amended complaint thus adequately pleads that Sterling detained Wade.

Second and in any event, the Amended Complaint alleges that the Kay Jewelers Individual Defendants acted "for the purpose of imposing a confinement, or with knowledge that such confinement will, to a substantial certainty, result from it." *Donroe, 186 Conn. at 268*. When all inferences are drawn in Wade's favor, the Amended Complaint alleges that: (1) the Kay Jewelers Individual Defendants called mall security to identify Wade as a suspect who had attempted to commit credit card fraud the previous week (Am. Compl. at ¶¶ 20–22, 35), and mall security called the police (Am. Compl. at ¶¶ 35, 51);[6] (2) a Kay Jewelers employee "directed the security/loss prevention personnel for Kay Jewelers and GGP, Jane Doe 3, who stopped Plaintiff" (Am. Compl. at ¶ 65) and that (3) the Kay Jewelers Defendants "intended for Plaintiff to be stopped or detained" because they "had to know" he would be detained as a result of the police being called. (Am. Compl. at ¶¶ 38–40.) Though allegations (2) and (3) would be conclusory on their own, they are supported by specific acts the Kay Jewelers Individual Defendants took, namely: (4) after leaving Kay Jewelers, defendant Jane Doe 3 informed Wade that one of the Kay Jewelers Individual Defendants had identified him as the suspect (Am. Compl. at ¶¶ 20–22); and (5) after Wade was allegedly confined, Officer Decker told Wade that "a Kay Jeweler employee downstairs told [Officer Decker] that Plaintiff, Wade, was the suspect and that he and others were walking around the mall looking for Plaintiff, Wade, until they found him." (*Id.* at ¶ 27.)[7]

**\*5** *Bryans v. Cossette*, which Sterling relies on, is distinguishable. *No. 3:11-CV-01263 JCH, 2013 WL 4737310 (D. Conn. Sept. 3, 2013).* *Bryans* addressed a motion for summary judgment, not a motion to dismiss. In addition, the undisputed facts there showed that a hospital's medical staff asked its security personnel to stop a patient leaving the hospital, but did *not* ask the police officers who were solely responsible for arresting him to do so. *See* 2013

Wade v. Kay Jewelers, Inc., Not Reported in Fed. Supp. (2018)

Case 5:22-cv-01202-MAD-ML    Document 8    Filed 03/28/23    Page 52 of 364

WL 4737310, at *13 (D. Conn. Sept. 3, 2013). Drawing all inferences in his favor, I conclude that Wade has plausibly alleged that the Kay Jewelers Individual Defendants directed the Mall Security Individual Defendants to stop plaintiff (Am. Compl. ¶¶ 20–22, 65), informed the police that he was the suspect (Am. Compl. ¶ 27), and *both* the Mall Security Individual Defendants and police detained him. (*See* Am. Compl. at ¶ 26.) Accordingly, I deny Sterling's motion to dismiss the false imprisonment count.

### *2. GGP*

GGP argues that the false imprisonment claim against it should be dismissed because Wade fails to plead that the Mall Security Individual Defendants actually confined Wade or possessed the requisite intent to do so. (ECF No. 45-1 at 14.) GGP's first argument rests entirely on admissions in Wade's pre-deposition suit, which the Court may not consider to the extent they contradict the allegations of the complaint. (*Id.*) In any event, those admissions—that Wade was not handcuffed, placed under arrest, or told he could not leave—do not foreclose a false imprisonment claim. *See* ⚑ *Donroe*, 186 Conn. at 267 (formal arrest and lengthy detention not required). Wade's complaint alleges facts showing that the Mall Security Individual Defendants confined him, specifically:

> Jane Doe 3 and John Doe 1 and Police Officer Decker surrounded Plaintiff, with Officer Decker in front facing Plaintiff and Jane Doe 3 on one side of Plaintiff and John Doe 1 on the other side of Plaintiff, confining Plaintiff within a space at Buckland Hills Mall, forcing Plaintiff to stay in the space, from where he could not leave

(Am. Compl. at ¶ 26.) The case GGP cites, *Richardson v. Costco Wholesale Corp.*, also addressed a motion for summary judgment, which the Court granted because the undisputed evidence showed that the plaintiffs knew that they could leave their supposed confinement by exiting through the employee door, notwithstanding the fact it would set off an alarm. *See* ⚑ 169 F. Supp. 2d 56, 61 (D. Conn. 2001).

By contrast, GGP does not point to any allegations in the complaint indicating that Wade's confinement was voluntary.

GGP's second argument about its lack of intent is easily addressed. As discussed above, the complaint alleges that the Mall Security Individual Defendants, along with Officer Decker, confined Wade. Accordingly, Wade has sufficiently alleged that GGP acted with the "purpose of imposing a confinement" on Wade. Accordingly, I will not dismiss the false imprisonment claim against GGP.

### C. Defamation *Per Se* (Sterling and GGP)

"To establish a prima facie case of defamation, the plaintiff must demonstrate that: (1) the defendant published a defamatory statement; (2) the defamatory statement identified the plaintiff to a third person; (3) the defamatory statement was published to a third person; and (4) the plaintiff's reputation suffered injury as a result of the statement."

⚑ *Gambardella v. Apple Health Care, Inc.*, 291 Conn. 620, 627 (2009). For defamation *per se*, "the [defamation] must be one which charges a crime which involves moral turpitude or to which an infamous penalty is attached," in other words, "that the crime be a chargeable offense which is punishable by imprisonment." *Skakel v. Grace*, 5 F. Supp. 3d 199, 206 (D. Conn. 2014) (citation omitted). "In the case of a statement that is defamatory per se, injury to a plaintiff's reputation is conclusively presumed such that a plaintiff need neither plead nor prove it." *Id.* at 207. "Whether a statement is defamatory per se is a question of law for the court." *Id.* (citation omitted). "[T]ruth is an affirmative defense to defamation."

⚑ *Cweklinsky v. Mobil Chemical Co.*, 267 Conn. 210, 228–229 (2004).

**\*6** Sterling first argues that Wade has not alleged any harm to his reputation. (ECF No. 43 at 38.) But the complaint alleges that Sterling made the defamatory statements that Wade had "been robbing [Kay Jewelers store] for three months" and "ATTEMPTED TO ILLEGALLY USE A CREDIT CARD IN [KAY JEWELERS] STORE." (ECF No. 36 at ¶ 73.)[8] Sterling's argument must fail because Wade has alleged defamatory statements accusing him of crimes potentially punishable by imprisonment, *i.e.* larceny or illegal use of a credit card, *see* ⚑ Conn. Gen. Stat. §§ 53a-119, 53a-128c *et seq.*, and thus reputational harm is conclusively presumed.

Case 5:22-cv-01202-MAD-ML   Document 8   Filed 03/28/23   Page 53 of 364

Wade v. Kay Jewelers, Inc., Not Reported in Fed. Supp. (2018)

Sterling next argues that Wade does not allege a defamatory statement was published about him, reasoning that "[c]onfusing an innocent person with a guilty person does not constitute a defamatory statement identifying the innocent person." (ECF No. 43 at 38–39.) While it is true that Wade has not alleged any facts showing that the Kay Jewelers Individual Defendants *lied* in reporting their suspicions, deliberate falsity is not required to prove defamation *per se* where the plaintiff is not a public figure or is not seeking punitive damages. [9] *See* Gambardella, 291 Conn. at 628, 630 (noting that a plaintiff who is a public figure or who is seeking punitive damages must show that the defendant published a defamatory statement with at least "reckless disregard for its truth"). Moreover, Sterling's brief does not adequately argue that Wade failed to adequately plead mental state, because Sterling squarely raised the issue for the first time only on reply. (ECF No. 53 at 6.) [10] *See United States v. Pepin*, 514 F.3d 195, 203 n.13 (2d Cir. 2008) (stating that generally, a court does "not consider issues raised in a reply brief for the first time because if a [party] raises a new argument in a reply brief [the opposing party] may not have an adequate opportunity to respond to it."). Further, none of the cases cited by Sterling stand for the proposition that a defamatory statement about a wrongly identified plaintiff is inactionable, as opposed to statements that do not mention the plaintiff at all. *See Sorensen v. Fayerweather Yacht Club, Inc.*, No. CV136033440S, 2013 WL 6989418, at *10 (Conn. Super. Ct. Dec. 13, 2013) (dismissing defamation claims brought by two plaintiffs where "there are no allegations of defamatory communications made to third parties concerning anyone other than [a third plaintiff]"); *Devone v. Finley*, No. 3:13-CV-00377 CSH, 2014 WL 1153773, at *9 (D. Conn. Mar. 20, 2014) (dismissing defamation claim to the extent the defamatory statements were about plaintiff's son or the police department, not the plaintiff); *Glover v. Glover*, No. CV085025507S, 2011 WL 3211180, at *2 (Conn. Super. Ct. June 22, 2011) (email "to the effect that the author agrees with his sister, that the property should not be sold" did not identify plaintiff). Both allegedly defamatory statements, read in full, do identify *Wade* (albeit not by name) as a suspect in the robberies, credit card fraud, and possible ID theft at the Kay Jewelers Store. (*See* Am. Compl. at ¶¶ 20, 35, 73). Accordingly, the defamatory statements were about Wade.

**\*7** The defamatory statements alleged against GGP, however, were literally true and thus are not actionable. (*See* ECF No. 45-1 at 15.) Wade's defamation count against GGP, read in light of the rest of the complaint, is premised on two statements: (1) that Jane Doe 3 told Wade that

"a Kay Jewelers' employee ... called with a description of Plaintiff, Wade as the one that's been robbing them for three months" (Am. Compl. at ¶¶ 20, 73), and (2) the police were "CALLED BY THE MALL SECURITY BECAUSE A MALE WAS IDENTIFIED BY AN EMPLOYEE OF KAYS JEWELERS AS A SUSPECT WHO ATTEMPTED TO ILLEGALLY USE A CREDIT CARD IN THEIR STORE LAST WEEK AND POSSIBLY ID THEFT." (Am. Compl. at ¶¶ 51, 73). Drawing all inferences in Wade's favor, both statements are true, as these allegations state that the Kay Jewelers Individual Defendants identified Wade to the Mall Security Individual Defendants, who reported to the police the fact of Wade's identification. [11] (*Id.*) Although truth is ordinarily an affirmative defense to a defamation action, I find that the facts Wade alleges show that the statements made by the Mall Security Individual Defendants—allegedly GGP's agents—were true. *Day v. Moscow*, 955 F.2d 807, 811 (2d Cir. 1992) ("[W]hen all relevant facts are shown by the court's own records, of which the court takes notice, the defense may be upheld on a Rule 12(b)(6) motion without requiring an answer."). Accordingly, I DISMISS Wade's defamation *per se* claim against GGP, but Wade may proceed on his claim against Sterling.

### D. 42 U.S.C. § 1981 "Equal Benefits" Claim (Sterling)

42 U.S.C. § 1981 provides:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981. To state a § 1981 claim, "plaintiff must allege facts in support of the following elements: (1) the plaintiff is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and

(3) the discrimination concerned one or more of the activities enumerated in the statute (i.e., make and enforce contracts, sue and be sued, give evidence, etc.)." *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1087 (2d Cir. 1993). When the enumerated activity is plaintiff's deprivation of the "full and equal benefit of all laws and proceedings," plaintiff must (1) allege racial animus; (2) "identify a relevant law or proceeding for the 'security of persons and property;' " and (3) allege "that defendants have deprived them of 'the full and equal benefit' of this law or proceeding." *Phillip v. Univ. of Rochester*, 316 F.3d 291, 298 (2d Cir. 2003) (citing 42 U.S.C. § 1981(a) ).

Sterling argues that Wade's "equal benefits" claim under 42 U.S.C. § 1981 must be dismissed because Wade does not allege specific facts showing racial animus or allege that Sterling deprived him of any law for the security of persons. (ECF No. 43 at 24–31.) Wade responds that he has sufficiently alleged discriminatory intent and that his false imprisonment and defamation *per se* tort claims supply the legal basis for his claim. (ECF No. 46 at 6–15.) Because Wade has alleged that he is member of a racial minority (Am. Comp. at ¶¶ 7, 13), and because I have found Wade has sufficiently alleged the torts of both false imprisonment and defamation *per se* against Sterling, which I assume without deciding supply a sufficient basis to meet the second and third elements of the *Phillips* test, I examine only whether Wade has sufficiently pleaded racial animus. *See* *Bishop v. Best Buy*, Co. Inc., No. 08 CIV. 8427 LBS, 2010 WL 4159566, at *5 (S.D.N.Y. Oct. 13, 2010) (denying motion to dismiss 1981 claim where plaintiff "sufficiently allege[d] the torts of assault and false imprisonment"), *reconsideration on other grounds,* 2011 WL 4011449 (S.D.N.Y. Sept. 8, 2011).

In order to survive a motion to dismiss on a section 1981 claim, a plaintiff must specifically allege the "circumstances giving rise to a plausible inference of racially discriminatory intent." *Yusuf v. Vassar Coll.*, 35 F.3d 709, 713 (2d Cir. 1994). "A plaintiff's 'naked allegation' of racial discrimination on the part of a defendant is too conclusory to survive a motion to dismiss." *Albert v. Carovano*, 851 F.2d 561, 572 (2d Cir. 1988); *see also Fouche v. St. Charles Hosp.*, 64 F. Supp. 3d 452, 457 (E.D.N.Y. 2014) ("[B]ald assertions of discrimination—unsupported by any meaningful comments, actions, or examples of similarly-situated persons outside of the Plaintiff's protected class being

treated differently—are insufficient to survive a motion to dismiss").

**\*8** Wade has made only conclusory allegations concerning the discriminatory intent of the Kay Jewelers Individual Defendants (the only defendants against whom he asserts his § 1981 claim). Wade's allegations of the Kay Jewelers Individual Defendants' racial animus are essentially that (1) "even though [they] were blacks," they identified Wade as the suspect because "they ... saw him as criminal because of the color of his skin and ... Plaintiff fit their idea of a shoplifter," and (2) they "describ[ed] the shoplifter who attempted to illegally use a credit card and who has been robbing Kay Jewelers for three months, as [Wade], the description consisting solely of Plaintiff, himself, a black, African-American, male, constitute racial profiling and intent to discriminate." (ECF No. 36 at ¶¶ 41, 57 (alterations omitted).) These allegations are not sufficient to plead racial animus, because they simply recast *Wade's belief* that the Kay Jewelers Individual Defendants singled him out because of his race. *See Morales v. City of New York*, 752 F.3d 234, 238 (2d Cir. 2014) (affirming dismissal of § 1981 claim containing only "conclusory allegations that the defendants violated [plaintiff's] rights 'because of their discriminatory intent' and 'based on his race and color.' "). Wade alleges no specific facts to support this conclusion, such as "meaningful comments, actions, or examples of similarly-situated persons outside of the Plaintiff's protected class being treated differently." *Fouche*, 64 F. Supp. 3d at 457; *cf.* *Bishop*, 2010 WL 4159566, at *6 (denying motion to dismiss on equal benefit claim where plaintiff alleged that Caucasian and non-African American were not subjected to discriminatory treatment and cited specific, racially-motivated comments by defendants). Nor does he allege anything the Kay Jewelers Individual Defendants did or said that suggests that they "saw him as a criminal because of the color of his skin" or that he "fit their idea of a shoplifter." Moreover, even his conclusory allegations are expressly contradicted by other allegations that suggest that the Kay Jewelers Individual Defendants identified Wade because he fit the description of a particular suspect, not because of his race. (*See* Am. Compl. ¶¶ 20, 22, 42.)

Wade also points to his allegation that "Kay Jewelers' top management practice and believe in discrimination (see, e.g., Jock *et al. v. Sterling Jewelers Inc.*, before the American Arbitration Association), creating a corporate culture where Kay Jewelers store employees routinely and

disproportionately discriminate leading to racial profiling of African-Americans and people of color for suspicion of criminal activity." (ECF No. 46 at 9 (citing Am. Compl. at ¶ 52).) This allegation fares no better, because, in addition to pleading a vague "corporate culture" of racial discrimination without specific examples, Wade does not supply any facts alleging a causal link between the alleged "corporate culture" and the specific discriminatory actions taken by the Kay Jewelers Individual Defendants. *See Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 75 (2d Cir. 2000) (citation omitted) ("[I]n order to make out a claim for individual liability under Section 1981, a plaintiff must demonstrate 'some affirmative link to causally connect the actor with the discriminatory action.' "). [12]

Wade cites *Martin v. J.C. Penney Corp.*, 28 F. Supp. 3d 153 (E.D.N.Y. 2014), and *Phillip*, 316 F.3d 291, in support of his argument that the amended complaint sufficiently pleads racial animus. (ECF No. 46 at 7–8.) *Martin* involved a summary judgment motion, and the Court concluded that the jury could infer that "defendants' surveillance of plaintiffs and their alleged failure to conform with store policy" prior to detaining a suspected shoplifter could support a finding of discriminatory intent. *Id.* at 157–58. Even if *Martin* had applicability to pleading standards, the Kay Jewelers Individual Defendants are not alleged to have surveilled Wade, and Wade does not allege any policy that the Kay Jewelers Individual Defendants failed to follow. Moreover, *Phillip*, though pre-*Twombly*, actually supports my conclusion that Wade's § 1981 claim fails. There, the Second Circuit vacated a grant of a motion to dismiss where the plaintiff had specifically alleged that "the plaintiffs were singled out of a group that apparently also contained non-minority students." *Phillip*, 316 F.3d at 299. As discussed above, Wade makes no allegations at all that he was singled out for disparate treatment relative to shoppers of other racial groups.

Accordingly, Wade has not sufficiently pleaded racial animus, and so his "equal benefit" claim against Sterling is DISMISSED.

### E. IIED (Sterling)

To prevail on a claim for intentional infliction of emotional distress under Connecticut law, a plaintiff must show "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." *Appleton v. Bd. of Educ. of Town of Stonington*, 254 Conn. 205, 210 (2000). Sterling argues that the Amended Complaint does not allege the Sterling employees' intent or allege that Sterling's employees committed extreme and outrageous conduct by calling mall security. (ECF No. 43 at 34–36; ECF No. 53 at 6–7.) Wade argues that the amended complaint adequately pleads intent, and submitting a false police report constitutes extreme and outrageous conduct. (ECF No. 46 at 25–28.)

**\*9** Whether a defendant's conduct is sufficient to satisfy the requirement that it be extreme and outrageous is initially a question for the court to determine. *See Appleton*, 254 Conn. at 210. Only where reasonable minds disagree does it become an issue for the jury. *Id.* The general rule is that the conduct must "be[ ] so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* at 211.

Connecticut courts have held that a report to the police typically does not constitute the type of "extreme and outrageous" conduct necessary to support a claim for intentional infliction of emotional distress. *See Crocco v. Advance Stores Co. Inc.*, 421 F. Supp. 2d 485, 504 (D. Conn. 2006) (collecting cases*); see Pantaleo v. Ravski*, No. CV 920326931, 1997 WL 94103, at \*5 (Sup. Ct. Feb. 14, 1997) ("[C]ourts in Connecticut and elsewhere have concluded that calling the police to report suspected wrongdoing normally does not constitute 'extreme and outrageous' conduct sufficient to impose liability for intentional infliction of emotional distress."). There is of course no bright line rule, and "the court must look to the specific facts and circumstances of each case in making its decisions." *Menon v. Frinton*, 170 F. Supp. 2d 190, 198 (D. Conn. 2001). Here, all the complaint alleges is that the Kay Jewelers Individual Defendants made a report to mall security that they believed Wade was the individual who they suspected committed various crimes in their store and directed the police to Wade. (*See, e.g.*, Am. Compl. at ¶¶ 20, 27, 35.) As discussed above, there are no facts pled to suggest that the Kay Jewelers Individual Defendants deliberately made

Wade v. Kay Jewelers, Inc., Not Reported in Fed. Supp. (2018)

Case 5:22-cv-01202-MAD-ML    Document 8    Filed 03/28/23    Page 56 of 364

false statements to anyone to induce Wade's detention or arrest. Even if their report was incorrect and negligently made, that conduct was not so extreme or outrageous to offend societal norms. Stores must regularly report suspected shoplifters or other crimes, and no arrest or other action against Wade allegedly resulted from the report. *See Bozelko v. Milici*, No. NNHCV115033844S, 2013 WL 1277295, at *14 (Conn. Super. Ct. Mar. 11, 2013) (collecting cases for the proposition that "[w]hether such allegations are sufficiently extreme and outrageous to survive a motion to strike depends, at least in part, on the seriousness of the offense reported to the police"); *Bremmer-McLain v. City of New London*, No. CV115014142S, 2012 WL 2477921, at *10 (Conn. Super. Ct. June 1, 2012) (granting motion to strike where plaintiffs did not allege facts showing that the "report to the police was false and misleading" or "that either plaintiff was arrested or that any other action was taken as a result of the false police report."), *aff'd*, 143 Conn. App. 904 (2013).

The two cases Wade cites in his complaint and opposition are not to the contrary. (Am. Compl. at 15 n.3; ECF No. 46 at 27–28.) In *Crocco*, the Court found that reasonable minds could differ on whether the undisputed evidence that defendants had "*knowingly* report[ed] false information to [the police] so as to give the impression that [plaintiff] was stalking or threatening them would constitute extreme and outrageous conduct" where plaintiff was ultimately arrested. ⚠️*Crocco*, 421 F. Supp. 2d at 505 (emphasis added). In *Jezierny*, the defendant made false harassment report to the police "to achieve a vindictive goal," *i.e.* to get plaintiff arrested and criminally prosecuted for a dispute over a chicken coop. 🚩2005 WL 2496525, at *3 (Conn. Super. Ct. Aug. 24, 2005). Here, Wade has not alleged that the Kay Jewelers knowingly made a false police report, or that any arrest or prosecution occurred as a result of that report. Because Wade does not allege outrageous conduct, I grant the motion to dismiss his IIED claim.

### F. NIED (Sterling and GGP)

**\*10**  To show negligent infliction of emotion distress under Connecticut law, plaintiff must prove "(1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's distress." 🚩*Carrol v. Allstate Ins. Co.*, 262 Conn. 433, 444 (2003). "The foreseeability requirement in a negligent infliction of

emotional distress claim is more specific than the standard negligence requirement that an actor should have foreseen that his tortious conduct was likely to cause harm." *Stancuna v. Schaffer*, 122 Conn. App. 484, 490 (2010). "In order to state a claim for negligent infliction of emotional distress, the plaintiff must plead that the actor should have foreseen that her behavior would likely cause harm of a specific nature, i.e., emotional distress likely to lead to illness or bodily harm." *Id.*

Both Sterling and GGP argue that Wade does not allege that they should have foreseen that their conduct was likely to cause emotional distress severe enough that it might result in illness or bodily harm. (ECF No. 43 at 43; ECF No. 45-1 at 17–18.) [13] Wade responds that the complaint alleges that his emotional distress was foreseeable because both the Kay Jewelers Individual Defendants and Mall Security Individual Defendants had to know that the police would come when they reported his supposed crimes (ECF No. 46 at 29; ECF No. 50 at 16; Am. Compl. at ¶¶ 36, 38, 40; *see also id.* at ¶¶ 27, 39, 40, 44, 46–49.)

Although the Court acknowledges that Wade's allegations are thin, they sufficiently allege that it was foreseeable that the defendants' conduct would cause Wade emotional distress likely to lead to illness or bodily harm. Wade has alleged (1) that both the Kay Jewelers Individual Defendants and the Mall Security Individual Defendants knew or should have known that Wade's detention was likely to result from their conduct (Am. Compl. at ¶¶ 38–40); (2) that at the time of his detention, "[Wade] was shaking, shaking the whole entire time. Anxiety was [sic] take over. [Wade] was so shaken...." (*id.* at ¶ 49); (3) that Wade has "been scarred" and "look[s] [back at the incident] at every day," (*id.* at ¶ 48); and (4) that Wade suffers as a result of the incident, among other things, "embarrassment, anxiety, stress, flashbacks, anger and emotional distress" requiring medical attention. (*Id.* at ¶¶ 88, 90.) In combination with Wade's allegation that the defendants' conduct "was reasonably foreseeable to cause emotional distress and in fact caused emotional distress to [Wade]," (*id.* at ¶ 86), I conclude that Wade has sufficiently pleaded that defendants should have foreseen that their conduct was likely to cause emotional distress severe enough that it might result in illness or bodily harm.

I therefore reject Sterling and GGP's arguments to dismiss the count for negligent infliction of emotional distress against them.

Case 5:22-cv-01202-MAD-ML    Document 8    Filed 03/28/23    Page 57 of 364

Wade v. Kay Jewelers, Inc., Not Reported in Fed. Supp. (2018)

### G. Negligent Supervision (Sterling and GGP)

To state a negligent supervision claim under Connecticut law, "plaintiff must plead and prove that she suffered an injury due to the defendant's failure to supervise an employee whom the defendant had [a] duty to supervise." 🗁 *Brooks v. Sweeney*, 299 Conn. 196, 209 n.12 (2010) (citing 🗁 *Roberts v. Circuit–Wise, Inc.*, 142 F. Supp. 2d 211, 214 (D. Conn. 2001) ). "Duty is a legal conclusion about relationships between individuals, made after the fact, and [is] imperative to a negligence cause of action." 🗁 *Doe v. Saint Francis Hosp. & Med. Center*, 309 Conn. 146, 174 (2013) (citation omitted). The "general rule" is that one has "no legal obligation to protect another," but an exception "may arise when the defendant's own conduct creates or increases the foreseeable risk that such other person will be harmed by the conduct of a third party." *Id.*

**\*11** Sterling argues that the amended complaint does not allege any facts to show that Sterling knew or reasonably should have known of any of its employees' propensity to engage in tortious conduct. (ECF No. 43 at 39–40; *see also* ECF No. 54 at 8 (GGP raises same argument on reply).) Wade responds that the Amended Complaint alleges that Sterling Jewelers "created a corporate culture where Kay Jewelers store employees routinely and disproportionately discriminate leading to racial profiling of African-Americans and people of color for suspicion of criminal activity." (ECF No. 46 at 32 (citing Am. Compl. at ¶ 51).) Accordingly, Wade argues that "Sterling Jewelers knew or reasonably should have known of the employee's propensity to engage in that type of tortious conduct." (*Id.*) [14]

Both parties are mistaken that Wade must plead that the defendants knew or should have known of an employee's "propensity" to engage in that type of tortious conduct to establish that such conduct was foreseeable, and thus that the defendants had a duty to prevent it. In *Saint Francis Hosp. & Med. Ctr.*, the Connecticut Supreme Court held that the trial court did not need to give a jury instruction on propensity in a negligent supervision claim against an employer because "[t]he criminal misconduct of a third party may be foreseeable under the facts of a particular case ... without a showing that the defendant had such actual or constructive knowledge of the third party's criminal propensity." 🗁 309 Conn. at 172. In other words, "proof of actual or constructive knowledge of propensity is but one way to establish that the criminal misconduct of the third party was foreseeable." 🗁 *Id.* at 173. Accordingly, Wade did not need to plead that the defendants knew or should have known its employees had a "propensity" for the type of tortious conduct alleged to establish defendants' duty to prevent such conduct.

For its part, GGP argues that the Mall Security Individual Defendants are not GGP employees, and both Sterling and GGP also assert that Wade has not adequately pleaded that their employees committed any tortious conduct. (ECF No. 43 at 45; ECF No. 45 at 22–23.) Because I have already concluded that Wade has pleaded that the Mall Security Individual Defendants were the "security/loss prevention personnel and/or agents" of GGP (Am. Compl. ¶ 12), and that Wade states false imprisonment and NIED claims against both defendants, I reject these arguments.

### H. PSC's Third-Party Motion to Dismiss

GGP impleaded PSC as the alleged employer of the Mall Security Individual Defendants and asserted claims for negligence, common law indemnification, and contractual indemnification. (ECF No. 57.) PSC moves to dismiss the negligence and common law indemnification counts for failure to state a claim. (ECF No. 70.)

First, PSC argues that the negligence count does not state a claim because that count asserts that PSC is liable to *Wade*, not GGP. (ECF No. 70-1 at 4; *see also* ECF No. 57 at ¶¶ 10–11 (alleging that "if the plaintiff [Wade]" was harmed, "it was due to the negligence ... of PSC" and any losses were "directly and caused proximately caused" by PSC).) I agree. While Rule 14 authorizes third-party complaints where the "third party's liability must be dependent upon the outcome of the main claim or the third party must be 'secondarily liable to the defending party,' " such claims must still assert that the third-party defendant is liable to the *third-party plaintiff*. *See* 🗁 *Hopkins v. Kawasaki Rail Car, Inc.*, No. 3:17-CV-839 (CSH), 2017 WL 3715247, at \*10 (D. Conn. Aug. 28, 2017) (asserting claims for indemnification, contribution, and apportionment to the third-party plaintiff); 🗁 *Am. Nat. Fire Ins. Co. v. A. Secondino & Sons*, No. CIV.A. 3:92-629(JAC), 1995 WL 253085, at \*3 (D. Conn. Apr. 28, 1995) ("[A] third-party plaintiff seeking to implead a third party must allege that a third-party defendant is liable to the third-party plaintiff."). Because GGP asserts a direct negligence claim against PSC, but does not actually assert that PSC is liable to GGP, GGP fails to state a claim. *See, e.g.,* 🗁 *Toberman v. Copas*, 800 F. Supp. 1239, 1242 (M.D. Pa. 1992) ("A defendant sued for negligence, for example, cannot implead a third

party whose negligence was totally responsible for plaintiff's injury. When a third party's conduct furnishes a complete defense against the defendant's liability, the defendant may raise that conduct defensively in his answer but may not use it as a foundation for impleader." (internal quotation marks and citation omitted).). GGP's negligence claim is therefore dismissed.

**\*12** Second, PSC argues that GGP's common law indemnification claim should be dismissed because the third party complaint does not contain any allegation about exclusive control by PSC. (ECF No. 70-1 at 3.) To assert a common law indemnification claim under Connecticut law, a defendant/third-party plaintiff must allege that: "(1) the party against whom the indemnification is sought was negligent; (2) that party's active negligence, rather than the defendant's own passive negligence, was the direct, immediate cause of the accident and the resulting injuries and death; (3) the other party was in control of the situation to the exclusion of the defendant seeking reimbursement; and (4) the defendant did not know of the other party's negligence, had no reason to anticipate it, and reasonably could rely on the other party not to be negligent." *Smith v. City of New Haven*, 258 Conn. 56, 66 (2001) (citing *Kaplan v. Merberg Wrecking Corp.*, 152 Conn. 405, 416 (1965) ). "While the question of exclusive control is ordinarily a question of fact to be determined by a jury," a claim may be dismissed as a matter of law where the allegations, evaluated against the backdrop of the plaintiff's complaint, "could not result in a jury finding that the third-party defendants were in exclusive control over the situation." *Pennsylvania Mfrs. Indem. Co. v. Cintas Fire Prot. & Fire Sys. of Springfield, CT*, No. 3:11-CV-650 VLB, 2012 WL 3779140, at \*5 (D. Conn. Aug. 30, 2012) (citations omitted).

This is not such a case. The Third-Party Complaint alleges that each count of Wade's complaint "alleges acts or omissions of security officers" who were "employed by, trained by, and worked at the direction of PSC." (ECF No. 57 at ¶¶ 16, 17.) If proven, the allegations in GGP's third-party complaint could result in a jury finding that PSC, not GGP, was in exclusive control of the Mall Security Individual Defendants who committed the tortious conduct

alleged in the Amended Complaint. I further agree with GGP that this case is distinguishable from *Pennsylvania Mfrs. Indem. Co. v. Cintas Fire Prot. & Fire Sys. of Springfield*. In that case, the court dismissed an indemnification claim against the installer of a deficient sprinkler system where parties did not dispute that the installer had no contact with the sprinkler system for almost a decade, and the plaintiff's negligence claims were premised on acts by the third-party plaintiff that would be inconsistent with the installer's exclusive control. *Pennsylvania Mfrs. Indem. Co.*, No. 3:11-CV-650 VLB, 2012 WL 3779140, at \*6 (D. Conn. Aug. 30, 2012). Here, the parties actively dispute PSC's role, and Wade's claims are not premised on any specific conduct by GGP that is inconsistent with PSC's exclusive control—in other words, Wade's proving his allegations that the Mall Security Individual Defendants falsely imprisoned him would not necessarily preclude a finding that PSC had exclusive control of them. (*See* Am. Compl. at ¶ 12 (alleging only that the Mall Security Individual Defendants were "security/loss prevention personnel and/or agents of ... GGP") ). I therefore deny PSC's motion to dismiss as to this count.

## IV. CONCLUSION

For the foregoing reasons, Sterling's (ECF No. 42) and GGP's (ECF No. 45) motions to dismiss the amended complaint (ECF No. 36) are GRANTED in part and DENIED in part.

The claims for violation of 42 U.S.C. § 1981 (Count One) and intentional infliction of emotional distress (Count Four) are DISMISSED in full. The defamation *per se* claim against GGP (Count Three) is DISMISSED. In addition, PSC's motion to dismiss the third-party complaint is GRANTED in part and DENIED in part. (ECF No. 70.) GGP's negligence claim (Count One) against PSC is DISMISSED. Finally, the Clerk is directed to terminate Kay Jewelers, Inc. as a defendant.

IT IS SO ORDERED.

## All Citations

Not Reported in Fed. Supp., 2018 WL 4440532

## Footnotes

**Wade v. Kay Jewelers, Inc.**, Not Reported in Fed. Supp. (2018)

Case 5:22-cv-01202-MAD-ML    Document 8    Filed 03/28/23    Page 59 of 364

1      Sterling has repeatedly asserted that there is no such entity as "Kay Jewelers, Inc.," which is simply a trade name for Sterling. The Amended Complaint likewise alleges that Kay Jewelers, Inc. is a "non-existent" entity (ECF No. 36 at ¶ 9). Accordingly, the Clerk is directed to terminate Kay Jewelers, Inc. as a defendant.

2      For ease of reference, I refer to defendants Jane Doe 1 and Jane Doe 2 as the "Kay Jewelers Individual Defendants" and defendants Jane Doe 3, John Doe 1, and John Doe 2 as the "Mall Security Individual Defendants." (Am. Compl. at ¶¶ 11–12, 24–25.)

3      I also decline that invitation because the plaintiff had not had a full opportunity to conduct discovery when Sterling's motion was filed. (*See* Fed. R. Civ. P. 56(d); *see* ECF Nos. 48, 51 (listing necessary discovery to oppose summary judgment motion).)

4      GGP also argues that the negligent supervision claim (Count 6) should be dismissed on similar grounds, which I address in the discussion of that claim. (ECF No. 45 at 6.)

5      Sterling argues that Wade conceded in his pre-suit deposition that none of individuals involved in detaining him worked for Kay Jewelers, but as discussed above the Court may not use the transcript to contravene Wade's complaint. (ECF No. 53 at 7.)

6      Although some allegations imply that a Kay Jewelers Individual Defendant called the police (Am. Comp. at ¶¶ 38–40), others contradict that assertion and state that mall security called. (Am. Compl. at ¶¶ 20, 35.) Moreover, these particular allegations (Am. Compl. at ¶¶ 38–40) quote Wade's testimony, which he acknowledges is based exclusively on the police report of the incident. (*See* ECF No. 43-1, Wade Tr. 27:2– 29:23.) The police report, which Wade's amended complaint adopts, states that the police were "CALLED BY THE MALL SECURITY." (Am. Compl. at ¶ 35.) Accordingly, I need not accept these particular allegations as true. *See* In re Livent, Inc. Noteholders Sec. Litig., 151 F. Supp. 2d 371, 405–06 (S.D.N.Y. 2001) ("[A] court need not feel constrained to accept as truth conflicting pleadings that ... are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely.").

7      Wade also argues in his opposition that the Kay Jewelers Individual Defendants "directed the police to find and stop or detain the Plaintiff," but this statement is not supported by the cited portion of the complaint. (ECF No. 46 at 21.)

8      The Court notes that this paragraph selectively edits the statement provided in full elsewhere in the complaint, but the distinction does not matter for these purposes.

9      Thus, while the lack of allegations suggesting deliberate falsity or reckless disregard forecloses the plaintiff's request for punitive damages (*see* Am. Compl. at 17, ¶ 3), it does not defeat his claim altogether.

10     I do not find that Sterling raised this argument in response to Wade's opposition, and it clearly differs from the "statements *about* Wade" argument raised in Sterling's opening brief. (ECF No. 43 at 39–40.)

11     Jane Doe 3 made the first statement to Wade, not a third party, and so the defamation claim against GGP based on that statement fails on this ground too.

12     The cited arbitration also appears to concern discrimination on the basis of gender, not race. *See* Jock v. Sterling Jewelers Inc., 284 F. Supp. 3d 566, 568 (S.D.N.Y. 2018) (noting allegations that "Sterling discriminated against them in pay and promotion on the basis of their gender").

13     Sterling makes additional arguments that Wade does not allege the Kay Jeweler Individual Defendants' conduct created an "unreasonable risk" of harm or that such conduct caused Wade's injuries, but such arguments appear to be premised on Wade's deposition admissions. (*See* ECF No. 43 at 43.) GGP similarly

argues that Wade's reaction was "unreasonable" in light of the Mall Security Individual Defendants' good faith conduct, but in light of Wade's specific pleadings about the reasonable foreseeability of severe emotional distress discussed below, it would be premature to decide this argument on a motion to dismiss. (ECF No. 45-1 at 22.)

14    Sterling also argues that the amended complaint does not allege any facts to show that Sterling inadequately supervised its employees, but does not press this argument on reply (ECF No. 53 at 9–10). In any event, notwithstanding Wade's conclusory "corporate culture" allegation, the amended complaint does plausibly allege that defendants failed to adequately train or supervise its employees on how to prevent "targeting African-American or people of color ... for suspected criminal activity" or falsely accusing, reporting to law enforcement, or detaining customers for shoplifting, credit card fraud, or other criminal activity. (*See* Am. Compl. at ¶¶ 53, 92, 93.)

---

**End of Document**                           © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 3936925

Only the Westlaw citation is currently available.

United States District Court, D. Connecticut.

Josephine MILLER, Plaintiff,

v.

BRIDGEPORT BOARD OF EDUCATION

and Mark Anastasi, Defendants.

Civil Action No. 3:12–CV–01287 (VLB).

|

July 30, 2013.

**Attorneys and Law Firms**

Josephine S. Miller, East Hartford, CT, for Plaintiff.

Betsy Edwards, Bridgeport, CT, for Defendants.

***MEMORANDUM OF DECISION GRANTING
DEFENDANTS' MOTION TO DISMISS***

*[Dkt. # 15]*

VANESSA L. BRYANT, District Judge.

### I. *Introduction*

**\*1** Plaintiff Josephine Miller ("Miller"), an African–American attorney licensed in Connecticut, brings this action for racial discrimination in the making and enforcement of contracts under 🚩 42 U .S.C § 1981 against Defendants Bridgeport Board of Education (the "Board") and Mark Anastasi ("Anastasi"), the City Attorney for the City of Bridgeport, in his official and individual capacities. Defendants have moved to dismiss pursuant to 🚩 Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief may be granted. For the reasons that follow, Defendants' Motion to Dismiss is GRANTED.

### II. *Factual Background*

The following facts are taken from Plaintiff's complaint. Plaintiff's action arises from her representation of Andrew Cimmino, an employee of the Board, in a civil action filed in 2006 in the United States District Court for the District of Connecticut, captioned *Lyddy, et al. v. Andrew Cimmino, et al.,* No. 3:06cv01420 (WWE). [Dkt. 1, Compl. ¶ 4]. Plaintiff

alleges that Cimmino, a defendant in the *Lyddy* action, was entitled to a "defense and indemnity by the Bridgeport Board of Education" pursuant to Connecticut General Statute § 7–101a. [Dkt. 1, Compl. ¶ 5]. From the outset of the litigation in 2006 through February 2010, Plaintiff alleges that Cimmino selected and was represented by an attorney whom the Board compensated for legal services provided pursuant to Conn. Gen.Stat. § 7–101a. [Dkt. 1, Compl. ¶¶ 6–7].

On February 12, 2010, Plaintiff entered an appearance in the above litigation at Cimmino's request and on his behalf "in lieu of the appearance of Cimmino's prior attorney," and performed legal services for Cimmino until at least August 31, 2012, the date of the complaint in the present action. [*Id.* at ¶¶ 8, 11]. Prior to her appearance on Cimmino's behalf, Plaintiff "inquired of Defendant Anastasi [the City Attorney for the city of Bridgeport] if there was any requirement she needed to fulfill in order to assume the defense of Cimmino." [*Id.* at ¶ 9]. Miller alleges that "[a]t no time did Anastasi inform Plaintiff of any reason why she was prohibited from assuming the defense of Cimmino, nor any other impediment to her providing legal services." [*Id.* at ¶ 10]. Miller does not allege that Anastasi acquiesced to her representation of Cimmino. In addition, she does not allege that she sent a letter of representation to Anastasi delineating the scope of the engagement and the basis for calculating or the amount of fees she would charge. Finally, she does not allege that she received a countersigned letter of representation from Anastasi.

On March 31, April 30, and May 31, 2010, Plaintiff submitted invoices to the Board for legal services performed representing Cimmino, but the Board "has failed and refused" to pay Plaintiff for the "valuable legal services performed." [*Id.* at ¶¶ 13–14]. Plaintiff alleges that the Defendants "have paid Caucasian attorneys for the legal services performed by them, unlike [their] refusal to pay for such services performed by Plaintiff," thereby depriving her of "the same right to make and enforce contracts as is enjoyed by white citizens." [*Id.* at ¶¶ 15, 16].

**\*2** Plaintiff has brought two counts alleging that the Defendants have racially discriminated against her in the making and enforcing of contracts in violation of 🚩 42 U.S.C. § 1981: the first against the Board and Anastasi in his official capacity, and the second against Anastasi in his individual capacity. Currently pending before the Court is Defendants' Motion to Dismiss both counts.

### III. *Standard of Review*

" 'To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.' " *Sarmiento v. U.S.,* 678 F.3d 147 (2d Cir.2012) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)). While Rule 8 does not require detailed factual allegations, "[a] pleading that offers 'labels and conclusions' or 'formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s] devoid of 'further factual enhancement.' " *Iqbal,* 556 U.S. at 678 (citations and internal quotations omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.' " *Id.* (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 557, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (internal citations omitted).

In considering a motion to dismiss for failure to state a claim, the Court should follow a "two-pronged approach" to evaluate the sufficiency of the complaint. *Hayden v. Paterson,* 594 F.3d 150, 161 (2d Cir.2010). "A court 'can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.' " *Id.* (quoting *Iqbal,* 556 U.S. at 679). "At the second step, a court should determine whether the 'well-pleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.' " *Id .* (quoting *Iqbal,* 556 U.S. at 679). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal,* 556 U.S. at 678 (internal quotations omitted).

In general, the Court's review on a motion to dismiss pursuant to Rule 12(b)(6) "is limited to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated by reference." *McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 191 (2d Cir.2007). The Court may also consider "matters of which judicial notice may be taken" and "documents

either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.,* 987 F.2d 142, 150 (2d Cir.1993); *Patrowicz v. Transamerica HomeFirst, Inc.,* 359 F.Supp.2d 140, 144 (D.Conn.2005) (MRK).

### IV. *Discussion*

**\*3** Plaintiff alleges two counts of discrimination in the making and enforcement of contracts under 42 U.S.C. § 1981. Defendants contend that Plaintiff's complaint must fail because she has failed to plead particularized facts sufficient to establish that the Defendants engaged in any discriminatory conduct or had an intent to discriminate against her on the basis of race, or that the alleged discrimination concerned the making or enforcing of a contract cognizable under § 1981. Plaintiff counters that Connecticut General Statute § 7–101a, which provides for a municipality's indemnification of the legal costs associated with certain actions brought against its officers or employees, forms the basis of a contract between her and the municipality and on which her § 1981 action is based, and that she has sufficiently pled discrimination in the making or enforcement of that contract.

42 U.S.C. § 1981 provides in relevant part that "[a]ll persons within the jurisdiction of the United States shall have the same right in every state and Territory to make and enforce contracts ... as is enjoyed by white citizens." 42 U.S.C. § 1981(a). To successfully plead a § 1981 claim, a plaintiff must show: "(1) that she is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) that the discrimination concerned one or more of the activities enumerated in § 1981." *Broich v. Inc. Vill. of Southampton,* 462 F. App'x 39, 41–42 (2d Cir.2012) cert. denied, ––– U.S. ––––, 133 S.Ct. 527, 184 L.Ed.2d 339 (2012) (quoting *Lauture v. Int'l Bus. Machines Corp.,* 216 F.3d 258, 261 (2d Cir.2000)); *see also Morris v. Yale Univ. Sch. of Med.,* 477 F.Supp.2d 450, 458 (D.Conn.2007) (same). Here, Plaintiff has established the first element of her § 1981 claim as it is not disputed that she is a member of a racial minority. As Plaintiff concedes that her § 1981 claim rests only on her allegedly impaired ability to make and enforce contracts (*see* Dkt. 16, p. 6), the Court now examines whether Plaintiff has met the second and third elements of her claim by

successfully alleging intentional racial discrimination in the making or enforcement of a contract.

### a. 🚩 *42 U.S.C. § 1981: Intent to Discriminate*

"Essential to an action under 🚩 Section 1981 are allegations that the defendants' acts were purposefully discriminatory and racially motivated." *Albert v. Carovano,* 851 F.2d 561, 571 (2d Cir.1988); *see also Gen. Bldg. Contractors Ass'n, Inc. v. Penn.,* 458 U.S. 375, 391, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982) (🚩 section 1981 can be violated only by purposeful discrimination). "In order to survive a motion to dismiss, the plaintiff must specifically allege the events claimed to constitute intentional discrimination as well as circumstances giving rise to a plausible inference of racially discriminatory intent." *Yusuf v. Vassar Coll.,* 35 F.3d 709, 713 (2d Cir.1994); *Timmons v. City of Hartford,* 283 F.Supp.2d 712, 717 (D.Conn.2003) (AWT) (quoting same); *Evans–Gadsden v. Bernstein Litowitz Berger & Grossman, LLP,* 332 F.Supp.2d 592, 596 (S.D.N.Y.2004) (same). "[A] complaint consisting of nothing more than naked assertions, and setting forth no facts upon which a court could find a violation of the Civil Rights Acts, fails to state a claim under 🚩 Rule 12(b)(6)." *Yusuf,* 35 F.3d at 713 (citing *Martin v. N.Y. State Dep't of Mental Hygiene,* 588 F.2d 371, 372 (2d Cir.1978)); *Timmons,* 283 F.Supp. at 717 (same); *Evans–Gadsden,* 332 F.Supp.2d at 596. Further, to state a claim for individual liability under § 1981, a plaintiff must allege a specific instance of racial discrimination and also "demonstrate some affirmative link to causally connect the actor with the discriminatory action." *Whidbee v. Garzarelli Food Specialties, Inc.,* 223 F.3d 62, 75 (2d Cir.2000); *Patterson v. Cnty. of Oneida, N.Y.,* 375 F.3d 206, 229 (2d Cir.2004) (same). Individual liability under 🚩 § 1981 must be predicated on the actor's personal involvement. *Id.*

**\*4** Here, the Plaintiff has not pled facts sufficient to allege that her race was the reason motivating Defendants' conduct. She has alleged that Cimmino chose an attorney who Defendants paid for his services, and who Cimmino then chose to replace with the Plaintiff, who the Defendants have subsequently not paid. Although Plaintiff alleges that Anastasi did not inform her of any reason why she could not assume Cimmino's defense or any impediment to her providing him with legal services, she has failed to connect either Anastasi's alleged position or the Board's failure to pay her with any racially motivated intent. Instead, Plaintiff simply notes that the Defendants "have paid Caucasian attorneys" for legal services performed and also paid Cimmino's former attorney (whose race does not appear in the complaint)[1] but have not paid her. Yet Plaintiff has not alleged that Anastasi or the Board hired or retained her to perform legal services on their behalf or promised to pay her for those services such that she would be similarly situated to Cimmino's former attorney or to the other unnamed Caucasian attorneys she cites without further reference, nor has she alleged that the Board was aware of any conversation that Anastasi allegedly had with the Plaintiff. Further, nowhere in the complaint does Plaintiff allege that either Anastasi (whose race Plaintiff fails to note) or the Board were *aware* of her race such that they could make decisions based upon it. Even had Plaintiff included the details of Cimmino's original attorney's race, the Court notes that the mere fact that this attorney was Caucasian and the Plaintiff is African American is insufficiently particularized to establish that race was a substantial factor in the Defendants' failure to pay her. *See Rivera v. Metro. Transit Auth.,* 750 F.Supp.2d 456, 461–62 (S.D.N.Y.2010) ("The unstated premise of [plaintiff's] argument is that anything unwelcome that befalls any person who is an identifiable member of a minority group probably occurs because the individual is a member of that group. While racism and all its manifestations are deplorable, the inference that it is present whenever something unwelcome happens to a member of an identifiable minority group is not rational. There is no evidence that anything that any defendant may have done was motivated, even in part, by an intention to discriminate on the basis of race.").

In sum, Plaintiff's failure to assert any particularized facts from which the Court could conclude that the Board's failure to compensate her was due to race and not a myriad of other reasons lacks facial plausibility pursuant to the pleading standard articulated in *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). She thus may not prevail on the second element of her 🚩 § 1981 claim. The court's analysis in *Yusuf v. Vassar Coll.,* 35 F.3d 709 (2d Cir.1994) is instructive. In that case Yusuf, an international student, alleged that he was racially discriminated against

by way of the discipline imposed upon him for allegedly sexually harassing his Caucasian roommate's girlfriend. The Second Circuit held that a plaintiff alleging a § 1981 claim must do more than recite conclusory assertions. Rather, a plaintiff must specifically allege events claimed to constitute intentional discrimination, which the plaintiff had failed to do. Yusuf's Caucasian roommate physically assaulted Yusuf without provocation, for which the roommate was arrested and charged with intoxication and battery, and as a result of which the college scheduled a disciplinary hearing. Yusuf's roommate and the roommate's girlfriend attempted to dissuade Yusuf from pressing charges with either the local authorities or with the college and, as a result, Yusuf agreed to drop all charges if his roommate would pay Yusuf's medical expenses. The roommate refused and the plaintiff consequently refused to drop the charges. At the disciplinary hearing, Yusuf was not questioned about the alleged assault and battery perpetrated by his roommate, but rather about his relationship with his roommate's girlfriend. The all-white hearing panel found Yusuf's roommate to be guilty but gave him only a "suspended suspension," allowing him to remain enrolled and complete his college degree. Thereafter, the girlfriend lodged a sexual harassment complaint with the college against the plaintiff. At a subsequent disciplinary hearing, the panel found the plaintiff guilty of sexually harassing his roommate's girlfriend. During the hearing, though, Yusuf was not permitted to present a key witness statement because the witness was unavailable during the hearing date, his witness list was cut down from twelve witnesses to seven, two of his witnesses were not allowed to present testimony before the close of the hearing as time had apparently run out, and Yusuf was not permitted to present medical records tending to show that he could not have committed the alleged harassment on one of two days alleged. He was given a suspended suspension for the current semester and a suspension for the following Fall semester. Yusuf then brought suit claiming that race was a motivating factor behind both the guilty verdict returned against him and the disparity in the sentences rendered against him and against his roommate.

**\*5** The Second Circuit affirmed dismissal of Yusuf's § 1981 claim under 12(b)(6) where the plaintiff "offered no reason to suspect that his being found guilty of sexual harassment had anything to do with his race, other than his assertion that the panel members were white and that he is Bengali." *Id.* at 714. The Court held that

[a] plaintiff alleging racial or gender discrimination by a university must do more than recite conclusory assertions. In order to survive a motion to dismiss, the plaintiff must specifically allege the events claimed to constitute intentional discrimination as well as circumstances giving rise to a plausible inference of racially discriminatory intent. Therefore, a complaint consisting of nothing more than naked assertions, and setting forth no facts upon which a court could find a violation of the Civil Rights Acts, fails to state a claim under Rule 12(b)(6).

*Id.* (citations omitted). Specifically, the court pointed out that there was no specific factual support for the plaintiff's assertion of racial discrimination and there were other reasons discernible from the record which suggested an alternative reason for the conviction and sentence disparity. Likewise, in the present case, there are other discernible reasons for the Board's failure to pay Miller. For instance, Miller does not state that she complied with the Connecticut Rules of Professional conduct requiring a lawyer to communicate to the client in writing the scope of the engagement and the fees and expenses for which the client will be responsible. Rule 1.5(b) provides that "[t]he scope of the representation, the basis or rate of the fee and expenses for which the client will be responsible, shall be communicated to the client, in writing, before or within a reasonable time after commencing the representation, except when the lawyer will charge a regularly represented client on the same basis or rate." Miller has neither alleged that the Board was a regularly represented client, nor that she communicated her fees or scope of representation to either the Board or Anastasi.

The facts of *Dickerson v. State Farm Fire & Cas. C* o., 95 CIV. 10733 MBM, 1997 WL 40966 (S.D.N.Y. Feb.3, 1997) aff'd, 133 F.3d 906 (2d Cir.1997) provide further elucidation of the pleading standard. The African American plaintiffs suffered a casualty loss of property stored in a rented storage facility and allegedly stolen during a burglary. Plaintiffs then filed a claim with the defendant insurer. To clarify the

claim, the insurer requested purchase receipts and extensive documentation as to every stolen item, as well as sworn attestations and examinations under oath of the plaintiffs' family members to whom the property belonged. The insurer denied the Plaintiffs' claim because of concealment, fraud and false swearing. *Id.* at *1. In bringing a 🚩 § 1981 claim, the plaintiffs argued that, despite industry custom, the insurer had failed to offer a reserve amount to settle the claim, delayed processing the claim so that it would not have to make payment under the policy, and that the fact that no insured had previously filed a complaint claiming improper denial based on defendant's allegations of fraud or misrepresentation show that defendant's charge against plaintiffs was pretextual and arbitrary, all of which demonstrated that the insurer had employed a "unique and unprecedented approach ... apparently reserved and applied *only* to an African–American family." *Dickerson,* 1997 WL 40966, at *2.

 *6  The court ruled that the Dickersons failed to plead sufficient facts to sustain a claim of race discrimination under 🚩 § 1981. Although the court acknowledged that the plaintiffs had asserted generally that the insurer had applied conditions to performing the insurance contract, including demands for documentation, testimony and financial documents, which were "different from and more burdensome than conditions defendant applies to similarly situated white claimants," the court concluded that such allegations were not enough to sustain a racial discrimination claim. The court clarified that "[t]o present a claim that they were subject to demands and conditions different from those imposed on white policy holders, and thus to present facts giving rise to an inference of discrimination, plaintiffs must at least 'relate specific instances where persons situated similarly in all respects were treated differently.' " *Id.* at *6 (citations omitted). The court also concluded that the plaintiffs had failed to demonstrate an intent to discriminate by alleging facts sufficient to "give rise to a plausible inference of racially discriminatory intent," as the plaintiffs had offered no facts to support a finding of racial animus. *Id.* at *3 (citing ⚠️ *Yusuf,* 35 F.3d at 713). The plaintiffs had similarly offered no evidence that any employee of the insurer involved in processing their claim made racial slurs or even more subtle racially suspect comments that would evidence an intent to discriminate based on race. Thus, "in the absence of any specific factual support for a claim of racial animus" and where plaintiffs' 🚩 § 1981 claim was based only on "naked assertions" of racial discrimination, the court

concluded that plaintiffs could not sustain a 🚩 § 1981 claim for racial discrimination.

Here, as in Yusuf and Dickerson, Miller has failed to provide any specific factual support for her claim of racial animus, and thus her 🚩 § 1981 claim must fail. *Compare* 🚩 *Evans–Gadsden v. Bernstein Litowitz Berger & Grossman, LLP,* 332 F.Supp.2d 592 (S.D.N.Y.2004) (dismissing 🚩 § 1981 claim where plaintiff had failed to allege that sabotage allegedly undertaken by defendants was racially motivated); ⚠️ *Timmons v. City of Hartford,* 283 F.Supp.2d 712, 717–18 (D.Conn.2003) (dismissing 🚩 § 1981 claim where contractor plaintiffs did not allege that city's actions against them relating to work performed under city's property rehabilitation program were taken because of racial discrimination and where plaintiffs did not allege that similarly situated non-minority contracts were treated differently); *and* *Garg v. Albany Indus. Dev. Agency,* 899 F.Supp. 961, 967 (N.D.N.Y.1995) aff'd sub nom. *Garg v. City of Albany,* 104 F.3d 351 (2d Cir.1996) (dismissing 🚩 § 1981 claim where Asian Indian hotel owner plaintiffs conclusorily alleged that mortgage company had racially discriminated against them when, among other things, it allegedly failed to dispense all mortgage funds and unreasonably delayed disbursement); *with* 🚩 *Dunk v. Brower,* 07CIV7087(RPP), 2009 WL 650352 (S.D.N.Y. Mar. 12, 2009) (denying motion to dismiss 🚩 § 1981 claim for discrimination in the making/ enforcing of contracts, where plaintiff's complaint alleged that he had been asked to cease martial arts training at school because of other students' negative comments about his Native American race, his membership in a Native American community, and his membership in the Ramapough Nation, and which referred to the community's "racial characteristics and racially stereotypical behavior").

### i. *Municipal Liability*

 *7  Similarly, Plaintiff's claim for municipal liability must also fail. "[W]hen the defendant sued for discrimination under 🚩 § 1981 or 🚩 § 1983 is a municipality—or an individual sued in his official capacity—the plaintiff is required to show that the challenged acts were performed pursuant to a municipal policy or custom." 🚩 *Patterson v. Cnty. of Oneida, N.Y.,* 375 F.3d 206, 226 (2d Cir.2004) (internal citations omitted).

To show a policy, custom, or practice, the plaintiff need not identify an express rule or regulation. It is sufficient to show, for example, that a discriminatory practice of municipal officials was so persistent or widespread as to constitute a custom or usage with the force of law, or that a discriminatory practice of subordinate employees was so manifest as to imply the constructive acquiescence of senior policy-making officials. A policy, custom, or practice may also be inferred where the municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction.

*Id.* (internal citations and quotation marks omitted).

Although the Plaintiff has brought this action against Anastasi in his official capacity and against the Board of Education, both proxies for the City of Bridgeport itself in terms of municipal liability, she has not alleged that any acts allegedly depriving her of her civil rights were performed pursuant to a municipal policy, custom, or practice, nor has she alleged that any deprivation was a result of the municipality's failure to train its employees. Indeed, the only allegation in the complaint that could be remotely construed as relating to a municipal liability claim is that the Defendants "have paid Caucasian attorneys for the legal services performed by them, unlike [their] refusal to pay for such services performed by Plaintiff." There is no allegation, though, that the City of Bridgeport or the Board acted pursuant to a policy, custom, or practice of racially discriminating against African Americans in the making or enforcement of contracts, or pursuant to a policy of not paying African American attorneys for their services. Absent any such allegation, Plaintiff's municipal liability claim is dismissed.

**b.** 🚩 *42 U.S.C. § 1981: Discrimination in the Making or Enforcement of Contracts*

🚩 Section 1981 prohibits intentional racial discrimination which affects "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 🚩 42 U.S.C. § 1981(b). Thus, any claim brought under 🚩 § 1981 for discrimination in the making or enforcement of contracts "must initially identify an impaired contractual relationship ... under which the plaintiff has rights." 🚩 *Domino's Pizza, Inc. v. McDonald,* 546 U.S. 470, 476, 126 S.Ct. 1246, 163 L.Ed.2d 1069 (2006). "Absent the requirement that the plaintiff himself must have rights under the contractual relationship, 🚩 § 1981 would become a strange remedial provision designed to fight racial animus in all of its noxious forms, but only if the animus and the hurt it produced were somehow connected to somebody's contract. [The Supreme Court has] never read the statute in this unbounded—or rather, peculiarly bounded—way." *Id.*

**\*8** The term "contract" pursuant to 🚩 § 1981 adopts its ordinary common law meaning. 🚩 *Lauture,* 216 F.3d at 261 ("In drafting 🚩 § 1981, Congress did not seek to promulgate some specialized federal definition of contract law, but merely intended the term 'contract' to have its ordinary meaning."); *see also* 🚩 *United States v. Shabani,* 513 U.S. 10, 13, 115 S.Ct. 382, 130 L.Ed.2d 225 (1994) (upholding "settled principle of statutory construction that, absent contrary indications, Congress intends to adopt the common law definition of statutory terms"). Under Connecticut law, "in order to form a contract, generally there must be a bargain in which there is a manifestation of mutual assent to the exchange between two or more parties" whose identities are "reasonably certain." 🚩 *Ubysz v. DiPietro,* 185 Conn. 47, 51, 440 A.2d 830, (Conn.1981); *see also* 🚩 *Bender v. Bender,* 292 Conn. 696, 728, 975 A.2d 636 (Conn.2009) (substantially same). In other words, there must be a meeting of the minds: "the court must find that the parties' minds had truly met ... if there has been a misunderstanding between the parties, or a misapprehension by one or both so that their minds have never met, no contract has been entered into by them and the court will not make for them a contract which they did not themselves make." *Tsionis v. Martens,* 116 Conn.App. 568, 577, 976 A.2d 53 (Conn.App.2009) (internal citations omitted).

A contract may be express or implied. *Janusauskas v. Fichman,* 264 Conn. 796, 804, 826 A.2d 1066 (Conn.2003). An implied contract can refer to either an implied in fact or to an implied in law contract. An implied in law contract is "not a contract, but an obligation which the law creates out of the circumstances present, even though a party did not assume the obligation.... It is based on equitable principles to operate whenever justice requires compensation to be made." *Vertex, Inc. v. City of Waterbury,* 278 Conn. 557, 574, 898 A.2d 178, (Conn.2006). A contract implied in law is another name for a claim of unjust enrichment. *Id.* at 573–74, 898 A.2d 178.

On the other hand, "[a]n implied in fact contract is the same as an express contract, except that assent is not expressed in words, but is implied from the conduct of the parties." *Id.* at 573–74, 898 A.2d 178. A contract implied in fact is "founded upon a meeting of minds, which, although not embodied in an express contract is inferred, as a fact, from conduct of the parties showing, in light of the surrounding circumstances, their tacit understanding." *Hercules Inc. v. U.S.,* 516 U.S. 417, 424, 116 S.Ct. 981, 134 L.Ed.2d 47 (1996) (quoting *Baltimore & Ohio R.R. Co. v. U.S.,* 261 U.S. 592, 597, 58 Ct.Cl. 709, 43 S.Ct. 425, 67 L.Ed. 816 (1923)). An implied in fact contract arises "where a plaintiff, without being requested to do so, renders services under circumstances indicating that he expects to be paid therefor, and the defendant, knowing such circumstances, avails himself of the benefit of those services." *Janusauskas,* 264 Conn. at 804–05, 826 A.2d 1066. Courts, though, have been reluctant to enforce implied contracts in the public sector, as doing so "would invite endless litigation on the basis of misinformation by employees, thereby drawing down the public fisc." *Biello v. Town of Watertown,* 109 Conn.App. 572, 583, 953 A.2d 656 (Conn.App.Ct.2008) (holding that representations by municipal employees not made in writing are of particularly little value in proving existence of implied contract).

**\*9** Nowhere in her complaint does Plaintiff allege that she had an express contract with the Board or with Defendant Anastasi. Thus, the Court addresses Plaintiff's various implied contract arguments.

**i. Contract Pursuant to *Conn. Gen.Stat. § 7–101a***

The Plaintiff chiefly asserts that her *§ 1981* claim rests on an implied contract created between her and the Bridgeport Board of Education pursuant to *Conn. Gen.Stat. § 7–101a,* which provides for the indemnification of municipal employees in certain legal actions brought against them. The U.S. Supreme Court has held, though, that "absent some clear indication that the legislature intends to bind itself contractually, the presumption is that a law is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise." *Nat'l R.R. Passenger Corp. v. Atchison Topeka & Santa Fe Ry. Co.,* 470 U.S. 451, 465–66, 105 S.Ct. 1441, 84 L.Ed.2d 432 (1985); *see also N.Y. State Court Officers Ass'n v. Hite,* 851 F.Supp.2d 575, 582 (S.D.N.Y.2012) aff'd, 475 F. App'x 803 (2d Cir.2012) (quoting same). The Court has further explained that

> [t]his well-established presumption is grounded in the elementary proposition that the principal function of a legislature is not to make contracts, but to make laws that establish the policy of the state. Policies, unlike contracts, are inherently subject to revision and repeal, and to construe laws as contracts when the obligation is not clearly and unequivocally expressed would be to limit drastically the essential powers of a legislative body. Indeed, the continued existence of a government would be of no great value, if by implications and presumptions, it was disarmed of the powers necessary to accomplish the ends of its creation. Thus, the party asserting the creation of a contract must overcome this well-founded presumption, and we proceed cautiously both in identifying a contract within the language of a regulatory statute and in defining the contours of any contractual obligation.

*Nat'l R.R. Passenger Corp.,* 470 U.S. at 466 (internal quotation marks and citations omitted). Recognizing the "fundamental legislative prerogative to reserve to itself the implicit power of statutory amendment and modification," the Connecticut Supreme Court has similarly held that "the well established rules of statutory construction" deem "that a statute does not create vested contractual rights absent a clear statement of legislative intent to contract." *Pineman v. Oechslin,* 195 Conn. 405, 414, 488 A.2d 803 (Conn.1985); *Cece v. Felix Indus., Inc.,* 248 Conn. 457, 465–66, 728 A.2d 505 (Conn.1999) (same). Thus, courts must presume that a statute does not create private vested contractual rights unless the legislature clearly and unambiguously intended otherwise.

To determine whether Conn. Gen.Stat. § 7–101a confers contractual rights on the Plaintiff the Court must first examine the language of the statute. *Nat'l R.R. Passenger Corp.,* 470 U.S. at 466 ("In determining whether a particular statute gives rise to a contractual obligation, it is of first importance to examine the language of the statute.") (internal quotation marks and citation omitted); *Pineman,* 195 Conn. at 410, 488 A.2d 803 ("In determining whether a law tenders a contract to a citizen it is of first importance to examine the language of the statute"). The plain meaning rule, codified at Conn. Gen.Stat. § 1–2z, dictates that

> **\*10** [t]he meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered.

Conn. Gen.Stat. § 1–2z; *see also Envirotest Sys. Corp. v. Comm'r of Motor Vehicles,* 293 Conn. 382, 978 A.2d 49, 53 (Conn.2009).

Conn. Gen.Stat. § 7–101a states, in relevant part:

> (a) Each municipality shall protect and save harmless any municipal officer ... or any municipal employee of such municipality from financial loss and expense, including legal fees and costs, if any, arising out of any claim, demand, suit or judgment by reason of alleged negligence, or for alleged infringement of any person's civil rights, on the part of such officer or such employee while acting in discharge of his duties.

Conn. Gen.Stat. § 7–101a(a). Subsection (a), which provides that a municipality "shall protect and save harmless" any municipal *officer* or *employee,* does not direct that municipalities are to have a direct contractual relationship with counsel for such defendant municipal officers or employees, nor does it either mention any rights or obligations with respect to counsel or explicitly give counsel standing to bring suit under the statute. Section 7–101a goes no further than to require municipalities to "protect and save harmless" its officers and employees from financial loss and expense arising from negligence or civil rights actions against them, although it prescribes no specific manner in which the protection must be undertaken. Thus, the statute on its face lacks a clear statement of any intent to provide contractual rights to attorneys representing municipal employees.

The legislative history of § 7–101a comports with the conclusion that the statute does not create contractual rights between the municipality and counsel for its defendant employees or officers. At the time of its enactment, the Connecticut legislature explained that the purpose of § 7–101a was to "provide indemnification for commission and board members against claims based on their actions as such members." H.R. 9256, 1971 Leg., January session (Conn.1971). Later enactments of and amendments to the statute consistently used the term "indemnification" in the legislative Statement of Purpose, including the most recent amendment, which extended indemnification coverage to part-time municipal employees. H.B. 7263, 1989 Leg., January session (Conn.1989). Although indemnification is not defined in the legislative history, it is commonly defined as "the action of compensation for loss or damage sustained;"

to indemnify is to "reimburse (another) for a loss suffered because of a third party's or one's own act or default," or to "give (another) security against such a loss." *Black's Law Dictionary* 837 (9th ed.2009). The legislative history of § 7–101a speaks exclusively of the rights of municipal officers and employees to indemnification from the municipality in certain types of actions; the history is devoid of any reference to any obligations created between the municipality and any attorney representing a defendant officer or employee. In the absence of any language whatsoever evidencing an intent by the Connecticut legislature to create contractual rights between municipalities and attorneys representing defendant officers or employees, this Court may not infer the existence of such contractual rights.

**\*11** Connecticut case law also supports the conclusion that § 7–101a confers no contractual rights on the Plaintiff. Numerous Connecticut courts have held that § 7–101a is an indemnification statute that does not provide a direct cause of action for a third party to bring suit against a municipality.

*See, e.g.,* 🚩 *Orticelli v. Powers,* 197 Conn. 9, 14, 495 A.2d 1023 (Conn.1985) ("By its terms, General Statutes § 7–101a(a) is a provision in this indemnification statute which protects municipal officers and full-time municipal employees from financial loss and expenses arising out of damage suits, including civil rights suits."); *Vibert v. Bd. of Educ. of Reg'l Sch. Dist. No. 10,* 260 Conn. 167, 174, 793 A.2d 1076 (Conn.2002) (§ 7–101a is an indemnification statute); *Rodriguez v. Anker,* FST CV 076000465 S, 2009 WL 323603 (Conn.Super.Ct. Jan.12, 2009) ("It is clear that § 7–101 a does not provide for a direct cause of action against a municipality" by a third party); *Early v. Allen,* CV065003421, 2007 WL 611261, at \*5 (Conn.Super.Ct. Feb.7, 2007) ("The language of § 7–101a gives no indication that the legislature intended the statute to provide an injured person an independent cause of action against a municipality"); *Williams v. City of Bridgeport Bd. of Educ.,* CV054009664, 2007 WL 3173457 (Conn.Super.Ct. Oct.12, 2007) (same); *Kuriansky v. City of Stamford,* CV91 0116189 S, 1992 WL 65428, at \*3 (Conn.Super.Ct. Mar.25, 1992) ("The ... statute is an indemnification statute ... The statute is therefore designed to provide indemnification to the employee from the municipality and there is nothing contained in the statute authorizing a direct action [by a third party]"); 🚩⚠ *Atwood v. Town of Ellington,* 427 F.Supp.2d 136, 142 (D.Conn.2006) (JBA) ("This statute governs allocation of legal expenses between a municipality and its employees who are subject to civil suits, but does not provide a direct cause of action

against a municipality."); *Gillespie v. Ancona,* 3:97–CV–2045 (EBB), 1999 WL 66538, at \*5 (D .Conn. Feb. 4, 1999) ("section 7–101a does not provide plaintiffs with a direct right of action against a municipality"); *Wilson v. City of Hartford,* CIVA3:97CV00671(AWT), 1998 WL 229819 (D.Conn. Mar. 24, 1998) (§ 7–101a does not authorize a direct action against a municipality or against a municipal employee).

Rather,

> The statute merely places the burden on a municipality to protect (i.e., to pay the costs of litigation and provide counsel for) and save harmless (i.e., indemnify) its employees who are sued for negligent acts committed in the scope of their employment. The statute ... speaks only of the relationship between the municipal employee and his employer.

*Early v. Allen,* CV065003421, 2007 WL 611261, at \*5 (Conn.Super.Ct. Feb.7, 2007) (collecting cases holding that 7–101a provides no independent cause of action). Thus, "in passing this section, the legislature countenanced two potential causes of action: one in which an injured party files claim against a liable municipal employee; and a second, in which the liable municipal employee files claim, for indemnification, against his municipal employer." *Id.* at \*6; *see also Parsons v. W. Hartford Bd. of Educ.,* CV94 0533484, 1994 WL 530169, at \*2 (Conn.Super.Ct. Sept.15, 1994) (§ 7–101a and § 10–235 are "meaningful for the class of people sought to be protected-employees of boards of education and towns. These statutes were not passed to give direct causes of action to anyone else."); 🚩⚠ *Peters ex rel. Estate of Peters v. Town of Greenwich,* CV950147192S, 2001 WL 51671 (Conn.Super.Ct. Jan.2, 2001) (same).

**\*12** Though most of the existing interpretations of Conn. Gen.Stat. § 7–101a pertain to plaintiffs bringing suit directly under the statute rather than using the statute as a basis to show a contractual relationship as Plaintiff does, this case law demonstrates the limited scope and applicability of § 7–101a for plaintiffs who are not municipal employees. Indeed, in a nearly identical case filed by this very Plaintiff in Connecticut Superior Court alleging claims for quantum meruit and unjust

enrichment against the Board for its failure to pay Ms. Miller pursuant to the same three invoices about which she complains in this action, the court held that Ms. Miller "would have no standing under [Conn. Gen.Stat. § 7–101a] to bring an action against the defendant to recover her legal fees." *Miller v. Bridgeport Bd. of Educ.,* No. CV106011406, 2011 WL 1886562, at *3 n. 6 (Conn.Super.Ct. Apr.21, 2011).[2] It is thus clear that the Plaintiff in this action would not have standing to bring suit under § 7–101a, as the statute confers no rights on her.

To bolster her contract claim Miller also argues that "[t]he statute does not prohibit the municipal employee from choosing his/her own attorney and indeed Mr. Cimmino had been permitted to do," and thus the Board's payment of Cimmino's prior attorney is an acknowledgement of an implied contract between the Board and the attorney providing a legal defense for a municipal employee. [Dkt. 16, P's Opp. to MTD, p. 7]. While the statute does not explicitly prohibit an employee from choosing his or her own attorney, § 7–101a also does not explicitly allow for such choice. At least one Connecticut court has held that a municipality "is not obligated to permit a municipal employee to select counsel of his own choosing." *Cusick v. City of New Haven,* CV010453210S, 2002 WL 31235421, at *1 (Conn.Super.Ct. Aug.30, 2002) (denying motion to disqualify counsel provided by city to municipal employee where employee could not establish existence of conflict of interest). Although the Connecticut Supreme Court has not addressed this issue explicitly, it has concluded that § 7–101a(a) "at least permit[s], or authorize[s], the same attorney to represent a municipality and an employee." 🔖*Pitchell v. City of Hartford,* 247 Conn. 422, 431, 722 A.2d 797 (Conn.1999). The *Pitchell* Court further concluded that, in a negligence action against a police officer, the defendant city had the statutory authority to retain an attorney to file an appearance on behalf of the officer, notwithstanding a potential conflict of interest between the city and the officer. 🔖*Id.* at 431–32, 722 A.2d 797 ("There is nothing extraordinary about an attorney entering an appearance on behalf of a client and later withdrawing due to a conflict of interest. Accordingly, the existence of a potential conflict of interest between the city and [defendant officer] did not alter the city's authority to file an appearance on behalf of [the officer] or alter [his] ability to raise his right to claim insufficient process."). Moreover, this court has previously recognized the right of the municipality to provide representation for an employee defendant, concluding that "[a]lthough a municipality may

meet this obligation [to hold an employee harmless under § 7–101a] by hiring separate lawyers for itself and its employees, in many cases it may be much more economical to have the same attorney represent both clients," so long as the municipality takes steps to reduce or eliminate any potential conflict of interest between the municipality and the employee. *Manganella v. Keyes,* 613 F.Supp. 795, 798 (D.Conn.1985) (EBB). Because a municipality may provide counsel for its defendant official or employee without the employee's express consent to that particular attorney, this Court logically infers that the municipal employee does not have a right to choose his own counsel pursuant to § 7–101a.

*13 Finally, although courts have recognized that a municipality may choose to provide a defense for a defendant officer or employee, nothing in § 7–101a compels the Board to pay the Plaintiff for her representation of Cimmino. Rather, the statute only requires that the municipality indemnify the employee—Cimmino—for his legal fees. *See Miller v. Bridgeport Bd. of Educ.,* No. CV106011406, 2011 WL 1886562, at *3 (Conn.Super.Ct. Apr.21, 2011) (reaching identical conclusion as to Plaintiff in this action); *Vibert,* 260 Conn. at 174–75, 176–77, 793 A.2d 1076 (noting that § 7–101a is an indemnification statute, and holding that § 10–235, an indemnification provision nearly identical to § 7–101a applying to various Board of Education staff, could not be read to impose a duty to defend "because a duty to indemnify for attorney's fees cannot coexist with a duty to defend: it would be impossible for a board [of education] to indemnify a teacher for attorney's fees if the board of education already has provided the teacher with counsel."). Thus, even and especially if § 7–101a merely provides for indemnification rather than a defense of a municipal employee, the Plaintiff's contract theory must fail. Cimmino, as the municipal employee, must first sustain a loss (the payment of legal fees owed to Plaintiff), before Cimmino himself could be eligible for indemnification under § 7–101 a, and after which Cimmino, and not the Plaintiff, would have standing to sue pursuant to the statute. In other words, the Board does not indemnify or owe reimbursement to Plaintiff directly, but rather, it owes only a duty of indemnification to Cimmino.

This Court agrees that the duty enumerated in § 7–101a does not equate to a duty to allow individual defendants to their choice of legal counsel, nor does the existing case law support Plaintiff's assertion that Cimmino had a right to choose his legal representative without the assent of the municipality. Here, the Plaintiff alleges only that Cimmino

chose her to represent him in place of his former attorney, that she "inquired of Defendant Anastasi if there was any requirement she needed to fulfill in order to assume the defense of Cimmino," and that "[a]t no time did Anastasi inform Plaintiff of any reason why she was prohibited from assuming the defense of Cimmino, nor any other impediment to her providing legal services." However, the Plaintiff has nowhere alleged that the municipality agreed to pay her for legal services stemming from Cimmino's representation, that she asked Anastasi whether there was any impediment to receiving payment from the municipality for legal services provided in Cimmino's defense, whether Anastasi enumerated any requirements Miller could fulfill to receive payment for her services, or whether, if he did, the Plaintiff fulfilled those requirements. While the Plaintiff has alleged that Anastasi did not inform her of any reason why she was prohibited from assuming Cimmino's defense, she has not alleged that the municipality agreed to Cimmino's choice of Miller as his counsel, and therefore there is no reason for the Court to believe that Anastasi would have had a duty to inform the Plaintiff of any such impediments. Moreover, Cimmino's independent selection and substitution of counsel without consulting the Board indicates that he is the intermediary in any relationship between the municipality and his defense counsel.

**\*14** Therefore, because § 7–101a is principally an indemnification statute assigning rights only to the municipal employee to be indemnified, and in the absence of any allegation that the municipality assented to payment for Plaintiff's legal services, Mr. Cimmino could bring an action under § 7–101a against the municipality for indemnification of any amounts he paid to the attorney retained by him. In other words, absent evidence that the municipality approved Cimmino's choice of Miller's representation of him, the Board does not owe reimbursement to Plaintiff directly, but rather, may owe to Cimmino the value of payments he has made to Miller for her legal counsel.

In sum, Conn. Gen.Stat. § 7–101a does not confer contractual rights on the Plaintiff—who is not a municipal employee [3]—such that she could satisfy the third element of her 42 U.S.C. § 1981 claim for discrimination in the making or enforcement of contracts.

### ii. *Implied in Fact Contractual Relationship between Plaintiff and the Board*

Defendants urge that Plaintiff's complaint should be dismissed because the Plaintiff has not alleged the existence of any communications or documents giving rise to an implied contract. The Plaintiff contends that an implied contract exists between her and the Board of Education not only pursuant to § 7–101 a, but also because of the "performance by Plaintiff of legal services with the full knowledge and acquiescence of City Attorney Anastasi" and because "[t]he failure of Anastasi, after notice by Plaintiff, to take any action to object to Plaintiff's performance of legal services also creates an implied contractual obligation for payment of services on a detrimental reliance theory." [Dkt. 16, P's Opp. to MTD, p. 7]. Plaintiff further argues that she "does not have to plead specifically the existence of a contractual relationship between her and either of the Defendants." [Dkt. 16, P's Opp. to MTD, p. 7].

"The parties' intentions manifested by their acts and words are essential to the court's determination of whether a contract was entered into and what its terms were." *Auto Glass Exp., Inc. v. Hanover Ins. Co.,* 293 Conn. 218, 225, 975 A.2d 1266 (Conn.2009). Plaintiff's implied in fact contract claim fails for the same reasons enumerated prior. First, § 7–101a does not impose a duty to allow individual defendants to choose their own counsel and, as such, Plaintiff has failed to allege that the municipality assented to her representation of Cimmino in place of an attorney they had agreed to compensate for his legal services. The Plaintiff has also not alleged that she asked Anastasi whether there was any impediment to receiving payment from the municipality for legal services provided in Cimmino's defense, whether Anastasi enumerated any requirements Miller could fulfill to receive payment for her services, or whether, if he did, the Plaintiff fulfilled those requirements. In addition, the Plaintiff does not contend in her complaint that Anastasi even had the power to bind the municipality in contract such that the City would be liable to the Plaintiff for any breach, or that he would have had the power to prohibit Cimmino from hiring the Plaintiff with Cimmino's own funds. Likewise, Plaintiff does not allege that any written communication exists between her and the municipality or that Anastasi spoke any words assenting to any sort of contractual relationship or acceptance of Plaintiff's services by Anastasi as an agent of the Board.

**\*15** The crux of Plaintiff's complaint is that Defendants compensated Cimmino's prior attorney and did not respond negatively to Plaintiff's inquiry about assuming Cimmino's representation. Plaintiff construes this silence as acceptance and formation of an implied contract. Silence may constitute

assent to an offer of contract if an offeree, by his words or conduct, leads the offeror to reasonably interpret that silence as such. *John J. Brennan Const. Corp. v. City of Shelton,* 187 Conn. 695, 710, 448 A.2d 180 (Conn.1982). "Whether such conduct took place so as to create a contract is a question of fact." *Sandella v. Dick Corp.,* 53 Conn.App. 213, 220, 729 A.2d 813 (Conn.App.Ct.1999) (quoting *John J. Brennan Construction Corp., Inc.,* 187 Conn. at 710, 448 A.2d 180). Here, though, the question of Anastasi's silence may not reach the finder of fact as the Plaintiff has not alleged in either her complaint or in her opposition to the Defendants' motion to dismiss that she reasonably interpreted Anastasi's silence as assent to the alleged implied contract. Nor has Plaintiff alleged in her complaint that the Defendants acted with the knowledge that the Plaintiff expected that she would be paid directly by the Bridgeport Board of Education rather than by her client, Andrew Cimmino, for legal services rendered. Without the municipality's knowledge of the potential ramifications of their silence, there can be no tacit understanding by the Defendants and the complaint has failed to allege a necessary element for the formation of an implied contract. *See Janusauskas,* 264 Conn. at 804–05, 826 A.2d 1066 (an implied in fact may be found "where a plaintiff, without being requested to do so, renders services under circumstances indicating that he expects to be paid therefor, and the defendant, knowing such circumstances, avails himself of the benefit of those services.").

### iii. *Implied in Law Contract*

To the extent that the Plaintiff has alleged the existence of a contract implied in law, the Court notes that an implied in law contract is "not a contract, but an obligation which the law creates out of the circumstances present, even though a party did not assume the obligation." *Vertex, Inc. v. City of Waterbury,* 278 Conn. 557, 574, 898 A.2d 178, (Conn.2006). An implied in law contract is another name for a claim of unjust enrichment, which is "grounded in the theory of restitution, not in contract theory." *Schirmer v. Souza,* 126 Conn.App. 759, 764–67 (Conn.App.Ct.2011). Therefore, an implied in law contract does not support a § 1981 claim for discrimination in the making or enforcement of contracts.

### V. *Conclusion*

For the foregoing reasons, Plaintiff's 42 U.S.C. § 1981 claim must fail and the Defendants' Motion to Dismiss [Dkt. 15] is GRANTED without prejudice to the Plaintiff filing an amended complaint within twenty-one (21) days of the date of this decision addressing the deficiencies in her 42 U.S.C. § 1981 claim.

IT IS SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2013 WL 3936925

## Footnotes

1      Although Plaintiff does not divulge this attorney's race in her complaint, she has alleged in her Reply to the Order to Show Cause that this attorney is Caucasian. [Dkt. 14, p. 2].

2      The complaint in the Plaintiff's Connecticut Superior Court action is nearly identical to her complaint in this action, except that it did not posit claims for discrimination in the making or enforcement of contracts pursuant to 42 U.S.C. § 1981, instead opting for claims under quantum meruit and unjust enrichment.

3      The Plaintiff does not allege that she is a municipal employee, nor can she be considered one for the purposes of this statute. The term "employee" is not defined in Title 7 of the Connecticut General Statutes. Pursuant to common definitional usage, an "employee" is a person who works in the service of an employer "under an express or implied contract of hire, under which the employer has the right to control the details of work performance." *Black's Law Dictionary* 602 (9th ed.2009). Cimmino chose Plaintiff to be his counsel in place of his original attorney; Plaintiff has no relationship to the Bridgeport Board of Education outside of her

representation of one of its employees, and it is Cimmino who has the right to control the details of Plaintiff's work performance. Thus, Plaintiff's relationship with the municipality is not sufficiently direct to make her a municipal employee.

---

**End of Document**                              © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 860064
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Manu J. TEJWANI, Plaintiff,

v.

UNITED AIRLINES, INC.; UAL Corp., Defendants.

No. 08 Civ. 2966(SCR).
|
March 31, 2009.

West KeySummary

**1**    **Civil Rights**  🔑 Public Conveyances

Airline passenger failed to adequately allege a claim of intentional racial discrimination against an airline. The passenger had been subjected to derogatory remarks and comments while attempting to check into a flight. However his complaint failed to allege that any airline employee uttered or encouraged any of the derogatory remarks, nor did it allege that the airline provided preferential or non-discriminatory treatment to any similarly situated non-minority passengers. 42 U.S.C.A. § 1981; Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**MEMORANDUM DECISION AND ORDER**

STEPHEN C. ROBINSON, District Judge.

**\*1**  Manu J. Tejwani commenced this action against United Airlines, Inc. and UAL Corp. (collectively, "United") alleging discrimination in violation of 42 U.S.C. § 1981 and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d. Dr. Tejwani's Complaint also seeks recovery for intentional and negligent infliction of emotional distress. United has filed a motion to dismiss Dr. Tejwani's Complaint or, in the alternative, a motion for summary judgment. For the reasons set forth in this opinion, the Court grants United's motion, and Dr. Tejwani's Complaint is dismissed.

**I**

**BACKGROUND**

This case is at the motion to dismiss stage, and therefore the Court assumes as true "all material factual allegations in the complaint." *Shipping Fin. Servs. Corp. v. Drakos,* 140 F.3d 129, 131 (2d Cir.1998).

Dr. Tejwani, a fifty-four year old citizen of the United States, has a dark-brown complexion and outwardly appears to be of Indian descent. On October 21, 2007, Dr. Tejwani and his wife arrived at Los Angeles International Airport ("LAX") at noon intending to board a flight scheduled to depart at 1:15 p.m. Dr. Tejwani and his wife had checked-in for flight 0890 on United's website before arriving at LAX but the couple had two bags to check-in.

Arriving at the east end of United's terminal, they were directed to a long baggage check-in line by the first United line agent that they encountered, B.B. Aranez. After waiting in line, Mr. Tejwani finally reached the front where he found himself across from Aranez. Dr. Tejwani again explained to Aranez that he and his wife had already checked in and thus only needed to check their bags. Aranez then opened the rope line to allow Dr. Tejwani and his wife to check their bags at an automatic baggage check-in kiosk. The kiosk machine, however, indicated that it was too late to check-in. Dr. Tejwani then returned to Aranez and explained the situation. Aranez instructed Dr. Tejwani to speak to the agents at the United desk, which would have required Dr. Tejwani to return to the line in which he originally was waiting.

Rather than returning to the rear of the line, Dr. Tejwani approached the United desk agents. According to Dr. Tejwani, he "waited patiently to catch her attention while she was processing a customer." Compl. ¶ 20. As Dr. Tejwani waited, "two adults in a family immediately ahead of Dr [sic] and Mrs. Tejwani's position in the baggage check in line started a ruckus, gesticulating and yelling that he was out of line." Compl. ¶ 21. After processing her customer, Ms. Chua, a United employee, instructed Dr. Tejwani and his wife to return to the line. The Tejwanis complied.

Thereafter, Dr. Tejwani claims that the two individuals who had complained about his attempt to circumvent the line made racially abusive and demeaning hand gestures toward Dr. Tejwani and his wife. Compl. ¶ 24. A white male passenger ("John Doe") ten to twenty positions behind the Tejwani's position "also joined the racial abuse" and threatened to send the Tejwanis "back to the Middle East." Compl. ¶ 25. After a few minutes of quiet, John Doe yelled out that the Tejwanis had "breached security and had crashed into the line." Compl. ¶ 26.

**\*2** When Dr. Tejwani and his wife were almost at the front of the line, Veronica Mathias, a United manager, arrived across from the Tejwanis. She asked them whether they had been on line before. Dr. Tejwani explained to her what had happened. Thereafter, "[a]t least six passengers behind [the Tejwanis] indicated to ... Mathias that [the Tejwanis] were in the proper place in line, had left for a short while and returned." Compl. ¶ 29.

Despite this, Mathias continued to insist that all passengers were saying that the Tejwanis were not in line. Mathias then told Dr. Tejwani "to go back 10 positions" in line, which required Dr. Tejwani and his wife to stand behind John Doe, the racially abusive passenger. Dr. Tejwani claims that "a family about four positions behind Dr. and Mrs. Tejwani leaned across and told Manager Matthias [sic] that they should be allowed to check in and board now, as they were properly in line and had only stepped out and back into the line." Compl. ¶ 34. After some exchange between him and Mathias, Mathias explained that "everybody" said that the Tejwanis were not in line. Compl. ¶ 36. Dr. Tejwani claims that Mathias had the "LA police swoop down and detain" him and his wife; he and his wife were not permitted to get back on line until after all of the passengers in the line had been processed. Compl. ¶ 40–42. The Complaint asserts that Mathias "conspired with passenger John Doe to violate" Dr. Tejwani's civil rights. Compl. ¶ 43. As a result of this incident, the Tejwanis missed their 1:15 flight, and they had to wait for several hours to board the next flight.

## II

## DISCUSSION

### A. Standard of Review

A motion to dismiss must granted if the complaint "fail[s] to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). In deciding a motion to dismiss, a court must " 'accept as true the factual allegations made in the complaint and draw all inferences in favor of the plaintiffs.' "

*Elektra Entm't Group, Inc. v. Barker,* 551 F.Supp.2d 234, 238 (S.D.N.Y.2008) (quoting *Grandon v. Merril Lynch & Co.,* 147 F.3d 184, 188 (2d Cir.1998)). Ultimately, the purpose of Rule 8 is "to give fair notice of a claim and the grounds upon which it rests so that the opposing party may identify the nature of the case, respond to the complaint, and prepare for trial." *Id.* (internal quotation marks and citations omitted).

In *Bell Atlantic v. Twombly,* the Supreme Court held that, "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." 550 U.S. 544, 127 S.Ct. 1955, 1964–65, 167 L.Ed.2d 929 (2007). A plaintiff therefore must include sufficient factual allegations to "raise a right to relief above the speculative level," *id.* at 1965; that is, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face," *id.* at 1974. The Second Circuit has explained that, in its view, "the Court is not requiring a universal standard of heightened fact pleading, but is instead requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render a claim *plausible.* " *Iqbal v. Hasty,* 490 F.3d 143, 157–58 (2d Cir.2007).

### B. Dr. Tejwani's Complaint Must Be Dismissed

**\*3** Title 42, section 1981(a) of the United States Code provides that

> all persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons

and property as is enjoyed by white
citizens, and shall be subject to like
punishment, pains, penalties, taxes,
licenses, and exactions of every kind,
and to no other.

The phrase "make and enforce contracts" is defined by
section 1981(b): "For purposes of this section, the
term 'make and enforce contracts' includes the making,
performance, modification, and termination of contracts,
and the enjoyment of all benefits, privileges, terms, and
conditions of the contractual relationship." To survive a
motion to dismiss a section 1981 claim, the Court of
Appeals for the Second Circuit has explained, a plaintiff
must "allege facts supporting the following elements: (1)
plaintiff[ ][is] a member[ ] of a racial minority; (2)
defendants' intent to discriminate on the basis of race; and
(3) discrimination concerning one of the statute's enumerated
activities." *Brown v. City of Oneonta,* 221 F.3d 329, 339
(2d Cir.2000). Indeed, the Second Circuit has emphasized
that "[s]ection 1981, like the Equal Protection Clause, only
prohibits intentional racial discrimination." *Id.; General
Bldg. Contractors Ass'n v. Pennsylvania,* 458 U.S. 375, 391,
102 S.Ct. 3141, 73 L.Ed.2d 835 (1982) ("We conclude ... that
§ 1981, like the Equal Protection Clause, can be violated
only by purposeful discrimination."). Accordingly, a plaintiff
"must specifically allege the events claimed to constitute
intentional discrimination as well as circumstances giving
rise to a plausible inference of racially discriminatory intent."
*Yusuf v. Vassar College,* 35 F.3d 709, 713 (2d Cir.1994);
*see also Bell Atl.,* 127 S.Ct. at 1964–65.

Dr. Tejwani's Complaint does not state a plausible claim
that he was subjected to intentional discrimination. The
Complaint does not assert that any United employee uttered
any derogatory remarks or comments or that any United
employee encouraged such behavior on the part of some of the
passengers waiting on line. Nor does Dr. Tejwani's Complaint
allege that United provided preferential or non-discriminatory
treatment to *any* similarly-situated non-minority passengers.
*Lizardo v. Denny's, Inc.,* 270 F.3d 94, 101 (2d Cir.2001)
(noting that, in a section 1981 case, a plaintiff may seek
to draw an inference of discriminatory intent by pleading
that "similarly situated patrons were given preferential

treatment"). Dr. Tejwani simply alleges, in conclusory
fashion, that Mathias "conspired with passenger John Doe
to violate" Dr. Tejwani's civil rights. Compl. ¶ 43. From
the allegations in the Complaint, however, it is evident that
Mathias was not present when passenger John Doe was
verbally abusing the Tejwanis with his despicable comments.
*See* Compl. ¶ 25–27 (noting that when John Doe ended his
tirade it was "several minutes" before "Veronica Mathias
showed up"). The Complaint does not allege that Mathias and
John Doe knew each other or that they ever had an opportunity
to agree to act in any concerted manner against the Tejwanis.

**\*4** Finally, as in *Yusuf v. Vassar College,* Dr. Tejwani's
Complaint itself identifies a number of race-neutral factors
that may have led to his perceived mistreatment by United's
employees. Dr. Tejwani admits that he left his position in the
check-in line to use a kiosk, and, after the kiosk machine
indicated that it was too late to check-in, he attempted to
get the attention of the counter agent, who was processing
another customer. To the customers on the line, it appeared
that Dr. Tejwani was attempting to circumvent the line and,
as a result, "two [individuals] ... *immediately ahead of [the
Tejwani's position in line]* started a ruckus, gesticulating,
and yelling that he was out of line." Compl. ¶ 21 (emphasis
supplied). As in Yusuf, "the abundance of other possible
reasons" for Mathias' treatment of Dr. Tejwani, "combined
with the lack of any specific factual support for his claim of
racial motivation [,] illustrates that his claim here is simply a
'naked allegation' of racial discrimination." *Yusuf,* 35
F.3d at 714. Consequently, the Court grants United's motion
to dismiss in its entirety. *

It is apparent from the allegations in the Complaint that Dr.
Tejwani and his wife were subjected to contemptible and
cutting comments by certain passengers on line. As vile as
those comments may have been, they were uttered by private
individuals, and it is apparent, from Dr. Tejwani's Complaint,
that those comments were neither sanctioned nor encouraged
by United Airlines. The Nation's discrimination laws do not
give this Court license to impose a general code of civility
by holding parties, irrespective of their participation, liable
for the intentional discrimination of others. *Oncale v.
Sundowner Offshore Srvs., Inc.,* 523 U.S. 75, 80, 118 S.Ct.
998, 140 L.Ed.2d 201 (1998).

**Conclusion**

For the foregoing reasons, the Court grants United's motion to dismiss. The Clerk of the Court is directed to close this case, including docket entries number 10 and 14.

*It is so ordered.*

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 860064

## Footnotes

\*    Dr. Tejwani's claim under Title VI also requires a showing of intentional discrimination, and therefore the Court dismisses that claim as well. *See* 42 U.S.C. § 2000d; *New York Urban League, Inc. v. State of New York,* 71 F.3d 1031, 1036 (2d Cir.1995) (noting that "the Supreme Court held that [section 2000d] only prohibits *intentional* discrimination") (emphasis in original). Having dismissed all of Dr. Tejwani's federal claims, this Court declines to exercise supplemental jurisdiction over the remaining state law claims. *See* 28 U.S.C. § 1367(c); *Rick v. DeStefano,* 530 F.3d 88, 122 (2d Cir.2008).

---

**End of Document**                                   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 5:22-cv-01202-MAD-ML   Document 8   Filed 03/28/23   Page 78 of 364

Burris v. Housing and Services Inc., Not Reported in Fed. Supp. (2019)

2019 WL 1244494
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Shirley BURRIS, Plaintiff,
v.
HOUSING AND SERVICES INC. et al., Defendants.

17-CV-9289 (JGK)
|
Signed 03/18/2019

**Attorneys and Law Firms**

Shirley Burris, New York, NY, pro se.

Siobhan Amanda Healy, Babchik & Young LLP, White Plains, NY, for Defendants.

## MEMORANDUM OPINION AND ORDER

John G. Koeltl, United States District Judge

**\*1**  The plaintiff, Shirly Burris, brings this action pro se against the defendants, Housing and Services Inc., Sara Stolfi, James Dill, and Ethan Jamron, alleging various state and federal causes of action arising out of the plaintiff's eviction and subsequent related proceedings. The defendants have moved to dismiss the plaintiff's amended complaint under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction and Rule 12(b)(6) for failure to state a claim upon which relief can be granted. The defendants' motion is **granted in part and denied in part.**

## I.

In defending against a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), the plaintiff bears the burden of proving the Court's jurisdiction by a preponderance of the evidence. Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000). In considering such a motion, the Court generally must accept the material factual allegations in the complaint as true. See J.S. ex rel. M.S. v. Attica Cent. Schs., 386 F.3d 107, 110 (2d Cir. 2004). The Court does not, however, draw all reasonable inferences in

the plaintiff's favor. Id.; see also Graubart v. Jazz Images, Inc., No. 02cv4645, 2006 WL 1140724, at \*2 (S.D.N.Y. Apr. 27, 2006). Indeed, where jurisdictional facts are disputed, the Court has the power and the obligation to consider matters outside the pleadings, such as affidavits, documents, and testimony, to determine whether jurisdiction exists. See Anglo–Iberia Underwriting Mgmt. Co. v. P.T. Jamsostek, 600 F.3d 171, 175 (2d Cir. 2010); APWU v. Potter, 343 F.3d 619, 627 (2d Cir. 2003); Kamen v. Am. Tel. & Tel. Co., 791 F.2d 1006, 1011 (2d Cir. 1986). In so doing, the Court is guided by the body of decisional law that has developed under Rule 56 of the Federal Rules of Civil Procedure. Kamen, 791 F.2d at 1011.

When presented with a motion to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction, and a motion to dismiss on other grounds, the first issue is whether the Court has the subject matter jurisdiction necessary to consider the merits of the action. See Rhulen Agency, Inc. v. Ala. Ins. Guar. Ass'n, 896 F.2d 674, 678 (2d Cir. 1990).

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the allegations in the complaint are accepted as true, and all reasonable inferences must be drawn in the plaintiff's favor. McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007). The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985). The Court should not dismiss the complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Moreover, pro se complaints are construed liberally. Dolan v. Connolly, 794 F.3d 290, 293 (2d Cir. 2015).

**\*2**  While the Court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions." Id. When presented with a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents that are referenced

in the complaint, documents that the plaintiff relied on in bringing suit and that are either in the plaintiff's possession or that the plaintiff knew of when bringing suit, or matters of which judicial notice may be taken. See Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002).

## II.

The following facts are undisputed for purposes of the pending motion to dismiss.

The plaintiff's mother, AB, obtained her residence in June 2012 through defendant Housing and Services Inc. ("HSI"). Am. Compl. at 6; Healy Decl. Ex. E ¶ 6. HSI is a private non-profit corporation that provides housing in conjunction with the HIV/AIDS Services Administration ("HASA") program of the New York City Human Resources Administration to individuals who, like AB, are diagnosed with HIV. Healy Decl. Exs. C at 9–10; E ¶¶ 3–4, p. 29. The plaintiff alleges that HSI is federally funded through HASA. Am. Compl. at 15. The plaintiff and her son were admitted into the program as family of AB, and they moved in with AB in late June 2012. Id. at 6–7; Healy Decl. Ex. C. In the summer of 2016, following an incident between the plaintiff and AB, AB requested a transfer to another HSI–HASA unit. See Opp'n at 15; Healy Decl. Exs. C; E ¶ 8. AB vacated her residence in August 2018, and the plaintiff and her son remained. Opp'n at 15; Healy Decl. Ex. E ¶ 8.

Because the plaintiff and her son remained in an HSI–HASA unit no longer occupied by an individual with an HIV diagnosis,[1] HSI attempted to evict the plaintiff. See Am. Compl. at 19; Healy Decl. Ex. D. The plaintiff alleges that defendant Sara Stolfi, an HSI program manager, initiated the proceedings. Amended Compl. at 11. The plaintiff refused to leave and filed a complaint with the New York State Division of Human Rights ("NYSDHR") on June 27, 2016, alleging that HSI sought to evict her due to her and her son's disabilities - the plaintiff and her son have a "Serious Persistent Mental Illness." Id. at 8; see Healy Decl. Ex. D.

The NYSDHR investigated the plaintiff's case and dismissed the plaintiff's complaint after determining that the plaintiff was not an HSI client and was not evicted on a discriminatory basis. Healy Decl. Ex. D. The plaintiff refused to leave the unit and HSI commenced a licensee holdover proceeding in the Civil Court of The City of New York ("Civil Court").

Id. Ex. E at 26. The parties ultimately reached a settlement whereby the plaintiff agreed to vacate the unit by September 30, 2017. Id. Ex. F. This settlement was ordered by the Civil Court judge. Id. The plaintiff initiated further proceedings in state court which led to her eviction being stayed temporarily, but that stay was vacated in a December 15, 2017 order by the Civil Court. See id. Ex. I. In that order, the court noted that the marshal advised that Adult Protective Services was investigating the plaintiff's case and thus the marshal would not go forward with the plaintiff's eviction until the investigation was complete. Id. The plaintiff appealed the Civil Court's December 15 order to the Appellate Term of the Supreme Court, First Department. Id. Ex. J.

*3  Around the time she filed her appeal, the plaintiff also instituted an Article 78 proceeding in the New York State Supreme Court, New York County, seeking review of the NYSDHR determination. See id. Ex. H. Following the failure to appear, answer, or move in the case by HSI and the other respondents, the state court ordered the NYSDHR to reopen the plaintiff's case and stayed HSI's holdover prosecution of the plaintiff in Civil Court pending further order of the state court. Id. Ex. N at 1–2, 13–14. On March 13, 2019, the state court vacated its prior order reopening the NYSDHR proceeding and staying HSI's holdover proceeding. Dkt. No. 59-1. The court found that the respondents had not in fact been served with notice of the prior petition and that the plaintiff's challenge to the NYSDHR determination was time-barred. Id.

The plaintiff filed an initial complaint in this Court on November 22, 2017, and an amended complaint on June 29, 2018. Construing the amended complaint in this case generously, the plaintiff appears to challenge the order of eviction following settlement in the holdover proceeding in the Civil Court. She also brings federal claims of unlawful discrimination due to her mental disability, retaliation, and failure to accommodate; a state-law claim for breach of the warranty of habitability; and she claims federal constitutional violations of procedural due process, the Fourteenth Amendment, and the Establishment Clause. She brings these causes of action under Title II of the Americans with Disabilities Act ("ADA"), § 504 of the Rehabilitation Act, the Fair Housing Act ("FHA"), 42 U.S.C. § 1983, and § 235-b of the New York Real Property Law.[2]

The defendants argue that this Court lacks subject matter jurisdiction over the plaintiff's case under the Rooker-Feldman doctrine and Younger abstention. See Hartford

Case 5:22-cv-01202-MAD-ML    Document 8    Filed 03/28/23    Page 80 of 364

Burris v. Housing and Services Inc., Not Reported in Fed. Supp. (2019)

Courant Co. v. Pellegrino, 380 F.3d 83, 90 (2d Cir. 2004) (noting that these two doctrines implicate subject matter jurisdiction). The defendants also argue that the plaintiff's federal suit is barred under 🚩 New York Executive Law § 297(9)) by her election of remedies. Next, they contend that the plaintiff cannot plausibly state claims of discrimination, retaliation, and failure to accommodate. Finally, the defendants argue that the plaintiff's 🚩 42 U.S.C. § 1983 and constitutional claims fail because HSI and the other defendants are not state actors, and add that this Court should not exercise supplemental jurisdiction over the plaintiff's state-law claim.

### III.

First, the defendants argue that to the extent the plaintiff challenges the order of eviction in the Civil Court proceeding, the Rooker-Feldman doctrine bars this Court from hearing such an appeal. They add, summarily, that because the plaintiff's discrimination, retaliation, and failure to accommodate claims are "inextricably intertwined" with that proceeding, this Court has no jurisdiction over those claims.

The Rooker-Feldman doctrine provides that "federal district courts lack jurisdiction over suits that are, in substance, appeals from state-court judgments." 🚩 Hoblock v. Albany Cty. Bd. of Elections, 422 F.3d 77, 84 (2d Cir. 2005). The doctrine has four requirements:

> (1) the federal-court plaintiff lost in state court; (2) the plaintiff complains of injuries caused by a state court judgment; (3) the plaintiff invites review and rejection of that judgment; and (4) the state judgment was rendered before the district court proceedings commenced.

🚩 Vossbrinck v. Accredited Home Lenders, Inc., 773 F.3d 423, 426 (2d Cir. 2014) (quotation marks and alterations omitted). To the extent the plaintiff challenges the Civil Court eviction order, she (1) does so after losing in state court, (2) complains of injury caused by that order, (3) invites this Court

to review the order, and (4) has filed this proceeding after the order was rendered. The plaintiff's agreement to leave the apartment, which was ordered by the Civil Court judge, was a state-court order. See 🚩 Reyes v. Fairfield Props., 661 F. Supp. 2d 249, 273 (E.D.N.Y. 2009). Accordingly, under the Rooker-Feldman doctrine, this Court does not have subject matter jurisdiction over the plaintiff's challenge to the order of eviction.

**\*4** However, the defendants' argument that the plaintiff's discrimination, retaliation, and failure to accommodate claims are "inextricably intertwined" with her Civil Court proceeding is not persuasive. In Hoblock, the Second Circuit Court of Appeals noted that the "inextricably intertwined" language in Rooker-Feldman jurisprudence led lower federal courts to apply the 🚩 Rooker-Feldman doctrine too broadly. 422 F.3d at 86. The Hoblock court clarified that

> describing a federal claim as "inextricably intertwined" with a state-court judgment only states a conclusion. Rooker-Feldman bars a federal claim, whether or not raised in state court, that asserts injury based on a state judgment and seeks review and reversal of that judgment; such a claim is "inextricably intertwined" with the state judgment. But the phrase "inextricably intertwined" has no independent content.

Id. at 86-87. "Inextricably intertwined" is "simply a descriptive label attached to claims that meet the [four factors] outlined" above. Id. at 87.

The defendants do not argue that, under this framework, the plaintiff's discrimination, retaliation, and failure to accommodate claims are barred under the four relevant factors. Rather, they summarily raise the point that the claims are barred as inextricably intertwined with the plaintiff's Civil Court proceeding and cite 🚩 Babalola v. B.Y. Equities, Inc., 63 F. App'x 534, 535 (2d Cir. 2003), and 🚩 Springer v. Lincoln Shore Owners, Inc., No. 03cv4676, 2007 WL 2403165, at \*4 (E.D.N.Y. Aug. 16, 2007). But Springer involved whether res judicata, not the Rooker-Feldman

Case 5:22-cv-01202-MAD-ML    Document 8    Filed 03/28/23    Page 81 of 364

Burris v. Housing and Services Inc., Not Reported in Fed. Supp. (2019)

doctrine, barred a federal action following a Civil Court action. 🔖 2007 WL 2403165 at *4. And in Babalola, issued prior to Hoblock, the Second Circuit Court of Appeals affirmed the district court's holding that the Rooker-Feldman doctrine barred the plaintiff's claims because "a review of the complaint would necessitate an inquiry into the propriety of the eviction warrant issued by the housing court, and the affirmance of that decision by the Appellate Term and the denial of leave to appeal to the Appellate Division." 🔖 63 F. App'x at 536. In this case, it is not clear – and the defendants do not attempt to delineate – the extent to which this Court would have to review the Civil Court eviction order when reviewing each of the plaintiff's claims in this case.

The defendants also argue that the Court should abstain from entertaining any claims involved in the plaintiff's NYSDHR proceeding under the Younger abstention doctrine. Younger abstention bars federal courts from enjoining certain pending state-court proceedings, namely: (1) "state criminal prosecutions," (2) certain "civil enforcement proceedings," and (3) "civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions." 🔖 Sprint Commc'ns, Inc. v. Jacobs, 571 U.S. 69, 73 (2013) (quotation marks omitted); see Wilmington Tr., Nat'l Ass'n v. Estate of McClendon, 287 F. Supp. 3d 353, 361-62 (S.D.N.Y. 2018); see generally 🔖 Younger v. Harris, 401 U.S. 37 (1971). While Younger began as a form of abstention from interference in ongoing criminal proceedings, under Younger federal courts can also "refrain from hearing cases that would interfere ... with certain types of state civil proceedings." 🔖 Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 716 (1996) (citation omitted). "Younger abstention is appropriate when: 1) there is an ongoing state proceeding; 2) an important state interest is implicated; and 3) the plaintiff has an avenue open for review of constitutional claims in the state court." 🔖 Hansel v. Town Court for Town of Springfield, N.Y., 56 F.3d 391, 393 (2d Cir. 1995).

 *5 Younger abstention applies to civil proceedings only when they are enforcement proceedings akin to a criminal case or "involv[e] certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions." 🔖 New Orleans Pub. Serv., Inc. v. Council of City of New Orleans, 491 U.S. 350, 368 (1989); 🔖 Huffman v. Pursue, Ltd., 420 U.S. 592, 604 (1975). The plaintiff's

civil NYSDHR proceeding does not meet either of these requirements and is therefore not the type of proceeding covered by Younger. In any event, the plaintiff does not seek to interfere with the NYSDHR proceeding which the state court has now declined to reopen.

Finally, the defendants argue that 🔖 New York Executive Law § 297(9) bars the plaintiff's federal suit because she pursued her claim before the NYSDHR; thus, the plaintiff has effectively elected to litigate her claims in that forum. 🔖 Section 297(9) provides, in short, that once New York State Human Rights Law claims are brought before the NYSDHR, they cannot be brought again as a plenary action in another court. 🔖 York v. Ass'n of Bar of N.Y.C., 286 F.3d 122, 127 (2d Cir. 2002). The plaintiff has elected her remedies for a violation of the New York State Human Rights Law by pursuing it before the NYSDHR. However, the plaintiff has not brought any claims under the New York State Human Rights Law in this case, and 🔖 New York Executive Law § 297(9) does not preclude the plaintiff from bringing other claims - such as violations of federal law – in this Court.

## IV.

The defendants contend that the plaintiff cannot plausibly allege discrimination, retaliation, or failure to accommodate under Title II of the ADA, § 504 of the Rehabilitation Act, or the FHA. They also contend that the plaintiff cannot state a 🔖 42 U.S.C. § 1983 claim or any other federal constitutional claim because the defendants are not state actors.

As an initial matter, individuals cannot be held liable under the ADA or the Rehabilitation Act. 🔖 J.L. on behalf of J.P. v. N.Y.C. Dep't of Educ., 324 F. Supp. 3d 455, 467 n.4 (S.D.N.Y. 2018). The plaintiff's discrimination and retaliation claims made under the ADA and Rehabilitation Act against the three individual defendants are therefore **dismissed with prejudice.** And although the FHA allows for individual liability, ⚠ Andujar v. Hewitt, No. 02cv2223, 2002 WL 1792065, at *10 (S.D.N.Y. Aug. 2, 2002), the plaintiff has not alleged facts connecting defendants James Dill and Ethan Jamron to the discriminatory and retaliatory conduct discussed below. The plaintiff's FHA discrimination and retaliation claims against those two defendants are **dismissed with prejudice.**

Case 5:22-cv-01202-MAD-ML    Document 8    Filed 03/28/23    Page 82 of 364

Burris v. Housing and Services Inc., Not Reported in Fed. Supp. (2019)

## A.

### 1.

To state a discrimination claim under Title II of the ADA, a plaintiff must allege that (1) she is a qualified individual with a disability, (2) the defendants are subject to the ADA, and (3) she was denied the opportunity to participate in or benefit from the defendants' services or was otherwise discriminated against by the defendants because of her disability. Shomo v. City of N.Y., 579 F.3d 176, 185 (2d Cir. 2009). The analysis under the Rehabilitation Act is generally the same, except that the plaintiff must also allege, as she does in this case, that the defendants received federal funding. Id.

The plaintiff first argues that she is being evicted because of her mental illness. However, she fails to allege that she is qualified for the HSI-HASA unit she occupies. That is, she does not claim to be HIV positive, and the program supplying her residence is reserved for people with an HIV diagnosis. Moreover, it follows that the defendants had a nondiscriminatory basis for attempting to evict the plaintiff – namely, she does not qualify to reside in the unit she occupies. The plaintiff's first basis for relief under the ADA and the Rehabilitation Act fails.

**\*6** The plaintiff also argues that the defendants discriminated against her based on her mental illness by not following an HASA policy – codified in the HASA March 2014 Desk Guide – that applies to "[a]ny individual who is not an HASA client and continues to reside in the apartment/ unit after the HASA client is no longer in residence." Healy Decl. Ex. E at 55. The policy states:

> Failure of the Provider to aggressively work toward rehousing non-HASA eligible individuals will result in a disallowance of any further payments on the apartment as of the sixth month following the death/departure of the HASA client. All efforts to re-house individuals in this category must be clearly documented.

> Provider must assist individual(s) to move, within six months of client's death/departure, either by having the lease assigned from the Provider's Program to the individual him/herself and find other means to pay the rent (e.g., PA shelter allowance); or seeking alternate housing at a rent the individual can afford.

Id. The plaintiff claims that, because of her disability and her disability-related NYSDHR complaint against the defendants, the defendants did not follow this policy and instead initiated eviction proceedings without working with her to find suitable housing. Indeed, the plaintiff filed her NYSDHR complaint on June 27, 2016, and received a letter dated August 3, 2016, from defendant Sara Stolfi, an HSI program manager, stating that the plaintiff was no longer qualified to stay in the HSI-HASA unit and "must seek housing independently from [HSI]." Id. Ex. C. This letter included portions of the HASA March 2014 Desk Guide that indicated that the plaintiff was no longer qualified for her unit but did not include the portion quoted above about relocation assistance. See id. Moreover, the defendants do not claim that they helped the plaintiff find a new residence. To the contrary, the plaintiff alleges that Stolfi initiated eviction proceedings against the plaintiff allegedly due to the plaintiff's disability and in retaliation for her filing the NYSDHR complaint.

The plaintiff has alleged adequately that she is qualified to receive the benefit of the HASA policy relating to relocation assistance but did not receive it because of her disability and in retaliation for filing her NYSDHR complaint. Moreover, HSI does not contest that it is subject to the ADA or the Rehabilitation Act. Therefore, the plaintiff has stated a discrimination claim against HSI under the ADA and the Rehabilitation Act. [3]

**\*7** The defendants' argument to the contrary is unpersuasive. The defendants cite a string of cases that stand for the proposition that a discrimination claim under the ADA or the Rehabilitation Act is not always the proper vehicle to challenge the particular level of care a defendant provides to the disabled, or to challenge a reduction in disability-related services previously provided. See, e.g., Doe v. Pfrommer, 148 F.3d 73, 82-84 (2d Cir. 1998) ("While such particularized treatment among the many services provided by [the defendant] to the disabled may be required under Title I, it is not necessarily required under the anti-discrimination provisions of the Rehabilitation Act, or by implication, the ADA."); Cercpac v. Health & Hosps. Corp., 147 F.3d 165, 168 (2d Cir. 1998) ("[T]he disabilities statutes do not guarantee any particular level of medical care for disabled persons, nor assure maintenance of service previously provided."); Flight v. Gloeckler, 68 F.3d 61, 63-64 (2d Cir. 1995) (stating that the Rehabilitation Act "does not clearly establish an obligation to meet a disabled person's

Case 5:22-cv-01202-MAD-ML    Document 8    Filed 03/28/23    Page 83 of 364

Burris v. Housing and Services Inc., Not Reported in Fed. Supp. (2019)

particular needs vis-a-vis the needs of other handicapped individuals, but mandates only that services provided [to] nonhandicapped individuals not be denied to a disabled person because [s]he is handicapped" (quotation marks omitted, alterations in original accepted) ). The defendants' citation to these cases illustrates their misunderstanding of the plaintiff's allegation. The plaintiff is not alleging, at least in this instance, that she was not provided services that she should be provided as a disabled individual; rather, she is alleging that she was not provided a service to which she was entitled – a service that is provided to all individuals, disabled or not – because of her disability.

Accordingly, the defendants' motion to dismiss the plaintiff's ADA and Rehabilitation Act discrimination claims is **denied** with respect to HSI.

### 2.

The plaintiff also brings a discrimination claim against the defendants under the FHA but does not specify which provision. It appears that she brings her claim pursuant to 🏴 42 U.S.C. § 3604(f)(2), which makes it illegal "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of ... that person." The defendants do not dispute that the plaintiff is handicapped. And, as discussed above, the plaintiff has pleaded sufficiently that the defendants failed to follow the HASA policy and provide her with assistance in finding new housing due to her disability. Thus, the remaining question is whether the defendants' failure to follow the HASA policy can constitute discrimination under the FHA in the terms, conditions, or privileges of rental of the plaintiff's dwelling or the provision of services in connection with such dwelling.

The Second Circuit Court of Appeals recently held that 🏴 42 U.S.C. § 3604 prohibits postacquisition discrimination – that is, discrimination occurring after a plaintiff rents a dwelling. 🚩 Francis v. Kings Park Manor, Inc., No. 15-1823-CV, 2019 WL 1006554, at *5 (2d Cir. Mar. 4, 2019). Accordingly, conduct that "constitute[s] discrimination ... in the provision of services associated with [one's] dwelling" after acquisition of that dwelling is prohibited. Id. (quotation marks omitted). In this case, the plaintiff was properly a tenant in the HSI-HASA residence as AB's family member until AB moved

residences. As such, she was entitled under HASA policy to assistance in finding a new residence when AB moved out. This policy is a "service associated with" the plaintiff's dwelling and thus covered by the FHA. Id. Holding otherwise, and thus ignoring the plaintiff's allegation that the defendants did not follow their housing-related policy because of her disability, "would contravene Congress's intent to root out discrimination in housing" and to foster "truly integrated and balanced living patterns." Id. (quotation marks omitted). The plaintiff has therefore stated a discrimination claim under the FHA.

Moreover, the FHA allows for claims to be brought against individuals. 🔶 Andujar, 2002 WL 1792065 at *10 ("Aggrieved persons have long been permitted to assert Fair Housing Act claims against individual defendants who engaged in affirmative acts of discrimination...."). The plaintiff has stated a sufficient discrimination claim against defendant Sara Stolfi. The plaintiff has alleged that she filed a disability-related NYSDHR complaint against Stolfi; that shortly after the complaint was filed Stolfi sent her a letter stating that HSI would not help the plaintiff find new housing; that the letter included only selective portions of HASA policy thus hiding the relocation services owed to the plaintiff; and that Stolfi initiated eviction proceedings against her because of her mental disability.

**\*8** Accordingly, the defendants' motion to dismiss the plaintiff's FHA discrimination claim is **denied** as it relates to HSI and defendant Sara Stolfi.

### B.

To state a retaliation claim under the ADA, the Rehabilitation Act, or the FHA, a plaintiff must allege that (1) she was engaged in a protected activity, (2) the defendants were aware of this activity, (3) the defendants took adverse action against the plaintiff, and (4) a causal connection exists between the protected activity and the adverse action. 🏴 Weixel v. Bd. of Educ. of City of N.Y., 287 F.3d 138, 148 (2d Cir. 2002) (ADA and Rehabilitation Act); Elmowitz v. Exec. Towers at Lido, LLC, 571 F. Supp. 2d 370, 376 (E.D.N.Y. 2008) (FHA).

The plaintiff was engaged in a protected activity - namely, filing a NYSDHR complaint. See Cortes v. MTA N.Y.C. Transit, 802 F.3d 226, 233 (2d Cir. 2015). The defendants were undoubtedly aware of the complaint. See Healy Decl.

Case 5:22-cv-01202-MAD-ML Document 8 Filed 03/28/23 Page 84 of 364

Burris v. Housing and Services Inc., Not Reported in Fed. Supp. (2019)

Ex. A (notifying the defendants of the NYSDHR complaint against them). And for the same reasons discussed in the preceding section, the plaintiff has sufficiently pleaded an adverse action and causal connection. She has therefore stated a retaliation claim under the ADA, the Rehabilitation Act, and the FHA.

Accordingly, the defendants' motion to dismiss is **denied** as it relates to the retaliation claims against HSI under the ADA, the Rehabilitation Act, and the FHA. The motion is also **denied** as it relates to the FHA retaliation claim against defendant Sarah Stolfi.

### C.

To state a prima facie case under the FHA for discrimination based on a failure to reasonably accommodate, the plaintiff must allege that she (1) suffers from a qualifying handicap, (2) the defendants knew or reasonably should have known of her handicap, (3) accommodation of the handicap may be necessary to afford her an equal opportunity to use and enjoy the residence, and (4) the defendants refused to make such an accommodation. Bentley v. Peace & Quiet Realty 2 LLC, 367 F. Supp. 2d 341, 345 (E.D.N.Y. 2005). Analysis of a failure to accommodate claim is treated the same under the FHA, the ADA, and the Rehabilitation Act. Super v. J. D'Amelia & Assocs., LLC, No. 09cv831, 2010 WL 3926887, at *3 (D. Conn. Sept. 30, 2010). "[A] defendant need not make an accommodation at all if the requested accommodation 'would fundamentally alter the nature of the service, program, or activity.' " Powell v. Nat'l Bd. of Med. Examiners, 364 F.3d 79, 88 (2d Cir.) (quoting 28 C.F.R. § 35.130(b)(7) ), opinion corrected, 511 F.3d 238 (2d Cir. 2004).

In this case, although the plaintiff has a right under HASA policy to assistance in finding a new residence, she does not have a right to be in the HSI-HASA unit she currently occupies because she does not have an HIV diagnosis. Moreover, to allow the plaintiff to continue to stay in the apartment she is occupying, the defendants would have to change fundamentally the nature of the HSI-HASA program. That is, they would have to change their program from one providing housing and services to HIV-positive persons and their families into one providing housing and services to those diagnosed with a mental illness. The plaintiff has failed to state a failure to accommodate claim.

### D.

**\*9** "To state a claim under [42 U.S.C.] § 1983, a plaintiff must allege that (1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States." Snider v. Dylag, 188 F.3d 51, 53 (2d Cir. 1999). "Because the United States Constitution regulates only the Government, not private parties, a litigant claiming that [the litigant's] constitutional rights have been violated must first establish that the challenged conduct constitutes 'state action.' " United States v. Int'l Bhd. of Teamsters, 941 F.2d 1292, 1295 (2d Cir. 1991).

The plaintiff does not allege that defendant HSI, a private non-profit corporation, or any of the individual defendants, are state actors or were acting under color of state law. Although she alleges that HSI is federally funded, "government funding of a private entity ... is insufficient to transform otherwise private conduct into state action." Young v. Halle Hous. Assocs., L.P., 152 F. Supp. 2d 355, 362 (S.D.N.Y. 2001). Accordingly, the plaintiff's 42 U.S.C. § 1983 and federal constitutional claims fail.

### V.

Finally, the plaintiff brings a state-law claim for breach of the warranty of habitability under § 235-b of the New York Real Property Law. The defendants urge this Court to refuse to exercise supplemental jurisdiction over this claim. But because some of the plaintiff's federal claims remain, this Court will exercise supplemental jurisdiction over the plaintiff's state-law claim.

All the facts the plaintiff alleges in support of her § 235-b claim are based on events and conditions occurring during and after April 2017, about eight months after AB left the HSI-HASA unit and after the plaintiff, in turn, lost any right to reside in the unit. See Am. Compl. at 13 & Ex. G. Moreover, the plaintiff does not allege that, as a holdover tenant, she paid rent. "It is settled that the duty of the tenant to pay rent is coextensive with the landlord's duty to maintain the premises in a habitable condition." Goethals Mobile Park, Inc.

Burris v. Housing and Services Inc., Not Reported in Fed. Supp. (2019)

Case 5:22-cv-01202-MAD-ML    Document 8    Filed 03/28/23    Page 85 of 364

v. Staten Island Meadowbrook Park Civic Ass'n, Inc., 618 N.Y.S.2d 409, 411 (App. Div. 1994); see King Enterprises Ltd. v. Mastro, No. 51583/2001, 2001 WL 1328712, at *3 (N.Y. Civ. Ct. June 1, 2001) (noting that a tenant must be in privity with a landlord to establish a claim for breach of the warranty of habitability); 🚩 N.Y. Real Prop. Law § 235-b (McKinney), Practice Commentaries 2018 ("There must be an obligation to pay rent for a tenancy to come under [§ 235-b's] purview.... [N]on-tenant occupants have no claim hereunder...." (citations omitted) ). The plaintiff's 🚩 § 235-b claim therefore fails.

## CONCLUSION

The Court has considered all the arguments raised by the parties. To the extent not specifically addressed, the arguments are either moot or without merit. For the reasons explained above, the defendants' motion to dismiss is **granted in part and denied in part.** Their motion is **denied** with respect to the plaintiff's discrimination and retaliation claims against HSI under the ADA, the Rehabilitation Act, and the FHA. Their motion is also **denied** with respect to the plaintiff's discrimination and retaliation claims against defendant Sara Stolfi under the FHA. The defendants' motion to dismiss is **granted** with respect to all other claims. Those claims are **dismissed with prejudice**, except the plaintiff's claims challenging her eviction, her 🚩 New York Real Property Law § 235-b claim, and any racial discrimination claim, which are **dismissed without prejudice**. Defendants James Dill and Ethan Jamron are dismissed from this case **with prejudice**.

 **\*10** The Clerk of Court is directed to close docket number 39.

## SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 1244494

## Footnotes

1    The plaintiff does not allege that she or her son has an HIV diagnosis, as required to reside in the HSI-HASA unit.

2    The plaintiff also cites Title VII of the Civil Rights Act in her amended complaint but does not bring any claims related to employment discrimination.

3    The plaintiff also summarily claims that she was discriminated against because of her race. She states that she and her son are the only black family in her building and alleges that she would not have been evicted if she were white. Am. Compl. at 13, 20. However, as it relates to her eviction, this claim fails because the plaintiff has not pleaded that she was qualified to be in the HSI-HASA unit. See Pandozy v. Segan, 518 F. Supp. 2d 550, 556 (S.D.N.Y. 2007) (noting that to state a claim for housing-related discrimination, the plaintiff must allege, among other things, that the plaintiff is "qualified for the dwelling at issue"), aff'd, 340 F. App'x 723 (2d Cir. 2009). It also fails as it relates to her not receiving assistance in finding new housing under the HASA policy because the plaintiff pleads no facts suggesting any link between her race and the defendants' failure to follow the policy. To the extent the plaintiff brings a racial discrimination claim, it **is dismissed without prejudice.**

Case 5:22-cv-01202-MAD-ML    Document 8    Filed 03/28/23    Page 86 of 364

Burris v. Housing and Services Inc., Not Reported in Fed. Supp. (2019)

2019 WL 1244494
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Shirley BURRIS, Plaintiff,

v.

HOUSING AND SERVICES INC. et al., Defendants.

17-CV-9289 (JGK)
|
Signed 03/18/2019

**Attorneys and Law Firms**

Shirley Burris, New York, NY, pro se.

Siobhan Amanda Healy, Babchik & Young LLP, White Plains, NY, for Defendants.

**MEMORANDUM OPINION AND ORDER**

John G. Koeltl, United States District Judge

**\*1** The plaintiff, Shirly Burris, brings this action pro se against the defendants, Housing and Services Inc., Sara Stolfi, James Dill, and Ethan Jamron, alleging various state and federal causes of action arising out of the plaintiff's eviction and subsequent related proceedings. The defendants have moved to dismiss the plaintiff's amended complaint under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction and Rule 12(b)(6) for failure to state a claim upon which relief can be granted. The defendants' motion is **granted in part and denied in part.**

**I.**

In defending against a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), the plaintiff bears the burden of proving the Court's jurisdiction by a preponderance of the evidence. Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000). In considering such a motion, the Court generally must accept the material factual allegations in the complaint as true. See J.S. ex rel. M.S. v. Attica Cent. Schs., 386 F.3d 107, 110 (2d Cir. 2004). The Court does not, however, draw all reasonable inferences in

the plaintiff's favor. Id.; see also Graubart v. Jazz Images, Inc., No. 02cv4645, 2006 WL 1140724, at \*2 (S.D.N.Y. Apr. 27, 2006). Indeed, where jurisdictional facts are disputed, the Court has the power and the obligation to consider matters outside the pleadings, such as affidavits, documents, and testimony, to determine whether jurisdiction exists. See Anglo–Iberia Underwriting Mgmt. Co. v. P.T. Jamsostek, 600 F.3d 171, 175 (2d Cir. 2010); APWU v. Potter, 343 F.3d 619, 627 (2d Cir. 2003); Kamen v. Am. Tel. & Tel. Co., 791 F.2d 1006, 1011 (2d Cir. 1986). In so doing, the Court is guided by the body of decisional law that has developed under Rule 56 of the Federal Rules of Civil Procedure. Kamen, 791 F.2d at 1011.

When presented with a motion to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction, and a motion to dismiss on other grounds, the first issue is whether the Court has the subject matter jurisdiction necessary to consider the merits of the action. See Rhulen Agency, Inc. v. Ala. Ins. Guar. Ass'n, 896 F.2d 674, 678 (2d Cir. 1990).

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the allegations in the complaint are accepted as true, and all reasonable inferences must be drawn in the plaintiff's favor. McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007). The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985). The Court should not dismiss the complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Moreover, pro se complaints are construed liberally. Dolan v. Connolly, 794 F.3d 290, 293 (2d Cir. 2015).

**\*2** While the Court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions." Id. When presented with a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents that are referenced

in the complaint, documents that the plaintiff relied on in bringing suit and that are either in the plaintiff's possession or that the plaintiff knew of when bringing suit, or matters of which judicial notice may be taken. See Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002).

## II.

The following facts are undisputed for purposes of the pending motion to dismiss.

The plaintiff's mother, AB, obtained her residence in June 2012 through defendant Housing and Services Inc. ("HSI"). Am. Compl. at 6; Healy Decl. Ex. E ¶ 6. HSI is a private non-profit corporation that provides housing in conjunction with the HIV/AIDS Services Administration ("HASA") program of the New York City Human Resources Administration to individuals who, like AB, are diagnosed with HIV. Healy Decl. Exs. C at 9–10; E ¶¶ 3–4, p. 29. The plaintiff alleges that HSI is federally funded through HASA. Am. Compl. at 15. The plaintiff and her son were admitted into the program as family of AB, and they moved in with AB in late June 2012. Id. at 6–7; Healy Decl. Ex. C. In the summer of 2016, following an incident between the plaintiff and AB, AB requested a transfer to another HSI–HASA unit. See Opp'n at 15; Healy Decl. Exs. C; E ¶ 8. AB vacated her residence in August 2018, and the plaintiff and her son remained. Opp'n at 15; Healy Decl. Ex. E ¶ 8.

Because the plaintiff and her son remained in an HSI–HASA unit no longer occupied by an individual with an HIV diagnosis, [1] HSI attempted to evict the plaintiff. See Am. Compl. at 19; Healy Decl. Ex. D. The plaintiff alleges that defendant Sara Stolfi, an HSI program manager, initiated the proceedings. Amended Compl. at 11. The plaintiff refused to leave and filed a complaint with the New York State Division of Human Rights ("NYSDHR") on June 27, 2016, alleging that HSI sought to evict her due to her and her son's disabilities - the plaintiff and her son have a "Serious Persistent Mental Illness." Id. at 8; see Healy Decl. Ex. D.

The NYSDHR investigated the plaintiff's case and dismissed the plaintiff's complaint after determining that the plaintiff was not an HSI client and was not evicted on a discriminatory basis. Healy Decl. Ex. D. The plaintiff refused to leave the unit and HSI commenced a licensee holdover proceeding in the Civil Court of The City of New York ("Civil Court").

Id. Ex. E at 26. The parties ultimately reached a settlement whereby the plaintiff agreed to vacate the unit by September 30, 2017. Id. Ex. F. This settlement was ordered by the Civil Court judge. Id. The plaintiff initiated further proceedings in state court which led to her eviction being stayed temporarily, but that stay was vacated in a December 15, 2017 order by the Civil Court. See id. Ex. I. In that order, the court noted that the marshal advised that Adult Protective Services was investigating the plaintiff's case and thus the marshal would not go forward with the plaintiff's eviction until the investigation was complete. Id. The plaintiff appealed the Civil Court's December 15 order to the Appellate Term of the Supreme Court, First Department. Id. Ex. J.

**\*3** Around the time she filed her appeal, the plaintiff also instituted an Article 78 proceeding in the New York State Supreme Court, New York County, seeking review of the NYSDHR determination. See id. Ex. H. Following the failure to appear, answer, or move in the case by HSI and the other respondents, the state court ordered the NYSDHR to reopen the plaintiff's case and stayed HSI's holdover prosecution of the plaintiff in Civil Court pending further order of the state court. Id. Ex. N at 1–2, 13–14. On March 13, 2019, the state court vacated its prior order reopening the NYSDHR proceeding and staying HSI's holdover proceeding. Dkt. No. 59-1. The court found that the respondents had not in fact been served with notice of the prior petition and that the plaintiff's challenge to the NYSDHR determination was time-barred. Id.

The plaintiff filed an initial complaint in this Court on November 22, 2017, and an amended complaint on June 29, 2018. Construing the amended complaint in this case generously, the plaintiff appears to challenge the order of eviction following settlement in the holdover proceeding in the Civil Court. She also brings federal claims of unlawful discrimination due to her mental disability, retaliation, and failure to accommodate; a state-law claim for breach of the warranty of habitability; and she claims federal constitutional violations of procedural due process, the Fourteenth Amendment, and the Establishment Clause. She brings these causes of action under Title II of the Americans with Disabilities Act ("ADA"), § 504 of the Rehabilitation Act, the Fair Housing Act ("FHA"), 42 U.S.C. § 1983, and § 235-b of the New York Real Property Law. [2]

The defendants argue that this Court lacks subject matter jurisdiction over the plaintiff's case under the Rooker-Feldman doctrine and Younger abstention. See Hartford

Case 5:22-cv-01202-MAD-ML   Document 8   Filed 03/28/23   Page 88 of 364

Burris v. Housing and Services Inc., Not Reported in Fed. Supp. (2019)

Courant Co. v. Pellegrino, 380 F.3d 83, 90 (2d Cir. 2004) (noting that these two doctrines implicate subject matter jurisdiction). The defendants also argue that the plaintiff's federal suit is barred under New York Executive Law § 297(9) by her election of remedies. Next, they contend that the plaintiff cannot plausibly state claims of discrimination, retaliation, and failure to accommodate. Finally, the defendants argue that the plaintiff's 42 U.S.C. § 1983 and constitutional claims fail because HSI and the other defendants are not state actors, and add that this Court should not exercise supplemental jurisdiction over the plaintiff's state-law claim.

## III.

First, the defendants argue that to the extent the plaintiff challenges the order of eviction in the Civil Court proceeding, the Rooker-Feldman doctrine bars this Court from hearing such an appeal. They add, summarily, that because the plaintiff's discrimination, retaliation, and failure to accommodate claims are "inextricably intertwined" with that proceeding, this Court has no jurisdiction over those claims.

The Rooker-Feldman doctrine provides that "federal district courts lack jurisdiction over suits that are, in substance, appeals from state-court judgments." Hoblock v. Albany Cty. Bd. of Elections, 422 F.3d 77, 84 (2d Cir. 2005). The doctrine has four requirements:

> (1) the federal-court plaintiff lost in state court; (2) the plaintiff complains of injuries caused by a state court judgment; (3) the plaintiff invites review and rejection of that judgment; and (4) the state judgment was rendered before the district court proceedings commenced.

Vossbrinck v. Accredited Home Lenders, Inc., 773 F.3d 423, 426 (2d Cir. 2014) (quotation marks and alterations omitted). To the extent the plaintiff challenges the Civil Court eviction order, she (1) does so after losing in state court, (2) complains of injury caused by that order, (3) invites this Court

to review the order, and (4) has filed this proceeding after the order was rendered. The plaintiff's agreement to leave the apartment, which was ordered by the Civil Court judge, was a state-court order. See Reyes v. Fairfield Props., 661 F. Supp. 2d 249, 273 (E.D.N.Y. 2009). Accordingly, under the Rooker-Feldman doctrine, this Court does not have subject matter jurisdiction over the plaintiff's challenge to the order of eviction.

**\*4** However, the defendants' argument that the plaintiff's discrimination, retaliation, and failure to accommodate claims are "inextricably intertwined" with her Civil Court proceeding is not persuasive. In Hoblock, the Second Circuit Court of Appeals noted that the "inextricably intertwined" language in Rooker-Feldman jurisprudence led lower federal courts to apply the Rooker-Feldman doctrine too broadly. 422 F.3d at 86. The Hoblock court clarified that

> describing a federal claim as "inextricably intertwined" with a state-court judgment only states a conclusion. Rooker-Feldman bars a federal claim, whether or not raised in state court, that asserts injury based on a state judgment and seeks review and reversal of that judgment; such a claim is "inextricably intertwined" with the state judgment. But the phrase "inextricably intertwined" has no independent content.

Id. at 86-87. "Inextricably intertwined" is "simply a descriptive label attached to claims that meet the [four factors] outlined" above. Id. at 87.

The defendants do not argue that, under this framework, the plaintiff's discrimination, retaliation, and failure to accommodate claims are barred under the four relevant factors. Rather, they summarily raise the point that the claims are barred as inextricably intertwined with the plaintiff's Civil Court proceeding and cite Babalola v. B.Y. Equities, Inc., 63 F. App'x 534, 535 (2d Cir. 2003), and Springer v. Lincoln Shore Owners, Inc., No. 03cv4676, 2007 WL 2403165, at \*4 (E.D.N.Y. Aug. 16, 2007). But Springer involved whether res judicata, not the Rooker-Feldman

Burris v. Housing and Services Inc., Not Reported in Fed. Supp. (2019)

Case 5:22-cv-01202-MAD-ML    Document 8    Filed 03/28/23    Page 89 of 364

doctrine, barred a federal action following a Civil Court action. 🚩 2007 WL 2403165 at *4. And in *Babalola*, issued prior to *Hoblock*, the Second Circuit Court of Appeals affirmed the district court's holding that the Rooker-Feldman doctrine barred the plaintiff's claims because "a review of the complaint would necessitate an inquiry into the propriety of the eviction warrant issued by the housing court, and the affirmance of that decision by the Appellate Term and the denial of leave to appeal to the Appellate Division." 🚩 63 F. App'x at 536. In this case, it is not clear – and the defendants do not attempt to delineate – the extent to which this Court would have to review the Civil Court eviction order when reviewing each of the plaintiff's claims in this case.

The defendants also argue that the Court should abstain from entertaining any claims involved in the plaintiff's NYSDHR proceeding under the *Younger* abstention doctrine. *Younger* abstention bars federal courts from enjoining certain pending state-court proceedings, namely: (1) "state criminal prosecutions," (2) certain "civil enforcement proceedings," and (3) "civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions." 🚩 Sprint Commc'ns, Inc. v. Jacobs, 571 U.S. 69, 73 (2013) (quotation marks omitted); see Wilmington Tr., Nat'l Ass'n v. Estate of McClendon, 287 F. Supp. 3d 353, 361-62 (S.D.N.Y. 2018); see generally 🚩 Younger v. Harris, 401 U.S. 37 (1971). While *Younger* began as a form of abstention from interference in ongoing criminal proceedings, under *Younger* federal courts can also "refrain from hearing cases that would interfere ... with certain types of state civil proceedings." 🚩 Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 716 (1996) (citation omitted). "*Younger* abstention is appropriate when: 1) there is an ongoing state proceeding; 2) an important state interest is implicated; and 3) the plaintiff has an avenue open for review of constitutional claims in the state court." 🚩 Hansel v. Town Court for Town of Springfield, N.Y., 56 F.3d 391, 393 (2d Cir. 1995).

**\*5** *Younger* abstention applies to civil proceedings only when they are enforcement proceedings akin to a criminal case or "involv[e] certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions." 🚩 New Orleans Pub. Serv., Inc. v. Council of City of New Orleans, 491 U.S. 350, 368 (1989); 🚩 Huffman v. Pursue, Ltd., 420 U.S. 592, 604 (1975). The plaintiff's

civil NYSDHR proceeding does not meet either of these requirements and is therefore not the type of proceeding covered by *Younger*. In any event, the plaintiff does not seek to interfere with the NYSDHR proceeding which the state court has now declined to reopen.

Finally, the defendants argue that 🚩 New York Executive Law § 297(9) bars the plaintiff's federal suit because she pursued her claim before the NYSDHR; thus, the plaintiff has effectively elected to litigate her claims in that forum. 🚩 Section 297(9) provides, in short, that once New York State Human Rights Law claims are brought before the NYSDHR, they cannot be brought again as a plenary action in another court. 🚩 York v. Ass'n of Bar of N.Y.C., 286 F.3d 122, 127 (2d Cir. 2002). The plaintiff has elected her remedies for a violation of the New York State Human Rights Law by pursuing it before the NYSDHR. However, the plaintiff has not brought any claims under the New York State Human Rights Law in this case, and 🚩 New York Executive Law § 297(9) does not preclude the plaintiff from bringing other claims - such as violations of federal law – in this Court.

**IV.**

The defendants contend that the plaintiff cannot plausibly allege discrimination, retaliation, or failure to accommodate under Title II of the ADA, § 504 of the Rehabilitation Act, or the FHA. They also contend that the plaintiff cannot state a 🚩 42 U.S.C. § 1983 claim or any other federal constitutional claim because the defendants are not state actors.

As an initial matter, individuals cannot be held liable under the ADA or the Rehabilitation Act. 🚩 J.L. on behalf of J.P. v. N.Y.C. Dep't of Educ., 324 F. Supp. 3d 455, 467 n.4 (S.D.N.Y. 2018). The plaintiff's discrimination and retaliation claims made under the ADA and Rehabilitation Act against the three individual defendants are therefore **dismissed with prejudice.** And although the FHA allows for individual liability, 🔺 Andujar v. Hewitt, No. 02cv2223, 2002 WL 1792065, at *10 (S.D.N.Y. Aug. 2, 2002), the plaintiff has not alleged facts connecting defendants James Dill and Ethan Jamron to the discriminatory and retaliatory conduct discussed below. The plaintiff's FHA discrimination and retaliation claims against those two defendants are **dismissed with prejudice.**

### A.

#### 1.

To state a discrimination claim under Title II of the ADA, a plaintiff must allege that (1) she is a qualified individual with a disability, (2) the defendants are subject to the ADA, and (3) she was denied the opportunity to participate in or benefit from the defendants' services or was otherwise discriminated against by the defendants because of her disability. Shomo v. City of N.Y., 579 F.3d 176, 185 (2d Cir. 2009). The analysis under the Rehabilitation Act is generally the same, except that the plaintiff must also allege, as she does in this case, that the defendants received federal funding. Id.

The plaintiff first argues that she is being evicted because of her mental illness. However, she fails to allege that she is qualified for the HSI-HASA unit she occupies. That is, she does not claim to be HIV positive, and the program supplying her residence is reserved for people with an HIV diagnosis. Moreover, it follows that the defendants had a nondiscriminatory basis for attempting to evict the plaintiff – namely, she does not qualify to reside in the unit she occupies. The plaintiff's first basis for relief under the ADA and the Rehabilitation Act fails.

**\*6** The plaintiff also argues that the defendants discriminated against her based on her mental illness by not following an HASA policy – codified in the HASA March 2014 Desk Guide – that applies to "[a]ny individual who is not an HASA client and continues to reside in the apartment/unit after the HASA client is no longer in residence." Healy Decl. Ex. E at 55. The policy states:

> Failure of the Provider to aggressively work toward rehousing non-HASA eligible individuals will result in a disallowance of any further payments on the apartment as of the sixth month following the death/departure of the HASA client. All efforts to re-house individuals in this category must be clearly documented.

> Provider must assist individual(s) to move, within six months of client's death/departure, either by having the lease assigned from the Provider's Program to the individual him/herself and find other means to pay the rent (e.g., PA shelter allowance); or seeking alternate housing at a rent the individual can afford.

Id. The plaintiff claims that, because of her disability and her disability-related NYSDHR complaint against the defendants, the defendants did not follow this policy and instead initiated eviction proceedings without working with her to find suitable housing. Indeed, the plaintiff filed her NYSDHR complaint on June 27, 2016, and received a letter dated August 3, 2016, from defendant Sara Stolfi, an HSI program manager, stating that the plaintiff was no longer qualified to stay in the HSI-HASA unit and "must seek housing independently from [HSI]." Id. Ex. C. This letter included portions of the HASA March 2014 Desk Guide that indicated that the plaintiff was no longer qualified for her unit but did not include the portion quoted above about relocation assistance. See id. Moreover, the defendants do not claim that they helped the plaintiff find a new residence. To the contrary, the plaintiff alleges that Stolfi initiated eviction proceedings against the plaintiff allegedly due to the plaintiff's disability and in retaliation for her filing the NYSDHR complaint.

The plaintiff has alleged adequately that she is qualified to receive the benefit of the HASA policy relating to relocation assistance but did not receive it because of her disability and in retaliation for filing her NYSDHR complaint. Moreover, HSI does not contest that it is subject to the ADA or the Rehabilitation Act. Therefore, the plaintiff has stated a discrimination claim against HSI under the ADA and the Rehabilitation Act.[3]

**\*7** The defendants' argument to the contrary is unpersuasive. The defendants cite a string of cases that stand for the proposition that a discrimination claim under the ADA or the Rehabilitation Act is not always the proper vehicle to challenge the particular level of care a defendant provides to the disabled, or to challenge a reduction in disability-related services previously provided. See, e.g., Doe v. Pfrommer, 148 F.3d 73, 82-84 (2d Cir. 1998) ("While such particularized treatment among the many services provided by [the defendant] to the disabled may be required under Title I, it is not necessarily required under the anti-discrimination provisions of the Rehabilitation Act, or by implication, the ADA."); Cercpac v. Health & Hosps. Corp., 147 F.3d 165, 168 (2d Cir. 1998) ("[T]he disabilities statutes do not guarantee any particular level of medical care for disabled persons, nor assure maintenance of service previously provided."); Flight v. Gloeckler, 68 F.3d 61, 63-64 (2d Cir. 1995) (stating that the Rehabilitation Act "does not clearly establish an obligation to meet a disabled person's

Burris v. Housing and Services Inc., Not Reported in Fed. Supp. (2019)

Case 5:22-cv-01202-MAD-ML    Document 8    Filed 03/28/23    Page 91 of 364

particular needs vis-a-vis the needs of other handicapped individuals, but mandates only that services provided [to] nonhandicapped individuals not be denied to a disabled person because [s]he is handicapped" (quotation marks omitted, alterations in original accepted) ). The defendants' citation to these cases illustrates their misunderstanding of the plaintiff's allegation. The plaintiff is not alleging, at least in this instance, that she was not provided services that she should be provided as a disabled individual; rather, she is alleging that she was not provided a service to which she was entitled – a service that is provided to all individuals, disabled or not – because of her disability.

Accordingly, the defendants' motion to dismiss the plaintiff's ADA and Rehabilitation Act discrimination claims is **denied** with respect to HSI.

### 2.

The plaintiff also brings a discrimination claim against the defendants under the FHA but does not specify which provision. It appears that she brings her claim pursuant to 42 U.S.C. § 3604(f)(2), which makes it illegal "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of ... that person." The defendants do not dispute that the plaintiff is handicapped. And, as discussed above, the plaintiff has pleaded sufficiently that the defendants failed to follow the HASA policy and provide her with assistance in finding new housing due to her disability. Thus, the remaining question is whether the defendants' failure to follow the HASA policy can constitute discrimination under the FHA in the terms, conditions, or privileges of rental of the plaintiff's dwelling or the provision of services in connection with such dwelling.

The Second Circuit Court of Appeals recently held that 42 U.S.C. § 3604 prohibits postacquisition discrimination – that is, discrimination occurring after a plaintiff rents a dwelling. Francis v. Kings Park Manor, Inc., No. 15-1823-CV, 2019 WL 1006554, at *5 (2d Cir. Mar. 4, 2019). Accordingly, conduct that "constitute[s] discrimination ... in the provision of services associated with [one's] dwelling" after acquisition of that dwelling is prohibited. Id. (quotation marks omitted). In this case, the plaintiff was properly a tenant in the HSI-HASA residence as AB's family member until AB moved

residences. As such, she was entitled under HASA policy to assistance in finding a new residence when AB moved out. This policy is a "service associated with" the plaintiff's dwelling and thus covered by the FHA. Id. Holding otherwise, and thus ignoring the plaintiff's allegation that the defendants did not follow their housing-related policy because of her disability, "would contravene Congress's intent to root out discrimination in housing" and to foster "truly integrated and balanced living patterns." Id. (quotation marks omitted). The plaintiff has therefore stated a discrimination claim under the FHA.

Moreover, the FHA allows for claims to be brought against individuals. Andujar, 2002 WL 1792065 at *10 ("Aggrieved persons have long been permitted to assert Fair Housing Act claims against individual defendants who engaged in affirmative acts of discrimination...."). The plaintiff has stated a sufficient discrimination claim against defendant Sara Stolfi. The plaintiff has alleged that she filed a disability-related NYSDHR complaint against Stolfi; that shortly after the complaint was filed Stolfi sent her a letter stating that HSI would not help the plaintiff find new housing; that the letter included only selective portions of HASA policy thus hiding the relocation services owed to the plaintiff; and that Stolfi initiated eviction proceedings against her because of her mental disability.

**\*8** Accordingly, the defendants' motion to dismiss the plaintiff's FHA discrimination claim is **denied** as it relates to HSI and defendant Sara Stolfi.

### B.

To state a retaliation claim under the ADA, the Rehabilitation Act, or the FHA, a plaintiff must allege that (1) she was engaged in a protected activity, (2) the defendants were aware of this activity, (3) the defendants took adverse action against the plaintiff, and (4) a causal connection exists between the protected activity and the adverse action. Weixel v. Bd. of Educ. of City of N.Y., 287 F.3d 138, 148 (2d Cir. 2002) (ADA and Rehabilitation Act); Elmowitz v. Exec. Towers at Lido, LLC, 571 F. Supp. 2d 370, 376 (E.D.N.Y. 2008) (FHA).

The plaintiff was engaged in a protected activity - namely, filing a NYSDHR complaint. See Cortes v. MTA N.Y.C. Transit, 802 F.3d 226, 233 (2d Cir. 2015). The defendants were undoubtedly aware of the complaint. See Healy Decl.

Case 5:22-cv-01202-MAD-ML    Document 8    Filed 03/28/23    Page 92 of 364

Burris v. Housing and Services Inc., Not Reported in Fed. Supp. (2019)

Ex. A (notifying the defendants of the NYSDHR complaint against them). And for the same reasons discussed in the preceding section, the plaintiff has sufficiently pleaded an adverse action and causal connection. She has therefore stated a retaliation claim under the ADA, the Rehabilitation Act, and the FHA.

Accordingly, the defendants' motion to dismiss is **denied** as it relates to the retaliation claims against HSI under the ADA, the Rehabilitation Act, and the FHA. The motion is also **denied** as it relates to the FHA retaliation claim against defendant Sarah Stolfi.

### C.

To state a prima facie case under the FHA for discrimination based on a failure to reasonably accommodate, the plaintiff must allege that she (1) suffers from a qualifying handicap, (2) the defendants knew or reasonably should have known of her handicap, (3) accommodation of the handicap may be necessary to afford her an equal opportunity to use and enjoy the residence, and (4) the defendants refused to make such an accommodation. Bentley v. Peace & Quiet Realty 2 LLC, 367 F. Supp. 2d 341, 345 (E.D.N.Y. 2005). Analysis of a failure to accommodate claim is treated the same under the FHA, the ADA, and the Rehabilitation Act. Super v. J. D'Amelia & Assocs., LLC, No. 09cv831, 2010 WL 3926887, at *3 (D. Conn. Sept. 30, 2010). "[A] defendant need not make an accommodation at all if the requested accommodation 'would fundamentally alter the nature of the service, program, or activity.' " Powell v. Nat'l Bd. of Med. Examiners, 364 F.3d 79, 88 (2d Cir.) (quoting 28 C.F.R. § 35.130(b)(7) ), opinion corrected, 511 F.3d 238 (2d Cir. 2004).

In this case, although the plaintiff has a right under HASA policy to assistance in finding a new residence, she does not have a right to be in the HSI-HASA unit she currently occupies because she does not have an HIV diagnosis. Moreover, to allow the plaintiff to continue to stay in the apartment she is occupying, the defendants would have to change fundamentally the nature of the HSI-HASA program. That is, they would have to change their program from one providing housing and services to HIV-positive persons and their families into one providing housing and services to those diagnosed with a mental illness. The plaintiff has failed to state a failure to accommodate claim.

### D.

**\*9** "To state a claim under [42 U.S.C.] § 1983, a plaintiff must allege that (1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States." Snider v. Dylag, 188 F.3d 51, 53 (2d Cir. 1999). "Because the United States Constitution regulates only the Government, not private parties, a litigant claiming that [the litigant's] constitutional rights have been violated must first establish that the challenged conduct constitutes 'state action.' " United States v. Int'l Bhd. of Teamsters, 941 F.2d 1292, 1295 (2d Cir. 1991).

The plaintiff does not allege that defendant HSI, a private non-profit corporation, or any of the individual defendants, are state actors or were acting under color of state law. Although she alleges that HSI is federally funded, "government funding of a private entity ... is insufficient to transform otherwise private conduct into state action." Young v. Halle Hous. Assocs., L.P., 152 F. Supp. 2d 355, 362 (S.D.N.Y. 2001). Accordingly, the plaintiff's 42 U.S.C. § 1983 and federal constitutional claims fail.

### V.

Finally, the plaintiff brings a state-law claim for breach of the warranty of habitability under § 235-b of the New York Real Property Law. The defendants urge this Court to refuse to exercise supplemental jurisdiction over this claim. But because some of the plaintiff's federal claims remain, this Court will exercise supplemental jurisdiction over the plaintiff's state-law claim.

All the facts the plaintiff alleges in support of her § 235-b claim are based on events and conditions occurring during and after April 2017, about eight months after AB left the HSI-HASA unit and after the plaintiff, in turn, lost any right to reside in the unit. See Am. Compl. at 13 & Ex. G. Moreover, the plaintiff does not allege that, as a holdover tenant, she paid rent. "It is settled that the duty of the tenant to pay rent is coextensive with the landlord's duty to maintain the premises in a habitable condition." Goethals Mobile Park, Inc.

Burris v. Housing and Services Inc., Not Reported in Fed. Supp. (2019)

Case 5:22-cv-01202-MAD-ML    Document 8    Filed 03/28/23    Page 93 of 364

v. Staten Island Meadowbrook Park Civic Ass'n, Inc., 618 N.Y.S.2d 409, 411 (App. Div. 1994); see King Enterprises Ltd. v. Mastro, No. 51583/2001, 2001 WL 1328712, at *3 (N.Y. Civ. Ct. June 1, 2001) (noting that a tenant must be in privity with a landlord to establish a claim for breach of the warranty of habitability); N.Y. Real Prop. Law § 235-b (McKinney), Practice Commentaries 2018 ("There must be an obligation to pay rent for a tenancy to come under [§ 235-b's] purview.... [N]on-tenant occupants have no claim hereunder...." (citations omitted) ). The plaintiff's § 235-b claim therefore fails.

## CONCLUSION

The Court has considered all the arguments raised by the parties. To the extent not specifically addressed, the arguments are either moot or without merit. For the reasons explained above, the defendants' motion to dismiss is **granted in part and denied in part.** Their motion is **denied** with respect to the plaintiff's discrimination and retaliation claims against HSI under the ADA, the Rehabilitation Act, and the FHA. Their motion is also **denied** with respect to the plaintiff's discrimination and retaliation claims against defendant Sara Stolfi under the FHA. The defendants' motion to dismiss is **granted** with respect to all other claims. Those claims are **dismissed with prejudice**, except the plaintiff's claims challenging her eviction, her New York Real Property Law § 235-b claim, and any racial discrimination claim, which are **dismissed without prejudice**. Defendants James Dill and Ethan Jamron are dismissed from this case **with prejudice**.

 **\*10**  The Clerk of Court is directed to close docket number 39.

## SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 1244494

---

## Footnotes

1    The plaintiff does not allege that she or her son has an HIV diagnosis, as required to reside in the HSI-HASA unit.

2    The plaintiff also cites Title VII of the Civil Rights Act in her amended complaint but does not bring any claims related to employment discrimination.

3    The plaintiff also summarily claims that she was discriminated against because of her race. She states that she and her son are the only black family in her building and alleges that she would not have been evicted if she were white. Am. Compl. at 13, 20. However, as it relates to her eviction, this claim fails because the plaintiff has not pleaded that she was qualified to be in the HSI-HASA unit. See Pandozy v. Segan, 518 F. Supp. 2d 550, 556 (S.D.N.Y. 2007) (noting that to state a claim for housing-related discrimination, the plaintiff must allege, among other things, that the plaintiff is "qualified for the dwelling at issue"), aff'd, 340 F. App'x 723 (2d Cir. 2009). It also fails as it relates to her not receiving assistance in finding new housing under the HASA policy because the plaintiff pleads no facts suggesting any link between her race and the defendants' failure to follow the policy. To the extent the plaintiff brings a racial discrimination claim, it **is dismissed without prejudice.**

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Saidin v. City of New York, Not Reported in Fed. Supp. (2020)

2020 WL 2571043
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Mohammad Ariff SAIDIN, Plaintiff,

v.

CITY OF NEW YORK, et al., Defendants.

20-CV-2851 (LLS)
|
Signed 05/19/2020

**Attorneys and Law Firms**

Mohammad Ariff Saidin, Bronx, NY, pro se.

ORDER OF DISMISSAL

LOUIS L. STANTON, United States District Judge:

**\*1** Plaintiff, appearing *pro se*, brings this action alleging that Defendants violated his rights. By order dated May 8, 2020, the Court granted Plaintiff's request to proceed without prepayment of fees, that is, *in forma pauperis* (IFP). The Court dismisses this action for the reasons set forth below.

**STANDARD OF REVIEW**

The Court must dismiss an IFP complaint, or any portion of the complaint, that is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2)(B); *see Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007). The Court must also dismiss a complaint if the court lacks subject matter jurisdiction. *See* Fed. R. Civ. P. 12(h)(3).

While the law mandates dismissal on any of these grounds, the Court is obliged to construe *pro se* pleadings liberally, *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009), and interpret them to raise the "strongest [claims] that they *suggest*," *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (internal quotation marks and citations omitted) (emphasis in original). But the "special

solicitude" in *pro se* cases, *id.* at 475 (citation omitted), has its limits – to state a claim, *pro se* pleadings still must comply with Rule 8 of the Federal Rules of Civil Procedure, which requires a complaint to make a short and plain statement showing that the pleader is entitled to relief.

The Supreme Court has held that under Rule 8, a complaint must include enough facts to state a claim for relief "that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible if the plaintiff pleads enough factual detail to allow the Court to draw the inference that the defendant is liable for the alleged misconduct. In reviewing the complaint, the Court must accept all well-pleaded factual allegations as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). But it does not have to accept as true "[t]hreadbare recitals of the elements of a cause of action," which are essentially just legal conclusions. *Twombly*, 550 U.S. at 555. After separating legal conclusions from well-pleaded factual allegations, the Court must determine whether those facts make it plausible – not merely possible – that the pleader is entitled to relief. *Id.*

**BACKGROUND**

Plaintiff, using the Court's general complaint form, brings this action invoking the Court's federal question jurisdiction. He sues the City of New York; Jeffrey Samuel & Partners, identified as the "Law Office for the City of New York;" Adult Protective Services (APS); and eight named employees of APS – Ramalu Magdalene, Jonathan Smart, David Colon, Stephen Rose, Andrea M. Leslie, Cesar Parra, Amenara Patterson, and Mr. Lani.[1] (ECF No. 2, at 4.) Plaintiff writes that Defendants have violated the following federal constitutional or statutory rights, "protected opinion, due process, equal protection, contract, fraud, negligence, and discrimination due to mental and medical disability." (*Id.* at 2.)

**\*2** The following facts are taken from the complaint. In the Summer of 2017, APS took over from the Social Security Administration (SSA) and became Plaintiff's representative payee, receiving Plaintiff's Supplemental Security Income (SSI) benefits payments. But APS "has been protective of [Plaintiff's] landlord by paying rent increases on Plaintiff's apartment "despite knowing of [his] deprived living conditions," which have been documented by New York

City Department of Housing Preservation and Development (HPD). (*Id.* at 5.) There have been no major capital improvements in the apartment to justify the rent increases, "such as no doorman, no air-conditioning, and the like." (*Id.*) As well as not protecting Plaintiff's tenant rights, APS also failed to mail his SSI checks for seven months in 2019, and his tax returns and W-2 forms in 2018, 2019, and 2020 – a service that the SSA used to provide to Plaintiff. APS also promised but failed to provide (1) movers to dispose of Plaintiff's old queen-sized mattress and box spring, (2) an aide to clean kitchen cabinets that has roaches and dust mites, and (3) an oxygen tank for breathing, which is required because of Plaintiff's exposure to second-hand smoke caused by loiterers. Plaintiff also need assistance because of his low-back pain and his kidney surgery. APS "has exacerbated [Plaintiff's] mental health conditions like depression, paranoia, schizophrenia, panic attacks, and [his] medical problems as treated by the Metropolitan Hospital Center." (*Id.* at 6.)

Plaintiff brings this action seeking "corrective measures" and monetary damages. (*Id.*)

## DISCUSSION

### A. The SSA's Representative Payee Program

Plaintiff brings this action asserting that Defendants violated his federal constitutional and statutory rights in the management of his SSI benefits. Because Plaintiff's assertions concern the SSA's representative payee program, the Court first examines whether Plaintiff's claims fall under the Social Security Act.

Under the Social Security Act, the Commissioner of Social Security may appoint a representative payee to receive benefits for the use of a beneficiary who is unable to manage his or her own affairs. 42 U.S.C. §§ 405(j)(1)(A) and 1383(a)(2)(A)(ii)(I). The SSA regulates and monitors the use of benefits and provides administrative remedies for a representative payee's misuse of funds.[2] *See* 42 U.S.C. §§ 405(j)(1)(A) and 1383(a)(2)(A)(iv). A representative payee has a responsibility to use benefits in the best interests of the beneficiary,[3] *see id.*; 20 C.F.R. §§ 416.635(a), 416.640(a), and is required to report to the SSA at least once a year "with respect to the use of such payments," 42 U.S.C. §§ 405(j)(3)(A) and 1383(a)(2)(C)(i).

The Social Security Act, however, does not provide a private right of action for a beneficiary to file a lawsuit against a representative payee who has mismanaged his or her benefits payments or otherwise violated the terms of the representative payee provisions. *See Bates v. Northwestern Human Servs., Inc.*, 466 F. Supp. 2d 69, 98–102 (D.D.C. 2006) (setting forth detailed analysis of statutory language of §§ 405(j) and 1383(a) and concluding that the provisions did not create a privately enforceable remedy for misuse of benefits by representative payees); *see also Goold v. Smith*, No. 16-CV-0413, 2016 WL 3556924, at *2 (N.D.N.Y. April 19, 2016) (finding that the Social Security Act does not give a plaintiff a private right of action against a representative payee). Rather, the statute and regulations envision that an aggrieved beneficiary will first seek remedy through the SSA. Once an individual has obtained a "final decision of the Commissioner," he may seek review in a district court under 42 U.S.C. § 405(g).[4] *See Escalera v. Comm'r of Social Security*, 457 Fed. App'x 4, 5 (2d Cir. 2011).

**\*3** Here, Plaintiff's assertions suggest that APS is not fulfilling its duties or is mismanaging his SSI benefits as representative payee. But he does not allege any facts indicating that he has presented his claims concerning his benefits to the SSA, that he received an initial or final agency determination that could be presented for judicial review under 42 U.S.C. § 405(g), or that circumstances excusing his exhaustion of remedies exist. Rather than pursuing this course of action, Plaintiff filed this lawsuit. Before he can proceed with his claims concerning his representative payee, Plaintiff must first seek review of the matter with the SSA.

*See Kriegbaum v. Katz*, 909 F.2d 70, 74 (2d Cir. 1990) ("the Social Security Administration alone has the power to enforce the duties of a representative payee through the appointment of a new payee when the current payee 'has not used the benefit payments on the beneficiary's behalf in accordance with the guidelines.' ") (quoting 20 C.F.R. § 404.2050); *see also Monet v. Mathews*, 535 F. Supp. 2d 132 (D.D.C. 2008) (federal court lacked subject matter jurisdiction over misuse of benefits claim, because the statutes provide for administrative review of alleged misconduct by representative payees, and claimants must exhaust administrative remedies before seeking relief in federal court); *Frohwerk v. Brinkley*, No. 09-CV-0161, 2009 WL 2106212, at *2 (N.D. Ind. July 14, 2009) (same).

Case 5:22-cv-01202-MAD-ML   Document 8   Filed 03/28/23   Page 96 of 364

Saidin v. City of New York, Not Reported in Fed. Supp. (2020)

## B. Section 1983

As Plaintiff asserts that Defendants violated his due process and equal protection rights, the Court will also consider whether he asserted any viable claims under 42 U.S.C. § 1983. To state a claim under § 1983, a plaintiff must allege both that: (1) a right secured by the Constitution or laws of the United States was violated, and (2) the right was violated by a person acting under the color of state law, or a "state actor." *West v. Atkins*, 487 U.S. 42, 48-49 (1988).

### 1. Defendants' Liability under § 1983

#### a. Claims against Adult Protective Services and the City of New York

Plaintiff brings claims against APS, a program administered by the New York City Human Resources Administration (HRA). But he cannot sue APS nor HRA because they are not entities that can be sued. *See* N.Y. City Charter ch. 17, § 396 ("[A]ll actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the city of New York and not in that of any agency, except where otherwise provided by law."); *Jenkins v. City of New York*, 478 F.3d 76, 93 n.19 (2d Cir. 2007); *see also Emerson v. City of New York*, 740 F. Supp. 2d 385, 396 (S.D.N.Y. 2010) ("[A] plaintiff is generally prohibited from suing a municipal agency.").

Plaintiff does name the City of New York as a defendant, but he fails to allege facts suggesting a claim for relief. When a plaintiff sues a municipality under § 1983, it is not enough for the plaintiff to allege that one of the municipality's employees or agents engaged in some wrongdoing. The plaintiff must show that the municipality itself caused the violation of the plaintiff's rights. *See Connick v. Thompson*, 563 U.S. 51, 60 (2011) ("A municipality or other local government may be liable under this section [1983] if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation.") (quoting *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 692 (1978)); *Cash v. Cnty. of Erie*, 654 F.3d 324, 333 (2d Cir. 2011). In other words, to state a § 1983 claim against a municipality, the plaintiff

must allege facts showing (1) the existence of a municipal policy, custom, or practice, and (2) that the policy, custom, or practice caused the violation of the plaintiff's constitutional rights. *See Jones v. Town of East Haven*, 691 F.3d 72, 80 (2d Cir. 2012); *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997) (internal citations omitted).

Plaintiff does not allege facts indicating that the City of New York, through APS, has engaged in an unconstitutional policy, custom, or practice that deprived him of his rights. Instead, Plaintiff complains of APS's payment of rent increases to his landlord despite the poor condition of his apartment, and the failure to provide services to which he believes he is entitled. Whatever disagreement Plaintiff may have with APS over the payment of his rent, the conditions in his apartment, or failure to provide certain services, this disagreement does not appear to concern a City policy, custom, or practice. Plaintiff's claims against the City of New York are therefore dismissed for failure to state a claim on which relief may be granted.

#### b. Claims against APS's Case Workers

**\*4** To state a claim under § 1983, a plaintiff must allege facts showing the defendant's direct and personal involvement in the alleged constitutional deprivation. *See Spavone v. N.Y. State Dep't of Corr. Serv.*, 719 F.3d 127, 135 (2d Cir. 2013) (citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)). A defendant may not be held liable under § 1983 solely because that defendant employs or supervises a person who violated the plaintiff's rights. *See Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior.").

Here, Plaintiff names as defendants eight employees of APS – Ramalu Magdalene, Jonathan Smart, David Colon, Stephen Rose, Andrea M. Leslie, Cesar Parra, Amenara Patterson, and Mr. Lani – but he fails to allege any facts suggesting that they were involved personally in violating any of Plaintiff's rights. Plaintiff's claims against these defendants must be dismissed. *See* 28 U.S.C. § 1915(e)(2)(B)(ii).

### c. Claims against Jeffrey Samuel & Partners

A claim for relief under § 1983 must also allege facts showing that each defendant acted under the color of a state "statute, ordinance, regulation, custom or usage." 42 U.S.C. § 1983. Private parties are therefore not generally liable under the statute. *Sykes v. Bank of America*, 723 F.3d 399, 406 (2d Cir. 2013) (citing *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001)). But a private entity's activity can be attributed to the state in three situations: (1) the entity acts using the coercive power of the state or is controlled by the state (the "compulsion test"); (2) the entity willfully participates in joint activity with the state or its functions are entwined with state policies (the "joint action" or "close nexus" test); or (3) the state has delegated a public function to the entity (the "public function" test). *Fabrikant v. French*, 691 F.3d 193, 207 (2d Cir. 2012).

Plaintiff brings claims against Jeffrey Samuel & Partners, identifying it as a law office representing the City. But absent special circumstances suggesting concerted action between an attorney and a state representative, *see Nicholas v. Goord*, 430 F.3d 652, 656 n.7 (2d Cir. 2005) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970)), an attorney's representation of a party, even a state actor, does not constitute state involvement sufficient for liability under § 1983. Plaintiff does not allege any facts suggesting that Jeffrey Samuel & Partners took any action in violation of his rights that can be attributed to the City of New York for purposes of liability under § 1983. Plaintiff therefore fails to state a claim against Jeffrey Samuel & Partners under § 1983. *See* 28 U.S.C. § 1915(e)(2)(B)(ii).

### 2. Due Process and Equal Protection Claims

Plaintiff asserts that Defendants violated his due process and equal protection rights. Although Plaintiff fails to allege facts suggesting that any defendant should be held liable under § 1983, in an abundance of caution, the Court considers whether the facts alleged suggest a constitutional violation.

The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." Where a plaintiff sues a defendant "to enforce procedural due process rights, a court must determine (1) whether a [liberty or] property interest is implicated, and if it is, (2) what process is due before the plaintiff may be deprived of that interest." *Nnebe v. Daus*, 644 F.3d 147, 158 (2d Cir. 2011) (citation omitted). "The fundamental requisite of due process of law is the opportunity to be heard ... at a meaningful time and in a meaningful manner." *Goldberg v. Kelly*, 397 U.S. 254, 267 (1970) (citations omitted). Generally, due process requires some kind of hearing prior to a final deprivation of an individual's liberty or property interest. *See Hodel v. Va. Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 299 (1981); *DiBlasio v. Novello*, 344 F.3d 292, 302 (2d Cir. 2003).

**\*5** Here, Plaintiff makes an assertion that his due process rights were violated, but nowhere does he explain how he was denied due process. Public assistance benefits "have long been afforded constitutional protection as a species of property protected by the federal Due Process Clause." *Kapps v. Wing*, 404 F.3d 105, 112 (2d Cir. 2005) (quoting *Goldberg*, 397 U.S. at 262 & n.8). But Plaintiff does not allege any facts suggesting that he was deprived of any interest without an opportunity to be heard. Thus, to the extent Plaintiff seeks to bring a due process claim in connection with APS's management of his SSI benefits, such a claim must be dismissed for failure to state a claim on which relief may be granted. *See* 28 U.S.C. § 1915(e)(2)(B)(ii).

Similarly, Plaintiff fails to allege facts in support of an equal protection claim. The Fourteenth Amendment's Equal Protection Clause "commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985) (citation omitted). To state an equal protection claim, a plaintiff must allege that he is a member of a suspect or quasi-suspect class of persons, *see Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir. 1995); such classes include, but are not limited to, classes identified by race, gender, alienage, or national origin, *see Myers v. Cnty. of Orange*, 157 F.3d 66, 75 (2d Cir. 1998). The plaintiff must also allege facts showing that the defendants have purposefully discriminated against the plaintiff because of his membership in that class. *See Turkmen v. Hasty*, 789 F.3d 218, 252 (2d

Saidin v. City of New York, Not Reported in Fed. Supp. (2020)

Case 5:22-cv-01202-MAD-ML    Document 8    Filed 03/28/23    Page 98 of 364

Cir. 2015) (quoting *Iqbal*, 556 U.S. at 676, *rev'd and vacated in part on other grounds sub nom.*, *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017)); *Giano*, 54 F.3d at 1057. "[P]urposeful discrimination requires more than intent as volition or intent as awareness of consequences. It instead involves a decisionmaker's undertaking a course of action because of, not merely in spite of, [the action's] adverse effects upon an identifiable group." *Turkmen*, 789 F.3d at 252 (quoting *Iqbal*, 556 U.S. at 676-77) (internal quotation marks and citations omitted, alterations in original).

Plaintiff does not allege any facts suggesting that Defendants took any adverse action against him because of his membership in a protected class or that he was treated differently from similarly situated people. He does not allege any facts implicating the Equal Protection Clause. Plaintiff therefore fails to state an equal protection claim under the Fourteenth Amendment, and the claim must be dismissed. *See* 28 U.S.C. § 1915(e)(2)(B)(ii).

**C. Disability Discrimination Claims**

Plaintiff also bring claims of "discrimination due to mental and medical disability." (ECF No. 2, at 2.) Construing the complaint liberally, Plaintiff may be asserting that Defendants denied him a reasonable accommodation or subjected him to discrimination because of his disabilities in violation of Title II of the Americans with Disabilities Act (ADA) of 1990, 42 U.S.C. § 12132, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a). [5] But Plaintiff does not allege any facts supporting a claim under Title II of the ADA or the Rehabilitation Act.

**\*6** Claims under the ADA and Rehabilitation Act are analyzed similarly. *Wright v. N.Y. State Dep't of Corr.*, 831 F.3d 64, 72 (2d Cir. 2016). To state a claim under both statutes, a plaintiff must show that he has a qualified disability, that the defendants are subject to the statutes, and that he was denied access to covered services, programs, or activities because of his disability. *Id.* Here, Plaintiff does not allege any facts concerning his mental or medical disability. But even if the Court assumes that Plaintiff suffers from a qualified disability, he does not allege any facts suggesting that Defendants failed to reasonably accommodate those disabilities or denied him access to services because of those disabilities. Plaintiff's disability discrimination claims under the ADA and the

Rehabilitation Act must also be dismissed for failure to state a claim. *See* 28 U.S.C. § 1915(e)(2)(B)(ii).

**D. State-Law Claims**

Plaintiff's remaining contract, fraud, and negligence claims fall under state law. A district court may decline to exercise supplemental jurisdiction over state-law claims when it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). Generally, "when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988). Having dismissed the federal claims over which the Court has original jurisdiction, the Court declines to exercise its supplemental jurisdiction over any state-law claims Plaintiff may be asserting. *See Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) ("Subsection (c) of § 1367 'confirms the discretionary nature of supplemental jurisdiction by enumerating the circumstances in which district courts can refuse its exercise.' ") (quoting *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997)).

**E. Denial of Leave to Amend**

District courts generally grant a *pro se* plaintiff an opportunity to amend a complaint to cure its defects, but leave to amend is not required where it would be futile. *See Hill v. Curcione*, 657 F.3d 116, 123–24 (2d Cir. 2011); *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988). Because the defects in Plaintiff's complaint cannot be cured with an amendment, the Court declines to grant Plaintiff leave to amend his complaint.

**CONCLUSION**

Plaintiff's complaint, filed IFP under 28 U.S.C. § 1915(a)(1), is dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii), without prejudice to his pursuit of relief from the Social Security Administration, and return to court when his remedies have been exhausted. All other matters are terminated.

This order is to be mailed in chambers.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2020 WL 2571043

## Footnotes

1    Plaintiff also states that there are John Doe defendants with "unrecalled names due to just oral talks during their home visits with empty promises of the APS Bronx Office...." (ECF No. 2, at 4.)

2    The Commissioner may order a report any time he "has reason to believe" that a payee is misusing a beneficiary's funds, 42 U.S.C. §§ 405(j)(3)(D), 1383(a)(2)(C)(iv), and among other measures, can call for revocation of the payee's appointment, §§ 405(j)(1)(A), 1383(a)(2)(A)(iii).

3    The regulations specifically provide that payments made for "current maintenance" are deemed to be "for the use and benefit of the beneficiary," defining "current maintenance" to include "cost[s] incurred in obtaining food, shelter, clothing, medical care, and personal comfort items." 20 C.F.R. §§ 404.2040(a), 416.640(a).

4    There are two parts to the "final decision." *Escalera v. Comm'r of Social Security*, 457 Fed. App'x 4, 5 (2d Cir. 2011). The first part is a jurisdictional requirement that cannot be waived, requiring that the plaintiff must have presented his claim to the agency. *Id.* The second requirement can be waived and requires a plaintiff to exhaust all administrative remedies. *Id.*

5    Title II of the ADA requires that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Section 504 of the Rehabilitation Act requires that "[n]o otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance...." 29 U.S.C. § 794(a).

---

**End of Document**          © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 137775
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Gwendolyn SHERMAN, Plaintiff,

v.

YONKERS PUBLIC SCHOOLS, Yonkers Public
Schools Board of Education, Edwin M. Quezada,
Superintendent, Cesar E. Chaves Elementary School, f/
k/a Cedar Place School, Magdaline M. Delany, Principal,
John Doe, #1-50, and Mary Roe, #1-50, Defendants.

No. 21-CV-7317 (CS)
|
Signed January 9, 2023

**Attorneys and Law Firms**

Adrian J. Johnson, Johnson & Associates, PC, Iselin, New
Jersey, Counsel for Plaintiff.

Joanna M. Topping, Abrams Fensterman, LLP, White Plains,
New York, Counsel for Defendants.

**OPINION & ORDER**

Seibel, United States District Judge

 *1  Before the Court is the motion to dismiss of Defendants
Yonkers Public Schools and Yonkers Public Schools Board
of Education (together, "YPS"), Dr. Edwin M. Quezada, and
Magdaline M. Delany (collectively, "Defendants"). (ECF No.
25.) [1] For the following reasons, the motion is GRANTED.

**I. BACKGROUND**

I accept as true the facts, but not the conclusions, set forth in
Plaintiff's AC.

**A. Factual Background**

Plaintiff Gwendolyn Sherman is Black woman employed by
YPS as a special education teacher at the Cesar E. Chavez
School ("Chavez"). (AC ¶¶ 14-15.) Defendant Magdaline M.
Delany is the principal at Chavez. (Id. ¶¶ 16-17.) Plaintiff
alleges that Defendants created a hostile work environment;
discriminated against her on the basis of her race, (AC ¶¶ 36,
78, 79), color, (id. ¶ 79), religion, (id.), gender, (id. ¶ 78), and

veteran status, (id.); and retaliated against her for speaking out
about student placement, (id. ¶ 46), student misconduct, (id.
¶ 32), and child abuse (id. ¶¶ 64-67).

Plaintiff alleges that from 2009 to 2019, Defendants
"collectively and individually" publicly belittled and
humiliated her and reprimanded her without basis. (Id. ¶¶
18-20.) She alleges she faced "verbal, mental and emotional
abuse" daily during this period. (Id. ¶ 71.) She does not
provide examples or any specifics regarding these alleged
belittlings, reprimands or abuses.

Plaintiff states that Defendants have reassigned Plaintiff's
classroom aides to allegedly "increase the difficulty"
for Plaintiff. (Id. ¶ 87.) As early as 2012, Defendant
Delany allegedly started punishing Plaintiff for protesting
the reassignment by transferring back to Plaintiff's class
"difficult" students who had earlier been transferred to
non-white co-workers by the Special Education Placement
Department. (Id. ¶¶ 24, 46.) These transfers from non-white
teachers are also alleged to constitute "favoritism towards
Caucasian teachers." (Id. ¶ 83.)

She alleges that starting in 2013, Defendant Delany
purposefully tampered with her evaluations, "in an attempt to
cause fear," (id. ¶ 21), and "force her to resign or retire," (id.
¶¶ 31, 55). She provides no facts regarding what was changed
in her evaluations or what effect this alleged conduct had.
She alleges that Defendants defamed her by portraying her
negatively to others outside of the school, preventing her
from transferring, being promoted, or being hired in other
districts. (Id. ¶¶ 97-99.) No specifics are provided regarding
any allegedly false statements made by Defendants, to whom
they were made, when they were made, how they were
communicated, or what connection they had to positions
for which Plaintiff applied. Plaintiff further alleges that
from 2014 through 2019, Delany allegedly "blackballed"
Plaintiff from applying for or obtaining higher-level positions
for which Plaintiff believes she was qualified, (id. ¶ 73),
and Plaintiff had to train staff members newly appointed
to those positions, (id. ¶ 74). No information is provided
about these positions, what Delany said or did, how Delany
communicated with the decision makers, or how Plaintiff's
qualifications compared to those of other applicants.

 *2  Pursuant to New York state law, Plaintiff was required
to report suspected child abuse. (Id. ¶¶ 61-63); see N.Y.
Soc. Serv. Law § 413(1)(a) (teachers, among others, "are
required to report ... when they have reasonable cause to

suspect that a child coming before them in their professional or official capacity is an abused or maltreated child."). During the 2016-2017 school year, Plaintiff reported to her building principal (presumably Delany) that she believed another teacher at the school was abusing a student, and was told that she should not report it, as the school would conduct an internal investigation. (AC ¶¶ 64-66.) She alleges that she was then "targeted" for opposing orders to not report such incidents, (*id.* ¶ 33; *see id.* ¶ 32), in that "harassing activities," (*id.* ¶ 67), directed against her intensified, (*id.* ¶¶ 67, 71). She does not describe what she said or did to protest the alleged orders. The only specific she provides about the retaliation is that "Defendants, collectively and individually, kept [her] from leaving her classroom at any time for any reason," (*id.* ¶ 68), but she also alleges that "Defendant Delany instructed [her] not to leave her classroom outside of her lunch or planning period," (*id.* ¶ 69). Plaintiff believes that the retaliatory harassment was intended to hamper her ability to teach and advocate on behalf of her special education and African-American students. (*Id.* ¶ 34.) Plaintiff also believes that because she expressed concerns about "the sexual misconduct of emotionally disturbed students, both disabled and non-disabled," Defendants retaliated against her by writing negative and false evaluations, verbally abusing and threatening her, humiliating her in front of her peers, and more. (*Id.* ¶ 32.) She does not say when or how she expressed these concerns, nor are there any facts regarding the evaluations or the other abuse.

Plaintiff also alleges she was assaulted by Defendant Delany. In November 2017, after meeting with Plaintiff in her office, Delany allegedly "had an angry attitude and rushed [Plaintiff] out of the door." (*Id.* ¶¶ 89-90.) Plaintiff turned around to ask Delany a question but she "slammed her door in [Plaintiff]'s face." (*Id.* ¶ 91.) Although the door did not touch her, Plaintiff believed she was in "imminent danger of being hit by the door." (*Id.* ¶ 92.)

Beginning in 2018 and through 2019, according to Plaintiff, Delany "embarrassed, humiliated and belittled Plaintiff in the presence of other staff members." (*Id.* ¶ 45.) At unstated times, "Defendants, collectively and individually," would allegedly reprimand Plaintiff "openly and publicly throughout the building," (*id.* ¶ 26), and publicly humiliate her during staff meetings, (*id.* ¶ 29), but again no facts about the alleged conduct are provided. Plaintiff alleges that she is "treated ... differently" in the presence of non-white team members, (*id.* ¶ 23), but does not say from whom she is treated differently, how she is treated, or how that treatment is different if white

staff members are present. Defendants allegedly stated that they had received complaints about Plaintiff from other staff members, but would not identify who lodged these complaints and did not put any complaints in her employee file. (*Id.* ¶¶ 26-27.)

Plaintiff is allegedly the only special education teacher who is denied access to information related to students' assessments and performance. (*Id.* ¶¶ 28, 52; *see id.* ¶ 85.) Plaintiff was "forced ... to come out of her classroom to address behavioral needs of students in other classrooms," which was not required of other teachers. (*Id.* ¶ 84.)

Allegedly at the instruction of Defendant Delany, (*id.* ¶ 54), support staff, "collectively and individually," would not schedule meetings for Plaintiff with the District superintendent or other administrators, (*id.* ¶ 30). Further, she claims she was denied funding for class trips, even though her white counterparts regularly received funding approval. (*Id.* ¶¶ 80-81.) She also believes she was intentionally excluded from administrative emails that were sent to other staff members. (*Id.* ¶ 82.)

Plaintiff alleges that as a result of Defendants' actions, she has suffered from many panic attacks, (*id.* ¶ 56), and in September 2019 applied to retire "to escape this nightmare," (*id.* ¶ 57), but due to the alleged stress her co-workers were facing, she withdrew her application and returned to work in November 2019, (*id.* ¶ 58). She also claims that she would have earned more had she gotten one of the positions she believes she was denied as a result of Defendants' "slanderous statements." (*Id.* ¶ 99; *see id.* ¶ 100.) These false statements have also resulted in her taking a medical leave of absence. (*Id.* ¶ 101.)

## **B. Procedural History**

Plaintiff filed her IC in this Court on August 31, 2021, bringing federal and state employment discrimination claims against Defendants YPS, Quezada, Cesar E. Chaves Elementary School, Delany, John Does #1-50, and Mary Roes #1-50. (ECF No. 1.) The case was initially assigned to Judge Paul A. Crotty. No summons was issued, yet Plaintiff purported to have served Defendants. (*See* ECF Nos. 6, 8.) On December 7, 2021, Defendants requested an extension of time to respond to the IC, which Judge Crotty granted. (ECF Nos. 4-5.) Defendants then requested a conference in advance of their anticipated motion to dismiss. (ECF No. 6.) On January 26, 2022, the matter was reassigned to the undersigned in White Plains. The Court then set a date for a pre-motion conference and ordered Plaintiff to respond to Defendants'

earlier letter. (ECF No. 7.) Plaintiff responded, (ECF No. 8), and on February 23, 2022, the Court held a pre-motion conference, granted Plaintiff leave to amend her complaint, and set a briefing schedule for this motion, (Minute Entry dated Feb. 23, 2022). [2] Plaintiff filed her AC on April 8, 2022, summonses were issued, and the instant motion followed. (AC; ECF Nos. 13-22; ECF Nos. 25-28.)

## II. LEGAL STANDARDS

### A. 🚩 Federal Rule of Civil Procedure 12(b)(6)

**\*3** "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). [3] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "While a complaint attacked by a 🚩 Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." 🚩 *Twombly*, 550 U.S. at 555. While Federal Rule of Civil Procedure 8 "marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, ... it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." 🚩 *Iqbal*, 556 U.S. at 678-79.

In considering whether a complaint states a claim upon which relief can be granted, the court "begin[s] by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," and then determines whether the remaining well-pleaded factual allegations, accepted as true, "plausibly give rise to an entitlement to relief." *Id.* at 679. Deciding whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'shown' – 'that the pleader is entitled to relief.' " *Id.* (quoting Fed. R. Civ. P. 8(a)(2)). [4]

## III. DISCUSSION

Plaintiff brings seven claims: (1) race-based discrimination and retaliation under 🚩 42 U.S.C. § 1981, (AC at 8-9); (2) conspiracy under 🚩 42 U.S.C. § 1985(3), (*id.* at 9-10); (3) hostile work environment, untethered to any provision of law, (*id.* at 10-13); (4) retaliation, untethered to any provision of federal law, (*id.* at 13-15); (5) discrimination under Title VI of the Civil Rights Act of 1964, (*id.* at 15-17); [5] (6) assault, (*id.* at 17-18); and (7) defamation, (*id.* at 18-19). All of these claims are dismissed.

### A. Federal Claims

#### 1. Statute of Limitations

**\*4** Defendants argue that the statute of limitations limits Plaintiff's discrimination and retaliation claims under 🚩 § 1981 and Title VI. (Ds' Mem. at 14.)

"[E]mployment discrimination claims arising under ... 🚩 § 1981 are subject to the four-year federal 'catch-all' statute of limitations...." *Bedden-Hurley v. N.Y.C. Bd. of Educ.*, 385 F. Supp. 2d 274, 278 (S.D.N.Y. 2005); *see* 🚩 *James v. Countrywide Fin. Corp.*, 849 F. Supp. 2d 296, 317-18 (E.D.N.Y. 2012). A three-year statute of limitations governs Title VI claims. *Singh v. Wells*, 445 F. App'x 373, 376 (2d Cir. 2011) (summary order). Recovery for discrete acts of discrimination that occur outside the applicable limitations period are barred, but a hostile work environment claim is timely, even if some of the conduct at issue occurred before the limitations period, so long as an act contributing to that environment occurred within that period. 🚩 *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 (2002).

Plaintiff filed her IC in this Court on August 31, 2021. Accordingly, any discrete acts of discrimination or retaliation under 🚩 § 1981 that are alleged to have occurred prior to August 31, 2017, and any such acts under Title VI that are alleged to have occurred prior to August 31, 2018, are time barred.

#### 2. Claims as to YPS

Defendants argue that Plaintiff's § 1981 and Title VI claims against YPS fail because Plaintiff does not allege that any civil rights violations occurred because of a municipal policy or custom. (Ds' Mem. at 3-4.) Plaintiff did not address this argument in her opposition, and thus has abandoned those claims as to YPS. *Horsting v. St. John's Riverside Hosp.*, No. 17-CV-3230, 2018 WL 1918617, at *6 (S.D.N.Y. Apr. 18, 2018) ("At the motion to dismiss stage, where review is limited to the pleadings, a plaintiff abandons a claim by failing to address the defendant's arguments in support of dismissing that claim."); *Johnson v. City of N.Y.*, No. 15-CV-8195, 2017 WL 2312924, at *17 (S.D.N.Y. May 26, 2017) ("By failing to address Defendants' arguments in support of dismissing this claim, it is deemed withdrawn or dismissed as abandoned.");

*Brandon v. City of N.Y.*, 705 F. Supp. 2d 261, 268 (S.D.N.Y. 2010) (claims abandoned where Plaintiff "did not raise any arguments opposing Defendants' motion") (collecting cases); *Bonilla v. Smithfield Assocs. LLC*, No. 09-CV-1549, 2009 WL 4457304, at *4 (S.D.N.Y. Dec. 4, 2009) (claims deemed abandoned and dismissed as a matter of law where defendants raised three arguments for dismissal of those claims and plaintiff responded to only one).

But while Defendants are correct that when a municipality (or an individual in his official capacity, *see* Hafer v. Melo, 502 U.S. 21, 25 (1991)), is sued for discrimination under § 1981, the plaintiff must show that the challenged acts were performed pursuant to a municipal custom or policy, *see, e.g.*, Jett v. Dall. Indep. Sch. Dist., 491 U.S. 701, 733-36 (1989), it has not provided authority for the proposition that the same is true under Title VI. Thus, despite Plaintiff's failure to oppose, I will dismiss only the § 1981 claims against Defendant YPS for failure to allege a policy or custom. As will be seen, the Title VI claim fails for different reasons.

### 3. Personal Involvement

**\*5** Defendants argue that Plaintiff has failed to plead facts showing the personal involvement of Defendant Quezada. (Ds' Mem. at 5-6.) As for claims under 42 U.S.C. § 1983, a showing of personal involvement by the defendant is required for liability under § 1981. *Patterson v. County of Oneida*, 375 F.3d 206, 229 (2d Cir. 2004); *Baker v. Connecticut*, No. 03-CV-1994, 2006 WL 581205, at *10

(D. Conn. Mar. 8, 2006); *see Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 75 (2d Cir. 2000) ("[P]ersonal liability under section 1981 must be predicated on the actor's personal involvement."). While Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995), laid out a special test for supervisory liability, outlining five ways a plaintiff could show personal involvement of a supervisor, the Second Circuit has clarified that under the Supreme Court's ruling in *Iqbal*, the *Colon* test is invalid and "a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.' " *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (quoting Iqbal, 556 U.S. at 676). "Simply put, there's no special rule of liability for supervisors." *Id.* While " '[t]he factors necessary to establish a [ § 1981] violation will vary with the constitutional provision at issue' because the elements of different constitutional violations vary," *id.* (quoting Iqbal, 556 U.S. at 676), "[t]he violation must be established against the supervisory official directly," *id.*

Plaintiff has not pleaded enough facts to render it plausible that Defendant Quezada – the Superintendent of YPS, (AC ¶ 8) – was personally involved in the alleged violations. While Plaintiff alleges that "Defendants, collectively and individually" retaliated against Plaintiff, created a hostile work environment, belittled and humiliated her, and reprimanded her for no reason, (*id.* ¶¶ 18-20, 35-38), these allegations are insufficient because they "lump[ ] all the defendants together in each claim and provide[ ] no factual basis to distinguish their conduct." *Tracey v. City of Geneva*, No. 17-CV-6567, 2018 WL 1509355, at *3 (W.D.N.Y. Mar. 26, 2018); *see Ruiz v. Westchester County*, No. 18-CV-7007, 2020 WL 4340788, at *4 (S.D.N.Y. July 28, 2020) (collecting cases); *see also Gonzalez v. Yepes*, No. 19-CV-267, 2019 WL 2603533, at *7 (D. Conn. June 25, 2019) ("As a corollary of the personal involvement requirement, complaints that rely on 'group pleading' and fail to differentiate as to which defendant was involved in the alleged unlawful conduct are insufficient to state a claim.") (collecting cases); *5465 Route 212, LLC v. N.Y. State Dep't of Transp.*, No. 19-CV-1510, 2020 WL 6888052, at *9 (N.D.N.Y. Nov. 24, 2020) ("Because the personal involvement of a defendant is a prerequisite to an award of damages under § 1983, a plaintiff cannot rely on a group pleading against all defendants without making specific individual factual allegations"). Plaintiff provides no

specifics as to anything Quezada did or did not do, or how he was involved in the alleged mistreatment of Plaintiff.

It is apparent that Quezada is being sued merely based on his supervisory position, which even before *Tangreti* would not have sufficed to show personal involvement. *See, e.g.,* ⚑ *Banks v. Annucci,* 48 F. Supp. 3d 394, 416 (N.D.N.Y. 2004) ("Where a defendant is a supervisory official, a mere linkage to the unlawful conduct through the chain of command (*i.e.,* under the doctrine of *respondeat superior*) is insufficient to show his or her personal involvement in that unlawful conduct."). Further, Plaintiff in her opposition does not address how Quezada may have been personally involved, so her ⚑ § 1981 claims against him have been abandoned.

The ⚑ § 1981 claims against Quezada are dismissed.

### 4. Discrimination Claims

#### a. ⚑ Section 1981 Claim

As established above, Plaintiff's ⚑ § 1981 claim remains only as to Defendant Delany. To state a claim under that statute, a plaintiff "must allege facts supporting the following elements: (1) plaintiff [is a] member[ ] of a racial minority; (2) defendants' intent to discriminate on the basis of race; and (3) discrimination concerning one of the statute's enumerated activities." ⚑ *Brown v. City of Oneonta,* 221 F.3d 329, 339 (2d Cir. 2000).

**\*6** In her AC, Plaintiff summarily states, "Defendants' conduct ..., motivated in substantial respect by race-based animus, violated Plaintiff's rights as guaranteed [under] ⚑ 42 U.S.C. § 1981." (AC ¶ 36.) But despite this allegation, the vast majority of the facts she provides are wholly unconnected to race. Plaintiff states that she was singled out – for example, she alleges she is the only special education teacher who was denied information on students' assessments and performance, (*id.* ¶¶ 28, 86); she was excluded from administrative emails that had been sent to other staff members, (*id.* ¶ 83); and, unlike other teachers, she had to leave her classroom to address other students' behavioral issues, (*id.* ¶ 84) – but nowhere does she provide facts suggesting that she was subjected to such treatment because of her race, as opposed to, say, Delany not liking her.

She does not describe any racially discriminatory remarks by Delany or any mistreatment of other Black teachers. Indeed, that Plaintiff attributes her mistreatment variously to her race, color, gender, veteran status, and religion, (*id.* ¶¶ 78-79), illustrates that Plaintiff lacks facts supporting the notion that her treatment was attributable to any particular protected characteristic.

The only allegations Plaintiff connects to race are that Defendants never approved her requests to fund class trips, even though her white colleagues regularly received approval, (*id.* ¶ 81), and that Delany reassigning difficult students back to Plaintiff was favoritism toward Caucasian teachers, (*id.* ¶ 83). Elsewhere Plaintiff alleges that the difficult students came back to her from non-white teachers, (*id.* ¶ 24), so it is hard to see how that conduct could reflect favoritism toward white teachers. And Plaintiff provides no facts about her trip requests or those of other teachers that would show the requests to be sufficiently similar to give rise to an inference of discrimination. *See* ⚑ *Wegmann v. Young Adult Inst., Inc., Trustees of Supplemental Pension Plan for Certain Mgmt. Emps. of Young Adult Inst.,* No. 20-1147, 2021 WL 3573753, at \*4 (2d Cir. Aug. 13, 2021) (where plaintiff seeks to make out *prima facie* case by reference to disparate treatment of other employees, situation of those employees must be sufficiently similar to support minimal inference that difference in treatment may be attributable to discrimination).

But even if she had, and even assuming that she meant to say that the difficult students came back to her from white teachers, Plaintiff's claim fails as to the third element of her *prima facie* case, because the treatment she describes does not amount to an adverse employment action. For purposes of a discrimination claim, "[a]n adverse employment action is a materially adverse change in the terms and conditions of employment," ⚑ *Mathirampuzha v. Potter,* 548 F.3d 70, 78 (2d Cir. 2008), "one which is more disruptive than a mere inconvenience or an alteration of job responsibilities," ⚑ *Brown v. City of Syracuse,* 673 F.3d 141, 150 (2d Cir. 2012). "Examples of materially adverse employment actions include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." ⚑ *Feingold v. New York,* 366 F.3d 138, 152 (2d Cir. 2004).

As a general matter, "assignments that are part of an employee's normal responsibilities are not adverse employment actions where, as here, the rate of pay and benefits remains the same." *Rodriguez v. Coca Cola Refreshments USA, Inc.*, No. 12-CV-234, 2013 WL 5230037, at *3 (E.D.N.Y. Sept. 16, 2013) (collecting cases); *see* *Potash v. Fla. Union Free Sch. Dist.*, 972 F. Supp. 2d 557, 584 (S.D.N.Y. 2013) ("Changes in assignments or responsibilities that do not radically change the nature of work are not typically adverse employment actions.") But "[a] change in duties or job reassignment may be an adverse employment action, if it results in a change in responsibilities so significant as to constitute a setback to the plaintiff's career." *Edwards v. Huntington Union Free Sch. Dist.*, 957 F. Supp. 2d 203, 211 (E.D.N.Y. 2013). "A plaintiff can make such a showing by demonstrating that the new assignment was materially less prestigious, materially less suited to his skills and expertise, or materially less conducive to career advancement." *Id.* But unfair work assignments or undesirable duties, absent negative ramifications for employment status, do not rise to the required level. *Grant v. N.Y. State Off. for People with Developmental Disabilities*, No. 12-CV-4729, 2013 WL 3973168, at *7 (E.D.N.Y. July 30, 2013). Nor does being berated or embarrassed by a supervisor. *Voss v. McDonough*, No. 17-CV-9015, 2021 WL 4199941, at *10, *17 (S.D.N.Y. Sept. 15, 2021); *see Stewart v. City of N.Y.*, No. 18-CV-7140, 2022 WL 4485048, at *5 (E.D.N.Y. Sept. 27, 2022) (reprimands, admonishments, and other actions causing embarrassment and anxiety are not adverse actions where they result in no tangible employment consequences).

**\*7** Disapproval of trip requests and assignment of "difficult" students do not involve a guaranteed employment benefit or a term or condition of employment, such that the denial amounted to a material adverse action. *See Smalls v. Allstate Ins. Co.*, 396 F. Supp. 2d 364, 371 (S.D.N.Y. 2005) (unfair criticism, unfavorable schedules, or undesirable work assignments do not rise to level of adverse employment actions because they do not have material impact on terms and conditions of employment). Nor does Plaintiff allege that teaching "difficult" students was outside her job responsibilities, *see Rodriguez*, 2013 WL 5230037, at *3 ("[I]t is well established that assignments that are part of an employee's normal responsibilities are not "adverse employment actions" where, as here, the rate of pay and benefits remains the same."), or "so significant as to constitute a setback to the plaintiff's career," *Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 641 (2d Cir. 2000). At most,

what Plaintiff describes can be characterized as "mere inconvenience," which is not enough to constitute an adverse employment action. *Brown*, 673 F.3d at 150. [6]

Therefore, Plaintiff's § 1981 discrimination claim is dismissed.

### b. Title VI Claim

Section 601 of Title VI of the Civil Rights Act of 1964 provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. For the same reasons described above, Plaintiff has not made out a plausible discrimination claim. She has provided only conclusions, not facts, to support the notion that her race resulted in any discrimination. But her Title VI claim must also be dismissed for independent reasons.

To begin, Title VI does not provide for individual liability, *see* *Bayon v. State Univ. of N.Y. at Buffalo*, No. 98-CV-578, 2001 WL 135817, at *2 (W.D.N.Y. Feb. 15, 2001), so any Title VI claim against Defendants Quezada and Delany in their individual capacities would have to be dismissed. Further, "covered entities can only be sued for employment discrimination [under Title VI] 'where a primary objective of the Federal financial assistance ... is to provide employment.' " *Reynolds v. Sch. Dist. No. 1*, 69 F.3d 1523, 1531 (10th Cir. 1995) (quoting 42 U.S.C. § 2000d-3). Thus, "for a claimant to recover under Title VI against an employer for discriminatory employment practices, a threshold requirement is that the employer be the recipient of federal funds aimed primarily at providing employment." *Ass'n Against Discrimination in Emp., Inc. ("AADE") v. City of Bridgeport*, 647 F.2d 256, 276 (2d Cir. 1981); *see Sulehria v. New York*, No. 13-CV-6990, 2014 WL 4716084, at *5 (S.D.N.Y. Sept. 19, 2014) ("To state a claim under Title VI, a plaintiff must plausibly allege ... that the federal funds have been made available primarily for providing employment."). "This section essentially requires a logical nexus between the use of federal funds and the practice toward which the action is directed." *Johnson v. County of Nassau*, 411 F. Supp. 2d 171, 175 (E.D.N.Y. 2006).

Plaintiff has not alleged, even in conclusory fashion (which in any event would not suffice), that the federal funds received by YPS were primarily intended to provide employment. *See Gilmore v. Univ. of Rochester*, 410 F. Supp. 2d 127, 132 (W.D.N.Y. 2006) (Title VI claim dismissed where complaint alleged only that defendant received federal funds, not that the funds were primarily intended to provide employment). The AC alleges that "[a]ll Defendants in this matter, in some form or another, receive financial benefits that can be traced back to Federal spending," (AC ¶ 76), but that is not enough to show that any federal funds were primarily intended to provide employment. *See Verdi v. City of N.Y.*, 306 F. Supp. 3d 532, 546 (S.D.N.Y. 2018) (Title VI claim dismissed because the "allegations regarding federal funding are bare and conclusory and do not describe the federal funding the DOE received, let alone link that funding to the students whose discrimination was the subject of Plaintiff's complaints"). Plaintiff thus has not plausibly alleged any "logical nexus between the use of federal funds and the practice toward which agency action is directed." *AADE*, 647 F.2d at 276; *see Dobroff v. Hempstead Union Free Sch. Dist.*, No. 21-CV-1567, 2022 WL 4641128, at *5 (E.D.N.Y. Sept. 30, 2022). [7]

**\*8** Plaintiff's Title VI claim is therefore dismissed.

### 5. Conspiracy Claim Under Section 42 U.S.C. § 1985(3)

To state a claim under § 1985(3), a plaintiff must show "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *Dolan v. Connolly*, 794 F.3d 290, 296 (2d Cir. 2015); *see* 42 U.S.C. § 1985(c). "[T]o maintain an action under Section 1985, a plaintiff must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Webb v. Goord*, 340 F.3d 105, 110 (2d Cir. 2003). Here, Plaintiff has provided no more than a conclusory allegation of conspiracy, stating,

"Under the premises Defendants' conduct violated Plaintiff's rights .... [W]e have such conspiracies by Defendants to violate Plaintiff's constitutional rights." (AC ¶¶ 40, 42.) On this basis alone, Plaintiff's conspiracy must be dismissed for failure to state a claim. *See Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997) (dismissal of "conclusory, vague or general allegations of conspiracy to deprive a person of constitutional rights" is proper). That Plaintiff's conclusory allegations are aimed at Defendants "collectively" does not, as Plaintiff argues in her opposition, render it plausible that Defendants acted as a collective and "with one objective in mind." (*See* P's Opp. at 8.)

Defendants also argue that Plaintiff's conspiracy claim fails because she does not show that racial animus motivated Defendants' claimed conspiracy. (Ds' Mem. at 10-11.) To plead a § 1985(3) claim, "[t]he conspiracy must also be 'motivated by some racial or perhaps otherwise class-based, invidious discriminatory animus.' " *Dolan*, 794 F.3d at 296 (quoting *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 791 (2d Cir. 2007)). The AC does not explicitly allege any race-based motivation for her conspiracy claim, and – as discussed above – barely mentions facts related to race. Even in her opposition, Plaintiff simply states that she has adequately shown that Defendants acted in concert toward her, (P's Opp. at 8), with no effort to describe any such actions or connect them to race.

Moreover, even if a sufficient connection to race were pleaded, the AC (as discussed) provides facts only against Delany, and she cannot conspire with herself. *See Jianjun Li v. Vill. of Saddle Rock*, No. 22-CV-2289, 2021 WL 1193618, at *10 (E.D.N.Y. Mar. 30, 2021); *Heinfling v. Colapinto*, 946 F. Supp. 260, 266-67 (S.D.N.Y. 1996). Finally, even if Plaintiff had pleaded facts as to Quezada, her claim would be barred by the intracorporate conspiracy doctrine. Under this doctrine, "officers, agents and employees of a single corporate entity are legally incapable of conspiring together." *Quinn v. Nassau Cnty. Police Dep't*, 53 F. Supp. 2d 347, 359 (E.D.N.Y. 1999) (applying doctrine in § 1985(3) context). [8]

**\*9** For all these reasons, the § 1985(3) conspiracy claim is dismissed.

#### 6. **Retaliation**

Plaintiff brings a "workplace retaliation" claim, alleging Defendants retaliated against her after she reported a potential instance of child abuse in 2016-2017. (AC ¶¶ 64-66.) She claims that after she reported the incident, Defendants harassed her by keeping her from leaving her classroom; verbally, mentally, and emotionally abused her; and obstructed her ability to apply for and get a higher-level administrative position. (*Id.* ¶¶ 67-74.)

As an initial matter, Plaintiff's retaliation claim is pleaded without specifying the statute under which it is brought. Defendants analyze it as a claim under § 1983 for retaliation for opposition to a discriminatory employment practice, and note that such a claim is analyzed under the same standards as a retaliation claim under Title VII. (Ds' Mem. at 12-14); *see Hicks v. Baines,* 593 F.3d 159, 164 (2d Cir. 2010). In her opposition, Plaintiff seems to concur, citing Title VII standards. (P's Opp. at 5). Accordingly, Plaintiff's retaliation claim can only be brought against Defendant Delany, for the reasons stated above. "[F]or a retaliation claim under § 1983 to survive a ... motion to dismiss, the plaintiff must plausibly allege that: (1) defendants acted under the color of state law, (2) defendants took adverse employment action against h[er], (3) because [s]he complained of or otherwise opposed discrimination." *Vega v. Hempstead Union Free Sch. Dist.,* 801 F.3d 72, 91 (2d Cir. 2015). "That is, [Plaintiff] must plead (1) engagement in opposition to an unlawful employment practice; (2) an adverse employment action; and (3) factual matter rendering plausible an inference of causation between her protected activity and the adverse employment action." *Ray v. N.Y. State Ins. Fund,* 2018 WL 3475467, at *9 (S.D.N.Y. July 18, 2018). "[T]o establish participation in a protected activity, a plaintiff is required to show not an actual violation of the act, but only that he was acting under a good faith, reasonable belief that such a violation existed." *Grant v. Hazelett Strip-Casting Corp.,* 880 F.2d 1564, 1569 (2d Cir. 1989). "Moreover, the employer must be able to reasonably understand that the complaint was directed at conduct prohibited by Title VII." *Bamba v. Fenton,* 758 F. App'x 8, 12-13 (2d Cir. 2018) (summary order).

Plaintiff's claim fails. First, Plaintiff alleges she reported a suspected incident of child abuse in 2016-2017, which is outside of three-year statute of limitations period. *Milan*

*v. Wertheimer,* 808 F.3d 961, 963 (2d Cir. 2015) ("Section 1983 actions in New York are subject to a three-year statute of limitations."). Thus any alleged retaliatory activity that occurred prior to August 31, 2018 is time-barred. Even assuming that at least some of the retaliatory activity occurred after this date [9] – and if it did, it is hard to see how it could be connected to the protected activity, *see Clark Cnty. Sch. Dist. v. Breeden,* 532 U.S. 268, 273 (2001) (To establish causation based on temporal proximity, period between protected activity and adverse action must be "very close.") – Plaintiff's claim fails because she does not plead a sufficient protected activity. Protected activity is complaining about or otherwise opposing discrimination. *Vega,* 801 F.3d at 91; *see Littlejohn v. City of N.Y.,* 795 F.3d 297, 316-17 (2d Cir. 2015). Here, Plaintiff does not allege that she complained about unlawful discrimination; rather, she reported a potential incident of child abuse. [10] Plaintiff does not even allege, let alone plausibly show, that she had a good faith reasonable belief that she was opposing an employment practice that is outlawed by federal law, or that there was any way her employer could have understood her report as such.

**\*10** Therefore, Plaintiff's retaliation claim must also be dismissed.

#### 7. **Hostile Work Environment**

Plaintiff also alleges a hostile work environment claim, and as with her retaliation claim, does not state under which statutory scheme she intends this claim to fall, but I will assume she meant to invoke a race-based or gender-based § 1981 or § 1983 claim.

"To establish a hostile work environment under Title VII, § 1981, or § 1983, a plaintiff must show that the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Littlejohn,* 795 F.3d at 320-21. Courts consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 321. Plaintiff must come forward

with "evidence not only that [she] subjectively perceived the environment to be hostile or abusive," but also that an objectively reasonable employee would perceive it to be so.

🚩 *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 745 (2d Cir. 2003); *see* 🚩 *Dawson v. County of Westchester*, 351 F. Supp. 2d 176, 186 (S.D.N.Y. 2004). Furthermore, "[a] plaintiff must also demonstrate that she was subjected to the hostility because of her membership in a protected class." 🚩 *Brennan v. Metro. Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999).

Plaintiff alleges that from 2009 to 2019, Defendants, "collectively and individually," created a hostile work environment by publicly belittling and humiliating her, (AC ¶¶ 18-19; *see id.* ¶ 45), but because no details about this alleged abuse are provided, it is impossible to conclude that an objectively reasonable employee would plausibly view it as severe or pervasive. She also specifies that: (1) from 2012 to 2019, Delany reassigned difficult students back to Plaintiff's classroom as punishment for Plaintiff speaking out, at an unspecified time, about removal of aides, (*id.* ¶¶ 46-47)[11]; (2) from 2010 through 2019, Delany reprimanded Plaintiff without cause, (*id.* ¶ 48); (3) from 2013 to 2019, Delany tampered with Plaintiff's evaluations in an unspecified way, (*id.* ¶¶ 49, 55); (4) from 2009 through 2019, Delany ordered Plaintiff to take on students "outside her teaching grade group," train staff members for positions she did not hold, and work with staff members against whom Plaintiff had filed complaints, (*id.* ¶ 50); (5) at an unspecified time, Delany did not provide Plaintiff with information about students' assessments and performances, (*id.* ¶ 52); (6) throughout Plaintiff's entire tenure, Delany divulged unspecified sensitive information about Plaintiff, (*id.* ¶ 53); and (7) at an unspecified time, Delany directed support staff to not schedule Plaintiff for meetings with administrators, (*id.* ¶ 54).

 **\*11** Without more detail, it is dubious whether these alleged events, over a ten-year period, are plausibly objectively severe or pervasive enough to constitute a hostile work environment. But regardless, Plaintiff plainly fails to show how any of these allegations, singularly or in the aggregate, occurred because of her membership in a protected class. Even in her opposition, Plaintiff addresses only whether the environment was sufficiently hostile, and makes no effort to suggest, let alone point to facts that support, that the hostility arose because she is Black and/or female. Allegations of unfair treatment directed at a member of a protected class do not establish a claim absent a basis to conclude that unfair

treatment arose because of the victim's membership in that class. *See* 🚩 *Grillo v. N.Y.C. Transit Auth.*, 291 F.3d 231, 235 (2d Cir. 2002) ("Even if [plaintiff's] highly dubious claim that he was unfairly singled out for punishment by the instructors is credited, [plaintiff] has done little more than cite to his alleged mistreatment and ask the court to conclude that it must have been related to his race."); 🚩 *Varughese v. Mount Sinai Med. Ctr.*, No. 12-CV-8812, 2015 WL 1499618, at \*42 (S.D.N.Y. Mar. 27, 2015) ("fallacy" for plaintiff to say: "I belong to a protected class; something bad happened to me at work; therefore, it must have occurred because I belong to a protected class"); *Rissman v. Chertoff*, No. 08-CV-7352, 2008 WL 5191394, at \*4 (S.D.N.Y. Dec. 12, 2008) ("In essence, plaintiff alleges that because he was yelled at [by his supervisors], this must have been because [of his protected status]. Such conclusory and speculative statements are insufficient.").

> Unfortunately, the term "hostile work environment" has been interpreted by some in the general public to refer to workplaces with abusive bosses, bullying, cutthroat competition, nastiness, or unfairness. While those workplaces may be hostile in the colloquial sense, they do not violate the law unless they are that way because of an employee's protected characteristic.

*Estevez v. Berkeley Coll.*, No. 18-CV-10350, 2021 WL 3115452, at \*19 n.21 (S.D.N.Y. July 19, 2021), *aff'd*, No. 21-1988, 2022 WL 16843460 (2d Cir. Nov. 10, 2022).

Accordingly, Plaintiff's hostile work environment claim is also dismissed.

### B. State Law Claims

Defendants argue that Plaintiff's state law claims for assault and defamation must be dismissed because Plaintiff did not file a notice of claim, as required by 🚩 N.Y. Educ. Law. § 3813, and they are time-barred, given that state law claims brought against a school district or its employees are subject to a one-year statute of limitation. (Ds' Mem. at 15-17.) Plaintiff did not address her state law claims in her opposition,

and as a result, those claims are deemed abandoned and dismissed.

#### C. **Leave to Amend**

Leave to amend a complaint should be freely given "when justice so requires." Fed. R. Civ. P. 15(a)(2). "[I]t is within the sound discretion of the district court to grant or deny leave to amend." Kim v. Kimm, 884 F.3d 98, 105 (2d Cir. 2018). "Leave to amend, though liberally granted, may properly be denied" for " 'repeated failure to cure deficiencies by amendments previously allowed' " or " 'futility of amendment,' " among other reasons. Ruotolo v. City of N.Y., 514 F.3d 184, 191 (2d Cir. 2008) (quoting Foman v. Davis, 371 U.S. 178, 182 (1962)).

Plaintiff has already amended, after having the benefit of a pre-motion letter from Defendants outlining the proposed grounds for dismissal, (ECF No. 8), and the discussion at the February 23, 2022 pre-motion conference, (*see* Minute Entry dated Feb. 23, 2022). In general, a plaintiff's failure to fix deficiencies in the previous pleading, after being provided notice of them, is alone sufficient ground to deny leave to amend. *See* Nat'l Credit Union Admin. Bd. v. U.S. Bank Nat'l Ass'n, 898 F.3d 243, 257-58 (2d Cir. 2018) ("When a plaintiff was aware of the deficiencies in his complaint when he first amended, he clearly has no right to a second amendment even if the proposed second amended complaint in fact cures the defects of the first. Simply put, a busy district court need not allow itself to be imposed upon by the presentation of theories seriatim."); In re Eaton Vance Mut. Funds Fee Litig., 380 F. Supp. 2d 222, 242 (S.D.N.Y. 2005) (denying leave to amend because "the plaintiffs have had two opportunities to cure the defects in their complaints, including a procedure through which the plaintiffs were provided notice of defects in the Consolidated Amended Complaint by the defendants and given a chance to amend their Consolidated

Amended Complaint," and "plaintiffs have not submitted a proposed amended complaint that would cure these pleading defects"), *aff'd sub nom.* Bellikoff v. Eaton Vance Corp., 481 F.3d 110, 118 (2d Cir. 2007) (*per curiam*) ("[P]laintiffs were not entitled to an advisory opinion from the Court informing them of the deficiencies in the complaint and then an opportunity to cure those deficiencies.").

 **\*12** Moreover, Plaintiff has not asked to amend or otherwise suggested that she is in possession of facts that would cure the deficiencies identified in this opinion. *See* TechnoMarine SA v. Giftports, Inc., 758 F.3d 493, 505 (2d Cir. 2014) (plaintiff need not be given leave to amend if plaintiff fails to specify how amendment would cure the pleading deficiencies in the complaint); Gallop v. Cheney, 642 F.3d 364, 369 (2d Cir. 2011) (district court did not err in dismissing claim with prejudice in absence of any indication plaintiff could or would provide additional allegations leading to different result); Horoshko v. Citibank, N.A., 373 F.3d 248, 249-50 (2d Cir. 2004) (*per curiam*) (district court did not abuse its discretion by not granting leave to amend where there was no indication as to what might have been added to make complaint viable and plaintiffs did not request leave to amend).

Accordingly, the Court declines to grant leave to amend *sua sponte*.

#### IV. **CONCLUSION**

For the foregoing reasons, Defendants' motion is GRANTED. The Clerk of Court is respectfully directed to terminate the pending motion, (ECF No. 25), and close the case.

**SO ORDERED.**

**All Citations**

Slip Copy, 2023 WL 137775

---

#### Footnotes

1        Defendants state, and Plaintiff does not dispute, that Cesar E. Chavez School – erroneously named as "Cesar E. Chaves Elementary School" in the initial Complaint, (ECF No. 1 ("IC")), and Amended Complaint, (ECF No. 11 ("AC")) – is within YPS and therefore not a separate legal entity. (ECF No. 26 ("Ds' Mem.") at 1 n.1.)

2  At the pre-motion conference, Plaintiff's counsel had no explanation for why he had served Defendants with an unsigned, unsealed "summons" that had not been issued by the Court, but in the interest of resolving the claims on the merits, I extended Plaintiff's time to serve to 21 days after the filing of the AC.

3  Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes, and alterations.

4  Plaintiff's counsel acknowledges that *Twombly* and *Iqbal* are more recent than *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), yet seems to rely on *Conley*'s statement that dismissal is not warranted unless it is apparent that Plaintiff can prove no set of facts that would entitle it to relief. (ECF No. 27 ("P's Opp.") at 9.) *Conley*'s "no set of facts" standard, however, was "retire[d]" by the Supreme Court in *Twombly*, 550 U.S. at 562-63, and the applicable standard is now one of plausibility, *see Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 570. No attorney should be citing to or relying on the "no set of facts" standard over a decade after it has been overruled.

5  The fifth claim in the AC is captioned "Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq." (AC at 15.) This caption is puzzling, because § 2000d is Title VI of the Civil Rights Act, whereas Title VII is § 2000e. It is even more puzzling because I specifically told Plaintiff's counsel at the pre-motion conference to make clear under which Title Plaintiff was bringing her claim. "Title VI prohibits a recipient of federal funds from discriminating on the basis of race, color, or national origin." *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 664 (2d Cir. 2012). Because Plaintiff in her fifth claim alleges that Defendants receive federal funds, (AC ¶ 76), and because at the pre-motion conference Defendants represented that no administrative complaint had been filed, as would be required for a Title VII claim, I conclude that Plaintiff means to assert a Title VI claim.

6  To the extent Plaintiff wishes to bring discrimination claims based on gender, those claims also fail. Gender is not a protected class under § 1981. *Anderson v. Conboy*, 156 F.3d 167, 170 (2d Cir. 1998) ("Section 1981 does not prohibit discrimination on the basis of gender or religion, national origin, or age.") More fundamentally, the AC is devoid of any facts even faintly suggesting that Defendants discriminated on the basis of her gender. The same is true as to Plaintiff's religion (which she does not describe) and veteran status.

7  In addition, as Defendants point out, (ECF No. 28 ("Ds' Reply") at 4-5), Plaintiff does not address this argument in her opposition, and thus has abandoned her Title VI claim.

8  "There is a 'personal interest' or 'personal stake' exception to the intracorporate conspiracy doctrine, however, which permits a § 1985 claim where there are individuals who are 'motivated by an independent personal stake in achieving the corporation's objective.' " *Salgado v. City of N.Y.*, No. 00-CV-3667, 2001 WL 290051, at *8 (S.D.N.Y. Mar. 26, 2001) (quoting *Girard v. 94th St. & Fifth Ave. Corp.*, 530 F.2d 66, 71-72 (2d Cir. 1976)). Plaintiff does not allege that any such exception applies, and courts in this district have held that personal bias, by itself, is insufficient to defeat the intracorporate conspiracy doctrine. *See Salgado*, 2001 WL 290051, at *9 (officer defendants' derogatory remarks about plaintiff's sexual orientation were insufficient to properly allege "personal interest" exception to intracorporate conspiracy doctrine); *Johnson v. Nyack Hosp.*, 954 F. Supp. 717, 723 (S.D.N.Y. 1997) ("[P]ersonal bias is not the sort of individual interest that takes a defendant out of the intraenterprise conspiracy doctrine," or else the exception would swallow the rule.).

9    The AC states that the directive to remain in her classroom (if indeed that is what Plaintiff was told, as opposed to being required to stay in her room except for her free periods) followed "[s]oon after" the report, (AC ¶¶ 67-69), and that the verbal abuse "intensified" after the report, (*id.* ¶¶ 67, 72). But it also says that Delany "increased" her abuse "[s]tarting in 2009 and running through 2019," (*id.* ¶ 71), and that Delany blackballed Plaintiff "[s]tarting in 2014 and running through 2019," (*id.* ¶ 73). It is hard to see how mistreatment after August 31, 2018 – which by Plaintiff's account was the continuation of years of increasing abuse – could be attributable to the protected activity. *See Cayemittes v. City of N.Y. Dep't of Hous. Pres. & Dev.*, 974 F. Supp. 2d 240, 262 (S.D.N.Y. 2013) ("It is well-settled that an adverse employment action cannot serve as the basis for a retaliation claim if the action was set in motion before a plaintiff engaged in protected activity."), *aff'd*, 641 F. App'x 60 (2d Cir. 2016) (summary order).

10   To the extent Plaintiff meant to advance a claim of retaliation under 🚩New York Social Services Law § 413(c) and 🚩New York Labor Law § 740 – and she makes no such suggestion in her opposition – it would be even further outside the statute of limitations, *see Lomonoco v. Anne*, No. 15-CV-1163, 2016 WL 4402029, at *6 (N.D.N.Y. Aug. 18, 2016) (no private right of action under N.Y. Social Services Law so Plaintiff must bring action under 🚩N.Y. Labor Law § 740) (collecting cases); *Geldzahler v. N.Y. Med. Coll.*, 746 F. Supp. 2d 618, 630 (S.D.N.Y. 2010) ("The statute of limitations for bringing an action under 🚩Section 740 is one year after the alleged retaliatory action was taken"), and would fail for the same reasons as her other state-law claims, as discussed below. Plaintiff plainly did not intend to advance a claim of First Amendment retaliation, as her IC contained such claims, (IC at 8, 11-12), and they were removed in the AC.

11   To the extent this allegation could be interpreted as advancing a claim that the hostile work environment was retaliation for this protest, it would fail for two reasons. First, as set forth in note 11 above, Plaintiff withdrew her First Amendment claims. Second, when teachers complain internally about their work conditions, they are speaking as employees, not citizens, and their speech does not constitute protected activity that can support a retaliation claim. *See, e.g.*, *Brooke v. County of Rockland*, No. 21-598-CV, 2022 WL 6585350, at *3-4 (2d Cir. Oct. 11, 2022); *Weintraub v. Bd. of Educ.*, 593 F.3d 196, 203 (2d Cir. 2010); *Geer v. Gates Chili Cent. Sch. Dist.*, 577 F. Supp. 3d 147, 177 (W.D.N.Y. 2021).

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Disagreement Recognized by TC v. Valley Cent. School Dist., S.D.N.Y., March 30, 2011

2001 WL 135817

Only the Westlaw citation is currently available.

United States District Court, W.D. New York.

Carlos BAYON, Plaintiff,

v.

THE STATE UNIVERSITY OF NEW YORK AT BUFFALO; Dr. Robert Dentan, Associate Professor of Anthropology, State University of New York at Buffalo, in his Individual Capacity; Dr. Christine Duggelbey, Director Graduate Studies, State University of New York at Buffalo, in her Official and Individual Capacity; Dr. Ann McElroy, Buffalo Associate Professor of Anthropology, State University of New York at Buffalo, in her Individual Capacity; Dr. Sarunas Milisauskas, Chair, Department of Anthropology, in his Official and Individual Capacity; Dr. Pauketat, Associate Professor, State University of New York at Buffalo, in his Individual Capacity; Dr. Donald Pollack, Director of Graduate Studies, State University of New York at Buffalo, in his Official and Individual Capacity; Dr. Steegmann, Jr., Associate Professor of Department of Anthropology, State University of New York at Buffalo, in his Individual Capacity; and Joanne Plunkett, Director of Finance and Records, State University of New York at Buffalo, in her Official and Individual Capacity; Defendants.

No. 98–CV–0578E(SR).
|
Feb. 15, 2001.

**Attorneys and Law Firms**

Doris A. Corbonelli–Medina, Esq., Buffalo, for the Plaintiff.

Ann C. Williams, Esq., Asst. Attorney General for NYS, Buffalo, for the Defendant.

MEMORANDUM and ORDER

ELFVIN, S.D.J.

**\*1** Plaintiff filed an Amended Complaint in this action January 5, 2000, claiming that the above-captioned defendants had acted to deprive him of civil rights guaranteed to him by Title VI of the Civil Rights Act of 1964 ("Title VI"), 42 U.S.C. § 2000d et seq., Title II of the American with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12131–12165 and 42 U.S.C. § 1983, as well as those rights secured to him "by the statutes[,] codes [,] rules, regulations, [and] common law of the State of New York." Am. Compl. ¶ 1. Jurisdiction is premised on 28 U.S.C. §§ 1331, 1343 and 1367. Presently before this Court is defendants' motion to dismiss the Amended Complaint except insofar as plaintiff has asserted an ADA claim. For the reasons that follow, defendants' motion will be granted.

Preliminarily, the undersigned notes that, since the filing of the Amended Complaint, plaintiff has apparently acted without the benefit of counsel, despite Doris A. Carbonell–Medina, Esq., having signed the Amended Complaint. By Order dated November 13, 2000, such counsel's motion to withdraw as attorney for plaintiff was denied without prejudice on the basis that "good cause" therefor had not been shown. Nevertheless, plaintiff has continued to act as a *pro se* litigant, as is evidenced by the facts that the response to the instant motion was signed by the plaintiff and not his counsel and that he has requested that this Court appoint counsel for him. While such lack of representation might normally preclude consideration of a motion to dismiss, in light of the fact that the instant motion to dismiss challenges only the legal efficacy of plaintiff's Amended Complaint and such having been submitted by counsel, consideration of such motion is not prejudicial and will proceed.

The following facts are drawn from the Amended Complaint in accordance with the standards governing motions to dismiss under or pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("FRCvP"). *See Cooper v. Parksky,* 140 F.3d 433, 440 (2d Cir.1998) (noting that, in ruling on a FRCvP 12(b)(6) motion, federal district courts are "required to accept as true all factual allegations in the complaint" and must "consider documents attached to or incorporated by reference in the complaint"). Plaintiff is of Puerto Rican descent and suffers from, *inter alia,* a disabling back condition. Am. Compl. ¶¶ 14, 15, Ex. J. During the 1996/1997 academic year, plaintiff was admitted to pursue a course of graduate study in the Department of Anthropology at the State University of New York at Buffalo ("SUNYAB"). Am. Compl. ¶ 11. By letter dated October 30,

1996, plaintiff wrote New York State Governor George E. Pataki "concerning [the] unprofessional conduct" of certain Department of Anthropology faculty and complained of disparate treatment. Am. Compl. ¶ 16. Such allegations were allegedly investigated. Am. Compl. ¶ 17. During the next academic semester and as a result of health-related issues that arose in the Spring of 1997, plaintiff made inquiries of a number of SUNYAB faculty members as to whether he could postpone the completion of certain tests and assignments. Am. Compl. ¶¶ 21, 23. As to none of such requests, however, did plaintiff obtain satisfactory relief. Plaintiff alleges, *inter alia,* that defendants would not grant him grades of "Incomplete" in two Department of Anthropology courses, that defendants refused his request to delay taking the "Physical Anthropology Qualifying Examination," that defendants prevented him from commencing "field work" in the Summer of 1997, that defendants refused to grant him a leave of absence in 1998 and that defendants wanted plaintiff to "resign" from SUNYAB. Am. Compl. ¶¶ 21–82. Sometime in late May 1997, moreover, plaintiff wrote the United States Department of Education Office of Civil Rights complaining about what he believed was the discriminatory basis for many of the aforementioned acts, for which complaint he was allegedly threatened by defendants. Am. Compl. ¶¶ 45, 101. Plaintiff alleges that these threats, as well as the discriminatory treatment, were motivated by impermissible considerations such as race, color, national origin and disability. Since the 1997/1998 academic year, plaintiff has not been registered as a student. Am. Compl. ¶¶ 84–85.

**\*2** A motion to dismiss pursuant to FRCvP 12(b)(6) may not be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46 (1957). This Court must not consider whether the claim will ultimately be successful, but merely "assess the legal feasibility of the complaint." *Cooper,* at 440. As stated previously, this Court must accept as true all factual allegations in the Amended Complaint, consider documents attached to or incorporated by reference in the Amended Complaint, and draw therefrom all reasonable inferences in favor of the plaintiff. *Ibid.* However, conclusory statements are not proper substitutes for minimally-sufficient factual allegations. *ECC v. Toshiba America Consumer Products, Inc.,* 129 F.3d 240, 243 (2d Cir.1997). Further, this Court must not presume that plaintiff will be able to prove facts

that are not alleged in the Amended Complaint or that are not consistent with facts alleged therein. *Ibid.*

Insofar as plaintiff has alleged ADA claims against the individual defendants in their individual capacities, such claims fail because the ADA does not provide for individual liability. Title II thereof states, in relevant part, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. As this Court has previously held, because "[n]othing in the legislative history of Title II of the ADA indicates that individual liability was intended" and because "Title II applies only to 'public entit[ies]' and such term was not defined to include individuals," imposition of "liability upon individuals for violations of Title II was not intended by the drafters of the ADA." *Smith v. University of State of New York,* No. 95–CV–0477E(H), 1997 WL 800882, at \*8 (W.D.N.Y. Dec. 31, 1997); *see also Montez v. Romer,* 32 F.Supp.2d 1235, 1241 (D.Colo.1999) (ruling that "individual defendants in their individual capacities are not properly subject to suit under the \* \* \* Disability Act"). Accordingly, all ADA claims alleged against the defendants in their individual capacities must be dismissed.

Similarly, plaintiff's Title VI claims against the individual defendants in their individual capacities fail because this act does not provide for individual liability. Title VI states, in relevant part, that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance ." 42 U.S.C. § 2000d. As a plain reading of the text of Title VI indicates and as other federal courts have found, "Title VI was designed to prohibit discrimination by organizations receiving assistance." *Farmer v. Ramsay,* 41 F.Supp.2d 587, 592 (D.Md.1999). The undersigned agrees that "the proper defendant in a Title VI case is an entity rather than an individual \* \* \*." *Jackson v. Katy Indep. School Dist.,* 951 F.Supp. 1293, 1298 (S.D.Tex.1996). Accordingly, all Title VI claims alleged against the defendants in their individual capacities must be dismissed.

**\*3** Plaintiff's section 1983 claims fail as against SUNYAB and the individual defendants in their official capacities. As was stated by this Court in this action

by Memorandum and Order dated May 11, 2000, "state defendants are protected by the Eleventh Amendment from damages claims brought by private parties for alleged constitutional violations" and neither " 'a State nor its officials acting in their official capacities are 'persons' under § 1983." ' Memorandum and Order, at 3 (May 11, 2000) (quoting *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71 (1989)). Accordingly, plaintiff's section 1983 claims against SUNYAB and the individual defendants in their official capacities must be dismissed.

Plaintiff's remaining section 1983 claims against the individual defendants in their individual capacities also fail because he has only implicated those rights protected by Title VI and the ADA in his Amended Complaint and plaintiff cannot use section 1983 to assert rights based solely on violations of the ADA or Title VI. *See Saulpaugh v. Monroe Comm. Hosp.,* 4 F.3d 134, 142–143 (2d Cir.1993). In other words, plaintiff's section 1983 claims, as pled, are not separate and distinct from his Title VI and ADA claims. Where Congress has established enforcement mechanisms containing remedial devices that are sufficiently comprehensive, as it has done with Title VI and the ADA, those enforcement mechanisms may not be bypassed by bringing suit under section 1983. *See Middlesex Cty. Sewerage Auth. v. Sea Clammers,* 453 U.S. 1, 20 (1981). Accordingly, plaintiff's remaining section 1983 claims against the individual defendants in their individual capacities must be dismissed.

Plaintiff's claims as they relate to a $2,729.70 loan that defendants "failed" to apply to his student account must be dismissed on the ground of claim preclusion. Federal courts must grant a prior state court decision the same preclusive effect—whether by claim preclusion or its subset, issue preclusion—that the courts of that state would give to it. Under the doctrine of claim preclusion, "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Rivet v. Regions Bank of La.,* 522 U.S. 470 (1998).[1] "Simply put, the doctrine states that once a final judgment has been entered on the merits of a case, that judgment will bar any subsequent litigation by the same parties or those in privity with them concerning 'the

transaction, or series of connected transactions, out of which the [first] action arose." ' *Maharaj v. BankAmerica Corp.,* 128 F.3d 94, 97 (2d Cir.1997) (quoting Restatement (Second) of Judgments § 24(1) (1982)). By Decision and Order dated August 12, 1999, Justice E. Michael Kavanaugh of the New York State Supreme Court, Albany County, dismissed with prejudice, claims by plaintiff that SUNYAB had attempted "to collect an illegal debt" based on plaintiff's assertion that a "summer loan left in [SUNYAB's] account a credit of $2,729.70." *See* Reply Brief Exhibits entitled "Motion to Vacate" & "Complaint." In that order, Justice Kavanaugh ruled that plaintiff's allegations had already been deemed to be "without merit [in a previous state court action] to establish a defense to * * * [the] action to collect the debt" and that "plaintiff's claims fail to state a cause of action." *Bayon v. Greiner,* Index No. 1581–99, at 3 (N.Y. Sup.Ct., Albany County, Aug, 12, 1999). Inasmuch as plaintiff seeks to relitigate in the instant action his allegation that "SUNYAB has failed to account for the $2,729.70 credit," it is plain that a different judgment in this action regarding such allegation would act to "destroy or impair interests established by the first [state court action]." *Schuykill Fuel Corp. v. B. & C. Nieberg Realty Corp.,* 250 N.Y. 304, 307 (1929). Accordingly, plaintiff's claims as they relate to such loan are barred by the doctrine of claim preclusion.

**\*4** Insofar as plaintiff seeks to assert causes of action based on unnamed "statutes, codes, regulations and common law of the State of New York," such fails for two reasons. Firstly and as defendants indicate, "a federal suit against state officials on the basis of state law contravenes the Eleventh Amendment when—as here—the relief sought and ordered has an impact directly on the State itself ." *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 117 (1984); *see also Dube v. State University of New York,* 900 F.2d 587, 594 (2d Cir.1990) (noting that, for Eleventh Amendment purposes, when "SUNYAB" is sued the State of New York is the real party). Secondly and insofar as such claims are meant to be asserted against the individual defendants in their individual capacities, in light of the fact that such Amended Complaint was signed by an attorney and the fact that plaintiff has had two previous opportunities in which to amend his pleading in a way which specifies the basis for such claims, such unidentified claims must be dismissed for failure to comply with the FRCvP. " 'The function of pleadings under the Federal Rules is to give fair notice of the claim asserted. Fair notice is that which will enable the adverse party to answer and prepare for trial, allow

the application of *res judicata,* and identify the nature of the case so it may be assigned the proper form of trial." , *Simmons v. Abruzzo,* 49 F.3d 83, 86–87 (2d Cir.1995) (quoting 2A Moore's Federal Practice ¶¶ 8.13). Under no set of circumstances can the undersigned imagine such "claims" as being anything other than "confused, ambiguous, vague, or otherwise unintelligible" such that their "true substance, if any, is well disguised." *Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1988). In short, such claims must be dismissed because they do not comport with FRCvP 8 and further leave to amend will not be granted. *See id.* (stating that "where leave to amend has previously been given and the successive pleadings remain prolix and unintelligible," a court may dismiss such claims without further leave to amend).

Finally, insofar as plaintiff seeks punitive damages for the claims that remain—*viz.,* the ADA and Title VI claims against SUNYAB and the individual defendants acting in their official capacities—, such damage claims must be dismissed because punitive damages may not be assessed against the remaining state defendants under either act. Given the fact that both provisions are silent as to whether a plaintiff may be entitled to punitive damages thereunder, the general rule that government entities are not subject to punitive damages applies. *See, e.g., City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247 (1981). Moreover, the fact that the 1991 Civil Rights Act explicitly amended Title I of the ADA (which guarantees equal employment opportunities), 42 U.S.C. §§ 12111–12117, by providing for the award of punitive damages counsels against any inference that punitive damages are available under Title II of the ADA without such statutory authorization. Such an inference would be "inappropriate" within the meaning of *Franklin v. Gwinnett County Public Schools,* 503 U.S. 60 (1992), wherein

was reiterated the longstanding rule that courts "presume the availability of all *appropriate* remedies unless Congress has expressly indicated otherwise." *Id.* at 66 (emphasis added); *see also* 42 U.S.C. § 1981a(a)(2) (allowing a complaining party under Title I of the ADA to recover punitive damages).

**\*5** Accordingly, it is hereby *ORDERED* that plaintiff's section 1983 claims are dismissed in their entirety, that plaintiff's ADA and Title VI claims are dismissed as against all defendants except SUNYAB and the individual defendants acting in their official capacities, that plaintiff's claims as they relates to a "\$2,729.70 loan" are dismissed, that plaintiff's claims are dismissed insofar as they assert causes of action based on unspecified New York law, that plaintiff's claim for punitive damages is dismissed, that— in the interest of eliminating undue complication without affecting the substantial rights of the parties—this Court substitutes SUNYAB as the defendant in this action in place and stead of all defendants named in their official capacities —FRCvP 21 ("[p]arties may be dropped or added by order of the court on motion of any party or on its own initiative at any stage of the action and on such terms as are just")—and that the caption of this case shall be changed to read

"CARLOS BAYON, Plaintiff,

-vs-

THE STATE UNIVERSITY OF NEW YORK AT BUFFALO, Defendant."

**All Citations**

Not Reported in F.Supp.2d, 2001 WL 135817

---

## Footnotes

1    Internal quotation marks omitted.

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by   Vaughn v. Empire City Casino at Yonkers Raceway,
S.D.N.Y.,   July 14, 2017

2015 WL 1499618

Only the Westlaw citation is currently available.

United States District Court,

S.D. New York.

Leena VARUGHESE, M.D., Plaintiff,

v.

MOUNT SINAI MEDICAL CENTER, Patrick
Lento, M.D., Carlos Cordon–Cardo, M.D., Adolfo
Firpo, M.D., and Ira J. Bleiweiss, M.D., Defendants.

No. Civ. 8812(CM)(JCF).

|

Signed March 27, 2015.

## MEMORANDUM DECISION AND
## ORDER GRANTING DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

McMAHON, District Judge.

**\*1**  Plaintiff Dr. Leena Varughese ("Varughese") has sued
Mount Sinai Medical Center ("Mount Sinai") and several
of its individual physicians and administrators (collectively
"Defendants") in connection with her September 21, 2011
termination from Mount Sinai's residency program. Now
before the Court is Defendants' motion for a summary
judgment of dismissal.

For the following reasons, the motion is GRANTED and all
of plaintiff's claims are dismissed with prejudice.

## BACKGROUND

Mount Sinai is a large medical center located on the upper
east side of Manhattan. From July 1, 2008 until September
21, 2011, Varughese was a resident in its Department of
Pathology. Each of the individually named defendants served
as an attending physician or supervisor in that department
during Varughese's residency.

Varughese, a woman of Indian descent, alleges that Mount
Sinai subjected her to discrimination and a hostile work
environment on the basis of her gender and national
origin (Indian); retaliated against her when she complained
about discrimination and alleged unsafe practices within the
hospital; punished her for failing to confess to nonexistent
misconduct; and ruined her job prospects with other
employers. Her complaint pleads eleven counts under federal,
state, and local anti-discrimination laws; one count of
interference with business relations; one count of defamation;
one count of breach of her employment contract; one count
of breach of the covenant of good faith and fair dealing;
one count of whistleblower retaliation under a state health
law; one count alleging a violation of  42 U.S.C. §
1981; one count of interference with her rights under the
Family and Medical Leave Act; and one count of individual
liability. [1]  (Docket # 66.) She seeks several million dollars in
damages, as well as injunctive relief that would both restrain
Defendants from disseminating an allegedly defamatory
evaluation and require them to provide her with various
certifications that would allow her continue her medical
training. (*Id.*)

In Defendants' view, Varughese was an insubordinate
employee who was disciplined, counseled, and then fired
after an escalating series of unprofessional errors and
omissions she refused either to acknowledge or to correct.
Defendants accuse her of repeated absenteeism, failure
to complete assigned tasks, failure to communicate with
supervisors and colleagues, ignoring supervisors' directions,
using inappropriate language, and behaving rudely and
in a manner that called her mental health into question.
Ultimately, Mount Sinai terminated Varughese because of
what it deemed repeated, egregiously unprofessional behavior
that culminated with her being caught while surreptitiously
rifling through files in someone else's office.

Varughese admits to much of the behavior assigned her,
although she denies that some of the events underlying these
accusations occurred in the manner Defendants describe. She
also alleges that similarly situated residents who were not
members of her protected class were not disciplined in the
same way for the same conduct.

**\*2**  Varughese was originally represented by counsel-for
example, her original complaint was drafted by counsel-but
she has been *pro se* for some time. She is, of course, required
to abide by all the rules of the Court, notwithstanding her *pro
se* status. However, she has made errors in her response to

Defendants' motion for summary judgment that are common among non-lawyer litigants. Her response to Defendants' Local Civil Rule 56.1 statement is conclusory and repetitive. To the extent that it relies on evidence at all, it relies in large measure on hearsay and other evidence rendered inadmissible by Federal Rules of Evidence 401, 403, 404, 802, and/or 805—even though a motion for summary judgment must be controverted by admissible evidence.

At times, her response veers into territory that has nothing to do with this lawsuit. For example, Varughese insinuates that the suicide of a colleague's relative was actually a murder for which yet another colleague is somehow responsible, and that Defendants' attorneys are involved in a criminal conspiracy. *See, e.g.,* Varughese 56.1 at ¶¶ 30.7–30.8 ("Residents ... were involved in what appeared to be the questionable suicide at best (by overdose of propofol of [one resident's] 'best friend' under the most suspicious circumstances ... The Caucasian leadership did not target ... [the resident's] rampant suspect conduct including ... not performing her duties or for suicide or homocide [sic] of her family member etc"); *id.* at ¶ 119.4 (complaining that the wife of one member of an internal appeal board "has the same surname as ... Rory McEvoy, the lawyers representing the Institution"), ¶ 123.2 ("McEvoy kept insisting ... that I had alleged a conspiracy against me by the Defendants to commit criminal acts, and to conduct an ongoing discrimination campaign, which, by the way, was obviously exactly what was happening.").

In order to give Varughese the benefit of any and every doubt, the Court has conducted a searching review of the several thousand pages of transcripts and other documents that she submitted in opposition to summary judgment. *DeRienzo v. Metro. Transp. Auth., Metro N. Commuter R.R.,* 237 F. App'x 642, 646 (2d Cir.2007) ("a district court has 'broad discretion ... to overlook a party's failure to comply with local court rules' and may 'opt to conduct an assiduous review of the record' even when one of the parties has failed to file a Rule 56.1 statement") (quoting Holtz v. Rockefeller & Co., 258 F.3d 62, 73 (2d Cir.2001)).

That record consists of: (1) deposition transcripts and several affidavits; (2) documentary evidence including e-mails, performance evaluations, letters and their attachments; (3) transcripts of sworn testimony given in the course of Dr. Varughese's use of Mount Sinai's internal appellate process, which was subject to cross examination; and (4) audiotaped conversations between Varughese and various individual defendants and other administrators at Mount Sinai, and transcripts of these tapes prepared by certified court reporters. [2]   As part of its exhaustive review of the record, the Court has both listened to the tapes and reviewed the transcripts.

**\*3**  The content of the lengthy Statement of Facts is drawn from any portion of a party's 56.1 Statement that relies on competent evidence, as well as the accompanying exhibits. As is customary, the facts are viewed most favorably to the non-moving party (Varughese). Unless otherwise noted, these facts are undisputed, purely conclusory assertions (there are many such) are identified and are not relied on to raise genuine issues of material fact.

## DISCUSSION

### I. Standard

A party is entitled to summary judgment when there is "no genuine issue as to any material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. *Anderson v. Liberty Lobby, Inc., All* U.S. 242, 247–48 (1986); *see* Fed.R.Civ.P. 56(a), (c). On a motion for summary judgment, the court must view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. *Celotex Corp. v. Catrett, All* U.S. 317, 323 (1986). Once such a showing has been made, the nonmoving party must present "specific facts showing that there is a genuine issue for trial." *Beard v. Banks,* 548 U.S. 521, 529, 126 S.Ct. 2572, 165 L.Ed.2d 697 (2006). The party opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998). Moreover, not every disputed factual issue is material in light of the substantive law that governs the case. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." *Anderson,* 477 U.S. at 248.

To withstand a motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,*

475 U.S. at 586. Instead, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmoving party. "Summary judgment is designed ... to flush out those cases that are predestined to result in directed verdict." *Lightfoot v. Union Carbide Corp.,* 110 F.3d 898, 907 (2d Cir.1997).

In cases involving allegations of employment discrimination, the court must exercise "an extra measure of caution" in determining whether to grant summary judgment "because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence." *Schiano v. Quality Payroll Sys., Inc.,* 445 F.3d 597, 603 (2d Cir.2006) (internal citations omitted); *see also Holcomb v. Iona Coll.,* 521 F.3d 130, 137 (2d Cir.2008). Even in an employment discrimination case, however, "a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment." *Holcomb,* 521 F.3d at 137. The ultimate test for summary judgment in discrimination cases, as in other cases, "is whether the evidence can reasonably support a verdict in plaintiff's favor." *James v. N.Y. Racing Ass'n,* 233 F.3d 149, 157 (2d Cir.2000).

**\*4** In considering the defendants' summary judgment motion, the court liberally construes all submissions by a *pro se* plaintiff and "interpret[s] [them] to raise the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 474 (2d Cir.2006) (per curiam) (citation and emphasis omitted). "This precept is especially important in the summary judgment context, where claims are subject to final adjudication." *S.E.C. v. Mattera,* No. 11 Civ. 8323,2013 WL 6485949, at \*6 (S.D.N.Y. Dec. 9, 2013). Indeed, the duty is "particularly strong when a *pro se* plaintiff alleges violation of h[er] civil rights." *Germany v. N.Y.S. D.O.C.S.,* No. 03 CIV. 148, 2003 WL 22203724, at \*3 (S.D.N.Y. Sept. 22, 2003) (citing *Weinstein v. Albright,* 261 F.3d 127, 132 (2d Cir.2001)).

The application of this forgiving standard for *pro se* litigants, however, "does not relieve plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Records,* 351 F.3d 46, 50 (2d Cir.2003) (citation omitted); *Nolley v. Swiss Reinsurance Am. Corp.,* 857 F.Supp.2d 441,454 (S.D.N.Y.2012) *aff'd,* 523 F. App'x 53 (2d Cir.2013). "[A]t some point in a lawsuit even *pro se* litigants must make clear

to the court their claims and the facts that they believed entitle them to specific relief. The summary judgment stage is an appropriate juncture to identify the real issues in a case, even where a party proceeds *pro se.*" *Mattera,* 2013 WL 6485949, at \*6 (quoting *Salahuddin v. Coughlin,* 781 F.2d 24, 29 (2d Cir.1986)).

Thus, even a *pro se* party "may not rely simply on conclusory allegations or speculation to avoid summary judgment, but instead must offer evidence to show that its version of the events is not wholly fanciful." *Shah v. Kuwait Airways Corp.,* 653 F.Supp.2d 499, 502 (S.D.N.Y.2009) (quoting *Auguste v. N.Y. Presbyterian Med. Ctr.,* 593 F.Supp.2d 659, 663 (S.D.N.Y.2009)). That evidence must be admissible under the Federal Rules of Evidence, which apply equally to *pro se* litigants. *See Holtz v. Rockefeller & Co.,* 258 F.3d 62, 73 (2d Cir.2001) (evidence submitted in summary judgment proceedings must be admissible, as required by Fed.R.Civ.P. 56(e)).

## II. Facts

Varughese was a resident physician in Mount Sinai's Department of Pathology ("the Department") from July 1, 2008 until September 21, 2011. (Defendants' 56.1 at ¶ 1).

During that period, there were two female residents of Indian descent (including Varughese) and three female fellows of Indian descent enrolled in the residency or fellowship program in the Department. (Johnson Decl. at ¶ 2, Defs.' Ex. 1.) All of the female residents and fellows of Indian descent in the Department graduated from the residency or fellowship program, except for Varughese. (Defendants' 56.1 at ¶ 132.)

### Job Duties and Employment Contract

As a resident in the Pathology department, Varughese was expected to perform clinical, educational, and administrative tasks in one-month rotations focused on different sub-disciplines of pathology. Some of these rotations occurred at Mount Sinai. Others took place under Mount Sinai's purview but at different hospitals, such as the Bronx Veterans' Affairs Hospital and the Elmhurst Hospital Center.

**\*5** A series of one-year contracts with Mount Sinai governed Varughese's employment. Each incorporated the provisions of Mount Sinai's House Staff Manual, which provided, in pertinent part, that, "The Program Director [or] the Department Chair ... may take disciplinary action,

including termination for cause, against any [resident] who ... fails to demonstrate an acceptable level of ... professionalism." (Defendants' 56.1 at ¶ 148)

The Department was in a state of turmoil during Varughese's employment. (Figur Dep. at 38.) In early 2011, a period of intense activity relevant to this case, the American College of Graduate Medical Education ("ACGME"), which accredits residency programs throughout the United States, cited the Department for various problems with its residency program. The Department's head changed several times during Varughese's tenure, as did its middle management. Its laboratories appear to have struggled to achieve adequate staffing levels. By the fall of 2011, Mount Sinai's director of medical education actually called the Department of Pathology a "zoo." A new director, Defendant Carlos Cordon–Cardo, who was charged with putting it in order, arrived just as long-standing issues involving Varughese came to a head.

*The First and Second Years of Varughese's Residency*
Varughese's allegations of discrimination, hostile work environment and retaliation concern the way that she was treated beginning with her third year of residency (July 2010– June 2011). However, as background, especially to her hostile work environment claim, she cites to several comments that she testified were made during her first and second years of residency, July 1, 2008–June 30, 2009.

Varughese testified that Dr. Allan Schiller, who chaired the Department from Varughese's arrival until December 2010, (when he remained as an employee but apparently gave over his Chair duties to a female Interim Chair) would say something to the effect of "you don't know the type of things you'll find in India or the crazy things you'll find in India" every time he saw her at a conference or supervised her for an autopsy. (Varughese Dep. at 765–68.) He allegedly used that "line ... at least four, maybe more times over" for as long as he interacted with her-from the beginning of her residency until Dr. Melissa Pessin–Minsley took over as Interim Chair of the Department in December 2010. (Defendants' 56.1 at ¶¶ 2–3.) There is no evidence that Schiller directly supervised Varughese thereafter except during individual, occasional autopsies. He is not named as a party defendant and has not been deposed.

Varughese appeared out of sorts towards the end of her first year of residency, in a way that other first-year residents were not. A "couple of months" into that first year, Dr.

Patrick Lento, the director of the Department's residency program, observed a change in Varughese's demeanor: "she never seemed to smile anymore," and "seemed distracted. When [Lento] would address her to say 'Hello, Leena,' she would not respond, which [Lento] thought was odd." (Lento Dep. at 51–52,60–61.)

**\*6** Varughese got mixed reviews during her first two years. Some supervisors rated her as superior; others found her work "inconsistent." Interim Chair Dr. Melissa Pessin–Minsley recalled that, when she sat on the residency committee during Varughese's first year, there was a "perception" on the committee "that in the end of [Varughese's] first year ... she was weak ... she wasn't performing at the strongest level of a pathology resident who had finished a first year of a pathology residency." (Pessin–Minsley Dep. at 52.)

In October 2009, three months into her second year, Schiller (who was still Chair of the Department) "wanted to see me ... about my unhappiness. He said that I didn't look happy ... if you're unhappy that's part of who you are and it's sort of your DNA and so on." (Varughese Dep. at 42.) According to Varughese, Schiller went on to say, "that [when] people were unhappy like that, it's trouble ... we don't want you to be in trouble." (*Id.* at 10, 43.) He "wanted to know if [Varughese] was speaking to someone, you know, getting help. [She] said no ... [She] didn't think [she] needed help." (*Id.*) Schiller, who obviously did think she needed therapy, told Varughese to seek professional help and bring back a note attesting that she was under someone's professional care. (*Id.*)

Varughese testified at her deposition that she understood the statement about unhappiness being in her DNA to be a reference to her race/national origin, rather than to any genetic basis of depression, which is a scientific/medical issue. (*Id.*) Varughese did not testify that Schiller made any remark about India or her Indian ancestry during this conversation.

The record contains no suggestion that Varughese told Schiller that any of his comments made her uncomfortable. Nor is there any evidence that she complained about Schiller's comments to anyone else until at least December 2010, by which time he was no longer acting as Chair and Varughese had received the first of several warnings that she was having performance problems.

From October 2009 through the summer of 2010 (the beginning of her second through the beginning of her third years of residency), the record reveals little about Varughese's

on-the-job performance or her experiences. So we turn to her third year of residency. That is when the problems that gave rise to this lawsuit began.

*The July 2010 Promotions of a Filipino Male and a Woman of Indian Descent*
In July 2010, the Department promoted two of Varughese's colleagues to Chief Resident: Drs. Kruti Maniar and Samuel McCash. (*See* Lento Dep. at 13.) Like Varughese, Maniar is a woman of Indian descent. Varughese consistently describes McCash as Caucasian (*see, e.g.,* Varughese 56.1 at ¶ 16.1), but he identifies himself as a Pacific Islander of Filipino descent. (Docket # 165, McCash Decl. at ¶ 2.), and there is no evidence that others in the Department (other than Varughese) perceived him as anything other than what he himself claims to be. I view his self-identification as undisputed; there is no evidence in the record that Dr. McCash is not a Pacific Islander of Filipino descent. I will not refer to him as Caucasian.

 **\*7** Chief Residents had the authority to assign tasks to other residents, to instruct them how to perform those tasks, to admonish them if the Chief's expectations were not met, and to control some portions of residents' scheduling. (Pessin–Minsley Dep. at 32–33.)

*Performance Issues*
Varughese began to be criticized for performance issues about this time.

Dr. Ira Bleiweiss, a named defendant and an attending pathologist at Mount Sinai, recalled having issues with her when she was assigned to him on frozen section duty, which is to say, on the shift that analyzes patient tissue samples sent down during surgery: "When you're on frozen section duty, there is an attending [physician] always and a resident who is assigned to be with you. I recall more than one occasion being on frozen section with Leena being the resident assigned to me and she [was] not anywhere to be found." (Bleiweiss Dep. at 54–55.)

In August 2010, a less senior resident, a Caucasian woman named Adrienne Jordan, e-mailed the two Chief Residents to complain about Varughese's work ethic: "How does she function!!!!!!! I just wonder how she gets out of bed in the morning and not hurt herself she is so lazy ..." (Aug. 13, 2010 e-mail from Jordan to McCash and Maniar, Docket # 205–5 at 2.) Later that same day, Jordan complained that her team

was missing a slide from one of Varughese's cases, which Lento needed, "but of course [Varughese] called out 'sick' today." (Aug. 13, 2010 e-mail from Jordan to McCash and Maniar, Docket # 205–5 at 5.)

*The September 14, 2010 Altercation with McCash*
On September 14, 2010, Varughese had the first of two notable run-ins with McCash.

There is some evidence that Varughese's relationship with McCash was strained from the beginning; Varughese alleges, for example, that McCash gave her menial tasks and overburdened her with work. (Varughese 56.1 at ¶¶ 11.4, 11.13.) But on the day in question, Varughese refused to cover for another resident who was on leave. This prompted an argument between her and McCash. Varughese alleges that McCash became irrationally angry about her refusal, and that he "screamed ... shut up, shut up, shut your mouth Leena" at her while "lurching" towards her (Docket # 205–4 at 85). He also allegedly "cursed and ranted about" her in public, insulted her professional qualifications, told her that no one liked her, and told her she was lucky to have a job. (Varughese 56.1 at ¶¶ 11.4, 11.13.)

Kruti Maniar-the woman of Indian descent who was promoted to Chief Resident at the same time as McCash-was present during McCash's alleged tirade. Interestingly, Maniar contacted Program Director Lento that same day to express her concern that *Varughese* had acted unprofessionally during this encounter. (Lento Dep. at 68, 69, 71.) Varughese contacted Lento after Maniar did, complaining that McCash had been "hostile" to her. (*Id.*) The next morning, Lento met with both women residents. (*Id.*)

 **\*8** Varughese repeated her version of events and said "something to the effect that she was perhaps singled out for coverage," meaning the duty to cover for an absent resident. (*Id.* at 82–84.) Lento asked whether Maniar agreed with Varughese's account; Maniar "pointedly" said no. (Lento Dep. at 75, 77, 90, 91.)

Lento later followed up with attending physician Dr. Melissa Pessin–Minsley, whose office was near where Varughese and McCash had argued. Pessin–Minsley told Lento that she did not hear McCash yelling at Varughese. (*Id.*) In fact, no one who was present in the area of the hospital where the encounter took place corroborated Varughese's story that McCash was yelling at her. (*Id.* at 85–90.)

Varughese claims that Maniar would support her version of the facts. (Varughese 56.1 at ¶¶ 11.5, 136.2.) Her opinion about what Maniar would say is, of course, not admissible evidence. Maniar was not deposed, but Mr. Sinai has submitted a declaration from her, in which she avers that McCash "treated all residents equally and always tried to be fair. I never had any reason to believe that McCash harbored any discriminatory animus towards me or any other female resident because of our gender or, in my case, because I am a woman of Indian descent." (Docket # 163 at ¶ 7.) Maniar also attests that "throughout my tenure at Mount Sinai, both as a medical student and as a resident, I felt encouraged and supported ... I never felt discriminated against by anyone at Mount Sinai for any reason." (*Id.* at ¶ 4.)

However, the Hospital responded as though Lento had been able to corroborate Varughese's story. Lento told Varughese that he would speak with McCash, and later did speak to McCash about how to handle similar situations in the future. (Lento Dep. at 82.) Varughese was not satisfied; she asked Pessin–Minsley to obtain an apology from McCash. Pessin–Minsley did not believe Varughese was entitled to an apology. Indeed, her view was that Varughese's unspecified "behavior over the weekend was irresponsible and could have jeopardized patient care." (Docket # 205–4 at 2, e-mail of Sept. 15, 2010 from Pessin–Minsley to Lento).

By September 17, 2010, three days after the encounter, Varughese complained to her supervisors that she was being made into a "scapegoat," and that the "hostile environment" McCash was creating caused her "far too much unhealthy mental stress." (Docket # 205–5 at 62, e-mail of Sept. 17, 2010 Varughese to Drs. Schiller and Pessin–Minsley.) Varughese did not want to deal with McCash, and on September 23, 2010, she tried to switch rotations with another resident, Jaclyn Hechtman, so she could avoid working with him. (Docket # 205–5 at 72, e-mail of Sept. 23, 2010 from Maniar to Hechtman, McCash and Varughese). She was prevented from doing so. (Varughese 56.1 at ¶ 11.6.)

But Varughese did not allege at that time that that "hostile" environment had anything to do with her membership in any protected class, or compare McCash's treatment of her to his treatment of anyone outside her protected groups (female and of Indian descent). Indeed, she did not assign either her gender or her national origin as the reason for McCash's loss of temper. The people to whom she complained about McCash (specifically Lento, Pessin–Minsley, and, at some point, attending physician and Defendant Ira J.

Bleiweiss) did not interpret her complaints as complaints about discrimination or hostile work environment based on her gender, her national origin or any protected category-although none of these individuals could recall seeing or being trained in Mount Sinai's anti-discrimination policy, or its anti-harassment policy, or its anti-retaliation policy. (Lento Dep. at 24–25; Pessin–Minsley Dep. at 38–39; Bleiweiss Dep. at 15–16.) After she complained about the September 14, 2010 incident, Varughese claims that her work materials, including slides of patient tissue, started to go missing. (Varughese Dep. at 824–27.) Varughese allows that she and other residents had always had some problems with misplaced slides-whether the fault of general organizational lapses or specific failures of other departments. (Varughese Dep. at 819.) However, "in terms of it being sort of a problem for me that was in excess of other people's issues, that didn't happen until after like September 2010." (*Id.* at 823.)

*The December 8, 2010 Altercation with McCash*

**\*9** A second and more serious altercation between McCash and Varughese occurred on December 8, 2010.

In and before December 2010, pathology residents could make extra money by "moonlighting," i.e., taking extra shifts within their own department. According to the Defendants, on December 8, 2010, McCash told Varughese to examine certain specimens (the complexity of which are in dispute), but Varughese instead gave that work to Paul Azar, a white male resident who was moonlighting. (Defendants' 56.1 at ¶¶ 9–10.)

Varughese admits that she gave the work to Azar. (*See* Self–Reflection Essay 1, Docket # 205–4 at 86). She contends that she was never clearly told that she had to do the work herself. (*Id* ). She also argues that any instruction would have been discriminatory, since two fellow residents-one a non-Indian female and the other a white male-"routinely assigned very complicated patient cases to moonlighters" and were never prohibited from doing so or disciplined for it. (Varughese 56.1 at ¶ 10.2.)

Whether the work she delegated was complicated or not, the particular work that Varughese delegated to Azar should not have been delegated to a moonlighter-and McCash should not have had to explain that to plaintiff. The samples came from patients of a Dr. Goldfarb. His standing order was that the resident on duty had to examine the particular kind of sample at issue (the margins of an incision into the breast). Dr. Goldfarb did not want the moonlighters doing this work,

presumably because they were working extra hours and might not be as alert as the resident on duty. (Figur Dep. at 44–45.) The record is replete with references to "Goldfarb cases" and the particular steps that were to be followed when handling "Goldfarb cases."

There was another reason why Varughese delegating her work to Azar was not appropriate. The Department was trying to cut back on moonlighters in order to achieve budgetary reductions. When Varughese assigned the work to Azar, he was about to leave; Jordan, another resident moonlighting that night, recalled that when she left, "Dr. Azar was supposed to be shortly behind [her] ... When he wasn't, [she] went back to see what was taking him so long because we were going to walk out together." (Jordan Dep. at 110.) By giving Azar extra work, Varughese increased the amount the Department would have to pay him; McCash testified that this was inappropriate "because it would have been very easy for her [Varughese] to have done that herself and not expend unnecessary resources." (McCash Dep. at 62–63.)

When McCash became aware of what had happened, he confronted Varughese. These followed a loud, profanity-laced altercation between Varughese and McCash about Varughese's having failed to follow McCash's instruction. Jordan testified that McCash raised his voice and followed Varughese around the room. (Jordan Dep. at 118–119.) Varughese characterizes McCash's behavior as a "rampage" that was physically intimidating and verbally threatening. (Varughese Dep. at 705–06.)

 **\*10** However, witnesses to the altercation also described Varughese's behavior as out of line, especially after she left the room to try to fetch Dr. Bleiweiss. Bleiweiss, who was on the phone in his office, could see that Varughese was "rather upset ... she was practically in tears," but when he did not immediately end the call to speak to her (Bleiweiss Dep. at 59, 61.), Varughese returned to the lab and began yelling. (Lento Dep. at 114; *see also* Defendants' 56.1 at ¶ 11.) Some of Varughese's ire was directed at Jordan, the white female resident who had previously complained about Varughese's work ethic (*see supra* at 11); Varughese engaged Jordan in a "one-sided yelling argument where [Varughese] was yelling at [Jordan]." (Jordan Dep. at 116.) Azar advised Jordan to leave, "something to the effect of 'You can't engage with [her]. She's not being rational.' " (Jordan Dep. at 116.)

In interviews conducted after this incident, numerous witnesses to the event-Jordan. Azar, Jaffer, Bleiweiss, a

medical student, a technician, and a fellow-told administrators that, while McCash may have lost his composure with Varughese, it was "not to the degree of what the other witnesses described [about] Varughese's behavior." (Figur Dep. at 48.) "They could understand what he [McCash] said. It was logical. It was coherent. Dr. Varughese was described as infantile, incoherent, unintelligible, and the wording was not making any sense to anybody else." (*Id.*) One medical student who was present became so upset that she had to leave the room.

Varughese does not dispute that she raised her voice and swore.

Late that evening, McCash e-mailed several supervisors to complain about Varughese's behavior, especially her assignment of the case to her Azar, which "ma[de him] question her work *ethnic.*") (McCash e-mail of Dec. 8, 2010 at 8:16 p.m., Docket # 205–6 at 2 (emphasis added).) The e-mail was several paragraphs long and includes no other reference to race, ethnicity, or any other protected category. (*Id.*) Shabnam Jaffer, an attending physician of Indian descent who was present, was carbon copied on the e-mail; Varughese was not. (*Id.*) There is no evidence that anyone noticed or commented on the "n" inserted into what, in the context of the email's entire text, appears to have been intended as "work ethic." At her deposition, Varughese testified that McCash never commented on her Indian background to her or to anyone else, to her knowledge. (Varughese Dep. at 175–176.) Either Varughese did not see this e-mail until after her deposition, or she did not interpret it as McCash denigrating her national origin until well into this lawsuit.

*The Department's Investigation of the December 8 Incident*
There were several administrative investigations into the December 8 altercation. Varughese alleges that hospital authorities were consistently and unfairly skeptical of her, and consistently and unfairly trusting of white and/or male employees (including McCash, who does not self-identify as white), during those investigations. Varughese asserts that these attitudes were the proximate cause of several disciplinary actions that were to follow, up to and including her eventual termination.

 **\*11** The Department of Pathology was the first to investigate. During the investigation, Varughese was told to report to Chief Resident Maniar (an Indian woman) rather than McCash. (Varughese Dep. at 179–80.)

As part of the investigation of the December 8, 2010 incident, Lento interviewed Drs. Bleiweiss, Jaffer, and Azar (the moonlighter), as well as a fellow who had been present. (Lento Dep. at 105, 113.) He also reviewed several e-mailed accounts from witnesses. (*Id.* at 105, 113.)

At least some of the people being interviewed had had doubts about Varughese before the December 8 incident. The reader will recall that Bleiweiss had found Varughese to be a no-show for several shifts, and that Jordan had previously complained that Varughese was lazy. They were not the only ones who criticized Varughese's professionalism. A departmental administrator named Eileen Hauptman assessed the December 8 incident as follows: "One person has [a work ethic] (SAM [McCash] ), the other (LEENA [Varughese] ) doesn't. Since Leena has been here, she has shown great antipathy to any work and least of all to patient care." (Docket # 205–6 at 5, e-mail of Dec. 9, 2010 from Hauptman to Pessin–Minsley *et al.* (emphasis in original).)

Prior to the December 8 incident, Varughese's formal evaluations reflected that she was "inconsistent" but were not negative. However, Bleiweiss' evaluation of Varughese for the period including December 8, 2010 (which he submitted on December 18, 2010) ranked her "below expectations" for professionalism. (Bleiweiss Evaluation, Docket # 205–7 at 14–15.) Others reviewing her for the same period marked her as satisfactory or slightly above average. (Evaluations, Docket # 204–8 at 4–23.)

During the investigation, Varughese refused to acknowledge that she had done anything wrong, that she could have handled her disagreement with McCash and Jordan differently, or that she might benefit from a different approach to conflict resolution. (Pessin–Minsley Dep. at 122.) As Dr. Pessin–Minsley testified, Varughese:

> was very angry. She was not hearing what [administrators] were saying to her and not responding to what we had asked her to do ... most situations are the fault of more than one side ... and there was no comprehension or any feeling that she might have had any responsibility or any part of it could have been her fault or she could have mitigated the situation.

(*Id.* at 123–24.) Varughese's attitude, as described by Pessin–Minsley, would surface again and again during the next nine months, as her career imploded. It is undisputed that whenever Varughese was questioned about an incident, she denied any wrongdoing and cast all blame on others, viewing her defensiveness as fully justified because of the unfairness of any and all complaints about her behavior. (*See* Varughese 56.1, *passim.*)

During the Department's investigation, Varughese went to Lento over and over again to complain about McCash's behavior on December 8. She alleges that Lento was unsympathetic to her complaints. However, Varughese did not think this was because of her gender, her national origin, or her membership in any other protected class. Instead, Varughese believed that Lento was hostile to her because she had given him a negative review in a student-to-teacher review of a rotation months earlier. Varughese testified that, during one December 2010 meeting, Lento "indicated to me that in so many words that my rights won't be protected as long as he believed that I wrote a negative evaluation" about the rotation. (Transcript of Internal Appeal at 281–82, Docket # 205–31 at 77.)

 **\*12**  The negative evaluation is not part of the record, but there is no evidence that it involved any complaint of discrimination, or that it otherwise constituted protected activity.

*The December 10, 2010 Altercation with Jordan*
Two days after the December 8, 2010 incident, Varughese was in trouble again, this time for ignoring an instruction to let the Department's investigation proceed without interference.

On December 10, 2010, Varughese allegedly confronted Jordan about her role in the December 8 incident. (*See* Docket # 205–5 at 10, e-mail of December 10, 2010 from Jordan to Pessin–Minsley, McCash and Lento.) The parties disagree about who started the confrontation, but Varughese agrees that it occurred at Jordan's desk.

Varughese received a written warning for interfering with the investigation; Jordan did not. Both Jordan and McCash sent e-mails to others in the department publicizing their version of what had happened on December 8. Neither was disciplined for interfering with the investigation.

At her deposition, Interim Chair Pessin–Minsley explained that Varughese alone was disciplined "because there was physical confrontation, as opposed to something put in an e-mail to senior people of a department ... [e]ven though, I would not have put all of those people in the e-mail." (Pessin–Minsley Dep. at 131–32.)

*December 21, 2010 Notice of Academic Advisement*
On December 21, 2010, the Department concluded its investigation and placed Varughese on a form of probation known as an Academic Advisement. The Department cited Varughese's behavior on both December 8, 2010 (the McCash incident) and December 10, 2010 (the confrontation at Jordan's desk) to justify the imposition of probation. (Dec. 21, 2010 Notice of Academic Advisement, Docket # 205–7 at 29.)

Academic Advisement warns a resident that she must improve her performance in accordance with certain guidelines or she will face discipline. (Defendants' 56.1 at ¶ 16.) Associate Director of Graduate Medical Education Scott Barnett testified that academic advisement

> was ... a very clever invention. Before academic advisement was available, all discipline was formal with, uhm, due process rights. And it didn't give the programs the flexibility to create remediation plans that fell short of formal discipline. So this category was created ... so as to avoid the first step being a formal discipline which could potentially be reported to regulatory bodies [such as] licensing authorities, boards [ ... or] the Office of Professional Medical Conduct of New York State.

(Barnett Dep. at 34–35.)

The Notice given to Varughese reads as follows:

> This letter is to inform you that you are being placed on Academic Advisement. This decision is based on the investigation of your altercation(s) with other residents

while on the Surgical Pathology rotation on Dec 8 th and Dec 10th, 2010.

*Brief summary of events*

> One of the chief residents had specifically discussed with you the need for you to gross specific specimen(s). Instead, you had one of the moonlighters handle the specimen(s). When confronted with this by the chief, you became loud and verbally abusive to his authority and advisement as chief. This altercation was upsetting to those present (including other residents in the gross room [i.e., the area where residents "grossed" (analyzed) patient tissue samples and slides], an attending (Dr. Jaffer) and a medical student, who felt she needed to leave the area as a direct result of the altercation) and disruptive to the Department's operations. You are also noted to have gotten into an argument with one of the moonlighting residents (Dr. Jordan) that evening and continued to harass her about it on another day. In addition, it was noted that you had failed to appropriately gross in cases that should have been taken care of that day.

*Problematic areas identified*

> **\*13** ○ Failure to demonstrate an appropriate level of professionalism
>
>> ○ Patient care related lapse (grossing-related responsibilities)
>
> These are critical areas fundamental to successful completion of your training.

*Plan of action*
After discussions with you, Dr. Pessin[-Minsley] and [nonparty] Dr. Stimmel, we hope the following plan with help you overcome these deficits:

> ○ Meeting with the Program Director or, as needed, interim chair/chair or others in authority within the Department of Pathology, every 3–4 weeks for continued assessment and advisement
>
> ○ Continued performance of assigned resident duties under the guidance of Pathology Chief resident(s), Pathology faculty and/or Program Director
>
> ○ Self–Reflection exercise (to be handed in to me within 4 weeks)-You are expected to write down your account of the situation and describe how you could

have approached things in a better fashion, including commentary on physician professionalism and its role in this circumstance.

○ Reading exercise-You are expected to read the book entitled *Practicing excellence: A physician's manual to exceptional healthcare* [sic] by Stephen Beeson during the 3 month period of academic advisement (we can obtain a copy for you if necessary).

*Follow up*

We will meet again in 3 months to review your progress. Your performance will be closely monitored for improvement in the areas of professionalism and patient care as outlined above. We expect that you will perform your duties in a manner that is professional, appropriate and non-threatening to others. We are hopeful that this plan of action will allow you to overcome the difficulties outlined and succeed in our training program.

We must make it clear, however, that if you are unable to improve your performance or if any future incidents involving poor professionalism recur, you may be subject to discipline up to and including termination from the Program.

(Docket # 205–7 at 29–30.)

McCash was not placed on Academic Advisement. (Varughese 56.1 at ¶ 7.1.) He was, however, disciplined. Lento testified that, as was his "standard," he applied an "individualized" and informal approach to disciplining McCash for his role in the December 8 incident. (Lento Dep. at 28–31.) McCash's informal discipline required him to accept "training" from supervisors "about how to handle situations like [this one] better in the future." (Varughese 56.1 at ¶ 14.3; Defendants' 56.1 at ¶ 144.) Further, in the months that followed, HR "actively follow[ed] up with McCash regarding his wrongdoing, and he apologized" to several supervisors. (Varughese 56.1 at ¶ 23.1.) Lento believed, however, that he needed to use a more "formal" approach to discipline with Varughese, because her behavior had been so extreme, and because less formal reprimands had not been effective thus far at convincing her that her behavior had been inappropriate. (Lento Dep. at 28–31.)

**\*14** When Lento informed Varughese that she was being placed on Academic Advisement on December 21, it seemed to him that she "lack[ed] insight into what happens and still

blames others for what occurred." (*See* Lento Notes, dated December 21, 2010, Docket # 205–7 at 30.)

And indeed, on December 23, 2010, Varughese sent a written response to the Notice of Academic Advisement contesting its version of events and identifying several "Problem areas ...:(1) Public humiliation by Dr. McCash[;] (2) Potential immediate danger[;] (3) Possible retaliatory action to this complaint ... (4) Negative consequences of this event on my health." (Docket # 205–9 at 11, e-mail and attachment of Dec. 23, 2010.) Among the recipients of this communication was Associate Director of Graduate Medical Education Scott Barnett. After reading it, he wrote to Pessin–Minsley, expressing concern that, if Varughese's "allegations regarding Sam [McCash] are true, he may need to be counseled and placed on" Academic Advisement himself. (Docket # 205–9 at 17, e-mail of Dec. 23, 2011 at 3:50 p.m.). Pessin–Minsley responded to Barnett based on her belief that none of Varughese's allegations were true:

I have witness documentation that there was no physician intimidation or abuse by Sam [McCash] ... All accounts indicate that his response to Leena not following his direction was appropriate. He was firm, but not loud or physical. Leena's account seems to be a figment of her imagination or at the very least, a significant exaggeration.

(Docket # 205–9 at 9, e-mail of Dec. 23, 2010 at 3:56 p.m.,) Pessin–Minsley's information came from Azar (the moonlighter) and Jordan. (Pessin–Minsley Dep. at 151–53.)

*Varughese Complains to HR*

In addition to protesting her Academic Advisement within the Department, Varughese submitted substantially the same grievance to Human Resources. This caused Caryn Tiger–Paillex of HR to begin a second, independent investigation.

Tiger–Paillex first met with Varughese. At that meeting, Varughese expressed concern that McCash was, "going out of his way to micromanage [her]" and questioned whether it was "because he is a guy?" (Tiger–Paillex Dep. at 30–32, 38, 41.) This was the first and only indication that Varughese

might have perceived McCash's behavior as motivated by her gender; even this was backhanded, though, since the statement literally indicates that Varughese correlated a negative behavior (micro-managing) with being a man.

During the meeting Varughese did not (1) allege that McCash treated other women or other people of Indian descent similarly, (2) allege that he treated men better or differently than he treated women, or (3) allege anything at all about her national origin.

Varughese testified that Lento began treating her coldly after she complained to HR. She alleges that, on January 10, 2011, Dr. Lento admonished Varughese for taking matters "outside the Department." (Varughese 56.1 at ¶ 35.1.) Varughese claims that this comment was part of a pattern of Lento's becoming progressively more "aggressive" toward her in person, but she does not identify any other acts that demonstrated this. (Varughese 56.1 at ¶ 37.2.)

*Varughese Fails to Fulfill the Requirements of the Academic Advisement*

 **\*15** Varughese did not fulfill the terms of her Academic Advisement. Her self-reflection essay was due on January 18, 2011. She did not ask for an extension; she simply did not submit it. (Defendants' 56.1 at ¶ 35.)

While Varughese met with supervisors "three, four times" in the period of her Advisement (Varughese Dep. at 270–71), she did not meet with them each time she was required to do so. (Defendants' 56.1 at ¶ 37.)

At her deposition, Varughese testified that she was excused from complying with the Advisement by virtue of complaining to the Department and to HR. (Varughese Dep. at 274.) No one ever told her that complaining excused compliance, and she never bothered to ask anyone whether the effect of her complaints was to lift the Advisement. (*Id.*) In fact, her complaint had no effect on her Advisement, which was part of the training component of her residency.

On January 19, 2011, the day after she was supposed to have submitted the self-reflection, Varughese told administrators that Lento was being hostile to her. Again, she ascribed that hostility to her negative review of Lento's rotation, not to retaliation for any protected activity. (*See* Notes entitled "LV– 1/19/11–w/SB," Docket # 205–9 at 32.)

On January 21, 2011, Varughese reported that someone had broken into her locked desk at work; she found a drawer that was normally locked was open; the lock was broken. (Docket # 205–21 at 11, Jan. 21, 2011 e-mail from Varughese to Maniar.)

*Varughese Accuses McCash and Jordan of Drinking on the Job*

In a January 24, 2011 meeting with Caryn Tiger–Paillex, Varughese injected a new issue into her complaints about McCash and Jordan: she accused them of drinking alcohol at work. (*See* Tiger–Paillex Notes of Jan. 24, 2011, Docket # 205–7 at 5; *see also* Docket # 205–10 at 2, e-mail of Apr. 25, 2011 (referencing Jan. 24 meeting as her first complaint on the subject).) Specifically, she accused McCash and Jordan of drinking Captain Morgan rum at work, "right before AP [anatomic pathology] call." (Tiger–Paillex Notes of Jan. 24, 2011, Docket # 205–7 at 5.) Varughese also accused other residents of conducting happy hours on work premises in the evenings. (*Id.*)

There is some evidence that residents, including McCash, engaged in a social drinking activity called "dementia rounds," on hospital premises. (*See* Docket # 205–3 at 8–18: e-mail of Sept. 9, 2009 from McCash to Michael Mikulasovich; e-mail of Oct. 7, 2010 from McCash to fellow residents; e-mail of Nov. 4, 2010 from McCash to fellow residents; e-mail of Dec. 1, 2010 from McCash to fellow residents). In organizing what appear to be weekly or monthly "dementia rounds"-normally on a weeknight in a hospital conference room-various residents either offered to bring alcohol or asked others to do so, in the form of beer, wine, or simply "booze." (*See* Docket # 205–3 at 19, e-mail from Jessica French to other residents; *id.* at 20, e-mail of March 4, 2009; *id.* at 21, e-mail of August 3, 2010.) There is also some evidence that dementia rounds occurred during, and not merely after, residents' shifts. For example, McCash promised to come to one evening of dementia rounds as a way to "tak[e] a *break* from grossing," meaning analyzing patients' tissue samples. (Docket # 205–3 at 16, e-mail of June 3, 2010 from McCash to other residents (emphasis added).) At his deposition, McCash denied ever having returned to work after drinking, and if McCash dropped in on a dementia round in mid-shift, that does not mean that he imbibed. Varughese testified that he did, but she did not explain how she knew this-whether she observed it personally, heard it from third parties, or simply inferred it from McCash's presence at an event. Whatever, simply having alcohol on hospital premises was at a minimum unwise and more than likely a violation

of hospital protocol; it was not behavior that could or should be ignored.

*The Physician Wellness Committee*

**\*16** After Varughese had been placed on Academic Advisement, and while the HR investigation into the December 8, 2010 incident was open, Interim Chair Pessin–Minsley referred her to the Physician Wellness Committee ("PWC").

The PWC is a hospital-wide resource that assists physicians suspected of being impaired for behavioral, psychiatric or physical reasons. (Defendants' 56.1 at ¶ 30.) Significantly for our purposes, if the PWC makes a request of any physician at Mount Sinai, immediate compliance is mandatory, on pain of termination.

Pessin–Minsley told Dr. Arthur Figur, the chair of the PWC's investigative arm, that she was making the referral because Varughese was "insubordinate, loses control, and shouts and screams when confronted with issues that she needs to address." (Figur Dep. at 24–25.)

Varughese alleges that the act of referring her to the PWC was a Kafka-esque attempt to humiliate and discredit her, even as she was managing thousands of cases for the hospital, caring for patients, and covering for other residents. (Varughese 56.1 at ¶¶ 30.2–30.3, 34.1.)

When the referral was made, Figur did something he has never done before or since-he investigated whether the referral to the PWC was itself appropriate. He did this, "Because the department was in turmoil." (Figur Dep. at 38.) He wanted to be sure that Varughese's behavior was appropriate for referral to the PWC, and that Varughese was not being made a casualty of departmental dysfunction. (*Id.*)

Figur conducted his own investigation of the events of December 8, interviewing more or less the same witnesses that the Department had interviewed and that HR was interviewing. He eventually concluded that McCash was "loud" with Varughese and "pressed the issue that she should be responsible and perform her duties," but that Varughese had lost control entirely. (Figur Dep. at 43, 48.)

Figur did not investigate the earlier September incident "because having interviewed other people, they have had similar experiences with Dr. Varughese. And there were issues of lateness coming in, not calling in when she would

not-was sick, at the appropriate times, not listening to other chief residents." (Figur Dep. at 48–50.) Such reports-of Varughese's lateness or absenteeism, and her failure to tell people where she was-pepper the record.

After conducting his own inquiry, Figur concluded that the referral was in fact appropriate. "We felt she had difficulties; we are here to help. And that it was not an administrative disciplinary type of issue, but something that could possibly be corrected." (Figur Dep. at 38.)

It took a long time to convince Varughese that she had no choice but to meet with the PWC; she failed to respond to messages and at first refused to cooperate with the referral. When she finally agreed, on pain of termination, she immediately gave the PWC cause for concern.

Because the PWC had reports that Varughese's behavior was erratic, Figur asked her to submit to a toxicology screen, which:

> **\*17** was negative, but she wanted to drink an excessive amount of water. When [Figur] told her no, [he] took her over and the nurse at employees health would also refuse to give her more water and she admitted that she is on [certain] medications [including a sleep aid and possibly a stimulant] ... I would then be very concerned and would mandate that she give us a prescription from her current treating [physician] who gave her these medications because I'm always concerned about self-medicating by physicians.

(Transcript of Internal Appeal at 242–244, Docket # 205–31 at 68.) In other words, Varughese admitted that she was taking medications (which might well have been as unwise or inappropriate as participating in dementia rounds). Her desire for excessive amounts of water prior to screening is consistent with flushing any residue out of her system before the toxicology screen; the Court is familiar with this gambit from criminal cases, where drug users use water to dilute evidence of drugs in their urine. Varughese's insistence on

drinking lots of water while being screened for drugs was itself of concern to the PWC, and justifiably so.

It was standard for the PWC to refer physicians to the staff psychiatrist, and Figur thought it was particularly appropriate that Varughese see someone, because her "behavior at various times during the past was inappropriate. She lost control of herself. Not being a psychiatrist," Figur "put down the pattern of behavior ... that she may have anger management issues, that she certainly does not deal [well] with authority." (Figur Dep. at 47.)

On April 11, 2011, Figur referred Varughese to a staff psychiatrist, Dr. Madeleine Fersh.

In the referral, Figur explained to Fersh that:

> most [of Varughese's] workplace behavioral issues can be summarized as inappropriate outbursts ... instead of collegial discussions ... by not accepting the hierarchy of delegated authority. The presenting behavior: shouting, screaming, incoherent rants in the hallway in response to an admonishment by a chief resident ... She did not admit to us that she was out of control although numerous unbiased witnesses agreed that she behaved in that manner ... The outbursts are 'unpredictable' and over 70% of the time she is collegial.

(Docket # 205–24 at 55.)

Varughese did eventually see Dr. Fersh, although she cancelled her first appointment, came to the second at the last second and [Redacted]

　[Redacted]

[Redacted] [3] (This paragraph will be redacted from the published decision.)

### Jordan is Promoted to Chief Resident

By mid-February 2011, Lento had promoted Jordan to be the third acting Chief Resident. Varughese's summary judgment opposition papers allege-again, for the first time in this litigation-that Jordan's promotion over her was discriminatory, presumably because of her national origin, since Jordan, like Varughese, is a woman. (The reader will recall that one of the Chief Residents, Dr. Maniar, was a woman of Indian descent).

 **\*18**  Jordan's promotion *was* unusual in one sense; she was only in her second year of residency. (*See* Docket # 205–9 at 57, e-mail of Feb. 17, 2011 from attending physician Dr. Tamara Kalir to colleagues; Jordan Tr. at 14.) One professor found "the matter of bypassing seniors to be very troubling. It has hurt resident morale-significantly ... Bypassing senior housestaff [i.e., residents] gives them the message that we don't believe in them. I feel very uncomfortable, not to mention a little embarrassed about this." (*Id.*)

However, Varughese does not explain why she was as or better qualified for the position than Jordan, and the undisputed evidence. The very fact that Varughese had difficulty dealing with colleagues, which is not in any genuine dispute, would appear to disqualify her from serious consideration. So would the fact that Varughese was on Academic Advisement, as well as the fact that she was resistant to being assessed by the PWC. Jordan suffered under none of these impediments. While Varughese points to difficulties Jordan had managing certain administrative responsibilities once she became a Chief Resident, she presents no evidence that Jordan had performance issues before the promotion.

There is no evidence that either Schiller (who allegedly referred to Varughese's national background in the early years of her residency) or McCash (whose e-mail referred to Varughese's "work ethnic") was involved in the decision-making process.

### Varughese Persists in Refusing to Fulfill the Terms of the Academic Advisement

On March 30, 2011, Varughese finally submitted the self-reflection essay that her Academic Advisement required. It was two and a half months late.

The reflection was hardly reflective. It is in fact highly defensive. It goes on for several pages about McCash's alleged wrongs. A representative sampling, beginning with the first words that appear in the reflection:

I was verbally intimidated by Samuel McCash in a very aggressive and confrontational manner on September 12 th 2010 ... [after meeting with Lento about the September 12 incident], I believed that the evaluations which, were to be completely anonymous were not in fact anonymous, and realized or suspected that they may pose a threat to residents if anyone were to negatively evaluate a rotation ... on December 8, 2010, there was a second incident with Samuel McCash, very much to my dismay ... Samuel McCash became verbally abusive towards me ... The next day, I sensed that there was much whispering and talking amongst the attendings and others regarding this event, and I felt humiliated and thoroughly distressed that I was in the midst of this situation ... I feel that I have attempted to remedy these situations to the best of my ability by utilizing the appropriate authoritative channels and giving Drs. Pessin and Lento the benefit of the doubt but these have only led to what seems to be additional complaints and accusations (i.e. insubordination on 12/21/2010) to be launched against me, even after several months after these incidents ... Samuel McCash has exhibited volatile, aggressive and dangerous behavior towards me twice already ... However I now find that I have to defend myself from not only avoiding and preventing abusive behavior from Samuel McCash but also to defend myself from complaints of unprofessionalism at how I handled a difficult situation to blatantly false aaccusations of insubordination when presented with the Notice of Academic Advisement ... Despite these incidents, I have completed my assigned rotations without taking time

off to deal with the traumatic and abusive nature of these incidents."

**\*19** Toward the end of the essay, Varughese wrote that, "finally," she was "apologetic that I did not find a better way to navigate [the September and December] incidents." (Self–Reflection Essay 1,

Docket # 205–4 at 88.), but she did not admit to having done anything wrong, explain what she could have done differently, or express how she could have better handled the confrontations. (Defendants' 56.1 at ¶¶ 35–36.)

Significantly for this lawsuit, Varughese's document mentions nothing about discrimination and does not suggest that her race or gender figured into the incidents she was describing.

When Pessin–Minsley read the reflection, she was not pleased. She wrote to HR that the essay "was supposed to be [Varughese's] reflection on how SHE would have handled herself differently ... Clearly she is incapable of any self-reflection." (Docket # 205–9 at 25, e-mail of Mar. 30, 2011 at 3:42 p.m.) She also wrote that Varughese had "twisted all the events and much is blatantly not true," and complained that "both Dr. McCash and Dr. Lento (as well as [her]self) [were] being harassed and slandered." (Docket # 205–9 at 25, e-mail of Mar. 30, 2011 at 2:58 p.m.)

During this time, Varughese alleges that the workplace environment was becoming unbearable for her. She alleges that Dr. Lento "was erratic and threatening" towards her (Varughese 56.1 at ¶ 18.3), and that McCash and Jordan "continued to harass" her and disrupt her work (*id.* at ¶ 18.1). She offers no evidence about specific instances or behaviors to support those conclusory assertions. And indeed, Varughese had no contact with McCash at all from and after December 8, 2010–a fact that she admitted to Tiger–Paillex. (Varughese Dep. at 142.) So he could not possibly have been making life difficult for her during this period.

*HR Concludes its Investigation and Permanently Removes Varughese from McCash's Supervision*
On April 5, 2011, Tiger–Paillex told Varughese that the investigation had concluded and that she would continue to report to Maniar, rather than to McCash. (Varughese Dep. at 131, 133.) Either at that meeting or on the phone shortly thereafter, Varughese told Tiger–Paillex that she had had no

direct interaction with McCash since December 2010. (*Id.* at 142.)

On April 7, 2011, Varughese asked for a copy of Tiger–Paillex's written summary of her investigation. (Docket # 205–9 at 13, e-mail of Apr. 7, 2011.) She also asked to "move on in my life. These continued investigations and interrogations have taken a toll on my physical and mental well-being. I find that I am relieving [sic] this event [sic] over and over again with each new interview, now nearly 4 months after the incident ... Under NYC law, workplace harassment and retaliation are crimes." (*Id.*)

That same day, Varughese forwarded an e-mail regarding a proposed "dementia round" to an attending physician, Mary Fowkes, to "voice my concern" that people should not "drink and 'drive'," i.e., drink and return to work. (*See* Docket # 205–3 at 13, e-mail of Apr. 7, 2011 from Varughese to Fowkes).

**\*20**  On April 11, 2011, HR sent Varughese a letter saying that it had been unable to substantiate her claim that McCash had engaged in inappropriate behavior on December 8, 2010. (Defendants' 56.1 at ¶ 23.) Nevertheless, HR confirmed that Varughese was to continue to report to Maniar, rather than McCash. (Defendants' 56.1 at ¶ 24.)

Of course, Maniar had been plaintiff's direct supervisor since December 8, and this had not solved any of Varughese's problems. As a supervisor, Maniar-an Indian woman, just like Varughese-was no more pleased with Varughese's professionalism than McCash had been. In her declaration, Maniar described Varughese as a problem employee who "would call out unexpectedly and for multiple days and it would be difficult for me to find coverage." (Docket # 163, Maniar Decl. at ¶ 8.) Maniar recalled one specific occasion on which Varughese said she would not be available to cover for another resident even before she knew what date the other resident would be absent. (*Id.*)

### Varughese Explicitly Complains About Gender Discrimination
On April 25, 2011, Varughese e-mailed the HR department, and, for the first time, explicitly asserted that McCash had discriminated against her because of her gender. (Defendants' 56.1 at ¶ 26.) Her

perception was and is that I am being threatened and berated by a male resident because I am a woman. I doubt that he would yell or attempt to physically intimidate a male resident ... My complaint is that of being discriminated against by the male chief resident based on the fact that I am a woman ...

(Docket # 205–10 at 2, e-mail of Apr. 25, 2011 from Varughese to Tiger–Paillex.) By the time she made this complaint, Varughese had long since ceased reporting to McCash; by her admission, she had had no dealings with McCash since December 8, 2010. [4]

Varughese's April 25, 2011 complaint also mentioned that Schiller had "said that there is something wrong with my DNA and asked me to see a therapist." (*id.*) This appears to refer to Varughese's discussion with Schiller in the fall of 2009, discussed above. (*See supra* at 9–10). Varughese did not suggest that this comment had anything to do with her race or gender. [5]

Finally, Varughese reported that she "had witnessed ... McCash and ... Jordan drinking ... liquor at work at 5 pm ... while still involved in patient care related duties, this situation was relayed to Dr. Figur and [departmental administrator] Paul Johnson at the second [PWC] interview." (Docket # 205–10 at 2, e-mail of Apr. 25, 2011 from Varughese to Tiger–Paillex.)

In response to Varughese's explicit complaint of discrimination on the basis of her sex, Tiger–Paillex of HR asked to meet with Varughese to discuss the matter further. Varughese refused; she thought that it would be a "waste of time." (Varughese Dep. at 177–79.)

### Varughese is Given a Fresh Start
On April 1, 2011, Dr. Carlos Cordon–Cardo joined Mount Sinai as Chair of the Department of Pathology, taking over from Interim Chair Pessin–Minsley. (Final Warning Letter, Docket # 205–7 at 33.) He had never before interacted with Varughese; he had no involvement in her Advisement.

**\*21**  Cordon–Cardo turned his attention to Varughese one month into his tenure. He met with her on May 3, 2011 to follow up on her original Academic Advisement. He told her that he wanted to give her a fresh start with him-a chance to rewrite the self-reflection and otherwise complete the terms of the Advisement, which she had thus far failed to complete. (Defendants' 56.1 at ¶ 40.)

Varughese surreptitiously taped that meeting; she has submitted both a copy of the audiorecording and a transcript. (*See* Docket # 205–24, beginning at 13.) The conversation began with Lento asking Varughese whether she had read the book on professionalism she was required to read as part of her Academic Advisement. (*Id.* at 14–15.) She claimed to have read the book, but could not recall the name of its author or any of its content beyond its title. (Docket # 205–24 at 5.) It was obvious to Lento-and to anyone who has listened to the tape-that she was not truthful when she said she had read the book, and indeed, at her depositrion, she admitted to having lost, not one, but two copies of it. (Varughese Dep. at 281–82.)

The tape reveals that Varughese evaded questions with further questions. (Docket 205–24, Transcript at 6, 8.) When Lento admonished her for rolling her eyes after Lento commented that she had "some anger issues regarding what happened," she neither apologized nor denied what she had done, but said, "Let's just ignore that." (*Id.* at 6, 8.) Even as her supervisors tried to focus her on how she would handle conflict in the future, Varughese kept rehashing the December 8, 2010 incident. (*See, e.g., id.* at 19.) She repeatedly interrupted her supervisors. (*See, e.g., id.* at 3, 14, 22, 23, 31.) To a listener, she does not come across well.

And still the hospital tried to work with her. An administrator who was present asked Varughese to rewrite her self-reflection, actually read the book and come back in two weeks. (*Id.* at 29.)

> If you can complete these processes and actually do them in the right way not just, okay, I'll read the book, you know, go through the motions. Actually do it the right way and come back to us in two weeks and say yes, I reflected, this is how I could have handled it differently. Really try and look at it from a different perspective. Not just go through the motions. I understand it's an exercise that probably nobody would want to go through, but this is where we are right now and how we're going to address it ... Give us an essay that ... to put aside all of these things and to be creative ... forward thinking.

(*Id.* at 29, 32.)

Varughese was supposed to submit the revised reflection prior to the May 24 follow-up meeting and no later than May 23, 2011. (Final Warning Letter, Docket # 205–7 at 33.)

*Varughese Again Complains about Drinking in the Hospital*
On May 5, 2011, two days after their first meeting, Varughese e-mailed Cordon–Cardo with a host of complaints. (*See* Docket # 205–24 at 47–48, e-mail of May 5, 2011 from Varughese to Cordon–Cardo.) She reiterated her complaint that McCash had discriminated against her because of her sex, and also complained for the first time about retaliation: "It has become apparent to me that the [disciplinary] actions taken thus far have been in retaliation to my complaints of harassment ..." (*Id.* at 48.) Varughese also characterized Lento's treatment of her as "unfair," but in contrast to her accusation that McCash's behavior was "based on gender bias," she did not ascribe that unfair treatment to discrimination or to retaliation. (*Id.*)

**\*22**  Varughese also revisited the topic of McCash and Jordan's drinking. This time, she said " 'dementia rounds' ... had never been an issue" (Docket # 205–24 at 44, e-mail of May 5, 2011 from Varughese to Cordon–Cardo.)–an odd thing for her to say, since dementia rounds was exactly what she had been complaining about. Instead, she complained that McCash and Jordan had been drinking while "involved with patient care duties on several evenings including November 23 [2010]." (*Id.*)

This allegation led to yet another internal investigation-conducted in part by Figur of the PWC. The investigation turned up a bottle of Captain Morgan rum on hospital premises. Without finally concluding who brought it, administrators immediately sent a hospital-wide e-mail forbidding anyone from bringing alcohol to work or drinking on hospital grounds. (*See* Johnson Dep. at 133–35.)

*The Second Essay*

Rather than submit her second self-reflection essay by the May 23 deadline, as instructed, Varughese submitted her second essay at the May 24 follow-up meeting. (Defendants' 56.1 at ¶¶ 44–45.)

The second essay was, if possible, less "reflective" than the first. Varughese complained that Defendants' request that she re-write the essay was itself retaliatory. She asserted that, even though she had "apologized for anything that I had done that was not perceived as positive or professional by Dr. Lento ... I had not done anything except defend myself in a difficult situation." (Self–Reflection Essay # 2, Docket # 205–10 at 8.) She continued to dispute Defendants' version of events on December 8, 2010, accused others of being "unprofessional," unreasonable and "retaliatory," and "stand by my decision[s]" thus far. (*Id.*) There is no suggestion in the essay that Varughese ever did anything inappropriate or that she could have done anything differently. (*See id.*) Rather, reflecting her refusal or inability to understand why she was on Academic Advisement, Varughese stated, "I have been professional throughout." (*Id.* at 9.)

Varughese alleges that, at the May 24, 2011 meeting, Cordon–Cordo instructed her to stop complaining about doctors drinking on the job. (Varughese 56.1 at ¶ 42.1). A verbatim transcript of that meeting and the tape show Dr. Cordon–Cardo telling her that "the best way ... to move on is not with this attitude. You can come here with another attitude and to say ... I'm going to drop all of this nonsense of people drinking ..." (Docket # 205–24 at 40.) Varughese interrupts him to say that those are important matters "that need to be addressed," and Cordon–Cardo responds

> We are addressing these people ... we are taking these matters very seriously today. We ... have a lot of work to do ... but at the end of the day it's a program to teach and train people that are excited and passionate about pathology, not that are upset or that have problems ... You can't keep going back and forth ... coming back with new allegations now this person is drinking and now the other person is drinking then no one knows what it's

about if you're talking and to be honest with you ...

**\*23**  (*id.* at 40–41.) At that point Varughese interrupted her supervisor with a long rambling speech about matters far afield from her conduct in issue. (*Id.*) [6]

The tape of the May 24, 2011 follow-up meeting is otherwise at variance with Varughese's account that she never engaged in unprofessional behavior. (*See* Docket # 205–24, beginning at 32.) The conversation begins with Varughese alternately speaking indiscernibly and swearing. (*See id.* at 33.) In response to the question "How are you?" Varughese launches into the following:

> this is rather silly given that I've already written a reflection ... and I apologized for whatever I had done [no apology is reflected in the transcripts of the May 3, 2011 or the May 24, 2011 meetings] ... I even changed my mind as to how I feel regarding everything, but ... You're retaliating against me for making a complaint ... Yeah. I already said I apologized ... Every single time there's a meeting there's something. And I'm supposed to go back and reflect ... What's happened has happened and that's that.

(*Id.* at 32–33.)

Varughese characterized her first essay as describing what she could have done differently in that it describes what she *did*. She appeared not to comprehend that she was supposed to identify things she should not have done or things did *not* do that she could and perhaps should have done. (*Id.* at 35–36.)

The essay ends with an apology, "if I ... offended anyone else in any way, shape or form." (*Id.* at 40.)

*Varughese's Job Performance Continues to be Problematic*

During May and June 2011, Varughese alleges that she was still actively working on various rotations, analyzing patients'

slides for diagnosis, teaching medical students, and otherwise doing her job. (Varughese 56.1 at ¶ 43.2.)

Her supervisors did not see it that way. In the hours following the morning meeting of May 24, 2011, Chief Resident Elizabeth Morency (an African American woman) wrote to Cordon–Cardo regarding "the ongoing problems we have been having with Leena Varughese." (Docket # 205–24 at 71–72, e-mail of May 24, 2011 from Elizabeth Morency to Cordon–Cardo.) She described Varughese's getting into arguments with Physicians' Assistants ("P.A.s"), in which she demanded that those P.A.s do more of her work in the grossing room. (*Id.*) "These disagreements have been escalating in the past couple of days and I had to stop grossing myself to help diffuse a disagreement between [a P.A.] and Leena this afternoon ... that was witnessed by several other residents and was completely unfounded." (*Id.*) After the argument, Morency related that Varughese left early, leaving work undone. (*Id.*) At her deposition, Morency testified that Varughese, "raised her voice and w[as] disproportionally angry to the situation at hand and ... [was] not calm and it was over grossing a specimen. It just seemed over the top." (Morency Dep. at 54.)

**\*24**  While Cordon–Cardo explained that Varughese had had a stressful morning (i.e. meeting with him), Morency went on that this was "just one example of an issue that has come up in the past couple of weeks." (*Id.* at 72.) She asked for a meeting "to discuss Leena's increasingly erratic behavior and her future in our program. I am becoming increasingly concerned, not only for [Varughese's] well-being, but for the well-being and morale of the other residents and PAs that are also affected by her behavior." (*Id.*)

After her outbursts, Lento asked several people to help Varughese with her work so that she could get "back on track." (*See* Docket # 205–24 at 82–83, e-mail chain of May 26, 2011.) It seemed to work; with assistance, one supervisor found Varughese to have shown "SIGNIFICANT improvement." (Docket # 205–24 at 93, e-mail of Jun. 2, 2011 from Kalir to Lento.)

Nevertheless, Varughese continued to have difficulties through June 2011. To be fair, she was not the only one; several people in Varughese's program were behind in their work. A white female resident had "about 15 cases from the middle to end of May that ha[d] yet to be signed out. Last week [a male resident of Asian descent] had 6 placentas that were 3 weeks late." (Docket # 205–11 at 17, e-mail of

Jun. 10, 2011 from Jordan to Lento, Bleiweiss and Morency) Jordan was having trouble completing her responsibilities-a supervisor had to "ask[ ] her to let [the supervisor] know when she is required elsewhere, so we can try and make provisions in her absence." (Docket # 205–11 at 18, e-mail of Jun. 13, 2011 from Kalir to Lento.)

Varughese's issues, however, were more intractable than others'. (*See* Tiger–Paillex Dep. at 105–106.) At some point in June, Cordon–Cardo asked whether they could hold Varughese accountable for failing to make certain data entries. (*Id.*) Tiger–Paillex asked whether others had the same issue and were going to be held accountable as well. (*Id.*) In the end, Tiger–Paillex concluded that Varughese was in a different situation from the othr residents, because she submitted her data entries later than everyone else. (*Id.* at 109.)

*Varughese Retains Counsel*
On June 10, 2011, Varughese's newly-retained counsel wrote a letter to Tiger–Paillex, advising her "that this firm has been retained ... to prosecute claims of sex/gender discrimination, perceived disability discrimination, and retaliation in violation of the [sic] Title VII ... the [NYSHRL] and the [NYCHRL] ... during [Varughese's] employment ... her supervisor Samuel McCash verbally and physically intimidated her ..." and referencing Varughese's April complaint as the first time she had complained about gender discrimination. (*See* Docket # 205–10 at 12.)

It is worth noting that counsel did not advance any race discrimination claim.

Counsel demanded a response by July 6, 2011, failing which it would take legal action. (*Id.*) The record does not contain any evidence of a response directed to counsel.

*Final Warning and the Supervision of Defendant Firpo*
**\*25**  The Department issued Varughese a Final Warning letter on July 15, 2011. (Docket # 205–7 at 32 (it is dated July 1, 2011, but Varughese actually received it on July 15).) The Warning was:

> To inform you of the Department's decision to issue this final warning to you. This decision stems from your failure to fulfill the requirements of your December 21, 2010 Academic

Advisement and your behavior at the follow up meeting on May 24, 2011.

The Academic Advisement required you:

(1) To prepare a written self-reflection by January 18, 2011

(2) To meet with [Lento] periodically to assess your progress

(3) To read [the book]

Throughout the period of Academic Advisement you showed a pattern of lack of professionalism. First, you submitted your self-reflection ... long after it was due, and, once submitted, the essay did not meet the Advisement's requirements. When I asked you on March 22, 2011 when you would be submitting the essay, you responded that you were 'really swamped' that week, did not know when you would have time to write the reflection, and asked to submit it the following week. You did not hand in the essay until March 30, 2011.

Although the Academic Advisement required a self-reflection on 'how you could have approached things in a better fashion, including commentary on physician professionalism and its role in this circumstance,' your essay contains nothing resembling self-reflection. Instead, it is a lengthy recitation of the events that led to the Academic Advisement and various ways in which you feel that you were wronged. Remarkably, it ends with a wish for mediation and an apology regarding these long-past events. There is no discussion of physician professionalism or its relevance to the situation. Your essay reflects a lack of insight into your own behavior, a failure to understand the role of physician professionalism-regardless of how others behave-or the impact of your behavior on those around you. You have utterly failed this exercise.

Second, you failed to meet with me as required by the Advisement. On February 17, 2011, I emailed you that we 'need' to meet on the following day and asked that you propose potential times. Your email response to me indicated you could meet at 5:30 p.m. on February 18, 2011. On the day in question, you did not show up to the meeting or contact me to let me know that you would not be coming. When I questioned this, you said that I did not confirm the time. Despite this purported 'miscommunication,' you made no effort to contact me-

your supervisor-to clarify any misunderstanding regarding whether we were meeting.

Dr. Carlos Cordon–Cardo ... was new to the Department and had not been involved in the earlier discussions with you. After reviewing the self-reflection you submitted and also determining that it did not meet expectations, Dr. Cordon–Cardo decided to give you a second chance to fulfill the requirements of the Academic Advisement. On Tuesday, May 24, 2011, you attended a scheduled follow-up meeting ... When the meeting was confirmed by email on May 9, 2011, you were instructed to submit a revised reflection prior to the meeting and no later than May 23, 2011. The purpose of this meeting was, in part, to give you the opportunity to meet your new Department Chair and to establish that you were able to meet the Department's professionalism expectations. Despite being given this fresh opportunity, you did not provide a revised reflection before the meeting as requested. Rather, you submitted it a day late, at the start of the meeting. When Dr. Cordon–Cardo asked if you read the book assigned to you, you cavalierly tossed the book on the table at him [Varughese disputes this fact], and continued to be flippant and disrespectful throughout this meeting.

**\*26** During the Academic Advisement period and again at the follow up meeting, your behavior reflected a lack of insight and a failure to appreciate the need to function within a hierarchy. We are, therefore, compelled to issue this formal notice of disciplinary warning that any recurrence of unprofessional behavior may result in further disciplinary action, up to and including your dismissal from the Program. You are expected to act at all times in a manner appropriate to your position as a house staff officer. If you have issues of concern, you may utilize any of the many mechanisms available to house staff to bring complaints, but you must behave in a professional manner.

You will be required to meet biweekly for three months with Dr. Adolfo Firpo, Director for Educational Activities, to review your performance. The purpose of this review is to provide guidance and to assess your improvement. These meetings will include discussion of feedback received from faculty, residents, and staff.

You have a right to appeal this disciplinary action by requesting, in writing, a hearing before the House Staff Affairs Committee of the Medical Board within ten days of receiving this notice. [It provides an address to which to

send the request.] If you do not appeal this action, it will become final at the end of the appeal period.

(Docket # 205–7 at 32–34.)
Varughese did not appeal the Final Warning.

Firpo, the doctor with whom she would now be required to meet, was new to the institution. Once again, Varughese had a chance to make a fresh start.

*Varughese's Performance Problems in August 2011*
When Varughese began a two-week rotation in the Cytogenetics lab in August 2011, she allegedly caused "the worst teaching experience" in the thirty-year career of her supervisor, Dr. Vesna Najfeld. (Najfeld Decl., Docket # 164 at ¶ 19). Najfeld is a woman; the record does not reveal her race or national origin.

Some of the underlying facts are contested, but Varughese does not dispute that she could not be reached when she was supposed to be available, and that she refused to provide coverage for her colleagues even when she was available to do so. (Najfeld Deck, Docket # 164 at ¶ 17; Varughese Dep. at 465.) Varughese used her blackberry while Najfeld was teaching (Varughese says she was taking notes), but when Najfeld asked that Varughese stop using the blackberry, Varughese admits that she disobeyed. (Varughese Dep. at 417.)

Varughese failed to complete some assignments in that rotation (Najfeld Deck, Docket # 164 at ¶ 16), and performed poorly on others. The straw that broke the camel's back for Najfeld was one particular assignment: Varughese was told to make a presentation to her colleagues and other physicians on a particular form of leukemia. Najfeld told plaintiff to provide her with the slides for the presentation in advance, so she could review them. Varughese waited until 4 p.m. on the day before the scheduled presentation to e-mail the slides to Najfeld. (*Id.* at ¶¶ 4–12). Najfeld e-mailed her back five minutes later that there were "major problems" with the presentation, asking that Varughese call her "a.s.a.p." (*Id.*) But Varughese did not check her e-mail before leaving campus, so she did not see Najfeld's response, until she got home (an hour away from the hospital), where she could do nothing to fix her presentation. (Varughese Dep. at 380–84.)

**\*27** When she finally called Najfeld, Varughese was directed to "Please send an e-mail that the conference will not

be held." (*Id.*) Varughese took that to mean that she should e-mail Najfeld to confirm that she would not be presenting. But that was silly; Najfeld already knew the conference would not be held, because she had decided to cancel it. Najfeld obviously wanted Varughese to e-mail the attendees of the conference to ensure that no one would show up for a presentation that had been cancelled. (*Id.* at 392.) Needless to say, Varughese did not notify other conference attendees of the cancellation; as a result, people showed up for the canceled conference early the next morning when they need not have shown up at all. (Defendants' 56.1 at ¶ 62.)

At her deposition, Varughese blamed everything on Najfeld. She complained that Najfeld should have called or paged Varughese in addition to e-mailing her. (*Id.* at 384.) Varughese also claimed to be "shock[ed]" that Najfeld did not "explain herself in the first email by giving reasons as to why the presentation was inadequate, rather than asking Varughese to call her. (*Id.*)

During the same period, Varughese was insubordinate towards now-Chief Resident Jordan. On August 4, 2011, Varughese refused a coverage assignment. She claimed to be injured, but refused to provide a doctor's note. (Termination Letter of Sept. 21, 2011, Docket # 205–7 at 37.) On August 12, 2011, Varughese ignored page after page from Jordan and Lento. (Termination Letter of Sept. 21, 2011, Docket # 205–7 at 38.) Ultimately, Lento was able to reach her only by calling Najfeld and asking Najfeld to bring Varughese to the phone so that he could speak with her. (*Id.*) Although Lento instructed Varughese to contact Jordan, she did not do so. (*Id.*)

At her deposition, Varughese admitted that, when Jordan asked her to confirm that she would provide coverage on that day, she did not respond, saying it was because she "did not have time." (Varughese Dep. at 465–66.) She also complained that asking her to confirm coverage was "outrageous," "a travesty" and "harassment." (*Id.*)

At her deposition, Varughese maintained that her behavior during the rotation with Najfeld was completely professional, and that she had done nothing untoward. (Varughese Dep. at 625–26.)

*Transfer Request*
Scheduling residents' various rotations was no small feat, requiring complex coordination among multiple departments. The schedule depended in part on residents' requests. Residents were responsible for ensuring that they had

sufficiently broad and deep experience to graduate in a timely fashion.

For her October 2011 rotation, Varughese initially requested a rotation in GI Pathology. She apparently submitted this request before a July cut-off date. (The reader will recall that July was the beginning of Mount Sinai's academic year.)

The overall schedule was then finalized.

 *28  After the schedule was finalized, Varughese changed her mind. She asked instead to be allowed to do a Dermatophatology rotation. She spoke to Firpo about her request, and he said he would see what he could do.

Firpo did follow up for Varughese, but the request required Firpo to go through several steps, including assessing its "possible impact on the existing schedule." (Jul. 13, 2011 e-mail from Firpo to Morency, Jordan et al., Docket # 205–17 at 19–20.) Even in July, Firpo described the request as "very late and [thus] ... in violation of the established policy." (*Id.* at 20.) Then again, Firpo described Varughese's request as having a "minor impact on the overall program" to a supervisor in the rotation that Varughese wanted to switch into, and that supervisor in return wrote to Firpo that Varughese would be welcome in the rotation. (E-mail Chain of Aug. 4, 2011 and Aug. 9, 2011, Docket # 205–28 at 3.)

Apparently, there were more problems with scheduling than Firpo anticipated in August. Varughese's scheduled roration "coincided with necessary coverage ... and alternative coverage could not be identified." (Termination Letter of Sept. 21, 2011, Docket # 205–7 at 38.) While Firpo apparently went to bat for Varughese and tried to get her a scheduling change, it was too late to get another resident to cover Varughese's scheduled rotation, and a first-year resident's illness and associated absence made scheduling even tighter. (*See* e-mail chain of Aug. 24, 2011, Docket # 205–27 at 171.) Moreover, while Varughese apparently told Firpo that another resident, Mabel Ko, had agreed to switch rotations with her, Ko denied that that she had agreed to the switch-she had already completed the rotation that Varughese wanted her to cover. (*See* Ko e-mail to Firpo of Sept. 7, 2011, Docket # 167–1 at 3.)

According to Firpo, when he told Varughese on September 7, 2011, that her transfer request had been denied, she became irate and accusatory, and continued to complain and seek a rotation change through late September. (Termination Letter

of Sept. 21, 2011, Docket # 205–7 at 38–39.) No matter what Firpo told her, Varughese went to others to renew her transfer request, fired off several e-mails, and complained to Associate Director of Graduate Medical Education Scott Barnett at a September 12, 2011 meeting. (*See* Transcript of Sept. 12, 2011 Conversation, Docket # 205–28 at 35.)

### Varughese's Poor Record of Attendance and Failures at Remediation

In August 2011, Varughese was notified that she was failing to meet the hospital's attendance requirement for educational conferences. (Defendants' 56.1 at ¶¶ 91–92.) The hospital required residents to be present at 80% of weekly conferences on different subjects relevant to their chosen discipline. Firpo had told Varughese that she should attend conferences that interested her. Varughese claims to have understood this to mean that she only need attend 80% of the conferences that interested her, rather than attending 80% of all conferences, with her choices of what to eliminate being guided by her interests. (Varughese Dep. at 495.)

 *29  In keeping with the Pathology Department's policy for residents who fell behind in conference attendance, Morency told Varughese on August 29, 2011, that plaintiff would have to present a lecture at the conference scheduled for September 14, 2011. (Defendants' 56.1 at ¶ 93.)

From then on, it appeared to Morency that Varughese "just seemed increasingly agitated, and, to some degree, unstable and unpredictable." (Morency Dep. at 51.) These impressions came from Morency's observations of Varughese getting into "altercations" "in the residents' room, in the gross room[; Varughese] just didn't seem to get along with many people in general." (*Id.* at 65.) By September 2011, Morency wrote to her supervisors that simply having Varughese around was "emotionally taxing." (*Id.* at 167.) At her deposition, she explained that, "having to deal with a resident who continually is unprofessional, unreliable, erratic at best, can be emotionally taxing when nothing is being done about it." (*Id.*)

On September 12, 2011, Varughese met with Scott Barnett, the Associate Director of Graduate Medical Education to complain about her treatment and ask for the same transfer that Firpo had already told her would not be granted. Varughese told Barnett, in essence, that everyone who had ever criticized her had been wrong and unfair. (*See generally* Transcript of Sept. 12, 2011 conversation, Docket # 205–28 at 35–112.) She ascribed the unfairness to petty politicking

rather than to discrimination. And she continued with her fixation on the December 8 incident, which she would not view as closed until the Hospital came around to her point of view about what had occurred. For example, she complained that her relationship with Lento had deteriorated after she gave Lento a negative evaluation. Lento "wouldn't discuss the whole incident [the December 8 incident] with Sam. And [Lento]'s like, oh, I'll speak to [McCash]. And then [Lento] said, oh, well, you know, that's too bad because why would you write a diatribe of an evaluation against surgical pathology rotation here?" (*Id.* at 82.)

While they were discussing her two inadequate self-reflective essays, Varughese alleges that Barnett asked "how dare you write that shit?" (Varughese 56.1 at ¶ 34.1.) The tape of that conversation-and its transcript-reveals that her memory is not accurate. (*See* Docket # 205–28 at 35–112.) In fact, Barnett said this about Varughese's self-reflections:

> If one of my kids were to read that, I would have screamed at them, how dare you write that? How dare you write that? It was one-sided. It was not an attempt in any way to address the program's concern[ ] ... It was a rehashing of issues that they were trying to put behind you. And it was not-my mind that was not a good faith attempt to do what they were asking you to do. And, basically, you got pissed off and you just threw some shit against the wall and hoped it would stick. That's what it was.

**\*30** (Transcribed Conversation of Sept. 12, 2011 at 58, Docket # 205–28 at 64.)

On September 13, the day before her scheduled presentation, Varughese called in sick. That afternoon, she had a conversation with Jordan about the next day's scheduled presentation. When told that she really did have to present at a make-up conference, Varughese responded that she did not "feel well, won't be able to present tomorrow." Jordan, hoping to avoid a repeat of the cancelled Najflaz conference, notified others who were supposed to be in attendance that Varughese would "be out sick tomorrow." Varughese took great offense at this, emailing Jordan, "Why are you stating

that I will be calling out tomorrow?" (*See* Docket # 205–29 at 30–32, e-mail chain of Sept. 13, 2011.). Jordan was unnerved by Varughese's response, especially as plaintiff did in fact call in sick on September 14, 2011. (Docket # 205–29 at 80, e-mail of Sept. 14, 2011.) (Defendants' 56.1 at ¶¶ 95–96.) Jordan e-mailed Firpo to say that she was "terrified to be at work right now" and was "afraid that at any moment [Varughese] will lash out at me or worse, hurt me or the residents around me." (Docket # 205–29 at 51, e-mail of Sept. 14, 2011.)

The cancelled conference was rescheduled for September 15. The program instructed Varughese to provide proof that she had in fact been sick on September 13 and 14, the days when she had called in sick. She failed to provide any proof. (Termination Letter of Sept. 21, 2011, Docket # 205–7 at 39.) Varughese does not contend otherwise, but alleges that unidentified "others" were not required to bring doctors' notes for absences. (*See* Varughese 56.1 at ¶¶ 74.1–74.3.) There appears to be some disagreement among Mount Sinai's witnesses about the hospital's policy on providing doctor's notes to confirm illness, [7] but whatever the policy in the ordinary course, it is undisputed that Varughese failed to comply with a direct order from a supervisor. Furthermore, the fact that she was still on Academic Advisement, and that she called out sick on a day when she was required to make a presentation-itself a make-up for a presentation for her previous failures to attend educational conferences-place her is a different category than a resident who had no special professional obligations on a day when she called in sick.

*Varughese Fails to Make Her Presentation and Inquires About Taking FMLA Leave*

Varughese did come to work on September 15, but she arrived late to the conference and she did not make her presentation. She stayed for fifteen minutes, left without giving her lecture, and did not return until everyone else had gone. (Defendants' 56.1 at ¶ 97.)

Bleiweiss, who was at the conference that morning, could not "recall ever having a[nother] situation where someone who was scheduled to present just simply walked out without saying a word, without any explanation or apology." (Bleiweiss Dep. at 90.)

Varughese has offered two excuses for her absence at various times. At her administrative appeal following her termination from the residency program, she said that she "never agreed" to give the lecture. (Transcript of Internal Appeal at 160–61,

Docket # 205–31 at 47.) At her deposition, she claimed that she had had a stomach virus. (Varughese Dep. at 540.)

**\*31**  On the afternoon of September 15, Firpo and Patel met with Varughese to discuss her latest vanishing act. Varughese raised the issue of taking FMLA leave. According to Firpo, Varughese told Firpo she felt overwhelmed and unable to concentrate or do any work. (Defendants' 56.1 at ¶¶ 99–101.) Patel thought Varughese "didn't seem like herself ... depressed, kind of ... out of it." (Patel Dep. at 70.) Varughese told Patel that "she didn't feel like herself, and she didn't feel like she could perform the tasks at hand." (Patel Dep. at 70.)

Varughese actually contends that this meeting did not occur, and now claims that she had no such concerns about her health or ability to work. (Varughese 56.1 at 100.4–100.5.) She admits, however, that she asked about the possibility of taking FMLA leave and that Patel discussed the issue with her. (Defendants' 56.1 at ¶¶ 102–104.)

At the end of the day on September 15, Varughese told Firpo that she wanted to continue working until she could be assessed by a doctor. (Termination Letter of Sept. 21, 2011, Docket # 205–7 at 39.) She said that she had a doctor's appointment the next day. (*Id.*)

In view of her behavior over the preceding few days, Varughese's suggestion was not acceptable to the Hospital. On September 16, Firpo e-mailed Varughese and directed her not return to work until the issue of FMLA leave was resolved. (Termination Letter of Sept. 21, 2011, Docket # 205–7 at 39.)

Over the next few days, administrators repeatedly tried to contact Varughese to ask about her health and also to inquire whether she would be making a formal request to take FMLA leave. Varughese did not respond to any of these inquiries.

Varughese disregarded Firpo's written directive not to come to work; she came to work on September 16 and 19. (Defendants' 56.1 at ¶ 106.) She felt free to ignore a direct order not to come in because she was dissatisfied with the Hospital's reason for telling her to stay home:

> because it was completely opposite of the day before and I did not know what the-what the issue was here. It was not really explained to me ... It seems very irregular.

> Q. Whether it was irregular, whether you understood why, I take it you understood that he told you not to come back to work.

A: Well, I'm a contracted employee. He has to provide me with a logical explanation as to why.

(Varughese Dep. at 563–64.)

*Varughese Rifles Through an Administrator's Files*

On September 20, 2011, Varughese-in defiance of two direct orders from her supervisors (one to provide a doctor's note and one to remain at home until the leave issue, which she had raised, was resolved)-decided to report for work. She stopped into a Starbucks on her way to work. (*See* Termination Letter of Sept. 21, 2011, Docket # 205–7 at 40.) Administrator Shema Patel (a woman of Indian descent, like Varughese) and her husband happened to be there. Varughese alleges that Patel was stalking her on behalf of the Hospital: her Rule 56.1 Statement says, "The Defendant Institution utilized Patel to confront me and stalk me because she was a woman of Indian descent, and I cannot ascribe Patel's presence at Starbucks on 96 th and Lexington as an innocent coincidence with her husband in tow." (Varughese 56.1 at ¶ 107.1). Varughese offers no evidence to suggest that Patel had any way of knowing that Varughese would be in the Starbucks at 96 th and Lexington at that precise moment, or otherwise to support this wholly conclusory allegation; Patel was deposed when Varughese still had counsel. Not surprisingly, counsel did not raise or otherwise explore Varughese's current stalking theory, but Patel simply testified that she was at the Starbucks with her husband when Varughese approached her. (Patel Dep. at 96.)

**\*32**  Patel knew that Varughese was not supposed to be at work until she provided a doctor's note. When Varughese said she was on her way to the hospital, Patel told Varughese to come to her office. (Defendants' 56.1 at ¶¶ 107–109.)

Shortly after they arrived, Patel was called away. She left Varughese alone in her office. (Defendants' 56.1 at ¶¶ 113.) When Patel returned, she saw Varughese looking through a file on her desk labeled "Pathology." (Defendants' 56.1 at ¶ 114.) When the supervisor told Varughese the files were confidential and asked her to explain herself, Varughese asked, "What's the big deal?" and told her to "chill out." (Defendants' 56.1 at ¶¶ 115–116.)

At her deposition, Varughese admitted (reluctantly, and only after repeated questioning) that she had in fact looked at a file on Patel's desk while Patel was absent from the room:

Q. Were there files on Ms. Patel's desk?

A. No, there were no files.

Q. Was there anything on Ms. Patel's desk?

A. There was one folder, I believe.

Q. And while Ms. Patel was out of the office did you look through that folder?

A. I picked it up, but I didn't really look through it.

Q. Did you open it?

A. Yes.

Q. Did you look through the pages?

A. Yes.

(Varughese Dep. at 581–82.) While admitting what she did, Varughese tried to minimize her conduct at deposition and currently characterizes what she did as a "mistake." She claims to have believed that the folder was her own. (Varughese 56.1 at ¶ 113–115.)

Varughese was then shepherded into Tiger–Paillex' office. She recorded the ensuing conversation and the Court has heard the tape. After talking through the still unresolved leave issue and making sure Varughese knew she would have to see the PWC again, Tiger–Paillex asked Varughese what had happened in Patel's office. Plaintiff refused to respond, saying, "I don't have anything to say about that." Varughese then accused Patel of simply "assuming" that Varughese had snooped into her files; when Tiger–Paillex told Varughese that there was no assumption, that Patel personally observed Varughese looking through the file-"there is a witness and [Patel] is the witness-Varughese told Tiger–Paillex that Patel should not have left someone alone in her office if confidential files were in the office. (Termination Letter of Sept. 21, 2011, Docket # 205–7 at 40–41.) Once again, the problem was of someone else's making, not hers.

No other resident has been caught rifling through an administrator's confidential files. (Cordon–Cardo Dep. at 220.)

*Varughese's Termination from the Residency Program*
Varughese was summarily terminated the next day.

Varughese was handed a termination letter (Docket # 205–7, beginning at 36). It explained that the Hospital was terminating her: "because your performance and conduct have been unacceptable and your continued presence in the Program is a risk to the Hospital and its patients." (*Id.*) The letter referred to the behavior recounted in the July 1 Final Warning and then went on to say, "[S]ince the final warning was issued, you have continued to demonstrate unprofessional behavior." (*Id.*) The next four pages recount the various performance and professionalism issues that had arisen in just the previous six weeks. (*Id.* at 37–40.)

**\*33** The letter concluded by noting that Varughese had "exercised extremely poor judgment in accessing Ms. Patel's file [and] lied several times when questioned about it." (*Id.* at 40.)

*Internal Appeal to the House Staff Affairs Committee*
As was her right, Varughese appealed her termination to the Mount Sinai School of Medicine House Staff Affairs Committee (the "Staff Affairs Committee") within ten days of receiving the termination letter.

Under Hospital rules, Varughese was permitted to review which Committee members would hear her appeal and to ask that members be removed from her panel. She challenged several members and they were removed from the panel at her request. (Varughese Dep. at 639–40.)

The Staff Affairs Committee held an appeal hearing regarding Varughese's termination on November 14, 2011. (*See generally,* Transcript of Internal Appeal at 284, Docket # 205–31 at 7–94.) It heard sworn testimony from seven physicians and three administrators, including Varughese. Varughese had the opportunity to cross-examine all witnesses, to present her own witnesses, to submit exhibits, and to make opening and closing statements. She was permitted to bring a friend with her, a practicing pathologist at a different hospital. While a lawyer for the hospital was present, Dr. Firpo, not counsel, presented the Department's case.

At the hearing, Varughese steadfastly maintained that she had done nothing wrong. Regarding her self-reflection essays, she testified that, "the reflection does accurately reflect what happened" on December 8, and also said it "accurately reflected with appropriate amount of insight [sic]." (*Id.* at 78.) She argued that her "defensive tone" was "necessitated" by "the actions taken against me instead of some acknowledgment and mediation." (*Id.*)

This defensiveness continued at the hearing. For example, Varughese cross-examined Jordan about why Jordan had forwarded Varughese's e-mail that Varughese would be out on the morning of September 13, 2011, asking: "Why did you state I was not presenting? I mean why did you state that I would not come into work?" (*Id.* at 43.) Then, in a comment addressed to the panel hearing her appeal, Varughese complained that Jordan "calls out sick for me on my behalf, how rude and obnoxious is that?" (*Id.* at 144,) and, addressing Jordan, "Do you think you're warranted to call out for me? ... To make a statement for me on my behalf, as the Chief Resident?" (*Id.* at 145.)

Regarding her decision to defy instructions to stay home until a doctor declared her fit for duty, she acknowledged that several supervisors and HR representatives "all sent me e-mails, left voice mails and so on stating that their sentiment regarding my right to be at work is that I do not have the right to be at work." (*Id.* at 84.) Nevertheless, "In this particular circumstance [she] felt the best course of action for me was to follow hospital policy and be present at work." (*Id.*)

**\*34** On the question of opening Ms. Patel's files, she alleged neither that it was a mistake (as she does in her sworn submissions to the Court, *see* Varughese 56.1 at ¶ 111.2), nor that she thought the file was her own (as she did at her deposition, *see supra*), but rather that "as I waited there, there was a folder on her desk next to where I placed my coffee which I leafed through with no ulterior motive." (Docket # 205–31 at 85.) Given the opportunity to cross-examine Patel at the hearing, Varughese asked her whether it was "appropriate" to leave people alone in her office "when you have confidential documentation or documents in your office." (*Id.* at 60.) She went on to state that, when Patel came back into the office and admonished her for looking through the file, "I was once again bewildered by the incongruency of the situation," (*Id.* at 85)—"incongruency" that she obviously did not believe was her fault.

When Varughese said that she wanted to conclude the hearing, she was asked if she had "any objection to the proceedings that took place today, anything that-the conduct of this hearing that you want to put on the record?" (*Id.* at 91.) She responded "no." (*Id.*) [8]

The Staff Affairs Committee issued its post-hearing decision on December 2, 2011. (Defendants' 56.1 at ¶¶ 118–121; Letter of Dec. 2, 2011, Docket # 205–7 at 43). It found "that there is

ample evidence to demonstrate that the [termination] ... was not arbitrary and capricious." (Findings and Conclusions of the Staff Affairs Committee, Docket # 205–7 at 46.)

It found that the "underlying facts" set forth in the September 21, 2011 Termination letter

> were clearly established by the Department with testimony and documentary evidence. For example, Dr. Vesna Najfeld ... testified ... and confirmed ... facts ... including Dr. Varughese's inadequate responses concerning her case conference presentation, her absenteeism, and her unprofessional interactions with faculty and staff ... Dr. Jordan ... and Dr. Lento ... testified to the facts set forth in the September 21, 2011 letter concerning coverage ... Lento, in particular, described a pattern of non-responsiveness to emails and pages that he sent to Dr. Varughese ... ("One of the difficulties that I have had with Leena is she virtually never responded to my pages and infrequently responded to my e-mails.") ...

> The Committee finds Dr. Varughese's presentation unpersuasive. She took issue with virtually every witness who testified and in some instances questioned their authority to make the decisions they did. Yet the testimony and evidence clearly demonstrate a continuing pattern of unprofessional conduct in the face of a final warning that put her on notice that further incidents of unprofessional conduct could lead to her dismissal. It is clear to the Committee that Dr. Varughese lacks insight into her behavior and her role as a resident in the Department as evidenced by the extensive testimony and documents presented to the Committee. Indeed, at the conclusion of the hearing, *Dr. Rocco, one of the two residents on the Committee, asked Dr. Varughese: 'Do you take responsibility or do you feel remorse involving any of the things that you 've talked about ... ? Dr. Varughese's response was argumentative and she never acknowledged responsibility for any of the events as to which there was ample testimony and evidence.*

**\*35** It is also clear from the testimony and other evidence that the Department gave Dr. Varughese multiple opportunities to correct her behavior and to become a constructive part of the Department's residency program ... Unfortunately ... Dr. Varughese's lack of insight into her behavior was such that she was unable to make the constructive changes to her behavior needed to fulfill her responsibilities ...

In sum ... based on the testimony and evidence presented, the Committee unanimously finds and concludes that the Department's actions to suspend and terminate Dr. Varughese from the Pathology Residency Program were clearly supported by the testimony and other evidence.

(*Id.* at 48–50 (emphasis added).)

*Internal Appeal to Mount Sinai's Appeal Committee*
Varughese took another appeal, to Mount Sinai's Appeal Committee. (*See* Defendants' 56.1 at 122–124.) The Appeal Committee was made up of three senior faculty members, including the Chief Medical Officer and Senior Vice President for Medical Affairs. (*Id.*)

On March 7, 2012, the Appeal Committee upheld the Staff Affairs Committee's determination. (*See* Letter and Decision of Mar. 7, 2012, Docket # 205–8.)

The Committee emphasized that *any* impairment of a Pathology resident can present a significant danger to patients. In its final determination upholding Varughese's termination, Mount Sinai's Appeal Committee wrote that:

> The Pathology Department at Mount Sinai is the largest in any single comparable academic institution in New York City. Pathology residents are given a great deal of responsibility. Though attending physicians supervise residents, the need for skilled performances by residents cannot be overemphasized ... A physician who ... displays physical signs of impairment to a degree that others fear for the physician's wellness ... clearly should not be charged with such critical responsibilities.

(Final Appeal Decision, Docket # 205–8 at 11.)

The Appeal Committee reviewed the transcript of Varughese's initial hearing and all of the exhibits submitted. On the basis of that review, it found fault with Varughese's behavior outright. For example, it found that Varughese "was

argumentative with Dr. Jordan ... [and] unwilling[ ] to accept instructions from those in positions of authority;" and that she "intentionally ignored ... instructions." (Docket # 205–8 at 7.) It explained why Varughese's radio silence in response to coverage requests was so problematic, and why her refusal to acknowledge wrongdoing regarding that issue was so baffling:

> Dr. Varughese's claim that her lack of response [to a request for coverage] signified that she affirmatively agreed to cover and that she did not have to respond to emails that simply stated facts is incomprehensible. Dr. Jordan could, under no circumstances, make an assumption that Dr. Varughese would cover surgical service and patient safety and care would be preserved. Patient care could not be left to supposition. The chaos that resulted from Dr. Varughese's inaction is clear from the numerous emails.

**\*36** (*Id.* at 8.) The Appeal Committee further found that Varughese tried to "subvert[ ] Dr.s Lento and Firpo" by repeatedly going to others to try to get a rotation change (*id.* at 8), and that these actions were "insubordinate." (*Id.*) It found Varughese's communications to Jordan and Morency regarding the remedial presentation to be "argumentative" and to have "challeng[ed] the authority of her Chief Residents." (*Id.* at 9.) Varughese's "continued insistence that Dr. Firpo exempted her from the 80% conference attendance policy, her refusal to adhere to departmental attendance policy, her failure to respond to and recognize the authority of her chief Residents, her refusal to present on a[ ] topic from a list selected by her Chief Residents, and her departure from the September 15 conference without presenting or saying a word to anyone ... among other actions, clearly indigate that Dr. Varughese has an issue with authority and an inability to abide by the rules." (*Id.* at 9–10.) Regarding Varughese's behavior on September 15, "Varughese herself admitted at the time that she was unable to work and indicated that she may need to take a leave. The fact that she lacked and continues to lack insight that her impairment could have posed a risk to others in the work environment, including patients, is extremely problematic." (*Id.* at 11.) It found that Varughese's blaming Patel for leaving her alone with confidential files

"showed that [Varughese] continued to fail to grasp the inherent wrongness of her actions." (*Id.* at 12.)

In sum, the Appeal Committee, which reviews Staff Affairs Committee findings to ensure that they have a "reasonable basis," found that there was indeed a reasonable basis for the Staff Affairs Committee's finding that firing Varughese was neither arbitrary nor capricious. (*Id.* at 13–14.)

Mount Sinai subsequently gave Varughese a final "summative evaluation," a standard document within the world of graduate medical education, which marked her as "unsatisfactory" in three of six categories (professionalism, interpersonal and communication skills, and patient care). She was assessed as not ready to practice without supervision. The document stated that Varughese had been promising in her first two years but that, in her third, her supervisors had found her performance to be "substandard" "unprofessional" and "unsatisfactory." (Docket # 162–6 at 39–40.)

There is no evidence whatever that the final summative evaluation was ever provided to anyone except Varughese herself. There is absolutely no evidence that Mount Sinai ever provided it to any potential employer. It was shown to a witness, Dr. Fyfe of Robert Wood Johnson Hospital, at a deposition in this case.

*Varughese's Job Search*

Meanwhile, Varughese–armed with support from Mount Sinai attending Tamara Kalir—had been looking for other employment. She actually secured an offer from Robert Wood Johnson Hospital ("RWJ") in New Jersey on January 31, 2012. (Varughese 56.1 at ¶ 1.4.) That offer was contingent on Mount Sinai's verification of certain records. A Dr. Fyfe of RWJ contacted Lento to request them. The administrative appeals were still pending, so Lento explained that he was unable to provide RWJ with any documentation at that time, because Varughese had "legal proceedings" ongoing with the hospital.

**\*37** By the time Varughese's appeal concluded in March 2012, RWJ had hired another candidate. Dr. Fyfe considered the person hired to be less academically qualified than Varughese

At her deposition, Dr. Fyfe testified that she still might have offered Varughese the job, even if she received a bad report from Mount Sinai. In light of Dr. Kalir's recommendation, Dr. Fyfe thought further investigation would have been required.

"In looking at [the summative evaluation for the first time at her deposition], I know that my first response would have been to try to get a little bit more information ... any specifics. These are general ... I would like ... to try to find out more of what was actually going on." (Fyfe Dep. at 48–49.)

The interim chair of RWJ's Department of Pathology and Laboratory Medicine, a Dr. Cadoff, only recalls that, "there were some kind of discussions because there was a reason that Dr. Varughese was leaving Mount Sinai that had to do with something at Mount Sinai. That's as much as I knew at the time." (Cadoff Dep. at 22.)

Varughese filed this lawsuit on December 4, 2012.

### III. The Complaint

Varughese's Second Amended Complaint (Docket # 66) includes 21 counts.

Varughese alleges that Defendants discriminated against her on account of her sex and her race and/or national origin in Counts 1, 2, 5, 6, 9, 10 and 18. These counts invoke the New York City Human Rights Law, New York State Human Rights Law, Title VII, and 🏳 § 1981.

Varughese alleges that she suffered a hostile work environment on account of her race and gender in counts 3, 7, 11 and 18. They invoke Title VII, the NYSHRL, the NYCHRL, and 🏳 § 1981, respectively.

Varughese alleges that Defendants subjected her to retaliation for protected complaints about discrimination in counts 4, 8, 12 and 18. Those counts invoke Title VII, the NYSHRL, the NYCHRL, and 🏳 § 1981, respectively.

In count 17, Varughese alleges a violation of the New York State healthcare whistleblower law.

Counts 15 and 16 accuse the Defendants of breaching their employment contract with Varughese and also violating the implied covenant of good faith and fair dealing.

Counts 13 and 14 allege that Defendants tortiously interfered with Varughese's offer of employment from RWJ Hospital, and that the summative evaluation Defendants issued is defamatory.

Count 19 alleges violations of the Family and Medical Leave Act ("F.M.L.A.").

Count 21 pursues individual liability for all of the foregoing against individual defendants Lento, Cordon–Cardo, Firpo and Bleiweiss.

Varughese voluntarily dismissed Count 20, a claim for intentional infliction of emotional distress, after Judge Francis told her she would have to submit to a psychiatric evaluation in order to pursue it.

### IV. The Motion for a Summary Judgment is GRANTED as to Counts 1, 2, 5, 6, 9, 10, 16, and 18 (Gender and Race/National Origin Discrimination under Title VII, the NYCHRL, the NYHRL, and 42 U.S.C. § 1981).

**\*38** Varughese argues that Mount Sinai and the individual defendants-Lento, Cordon–Cardo, Firpo and Bleiweiss-subjected her to disparate treatment on the basis of her gender and Indian ancestry during the nine-month period from December 2010 to her termination on September 21, 2011.

Discrimination claims brought under Title VII, § 1981, the New York State Human Rights Law ("NYSHRL") and New York City Human Rights Law ("NYCHRL") all are analyzed under the burden-shifting framework that the Supreme Court established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Ruiz v. Cnty. of Rockland,* 609 F.3d 486, 491 (2d Cir.2010); *Holcomb v. Iona Coll.,* 521 F.3d 130, 138 (2d Cir.2008); *Dawson v. Bumble & Bumble,* 398 F.3d 211, 216–17 (2d Cir.2005) (applying *McDonnell Douglass* to NYSHRL and NYCHRL discrimination claims).

That framework requires a plaintiff to establish a *prima facie* case of discrimination. *Holcomb,* 521 F.3d at 138. To do so, the plaintiff must submit evidence that (1) she is a member of a protected class; (2) her job performance was satisfactory; (3) she suffered an adverse employment action; and (4) the action occurred under conditions giving rise to an inference of discrimination. *Demoret v. Zegarelli,* 451 F.3d 140, 151 (2d Cir.2006) (citing *McDonnell Douglas,* 411 U.S. at 802). "The burden of establishing a *prima facie* case is

not onerous, and has frequently been described as minimal." *Scoria v. Rubin,* 117 F.3d 652, 654 (2d Cir.1997).

After a *prima facie* case is established, a presumption of discrimination arises and the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Holcomb,* 521 F.3d at 138.

Once the defendant provides such a reason, "the burden shifts back to the plaintiff to demonstrate by competent evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination," *Leibowitz v. Cornell Univ.,* 584 F.3d 487, 499 (2d Cir.2009) (internal quotation marks and citations omitted), *superseded on other grounds by* N.Y. Local L. No. 85.

A plaintiff who establishes both a *prima facie* discrimination case and pretext must still, in order to survive summary judgment, demonstrate that she can meet her "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against her." *Schnabel v. Abramson,* 232 F.3d 83, 90–91 (2d Cir.2000) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)).

While the *McDonnell Douglass* burden-shifting framework applies to all of Varughese's claims, her discrimination claims under the NYCHRL, *i.e.* counts 9 and 10, "must be reviewed independently from and more liberally than their federal and state counterparts" in light of the local statute's "uniquely broad and remedial' purposes." *Loeffler v. Staten Island Univ. Hosp.,* 582 F.3d 268, 278 (2d Cir.2009) (quoting *Williams v. N.Y. City Hous. Auth.,* 61 A.D.3d 62, 66–69, 872 N.Y.S.2d 27 (1 st Dep't 2009)). There is thus a "one way ratchet" at work, under which "interpretations of New York state and federal statutes with similar wording may be used to aid in interpretation of New York City Human Rights Law, viewing similarly worded provisions of federal and state civil rights laws as a *floor* below which the City's Human Rights law cannot fall." *Id.*

**\*39** The NYCHRL's uniquely broad and remedial purpose requires courts to construe the statute "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible." *Albunio v. City of New York,* 16 N.Y.3d 472, 477–478, 922 N.Y.S.2d 244, 947 N.E.2d 135

(N.Y.2011); *see also* Administrative Code § 8–130. In doing so, courts have noted two differences between the NYCHRL and its state and federal counterparts that bear mentioning at the outset.

First, to make out a *prima facie* case under state or federal law, the plaintiff must submit proof that she "endure[d] a 'materially adverse change' in the terms and conditions of her employment." 🚩 *Galabya v. NYC Bd. of Educ.,* 202 F.3d 636, 640 (2d Cir.2000) (quoting 🚩 *Richardson v. New York State Dep't of Correctional Servs.,* 180 F.3d 426, 446 (2d Cir.1999).

> To be "materially adverse" a change in working conditions must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." 🚩 *Crady,* 993 F.2d at 136. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation.

*Id.* (internal quotations and citations omitted).

By contrast, the NYCHRL does not require that the offending employment action be "materially adverse." *See, e.g.,* 🚩 *Williams,* 872 N.Y.S.2d at 34 (holding there is no material adversity requirement for a retaliation claim under the NYCHRL); 🚩 *Margherita v. FedEx Exp.,* No. 07 CV 4826, 2011 WL 5024577, at *8 (E.D.N.Y. Oct. 20, 2011) (no material adversity requirement for a discrimination claim under the NYCHRL). Rather, "In order to make out the [adverse action] prong of a *prima facie* case of discrimination under the NYCHRL, a plaintiff must simply show that she was treated differently from others in a way that was more than trivial, insubstantial, or petty." *Williams v. Regus Mgmt. Group, LLC,* 836 F.Supp.2d 159, 173 (S.D.N.Y.2011) (describing development of NYCHRL case law since legislation removed the materiality requirement from the NYCHRL's adverse action prong in 2005).

Second, the NYCHRL places a burden with the defendant that rests with the plaintiff under state and federal law. Under state and federal law, a plaintiff may pursue a "mixed-motive" theory that discriminatory animus was "a motivating factor" in the adverse action, rather than its but-for cause. *See* 🚩 *Univ. of Texas Sw. Med. Ctr. V. Nassar,*

— U.S. ——, ——, 133 S.Ct. 2517, 2526, 186 L.Ed.2d 503 (2013) (recounting the evolving jurisprudence of Title VII's causation requirement). Under a mixed-motive theory, a plaintiff may

> obtain declaratory relief, attorney's fees and costs, and some forms of injunctive relief based solely on proof that race, color, religion, sex, or nationality was a motivating factor in the employment action; but the employer's proof that it would still have taken the same employment action [in the absence of the impermissible motivating factor] would save [the employer] from monetary damages and a reinstatement order.

**\*40** *Id.*

Under federal and state law, plaintiffs pursuing this "mixed-motive" theory must have particularly strong evidence of discriminatory animus. "[T]o warrant a mixed-motive burden shift, the plaintiff must be able to produce a 'smoking gun' or at least a 'thick cloud of smoke' to support his allegations of discriminatory treatment." *Sista v. CDC Ixis N. Am., Inc.,* 445 F.3d 161, 173–74 (2d Cir.2006) (internal citation omitted).

Under the NYCHRL, however, it is not plaintiffs who must show their proof deserves a mixed-motive analysis, but defendants who must show that the proof precludes mixed motive liability. Claims under the NYCHRL should be dismissed at the summary judgment stage "only if the *defendant* demonstrates that it is entitled to summary judgment under both" the *McDonnell Douglas* analysis and also the "mixed motive" analysis. 🚩 *Melman v. Montefiore Med. Ctr.,* 98 A.D.3d 107, 113, 946 N.Y.S.2d 27 (N.Y.App. Div. 1 st Dep't 2012) (citing 🚩 *Albunio,* 16 N.Y.3d at 477–78, 922 N.Y.S.2d 244, 947 N.E.2d 135) (emphasis added).

Notwithstanding these important analytical differences, the state courts have cautioned that "the NYCHRL does not alter the kind, quality or nature of evidence that is necessary to support or defeat a motion for summary judgment under Rule 56." *Lytle v. JPMorgan Chase,* No. 08 Civ. 9503,

2012 WL 393008, at *19 (S.D.N.Y. Feb.8, 2012) *report and recommendation adopted sub nom. Lytle v. JP Morgan Chase,* No. 08 CIV. 9503 DAB, 2012 WL 1079964 (S.D.N.Y. Mar.30, 2012) *aff'd,* 518 F. App'x 49 (2d Cir.2013) (quoting *Williams,* 2011 WL 6073560, at *6 (quotation marks and citations omitted)). Thus, "The mere fact that [plaintiff] may disagree with her employer's actions or think that her behavior was justified does not raise an inference of pretext." *Melman v. Montefiore Med. Ctr.,* 98 A.D.3d 107, 121, 946 N.Y.S.2d 27 (1st Dep't 2012). So too, for a plaintiff to raise an inference of discrimination through comparative analysis, the NYCHRL requires the plaintiff to show that she is "similarly situated in all material respects" to the coworker to whom she compares herself. *Shah v. Wilco Systems, Inc..,* 27 A.D.3d 169, 169, 806 N.Y.S.2d 553 (N.Y.App. Div. 1st Dep't 2005)

Moreover, "a plaintiff must still link the adverse employment action to a discriminatory motivation" to withstand summary judgment on her NYCHRL claim." *Sotomayor v. City of New York,* 862 F.Supp.2d 226, 258 (E.D.N.Y.2012) *aff'd,* 713 F.3d 163 (2d Cir.2013) (citing *Williams,* 872 N.Y.S.2d at 34–35). "Where a plaintiff cannot do so, her claims fail." *Id.*

That is, local law mirrors state and federal law in that "the burden of persuasion of the ultimate issue of discrimination always remains with the plaintiff," *Stephenson v. Hotel Empls. & Rest. Empls. Union Local 100 of AFL–CIO,* 6 N.Y.3d 265, 271, 811 N.Y.S.2d 633, 844 N.E.2d 1155 (N.Y.2006).

Construed liberally, Varughese's papers suggest eight separate instances of discrimination in violation of the NYCHRL, the NYSHRL, Title VII and § 1981:

**\*41** (1) The July 2010 failure to promote Varughese to Chief Resident, rather than McCash;

(2) The December 2010 altercation with McCash;

(3) The December 21, 2010 Academic Advisement;

(4) The January 2011 failure to promote Varughese to Chief Resident, rather than Jordan;

(5) The Winter 2011 Referral to the PWC

(6) The July 15, 2011 Final Warning

(7) The August–September 2011 Denial of Transfer

(8) The September 21, 2011 Termination

Varughese argues that each of these actions was individually discriminatory, and that all of them collectively contributed to a hostile work environment, which is itself a form of discrimination.

Again, Title VII, the NYSHRL and § 1981 (which I shall refer to collectively as "state and federal anti-discrimination laws") are all subject to the same *McDonnell Douglas* analysis. *Ruiz,* 609 F.3d at 491.

Varughese's NYCHRL claims, however, must be analyzed under the more lenient modification of the *McDonnell Douglas* burden shifting analysis set forth above.

*Failure to Promote Varughese to Chief Resident*
Varughese argues that she has a claim for discriminatory failure to promote her to the position of Chief Resident, both when McCash took the position in July 2010 and again when Jordan was promoted in January 2011. The former implicates both sex and national origin discrimination, the latter only national origin discrimination.

This specific allegation is not asserted in the complaint-in fact, the first time it has come up during this lawsuit, at least in the court's memory, is in Varughese's response to the Defendants' motion for summary judgment. No one has provided Varughese's administrative charge to the Court, so I have no idea whether the charge was administratively exhausted. No one has analyzed this issue, so I assume that it was; otherwise, any challenge to administrative exhaustion appears to have been waived.

In any event, the hospital is entitled to summary judgment on the merits.

To make out *a prima facie* case of discriminatory failure to promote, a plaintiff

> ordinarily must demonstrate that: (1) she is a member of a protected class; (2) she applied and was qualified for a job for which the employer was seeking applicants; (3) she was rejected for the position; and (4)

the position remained open and the employer continued to seek applicants having the plaintiff's qualifications.

*Yu v. New York City Hous. Dev. Corp.,* 494 F. App'x 122, 124–25 (2d Cir.2012) (citing *Estate of Hamilton v. City of New York,* 627 F.3d 50, 55 (2d Cir.2010) (applying NYCHRL) (internal citation and quotations omitted). "Of course, the fourth element is also established if the employer fills the position with 'a person outside the protected class who was similarly or less qualified than' the plaintiff." *Id.* at n. 4 (citing *Stockwell v. City of Harvey,* 597 F.3d 895, 901 (7th Cir.2010).

Varughese fails to make out a *prima facie* case, because she offers no evidence that Defendants filled the position with "a person outside the protected class *who was similarly or less qualified* than*"* Varughese was. *See id.* She alleges in conclusory fashion that McCash was less qualified than she was, but she provides the Court with no actual evidence to support that assertion. I have been provided no evidence whatever of McCash's evaluations, nor his performance before his July 2010 promotion to Chief Resident. It is impossible to draw an inference of discrimination in a failure to promote claim where the available evidence provides no foundation for comparison between the plaintiff and the person promoted. *See Sareen v. Port Auth. of N.Y. & N.J.,* No. 12 Civ. 2823(PAE), 2013 WL 6588435, at *9 (S.D.N.Y. Dec.16, 2013) (granting summary judgment where plaintiff "[did] not offer any evidence on which to assess [the allegedly similarly situated employee's] qualifications"). Varughese's personal opinion about McCash's qualifications is irrelevant. [9]

**\*42** Moreover, it is not clear that Varughese can make the requisite showing under the second prong of a *prima facie* case of failure to promote. Normally, a specific application is required to satisfy the second element of such a claim. *See Petrosino v. Bell Atlantic,* 385 F.3d 210, 227 (2d Cir.2004). A narrow exception to this requirement, exists, however, where a plaintiff can

demonstrate that (1) the vacancy at issue was not posted, and (2) the employee either had (a) no knowledge

of the vacancy before it was filled or (b) attempted to apply for it through informal procedures endorsed by the employer.

*E.E.O.C. v. Bloomberg L.P.,* 967 F.Supp.2d 816, 846 (S.D.N.Y.2013) (analyzing claim brought under Title VII, the NYSHRL, and the NYCHRL) (internal quotation and citation omitted).

Varughese has made no such showing with respect to the Chief Resident position. It does not appear to have been posted; rather, it appears to have been offered at regular intervals. But

Varughese has not even alleged-let alone offered evidence-that she lacked knowledge of the position; nor has she testified that she ever expressed any interest in it. Indeed, the record suggests that one of Varughese's colleagues turned down the Chief Resident position before it was offered to Jordan. I cannot simply assume that anyone offered the job would have taken it.

Even under the NYCHRL, failure to express interest in a promotion or otherwise invoke an exception like the ones above is fatal to a failure to promote claim. *Hen ry v. Metro. Transp. Auth.,* No. 07 CIV. 3561 DAB, 2014 WL 4783014, at *15 (S.D.N.Y. Sept.25, 2014) (failure to submit proof of interest in the position or proof that others were promoted without expressing interest fatal to the *prima facie* case under the NYCHRL).

Finally, assuming arguendo that Varughese had made out a *prima facie* case on this point, Defendants would still prevail on their motion, because no evidence in the record suggest that the failure to promote her was occasioned by her gender or her race/national origin. Indeed, her assertion is particularly weak because McCash was not the only person promoted to Chief Resident in July 2010. Kruti Maniar, a woman of Indian descent, was also promoted; they were named co-chief residents. When a woman of Indian descent got the job instead of plaintiff, no reasonable trier of fact could possibly conclude, that Varughese lost out because of her gender or her national origin.

At the third *McDonnell Douglas* stage, it is not enough for the plaintiff to say: "I belong to a protected class; something bad happened to me at work; therefore, it must have occurred

because I belong to a protected class." *Peters v. Mount Sinai Hosp.,* No. 08 Civ. 7250, 2010 WL 1372686, at *8 (S.D.N.Y. Mar.30, 2010) (citing *Grillo v. N.Y. City Transit Auth.,* 291 F.3d 231, 235 (2d Cir.2002) ("Even if [plaintiff's] highly dubious claim that he was unfairly singled out for punishment by the instructors is credited, [plaintiff] has done little more than cite to [his alleged] mistreatment and ask the court to conclude that it must have been related to [his] race. This is not sufficient." (internal quotations omitted)); 🔖 *Lizardo v. Denny's, Inc.,* 270 F.3d 94, 104 (2d Cir.2001)). That logical fallacy is also insufficient to sustain plaintiff's claim under 🔖 § 1981 for national origin discrimination. *See Kantrowitz v. Uniondale Union Free Sch. Dist.,* 822 F.Supp.2d 196, 215 (E.D.N.Y.2011) ("employment discrimination claims brought pursuant to 🔖 Sections 1981 and 🔖 1983 are analyzed under the three-step, burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp.*" (internal citations omitted)). The NYCHRL must of course be interpreted as liberally as is "reasonably possible," but even under that statute, acceding to the logical fallacy of *post hoc ergo propter hoc* is not reasonable.

 **\*43** Varughese's summary judgment papers also argue that Defendants' failure to promote her to Chief Resident in January 2011 was a discriminatory adverse act. Again, this claim is raised for the first time in her opposition to the motion for summary judgment.

This claim is slightly different from Varughese's other failure-to-promote claim, because we know at least one way in which Jordan's and Varughese's qualifications differed in a manner favorable to plaintiff: Jordan was only in her second year of residency, while Varughese was in her third. At least one member of Mount Sinai's Pathology staff, attending physician Tamara Kalir, questioned the propriety of promoting Jordan over more senior residents, of whom Varughese was one.

However, Varughese has again failed to make out the second prong of a *prima facie* case even under the NYCHRL. That is, she submits no testimony that she was interested in the position or would have accepted it had it been offered.

Assuming arguendo that she did make out a *prima facie* case, she also fails at the third step in the *McDonnell Douglas* analysis: there is no evidence that Jordan was promoted over Varughese in circumstances giving rise to an inference that national origin was any part of the motivation. As noted

above, one of the (now) three Chief Residents was an Indian woman, so Mount Sinai had plainly established a willingness to promote someone who belonged to both of plaintiff's protected classes. There is no evidence that any person involved in the decision to promote Jordan had ever expressed any bias toward Varughese or anyone else on the basis of national origin. Gender, of course, is irrelevant where Jordan's promotion is concerned. [10] Finally, at the time Jordan was promoted, Varughese was on an Academic Advisement (with which she was not cooperating), was the subject of numerous complaints and had been referred to the PWC. There is no evidence that Jordan labored under similar constraints. [11] Under those circumstances, no reasonable trier of fact could find that the promotion of Jordan ahead of Varughese was the product of discrimination, in whole or in part.

Defendants' motion for summary judgment dismissing Counts 1, 2, 5, 6 and 18 is GRANTED insofar as addressed to plaintiff's assertion that the failure to promote her was discriminatory.

*December 8.2010 Incident with McCash*
Varughese's first claim of gender discrimination was her statement to HR in April 2011 that McCash would not have acted the way he did on December 8, 2010–yelling at her and moving toward her in a way she found threatening (though she makes no claim that McCash touched her)-but for her gender. She has added a claim that the December 8 incident was motivated by racism in the course of this lawsuit.

Under federal and New York State antidiscrimination laws, "yelling at an employee ... does not amount to an adverse action." *E.E.O.C. v. Bloomberg, L.P.,* 967 F.Supp.2d 816, 873 (S.D.N.Y.2013) (citing 🔖 *Sekyere v. City of N.Y.,* No. 05 Civ. 7192, 2009 WL 773311, at *3 (S.D.N.Y. Mar. 18, 2009)). Therefore, Defendants are entitled to summary judgment dismissing Counts 1, 2, 5, 6, and 18 insofar as those counts relate to the December 8, 2010 incident.

 **\*44** As I have explained, the NYCHRL has a more lenient definition of what constitutes an "adverse action" for purposes of establishing *a prima facie* case of discrimination than federal law has. Judge Gleeson has explained that, "A plaintiff who is treated worse, in a nontrivial way, because of [her race or gender] is subject to an adverse employment action for purposes of the CHRL." *Forgione v. City of New York,* No. 11–CV–5248, 2012 WL 4049832,

at *6 (E.D.N.Y. Sept.13, 2012). In Williams v. New York City Rous. Auth., 61 A.D.3d 62, 78–79, 872 N.Y.S.2d 27 (N.Y.App. Div. 1 st Dep't 2009), the New York Appellate Division, First Department, held that "a focus on unequal treatment based on gender regardless of whether the conduct is 'tangible' (like hiring or firing) or not-is in fact the approach that is most faithful to the uniquely broad and remedial purposes of the local statute." Thus, many acts that would not constitute "adverse actions" under federal law have been held to suffice under the NYCHRL. See Kellman v. Metro. Transp. Auth., No. 07 Civ. 3561, 2014 WL 1243698 (S.D.N.Y. Mar. 26, 2014) (denial of training constituted an adverse action under the NYCHRL even though it did not affect plaintiff's wages or chances of promotion); Williams, 836 F.Supp.2d at 175–76 (holding that ignoring plaintiff's opinion and communicating with him differently than Caucasian employees was adverse under NYCHRL even though it was probably not adverse under Title VII); see also Forgione v. City of New York, No. 11 Civ. 5248, 2012 WL 4049832, at *5–6 (E.D.N.Y. Sept.13, 2012) (holding that defendants' referral ofplaintiff for psychological evaluation, while not materially adverse under NYSHRL, was not "merely trivial" under NYCHRL); Sotomayor v. City of New York, 862 F.Supp.2d 226, 255, 257–58 (E.D.N.Y.2012) (holding that negative observations, evaluations, and letters to file that did not trigger negative consequences for plaintiff's employment were not adverse under Title VII or NYSHRL but were adverse under NYCHRL).

However, the NYCHRL, like Title VII, is not a "general civility code." Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 113 (2d Cir.2013). Thus, one state court found that the NYCHRL's "adverse action" requirement was not met even where an employer "(i) told [plaintiff] that his "medicine was wrong"; [and] (ii) made fun of his accent." Hanna v. New York Hotel Trades Council, 18 Misc.3d 436, 440–41, 851 N.Y.S.2d 818 (Sup.Ct.2007). The state trial court found that, "Although making fun of an employee's accent is offensive and inappropriate, it does not constitute an adverse employment action [under the NYCHRL]." Id.

Varughese has not managed to make out a prima facie case, even under the extremely lenient standard of the City Human Rights Law. A single instance of being addressed publicly in an inappropriate fashion (assuming that yelling at a subordinate is always inappropriate) does not rise to the level of being "treated worse in a non-trivial way"-especially

in light of the hospital's immediate corrective action of removing Varughese from McCash's supervision. [12]

**\*45** However, even if Varughese were able to make out a prima facie case under city law, her claim still would fail.

Defendants articulate a legitimate and non-discriminatory reason for McCash's behavior: Varughese earned his ire by disobeying a direct instruction from a supervisor. The burden thus shifts back to Varughese to prove both (1) pretext; and (2) that the real reason McCash yelled at her was her membership in a protected class.

To prove pretext, Varughese (1) claims that no clear instruction was given as to the need for her to do the work; and (2) points to some direct evidence of McCash having a discriminatory bias against her: his December 8, 2010 complaint regarding her "work ethnic."

There is no genuine issue of fact as to the first of these issues. The slides in question came from a Dr. Goldfarb, and that doctor had a standing instruction that the resident on duty, not a moonlighter, was to examine all of his breast slides. Varughese was the duty resident; Azar was a moonlighter. Varughese, like all residents, was charged with knowing about standing orders from doctors and obeying them. She offers no evidence to the contrary. Therefore, the issue is not whether McCash was sufficiently specific; he did not need to be, because no resident, not even the Chief Resident, could countermand Dr. Goldfarb.

As to the second: rather than discussing this issue in the context of a prima facie case, where the plaintiff's burden is light, I will skip to the third McDonnell Douglas step-where I conclude that there is simply no genuine issue of fact as to the question whether discriminatory animus motivated McCash on December 8, 2010. Drawing all inferences in Varughese's favor, no reasonable trier of fact could possibly conclude that McCash yelled at Varughese because she was a woman or because she was of Indian descent.

This is not a close question.

The only evidence offered by Varughese to show that there was any discriminatory animus behind McCash's behavior on December 8, 2010 is the "n" in "work ethnic" in McCash's e-mail. I must draw all reasonable inferences in Varughese's favor, but the only reasonable inference here is that McCash made a very unfortunate typo. His lengthy e-mail is rendered

offensive by the insertion of a single letter. The Court has reviewed *many* e-mails from McCash, to Varughese and to others, and this is the only one with any language that is even arguably discriminatory. There is no reference at all to Varughese's gender in the e-mail, and when she complained of McCash's behavior, she believed it to be motivated by her sex. There is no evidence in the record that McCash ever said or did anything derisivie about persons of Indian ancestry; indeed, the record reveals no instance in which he so much as commented about anyone's ancestry.

Furthermore, McCash sent this particular e-mail to numerous recipients, including Shabnam Jaffer, a woman of Indian descent who was an attending physician *and his supervisor*. Without some other evidence, there is no reason to believe that McCash decided to do something that might amount to professional suicide by uttering a slur that would have tended to be offensive to someone who shared membership in Varughese's protected classes. (Incredibly, McCash was not asked about this e-mail at his deposition by either side, and Defendants did not submit any declaration from him except one explaining that he is Filipino, so we have no way of knowing what he would say about it).

 **\*46**  Moreover, McCash's conduct on December 8 is colored by the history he shared with Varughese: they had a difficult relationship. There had been a confrontation between them in September, and she was repeatedly insubordinate to him. "Mere personality conflicts must not be mistaken for unlawful discrimination." *Taylor v. New York Univ. Med. Ctr.,* 21 Misc.3d 23, 871 N.Y.S.2d 568, 571–72 (N.Y.App. Term 1st Dep't 2008).

There is no evidence that McCash had any problems working with other women, other people of Indian descent, or with women who were also of Indian descent. There certainly is no evidence that he had any problems with his co-Chief Resident, a woman of Indian descent; she has averred that he was never discriminatory toward anyone. The only fair inference is that McCash had a problem with Varughese-the same problem lots of other people had.

In short, no reasonable jury could find by a preponderance of the evidence that discriminatory animus, whether based on race or gender, was behind McCash's loss of temper. So even under city law, the claim that this outburst was an instance of either gender-based or national origin-based discrimination must be dismissed.

*The December 21, 2010 Academic Advisement*
Varughese alleges that Defendants placed her on Academic Advisement on account of her sex and her race.

I assume without deciding that an Academic Advisement could constitute an adverse employment action under city, state and federal law. This is not immediately apparent under federal and state law. *See Phillips v. Bowen,* 278 F.3d 103, 109 (2d Cir.2002) ("courts in this circuit have found that reprimands, threats of disciplinary action and excessive scrutiny do not constitute adverse employment actions in the absence of other negative results such as a decrease in pay or being placed on probation."); *Uddin v. City of N.Y.,* 427 F.Supp.2d 414, 429 (S.D.N.Y.2006);

*see also Weeks v. New York State,* 273 F.3d 76, 86 (2d Cir.2001) ("It hardly needs saying that a criticism of an employee (which is part of training and necessary to allow employees to develop, improve and avoid discipline) is not an adverse employment action."), *abrogated on other grounds,*

*National R.R. Passenger Co. v. Morgan,* 536 U.S. 101, 122, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002).

On the question whether Defendants have offered a legitimate, non-discriminatory reason for that Advisement, Judge Cote's analysis in *Nolley v. Swiss Reinsurance Am. Corp.,* 857 F.Supp.2d 441 (S.D.N.Y.2012), *aff'd sub nom. Nolley v. Swiss Reinsurance Am. Holding Corp.,* 523 F. App'x 53 (2d Cir.2013), a case brought under the same suite of city, state and federal antidiscrimination laws at issue here, is instructive. The employer placed Nolley on a "Performance Improvement Plan" ("PIP") after customers complained that Nolley was aggressive and confrontational. The PIP required Nolley to improve his professionalism, or else. When he did not improve, but rather, reacted to the PIP with yet more hostility and aggressively confronted his superior, he was terminated. Once in court, Mr. Nolley contested the truth of the customer complaints but could not dispute that they had in fact been made-that customers had deemed his conduct offensive and unprofessional. The fact of the complaints alone was enough to constitute a legitimate, non-discriminatory justification that satisfied the employer's burden at the second stage of the *McDonnell Douglas* analysis-even if, as Nolley insisted, the complaints were entirely unwarranted.

 **\*47**  So too here. Defendants received multiple reports that Varughese was erratic and disruptive. Administrators received reports that Varughese lost the faculty of cogent

speech on December 8, 2010, that she accosted Jordan on December 10, 2010, and that she refused to address her own role in the December 8 fracas. They also heard that she had been insubordinate to McCash, ignoring a clear instruction to do certain work herself, which instruction was grounded in a general need to cut costs and also the instructions of a particular surgeon. Varughese disagrees that her conduct was worthy of complaint, but she does not raise any genuine issue about whether complaints were in fact made.

The receipt of these complaints that Varughese was disruptive and insubordinate-from her fellow residents, her two Chief Residents, two attending physicians, a lab technician and a medical student-are enough to satisfy Defendant's burden at the second stage of the *McDonell Douglas* analysis, even if they are unfounded, and without considering in any way Varughese's admission that she raised her voice and swore on December 8, 2010.

In sum, Defendants offer what the Second Circuit has found to be a legitimate and nondiscriminatory reason for adverse employment actions against an employee: "gross insubordination." *Owens v. New York City Hous. Auth., 934 F.2d 405, 409 (2d Cir.1991)*; *see also Zambrano–Lamhaouhi v. New York City Bd. of Educ., 866 F.Supp.2d 147, 172 (E.D.N.Y.2011)* (recognizing insubordination as a legitimate non-discriminatory reason in the NYCHRL context).

Because defendants have produced a legitimate, nondiscriminatory reason for the Advisement, the presumption of discrimination raised by her *prima facie* case simply "drops out of the picture." *Cifra v. General Electric, 252 F.3d 205, 215 (2d Cir.2001)* (quoting *St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)); see also See Kaytor v. Elec. Boat Corp., 609 F.3d 537, 553 (2d Cir.2010).*

The question now is whether Varughese has provided sufficient evidence for a factfinder to conclude that Defendants' purported rationale for the Advisement was actually a pretext for discrimination on the basis of either her gender or her national origin. *Pearson v. Unification Theological Seminary, 785 F.Supp.2d 141, 158–59 (S.D.N.Y.2011).* The plaintiff must not simply produce "some" evidence, but "sufficient evidence to support a rational finding that the legitimate, nondiscriminatory reasons

proffered by the defendant[s] were false, and that more likely than not [discriminatory animus] was the real reason for the employment action." *Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir.2000)* (quoting *Woroski v. Nashua Corp., 31 F.3d 105, 110 (2d Cir.1994))*. Alternatively, the plaintiff may show that the defendants' non-discriminatory justifications for the adverse action "were not the only reasons and that the prohibited factor was at least one of the motivating factors." *Holcomb, 521 F.3d at 138* (internal quotation and citation omitted).

**\*48**  In order to show pretext, a plaintiff must "establish a genuine issue of material fact either through direct, statistical, or circumstantial evidence as to whether the employer's reason for [the relevant adverse action] is false and as to whether it is more likely that a discriminatory reason motivated the employer" to undertake it. *Dhar v. NYC Dep't of Transp.,* No. 10–CV–5681, 2014 WL 4773965, at \*10 (E.D.N.Y. Sept. 24, 2014) (internal citations omitted).

Varughese again fails to raise any genuine issue of material fact as to whether it is more likely that a discriminatory reason motivated Defendants to place her on Academic Advisement. After the December 8 incident with McCash, witness after witness came forward to complain, not only that Varughese had completely lost control of herself, but also to voice apparently longstanding complaints about her reliability and work ethic. Varughese may and obviously does disagree with those assessments, but she cannot deny that hospital administrators had to weigh her word alone against the word of at least five witnesses (not including McCash or Jordan), all of whom attested that she was out of control. Whether those witnesses were right is not the point. The point is that the hospital had every non-discriminatory reason in the world to be concerned about Varughese's behavior, and so to place her on an Academic Advisement.

Varughese complains that Defendants took everyone else's word over her own because Lento and others "wanted to believe" that McCash, a white male (only according to Varughese—recall that he self-identifies as an Asian Pacific Islander of Filipino descent, and that this Court does not find any genuine dispute that he is correct), had done nothing wrong. But she offers no *evidence* to support that wholly conclusory assertion. None whatever.

Disparate treatment-which may serve to both raise an inference of discrimination in the first step of the *McDonnell*

*Douglass* burden-shifting analysis and establish pretext at the third [13]—occurs where an employer "treat[s] [the plaintiff] ... less favorably than a similarly situated employee outside h[er] protected group." *Graham v. Long Island R.R.,* 230 F.3d 34, 39 (2d Cir.2000) (citing *Int'l Bhd. of Teamsters v. U.S.,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977)).

To benefit from a disparate treatment analysis, however, the plaintiff needs someone to whom she can reasonably compare herself. She need not show that the person to whom she compares herself is identical to her, but she must show that she and her proposed comparator are similarly situated in "all material respects." *Id.* at 39–40; *see also Shumway v. United Parcel Serv., Inc.,* 118 F.3d 60, 64 (2d Cir.1997); *Shah v. Wilco Systems, Inc.,* 27 A.D.3d 169, 169, 806 N.Y.S.2d 553 (N.Y.App. Div. 1st Dep't 2005) (applying same standard to NYCHRL claims). Where there is too much dissonance between a plaintiff's circumstances and her proposed comparator's, the employer's "treatment of th [at] [other] employee[ ] ha[s] no logical relevance to the plaintiff's claims" and thus cannot give rise to an inference of discrimination. *McGuinness v. Lincoln Hall,* 263 F.3d 49, 54 (2d Cir.2001); *see also LeBlanc v. United Parcel Service,* No. 11 Civ. 6983, 2014 WL 1407706, at *15 (S.D.N.Y. Apr. 11, 2014) (applying same standard to analysis whether plaintiff has raised triable issue regarding a "similarly situated" coworker under the NYCHRL).

**\*49** In the particular context of this motion, a court examining a discrimination claim only compares two employees' treatment when those employees are "similarly situated in all material respects." *Graham v. Long Island R.R.,* 230 F.3d 34, 39 (2d Cir.2000) (citing *Int'l Bhd. of Teamsters v. U.S.,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977)). The Circuit has recognized that "[w]hat constitutes 'all material respects' [ ] varies somewhat from case to case and ... must be judged based on (1) whether the plaintiff and those [she] maintains were similarly situated were subject to the same workplace standards and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness." *Id.* at 40.

Varughese argues that Defendants showed their discriminatory hand by placing her on Academic Advisement

while failing to place McCash on Academic Advisement. But McCash ws not similarly situated to Varughese in all material respects. McCash was Varughese's *supervisor* at that time. Leaving aside the disputed factual question of who yelled more loudly or struck more fear into coworkers' hearts on December 8, 2010, a supervisor yelling at his subordinate is something quite different from a subordinate yelling at her supervisor. Varughese admits that she yelled at McCash. She also admits to yelling at coworker Jordan-while McCash is not alleged to have yelled at anyone other than his subordinate (Varughese). Any workplace's standard regarding insubordination will inherently be more onerous toward a subordinate's behavior, because the supervisor cannot be "insubordinate" to the subordinate.

Moreover, there is no dispute that the evidence before the Hospital decision-makers did not indicate that Varughese's and McCash's conduct was of comparable seriousness. The unbiased third party witnesses all told administrators that Varughese's behavior was more seriously out of line than McCash's. Again, the issue is not whether or not that is true; it is whether the evidence to that effect was given to the Hospital.

Finally, in the fortnight between the December 8, 2010 incident and the December 21 advisement, McCash acknowledged wrongdoing and submitted to counseling. Varughese, by contrast, categorically refused to do so. During those same 12 days, Varughese interfered with the investigation by getting into a confrontation with Jordan; McCash did no such thing.

So McCash and Varughese are simply not "similarly situated in all material respects." For that reason the decision to discipline McCash more leniently (and remember, he was disciplined), while placing Varughese on Academic Advisement, does not lend itself to an inference of either gender or national origin discrimination.

There is evidence in the record of an instance when the hospital put a male resident on Academic Advisement when the male resident behaved in a manner similar to Varughese. In the summer of 2011, a male resident of Asian descent threw a temper tantrum and yelled at a technician who was trying to help him with a dictation machine. That resident was placed on Academic Advisement. He did not react to being on Advisement in the same way as Varughese, however; he apologized profusely, revised his written apology twice

to make it more personal and self-reflective, and met with supervisors for months to talk about professionalism.

**\*50** Varughese also seeks to raise an inference that discrimination motivated the Academic Advisement by pointing to Schiller's comments from 2008–2009 and McCash's December 2010 "work ethnic" e-mail. Assuming arguendo that Schiller's comments can be deemed evidence of ethnic bias (I have already address why McCash's email with its obvious typo cannot), this argument gets plaintiff nowhere, because Schiller played no role in the December 8 incident and there is no evidence that he was involved in the decision to put Varughese on Academic Advisement. Melissa Pessin–Minsley had taken over as Interim Chair of the Department by that time. There is no evidence in the record that Schiller was even consulted about the Advisement. Nor is there any evidence that anyone involved in the decision to place Varughese on Advisement knew about Schiller's comments; Varughese herself had not yet complained about them.

As for McCash, the Chief Resident, he too played no role in making the decision about Academic Advisement, and Varughese was removed from his supervision.

Schiller's stray remarks and McCash's email, assuming any of them to be offensive, thus have no bearing on attitudes displayed by anyone who actually made the decision to place Varughese on Academic Advisement. That means they are not evidence of pretext on the part of those decisionmakers and Mount Sinai. "Statements by nondecisionmakers or statements by decisionmakers unrelated to the decision process itself are insufficient to establish discriminatory intent, even under city law, and certainly under federal and state law." *Taylor v. New York Univ. Med. Ctr.,* 21 Misc.3d 23, 871 N.Y.S.2d 568, 572 (N.Y.App. Term 1st Dep't 2008) (quoting *Forrest v. Jewish Guild,* 3 N.Y.3d at 308, 786 N.Y.S.2d 382, 819 N.E.2d 998); *Bir v. Pfizer, Inc.,* 510 F. App'x 29, 31–32 (2d Cir.2013) (citing *James v. N.Y. Racing Ass'n,* 233 F.3d 149, 154 (2d Cir.2000)).

Ultimately, Varughese's attempt to prove pretext through a disparate treatment analysis fails with respect to the Academic Advisement because she relies on only on her own conclusory accusations of bias and a disparate treatment analysis that fails for lack of a real comparator. She offers nothing else, and the Court's exhaustive review of the record reveals nothing else.

By contrast, Defendants have presented voluminous evidence from multiple sources to show that Varughese was placed on Advisement for perfectly legitimate reasons having nothing whatever to do with her membership in any protected class.

No reasonable jury could find that the Advisement was imposed as a pretext for discrimination. Plaintiff fails to carry her burden at Step 3. Counts 1, 2, 5, 6, 9, 10, 16 and 18 are dismissed insofar as they are predicated on Varughese's allegation that the Academic Advisement was imposed as an act of discrimination.

*Referral to the PWC*

Varughese also suggests that she views her referral to the PWC as a distinct discriminatory act.

The referral is not cognizable under state or federal antidiscrimination law because it is not "materially" adverse. She was required to meet with Dr. Figur and Dr. Fersh, and to submit to a toxicology screen. The referral did not cause her to lose any benefits, to lose any responsibilities, to have a lesser title, to disclose the fact of her referral to coworkers, or indeed do anything beyond meet with a few doctors whose job it was to help her. Forcing someone to seek medical or psychological help is not itself an adverse employment action where it is not accompanied by any diminution of the benefits or responsibilities of employment or some actual adverse consequence to the terms or conditions of employment. To the extent that Varughese claims that the referral itself constituted discrimination in violation of state or federal statutes, that claim is dismissed because it was not an adverse employment action.

**\*51** However, Judge Gleeson has specifically found that referring a plaintiff for psychological evaluation, while not materially adverse under federal or state law, is not "merely trivial" under the NYCHRL. *Forgione v. City of New York,* No. 11 Civ. 5248, 2012 WL 4049832, at \*5–6 (E.D.N.Y. Sept.13, 2012). Imustagree.

Nevertheless, I cannot agree that Varughese's claim should proceed to trial because, in support of her claim that the referral was *discriminatory,* Varughese has presented only her own conclusory allegations. *See, e.g.,* Varughese 56.1 at ¶ 32.3 ("The PWC is paranoid about their illegal fraudulent conduct against minority women ..."). She has not presented any evidence.

In particular, on this claim Varughese has presented no testimony that anyone was similarly situated to her-i.e. any other resident or doctor who behaved in the erratic and disruptive way that multiple witnesses described to Hospital administrators-was not referred to the PWC. The hospital has submitted evidence that it referred a black female resident to the PWC when she persisted in making inappropriate advances towards another employee.

Varughese's unconvincing "comparator" analysis asks the Court to conclude that her referral to the PWC was discriminatory insofar as Dr. Najfeld was not also referred to the PWC. Varughese claims that the PWC should have been called to investigate Najfeld after Najfeld criticized Varughese for her failure to prepare an adequate presentation. It should go without saying that a supervisor reprimanding Varughese for her deficient performance does not constitute "erratic" behavior but rather, a natural consequence of Varughese's own performance problems.

Further, Varughese has not presented any direct evidence that the person who made the referral (Pessin–Minsley) or the person who did his own research to confirm the propriety of the referral (Figur) harbored any discriminatory animus against her, based on either her gender or her national origin. Notwithstanding Varughese's unsupported assertions in her Rule 56.1 statement that Figur has been the subject of some unspecified other litigation, there is no evidence in the record of gender or ethnicity-based comments or prior actions by either of them.

No reasonable jury could find fault with the decision to refer a physician who had exhibited obvious signs of distress, and whose behavior was causing severe disruptions in her department, to an administrative body designed to assist troubled physicians,.

Varughese's claim that her referral to the PWC constituted gender or national origin discrimination is dismissed under the City Human Rights Law as well.

*The July 15, 2011 Final Warning*
Next, Varughese alleges that Defendants discriminated against her on the basis of her sex and her national origin by issuing her a Final Warning on July 1, 2011.

Defendants' reasons for issuing the Final Warning-detailed in the warning itself (*see supra* at 43–45)–are on their face perfectly legitimate and completely nondiscriminatory.

They are also entirely true. The Department accused her of failing to comply with the terms of her Academic Advisement; Varughese admits that she failed to comply with the terms of her Academic Advisement. The Department accused her of missing required appointments; she admits that she missed appointments required under her advisement. The Department accused her of failing to submit her self-reflective essay; she admits that she submitted her essay on professionalism two and a half months late, and that she also submitted the revised essay after its due date. The Department accuses her of failing to respond to pages, refusing to cover for other residents, being late with assignments, and being late to work; she admits to it all. The list goes on and on.

**\*52** That she has excuses and what seem to her explanations matters not. Defendants' burden of production at this second stage of the *McDonnell Douglass* analysis is satisfied.

At Stage Three, Varughese offers no evidence that those stated reasons are pretextual. She submits a sampling of e-mails showing that other residents were sometimes late, or could not cover a shift. The most notable thing about those e-mails, however, is that they are proof that other residents actually communicated to others about when they would be absent, when Varughese routinely failed to do so. Varughese also submits the admissions of Morency, Jordan, and others that they were not always in perfect health and sometimes took time off and were unable to cover for other residents. This is unsurprising, to say the least.

Varughese presents *no* evidence that any other resident had an extensive history of stubborn insubordination and absenteeism without notice, i.e. a history comparable to her.

Varughese also fails to come to grips with the difference between her behavior when counseled by administrators and the behavior of others. After the December 8, 2010 incident, McCash accepted counseling and apologized; Varughese did not. The male resident was placed on Academic Advisement, apologized profusely and met with supervisors for months to talk about professionalism; Varughese refused to acknowledge that she had ever exhibited unprofessional behavior.

Varughese is similar to the plaintiff in *Shekhem' El–Bey v. City of New York, et al.,* 419 F.Supp.2d 546 (S.D.N.Y.2006). In that case, Mr. Shekhem' El-Bay complained that his termination must have been the product of discrimination discriminatory because, even though he filed fraudulent tax returns, others

who did so were not fired. The Court found him to be without comparators, because:

> not one of the DOC employees cited in plaintiff's complaint was even remotely similarly situated to plaintiff with respect to the disciplinary action taken by the DOC. Mr. El–Bey, in addition to having filed fraudulent tax documents, was found guilty of numerous other disciplinary violations while employed with the DOC, *e.g.,* countless sick leave violations and excessive absenteeism. Nowhere does the complaint allege that even one of the purportedly similarly situated corrections officers was guilty of committing a single act of misconduct other than filing fraudulent tax documents.

419 F.Supp.2d at 551 (internal citations omitted). Varughese has too many strikes against her to compare her to those with just a one or even a few.

It also bears noting that, according to the record, the only other resident who was persistently absent without an adequate excuse-a white male-was also put on final warning. He improved his punctuality and attendance, and successfully graduated from the residency program.

Varughese's claim that Defendants subjected her to illegal discrimination by issuing the Final Warning is dismissed.

*Fall 2011 Refusal to Transfer*

**\*53** Varughese also alleges that Defendants discriminated against her by refusing her request to allow her to switch rotations in October 2011. This incident would not seem to be of any moment; since Varughese was kicked out of the residency program nine days prior to October 2011, so she could not have assumed a different rotation even if the switch had been authorized.

The However, the Department's refusal was communicated to her multiple times—including on September 7, 2011, and certainly before she was sent a Termination Letter, so I will

analyze whether she has raised a genuine issue of fact about the reason why her rotation was not changed. She has not.

I will accept, for purposes of this analysis, that not being allowed to change rotations could be an adverse employment action-although I can think of many reasons why that might not be so. However, the Hospital has advanced a legitimate and non-discriminatory reason why it did not authorize the change in her schedule: Varughese missed the July 1, 2011 deadline to request a scheduling change (a fact that is not in dispute) and granting her request would have had a ripple effect on the schedules of others that would have been too difficult to manage, since no one could be found to cover the rotation to which Varughese was assigned-which, by the by, was the rotation she had requested during the period when requests were being accepted.

The question then becomes, at Step Three, whether Varughese has raised a genuine issue of fact going to either pretext or to the real reason for the decision's being discrimination. She has not. Varughese submits no evidence that the decision to deny her change of schedule request was a mere pretext for anything, let alone for discrimination. Defendants note, as they did when they denied the request in in September 2011, that 8 out of 10 residents' requests for schedule changes" that came after that July 1, 2011 deadline were denied. (Termination Letter of Sept. 21, 2011, Docket # 205–7 at 38.) Varughese has not submitted any evidence that Defendants granted any transfer requests that were as untimely as hers. Her own conclusory assertion that her request must have been denied because of her gender and/or national origin is woefully insufficient.

Varughese's claim that Defendants violated federal, state, and local antidiscrimination law by refusing her belated schedule change request is dismissed.

*The September 21, 2011 Termination*

I come now to the heart of Varughese's claim: that Defendants should not have kicked her out of Mount Sinai's residency program on September 21, 2011.

I will assume that she makes out a *prima facie* case and ignore the obvious argument that her performance issues rendered her unqualified for her position.

The letter notifying her of her summary suspension reveals multiple, independent, legitimate and nondiscriminatory reasons to have terminated Varughese.

I begin with the most obvious: she rifled through an administrator's files when left alone in that administrator's office. Varughese admits (reluctantly) that she did so. There can be little dispute that this conduct would provide a legitimate, nondiscriminatory reason for termination in any workplace.

**\*54** There is no evidence that Varughese's secret examination into the file on Patel's desk was simply seized on as pretextual cover for an action Defendants were prepared to take for reasons related to Varughese's gender or her national origin. No one else who was guilty of similar misconduct has even been identified; Cordon–Cardo has testified, without contradiction, that there is no such person. It thus stands to reason that no one has ever been allowed to get away with such serious misconduct.

Varughese offers no evidence, direct or even circumstantial, that anyone involved in the decision to fire her (a group that does not include either Schiller or McCash) had ever exhibited any sort of discriminatory attitude, toward her or anyone else. The fact that she was in Patel's office only by accident (because Patel encountered her at Starbucks that morning) negates any notion that she might have been "set up;" the fact that she was caught in the act eliminates any possible suggestion that she was singled out. Where, as here, a plaintiff fails

> to rebut specific, credible evidence offered in support of an employer's articulated reason for their firing, [she] cannot maintain claims that [her] firing[s] w[as] discriminatory.

*Griffin v. Ambika Corp.,* 103 F.Supp.2d 297, 310 (S.D.N.Y.2000) (internal citations omitted) (analyzing case brought under Title VII, the NYSHRL, and the NYCHRL).

Varughese's argument that she should have kept her job despite her snooping relies on her own conclusory and unsubstantiated assertions that Defendants were engaged in a discriminatory "conspiracy" of some kind. But her unsubstantiated and conclusory allegations that there was discrimination "in the air," and that Defendants engage in "plantation politics," do not meet her third stage burden of

producing evidence to raise any genuine issue of fact that would require a trial. "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment."

*Bickerstaff,* 196 F.3d at 451–52 (restating principle that to defeat summary judgment, plaintiffs', "affidavits must be based upon concrete particulars, not conclusory allegations") (citing, *inter alia, BellSouth Telecomms., Inc. v. W.R. Grace & Co.,* 77 F.3d 603, 615 (2d Cir.1996)). *See also Ricks,* 92 F.Supp.2d at 346–47 (basing grant of summary judgment for defendant in Title VII case, in part, on plaintiff's reliance on conclusory allegations to rebut defendants' specific evidence); *Lytle,* 2012 WL 393008, at *19 ("the NYCHRL does not alter the kind, quality or nature of evidence that is necessary to support or defeat a motion for summary judgment under Rule 56.").

The analysis might stop there. But inquiring into the hospital's other justifications for terminating Varughese-and her rejoinders-only strengthens Defendants' case.

The termination letter cited six additional reasons why she was being fired. First, there was her disastrous performance on Najfeld's rotation. Varughese admits that, during that rotation, she disobeyed instructions to stop fiddling with her phone, failed to follow Najfeld's instructions on how to prepare a presentation, provided Najfeld with an incomplete presentation only an hour before the close of business the day before the presentation was to be made, and failed to notify others that the presentation conference was being canceled. Varughese submits no evidence that anyone else engaged in similar conduct. Nor does she submit any evidence that Najfeld, a woman, complained about Varughese because of plaintiff's gender or her national origin, rather than because of her admitted bad conduct.

**\*55** Next is Varughese's insubordinate behavior towards Jordan on August 5, 2011 and August 12, 2011. Varughese admits that, on those dates, she failed to respond to Jordan's e-mails and pages. Indeed, she admits that she failed to respond to Jordan even after Lento explicitly told her to do so. Varughese submits no evidence that anyone else was allowed to engage in a similar pattern of disobeying instructions and failing to communicate with supervisors regarding coverage. Nor does she submit any direct evidence that Jordan, Lento or Najfeld-the three persons who testified about these incidents-had any bias against her because of her gender or national origin.

Third is Varughese's "Unprofessional Response to Request for Change of Elective Rotation," referring to Varughese's refusal to accept the Department's decision not to consent to her untimely request to switch rotations. Varughese does not dispute that, when one administrator denied her request, she went to supervisor after supervisor to renew her request, failing in each instance to tell anyone that it had already been denied by others. Varughese points to no one else who engaged in similar conduct. Nor does she submit any direct evidence of discriminatory animus by any of the administrators involved, i.e. Firpo, a Dr. Harpaz, Scott Barnett, and Paul Johnson.

Fourth, the Department cited her for her poor conference attendance. When a male resident was told that he was below the 80% conference attendance requirement, he gave a make-up presentation without complaint. (*Id.* at 72–73). When Varughese was told the same thing, she procrastinated, objected, and then walked out of her scheduled presentation with neither explanation nor apology. She never made the presentation.

Fifth is Varughese's "poor communication regarding leave of absence." Varughese does not dispute that she herself asked about taking F.M.L.A. leave on September 15, 2011. Nor she does dispute that Defendants encouraged her to take a leave and gave her materials so she could make such a request. In the days that followed, several hospital administrators tried to reach Varughese to inquire about whether she would in fact be making a leave request, as well as to ask about her health. She did not respond to any of these queries, although she admits that she read them. She showed up at work despite having been being told-by Lento, in writing-*not* to come to work. Varughese submits no evidence that anyone else engaged in similar behavior. Nor does she submit evidence that Lento or anyone else demonstrated animus toward women or anyone because of national origin.

Sixth, all of this behavior occurred in the brief six week period following Varughese's receipt of a Final Warning telling her that she had to start acting more professionally or she would be fired. None of this behavior is particularly professional. All of it is either petulant or insubordinate.

Varughese may take issue with what it meant to behave "professionally" at Mount Sinai, but she cannot get around the fact that, "an employer is permitted to set its own performance standards" including standards ... so long as they are not

discriminatory." *Nolley,* 857 F.Supp.2d at 441 (analyzing case under federal law, state law, and the NYCHRL). As neither the Final Warning nor the Advisement was discriminatory, Defendants cannot be faulted for firing Varughese when she failed to abide by their terms.

**\*56** Whether summary judgment is appropriate always depends on ' "the strength of the plaintiff['s'] *prima facie* case, the probative value of the proof that the [defendants'] explanation is false, and any other evidence' that supports the defendants' case." *Lizardo v. Denny's, Inc.,* 270 F.3d at 103 (2d Cir.2001) (quoting *Reeves,* 530 U.S. at 148–49). Having reviewed the entire record as submitted by Varughese, I conclude that Varughese has failed to mount an evidentiary carry her burden of production at the third stage of the analysis and her ultimate burden of persuasion. On the evidence in the record, no reasonable juror could find Varughese to have overcome the overwhelming evidence that Defendants disciplined and terminated her, not because of her sex or her ethnicity, but because of her own admitted behavior-behavior that her employer found unprofessional and inappropriate.

In *Pearson v. Unification Theological Seminary,* 785 F.Supp.2d 141 (S.D.N.Y.2011), the Court dismissed a Title VII plaintiff's claims because it was not disputed that she

> engaged in a loud argument with her boss and called her a "racist" and a "liar." Whatever occurred, it required the presence of building security, the NYPD, and EMS. This is not acceptable office behavior, and a complaint of racial discrimination does not shield an employee from termination when she acts inappropriately.

*Id.* at 161 (analyzing claims brought under, *inter alia,* the NYCHRL). Throughout the final year of her residency, Varughese engaged in unacceptable workplace behavior. By her own admission, she yelled, she swore, she interrupted, she rolled her eyes, she was late, absent, and-in conversations she recorded and submitted to the Court-by turns confrontational and evasive. The very tape recordings she made-and the pacing and aggressive tone of voice they reveal-confirm the testimony of others about her attitude and her behavior. This

court can hardly ignore what is on the tapes for anyone to hear. *See* 🚩 *Scott v. Harris,* 550 U.S. 372, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (appropriate for a court to take judicial notice of facts regarding intangible circumstances of encounter preserved in audiovisual recordings if court reviews said recordings).

Yet despite her protracted confrontational conduct, Defendants appear to have bent over backwards to assist Varughese. She received counseling from the Department, from the hospital's overarching Office of Graduate Medical Education, from Human Resources, and from the PWC. Several administrators came in from outside Mount Sinai and were prepared to offer her a clean slate, which she promptly sullied. Even if the Department was, at times, in disarray, antidiscrimination law "does not make [defendants] liable for doing stupid or even wicked things; it makes them liable for *discriminating."* ⚠️🚩 *Norton v. Sam's Club,* 145 F.3d 114, 120 (2d Cir.1998) (analyzing ADEA claim) (emphasis in original). There is no evidence on which a reasonable jury could conclude that Defendants *discriminated* against Varughese on the basis of her race or her gender.

**\*57** *Nolley* again proves instructive. When Mr. Nolley was given a PIP and told to improve his professionalism, he broke the standards set forth in that PIP by aggressively confronting his superior about what he thought were lies in the customers' complaints that had prompted the PIP in the first instance. He ultimately was fired because he could not handle professionally the complaints about professionalism. It did not matter whether the initial complaints were truthful, it mattered that he was unable to resolve his differences with his employer peacefully and professionally.

Varughese's case suffers from the same defect. As in *Nolley,* "Any deceitful conduct by [Jordan or McCash] or deficiencies in [her supervisors'] performance *do not create an issue of fact regarding [Varughese's] own performance* during [the months-long disciplinary process] or [Defendants'] motives in firing [her] for [her] failure to perform as [her] employer expected and as outlined in the [Academic Advisement."](emphasis added). She has therefore failed to raise a genuine issue of material fact that her termination or any of the supposedly adverse actions preceding it were pretextual or that they were motivated, in whole or in part, by any desire to discriminate against her, on any ground. She *Nolley,* 857 F.Supp.2d at 460.

Varughese has also been unable to point to any circumstantial evidence of discriminatory animus because she has identified *no one* who was similarly situated to her in all material respects-material respects including being on Academic Advisement, having been referred to the PWC, and being on Final Warning. No one else whose existence is disclosed in the record had a similarly pockmarked record of chronic lateness, absenteeism, refusal to follow instructions, and explosive anger. No one else simply refused to comply with the terms of an Academic Advisement or made up silly excuses for not doing so, like "I complained to HR so I don't have to comply." Any mistakes made by other residents to which Varughese points are either less severe, less frequent, or more willingly remedied by their perpetrators-and in most instances, all three.

Rather than point to others outside her protected class who engaged in similar conduct and received preferential treatment, Varughese blames others for her own conduct. She failed to plan an acceptable presentation? That was Najfeld's fault, for not telling her soon enough that it was unacceptable-never mind that Varughese did not send it to her supervisor until an hour before the close of business on the day before she was scheduled to present. (Varughese Dep. at 384.) Varughese was caught going through the files on someone else's desk? That was Patel's fault, for leaving her in an office with files on the desk. (Internal Appeal Hearing, Docket # 205–31 at 60.) Varughese failed to confirm that she could not cover for a sick resident? That was Jordan's fault, for asking her to provide coverage in the first place-the very request constituted "outrageous harassment." (Varughese Dep. at 465–66.)

**\*58** There is no evidence in the record that any other resident acted out in such a way. Moreover, even under the NYCHRL, a plaintiff cannot "establish pretext "by rationalizing her errors or by blaming others." 🚩 *Melman,* 98 A.D.3d at 121, 946 N.Y.S.2d 27 (N.Y.App. Div. 1st Dep't 2012) (internal citations omitted).

There are a few instances when Varughese is able to point to other residents who engaged in single bad acts, or who had bad weeks. But the record contains no evidence that anyone else had her lengthy record of persistently bad behavior. While other residents were cited for inappropriate attitudes or isolated angry outbursts, Varughese's lapses in professionalism were chronic and cumulative. (Firpo Dep. at 43, 170–74.) Varughese submits no evidence of anything different.

As the New York Court of Appeals has found, "it matters not whether the [employer's] stated reason for [the challenged action] was a good reason, a bad reason, or a petty one. What matters is that the [employer's] stated reason for [the action] was nondiscriminatory." *Forrest v. Jewish Guild for the Blind,* 3 N.Y.3d 295, 308 n. 5, 786 N.Y.S.2d 382, 819 N.E.2d 998 (N.Y.2004). Varughese has submitted no evidence that discrimination played any part–even a small part–in the decisions to discipline or terminate her. *Kerman–Mastour v. Fin. Indus. Regulatory Auth.,* 814 F.Supp.2d 355, 367 (S.D.N.Y.2011) ("[E]ven under the more liberal NYCHRL, summary judgment will still be appropriate where a plaintiff does not adduce sufficient evidence of a link between her termination and a discriminatory motive ..."); *see also Jeune v. City of New York,* No. 11 Civ. 7424, 2014 WL 83851, at *4 (S.D.N.Y. Jan. 9, 2014) (collecting cases). She has done little more than recount that she was subjected to adverse actions and that she was a member of two protected classes. More is required. *Dhar,* 2014 WL 4773965, at *7.

The motion for a summary judgment of dismissal is GRANTED as to Counts 1, 2, 5, 6, 9, 10, 16, and 18.

## V. The Motion for Summary Judgment is GRANTED as to Counts 3, 7, 8, and 11 (Hostile Work Environment under Title VII, NYHRL and NYCHRL).

Varughese claims–in counts 3, 7, 8 and 11–that Defendants subjected her to a hostile work environment on the basis of her race and gender, in violation of state, local and federal law.

### A. *Varughese's State and Federal Claims*

To defeat a motion for summary judgment on a claim of racially or sexually hostile work environment under federal and state law, a plaintiff must produce evidence that "the work environment both objectively was, and subjectively was, perceived by the plaintiff to be," *Schiano v. Quality Payroll Sys., Inc.,* 445 F.3d 597, 604 (2d Cir.2006), "permeated with discriminatory intimidation, ridicule, and insult, that [wa]s sufficiently severe or pervasive to alter the conditions of the victim's employment." *Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 570 (2d Cir.2000) (citation and quotation marks omitted). The Supreme Court has "made it clear that that conduct must be extreme to amount to a change in the terms and conditions of employment" and that courts must filter out complaints attacking "the ordinary tribulations of the

workplace." *Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). Isolated incidents ordinarily will not rise to the level of a hostile work environment, but may if sufficiently severe. *See id.; Kemp v. A & J Produce Corp.,* 164 Fed. Appx. 12, 14 (2d Cir.2005); *Howley v. Town of Stratford,* 217 F.3d 141, 153 (2d Cir.2000).

**\*59** In determining whether the alleged conduct was so severe or pervasive as to create an objectively hostile or abusive work environment, courts should consider the totality of the circumstances, including such factors as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).

Varughese's hostile work environment claims are based on an accumulation of discrete indignities. In addition to the matters she assigned as discrimination-all of which make up part of her hostile work environment claims-these include (1) Schiller's few sporadic comments during the first two years of her residency, (2) her desk was broken into (although she does not know by whom), (3) the lab slowed processing of her patient slides, (4) other people whispered about her, (5) McCash yelled at her before she was removed from his supervision, and "stomped around" afterward. For purposes of this motion, I will presume that all of these things happened.

*Varughese Has Failed to Present Any Evidence Connecting These Any of These Events to Her Membership in a Protected Class.*

The principal reason why the Hospital is entitled to summary judgment dismissing Varughese's hostile work environment claim under federal and state law. Varughese has not presented any evidence from which a reasonable jury could infer that that any of those events-let alone all of them collectively-occurred under circumstances giving rise to an inference of discrimination.

While "the incidents comprising a hostile work environment claim need not make reference to any trait or condition on the basis of which the discrimination has occurred" they must occur under circumstances in which "the incidents can reasonably be interpreted as having taken place on the

basis of that trait or condition." *Svenningsen v. Coll. of Staten Island,* No. 01–CV–7550, 2003 WL 21143076, at *2 (E.D.N.Y.Mar.23, 2003) (citing *Gregory v. Daly,* 243 F.3d 687, 694–95 (2d Cir.2001)). "Everyone can be characterized by ... race ... and many bosses are harsh, unjust, and rude. It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination." *Alfano v. Costello,* 294 F.3d 365, 377 (2d Cir.2002). Facially neutral incidents may be sufficient to establish a hostile work environment claim "so long as a reasonable fact finder could conclude that they were, in fact, based on [race]. But this requires some circumstantial or other basis for inferring that incidents [race]-neutral on their face were in fact discriminatory." *Id.* at 378.

Varughese points to no evidence that would allow a jury to conclude that she was subjected to any purported indignity because of either her race or her sex. As discussed above, when analyzing Varughese's discrimination claims, there is no evidence in the record to connect any of the eight adverse actions she identified as discriminatory to Varughese's being a woman or being of Indian descent. That lack of evidence does not change when those activites are viewed through the prism of hostile work environment analysis.

**\*60** Varughese also submits no evidence connecting the other incidents described-such as the broken lock on her desk, or the lab's pace in processing her slides-to her membership in any protected class. None whatever.

So her hostile work environment claim under state and federal law rises and falls on whether Schiller and McCash's comments created a hostile work environment for her. They do not. They were the quintessence of "stray remarks"-neither so many nor so frequent as to alter her workplace in any material way. This is without regard to the fact that at least two of the comments-Schiller's DNA remark and McCash's "work ethnic" e-mail-could not be understood by any reasonable trier of fact as the ethnic slurs Varughese makes them out to be.

It is not clear that these allegedly scurrilous remarks were made more than 300 days before plaintiff filed her charge with the EEOC: Schiller's remarks were made during the first two years of her residency. Nevertheless, "consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period,

is permissible for the purposes of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory time period." *McGullam v. Cedar Graphics, Inc.,* 609 F.3d 70, 75 (2d Cir.2010) (quoting *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 105, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002)).

Schiller's alleged comments about the "crazy things you'll find in India" were perhaps impolitic but they are hardly "severe" or "pervasive" enough to create a hostile work environment, since they are alleged to have occurred four times over the course of her employment. That is by definition not "pervasive."

Schiller's DNA remark was made early in Varughese's second year of residency, in the fall of 2009. It was a one-off remark. It contained no reference to her ethnicity or national origin. In context, it was a remark about the genetic basis of depression, which was the subject under discussion-Varughese's mental health, her perceived depression. Schiller directed Varughese to obtain mental health counseling, not because of her gender or her ethnicity, but because she presented as depressed in the workplace. Many people, including doctors, believe that there is a genetic (i.e., DNA-based) component to depression. *See, e.g.,* Eileen P. Ryan, D.O., "What Psychiatry, Developmental Psychology, and Neuroscience Can Teach Us About at-Risk Students," 17 Wash. & Lee J. Civil Rts. & Soc. Just. 59, 64–65 (2010). Schiller's comment cannot reasonably be understood in any manner other than this.

As for McCash's e-mail, it was discussed extensively above. It does not refer to Varughese's status as a person of Indian descent. The insertion of the letter "n" into the phrase "work ethic" is an obvious typographical error. For that reason it does not evidence a hostile work environment on any forbidden basis.

But there is another reason why this email is not evidence of a hostile work environment. Varughese did not become aware of it until long after she stopped working for Defendants. Varughese was not carbon copied on the "work ethnic" e-mail. At her deposition (which occurred after her termination), she denied knowing about any discriminatory comments ever uttered by McCash. Only now does she allege that this, email contributed to the purportedly hostile environment she faced.

**\*61** A plaintiff need not herself be the target of discriminatory comments in order for those comments to

contribute to a hostile work environment; nor does the plaintiff need to hear such comments first-hand. 🏳 *Whidbee v. Garzarelli Food Specialties, Inc.,* 223 F.3d 62, 69–70 (2d Cir.2000); *see also* 🏳 *Perry v. Ethan Allen, Inc.,* 115 F.3d 143, 150 (2d Cir.1997) ("Since one of the critical inquiries with respect to a hostile environment claim is the nature of the environment itself, evidence of the general work atmosphere is relevant."); 🚩 *Cruz,* 202 F.3d at 571 (finding that, even if plaintiff were not present when some comments were made, "a jury plausibly could find that [defendant's] persistently offensive conduct created an overall hostile or abusive environment" which "exacerbated the effect of the harassment [plaintiff] experienced individually" (internal quotation marks and citations omitted))..

But, to rely on discriminatory comments in pursuit of a hostile work environment claim, a plaintiff must at least have been generally *aware* that such comments were uttered. The *Whidbee* court examined the totality of the circumstances and found that "the plaintiffs were subjected to, *or at the very least aware of,* a stream of racially offensive comments." 🏳 223 F.3d at 70 (emphasis added). The *Whidbee* court relied on 🏳 *Schwapp v. Town of Avon,* 118 F.3d 106 (2d Cir.1997). In *Schwapp,* the court explained that, "The mere fact that [the plaintiff] was not present when a racially derogatory comment was made will not render that comment irrelevant to his hostile work environment claim" *because* "the fact that a plaintiff learns second-hand of a racially derogatory comment or joke by a fellow employee or supervisor also can impact the work environment." 🏳 118 F.3d at 111.

Here, Varughese did not learn of the "work ethnic" comment even second-hand. She was not aware of the email at all during the period while she was a resident at Mount Sinai. It would be difficult indeed for a comment to alter the conditions of Varughese's employment if she was unaware of it until well after she stopped being employed. "A plaintiff need not be the recipient of [racially] offensive material for it to contribute to a hostile work environment. Nevertheless, if the material is not publicly displayed or disseminated, and is not something [she was] ... generally aware of, its contribution to a hostile work environment may be negligible. *Ortiz–Moss v. New York City Dep't of Transp.,* 623 F.Supp.2d 379, 401 n. 19 (S.D.N.Y.2008); *cf.* 🏳 *Patane v. Clark,* 508 F.3d 106, 114 (2d Cir.2007) (plaintiffs regular observation of male employee watching pornographic videos, and her being

required to handle pornographic material herself in opening supervisor's mail, were relevant to assessing whether her work environment was objectively hostile to women). Here, where there is literally no other evidence of ethnic slurs (as there was in *Whidbee),* and no other evidence of compromised behavior on McCash's part, the probative value of the email is not just negligible; it is nil.

**\*62** The "work ethnic" e-mail is the *only* comment with any nexus whatsoever to the treatment she describes as hostile that occurred within the statutory period, in that it has a connection to the December 8, 2010 incident. There is no other evidence of discriminatory comments or other direct evidence of animus that relates to the treatment of which she complains. I therefore cannot consider the comment as but one instance of a general atmosphere of discriminatory hostility, particularly in view of the circumstances under which the comment was made-i.e. that it would be reasonable to consider it a scrivener's error.

Moreover, when Varughese complained about McCash's behavior in December (i.e., at the time he composed the e-mail), Defendants removed her from his supervision and ensured that they did not have to work together, even as colleagues, thus shielding her from whatever hostility she alleges. She now claims that McCash "stomped around" her desk on a subsequent rotation, but admits that she did not have to work with him and that she never notified anyone that she was still having problems with him.

Under federal and state laws, to prevail on a hostile work environment claim, plaintiffs must show not only severe or pervasive harassment but also "a specific basis ... for imputing the conduct that created the hostile environment to the employer." 🏳 *Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 715 (2d Cir.1996). Because the "stomping" was by a co-worker (as she no longer reported to him) and not a supervisor, Varughese must demonstrate that Defendants "either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it." *Id.* (internal quotation marks omitted). "[A]n employer will be liable in negligence for a racially ... hostile work environment created by a victim's co-workers if the employer knows about (or reasonably should know about) that harassment but fails to take appropriately remedial action." 🚩 *Richardson,* 180 F.3d at 446 (citing 🏳 *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 759, 118 S.Ct. 2257, 141 L.Ed.2d 633, (1998)); *see*

🚩 *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 766 (2d Cir.1998).

In the end, "Determining whether workplace harassment was severe or pervasive enough to be actionable depends on the totality of the circumstances." 🚩 *Cruz,* 202 F.3d at 570. Here, the totality of the circumstances do not even remotely suggest that Varughese was the victim of a hostile work environment, either because she was a woman or because she was of Indian descent. If there is any suggestion of hostility at all-a proposition very much in dispute-the entirety of the evidence points to Varughese's uncooperative, insubordinate attitude as its root cause. The statutes she invokes do not protect Varughese from the consequences of her own behavior. Varughese has failed to provide evidence from which a reasonable jury could conclude that any dislike was based on her race or her sex.

**\*63** Consideration of the totality of Varughese's employment does not yield any evidence of an environment severely or pervasively infected with discriminatory hostility on the basis of her gender and/or her race. It merely reveals that, when she acted out, there were consequences, and that she happened to be a woman of Indian descent. But again, "I am a member of a protected class; my workplace was hostile; it must have been because of my protected class," is a logical fallacy that does not insulate a plaintiff from summary judgment where the undisputed facts warrant dismissal of her claims as a matter of law.

While "the appalling conduct alleged in prior cases should not be taken to mark the boundary of what is actionable,"

🚩 *Richardson v. New York State Dep't of Correctional Serv.,* 180 F.3d 426, 439 (2d Cir.1999), Varughese's evidence of McCash's e-mail, Schiller's interest in India, and Schiller's concern that her depression might be DNA-based are neither "severe" nor "continuous" nor "concerted," 🚩 *Cruz,* 202 F.3d at 570 (internal quotation marks omitted)-and so will not sustain a hostile work environment claim under federal or state law. There is *no* evidence in this record that Varughese was subjected to repeated indignities (or even to one particularly egregious indignity) *because of either her race or her gender.*

Not a single piece of evidence even *alludes* unfavorably to Varughese's gender. Plaintiff did not complain that she was experiencing a hostile work environment based on her gender until April 2011. But when she did so, she accused

McCash of creating the hostile work environment. But the record contains evidence of only two run-ins between McCash and Varughese-in September 2010 and again in December 2010–which is too sporadic to create a hostile work environment. After that, the hospital removed Varughese from McCash's supervision-five months before she uttered her first complaint. In short, there is not a scintilla of support for her claim of a gender-based hostile work environment.

And so we turn to national origin. Schiller's comments about things one might find in India were, *at worst,* subject to interpretation-and both few in number and sporadic. They were also made well before Varughese's workplace problems began. Even if these were racially insensitive remarks, his comments cannot be attributed to others, and he ceased being chairman of the Pathology Department before the December 8 incident, the Academic Advisement or the PWC referral.

Schiller's comment about depression's being associated with DNA cannot logically be construed as a comment on Varughese's national origin except under some sort of utterly unreasonable, Oliver Stone-like "conspiracy theory" And McCash's "work ethnic" e-mail almost certainly contains a typographical error, given the complete lack of any other evidence suggesting that McCash was insensitive or worse toward anyone on the basis of their race or national origin. At worst, it is at worse a single stray remark-which, under federal and state law, is insufficient to prove hostile work environment. And of course, Varughese *never* complained that she was being subjected to a hostile work environment on the basis of her race during her tenure at Mount Sinai. Even when she retained counsel in June 2011, her lawyers claimed that the hospital was discriminating against her because of her *gender.*

**\*64** What remains are only Varughese's conclusory allegations that everyone in the hospital was a racist, a sexist, or both. That is not enough.

Defendants' motion for a summary judgment of dismissal is GRANTED as to counts 3, 5, and 18, i.e. Varughese's state and federal hostile work environment claims.

B. *Varughese's Hostile Work Environment Claim under the NYCHRL*

Having dismissed Varughese's hostile work environment claim under state and federal law, I now consider whether Varughese's city law claim of hostile work environment can survive Defendants' motion for summary judgment.

The NYCHRL has a more forgiving standard for hostile work environment claims than federal or state laws do. There is no "severe or pervasive" requirement under city law, and "while courts may still dismiss 'truly insubstantial cases,' even a single comment may be actionable in the proper context."

*Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.,* 715 F.3d 102, 113 (2d Cir.2013) (citing *Williams,* 872 N.Y.S.2d at 41 & n. 30).

Nevertheless, the NYCHRL "is not a general civility code," and "summary judgment is still appropriate in NYCHRL cases ... if the record establishes as a matter of law that a reasonable jury could not find the employer liable under any theory." *Id.* (internal citations omitted). In this case, the record establishes precisely that. Varughese offers no evidence connecting the incidents she now perceives as hostile to bias related either to her race or to her gender. Her wide-ranging, conclusory assertions that there was discrimination in the air do not withstand any level of scrutiny.

Count 11 is dismissed.

### VI. The Motion for Summary Judgment is GRANTED as to Counts 4, 8 and 12 (Retaliation under Title VII, NYHRL and NYCHRL).

Varughese alleges-in counts 4, 8 and 12 of her Second Amended Complaint-that she was disciplined and terminated in retaliation for engaging in the protected activity of complaining about discrimination.

Title VII provides, "It shall be an unlawful employment practice for an employer to discriminate against any ... employee [ ] ... because [the employee] has opposed any practice made an unlawful employment practice by" Title VII.

*42 U.S.C. § 2000e–3(a).* Retaliation claims are cognizable under *§ 1981. See Choudhury v. Polytechnic Inst. of N.Y.,* 735 F.2d 38, 43–44 (2d Cir.1984).

To survive summary judgment with respect to her claim of retaliation, Varughese must raise a genuine issue of fact whether "(1) she participated in a protected activity known to the defendant; (2) the defendant took an employment action disadvantaging her; and (3) there existed a causal connection between the protected activity and the adverse action." *Patane,* 508 F.3d at 115 (citing *Feingoldv. New*

*York,* 366 F.3d 138, 156 (2d Cir.2004)). The NYCHRL against has no "materiality" requirement; it forbids any form of retaliatory action.

It is well-established that a "plaintiff may prevail on a claim for retaliation even when the underlying conduct complained of was not in fact unlawful so long as he can establish that he possessed a good faith, reasonable belief that the underlying challenged actions of the employer violated [the] law." *Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir.2002) (internal quotation marks omitted). The law protects employees in the filing of formal charges of discrimination as well as in the making of informal protests of discrimination, including complaints to management. *See Sumner v. U.S. Postal Serv.,* 899 F.2d 203, 209 (2d Cir.1990). Moreover, as the Supreme Court has explained, any action that "could well dissuade a reasonable worker from making or supporting a charge of discrimination" may constitute retaliation. *Burlington N. and Santa Fe Ry. Co. v. White,* 548 U.S. 53, 57, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006).

**\*65** In this Circuit, the analysis of a retaliation claim follows the same *McDonnell–Douglas* framework discussed in Part III, *supra. Kemp v. A & J Produce Corp.,* 164 F. App'x 12, 15–16 (2d Cir.2005). Thus, "once the plaintiff has made out a *prima facie* case of retaliation, the defendant then has the burden of pointing to evidence that there was a legitimate, non-retaliatory reason for the challenged action. If the defendant meets that burden, the plaintiff must then demonstrate that there is sufficient evidence upon which a reasonable jury could find the proffered legitimate reason merely a pretext for impermissible retaliation." *Id.* (citing *Gallagher v. Delaney,* 139 F.3d 338, 349 (2d Cir.1998)).

With respect to retaliation, Varughese does not get past the first step of the inquiry.

Varughese's 56.1 Statement repeatedly claims that she complained about "discrimination" earlier than April 2011, but *nothing* in the record supports that assertion. Certainly she complained about a "hostile environment" at work as early as September 2010, and described others' behavior as "offensive," but she never gave anyone any reason to suspect that the hostile or offensive environment she was complaining about had anything to do with either her race or gender. She did not mention her sex or her ethnicity in her complaints. She did not complain about any allegedly racist

or sexist comments. She did not ascribe what she perceived as mistreatment to her membership in any protected class. She did not compare the way she was being treated to the way Caucasians or males were treated. The people explicitly contradicting her versions of events were often members of one or both of the same protected categories as she-including Drs. Jaffer and Maniar, women of Indian descent, both of whom were outranked her and one of whom outranked McCash. Maniar, who Varughese believes would support her version of events, denied that Varughese had ever complained to her about discrimination or retaliation. (Docket # 163 at ¶ 10.)

When Varughese complained about "retaliation" before April 2011, she explicitly linked the alleged retaliation to non-protected activities-principally to having given Lento's rotation a negative internal review or making general allegations about unfair treatment and workplace bullying. Her first reflection explicitly declined to ascribe McCash's behavior to any motive at all: "*I will not claim to know why Samuel McCash treats me the way he does,* nor will I need to understand why ... But I feel that he is resentful of any success or well-being I may exhibit." (Self–Reflection Essay # 1, Docket # 205–10 at 19.) (emphasis added) Not until April 25, 2011 did Varughese explicitly assert that McCash's behavior toward her was based on her gender. (E-mail from Varughese to Tiger–Paillex of Apr. 25, 2011, Docket # 205–10 at 2.) The letter written by her attorney to Mt Sinai in June 2011 (*See* Docket # 205–10 at 12) identifies a December 23, 2010 email as containing an earlier complaint that she was being discriminated against on the basis of her gender and/or some perceived disability (which is not a claim asserted in this lawsuit). However, that December 23 email asserts nothing about discrimination: she complained about what she characterizes as abusive behavior and public humiliation. Neither her gender nor her national origin is mentioned; there is nothing in the email to alert the recipient (Tiger–Paillex) that these were the basis of her complaint.

 **\*66**  Thus, notwithstanding Varughese's conclusory assertions in her 56.1 Statement, there is no *evidence* that she engaged in any protected activity prior to being placed on Academic Advisement.

Instead, all of her statutorily protected activity began in April 2011–well after her December 21, 2010 Academic Advisement, well after McCash's and Jordan's promotions to Chief Resident, and well after Pessin–Minsley's referral of Varughese to the PWC. None of those issues can be chalked

up to retaliation for any complaint about discrimination based on gender or national origin.

Of course, her Final Warning and ultimate termination occurred after Varughese engaged in protected activity. But those adverse actions cannot be chalked up to retaliation, either, because they were part and parcel of a course of conduct that began well before any protected activity took place. Under federal and state law, where "gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." *Slattery,* 248 F.3d at 95. The same is true under the NYCHRL. *Melman v. Montefwre Med. Ctr.,* 98 A.D.3d 107, 129, 946 N.Y.S.2d 27, 42 (2012) ("an employer's continuation of a course of conduct that had begun before the employee complained does not constitute retaliation because, in that situation, there is no causal connection between the employee's protected activity and the employer's challenged conduct ...") (internal citations omitted).

Varughese thus "cannot establish a *prima facie* case of retaliation based on the temporal proximity between the adverse employment actions and her protected activity, even though some of the things about which [she] complains occurred after she engaged in protected activity" in April 2011. *Williams v. Woodhull Med. & Mental Health Ctr.,* 891 F.Supp.2d 301, 315 (E.D.N.Y.2012).

Bending over backward to try to find some way to keep Varughese's claim of retaliation alive, the Court has considered whether her off-hand question to Tiger–Paillex in late December 2010 or January 2011 whether McCash wanted to micromanage her "because he is a guy?" qualifies as protected activity. First, let us assume that this actually qualifies as a complaint of gender-based treatment, rather than evidence of Varughese's own gender bias. However, even assuming that it qualifies as protected, Varughese only raised the concern *after she had already been placed on Academic Advisement.* It does not get her out from under the rule announced above.

The totality of the evidence simply does not admit of an inference that Defendants retaliated against Varughese for engaging in any protected activity.

Defendants' motion for a summary judgment of dismissal is GRANTED as to counts 4, 8 and 12.

## VII. The Motion for Summary Judgment is GRANTED as to Count 17 (Whistleblower Retaliation).

Varughese claims that Defendants violated 🚩 New York Labor Law § 740, New York's whistleblower statute, by penalizing her for reporting McCash and Jordan for drinking on the job. Presumably, Varughese invokes 🚩 § 740 because it provides the only private right of action for enforcing § 741, New York's Health Care Whistleblower statute.

**\*67** Section 741 specifically protects healthcare providers who "disclose [ ] or threaten[ ] to disclose to a supervisor, or to a public body an activity, policy or practice of the employer ... that the employee, in good faith, reasonably believes constitutes improper quality of patient care; or objects to, or refuses to participate in" any such activity, policy or practice. 🚩 N.Y. Labor Law § 741(a)-(b). An employer may not take any adverse personnel action against an employee "because" she engages in protected activity. 🚩 N.Y. Labor Law § 740.

Relying on a 2010 Appellate Division decision, Defendants argue that Varughese's whistleblower retaliation claim should be dismissed because she has "failed to identify a specific law, rule or regulation" that the alleged drinking purportedly violated. *See* Defs. Mem., Docket # 172 at 24–25, *citing Deshpande v. Medisys Health Network, Inc.,* 70 A.D.3d 760, 762, 896 N.Y.S.2d 103 (2d Dep't 2010).

The case on which Defendants rely is no longer good law. The New York Court of Appeals expressly directed that it not be followed two months before Defendants filed their brief. *Webb–Weber v. Cmty. Action for Human Servs., Inc.,* 23 N.Y.3d 448, 451, 992 N.Y.S.2d 163 (2014) ("there is no such [identification] requirement ... [and] Appellate Division authority ... should no longer be followed for that proposition.").

The Court of Appeals cautioned that *"recover [y]* under a 🚩 Labor Law § 740 theory" requires an actual violation of law, 23 N.Y.3d at 452–53, 992 N.Y.S.2d 163, but, were Varughese's accusations true, there would have been a violation of actual law. Undertaking the liberal review that I must for a *pro se* plaintiff, it is not difficult to find a regulation that would be violated if Defendants' physicians —the need for whose "skilled performances ... cannot be overemphasized" (Docket # 205–8 at 11)—were becoming intoxicated before assessing whether, say, someone had cancer. Specifically, 🚩 New York Public Health Law § 230 *et seq.* is clear that a physician "practicing the profession while impaired by alcohol" has committed "professional misconduct" that can lead to the revocation of his or her medical license. 🚩 N.Y. Pub. Health Law § 230(1) (incorporating by reference the definition of professional misconduct in 🚩 N.Y. Educ. Law § 6530); *see also* 🚩 N.Y. Educ. Law § 6530(7).

Defendants' better objection is that there is no evidence that Plaintiff was terminated in retaliation for engaging in conduct protected by the statute.

New York "enacted 🚩 Section 741 of the Labor Law to encourage employees to report hazards to their supervisors and to protect them from retaliatory personnel actions when they make such reports." *Pal v. New York Univ.,* No. 06 CIV.5892, 2007 WL 4358463, at \*7 (S.D.N.Y. Dec. 10, 2007) (citing Sponsor's Mem. (Oct. 23, 2001), N.Y. Bill Jacket, L.2002, ch. 24); *see also Collate v. St. Luke's Roosevelt Hosp.,* 132 F.Supp.2d 256, 263 (S.D.N.Y.2001) (citing 🚩 *Rodgers v. Lenox Hill Hosp.,* 211 A.D.2d 248, 250– 51, 626 N.Y.S.2d 137 (1st Dep't 1995)).

**\*68** However, to fall afoul of the statute, the adverse action must be taken "because" the employee engaged in protected activity. 🚩 § 740. In other words, the whistleblower statute, like the anti-discrimination laws, requires some causal connection between an adverse personnel action and a report of dangerous activity.

No reasonable jury could conclude that Defendants took any adverse action to retaliate against Varughese for reporting residents' drinking. Indeed, Varughese herself has specifically disclaimed any idea that there is any causal link between her reports of drinking and any adverse action she experienced: "I don't see it as retaliation for a complaint about people drinking on the job." (Varughese Dep. at 748.)

Even if Varughese had not waived reliance on this theory, however, the record does not support it.

Every time Varughese reported Dementia rounds or other alcoholic activity, she had just been taken to task for her

own behavior-not the other way around. She made the first allegation about drinking after she was placed on Academic Advisement and around the time she was referred to the PWC. Varughese brought the issue up again in April, two days after Tiger–Paillex told her that HR could not substantiate her claims regarding the December 8 incident. Her third allegation-specifically claiming that McCash and Jordan had been drinking while involved with patient-care duties-came two days after her contentious May 3, 2011 meeting with Cordon–Cardo, in which she was told to rewrite her self-reflection.

At the follow-up meeting on May 24, when Varughese submitted her self-reflection late, rolled her eyes and allegedly threw a book on the table, Cordon–Cardo said: "the best way ... to move on is not with this attitude. You can come here with another attitude and to say ... I'm going to drop all of this nonsense of people drinking ..."

> We are addressing these people ... we are taking these matters very seriously today. We ... have a lot of work to do ... but at the end of the day it's a program to teach and train people that are excited and passionate about pathology, not that are upset or that have problems ... You can't keep going back and forth ... coming back with new allegations now this person is drinking and now the other person is drinking then no one knows what it's about if you're talking ..."

(Docket # 205–24 at 40–41). When he said that they were indeed taking these matters seriously, he was not kidding. He was obviously referring to Figur's involvement, which led to finding a bottle of Captain Morgan on hospital premises. This in turn led to a hospital-wide e-mail admonishing people to stop bringing alcohol to work. Varughese was not punished for her "whistleblowing" activity; to the contrary, it was followed up on, and things improved. But as with her claims of retaliation under Title VII and the state and city human rights laws, we must look at the totality of the circumstances, as demonstrated by the admissible evidence, rather than conclusion or conjecture.

**\*69**  The totality of the circumstances of this case would not permit any reasonable juror to conclude that the hospital was reacting to Varughese's complaints about alcohol with adverse actions, rather than the other way around. Before she uttered a word about alcohol, Varughese had been put on Academic Advisement, so that very serious disciplinary action cannot be attributed to her whistleblowing. The evidence is undisputed that she failed to comply with the conditions of her Advisement; that was misconduct on her part, which was in no way excused by her whistleblowing. Ample evidence of her behavior at work justifies her being referred to the PWC. And her termination was occasioned by admitted instances of misconduct, the last straw being her admitted rifling through a file on the desk of an HR employee. Engaging in whistleblowing does not insulate an employee from being disciplined or fired for misconduct, and here, there is no genuine issue of fact that misconduct warranting discipline occurred.

The motion for summary judgment is GRANTED as to Varughese's §§ 740–741 claim (Count 17).

## VIII. The Motion for Summary Judgment Dismissing Count XIX (Family and Medical Leave Act) is GRANTED.

Varughese's FMLA claim is an unusual one.

In September 2011, Varughese herself suggested she might take a leave of absence from work. Defendants encouraged her to do so, provided her with the materials necessary to apply for

FMLA leave, and followed up to see how Varughese was doing when she failed to submit an application. Several days after her initial inquiry and (according to her Rule 56.1 Statement) before she had even made a formal request to take leave, she said she wanted to take some leave at a later date and and come back to work. Her FMLA claim is based on the hospital's refusal to allow her to come back to work until she obtained a doctor's assessment that she was fit to return, essentially forcing her to take involuntary leave. *See* Docket # 66 at ¶ 56. The undisputed facts also establish that she disobeyed her employer's orders and came to work without permission for several days.

This is not a violation of the FMLA. The claim is dismissed.

FMLA was enacted because Congress believed "there is inadequate job security for employees who have serious health conditions that prevent them from working for temporary periods ..." 🚩 29 U.S.C. § 2601(a)(4). FMLA therefore provides employees with certain substantive rights, with which employers cannot interfere. 🚩 *Sarno v. Douglas– Elliman,* 183 F.3d 155 (2d Cir.1999). The Act provides eligible employees the right to take unpaid leave for up to twelve weeks for a serious medical condition as defined by the Act. 🚩 29 U.S.C. § 2612(a)(1). It further provides that at the end of that leave the employee is entitled to reinstatement to the former position or an equivalent position. 🚩 29 U.S.C. § 2614(a). To ensure the availability of these rights, section 2615(a)(1) makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." Therefore, employers may not "use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions." 🚩 29 C.F.R. § 825.220(c).

 **\*70** Forced leave, however, "by itself, does not violate any right provided by the FMLA." *Sista v. CDC Ixis N. Am., Inc.,* 445 F.3d 161, 175 (2d Cir.2006). The FMLA establishes certain rights, including, inter alia, "to take leave, to restoration of position, and to maintain a civil action," but it "does not create a right to be free from suspension with or without pay, nor does the FMLA create a right against infliction of emotional distress." *Id.*

The Second Circuit has allowed that a cause of action "might" lie under the FMLA if such a forced leave "interfered with, restrained, or denied the exercise or attempted exercise of a right provided under the FMLA." But Varughese does not allege that the requirement that she not come back without a doctor's note interfered with her ability to take leave under the FMLA, or with her ability to communicate with Defendants' HR department and submit her FMLA forms. It didn't even interfere with her ability to work; she ignored orders and reported to work anyway.

There can be no question that the Defendants wanted Varughese to exercise her rights under FMLA; they believed she was unstable and needed to take some leave. They did nothing to prevent her from taking FMLA leave; they encouraged her to take a leave.

There is no evidence in the record that would permit a reasonable juror to conclude that Defendants interfered with any right guaranteed by FMLA by requiring Varughese- who, by her own admission, had been ill frequently to the point of absence, and was extremely anxious-to provide a doctor's certification that she was fit for duty before she returned to making assessments that could affect patients' health. *See Robertson v. Amtrak/Nat'l R.R. Passenger Corp.,* 400 F.Supp.2d 612, 614 (S.D.N.Y.2005) (Chin, J.)

Further, even if Varughese had exercised her right to take leave under FMLA, "an employer is entitled to a certification of fitness to return to duty for such absences up to once every 30 days if reasonable safety concerns exist regarding the employee's ability to perform his or her duties, based on the serious health condition for which the employee took" a leave. 29 C.F.R. § 825.312. For a hospital to require a doctor's note certifying the fitness of a physician who has taken, or indicated a desire to take FMLA leave, is a prudent measure for the protection of the public.

To the extent that Varughese claims that Defendants did not require doctors' certifications of fitness from persons not in her protected class, her claim does not lie under the FMLA.

The motion for a summary judgment is GRANTED as to count 19.

## IX. The Motion for Summary Judgment Dismissing Count XV and XVI (Breach of Contract and Breach of Covenant of Good Faith and Fair Dealing) is GRANTED.

Varughese claims that her termination breached her employment contract. The Second Amended Complaint does not specify the alleged breach, but the gravamen of Varughese's contractual claim at her deposition and in her *pro se* papers has been that she was terminated without cause.

 **\*71** Varughese's employment contract provided that: "The Program Director [or] the Department Chair ... may take disciplinary action, including termination for cause, against any [resident] who ... fails to demonstrate an acceptable level of ... professionalism."

Varughese has *admitted* to, *inter alia,* screaming, swearing, rolling her eyes, being absent, being late, ignoring pages, ignoring e-mails, ignoring calls, ignoring instructions, going through the files on someone else's desk, canceling a presentation without notice, and submitting an essay on

professionalism two months late. The hospital concluded that the admitted behavior did not demonstrate an acceptable level of professionalism. Two appeals boards upheld that determination.

The hospital, not Dr. Varughese and not a jury, has the right to decide which behavior in a resident physician is sufficiently unprofessional to constitute cause for termination. She was terminated for cause. Her contract was not breached.

Her breach of the covenant of good faith and fair dealing fares no better.

Under New York law, there is a covenant of good faith and fair dealing implied in all contracts. *See 511 West 232nd Owners Corp. v. Jennifer Realty Co.,* 98 N.Y.2d 144, 153, 746 N.Y.S.2d 131, 773 N.E.2d 496 (N.Y.2002); *Carvel Corp. v. Diversified Mgmt. Grp.,* 930 F.2d 228, 230 (2d Cir.1991). "This covenant embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."

*Harris v. Provident Life & Accident Ins. Co.,* 310 F.3d 73, 80 (2d Cir.2002). While the implied covenant of good faith and fair dealing does not "imply obligations inconsistent with other terms of the contractual relationship," it does encompass "any promises which a reasonable person in the position of the promisee would be justified in understanding were included."

*Manhattan Motorcars, Inc. v. Automobili Lamborghini,* 244 F.R.D. 204 (S.D.N.Y.2007) (quoting *Murphy v. Am. Home Prods. Corp.,* 58 N.Y.2d 293, 304, 461 N.Y.S.2d 232, 448 N.E.2d 86 (N.Y.1983); *Rowe v. Great Atl. & Pac. Tea Co.,* 46 N.Y.2d 62, 69, 412 N.Y.S.2d 827, 385 N.E.2d 566 (N.Y.1978)).

To avoid redundancy, "Claims of breach of the implied covenant ... must be premised on a different set of facts from those underlying a claim for breach of contract."

*Deutsche Bank Sec. Inc. v. Rhodes,* 578 F.Supp.2d 652, 664 (S.D.N.Y.2008). "A party may maintain a claim for breach of the implied covenant only if the claim is based on allegations different from the allegations underlying the accompanying breach of contract claim." *Id.* Accordingly, "A claim for breach of the implied covenant will be dismissed as redundant where the conduct allegedly violating the implied covenant is also the predicate for breach of covenant of an express provision of the underlying contract." *ICD Holdings*

*S.A. v. Frankel,* 976 F.Supp. 234, 2434 (S.D.N.Y.1997); *Murphy,* 58 N.Y.2d 293, 461 N.Y.S.2d 232, 448 N.E.2d 86 (holding that the implied obligation is simply "in aid and furtherance of other terms of the agreement of the parties.");

*Madison Capital Co., LLC v. Alasia, LLC,* 615 F.Supp.2d 233, 239 (S.D.N.Y.2009).

**\*72** Here, Varughese has not provided any separate set of facts to support her breach of covenant claim, and the Court's own review of the record suggests none.

The motion to dismiss counts 15 and 16 is GRANTED.

## X. The Motion for Summary Judgment is GRANTED as to Count 13 (Tortious Interference with Business Relations).

Varughese alleges that, by failing to provide a summative evaluation to prospective employer RWJ hospital in January of 2011, Defendants engaged in the New York common law tort of interference with business relations, also known as tortious interference with prospective economic advantage.

"To state a claim for tortious interference with prospective economic advantage, a Plaintiff must show that '(1) the Plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship.' " *Doe v. White Plains Hosp. Med. Ctr. (WPHMC),* No. 10 CIV. 5405 GBD, 2011 WL 2899174, at *4 (S.D.N.Y. July 8, 2011) *aff'd sub nom. Doe v. French,* 458 F. App'x 21 (2d Cir.2012) (quoting *Catskill Dev., LLC v. Park Place Entm't,* 547 F.3d 115, 132 (2d Cir.2008)).

Varughese's claim founders on the third element. She has provided nothing other than her own conclusory assertions to prove that Mount Sinai "acted for a wrongful purpose or used dishonest, unfair, or improper means" when it refused to provide RWJ Hospital with a summative evaluation while her appeals were pending.

The Second Circuit has explained that, under New York law, the phrase "wrongful means"

represent[s] 'physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure; they do not, however, include persuasion alone although it is knowingly directed at

interference with the [prospective] contract.' " *NBT Bancorp,* 664 N.E.2d at 497, 641 N.Y.S.2d at 586 (quoting *Guard–Life Corp. v. S. Parker Hardware Mfg. Corp.,* 50 N.Y.2d 183, 428 N.Y.S.2d 628, 632, 406 N.E.2d 445, 449 (N.Y.1980)).

*Scutti Enterprises, LLC. v. Park Place Entm't Corp.,* 322 F.3d 211, 216 (2d Cir.2003)

There is neither an allegation nor any evidence that Mount Sinai used the means described in *Scutti Enterprises.* Defendants did not wish to release any summative evaluation of Varughese's employment until her internal appeals of her termination had concluded. This decision actually was to Varughese's benefit; when the request was made her status was "terminated for cause," so if her appeal had been successful in overturning that determination, the information Mount Sinai would have provided would have been incorrect. The hospital was prudent to abide the final resolution of the appeals; prudence does not amount to fraud or any of the other improper means listed above.

The motion to dismiss Count 13 is GRANTED.

## XI. The Motion for Summary Judgment is GRANTED as to Count 14 (Defamation and Defamation Per Se).

**\*73** Varughese alleges that Defendants' act of forwarding the "summative evaluation" to a potential employer would constitute defamation and defamation *per se.* She seeks an injunction preventing Defendants from sending the "summative evaluation" to anyone.

To recover for defamation in New York, Varughese must prove that the Defendants made:

> (1) a false statement about the plaintiff, (2) published to a third party without authorization or privilege; (3) through fault amounting to at least negligence on [the] part of the publisher, (4) that either constitutes defamation *per se* or caused 'special damages.'

*Thorsen v. Sons of Norway,* 996 F.Supp.2d 143, 173 (E.D.N.Y.2014), *reconsideration denied* (May 14, 2014) (quoting *Thai v. Cayre Grp., Ltd.,* 726 F.Supp.2d 323, 329 (S.D.N.Y.2010) (internal citations omitted).

The claim must be dismissed because there is no evidence in the record that Defendants have actually published the summative evaluation to anyone except plaintiff. Unless there is publication to a third party, there is no defamation. [14]

Varughese's real goal is to obtain an injunction prohibiting Mount Sinai from publishing the evaluation to anyone in the future on the ground that it is defamatory. That claim fails because the statements in the summative evaluation she protests are not statements of fact. They are thus not actionable as defamation.

The "threshold issue which must be determined, as a matter of law, [in a defamation case] is whether the complained of statements constitute fact or opinion." *Steinhilber v. Alphonse,* 68 N.Y.2d 283, 290, 508 N.Y.S.2d 901, 501 N.E.2d 550 (1986); *Cohen v. Google, Inc.,* 25 Misc.3d 945, 887 N.Y.S.2d 424 (N.Y.Sup.2009). In determining whether a statement constitutes fact or opinion, a court should consider: "(1) whether the specific language at issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal ... readers or listeners that what is being read or heard is likely to be opinion, not fact." *Gross v. New York Times Co.,* 82 N.Y.2d 146, 153, 603 N.Y.S.2d 813, 623 N.E.2d 1163 (N.Y.1993) (quoting *Steinhilber,* 68N.Y.2d at 290, 68 N.Y.2d 283, 508 N.Y.S.2d 901, 501 N.E.2d 550). A court is to consider the context of the statement as a whole. *Sandals Resorts Intern. Ltd. v. Google, Inc.,* 86 A.D.3d 32, 925 N.Y.S.2d 407, 2011 WL 1885939, at \*5 (N.Y.2011).

If the statements are "pure opinion," then they are not defamatory as a matter of law even if they are false and libelous. *Steinhilber,* 68 N.Y.2d at 289, 508 N.Y.S.2d 901, 501 N.E.2d 550; *Rinaldi v. Holt, Rinehart & Winston, Inc.* 42 N.Y.2d 369, 380–81, 397 N.Y.S.2d 943, 366 N.E.2d 1299 (*Ct.App.1977* ). "A 'pure opinion' is a statement of opinion

which is accompanied by a recitation of the facts upon which it is based." 🔖 *Steinhiber,* 68 N.Y.2d at 289, 508 N.Y.S.2d 901, 501 N.E.2d 550.; *see also* 🔖 *Sandals Resorts Intern. Ltd.,* 86 A.D.3d 32, 925 N.Y.S.2d 407, 2011 WL 1885939, at *5. Such statements are not actionable because "a proffered hypothesis that is offered after a full recitation of the facts on which it is based is readily understood by the audience as conjecture." *Gross,* 80 N.Y.2d at 154, 589 N.Y.S.2d 833, 603 N.E.2d 938.

**\*74** The Summative Evaluation is a two-page document consisting of checked boxes marking Varughese as "satisfactory" or "unsatisfactory" in six categories, plus two explanatory paragraphs:

Dr. Varughese's evaluations over the initial portion of her Pathology residency training at Mount Sinai demonstrated satisfactory development in the six Core Competency domains. In some rotations her performance was considered superior by individual attendings, particularly in the areas of patient care (gynecological pathology) and medical knowledge (VA hospital rotations).

However, Dr. Varughese began to exhibit unprofessional behavior and was placed on academic advisement in December 2010, in the middle of her third year of training. While the program advanced Dr. Varughese to her fourth year of training, her substandard performance led the Department Chair to issue her a final warning notice on July 1, 2011. Dr. Varughese's level of professionalism continued to be unsatisfactory and she was summarily suspended pending termination from the program on September 21, 2011. Following Mount Sinai's grievance procedures, Dr. Varughese appealed the termination, but the decision was upheld.

(Docket # 162–6 at 39–40.) The evaluation then checks "no" in response to the prompt "The resident/fellow has demonstrated sufficient competence to enter practice without direct supervision." (*Id.* at 40, 589 N.Y.S.2d 833, 603 N.E.2d 938.)

The only factual assertions in that document are ones with which Varughese does not take issue. They recount what other people thought, the dates of various actions that unquestionably took place, and the results of Varughese's appeals.

What Varughese objects to are the characterizations of her work as "unsatisfactory" "unprofessional" and "substandard." But these are matters of *opinion,* not actionable assertions of fact. *See Tasso v. Platinum Guild Int'l,* No. 94 Civ. 8288, 1998 WL 841489, at *5 (S.D.N.Y. Dec.3, 1998) (finding statements that plaintiff was "unethical, untrustworthy, unprofessional" and "incompetent" to be non-actionable opinion) (citing *Gavenda v. Orleans County,* No. 95–CV–0215E, 1997 WL 65870, at *8, (W.D.N.Y. Feb.10, 1997) (statements that plaintiff was "incompetent," and "there had been problems with her before and she wasn't doing her job right" were non-actionable statements of opinion); *Miller v. Richman,* 184 A.D.2d 191, 592 N.Y.S.2d 201, 203 (App.Div.1992) (statements criticizing plaintiff's performance and comparing her unfavorably to other employees as "one of the wors[t]" nonactionable as a matter of law); 🔖 *Amodei v. N.Y. State Chiropractic Ass'n,* 160 A.D.2d 279, 553 N.Y.S.2d 713, 715–16 (App.Div.1990), *aff'd,* 11 N.Y.2d 891, 77 N.Y.2d 891, 568 N.Y.S.2d 900, 571 N.E.2d 70 (1991) (statement accusing chiropractor of "unprofessional conduct" fails to state an action in defamation); *Hollander v. Cayton,* 145 A.D.2d 605, 606, 536 N.Y.S.2d 790, 792 (App.Div.1988) (statements allegedly made by president of professional staff that plaintiff-physician was "immoral," "unethical," and had "mismanaged cases" were non-actionable)).

**\*75** Moreover, as Judge Daniels has explained, "New York courts have consistently held that subjective job evaluations, including those in connection with an employee's termination, are non-actionable opinion." *Doe v. White Plains Hosp. Med. Ctr. (WPHMC),* No. 10 Civ. 5405, 2011 WL 2899174, at *3 (S.D.N.Y. July 8, 2011) *aff'd sub nom. Doe v. French,* 458 F. App'x 21 (2d Cir.2012) (citing *Williams v. Varig Brazilian Airlines,* 169 A.D.2d 434, 564 N.Y.S.2d 328, 331 (1st Dep't 1991) (memorandum of one supervisor to another and a termination letter from supervisor to Plaintiff are non-actionable opinion); *Ott v. Automatic Connector, Inc.,* 193 A.D.2d 657, 598 N.Y.S.2d 10 (2d Dep't 1993) (unfavorable assessment of work performance in termination letter amounted to a non-actionable expression of opinion). Such statements are non-actionable because "[a]n employer has the right to assess an employee's performance on the job without judicial interference." *Ott,* 193 A.D.2d at 658, 598 N.Y.S.2d 10 (citing *Miller v. Richman,* 184 A.D.2d 191, 592 N.Y.S.2d 201 (4th Dep't 1992); *Williams,* 169 A.D.2d 434, 564 N.Y.S.2d 328; 🔖 *Goldberg v. Coldwell Banker,* 159 A.D.2d 684, 553 N.Y.S.2d 432 (2d Dep't 1990)). While

not a per se rule, courts are reluctant to sustain a claim for defamation for statements made in the context of an employee evaluation or termination because "no workplace ... can operate effectively unless the employers and employee who work there have the ability to speak freely in evaluating the actions of their employees and co-employees." *Albert v. Locksen,* 239 F.3d 256, 268 (2d Cir.2001)).

There is no reason to depart from that rule here. Indeed, Varughese presented testimony from her prospective employer essentially discounting the importance of the Summative Evaluation as a mere opinion. Had RWJ Hospital received it earlier, it would have investigated the underlying *facts.* That testimony merely confirms the wisdom of the rule in New York: end-of-job evaluations are generally not actionable in defamation suits.

Defendants' motion for a summary judgment of dismissal is GRANTED as to Count 14.

**XII. The Motion for Summary Judgment is GRANTED as to Count 21 (Individual Liability against Defendants Cordon–Cardo, Firpo, and Lento).**

As I have found that Varughese cannot withstand summary judgment on any of her claims, no individual liability can attach as to those claims.

The motion for summary judgment is GRANTED as to count 21's claim for individual liability as against defendants Cordon–Cardo, Firpo, Lento and Bleiweiss.

## CONCLUSION

For the foregoing reasons, Defendants' motion for a summary judgment of dismissal as to all counts is GRANTED and the case is dismissed.

The Clerk of the Court is directed to remove Docket No. 161 from the Court's list of pending motions and to close the file.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 1499618

## Footnotes

1    Varughese voluntarily dismissed another count for intentional infliction of emotional distress after Magistrate Judge Francis ordered her to submit to a psychiatric evaluation as a condition of maintaining it. *See* Docket # 45.

2    Only the transcripts were submitted with the motion. By order dated March 13, 2015 (Docket # 215), the Court ordered Varughese to produce the tapes so that I could listen to them myself, rather than merely reading the transcripts or relying on the parties' characterizations of what was said and how. *See Scott v. Harris,* 550 U.S. 372, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (appropriate for a court to take judicial notice of facts regarding intangible circumstances of an encounter preserved in audio-visual recordings if court reviews said recordings).

3    Varughese herself provided this document to the Court in a public filing. *See* Docket # 205–24.

4    In May 2011, after she made this complaint, Varughese was on rotation at the VA Hospital in the Bronx. (Varughese Dep. at 127–128.) McCash was also there. (*Id.*) There is no evidence that he had any supervisory authority over Varughese, and it is undisputed that he and Varughese were kept apart. (*Id.*) While Varughese reports that McCash "glared" at her or "stomped" around her workplace, she did not report this to anyone. (*Id.*)

5    There is no evidence in the record that Schiller had any role in guiding the course of the Department's investigation of the December 8 incident. The record is also devoid of evidence that Schiller had any role in placing Varughese on Academic Advisement.

6    It begins, "Well, we need some honesty and transparency then because, you know, you can't just have one person, you know, saying whatever they want and doing whatever they want, such as on the moonlighting nights-I'm the primary moonlighter, really, then why does the schedule say somebody else is the primary moonlighter? You know, these are issues like, you need to address, like if you are going to have integrity you're going to have integrity across the board, if not, you're not." (*Id.*) It goes on for another paragraph in the transcript.

7    Jordan testified that a doctor's note was required whenever an absence prevented a resident from fulfilling a departmental requirement *or* whenever the resident is out for three or more days (Jordan Dep. at 162); Morency testified that a note was not required unless the absence was longer than three days. (*See* Transcript of Internal Appeal at 158, Docket # 205–31 at 47.) Specifically, Morency was asked whether she ever asked Varughese "for proof ofillness since her absences precluded her from fulfilling a task?" She answers "No, because the policy is you have to miss three consecutive days and she only missed two, so I didn't ask her." (*Id.*)

8    Varughese's claim that the Staff Affairs Committee was a kangaroo court (*see* Varughese 56.1, *passim*), must be assessed in light of her contemporaneous refusal to put any objection to the conduct of the proceedings when those objections could have been addressed.

9    I cannot fault the Hospital for failing to make records available if it did not do so, since this claim has arisen at the last possible moment, long after the close of discovery.

10   Lento appears to have been responsible for Jordan's selection as Chief Resident. Varughese submits only her own conclusory assertions of bias as against him. There is no evidence that McCash had anything to do with the decision, and Schiller was no longer acting as Chair.

11   These facts could also demonstrate that Varughese failed to meet her burden, at McDonnell–Douglas Stage One, of proving, as part of her prima facie case, that she was qualified for the position. It really does not matter, however, whether one analyzes this as a Stage One or a Stage Three issue: there were significant differences between Jordan and Varughese that easily overcame her lesser experience.

12   One might ask whether the hospital's immediate corrective action is enough to save it from liability under the NYCHRL. After all, it immediately removed Varughese from McCash's supervision and separated them moving forward. The answer is no, at least in the context of sexual harassment. *See* ⚑ *Zakrzewska v. New Sch.,* 14 N.Y.3d 469, 477, 902 N.Y.S.2d 838, 928 N.E.2d 1035, 1037–38 (2010). In *Zakrzewska,* the state high court returned to the language of the city statute to find that "the affirmative defense to employer liability articulated in ⚑ *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) and ⚑ *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) [does not] apply to sexual harassment and retaliation claims under section 8–107 of the New York City Administrative Code." *Id.* (answering certified question from the Second Circuit in the negative). Of course, there is no Faragher–Ellerth defense under federal law to claims of discrimination, as opposed to harassment/retaliation CHECK; the pertinence of the Hospital's action is that the employer did not discriminat

13    *McDonnell Douglas,* 411 U.S. at 804; *see also Ellis v. Long Island Rail Road Co.,* No. 05–CV–3847, 2008 WL 838766, at *4 (E.D.N.Y. Mar. 31, 2008) (*citing Collins v. New York City Transit Auth.,* 305 F.3d 113, 119 n. 1 (2d Cir.2002)).

14    The evaluation was shown to persons who were deposed, including Dr. Fyfe of Robert Wood Johnson Hospital, but that is a privileged act, taking place in the context of a lawsuit, where the witness (who was identified by Varughese) was being questioned about whether RWJ would have been willing to employ Varughese if the evaluation had been sent (it had not even been written yet when Varughese was discussing possible employment at RWJ). It is not actionable.

---

End of Document                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 5191394

Only the Westlaw citation is currently available.

United States District Court,

S.D. New York.

Garry RISSMAN, Plaintiff,

v.

Michael CHERTOFF et al., Defendants.

No. 08 Civ. 7352(DC).

|

Dec. 12, 2008.

West KeySummary

**1**    **Civil Rights**    Particular Cases

An airport luggage screener could not maintain an employment discrimination claim since discrimination based on an individual's sexual orientation or perceived sexual orientation was not actionable under federal law. Though individuals may maintain a claim under Title VII for adverse employment actions caused by their lack of conformity to gender stereotypes, the screener did not allege any facts that would support a gender discrimination claim. 42 U.S.C.A. § 2000e et. seq.

20 Cases that cite this headnote

**Attorneys and Law Firms**

Garry Rissman, New York, NY, pro se.

*MEMORANDUM DECISION*

CHIN, District Judge.

**\*1** *Pro se* plaintiff Garry Rissman filed a complaint on August 19, 2008, against defendant Michael Chertoff under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et. seq.,* and for alleged violations of his Fifth Amendment rights under *Bivens v. Six Unknown Agents*

*of the Fed. Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). Upon review of the complaint, I ordered plaintiff to show cause why his Title VII claim for discrimination based on sexual orientation or perceived sexual orientation and his *Bivens* claim should not be dismissed. Plaintiff submitted a response on November 5, 2008. He also filed an amended complaint on November 3, 2008, naming nine additional defendants, and adding a defamation claim against defendant John Allen. As defendants have not answered, plaintiff has the right to file an amended complaint. His amended complaint is accepted, and I consider the merits of the amended complaint.

Plaintiff has now had two opportunities to articulate a claim. Upon review of plaintiff's amended complaint, as well as his November 5, 2008 response to my order to show cause, I am dismissing the amended complaint *sua sponte* for failure to state a claim upon which relief may be granted. My reasons are as follows: first, plaintiff may not maintain a claim for employment discrimination (including any hostile work environment claim) based on his sexual orientation or perceived sexual orientation; second, plaintiff fails to allege sufficient facts to assert a plausible claim for employment discrimination (including hostile work environment) based on race, religion, or age; third, plaintiff's *Bivens* claim is time-barred by the applicable statute of limitations; and fourth, plaintiff's defamation claim is also time-barred by the applicable statute of limitations.

*BACKGROUND*

Plaintiff was employed from September 1, 2002, to July 27, 2004, by the Transportation Security Agency ("TSA") as a passenger and luggage screener at LaGuardia International Airport in Queens, New York. (Am.Compl.¶ 19). He is a white, Jewish, gay male who was 48 years old when he commenced working at TSA. (*Id.* ¶ 21). He contends that during his employment with TSA, he was discriminated against on the basis of his race, religion, age, sexual orientation, and perceived sexual orientation, and he was denied equal protection of the laws. He also contends defendant Allen lied about him during TSA's investigation into his discrimination claims. (*Id.* ¶¶ 34-35).

*DISCUSSION*

**A.** *Pleading Standard*

At the pleadings stage, plaintiff's amended complaint must only satisfy Fed.R.Civ.P. 8(a), which calls for "a short and plain statement of the claim," and allege " 'enough facts to state a claim for relief that is plausible on its face.' " *Patane v. Clark,* 508 F.3d 106, 111-12 (2d Cir.2007) (quoting *Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1975, 167 L.Ed.2d 929 (2007)). A *prima facie* case is not required. *Amron v. Morgan Stanley Inv. Advisors Inc.,* 464 F.3d 338, 343 (2d Cir.2006).

**\*2** Here, neither plaintiff's complaint nor his response to my order to show cause asserts facts sufficient to state a plausible claim for relief. Even according *pro se* plaintiff's amended complaint the leniency it is due and interpreting it "to raise the strongest arguments that [it] suggest[s]," plaintiff's amended complaint fails to state a claim upon which relief can be granted. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (quotations omitted).

## B. *Employment Discrimination*

### 1. *Sexual Orientation Discrimination*

As discussed in my September 22, 2008 order to show cause, employment discrimination and workplace harassment based on an individual's sexual orientation or perceived sexual orientation are not actionable under federal law. *See Dawson v. Bumble & Bumble,* 398 F.3d 211, 217-18 (2d Cir.2005). Though individuals may maintain a claim under Title VII for adverse employment actions caused by their lack of conformity to gender stereotypes, *id.* at 218, plaintiff does not allege any facts that would make out a case for gender discrimination under Title VII. Therefore, plaintiff's claims alleging discrimination and hostile work environment because of his sexual orientation or perceived sexual orientation are dismissed.

### 2. *Race, Religion, Age Discrimination*

Plaintiff's claims of employment discrimination and hostile work environment on the basis of his race, religion, and age are also dismissed for failure to allege facts sufficient to state a plausible claim. Plaintiff alleges a litany of facts regarding his mistreatment by co-workers and supervisors at TSA in LaGuardia Airport. He states that although his work was above average in quality (Am.Compl.¶¶ 36-38), he was frequently reprimanded without justification by his supervisors and co-workers in the presence of others, including passengers (*id.* ¶¶ 27, 44-45, 47, 56, 59). Plaintiff describes specific instances where he was reprimanded without justification, but he does not allege any facts establishing that this mistreatment was prompted by animus towards him because of his race, religion, or age. Disrespectful, harsh, and unfair treatment in the workplace alone does not state a claim for violation of federal employment law. *See Fridia v. Henderson,* No. 99 Civ. 10749(BSJ), 2000 WL 1772779, at \*6 (S.D.N.Y. Nov.30, 2000) ("not every unpleasant matter creates a cause of action"). To be actionable under Title VII or the Age Discrimination in Employment Act (the "ADEA"), abusive conduct in the workplace must have occurred at least in part because of plaintiff's membership in a protected class. *See Holtz v. Rockefeller & Co.,* 258 F.3d 62, 76 (2d Cir.2001); *Brennan v. Metro. Opera Ass'n,* 192 F.3d 310, 318 (2d Cir.1999); *Ford v. New York City Dep't of Mental Health & Hygiene,* 545 F.Supp.2d 377, 393 (S.D.N.Y.2008). The statutes prohibit discrimination; they do not constitute civility codes. *See Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998).

**\*3** The few facts alleged by plaintiff relating to his race or religion do not amount to more than stray remarks made by co-workers and cannot support a plausible claim of hostile work environment. *See Petrosino v. Bell Atl.,* 385 F.3d 210, 223 (2d Cir.2004) ("Simple teasing, offhand comments, or isolated incidents of offensive conduct (unless extremely serious) will not support a claim of discriminatory harassment."). For instance, plaintiff alleges that when he remarked that the Mel Gibson-directed movie *Passion of the Christ* was "the most anti-semitic [sic] movie ever made, one female screener ... said: 'Your Rabbi told you to say this!' " (Am.Compl.¶ 76). Plaintiff also states he heard "many comments to make him feel left out as one of the few non-Hispanic white persons." (*Id.* ¶ 80). Even interpreting these factual allegations "to raise the strongest arguments they suggest," *Graham v. Henderson,* 89 F.3d at 79, they do not state a plausible claim for a hostile work environment "permeated with discriminatory intimidation, ridicule, and insult ... that was sufficiently severe or pervasive to alter the conditions of ... employment" and create an abusive working environment. *Petrosino,* 385 F.3d at 223 (internal quotation marks and citations omitted).

Nor does plaintiff allege a plausible claim that he suffered adverse employment action because of his race, religion, or age. Instead of pleading facts regarding defendants' discriminatory animus, plaintiff merely makes conclusory statements attributing discriminatory intent to defendants' actions. For instance, plaintiff alleges:

> [T]he very fact that Plaintiff was constantly screamed at by TSA employees for being too "thorough" must be the ultimate red flag that he was being discriminated against. Is there any sphere of federal activity where quality work is penalized? If a staff physician at a Veterans' Administration hospital were too "thorough" during surgery and thereby had a zero mortality rate, would he then be penalized or rewarded? Would such a physician receive a recommendation letter? Plaintiff knows from his life experience that such good work would be rewarded. Such a physician would also have been given a very strong recommendation letter without even having to ask.

> Therefore, Plaintiff was discouraged repeatedly from applying for the position for Lead Screener because of his race, religion, and sexual orientation....

(Am.Compl.¶¶ 38-39).

He also alleges:

> No one cared to even listen to Plaintiff's point of view, which is the "reason d'etre" of this suit. The powers that be, [defendants] John Allen and John Ellison already made up their made [sic] before they even spoke to Plaintiff. Not once did they let him speak at length. They badgered and scolded Plaintiff for hours as if he were a terrorist in a poorly written "B" movie script.

> This was the most extreme example of a constant and one-sided harassment of Plaintiff and intentional infliction of a hostile work environment, which was perpetrated by Defendants because of Plaintiff's race, religion and sexual orientation in violation of Title VII and the Fifth Amendment....

**\*4**  (*Id.* ¶¶ 69-70).

Without support, plaintiff concludes that defendants:

> [I]nflicted this hostile work environment upon Plaintiff in a deliberate attempt to induce him to

> resign his employment because they did not want an effeminate, gay, Jewish older white male working together with them in the same team.

(*Id.* ¶ 50). He also speculates he "is certain [defendant Annette Torres] would not have yelled at Plaintiff had he been either heterosexual or an African American as she was." (*Id.* ¶ 58).

In essence, plaintiff alleges that because he was yelled at, this must have been because he was "an effeminate, gay, Jewish older white male." Such conclusory and speculative statements are insufficient. While the court must accept the factual allegations of the complaint as true and draw all reasonable inferences in favor of the plaintiff, *Bernheim v. Litt,* 79 F.3d 318, 321 (2d Cir.1996), "bald contentions, unsupported characterizations, and legal conclusions are not well-pleaded allegations" and are insufficient to state a claim for which relief may be granted. *Gavish v. Revlon, Inc.,* No. 00 Civ. 7291(SHS), 2004 WL 2210269, at \*10 (S.D.N.Y. Sept.30, 2004) (quoting *Citibank, N.A., v. Itochu Int'l Inc.,* No. 01 Civ. 6007(GBD), 2003 WL 1797847, at \*1 (S.D.N.Y. Apr.4, 2003)).

Accordingly, plaintiff's claims alleging violation of his rights under federal employment law are dismissed.

## B. *Bivens* Claim

Plaintiff's *Bivens* claim for violations of his right to equal protection is dismissed because it is time-barred by the applicable statute of limitations. A three-year statute of limitations under New York C.P.L.R. § 214(5) applies to *Bivens* actions brought in federal district court in New York. *Chin v. Bowen,* 833 F.2d 21, 24 (2d Cir.1987). Plaintiff worked as a screener for TSA at LaGuardia International Airport until July 27, 2004. (Am.Compl.¶ 19). The entirety of his *Bivens* claim arises from events that occurred while he was working at the airport.

Accordingly, to the extent that plaintiff's *Bivens* claim is distinct from his statutory employment discrimination claims, it is time-barred. [1] Even assuming any alleged constitutional violations were of a continuing nature that lasted until the date of his departure, plaintiff's *Bivens* claim is time-barred

because he filed this action on August 19, 2008, more than four years after he stopped working at the airport.

## C. *Defamation*

Plaintiff's defamation claim against Allen is also dismissed as time-barred. Under New York law, an action to recover damages for defamation must be commenced within one year of the publication of the allegedly defamatory material. *See* N.Y. C.P.L.R. § 215(3); *Shamley v. ITT Corp.,* 869 F.2d 167, 172 (2d Cir.1989). When the plaintiff actually discovers the publication is not relevant. *See Memory's Garden, Inc. v. D'Amico,* 84 A.D.2d 892, 892, 445 N.Y.S.2d 45 (3d Dep't 1981); *Rand v. New York Times Co.,* 75 A.D.2d 417, 424, 430 N.Y.S.2d 271 (1st Dep't 1980). The cause of action accrues on the date of the utterance.

 **\*5** Plaintiff alleges Allen lied in a written statement he made to a TSA investigator who was investigating plaintiff's employment discrimination claims. (Am.Compl.¶¶ 34-35). The statement was signed by Allen on November 2, 2005, and the report of investigation was submitted December 22, 2005. (*Id.* Ex. B at F-4). Accordingly, any claim plaintiff may have against Allen for making false factual statements is barred by the one-year statute of limitations.

## *CONCLUSION*

For the reasons set forth above, plaintiff's amended complaint is dismissed, with prejudice and without costs. The Clerk of the Court shall enter judgment accordingly and close the case.

SO ORDERED.

## All Citations

Not Reported in F.Supp.2d, 2008 WL 5191394

---

## Footnotes

1    To the extent plaintiff's *Bivens* claim concerns employment discrimination (including hostile work environment) at TSA, Title VII and the ADEA are his exclusive remedies and no *Bivens* cause of action may lie. *See Brown v. Gen. Servs. Admin.,* 425 U.S. 820, 835, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976) (holding Title VII to be the "exclusive judicial remedy for claims of discrimination in federal employment"); *Briones v. Runyon,* 101 F.3d 287, 289 (2d Cir.1996) ("Title VII is the exclusive remedy for discrimination by the federal government on the basis of race, religion, sex, or national origin."); *Bumpus v. Runyon,* No. 94 Civ. 2570(DC), 1997 WL 154053, at *4 (S.D.N.Y. April 2, 1997) ("ADEA provides the exclusive remedy for federal employees who allege age discrimination.").

---

End of Document                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 2394116
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Elaine Williams BETHEA, Plaintiff,

v.

NYCHA LAW DEPARTMENT, Defendant.

23-CV-0803 (LTS)
|
Signed March 6, 2023

**Attorneys and Law Firms**

Elaine Williams Bethea, New York, NY, Pro Se

### ORDER OF DISMISSAL

LAURA TAYLOR SWAIN, Chief United States District Judge:

**\*1** Plaintiff, who is appearing *pro se*, invokes the court's federal question jurisdiction, alleging that Defendant "NYCHA Law Department" violated her rights. By order dated February 15, 2023, the Court granted Plaintiff's request to proceed *in forma pauperis* (IFP), that is, without prepayment of fees. For the reasons set forth below, the Court grants dismisses the complaint, but grants Plaintiff 30 days' leave to replead her claims in an amended complaint.

### STANDARD OF REVIEW

The Court must dismiss an IFP complaint, or any portion of the complaint, that is frivolous or malicious, fails to state a claim on which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2)(B); *see* Livingston v. Adirondack Beverage Co., 141 F.3d 434, 437 (2d Cir. 1998). The Court must also dismiss a complaint when the Court lacks subject matter jurisdiction of the claims raised. *See* Fed. R. Civ. P. 12(h)(3).

While the law mandates dismissal on any of these grounds, the Court is obliged to construe *pro se* pleadings liberally, Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009), and

interpret them to raise the "strongest [claims] that they suggest," Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 474 (2d Cir. 2006) (internal quotation marks and citations omitted) (emphasis in original). But the "special solicitude" in *pro se* cases, id. at 475 (citation omitted), has its limits – to state a claim, *pro se* pleadings still must comply with Rule 8 of the Federal Rules of Civil Procedure, which requires a complaint to make a short and plain statement showing that the pleader is entitled to relief.

Rule 8 of the Federal Rules of Civil Procedure requires a complaint to include enough facts to state a claim for relief "that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). A claim is facially plausible if the plaintiff pleads enough factual detail to allow the Court to draw the inference that the defendant is liable for the alleged misconduct. In reviewing the complaint, the Court must accept all well-pleaded factual allegations as true. Ashcroft v. Iqbal, 556 U.S. 662, 678-79 (2009). But it does not have to accept as true "[t]hreadbare recitals of the elements of a cause of action," which are essentially just legal conclusions. Twombly, 550 U.S. at 555. After separating legal conclusions from well-pleaded factual allegations, the Court must determine whether those facts make it plausible – not merely possible – that the pleader is entitled to relief. Id.

### BACKGROUND

Plaintiff brings her claims using the court's general complaint form. She checks the box to invoke the court's federal question jurisdiction and, in response to the question asking which of her federal constitutional or federal statutory rights have been violated, writes "Discrimination under the Fair Housing policy. Intimidation, Racism[.]" [1] (ECF 2, at 2.) She alleges that the events giving rise to her claims occurred at an address in New York, New York, from "June 2001 to Present." (*Id.* at 5.)

**\*2** The following allegations are taken from the complaint. In 2001, Plaintiff was selected for a two-bedroom apartment at the Robert Fulton Houses. (*Id.*) She was selected for the apartment under a "Class Action suit." (*Id.*) However, Plaintiff "was not given that selection at all." (*Id.*) She instead was placed in a one-bedroom apartment in which she continues to reside with her grandson.

"Another material issue of fact" is that the "tenant selection and assignment plan" (TSAP) "is designed to 'ensure' the housing Authority processes applications and transfer requests in a 'fair' and 'objective' manner in accordance with applicable Federal Law and regulations," which Plaintiff maintains she was "never afforded ... twenty-one years ago!" (*Id.*) (quotation marks and emphasis in original).

She asks the Court to "please explain to [her] why a waiting List Annual canvass case #62756, after twent[y]-one years is being offered to [her] now[.]" (*Id.* at 6) (emphasis in original). She further asks,

> if the TSAP is designed to "Ensure" the housing authority processes applications in a fair and objective manner in accordance with applicable Federal Law and regulations[,] why didn't they do so, and if they had done so, would I have sustained a devastating slip and fall, which ended me up in the hospital having emergency spine surgery and paralized during the pandemic??

(*Id.*)

Plaintiff describes her injuries as the following:

> Hospitalized five days, Mold and Mildew, awful odor for months, leaking water from radiator in living room Quality of air in apartment unsafe as per health inspector taking grandson back and forth to emergency and Pediatrician or asthma. Sleeping with front door to apartment open to remove the awful odor for months. The Brown water from all areas in apartment faucets.

(*Id.*)

Plaintiff does not specify the relief she is seeking.

## DISCUSSION

### A. Fair Housing Act

Because Plaintiff states that she experienced discrimination, intimidation, and racism, (*see* ECF 2, at 2), the Court construes the complaint as attempting to assert claims under the Fair Housing Act (FHA), 42 U.S.C. § 3604.[2] The FHA "broadly prohibits discrimination in housing." *Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91, 93 (1979). Specifically, it prohibits discrimination "against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status ... national origin," or disability. 42 U.S.C.§ 3604(b), (f). The FHA also prohibits retaliation against persons who have asserted their rights under the FHA. *See id.* § 3617 (unlawful "to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by [among others, §§ 3604 and 3605] of this title").

Here, Plaintiff does not allege any facts suggesting a violation of the FHA. She does not allege that (1) Defendant did anything to discriminate against her based on her race, (2) she exercised her rights under the FHA, or that (2) Defendant coerced, intimidated, or threatened her, or interfered with her exercise of those rights because of her race. *See* 42 U.S.C. § 3604, 3617. In fact, nowhere in the complaint does Plaintiff specify her race. Rather, Plaintiff alleges that, in 2001, she was "approved and selected" for a two-bedroom apartment, but she was instead given a one-bedroom apartment. Because Plaintiff does not allege any facts plausibly suggesting that Defendant subjected her to discrimination or retaliation in housing on the basis of any impermissible factor, she fails to state a claim under the FHA. The Court therefore dismisses Plaintiff's claims under the FHA for failure to state a claim on which relief may be granted. *See* 28 U.S.C. § 1915(e)(2)(B)(ii).

**\*3** Because Plaintiff asserts that Defendant discriminated against her on the basis of her race, however, the Court, in an abundance of caution, grants her 30 days' leave to file an amended complaint in which she alleges additional

facts suggesting an FHA claim. If Plaintiff files an amended complaint, the pleading should include specific facts describing how a named defendant discriminated against Plaintiff in housing because of her race.

Plaintiff's amended complaint should also address timeliness of her FHA claims. A civil action under the FHA may be brought no "later than 2 years after the occurrence or the termination of an alleged discriminatory housing practice." 42 U.S.C. § 3613(a). Under the continuing violation doctrine, when an unlawful practice "continues into the limitations period, the complaint is timely" if the last alleged practice is within the two-year statutory period. *Havens v. Coleman*, 455 U.S. 363, 380 (1982). "A continuing violation may be found where there is proof of specific ongoing discriminatory policies or practices, or where specific and related instances of discrimination are permitted ... to continue unremedied for so long as to amount to a discriminatory policy or practice." *Tejada v. Little City Realty LLC*, 308 F. Supp. 3d 724, 730 (E.D.N.Y. 2018) (relying on *Cornwell v. Robinson*, 23 F.3d 694 (2d Cir. 1994)).

Here, Plaintiff alleges that she was denied a two-bedroom apartment in 2001, 21 years before she filed this action. She also alleges, however, that the events giving rise to her claims are continuing to the present. If Plaintiff files an amended complaint, she should clearly state when any alleged discrimination occurred and allege any facts suggesting that any such discrimination continued beyond the two-year statutory limitations period so that her claims are timely under the continuing violation doctrine.

**B. Constitutional claims under Section 1983**

Plaintiff also may be attempting to assert constitutional claims under 42 U.S.C. § 1983. To state a claim under Section 1983, a plaintiff must allege both that: (1) a right secured by the Constitution or laws of the United States was violated, and (2) the right was violated by a person acting under the color of state law, or a "state actor." *West v. Atkins*, 487 U.S. 42, 48-49 (1988).

In the "injuries" section of the complaint, Plaintiff alleges that her apartment had mold and mildew, an "awful odor," water leaking from the radiator, and brown water coming from the faucets. (*See* ECF 2, at 6.) To the extent Plaintiff is seeking to hold Defendant responsible for inadequate conditions in her apartment, she fails to state a claim for relief. Courts

have long held that there is no constitutional right to adequate or safe housing. *See Lindsay v. Normet*, 405 U.S. 56, 74 (1972) ("We do not denigrate the importance of decent, safe, and sanitary housing. But the Constitution does not provide judicial remedies for every social and economic ill. We are unable to perceive in [the constitution] any guarantee of access to dwellings of particular quality .... Absent constitutional mandate, the assurance of adequate housing ... [is a] legislative, not judicial, function[ ]"); *Paige v. New York City Hous. Auth.*, No. 17-CV-7481, 2018 WL 3863451, at *11 (S.D.N.Y. Aug. 4, 2018) ("Defendants' failure to prevent lead paint poisoning is not tantamount to a violation of substantive due process. So too, it is not enough to allege that Defendants' 'stood by and did nothing.' ") (citation omitted); *Richardson v. City of New York*, No. 12-CV-2545, 2013 WL 2124176, at *2 (S.D.N.Y. Apr. 17, 2013) (holding there is no "government obligation to provide adequate housing") (citation omitted); *see also Allen v. New York City Hous. Auth.*, No. 10-CV-0168, 2012 WL 4794590, at *8 (S.D.N.Y. Sept. 11, 2012) (rejecting due process claims arising from NYCHA's failure to address mold). The Court therefore dismisses any Section 1983 claims related to the conditions in her apartment that Plaintiff may be asserting for failure to state a claim on which relief may be granted. *See* 28 U.S.C. § 1915(e)(2)(B)(ii).

**C. Claims under state law**

**\*4** Plaintiff's assertions may implicate claims under state law. A district court may decline to exercise supplemental jurisdiction over state law claims when it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). Generally, "when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)). Having dismissed the federal claims of which the Court has original jurisdiction, the Court declines to exercise its supplemental jurisdiction of any state-law claims Plaintiff may be asserting. *See Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) ("Subsection (c) of § 1367 'confirms the discretionary nature of supplemental jurisdiction by enumerating the circumstances in which district courts can refuse its exercise.' ") (quoting *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997)).

#### D. Federal Rule of Civil Procedure 5.2

Under Rule 5.2(a)(3) of the Federal Rules of Civil Procedure, court submissions that refer to the name of a minor child must do so by using only the child's name's initials. *See* Fed. R. Civ. P. 5.2(a)(3). Plaintiff, in her complaint, appears to reveal the full name of a minor child. Thus, in an abundance of caution, the Court has directed the Clerk of Court to restrict electronic access to that submission to a "case participant-only" basis. If Plaintiff files an amended complaint, she must comply with Rule 5.2 by referring to any minor child using only that child's initials.

### LEAVE TO AMEND

Plaintiff proceeds in this matter without the benefit of an attorney. District courts generally should grant a self-represented plaintiff an opportunity to amend a complaint to cure its defects, unless amendment would be futile. *See* Hill v. Curcione, 657 F.3d 116, 123-24 (2d Cir. 2011); Salahuddin v. Cuomo, 861 F.2d 40, 42 (2d Cir. 1988). Indeed, the Second Circuit has cautioned that district courts "should not dismiss [a *pro se* complaint] without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." Cuoco v. Moritsugu, 222 F.3d 99, 112 (2d Cir. 2000) (quoting Gomez v. USAA Fed. Sav. Bank, 171 F.3d 794, 795 (2d Cir. 1999)). Because Plaintiff may be able to allege additional facts to state a valid FHA claim, the Court grants Plaintiff 30 days' leave to file an amended complaint detailing her claims.

In the "Statement of Claim" section of the amended complaint form, Plaintiff must provide a short and plain statement of the relevant facts supporting each claim against each defendant. If Plaintiff has an address for any named defendant, Plaintiff must provide it. Plaintiff should include all of the information in the amended complaint that Plaintiff wants the Court to consider in deciding whether the amended complaint states a claim for relief. That information should include:

    a) the names and titles of all relevant people;

    b) a description of all relevant events, including what each defendant did or failed to do, the approximate date and time of each event, and the general location where each event occurred;

    c) a description of the injuries Plaintiff suffered; and

    d) the relief Plaintiff seeks, such as money damages, injunctive relief, or declaratory relief.

Essentially, Plaintiff's amended complaint should tell the Court: who violated her federally protected rights and how; when and where such violations occurred; and why Plaintiff is entitled to relief.

Because Plaintiff's amended complaint will completely replace, not supplement, the original complaint, any facts or claims that Plaintiff wants to include from the original complaint must be repeated in the amended complaint.

### CONCLUSION

**\*5** The Court dismisses Plaintiff claims under the FHA and Section 1983 for failure to state a claim on which relief may be granted. *See* 28 U.S.C. § 1915(e)(2)(B)(ii).

The Court declines to exercise supplemental jurisdiction of any state law claims Plaintiff may be asserting. *See* 28 U.S.C. § 1367(c)(3).

The Court grants Plaintiff 30 days' leave to replead her claims under the FHA in an amended complaint, as described above.

Plaintiff must submit the amended complaint to this Court's Pro Se Intake Unit within sixty days of the date of this order, caption the document as an "Amended Complaint," and label the document with docket number 23-CV-0803 (LTS). An Amended Complaint form is attached to this order. No summons will issue at this time.

If Plaintiff does not file an amended complaint within the time allowed, or cannot show good cause as to why to excuse such failure, the Court will enter judgment: (1) dismissing Plaintiff's claims under federal law for failure to state a claim on which relief may be granted, *see* 28 U.S.C. § 1915(e)(2)(B)(ii), and; (2) declining to consider, under the Court's supplemental jurisdiction, any claims Plaintiff may be asserting under state law, *see* 28 U.S.C. § 1367(c)(3).

The Court certifies under 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore IFP status is denied for the purpose of an appeal. *Cf.*

*Coppedge v. United States*, 369 U.S. 438, 444-45 (1962) (holding that an appellant demonstrates good faith when he seeks review of a nonfrivolous issue).

SO ORDERED.

### Attachment

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____    ____ Civ. _____ ( ____ )

*(In the space above enter the full name(s) of the plaintiff(s).)*

**AMENDED
COMPLAINT**

-against-

_____    Jury Trial: ☐ Yes  ☐ No
_____          *(check one)*
_____
_____
_____
_____
_____

*(In the space above enter the full name(s) of the defendant(s). If you cannot fit the names of all of the defendants in the space provided, please write "see attached" in the space above and attach an additional sheet of paper with the full list of names. The names listed in the above caption must be identical to those contained in Part I. Addresses should not be included here.)*

**I.    Parties in this complaint:**

A.    List your name, address and telephone number. If you are presently in custody, include your identification number and the name and address of your current place of confinement. Do the same for any additional plaintiff named. Attach additional sheets of paper as necessary.

Plaintiff    Name _____
            Street Address _____
            County, City _____
            State & Zip Code _____
            Telephone Number _____

B.    List all defendants. You should state the full name of the defendant, even if that defendant is a government agency, an organization, a corporation, or an individual. Include the address where each defendant may be served. Make sure that the defendant(s) listed below are identical to those contained in the above caption. Attach additional sheets of paper as necessary.

*Rev. 12/2009*                                 1

Defendant No. 1    Name _____
                   Street Address _____
                   County, City _____
                   State & Zip Code _____
                   Telephone Number _____

Defendant No. 2    Name _____
                   Street Address _____
                   County, City _____
                   State & Zip Code _____
                   Telephone Number _____

Defendant No. 3    Name _____
                   Street Address _____
                   County, City _____
                   State & Zip Code _____
                   Telephone Number _____

Defendant No. 4    Name _____
                   Street Address _____
                   County, City _____
                   State & Zip Code _____
                   Telephone Number _____

**II.    Basis for Jurisdiction:**

Federal courts are courts of limited jurisdiction. Only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties. Under 28 U.S.C. § 1331, a case involving the United States Constitution or federal laws or treaties is a federal question case. Under 28 U.S.C. § 1332, a case in which a citizen of one state sues a citizen of another state and the amount in damages is more than $75,000 is a diversity of citizenship case.

A.    What is the basis for federal court jurisdiction? *(check all that apply)*
      ☐ Federal Questions        ☐ Diversity of Citizenship

B.    If the basis for jurisdiction is Federal Question, what federal Constitutional, statutory or treaty right is at issue? _____
      _____
      _____

C.    If the basis for jurisdiction is Diversity of Citizenship, what is the state of citizenship of each party?
      Plaintiff(s) state(s) of citizenship _____
      Defendant(s) state(s) of citizenship _____

*Rev. 12/2009*                                 2

**III.    Statement of Claim:**

State as briefly as possible the facts of your case. Describe how each of the defendants named in the caption of this complaint is involved in this action, along with the dates and locations of all relevant events. You may wish to include further details such as the names of other persons involved in the events giving rise to your claims. Do not cite any cases or statutes. If you intend to allege a number of related claims, number and set forth each claim in a separate paragraph. Attach additional sheets of paper as necessary.

A.    Where did the events giving rise to your claim(s) occur? _____

B.    What date and approximate time did the events giving rise to your claim(s) occur? _____

C.    Facts: _____

What
happened
to you?    _____
           _____

Who did
what?      _____
           _____

Was anyone
else
involved?  _____

Who else
saw what
happened?  _____
           _____

**IV.    Injuries:**

If you sustained injuries related to the events alleged above, describe them and state what medical treatment, if any, you required and received.
_____
_____
_____
_____
_____

*Rev. 12/2009*                                 3

**V.     Relief:**

State what you want the Court to do for you and the amount of monetary compensation, if any, you are seeking, and the basis for such compensation. _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

**I declare under penalty of perjury that the foregoing is true and correct.**

Signed this ___ day of _____, 20___.

Signature of Plaintiff     _____

Mailing Address           _____

                          _____

                          _____

Telephone Number          _____

Fax Number *(if you have one)*   _____

**Note:**  All plaintiffs named in the caption of the complaint must date and sign the complaint.  Prisoners must also provide their inmate numbers, present place of confinement, and address.

**For Prisoners:**

I declare under penalty of perjury that on this _____ day of _____, 20___, I am delivering this complaint to prison authorities to be mailed to the *Pro Se* Office of the United States District Court for the Southern District of New York.

Signature of Plaintiff     _____

Inmate Number              _____

*Rev. 12/2008*                              4

**All Citations**

Slip Copy, 2023 WL 2394116

---

### Footnotes

1       The Court quotes from the complaint verbatim. All spelling, punctuation, and grammar are as in the original unless otherwise indicated.

2       The Court assumes for the purposes of this order that the FHA covers Plaintiff's residence. *See* 🚩42 U.S.C. § 3604(b) (defining "dwelling," in part, as a "building" that is "occupied as ... a residence by one or more families").

---

**End of Document**                         © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 5:22-cv-01202-MAD-ML    Document 8    Filed 03/28/23    Page 183 of 364

DeSouza v. Park West Apartments, Inc., Not Reported in Fed. Supp. (2018)

KeyCite Yellow Flag - Negative Treatment

On Reconsideration  DeSouza v. Park West Apartments, Inc.,   D.Conn.,
October 11, 2018

2018 WL 2990099
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Hailee R. DESOUZA, Plaintiff,

v.

PARK WEST APARTMENTS, INC. et al., Defendant.

No. 3:15-CV-01668 (MPS)
|
Signed 06/14/2018

**Attorneys and Law Firms**

Hailee R. DeSouza, Vernon, CT, pro se.

Allison P. Dearington, Edward M. Richters, Jackson Lewis—
P.C., Hartford, CT, for Defendant.

**RULING ON MOTION FOR SUMMARY JUDGMENT**

Michael P. Shea, U.S.D.J.

**I. Introduction**

 **\*1**  Hailee R. DeSouza ("DeSouza") brings this suit[1]
against his landlord, Park West Apartments, Inc., and The
Community Builders, Inc., the nonprofit corporation that
controls it (collectively "Park West").[2] DeSouza chiefly
claims that Park West racially discriminated and retaliated
against him by repeatedly attempting to evict him. He also
claims that Park West violated his privacy rights by informing
other tenants of the eviction proceedings and that Park West's
former property manager, Kim Doughtie, falsely accused him
of sexually assaulting her daughter and granddaughter. He
sets out claims against Park West for: (i) race discrimination
and retaliation in violation of the Fair Housing Act ("FHA")
(Counts 1, 2, and 3); (ii) violation of the First Amendment
(Count 4); (iii) violation of the Fourth Amendment (Count
5); (iv) interference, coercion or intimidation in violation of
42 U.S.C. § 3617 of the FHA (Count 6); (v) discrimination
and retaliation in violation of  42 U.S.C. § 1981 (Count 7);
(vi) violation of the Privacy Rights Act of 1974,  5 U.S.C.
§ 552a ("Privacy Act") (Count 8); and (vii) common law

slander and intentional infliction of emotional distress for Ms.
Doughtie's alleged false sexual assault allegation[3] (Count 9).
(*See* ECF No. 100-2 at 17-19).

Park West now moves for summary judgment on all counts.
(ECF No. 128). For the reasons set forth below, Park
West's motion for summary judgment is GRANTED IN
PART AND DENIED IN PART. The motion is denied with
respect to the portion of DeSouza's retaliation claims under
the FHA concerning Park West's filing of an affidavit of
noncompliance in March of 2015 (Counts 1, 2, 3, 6), and
granted with respect to the remainder of his claims.

**II. Factual Background**

**a. Eviction Proceedings**
The following facts, which are taken from the parties' Local
Rule 56(a) Statements and the exhibits, are undisputed unless
otherwise indicated. DeSouza applied to rent and received a
"Section 8 assisted two bedroom apartment with a basement
at Park West" "approximately [thirteen] years ago." (ECF
No. 130, Defendant's Local Rule 56(a)1 Statement ("Def.'s
L.R. 56(a)1 Stmt.") at ¶ 4); (ECF No. 151-1, Plaintiff's Local
Rule 56(a)2 Statement ("Pl.'s L.R. 56(a)2 Stmt.") at ¶ 4.)
Although DeSouza received several "KAPA letters"—i.e.,
pre-termination notices provided in cases of lease violations
—and notices to quit prior to the events underlying this
case, he remained in his apartment continuously through the
beginning of 2014. (Def.'s L.R. 56(a)1 Stmt. at ¶¶ 9-10, 13,
41; Pl.'s L.R. 56(a)2 Stmt. at ¶¶ 9-10, 13, 41.)[4]

 **\*2**  In January of 2014, DeSouza attained a position with
"Swift Worldwide as a senior project engineer." (Def.'s L.R.
56(a)1 Stmt. at ¶ 6; Pl.'s L.R. 56(a)2 Stmt. at ¶ 6.) He
retained this position until April of 2014. (*Id.*) Given his
change in income upon attaining this position, DeSouza
had to "complete an interim recertification" to retain his
Section 8 subsidy. (Def.'s L.R. 56(a)1 Stmt. at ¶ 7; Pl.'s L.R.
56(a)2 Stmt. at ¶ 7.) Here, the parties' accounts diverge. Park
West contends that DeSouza did not complete the interim
recertification process, and that it issued a KAPA letter to
him "on or about March 3, 2014 advising him that he had
to recertify in accordance with his lease requirements within
35 days" to prevent the termination of his rental agreement.
(Def.'s L.R. 56(a)1 Stmt. at ¶ 8.) DeSouza avers that the
interim recertification process "only require[d] him to report
his new income" and that he performed this obligation. (Pl.'s
L.R. 56(a)2 Stmt. at ¶ 8.) DeSouza did not take any further

steps to complete the recertification in accordance with Park West's directives within the thirty-five day period; Park West subsequently issued him a Notice to Quit on April 22, 2014. (Def.'s L.R. 56(a)1 Stmt. at ¶¶ 11-12; Pl.'s L.R. 56(a)2 Stmt. at ¶¶ 11-12.)

On June 12, 2014, DeSouza received an eviction notice for failing to complete the recertification process in violation of his lease. (Def.'s L.R. 56(a)1 Stmt. at ¶ 14; Pl.'s L.R. 56(a)2 Stmt. at ¶ 14.) He retained a lawyer, Edward Taiman, to represent him in the eviction action. (Def.'s L.R. 56(a)1 Stmt. at ¶ 15; Pl.'s L.R. 56(a)2 Stmt. at ¶ 15.) The parties' accounts once again split off regarding the subsequent eviction proceedings. Park West avers that the parties successfully mediated the matter with a housing court mediator on August 29, 2014, resulting in the execution of an Agreement providing, among other things, that DeSouza agreed to "complete the recertification process." (Def.'s L.R. 56(a)1 Stmt. at ¶¶ 17-18.) DeSouza recounts a more complex version of events, averring that Park West conspired with the housing mediator—who falsely posed as the Superior Court judge's secretary—in coercing DeSouza to sign the stipulated agreement. (Pl.'s L.R. 56(a)2 Stmt. at ¶¶ 17-18) (averring that DeSouza "was acting on coerced-induced-made-to-believe orders as coming from defendants [sic] criminally and [falsely] imaginary created non-existent UFO eviction court judge with unlawful fabricated inducted [sic] orders, with already falsely made-up crafted instructions, already falsely made-up crafted directives, of defendants['] purported stipulation agreement" (emphases omitted) (some internal quotation marks omitted).) [5] In any event, the Stipulated Agreement—which was signed by each of the parties—provided in relevant part that DeSouza "agrees to complete the recertification process" on "September 3, 2014" and that "[b]oth parties shall be respectful and courteous to one another." (*See* ECF No. 130-8, Exhibit H, at 2 ("Stipulated Agreement").) The latter language was added based on DeSouza's recommendation. (Def.'s L.R. 56(a)1 Stmt. at ¶ 19; Pl.'s L.R. 56(a)2 Stmt. at ¶ 19.)

The parties' September 3, 2014 recertification meeting went poorly. During the meeting, Park West staff asked several times whether DeSouza was recording them. (Def.'s L.R. 56(a)1 Stmt. at ¶ 21; Pl.'s L.R. 56(a)2 Stmt. at ¶ 21.) DeSouza responded several times that "I do not answer to you" and refused to confirm one way or another whether he was recording the meeting. [6] (*Id.*; *see also* ECF No. 130-9 at 1, Exhibit I ("Exhibit I") (audio recording of the proceeding filed manually with the Court).) Park West subsequently filed

with the Superior Court "an Affidavit of non-compliance with the stipulation on September 4, 2014." (Def.'s L.R. 56(a)1 Stmt. at ¶ 22; Pl.'s L.R. 56(a)2 Stmt. at ¶ 22.) The affidavit noted as follows:

> **\*3** On August 27, 2014 [7] [the] parties entered into a stipulated agreement. The parties agreed that a recertification will [sic] take place on Wednesday, September 3, 2014 between 12:00 p.m. and 1:00 p.m. Both parties shall be respectful and courteous to one another. The defendant came to the plaintiff's office for recertification at the time stated in paragraph 4 [of the Stipulated Agreement]. It was noticed that recording devices were being used by him and his son. We asked if we were being recorded. Mr. [DeSouza] son [sic] nodded his head yes but Mr. [DeSouza] [sic] refused to tell us. He said I do not answer to you over and over. He became loud, volatile and scary. We fear him [sic] and asked him to leave.

(ECF No. 130-10, Exhibit J at 2 ("First Affidavit of Noncompliance").) A "hearing was held [on the matter] before Superior Court Judge Rupal Shah on September 12, 2014." (Def.'s L.R. 56(a)1 Stmt. at ¶ 23; Pl.'s L.R. 56(a)2 Stmt. at ¶ 23.) Judge Shah reserved decision at the conclusion of the hearing and never issued an order. (Def.'s L.R. 56(a)1 Stmt. at ¶ 25; Pl.'s L.R. 56(a)2 Stmt. at ¶ 26.)

On December 16, 2014, "as [DeSouza] still had not completed his recertification, ... he was served with a Notice of Intent to Remove Subsidy, which notified [DeSouza] that he would be required to pay a [Department of Housing and Urban Development ("HUD")] approved market rent for his unit." (Def.'s L.R. 56(a)1 Stmt. at ¶ 26; Pl.'s L.R. 56(a)2 Stmt. at ¶ 26.; *see also* ECF No. 130-12, Exhibit L at 2 ("Notice of Intent to Remove Subsidy").) Temporary Staffing Resources ("TSR"), which had helped DeSouza obtain employment in November of 2014, "ultimately verified his income on or about December 29, 2014 via [an] Employment Verification form sent by Park West to TSR." [8] (Def.'s L.R. 56(a)1

Case 5:22-cv-01202-MAD-ML   Document 8   Filed 03/28/23   Page 185 of 364

DeSouza v. Park West Apartments, Inc., Not Reported in Fed. Supp. (2018)

Stmt. at ¶ 28; Pl.'s L.R. 56(a)2 Stmt. at ¶ 28.) Since the information supplied by TSR demonstrated that DeSouza "was earning $69 per hour, Park West advised [him] on January 14, 2015, that his HUD subsidy had been terminated effective December 1, 2014, and [that] his new rent would be $1352.00 per month." (Def.'s L.R. 56(a)1 Stmt. at ¶ 29; Pl.'s L.R. 56(a)2 Stmt. at ¶ 29.) While Park West contends that the "HUD rent schedule indicates that the unsubsidized rent for a two-bedroom unit with a basement is $1352.00 per month" (Def.'s L.R. 56(a)1 Stmt. at ¶ 30 (citing ECF No. 130-15, Exhibit O at 2(HUD rent schedule for low income housing indicating that the "Rent Per Unit" for a "2 Bedroom, w/ Basement" apartment was $1,352) ) ), DeSouza argues that he should have been able to rent the unit for $989 per month— the rate that he contends was advertised to the general public. (See Pl.'s L.R. 56(a)2 Stmt. at ¶ 30 (citing ECF No. 151-8, Plaintiff's Exhibit ("Pl.'s Exh.") 54 at 12 (advertising "2 BR Market With Basement $989/month H/HW Included") ).)

**\*4** After DeSouza refused to pay the $1,352 rent, Park West subsequently "filed a second Affidavit of noncompliance with the [Stipulated Agreement] on March 11, 2015" "[d]ue to his failure to pay the increased rent, and because he had repeatedly referred to Ms. Doughtie in grossly disparaging terms...."[9] (Def.'s L.R. 56(a)1 Stmt. at ¶¶ 31-32; Pl.'s L.R. 56(a)1 Stmt. at ¶¶ 31-32.)[10] In the affidavit, Park West avers that DeSouza's use of discourteous language directed toward itself and Kim Doughtie, a Park West manager, violated part five of the parties' Stipulated Agreement. (See ECF No. 130-17 at 2, Exhibit Q, Affidavit of Noncompliance ("Second Affidavit of Noncompliance").) Park West noted in the affidavit that DeSouza had used various epithets to refer to it and had, amongst other discourtesies, compared Ms. Doughtie to Charles Manson and Susan Smith, a woman who had drowned her two young children in South Carolina.[11] (See id.)

**\*5** Judge Prats of the Superior Court subsequently held hearings on March 27, 2015 and April 24, 2015. (Def.'s L.R. 56(a)1 Stmt. at ¶ 33; Pl.'s L.R. 56(a)2 Stmt. at ¶ 33.) She issued a Memorandum of Decision on June 22, 2015. (See ECF No. 130-18, Exhibit R, Memorandum of Decision In Re: Affidavit of Noncompliance Dated August 29, 2014 ("Memorandum of Decision").) In this memorandum, she found "that [Park West] ha[d] proved by a preponderance of the evidence that [DeSouza] did in fact violate paragraph three of the [Stipulated Agreement], by not paying the use and occupancy at the higher rate once he no longer qualified for the [Section 8] subsidy." (Id. at 3.) She noted, however,

that Park West had proven a violation of paragraph four of the Stipulated Agreement—i.e., the paragraph requiring him to complete the recertification process—"only in part, because it was not clear from the record that Mr. DeSouza's failure to complete the recertification process was truly willful." (Id.) With regard to the increased rent of $1,352 per month charged to DeSouza, Judge Prats concluded that such rent was not excessive, as DeSouza had argued, but rather in accordance with the rent schedules proffered by Park West. (See id. at 3-4.) She therefore concluded that DeSouza was obligated to pay that amount for the months he was employed.[12] (Id. at 4.) Judge Prats found that Park West had failed to prove by a preponderance of the evidence that DeSouza had committed any other violations of the Stipulated Agreement. (Id. at 5.)

DeSouza paid the outstanding arrearage to Park West in July of 2015 in compliance with Judge Prats' order. (Def.'s L.R. 56(a)1 Stmt. at ¶ 37; Pl.'s 56(a)2 Stmt. at ¶ 37.) Since that time, DeSouza has continued to live in his apartment.[13] (Def.'s L.R. 56(a)1 Stmt. at ¶¶ 41-43; Pl.'s 56(a)2 Stmt. at ¶¶ 41-43.) He currently pays only $25.00 per month for utilities and nothing in rent. (Def.'s L.R. 56(a)1 Stmt. at ¶¶ 43-44; Pl.'s L.R. 56(a)2 Stmt. at ¶¶ 43-44.)

### b. DeSouza's HUD Complaints

On February 18, 2014, DeSouza filed a complaint with HUD offices in Washington, DC, and Boston, Massachusetts. (Def.'s L.R. 56(a)1 Stmt. at ¶ 45; Pl.'s L.R. 56(a)2 Stmt. at ¶ 45.) The complaint recounted a variety of DeSouza's disputes with Park West staff, alleging among other things that Park West management had informed him that they wanted him to leave his apartment. (See ECF No. 130-21, Exhibit U, February 18, 2014 Complaint to HUD ("February Complaint").) Park West avers that it was "not copied on the February 18, 2014 complaint, and [that] there is no evidence that [it was] put on notice of the complaint prior to sending [DeSouza] the Notice to Quit." (Def.'s L.R. 56(a)1 Stmt. at ¶ 46.) DeSouza denies this statement. (Pl.'s L.R. 56(a)2 Stmt. at ¶ 46.) DeSouza sent another copy of this letter to HUD offices in Washington and Boston on March 18, 2014. (Def.'s L.R. 56(a)1 Stmt. at ¶¶ 47-48; Pl.'s L.R. 56(a)2 Stmt. at ¶¶ 47-48; ECF No. 130-22, Exhibit V, March 18, 2014 Complaint to HUD ("March Complaint").) As with the previous complaint, the parties dispute whether Park West received a copy of the letter prior to issuing its notice to quit to DeSouza in April of 2014. (Compare Def.'s L.R. 56(a)1 Stmt. at ¶ 49 (averring that Park West was not copied on the March 18, 2014 letter and did not receive a copy prior to issuing its notice to quit

to DeSouza) *with* Pl.'s L.R. 56(a)2 Stmt. at ¶ 49 (denying that proposition).)

On April 23, 2014—the day he received a notice to quit—DeSouza "mailed a document containing three questions" to various HUD personnel and Park West. (Def.'s L.R. 56(a)1 Stmt. at ¶ 50; Pl.'s L.R. 56(a)2 Stmt. at ¶ 50.) Two of the questions concerned Park West's conduct during the recertification process, while the other asked about Park West employees' ability to smoke in HUD rental offices. (*See* ECF No. 130-23, Exhibit W at 2 ("April Letter").) On the same day, according to Park West, DeSouza "mailed a letter to [Park West] Attorney Neil Paul advising him, for the first time, of the February 18, 2014 complaint to HUD and the March 18, 2014 follow-up letter." (Def.'s L.R. 56(a)1 Stmt. at ¶ 51.) DeSouza denies this contention, averring that he has "never mailed [any of his HUD complaints] dated 02/18/2014 or 03/18/2014 to [Park West's] eviction atty. Neil Paul whatsoever." (Pl.'s L.R. 56(a)2 Stmt. at ¶ 51.)

**\*6** "Between October 8, 2014 and October 11, 2014," DeSouza filed either four or five more complaints with HUD and various other parties, including Representative Joe Courtney and the Chief Architect of Park West. (Def.'s L.R. 56(a)1 Stmt. at ¶ 52 (averring that he filed four such complaints); Pl.'s 56(a)2 Stmt. at ¶ 52 (averring that he filed five such complaints).) The complaints chiefly alleged that Park West violated DeSouza's right to privacy by informing other tenants about the eviction proceedings against him. (*See* ECF No. 130-25, Exhibit Y ("October Complaints").)

### c. Other Relevant Conduct

DeSouza testified in his deposition to several other incidents. He stated that "[i]n August, 2014, a young girl who is also a resident of Park West allegedly said to [him] "why are you here? Park West doesn't want you here. So why you here?" (Def.'s L.R. 56(a)1 Stmt. at ¶ 53; Pl.'s L.R. 56(a)2 Stmt. at ¶ 53.) He also alleged separately that "another tenant was told about the eviction proceedings against him." (Def.'s L.R. 56(a)1 Stmt. at ¶ 54; Pl.'s L.R. 56(a)2 Stmt. at ¶ 54.) Finally, DeSouza stated that "[o]n or about July 27, 2014, ... Ms. Doughtie told the police that [DeSouza] had raped her daughter and her 10 or 20 month old granddaughter and left them in a pool of blood." (Def.'s L.R. 56(a)1 Stmt. at ¶ 55; Pl.'s L.R. 56(a)2 Stmt. at ¶ 55.)

### d. Plaintiff's Complaint

As noted previously, DeSouza sets out five counts against Park West based upon race discrimination and retaliation; four of them fall under the FHA while the fifth invokes 42 U.S.C. § 1981. (*See* ECF No. 100-2 at 17-19.) He also alleges that Park West violated his First Amendment rights by discriminating against him based upon his race and by retaliating against him. (*Id.* at 18.) He avers that Park West violated his Fourth Amendment rights by attempting to evict him "with the sole intent to destabilize [his] household and security...." (*Id.*) DeSouza further claims that Park West violated his rights under the Privacy Act by informing other tenants of the eviction proceedings against him. (*Id.* at 19.) Finally, he sets out one count of slander and intentional infliction of emotional distress against Park West based upon Ms. Doughtie's alleged accusations that he sexually assaulted her daughter and granddaughter. (*Id.*)

### III. Standard of Review

Summary judgment is appropriate only when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In making that determination, a court must view the evidence in the light most favorable to the opposing party." *Tolan v. Cotton,* 134 S.Ct. 1861, 1866 (2014) (internal quotation marks omitted). "A fact is material if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 202 (2d Cir. 2007) (internal quotation marks omitted). The moving party bears the burden "of showing that no genuine factual dispute exists ..., and in assessing the record to determine whether there is a genuine issue as to any material fact, the court is required to resolve all ambiguities and draw all factual inferences" in favor of the non-moving party. *Cronin v. Aetna Life Ins. Co.,* 46 F.3d 196, 203 (2d Cir. 1995). [14]

### IV. Discussion

#### a. Racial Discrimination Claims (Counts 1, 2, 3 and 7) [15]

**\*7** DeSouza advances three claims of racial discrimination under the FHA [16] and one under 42 U.S.C. § 1981. (ECF No. 100-2 at 17-19.) I begin with the FHA racial discrimination claims. The FHA prohibits "discriminat[ion] against any person in the terms, conditions, or privileges of

Case 5:22-cv-01202-MAD-ML   Document 8   Filed 03/28/23   Page 187 of 364

DeSouza v. Park West Apartments, Inc., Not Reported in Fed. Supp. (2018)

sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race...." 42 U.S.C. § 3604(b). Courts evaluate FHA discrimination claims under the "*McDonnell Douglas* burden-shifting framework." *Mitchell v. Shane*, 350 F.3d 39, 47 (2d Cir. 2003). Under that framework, "once a plaintiff has established a prima facie case of discrimination, the burden shifts to the defendant to assert a legitimate, nondiscriminatory rationale for the challenged decision." *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 702-03 (1973) ). "If the defendant makes such a showing, the burden shifts back to the plaintiff to demonstrate that discrimination was the real reason for the defendant's action.... Summary judgment is appropriate if no reasonably jury could find that the defendant's actions were motivated by discrimination." *Id.* (internal citation omitted).

To set out a prima facie case of discrimination under the FHA, "a plaintiff must show that: (1) he is a member of a protected class; (2) that the defendant took adverse action against him; and (3) that the adverse action took place under circumstances giving rise to an inference of discrimination." *Mazzocchi v. Windsor Owners Corp.*, 204 F. Supp. 3d 583, 615 (S.D.N.Y. 2016). The parties do not dispute that DeSouza, as an African American, is a member of a protected class. Although the parties differ regarding whether DeSouza suffered an adverse action,[17] I need not resolve this dispute given DeSouza's failure to present a shred of evidence that any such adverse action took place under circumstances giving rise to an inference of discrimination. A party may establish an inference of discrimination in several ways. First, the Second Circuit has held, in interpreting Title VII,[18] that a party may raise such an inference by demonstrating that she has been treated "less favorably than a similarly situated [party] outside [her] protected group." *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000). The Second Circuit has also noted that a plaintiff may satisfy "this element of the prima facie case by showing direct evidence of discriminatory animus, such as 'remarks made by decisionmakers that could be viewed as reflecting [such] animus.' " *Henry v. New York State*, 842 F. Supp. 2d 530, 553 (S.D.N.Y. 2012) (construing Title VII) (quoting *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996) ).

**\*8** Since DeSouza does not argue that he was treated less favorably than other similarly situated parties outside of his protected group (*see, e.g.* ECF No. 151-1 at 1-2 (conceding that there were other African American tenants at Park West), 14 (noting that he lacks knowledge as to Park West's eviction practices regarding "Caucasian, Hispanic, and African American tenants") ), his discrimination claim rests upon his argument that certain statements made by Park West personnel evidence racial animus. (*See* ECF No. 151-2 at 3 (contending that Park West's "own emails" constituted evidence "of unlawful eviction plots and derogatory statements about [Desouza].").) DeSouza cites the following emails from Park West personnel as evidence of discriminatory animus:

- An email exchange that took place on April 24, 2014 between Ms. Doughtie, Nancye[19] Frank, a HUD Project Manager, and Tony Berthod, a director for Park West, concerning DeSouza's HUD complaints, in which Ms. Doughtie notes that "[t]here is an active court case for Mr. DeSouza that I am not sure I should speak about." (ECF No. 151-5, Pl.'s Exh. 28 at 29.)

- A continuation of the email chain above in which Mr. Berthod notes that he will "reach out" to DeSouza but that he would "have a limited conversation based on the fact that [DeSouza] has a legal case pending." (ECF No. 151-5, Pl.'s Exh. 29 at 31.) Mr. Berthod also notes that "there appear[ed] to be a couple of issues" with DeSouza, "[o]ne being his occupancy, not residing in the unit [a]nd [the other being] unreported income as a result of an income discrepancy report from [Enterprise Income Verification] during his last annual recertification [in] November of 2013." (*Id.*)

- An email exchange between Ms. Doughtie and Mr. Berthod on September 5, 2014 in which both note their view that DeSouza is mentally unstable. (*See* ECF No. 151-9, Pl.'s Exh. 61 at 2.) In particular, Mr. Berthod sent an email to Ms. Doughtie noting that "[DeSouza] appears to be mentally unstable" and advising her to "inform [her attorney that she is] in fear of [DeSouza] and have them [sic] slap a restraining order-no contact or no trespass on him to keep him away from [Ms. Doughtie] and the office staff...." (*Id.*). Ms. Doughtie replies that she "left a message for our attorney to apply for a protective order" and that "[DeSouza] is very unstable, every action he takes every letter he has written shows that." (*Id.*)

- An email exchange between Mr. Berthod and Ms. Frank on August 15, 2014, in which Mr. Berthod notes that

"[w]e are looking to evict [DeSouza] for unreported income and not living at the site for extended periods of time." (ECF No. 151-9, Pl.'s Exh. 63, at 4.) [20] He also avers that "[DeSouza] has also been taking photographs and videos of the staff and residents among a host of other really strange and disturbing things on the property." (*Id.*)

- An email from Ms. Doughtie to Mr. Berthod on September 5, 2014, in which Ms. Doughtie notes her fear of DeSouza. (ECF No. 151-9, Pl.'s Exh. 63, at 6.) In particular Ms. Doughtie states: "I need my company to back me in this situation to see this man for what he is!!! We at this point are deathly afraid of this man. Our concern is that he is going to take the final step off the cliff and harm us." (*Id.*)

There is one other email chain in the same vein as the communications listed above contained in the record. [21] The email exchange in question, which took place between Ms. Doughtie and Attorney Paul on February 26, 2015, begins with an email from Ms. Doughtie stating as follows:

> **\*9** This letter was hand delivered about 15 minutes ago by Desouza himself. I am hoping you can get this man evicted. I consider his words a hate crime which [sic] is against the law. It is also untrue slander. I have never had an accident let alone a hit and run. Being a lawyer please tell me how to stop this person? ? ? ?

(ECF No. 88-2 at 3.) [22]

While these communications demonstrate a level of hostility between Park West personnel and DeSouza, they do not establish any racial animus on the part of the former. As an initial matter, none of the remarks reference race. *See Jackson v. Post Univ., Inc.*, 836 F. Supp. 2d 65, 94 (D. Conn. 2011) (concluding that although an employee's "remark was tasteless and derogatory," it did not give rise to an inference of discrimination in part because "it [did] not explicitly or specifically reference race"). Second, DeSouza does not contend nor does the record reflect that any of the remarks above or their context implicitly reference race in any manner.

*Contrast, e.g., Curtis v. Airborne Freight Corp.*, 87 F. Supp. 2d 234, 251 (S.D.N.Y. 2000) (noting that employee's remark was racist despite lack of specific reference to race because it was based on racist stereotypes); *Hayes v. Cablevision Sys. New York City Corp.*, No. 07-CV-2438 RRM, 2012 WL 1106850, at \*9 (E.D.N.Y. Mar. 31, 2012) ("A facially neutral insult could constitute harassment motivated by racial animus if uttered in an environment otherwise marked by abundant racial animosity or under circumstances that render it an expression of racial antipathy." (internal quotation marks omitted) ).

In the end, DeSouza's only salient contention is that he subjectively construed the admittedly hostile remarks recounted above as evidence of racial animus on the part of Park West. This is not enough, however, to support an inference of discrimination. *See Pearson v. Bd. of Educ.*, 499 F. Supp. 2d 575, 593 (S.D.N.Y. 2007) (employee's racially neutral insults toward plaintiff could not be construed as "race-based remarks" despite plaintiff's subjective interpretation of them); *Rajaravivarma v. Bd. of Trustees for Connecticut State Univ. Sys.*, 862 F. Supp. 2d 127, 152 (D. Conn. 2012) (reaching similar conclusion regarding employee's insult toward plaintiff). DeSouza "has done little more than cite to [his alleged] mistreatment and ask the court to conclude that it must have been related to [his] race. This is not sufficient." *Grillo v. New York City Transit Auth.*, 291 F.3d 231, 235 (2d Cir. 2002) (quoting *Lizardo v. Denny's, Inc.*, 270 F.3d 94, 104 (2d Cir. 2001) ). I therefore conclude that DeSouza has failed to set out a prima facie case of racial discrimination in violation of the FHA.

Even if DeSouza had set out a prima facie case, Park West has set forth a valid non-discriminatory rationale for the actions it took against him. DeSouza concedes in his Local Rule 56 Statement that he did not cooperate with Park West's recertification process and that he only reported his new income. (ECF No. 151-1 at 2 (averring that HUD regulations only required him to report his new income to Park West).) This, according to DeSouza, was his only obligation-Park West was supposed to do the rest. (*Id.*) But the very regulations DeSouza cites in support of this claim undermine it. These regulations require the owner of a HUD multifamily complex to undertake a detailed process in recertifying a tenant who provides notice of a change in income. (See ECF No. 151-4, Pl.'s Ex. 15 at 45 (listing a HUD regulation requiring an owner completing an interim recertification to take several steps, including

Case 5:22-cv-01202-MAD-ML    Document 8    Filed 03/28/23    Page 189 of 364

DeSouza v. Park West Apartments, Inc., Not Reported in Fed. Supp. (2018)

interviewing the tenant, obtaining third-party verification of the new income, and obtaining the tenant's signature on the interim recertification.) While these steps are concededly the responsibility of the owner, they also require the cooperation of the tenant with respect to paperwork and the interview. Given that DeSouza acknowledges that he did nothing more than provide notice of his new income, Park West had cause to take action against him. *See* U.S. Dep't Hous. & Urban Dev., HUD Handbook 4350.3: Occupancy Requirements of Subsidized Multifamily Housing Programs § 8-13 (Nov. 2013) ("HUD Handbook"), available at http://portal.hud.gov/hudportal/documents/huddoc?id=43503HSGH.pdf (noting that "Owners may terminate tenancy when a tenant is in material noncompliance with the lease including ... [f]ailure of the tenant to submit in time all required information on household income and composition").

**\*10** In any event, Park West gave DeSouza ample opportunity to complete the recertification process prior to initiating eviction proceedings. (*See* Def.'s L.R. 56(a)1 Stmt. at ¶ 8 (noting DeSouza received letter on March 2, 2014 giving him 35 days to complete recertification process); Pl.'s L.R. 56(a)2 Stmt. at ¶ 8 (conceding this point).) After DeSouza received a notice to quit on April 22, 2014, he nonetheless still failed to complete the recertification process required by Park West. He and his counsel then entered into a Stipulated Agreement conceding judgment to Park West on that issue, subject to a stay of execution pursuant to certain conditions. (*See* Stipulated Agreement.) The legitimacy of the Park West's decision to terminate DeSouza's housing subsidy and to raise his rent to $1,352 for the months he was employed was verified by Judge Prats. (*See* Memorandum of Decision at 2-3 (concluding that Park West charged DeSouza the correct amount of rent for the months he was employed in late 2014 and early 2015).) Finally, Park West's affidavits of noncompliance decried DeSouza's discourteous behavior toward Park West employees. Thus, contrary to DeSouza's position, Park West did have a nondiscriminatory rationale for the actions it took against him.

Finally, DeSouza has failed to point to any evidence in the record indicating that Park West's rationale was pretext for race discrimination.

For these reasons, I grant Park West's motion for summary judgment with respect to DeSouza's FHA discrimination claims. Since housing discrimination claims brought under 42 U.S.C § 1981 are also "analyzed under the *McDonnell Douglas* Test," I grant Park West summary judgment on that

claim as well. *Mitchell v. Century 21 Rustic Realty*, 233 F. Supp. 2d 418, 437 (E.D.N.Y.), aff'd, 45 Fed.Appx. 59 (2d Cir. 2002); *Rhodes v. Advance Prop. Mgmt., Inc.*, No. 3:10-CV-826 (JCH), 2012 WL 12904797, at *8 (D. Conn. Aug. 30, 2012) ("As with housing discrimination claims under the FHA and section 1981, section 1982 claims are subject to *McDonnell-Douglas* analysis.").

**b. Retaliation Claims (Counts 1, 2, 3, 6, and 7)**

DeSouza's retaliation claims present a closer question. He contends that Park West's actions against him constituted retaliation for the letters he wrote to HUD complaining of Park West's purported racial discrimination towards him. (*See* ECF No. 100-2 at 17-18.)

**i. FHA Retaliation Claims (Counts 1, 2, 3, and 6)**

I begin with DeSouza's retaliation claims under the FHA (Counts 1, 2, 3, and 6). [23] The Fair Housing Act provides that:

> It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of [the FHA].

42 U.S.C. § 3617. To establish retaliation in violation of 42 U.S.C. § 3617, a plaintiff must demonstrate: "(1) that the plaintiff was engaged in a protected activity; (2) that the [defendant] was aware of this activity; (3) that the [defendant] took adverse action against the plaintiff; and (4) that a causal connection exists between the protected activity and the adverse action." *Robbins v. Connecticut Inst. for the Blind*, No. 3:10CV1712 JBA, 2012 WL 3940133, at *6 (D. Conn. Sept. 10, 2012). The "*McDonnell-Douglas* burden-shifting rules [apply] to claims of retaliation" under the FHA. *Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294

Case 5:22-cv-01202-MAD-ML    Document 8    Filed 03/28/23    Page 190 of 364

DeSouza v. Park West Apartments, Inc., Not Reported in Fed. Supp. (2018)

F.3d 35, 54 (2d Cir. 2002) ("*RECAP*"), *superseded by statute on other grounds*, ADA Amendments of 2008, Pub. L. No. 110-325, 122 Stat. 3553. Hence, "[i]f a plaintiff establishes a prima facie case, the defendant has the burden to produce a legitimate non-retaliatory reason for its action." *Joseph's House & Shelter, Inc. v. City of Troy*, N.Y., 641 F. Supp. 2d 154, 160 (N.D.N.Y. 2009) (internal emphasis omitted). If the defendant carries this burden, the plaintiff must then "show that the defendant's proffered reason is not worthy of credence or that the reason is mere pretext for a retaliatory action." *Id.*

### A. Prima Facie Case

**\*11** I begin with whether DeSouza has established a prima facie case. "Protected activity under the FHA refers to 'action taken to protest or oppose statutorily prohibited discrimination.' " *Miller v. Bd. of Managers of Whispering Pines at Colonial Wood Condo. II*, 457 F. Supp. 2d 126, 131 (E.D.N.Y. 2006) (quoting *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000) ). HUD regulations have interpreted 42 U.S.C. § 3617 to prohibit "[r]etaliating against any person because that person has made a complaint, testified, assisted, or participated in any manner in a proceeding under the [FHA]." 24 C.F.R. § 100.400. DeSouza's complaints do not appear to complain directly of discriminatory conduct. Rather, as mentioned above, they complain chiefly of a variety of disputes with Park West staff and in particular staff's alleged representations that they wanted DeSouza out of his apartment. (*See, e.g.*, February Complaint at 2-10 (complaining of his treatment at the hands of Park West staff); March Complaint at 2-10 (same) ). Nonetheless, they do contain passages in which DeSouza appears to be accusing Park West staff of racial discrimination. (*See, e.g.*, February Complaint at 3 (noting that DeSouza told Park West staffer that she "seemed to be angry and upset for an African American or a minority making or income changes [sic]"), 6 (DeSouza suggesting that he faced an eviction threat for certain conduct while his son reported that other white tenants in his building were not threatened with eviction); October Complaints at 9 (claiming Park West's actions violated DeSouza's civil rights).) Further, Park West does not argue that the plaintiff's complaints do not constitute protected activity. (*See* ECF No. 129 at 17.); *Goenaga v. Mar. of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) ("A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists."). As such, I conclude that the plaintiff

has raised a genuine issue of material fact concerning whether his complaints constitute protected activity under the FHA.

The awareness requirement of the prima facie case presents a closer issue. Park West contends that there is no evidence that it was aware of DeSouza's complaints to HUD prior to the issuance of its notice to quit in April of 2014. (ECF No. 129 at 17.) The record, however, is not as clear cut as Park West argues. The complaints filed by DeSouza in February and March of 2014 denote the receiving parties and concedly do not list any Park West personnel. (*See* February Complaint (February, 2014 complaint addressed to HUD's headquarters in Washington, D.C., along with three other HUD personnel in that office); March Complaint (March, 2014 complaint addressed to the same parties) ). Further, DeSouza testified in his deposition that he could recall providing copies of the complaints only to the recipients listed in the complaints and possibly to HUD's office in Boston. (*See* ECF No. 130-2, Exhibit B, Affidavit of Hailee DeSouza ("DeSouza Aff.") at 45-46 (DeSouza notes that he could only recall sending copies of the February, 2014 HUD complaint to the individuals listed as recipients in the complaint and possibly to HUD's Boston office), 47-48 (same with respect to March, 2014 HUD complaint).) DeSouza included a HUD regulation in his objection, however, stating that HUD would "send a letter and a copy of [any complaint filed] to the party [accused of discrimination]" "[w]ithin 10 days of receiving [the] signed complaint...." (ECF No. 151-10, Pl.'s Exh. 70 at 3.) This raises a genuine issue of material fact regarding whether Park West was aware of DeSouza's complaints prior to the issuance of the notice to quit. [24]

I now turn to the adverse action requirement of the prima facie case. Park West's initiation of eviction proceedings in June of 2014, along with its submissions of affidavits of noncompliance in September of 2014 and March of 2015 (*see* Superior Court Docket), all constitute adverse actions under 42 U.S.C. § 3617. [25] *See* *Reyes v. Fairfield Properties*, 661 F. Supp. 2d 249, 267 n. 10 (E.D.N.Y. 2009) ("[T]he Court ... concludes that an eviction proceeding could constitute an adverse action under [42 U.S.C. § 3617]."); *Wentworth v. Hedson*, 493 F. Supp. 2d 559, 571 (E.D.N.Y. 2007) (concluding that summary judgment was not warranted on plaintiff's retaliation claim under 42 U.S.C. § 3617 predicated on defendant's initiation of eviction proceedings against her*); Robbins v. Connecticut Inst. for the Blind*, No. 3:10CV1712 JBA, 2012 WL 3940133, at *7 (D. Conn. Sept. 10, 2012) (noting "that attempted evictions are considered 'adverse

Case 5:22-cv-01202-MAD-ML    Document 8    Filed 03/28/23    Page 191 of 364

DeSouza v. Park West Apartments, Inc., Not Reported in Fed. Supp. (2018)

actions' under the FHA"); 🚩*Bloch v. Frischholz*, 587 F.3d 771, 782 (7th Cir. 2009) (concluding that even a threat of eviction can constitute a violation of 42 U.S.C. § 3617). Park West's termination of DeSouza's HUD subsidy effective December 1, 2014 also constitutes an adverse action.[26] *See* 🚩*RECAP*, 294 F.3d at 54 (holding that plaintiff "suffered an adverse action in losing funding that had been committed to it").

 **\*12** That leaves the question whether there was a causal connection between DeSouza's filing of the HUD complaints and Park West's adverse actions. To meet this element, a plaintiff must demonstrate that the defendant possessed "a retaliatory motive" in taking adverse actions against him. *Austin v. Town of Farmington*, 826 F.3d 622, 630 (2d Cir. 2016). The Second Circuit has provided plaintiffs with at least two ways to meet this burden. First, a plaintiff may set out proof of a causal connection between protected activity and an adverse action "indirectly by showing that the protected activity was closely followed in time by the adverse action." *See* 🚩*RECAP*, 294 F.3d at 54 (internal quotation marks omitted). The Second Circuit has "not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship," 🚩*Gorman-Bakos v. Cornell Coop. Extension*, 252 F.3d 545, 554 (2d Cir. 2001), however, and courts have construed this temporal factor with varying degrees of liberality. *Compare, e.g.,* ⚠️*Filipovic v. K & R Exp. Systems, Inc.*, 176 F.3d 390, 399 (7th Cir. 1999) (concluding four month lapse between protected activity and termination undermined retaliation claim) *with* 🚩*Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 45-46 (2d Cir. 1980) (concluding eight month period between plaintiff's protected activity and defendant's adverse action against him supported causal connection). Second, a plaintiff may support a retaliation claim more directly by providing direct evidence of the defendant's retaliatory motive, such as a statement by the defendant indicating such motivation. *See, e.g., RECAP*, 🚩294 F.3d at 54 (holding that defendant's comment that plaintiff "should not 'bite the hand that feeds it' " supported causal connection between protected activity and adverse action). I set analyze the causal connection with respect to each adverse action below.

### 1. Commencement of Eviction Proceedings

Although the evidence in the record supporting a causal connection between DeSouza's filing of the HUD complaints and Park West's commencement of eviction proceedings against him in April of 2014 is scant, the existence of a close temporal relationship between them allows DeSouza to make out a prima facie case of retaliation. As noted previously, DeSouza has raised a genuine issue of material fact regarding whether the defendant knew of his complaints within ten days of their filing. Thus, when all reasonable inferences are drawn in favor of DeSouza, the record demonstrates that Park West sent DeSouza a notice to quit about a month after receiving notice of DeSouza's March, 2014 complaint to HUD. This period is short enough to support a prima facie showing of causation indirectly through temporal proximity. *See* 🚩*Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 845 (2d Cir. 2013) (concluding three week period between protected activity and adverse action sufficient to make out prima facie showing of causation); 🚩*Risco v. McHugh*, 868 F. Supp. 2d 75, 114 (S.D.N.Y. 2012) (holding less than two month period between protected activity and adverse action, by itself, made out prima facie case of retaliation).

### 2. September 2014 Affidavit of Noncompliance

The same cannot be said of Park West's filing of its first affidavit of noncompliance. As an initial matter, that affidavit was filed more than five months after DeSouza's April letter to HUD; this five-month period gives rise to a weak inference of causation at best. Further, that affidavit, which was sworn to by Ms. Doughtie, is clearly predicated on DeSouza's conduct at the parties' recertification meeting. In the affidavit, the full text of which is recounted above, Ms. Doughtie complains only of DeSouza's conduct at the recertification meeting. (*See* First Affidavit of Noncompliance (noting that DeSouza refused to say whether he was recording the parties' meeting and that he "became loud, volatile and scary").) Nothing in the affidavit suggests that Park West or its personnel harbored a retaliatory motive based on DeSouza's prior HUD complaints. Finally, the fact that the affidavit was filed the day after the parties' disastrous recertification meeting also supports the idea that it was filed in response to DeSouza's conduct at that event.

DeSouza v. Park West Apartments, Inc., Not Reported in Fed. Supp. (2018)

Case 5:22-cv-01202-MAD-ML    Document 8    Filed 03/28/23    Page 192 of 364

### 3. Termination of Housing Subsidy

In October of 2014, DeSouza filed either four or five more complaints with HUD, sending copies to various other entities including the Chief Architect of Park West. (Def.'s L.R. 56(a)1 Stmt. at ¶ 52; Pl.'s L.R. 56(a)2 Stmt. at ¶ 52). The next adverse action, however, took place in January of 2015 when Park West terminated DeSouza's housing subsidy effective December 1, 2014 in light of his income. (Def.'s L.R. 56(a)1 Stmt. at ¶ 29; Pl.'s L.R. 56(a)2 Stmt. at ¶ 29.) There is no indication in the record that Park West engaged in this action for purposes of retaliation. Rather, the record supports the view that Park West terminated DeSouza's subsidy because he was making too much money to qualify for it. Indeed, even DeSouza does not question Park West's decision to terminate his subsidy, but rather its decision to charge him $1,352 in rent for his apartment. (*See* ECF No. 151-1 at 10-19 (contending that the market rent for the apartment was lower).) This argument, however, was foreclosed by Judge Prat's decision concluding that DeSouza did in fact owe $1,352 in rent for each month he was employed. (*See* Memorandum of Decision at 3-4.) I therefore conclude that DeSouza has failed to present a prima facie case of retaliation with respect to Park West's termination of his housing subsidy.

### 4. March 2015 Affidavit of Noncompliance

**\*13** The remaining affidavit of noncompliance, however, is a different matter. Ms. Doughtie's February 26, 2015 email (ECF No. 88-2 at 2-3) expresses an animus toward DeSouza absent from the prior communications in the record. In that email, she notes to Attorney Paul that she is "hoping that you can get [DeSouza] evicted." (*Id.* at 3.) Significantly, she does not elaborate on any basis for such an eviction, suggesting that she wished DeSouza to be evicted as a general matter rather than as a result of specific misconduct on his part. Although Attorney Paul, to his credit, does not respond in kind, the email raises the inference that Park West's property manager possessed an intent to get DeSouza evicted at all costs. While the full text of the email suggests that Ms. Doughtie harbored animosity against DeSouza for accusing her of taking part in a "hit and run" (*id.*), it could also indicate a broader animus toward DeSouza based at least in part on his filing of the HUD complaints. Given that this email was sent by a Park West employee to a Park West attorney just a few weeks prior to the filing of Park West's second affidavit of noncompliance, it is highly probative of Park West's intent in filing that

affidavit. DeSouza has therefore established a prima facie case of retaliation with respect to Park West's initiation of eviction proceedings against him in the spring of 2014 and its filing of the second affidavit of noncompliance in March of 2015.

### B. Non-Discriminatory Rationale and Pretext

The burden then shifts to Park West to present a non-retaliatory reason for its commencement of eviction proceedings against DeSouza in the spring of 2014 and its filing of the second affidavit of noncompliance in March of 2015. Park West has successfully made this showing with respect to the former. As noted above, Park West avers that it commenced eviction proceedings against DeSouza because he failed to complete the recertification process in a timely manner. This constitutes a non-retaliatory rationale.

The burden then shifts to DeSouza to establish that this motive was pretext. DeSouza fails to make such a showing. As an initial matter, the record does not contain any direct evidence that Park West possessed such a motive in initiating eviction proceedings against DeSouza. The record is also nearly devoid of any indirect evidence of a retaliatory motive. The only such indirect evidence is the temporal correlation between DeSouza's filing of his HUD complaints and Park West's commencement of eviction proceedings. Mere temporal relation alone, however, is not enough to establish pretext. *See* 🚩 *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010) ("Although the] temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a prima facie case of retaliation ..., without more, such temporal proximity is insufficient to satisfy [a party's] burden to bring forward some evidence of pretext....").

Further, the remainder of the record strongly cuts against the contention that Park West's non-discriminatory rationale was pretextual. First, the context of Park West's actions cut against any inference of retaliatory intent. *See* 🚩 *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 69 (2006) (noting that "[c]ontext matters" in adjudicating whether an action was "undertaken for retaliatory purposes). As noted above, Park West had legitimate reasons for initiating the eviction proceedings against DeSouza. In addition, it provided DeSouza with ample time to complete the recertification process prior to initiating summary process

against him. Second, Park West engaged in mediation with DeSouza and entered into a Stipulated Agreement that allowed him to remain in his residence with relatively few additional conditions attached. This remedial conduct negates any inference that Park West intended to retaliate against DeSouza for his HUD complaints. Third, Park West had sent the plaintiff KAPA letters numerous times in the past. (*See* Def.'s L. R. 56(a)1 Stmt. at ¶ 9; Pl.'s L.R. 56(a)2 Stmt. at ¶ 9.) This further negates any inference of retaliatory intent. *Cf.* 🔖 *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001), *as amended* (June 6, 2001) ("Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise."). As such, I conclude that Park West is entitled to summary judgment with respect to DeSouza's retaliation claims concerning its initiation of eviction proceedings against him in the spring of 2014.

**\*14** The March, 2015 affidavit presents a closer question. Park West contends that its March, 2015 affidavit of noncompliance was filed in good faith and that, in any event, the email from Ms. Doughtie is emblematic of her frustration with "[DeSouza's] unstable conduct," as opposed to his HUD complaints. (*See* ECF No. 153 at 4-5.) To be sure, the March, 2015 affidavit of noncompliance appears to aver that DeSouza had failed to comply with the Stipulated Agreement by failing to be courteous to Park West staff and by failing to pay the full amount of his rent.[27] (*See* Second Affidavit of Noncompliance). Ms. Doughtie's email, however, suggests a broader intent—an intent to get DeSouza evicted by any means. While the email does not mention DeSouza's filing of prior HUD complaints, it does, when viewed in the light most favorable to DeSouza, 🔖 *Tolan*, 134 S.Ct. at 1866, raise a genuine issue of material fact concerning whether Ms. Doughtie wanted DeSouza evicted at least in part on the basis of his prior HUD complaints.

Even if DeSouza's conduct provided Park West with just cause to file the affidavit of noncompliance, this improper motivation would still provide DeSouza with a viable claim for retaliation. In *Raniola v. Bratton*, the Second Circuit noted that a plaintiff may set out a viable retaliation claim "even when a retaliatory motive is not the sole cause of the adverse employment action, or when there were other objectively valid grounds for [the adverse action]." 🔖 243 F.3d 610, 625 (2d Cir. 2001) (internal quotation marks and citations omitted). In such instances, however, "[a] retaliatory motive

must be ... 'at least a substantial or motivating factor' behind the adverse action." *Id.* (quoting 🔖 *Mt. Healthy City Sch. Dist. Bd. Of Educ. v. Doyle*, 429 U.S. 274, 287 (1977) ) (some internal quotation marks omitted). A plaintiff may meet this burden "through evidence of retaliatory animus directed against the plaintiff by the defendant." 🔖 *Gordon v. New York City Bd. Of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000). Here, Ms. Doughtie's email provides such direct evidence of potentially retaliatory animus. Further, I cannot conclude that Park West was entirely justified in filing this affidavit of noncompliance given Judge Prats's conclusion that Park West had failed to prove by a preponderance of the evidence that DeSouza had been discourteous to Park West staff in violation of the parties' Stipulated Agreement. (*See* Memorandum of Decision at 5.) Finally, Park West did not argue that DeSouza's retaliation claims failed because it would have taken the same actions against him regardless of his protected activity. *See* 🔖 *Mt. Healthy*, 429 U.S. at 287.

I therefore deny Park West's motion for summary judgment with respect to DeSouza's retaliation claims relating to Park West's filing of the March, 2015 affidavit of noncompliance. Park West's motion is granted with respect to the remainder of those claims.

**ii.** 🔖 **42 U.S.C. § 1981 Retaliation Claim**

DeSouza's retaliation claim under 🔖 42 U.S.C. § 1981 is a different story. That statute, passed in the aftermath of the Civil War, provides that:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

Case 5:22-cv-01202-MAD-ML    Document 8    Filed 03/28/23    Page 194 of 364

DeSouza v. Park West Apartments, Inc., Not Reported in Fed. Supp. (2018)

**\*15** 42 U.S.C. § 1981(a). The statute defines the term, "make and enforce contracts," as "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). The Supreme Court has held that the statute "encompasses retaliation claims" as well. CBOCS West, Inc. v. Humpries, 553 U.S. 442, 446 (2008). The Supreme Court has also held, however, that "[a]ny claim brought under § 1981 ... must initially identify an impaired contractual relationship, under which the plaintiff has rights." Domino's Pizza, Inc. v. McDonald, 546 U.S. 470, 476 (2006). Here, DeSouza has failed to identify how Park West's alleged retaliation against him for filing his HUD complaints has in any way impaired a contractual relationship. While DeSouza possessed a statutory right under the FHA to file his complaints with HUD, nothing in the record suggests that DeSouza also held a contractual right to file such complaints. His claim under 42 U.S.C. § 1981 therefore fails as a matter of law. See Miller v. City of Bridgeport Police Dep't, 718 Fed.Appx. 49, 50 (2d Cir. 2017) (dismissing claim under 42 U.S.C. § 1981 due to plaintiff's failure to allege that "she has or would have rights under [an] existing or proposed contractual relationship with the defendant" (internal quotation marks omitted) ).

I therefore grant Park West's motion for summary judgment with respect to DeSouza's retaliation claim under 42 U.S.C. § 1981.

### c. First Amendment Claim (Count 4)

DeSouza argues that Park West violated his First Amendment rights by "grossly discriminat[ing] against [him]" and by "retaliat[ing] against [him]" for filing his complaints with HUD. (ECF No. 100-2 at 18.) Since the First Amendment does not provide a cause of action for racial discrimination, I interpret DeSouza's contention as a First Amendment retaliation claim. As a general matter, a private citizen alleging a First Amendment retaliation claim "must prove: (1) he has an interest protected by the First Amendment; (2) defendants' actions were motivated or substantially caused by his exercise of that right; and (3) defendants' actions effectively chilled the exercise of his First Amendment right." Curley v. Vill. of Suffern, 268 F.3d 65, 73 (2d

Cir. 2001). A plaintiff bringing such a claim, however, must also establish as a preliminary matter that the defendant's challenged conduct constitutes state action. See United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO, 941 F.2d 1292, 1295 (2d Cir. 1991) ("Because the United States Constitution regulates only the Government, not private parties, a litigant claiming that his constitutional rights have been violated must first establish that the challenged conduct constitutes state action." (internal quotation marks omitted) ). "[S]tate action requires both an alleged constitutional deprivation caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible, and that the party charged with the deprivation must be a person who may fairly be said to be a state actor." Flagg v. Yonkers Sav. And Loan Ass'n, FA, 396 F.3d 178, 186 (2d Cir. 2005) (internal quotation marks omitted).

DeSouza cannot establish that Park West[28] "may fairly be said to be a state actor." Both Park West Apartments, Inc., and The Community Builders, Inc. are private corporations. (See ECF No. 27 (defendants' corporate disclosure statement) ). To demonstrate that a private actor's conduct constitutes state action, "a plaintiff must show that the allegedly unconstitutional conduct is fairly attributable to the [S]tate." Cranley v. National Life Ins. Co. of Vermont, 318 F.3d 105, 111 (2d Cir. 2003) (internal quotation marks omitted). "For the conduct of a private entity to be fairly attributable to the state, there must be such a close nexus between the state and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." Id. (internal quotation marks omitted). "The purpose of [the close-nexus] requirement is to assure that constitutional standards are invoked only when it can be said that the State is responsible for the specific conduct of which the plaintiff complains." Blum v. Yaretsky, 457 U.S. 991, 1004 (1982) (emphasis in original).

**\*16** A court's analysis of whether a private entity's conduct meets this standard is a "necessarily fact-bound inquiry...." Lugar v. Edmondson Oil Co., Inc., 457 U.S. 922, 939 (1982); see also Burton v. Wilmington Parking Authority, 365 U.S. 715, 722 (1961) ("Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance."). A private entity's conduct "may be deemed state action when the state

exercises coercive power, is entwined in [the] management or control of the private actor, or provides the private actor with significant encouragement, either overt or covert, or when the private actor operates as a willful participant in joint activity with the State or its agents, is controlled by an agency of the State, has been delegated a public function by the state, or is entwined with governmental policies." *Cranley*, 318 F.3d at 112 (internal quotation marks omitted).

As this standard suggests, the line between state action and private conduct can be difficult to pin down. There are certain factors, however, which affirmatively do not create state action. For example, "[a] finding of state action may not be premised solely on the private entity's creation, funding, licensing, or regulation by the government." *Id.* (citing *San Francisco Arts & Athletics, Inc. v. United States Olympic Committee*, 483 U.S. 522, 543-44 (1987) ). "Government funding of a private entity, ... no matter how extensive, is insufficient to transform otherwise private conduct into state action." *Young v. Halle Hous. Assocs., L.P.*, 152 F. Supp. 2d 355, 362 (S.D.N.Y. 2001). Further, "[a]ction taken by private entities with the mere approval or acquiescence of the State is not state action." *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 52 (1999).

The record does not reflect a "close-nexus" between the State and Park West's actions underlying this case. As an initial matter, the mere fact that Park West receives funding from HUD via residents' housing subsidies and, through its relationship with HUD, is subject to government regulation, does not render its conduct state action. *See Young*, 152 F. Supp. 2d at 362-63 (concluding that private housing project's heavy reliance upon government funding including HUD rent subsidies and extensive government regulation did not render it a state actor); *Kabbani v. Council House, Inc.*, 406 F. Supp. 2d 1189, 1194 (W.D. Wash. 2005) (concluding that housing project was not state actor despite fact that it received substantial money from HUD, was subject to substantial federal regulations, had to obtain HUD approval of its leases, and used State eviction procedures); *X-Men Sec., Inc. v. Pataki*, 983 F. Supp. 101, 110 (E.D.N.Y. 1997) (concluding that fact that private housing provider was "subject to extensive regulation" and "publicly subsidized" did not "turn their owners into state actors"), *on reconsideration* (Oct. 29, 1997), *and rev'd on other grounds*, 196 F.3d 56 (2d Cir. 1999).

More significantly, there is no apparent relationship between the State and Park West's actions against DeSouza. *See Young*, 152 F. Supp. 2d at 364 ("[T]he crucial relationship for a finding of state action is between the governmental entity and the *action* taken by the private entity, not ... between the governmental entity and the private *actor.*"). DeSouza does not argue that any governmental entity was involved in Park West's decision to initiate eviction proceedings against him. For example, he does not contend that HUD ordered Park West to evict him or that HUD was in any way involved in Park West's decision to initiate eviction proceedings against him. [29] At best, DeSouza could claim that the recertification requirements themselves were originally promulgated by HUD and that their incorporation into his lease, along with his subsequent eviction, constitutes state action. This attenuated connection, however, does not constitute the "close-nexus" required to transform private conduct into state action. *See Spavone v. Transitional Servs. of New York Supportive Hous. Program (TSI)*, No. 16-CV-1219 (MKB), 2016 WL 2758269, at *4 (E.D.N.Y. May 12, 2016) (holding that constitutional claim failed "because [p]laintiff fail[ed] to allege any state involvement in the *precise conduct* on which [p]laintiff's claims are based" (emphasis added) ); *contrast Jones v. Cty. of Suffolk*, No. 15-CV-0111(JS)(ARL), 2018 WL 2023477, at *11 (E.D.N.Y. May 1, 2018) (concluding that governmental entity's actual administration of program with private actor and maintenance of control over said program rendered private actor's conduct state action).

*\*17* I therefore grant Park West's motion for summary judgment with respect to DeSouza's First Amendment claim.

### e. Fourth Amendment Claim (Count 5)

DeSouza's Fourth Amendment claim alleges effectively the same conduct as his claims addressed above. He avers that Park West "grossly discriminated" against him based upon his racial ethnicity and that it then "retaliated against [him] ... with the sole intent to destabilize [his] household and security secured ... under [the] Fourth (IV) Amendment." (ECF No. 100-2 at 18.) Putting aside the fact that DeSouza's claim fails at the outset given that Park West's conduct does not constitute state action for the reasons set out above, the claim also fails on the merits. DeSouza's count does not make any mention of an illegal search or seizure, the hallmark violations of the Fourth Amendment. *See, e.g., Velazquez v. Thompson*, 321 F. Supp. 34, 38 (S.D.N.Y. 1970) (rejecting plaintiff's claim that marshal's entry pursuant to

Case 5:22-cv-01202-MAD-ML    Document 8    Filed 03/28/23    Page 196 of 364

DeSouza v. Park West Apartments, Inc., Not Reported in Fed. Supp. (2018)

court ordered warrant of eviction constituted violation of Fourth Amendment due to lack of unreasonable search or illegal seizure). Liberally construed, DeSouza's claim avers that Park West's attempt to evict him constituted an attempt to "seize" his home in violation of the Fourth Amendment. This argument falters for three reasons. First, Park West's initiation of lawful eviction proceedings hardly constitutes an unlawful seizure of DeSouza's property. Second, DeSouza's apartment was never "seized" in any event given that he was never evicted. *Contrast* Soldal v. Cook Cty., Ill., 506 U.S. 56, 62 (1992) (police's seizure of plaintiff's mobile home constituted "seizure" for purposes of Fourth Amendment). Finally, even if it was, DeSouza's claim would fail in any event given the absence of state action in this case. *See Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.,* 941 F.2d at 1295.

I therefore grant Park West's motion for summary judgment with respect to DeSouza's Fourth Amendment claim.

### e. Privacy Act Claim (Count 8)

DeSouza alleges that Park West violated his rights under the Privacy Act by disclosing information regarding the eviction proceedings against him to "numerous third parties" without his consent. (ECF No. 100-2 at 19). The Privacy Act, "codified in part at 5 U.S.C. § 552a, 'contains a comprehensive and detailed set of requirements for the management of confidential records held by Executive Branch agencies.' " *Conyers v. United States Dep't of Veterans Affairs,* No. 16CV00013JFBSIL, 2018 WL 1867106, at *6 (E.D.N.Y. Jan. 29, 2018), *report and recommendation adopted,* No. 16CV00013JFBSIL, 2018 WL 1089736 (E.D.N.Y. Feb. 26, 2018) (quoting *F.A.A. v. Cooper,* 566 U.S. 284, 287 (2012) ). The Second Circuit has limited "the private right of civil action created by the Privacy Act," however, "to actions against agencies of the United States government." *Burch v. Pioneer Credit Recovery, Inc.,* 551 F.3d 122, 124 (2d Cir. 2008) (citing *Unt v. Aerospace Corp.,* 765 F.2d 1440, 1447 (9th Cir. 1985) ("The civil remedy provisions of the Privacy Act do not apply against private individuals, state agencies, private entities, or state and local officials." (citations omitted) ) ). Since the record does not reflect and DeSouza does not allege that the defendants are agencies of the United States government, his claim under the Privacy Act fails as a matter of law.

**\*18** I therefore grant Park West's motion for summary judgment with respect to DeSouza's Privacy Act claim.

### f. Slander and Intentional Infliction of Emotional Distress Claim (Count 9)

DeSouza's final claim avers that Park West committed the torts of slander and or intentional infliction of emotional distress through Ms. Doughtie's alleged statements to a police officer that he "had viciously sexually assaulted and raped both [Ms. Doughtie's] daughter ... and her little 20-month old baby girl and mercilessly left them in a pool of blood...." (ECF No. 100-2 at 14, 19.) In support of this contention, DeSouza attaches as an exhibit to his objection an affidavit from a neighbor, Wendy Secore, attesting that this took place at a party at Park West on or around July 26, 2014. (ECF No. 151-3, Pl.'s Exh. 8, at ¶ 21 (stating that Ms. Doughtie told the officer that DeSouza "just broke into my daughter's apartment, raped by daughter and her 10-month old baby and let [sic] them in blood of blood [sic]").) Park West attached to their motion for summary judgment a police report from July 26, 2014, that omits any mention of this incident. (ECF No. 130-26, Exhibit Z, at 2-3 (making no mention of Ms. Doughtie's allegation or, indeed, Ms. Doughtie).) While this question of fact "cannot be resolved on the basis of conflicting affidavits," *Molinaro v. Sears, Roebuck & Co.,* 478 F. Supp. 818, 823 (S.D.N.Y. 1979), Desouza's claims nonetheless fail as a matter of law.

Since DeSouza has alleged his common law tort claims against a corporate defendant for the intentional actions of its employee, he may establish his claim through one of two theories of liability. First, "under the common-law principle of respondeat superior, an employer is vicariously liable for compensatory damages arising out of the tortious conduct of his employee when that conduct occurs during the course of the employee's employment." *Matthiessen v. Vanech,* 266 Conn. 822, 839 (2003) (emphasis omitted). Second, a plaintiff may allege, "independent of any vicarious liability," "that the corporation committed, directed or ratified the intentional act." *Larsen Chelsey Realty Co. v. Larsen,* 232 Conn. 480, 505 (1995) (describing corporate liability for employees' torts separate from respondeat superior liability). "In order for direct liability to attach to [Park West], therefore, agents of the corporation, acting on behalf of the corporation, must have authorized or ratified the wrongful acts." *Id.* To establish such liability, a plaintiff must demonstrate that "agents of the corporation, acting on behalf of the corporation, must have authorized or ratified the wrongful acts." *Id.*

Case 5:22-cv-01202-MAD-ML    Document 8    Filed 03/28/23    Page 197 of 364

DeSouza v. Park West Apartments, Inc., Not Reported in Fed. Supp. (2018)

DeSouza's claim fails under both of these theories. In order to establish that an employee committed a tort "within the scope of her employment," a plaintiff must establish that the employee committed the tort "while engaged in the service of the master." *Levitz v. Jewish Home for the Aged, Inc.*, 156 Conn. 193, 198 (1968). "Thus, 'it must be the affairs of the principal [or master], and not solely the affairs of the agent [or servant], which are being furthered in order for this doctrine to apply.'" *Matthiessen*, 266 Conn. at 839 n. 15 (quoting *Mitchell v. Resto*, 157 Conn. 258, 262 (1968) ). DeSouza fails to present any possible way that Ms. Doughtie's alleged accusation could serve Park West's interests. Further, the accusation plainly does not fall within Ms. Doughtie's duties as an employee of Park West. Thus, DeSouza's claim against Park West fails under the doctrine of respondeat superior liability. It fares little better under general corporate liability. The record does not contain any evidence suggesting that any agents of Park West authorized or ratified Ms. Doughtie's purported sexual assault allegations.

**\*19** For these reasons, I grant Park West's motion for summary judgment with respect to DeSouza's state tort claims.

### V. Conclusion

For the foregoing reasons, Park West's motion for summary judgment (ECF No. 128) is hereby GRANTED IN PART AND DENIED IN PART. The motion is denied with respect to the portion of DeSouza's retaliation claims under the FHA regarding Park West's filing of the second affidavit of noncompliance in March, 2015 (Counts 1, 2, 3, 6) and granted with respect to the remainder of his claims.

IT IS SO ORDERED.

### All Citations

Not Reported in Fed. Supp., 2018 WL 2990099

### Footnotes

1    This case was consolidated with a similar case filed by DeSouza—DeSouza v. Community Builders, Inc., 3:17-CV-00016 (MPS), in May of 2017. (*See* ECF No. 90 (order granting Park West's motion for consolidation); ECF No. 91 (Notice of Consolidation).)

2    Since Community Builders, Inc., and Park West are part of the same entity, I refer to the defendants collectively as Park West throughout this ruling for convenience.

3    DeSouza did not name Ms. Doughtie as a defendant in this action.

4    Although DeSouza contends in his Local Rule Statement that the KAPA letters he received from Park West were baseless (*see* Pl.'s L.R. 56(a)2 Stmt. at ¶¶ 9-10, 13, 41), he does not deny that he received the letters nor that he remained in his apartment.

5    DeSouza filed various claims against the housing mediator who worked with the parties, and against his counsel; I dismissed both sets of claims in separate actions prior to this ruling. *See DeSouza v. Kennedy*, No. 3:16-CV-01126, 2017 WL 3431393, at \*1 (D. Conn. Aug. 9, 2017) (dismissing the claims against the housing mediator); *DeSouza v. Taiman*, No. 3:16-CV-00490, 2017 WL 3444672, at \*1 (D. Conn. Aug. 10, 2017) (dismissing the claims against DeSouza's lawyer).

6    DeSouza concedes in his Local Rule Statement that both he and his son, Eugene DeSouza, who was also present at the recertification meeting, were recording the meeting with Park West Staff. (*See* Pl.'s L.R. 56(a)2 Stmt. at ¶ 21 (noting the existence of "Real-Time Live six (6) minute approx. audio recordings ... captured by both [DeSouza] and son" (emphases omitted) ).) The recording, which was submitted to the Court by both parties, demonstrates that the parties' meeting started off in a promising manner but slowly devolved after

Case 5:22-cv-01202-MAD-ML    Document 8    Filed 03/28/23    Page 198 of 364

DeSouza v. Park West Apartments, Inc., Not Reported in Fed. Supp. (2018)

DeSouza refused to answer a Park West staff member's question concerning whether he was recording the meeting. (*See* Exhibit I).

7    The Stipulated Agreement submitted by the parties is dated August 29, 2014. (*See* Stipulated Agreement.)

8    The plaintiff avers in his Local Rule Statement that he had sent Park West a letter in early November of 2014 noting that he had obtained such employment. (*See* Pl.'s L.R. 56(a)2 Stmt. at ¶ 28.) He admits, however, that TSR sent the letter in question to Park West verifying his income from that employment.

9    DeSouza included as an exhibit to his objection to Park West's motion for summary judgment a copy of the Superior Court docket for Park West's eviction proceedings against him. (*See* ECF No. 151-7, Pl.'s Exh. 45, at 19-21 ("Superior Court Docket") ). The docket notes three entries for "Affidavits of Noncompliance with Stipulation"—one on September 8, 2014, one on March 13, 2015, and one on February 17, 2015. (*See id.*) Since the parties only mention two affidavits and refer to the March, 2015 affidavit as the "second" such affidavit, however, I presume for the sake of this ruling that only two such affidavits were filed.

10    DeSouza contends that he did not pay the increased rent because a Superior Court judge ruled in his favor on the matter. (*See* Pl.'s L.R. 56(a)2 Stmt. at ¶¶ 31-32.) In support of this contention, he cites a Superior Court docket entry dated February 17, 2015 reading as follows: "Affidavit of Noncompliance with Stipulation —Summary Process *Result*: Denied 2/27/2015 Hon Stanley Fuger." (*See* Superior Court docket). DeSouza does not cite any materials beyond this docket entry, however, and nothing supports his contention in his Local Statement that Judge Fuger's ruling meant that he "ha[d] absolute[ly] no obligation to anyone whatsoever [to] do anything." (*See* Pl.'s L.R. 56(a)2 Stmt. at ¶ 32 (emphases omitted).) Further, the transcript of the hearing before Judge Fuger on February 27, 2015, which the plaintiff included in his exhibits, suggests that the judge did not issue a ruling at that time. (*See* ECF No. 151-8, Pl.'s Exh. 58, at 31 (Judge Fuger notes that he was going to send the parties "back to the Housing folks" as "[t]here seems to be ground that [the parties] can [use to] come to some agreement here").)

11    DeSouza does not deny that he used such language towards Ms. Doughtie and, indeed, refers to her in his Local Statement as "belligerent, deceitful, volatile, manipulative ..., [and] out-of-control." (Pl. L.R. 56(a)2 Stmt. at ¶ 32.) As the Second Circuit has noted, "[c]ourts can adjudicate disputes only when the parties present reasoned arguments rather than invective-laden diatribes." *Koehl v. Greene*, 424 Fed.Appx. 61, 62 (2d Cir. 2011). The fact that DeSouza is "representing himself in this matter does not relieve him of his obligation to respect the dignity of the proceeding...." *Id.*; *see also McDonald v. Head Criminal Ct. Supervisor Officer*, 850 F.2d 121, 124 (2d Cir. 1988) ("[W]hile pro se litigants may in general deserve more lenient treatment than those represented by counsel, all litigants, including pro ses, have an obligation to comply with court orders. When they flout that obligation they, like all litigants, must suffer the consequences of their actions."). DeSouza is hereby advised that should he continue to level personal ad hominem attacks against Park West or its agents, he could suffer sanctions up to and including dismissal of his case. *See Morris v. Antonio*, No. 14-CV-1749 (AMD)(LB), 2016 WL 5660373, at *4 (E.D.N.Y. Sept. 30, 2016) (advising plaintiff that should "her pattern of behavior and insulting language" continue, it could support sanction of dismissal).

12    Judge Prats noted that DeSouza had stated previously that he was no longer employed as of April 24, 2015. (*See* Memorandum of Decision at 4.)

13    Park West notes in its Local Statement that DeSouza "has never been evicted from his apartment nor has he ever been denied admission to his apartment in any way," and that his lease has been renewed every year since 2014. (Def.'s L.R. 56(a)1 Stmt. at ¶¶ 41-42.) DeSouza contests both of these statements on the grounds that Park West attempted to evict him in 2014 and 2015, and that his lease "has not been [renewed]

Case 5:22-cv-01202-MAD-ML    Document 8    Filed 03/28/23    Page 199 of 364

DeSouza v. Park West Apartments, Inc., Not Reported in Fed. Supp. (2018)

for rental lease years [2013-2018]." (Pl.'s L.R. 56(a)2 Stmt. at ¶¶ 41-42.) He does not deny, however, that he has remained in his apartment through this period.

14    In accordance with this Court's Local Rules, Park West filed a "Notice to Self-Represented Litigant" regarding the procedure for responding to a motion for summary judgment. (ECF No. 131); *See* D. Conn. L.R. 56(b) ("Any represented party moving for summary judgment against a self-represented party must file and serve, as a separate document ... a 'Notice to Self-Represented Litigant Concerning Motion for Summary Judgment.' ").

15    Since Counts 1, 2, 3, and 7 plead both claims of racial discrimination and retaliation, I address each of these causes of action separately.

16    All three of DeSouza's FHA claims advance the same claims concerning racial discrimination—i.e., that Park West "grossly discriminated against [DeSouza] because of race and color." (*See* ECF No. 100-2 at 17-18). I therefore address these claims concurrently.

17    Park West contends that DeSouza has not suffered an adverse action because he "has never been evicted from his apartment nor has he ever been denied admission to his apartment in any way." (ECF No. 129 at 14.) There is a circuit split regarding whether the FHA countenances post-acquisition discrimination claims short of eviction. *Compare, e.g., The Comm. Concerning Cmty. Improvement v. City of Modesto*, 583 F.3d 690, 713 (9th Cir. 2009) (concluding that the "FHA reaches post-acquisition discrimination"); *Hunt v. Aimco Properties, L.P.*, 814 F.3d 1213, 1223 (11th Cir. 2016) (concluding 42 U.S.C. § 3604 countenanced claim of discrimination concerning attempted eviction where plaintiffs remained in the property); *with Cox v. City of Dallas, Tex.*, 430 F.3d 734, 746 (5th Cir. 2005) (concluding that the FHA did not encompass post-acquisition discrimination claims short of "actual or constructive eviction"); *Halprin v. Prairie Single Family Homes of Dearborn Park Ass'n*, 388 F.3d 327, 329 (7th Cir. 2004) (reaching similar conclusion). Although the Second Circuit has yet to weigh in on this dispute, several district courts in this circuit have concluded that 42 U.S.C. § 3604 reaches post-acquisition discrimination claims not alleging actual or constructive eviction. *See, e.g., Mazzocchi v. Windsor Owners Corp.*, 204 F. Supp. 3d 583, 607 (S.D.N.Y. 2016) ("[T]he Court finds that Section 3604(f)(2) of the FHA reaches post-acquisition conduct—even where that conduct falls short of constructive or actual eviction...."); *Viens v. Am. Empire Surplus Lines Ins. Co.*, 113 F. Supp. 3d 555, 569 (D. Conn. 2015) (concluding that 42 U.S.C. § 3604(b) countenanced discrimination claim against insurer that allegedly charged higher rates on discriminatory basis); *Khodeir v. Sayyed*, No. 15 CIV. 8763 (DAB), 2016 WL 5817003, at *4 (S.D.N.Y. Sept. 28, 2016) (concluding that 42 U.S.C. § 3604(b) countenanced discrimination claim predicated on harassment short of eviction); *Davis v. City of New York*, 902 F. Supp. 2d 405, 436 (S.D.N.Y. 2012) (concluding that 42 U.S.C. § 3604(b) "is best understood to prohibit post as well as pre-acquisition discrimination in the provision of housing related services").

18    "Courts, including the Second Circuit, have consistently relied on Title VII cases in their analysis of housing discrimination under the FHA." *See United States v. E. River Hous. Corp.*, 90 F. Supp. 3d 118, 135 n. 17 (S.D.N.Y. 2015) (quoting *Lax v. 29 Woodmere Blvd. Owners, Inc.*, 812 F. Supp. 2d 228, 234 n. 4 (E.D.N.Y. 2011) ).

19    Ms. Frank's first name is spelled in emails with an "e" at the end. (*See, e.g.* ECF No. 151-5, Pl.'s Exh. 28 at 29.)

20    Plaintiff's Exhibit 65 contains a duplicate of this email exchange. (*See* ECF No. 151-9, Pl.'s Exh. 65, at 11.)

Case 5:22-cv-01202-MAD-ML    Document 8    Filed 03/28/23    Page 200 of 364

DeSouza v. Park West Apartments, Inc., Not Reported in Fed. Supp. (2018)

21    Although DeSouza did not cite or produce this email chain in his response to Park West's motion for summary judgment, the Court may consider it for the purposes of determining whether summary judgment is warranted. *See* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

22    The letter is not attached to the email and has not been provided to the Court.

23    The plaintiff brings four counts of retaliation under the FHA, all of which center around the same conduct as his discrimination claims. (*See* ECF No. 100-2 at 17-18.)

24    On April 24, 2014—the day after DeSouza received the notice to quit from Park West—, he mailed a document containing three questions to various parties including Park West. (Def's L.R. 56(a)1 Stmt. at ¶ 50; Pl.'s L.R. 56(a)2 Stmt. at ¶ 50.) On the same day, Mr. Berthod emailed Ms. Doughtie and Ms. Frank about DeSouza's "tenant complaint," suggesting that Park West was definitely aware of DeSouza's complaints by this point. (*See* ECF No. 151-5, Pl.'s Exh. 29 at 31.)

25    While one could argue that submitting an affidavit of noncompliance is different in kind from initiating eviction proceedings, these actions functionally amounted to the same act in this case given that the affidavits of noncompliance constituted an attempt to lift the stay of execution on the eviction proceeding against DeSouza.

26    As noted above, Judge Prats determined that Park West's termination of the DeSouza's HUD subsidy was warranted. (*See* Memorandum of Decision at 2-3 (concluding that Park West charged DeSouza the correct amount of rent for the months he was employed in late 2014 and early 2015).)

27    The portion of the affidavit Park West attached to its motion for summary judgment as an exhibit does not include any language concerning DeSouza's rent and instead focuses solely on his disparaging conduct toward Park West personnel. (*See* Second Affidavit of Noncompliance.) As noted previously, DeSouza disputed his obligation to pay the increased rent; he did not dispute that Park West filed its affidavit of noncompliance at least in part on the basis that he had failed to pay this increased rent. (Def.'s L.R. 56(a)1 Stmt. at ¶ 32; Pl.'s L.R. 56(a)2 Stmt. at ¶ 32.)

28    As noted above, when I refer to Park West, I refer to both Park West Apartments, Inc. and The Community Builders, Inc.

29    Indeed, he argues just the opposite—that Park West wished to evict him at least in part because his filing of HUD complaints was jeopardizing its contract with HUD. (*See* ECF No. 151-2 at 8 (claiming that his lawyer told him that "the real reason [he was] being evicted [was] because ... [Park West staff] and atty. Neil Paul are under extreme pressure to have you evicted for constantly filing complaints with HUD-DC ... since they are very much afraid to lose their contract with HUD....").)

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 2480012
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

JOAQUIN **DEAN**, Plaintiff,

v.

JEREMY **DOBERMAN** and MARC
WOHLGEMUTH, Defendants.



21
CV
8320

(VB)
|
Filed 03/13/**2023**

**OPINION AND ORDER**

Vincent L. Briccetti United States District Judge

**\*1**  Plaintiff Joaquin **Dean**, proceeding pro se, brings this action against Jeremy **Doberman** and Marc Wohlgemuth, attorneys for the purchaser of property formerly owned by plaintiff in quiet title and holdover tenant proceedings. Plaintiff alleges defendants made discriminatory and inaccurate statements during state court proceedings in violation of the Fair Housing Act of 1968, 🚩 42 U.S.C. §§ 3601 et seq. ("FHA"). Plaintiff seeks to enjoin the sale of his property and his eviction from the property.

Now pending is defendants' motion to dismiss the amended complaint pursuant to Rules 12(b)(1) [1] and 12(b)(6), as well as their request for a filing injunction. (Doc. #21).

For the reasons set forth below, both the motion to dismiss and the request for a filing injunction are GRANTED.

**BACKGROUND**

For the purpose of ruling on the motion to dismiss, the Court accepts as true all well-pleaded factual allegations in the amended complaint, any documents attached thereto, [2] and certain factual allegations in plaintiff's opposition. [3] Further, the Court takes judicial notice of court filings in other litigation, not for their truth but for the fact that

such filings were made and that other litigation exists, and public records. [4] The Court draws all reasonable inferences in plaintiff's favor, as summarized below.

I. Foreclosure Action

**\*2**  In 2010, JPMorgan Chase Bank, N.A. ("J.P. Morgan") filed an action in Supreme Court, Rockland County, seeking to foreclose (the "Foreclosure Action") a mortgage on a house then owned by plaintiff located at 246 Cherry Lane, Suffern, New York, 10901 (the "Property"). Plaintiff identifies the Property as his residence. Foreclosure proceedings ensued, and on July 2, 2014, the state court entered a judgment of foreclosure and sale in the Foreclosure Action (the "Foreclosure Action Judgment"). (Doc. #23-1).

After the Foreclosure Action Judgment, plaintiff filed six bankruptcy petitions in this district, all seeking to stop the foreclosure of the Property through the effect of the automatic stay. (Doc. #23-2). On June 19, 2018, the Bankruptcy Court issued an Order concluding the automatic stay did not bar enforcement of the Foreclosure Action Judgment or related eviction proceedings against plaintiff, stating "the foreclosure sale conducted on May 2, 2018, is hereby validated nunc pro tunc, on the Property, in all respects." (Doc. #23-3 (the "Validation Order") at ECF 2). U.S. Bank Trust ("U.S. Bank") then completed its purchase of the Property; however, the Validation Order did not permit U.S. Bank's deed (the "Referee's Deed") to be recorded (id.), and thus, the Rockland County Clerk was later ordered to expunge it from its records. (See In re Joaquin **Dean**, 18-BR-11281 (CGM) (Bankr. S.D.N.Y.), Doc. #38 (ordering that "the foreclosure sale conducted on May 2, 2018 as to the Subject Property remains valid in all respects")).

II. Quiet Title and Holdover Actions

Thereafter, Communipaw Lafayette LLC ("Communipaw") entered into a contract to purchase the Property from U.S. Bank. On May 19, 2021, Communipaw filed a quiet title action in Supreme Court, Rockland County (the "Quiet Title Action"), seeking, as U.S. Bank's contract vendee, to: (i) establish the Bank's title to the Property; and (ii) permit a copy of the Referee's Deed to be rerecorded, as the original had allegedly been lost or was unavailable to U.S. Bank. (Doc. #23-4 at ECF 3, 6). Defendants **Doberman** and Wohlgemuth are attorneys at the law firm Marc Wohlgemuth & Associates P.C. and represented Communipaw in the Quiet Title Action.

On July 26, 2021, the state court entered an order and judgment in the Quiet Title Action (the "Quiet Title Action Judgment"), which quieted title to the Property in U.S. Bank and directed the Rockland County Clerk to accept a copy of the Referee's Deed for filing. (Doc. #7 ("Am. Compl.") at 60–61). A subsequent deed memorializing U.S. Bank's sale of the property to Communipaw was recorded on August 20, 2021. (Doc. #23-5).

On August 10, 2021, Communipaw, again represented by defendants, served plaintiff with a "ten-day" eviction notice, directing him to leave the Property by August 25, 2021, and informing him that if he failed to do so, Communipaw would commence a proceeding to recover possession of the Property. (Am. Compl. at ECF 93–94). On September 15, 2021, defendants, as attorneys for Communipaw, verified a petition to evict plaintiff from the Property and obtain possession of the Property. (Id. at ECF 16–17). On October 13, 2021, Communipaw filed a notice of petition for a holdover proceeding in Justice Court, Town of Ramapo, seeking possession of the Property and to evict plaintiff (the "Holdover Action"). (Id.).

### III. Renewal of Judgment Action

On February 2, 2022, non-party Lakeside Willow LLC ("Lakeside"), also represented by defendants, sued plaintiff in Supreme Court, New York County, Index No. 505014/2022, for renewal of a monetary judgment (the "Renewal of Judgment Action"). (See Opp. at 192–93). In the Renewal of Judgment Action, Lakeside—which had been assigned the right to a judgment entered in favor of non-party Signature Bank on June 7, 2012, against plaintiff and certain corporate entities with which he was affiliated (Renewal of Judgment Action, Doc. #1)—obtained a judgment against plaintiff and the affiliated entities in the amount of $356,869.69. (Renewal of Judgment Action, Doc. #22). Subsequently, Lakeside, as a judgment creditor, levied $306,000 from plaintiff's bank accounts. (See Opp. at ECF 183–85). Defendants, as attorneys for Signature Bank and Lakeside, prepared the legal papers seeking the levy. (See id. at 179–81).

### IV. Seventh Bankruptcy Action

**\*3** On March 2, 2022, plaintiff filed his seventh bankruptcy petition in this district. (See In re Joaquin Dean, 22-BR-22101 (SHL) (Bankr. S.D.N.Y.) ("2022 Bankruptcy"), Doc. #1)). Upon motion by Communipaw, whom defendants represented, on June 2, 2022, the Bankruptcy Court granted an order lifting the automatic stay as applied to Communipaw so

that Communipaw could "pursue its rights under applicable law with respect to the eviction of [plaintiff] from the Property and/or the termination of [plaintiff's] possessory rights to the Property." (Doc. #23-6 at 2). On July 7, 2022, the Bankruptcy Court dismissed the 2022 Bankruptcy with a two-year bar to refiling. (Doc. #23-7).

### V. The Instant Action

On October 8, 2021, plaintiff commenced this action by filing a complaint against Communipaw and U.S. Bank, as well as an attorney and the Rockland County Clerk, who were named defendants in the Quiet Title Action. (Doc. #1). On December 29, 2021, plaintiff filed an amended complaint adding defendants **Doberman** and Wohlgemuth, as well as three other attorneys. (Am. Compl. at ECF 4–6). By Orders dated July 1, 2022 (Doc. #18), and August 11, 2022 (Doc. #24), the Court dismissed all defendants except **Doberman** and Wohlgemuth because of plaintiff's failure to serve them with the summons and complaint.

In the amended complaint, plaintiff asserts federal claims for "Fair Housing Opportunity, Race, Mortgage Discrimination, Religion, [and] Income Discrimination." (Am. Compl. at ECF 2). In support, plaintiff alleges Wohlgemuth "make comments aboutt Selling property to people Like me." (Id. at ECF 6). Plaintiff also alleges "**Doberman**, write comments about my bankruptcies to Judge, I've find the comment to be discriminatory against me when, I was a victim of an, illegal foreclosure scam." (Id.).

Further, plaintiff alleges that in an affidavit of service, he "was described to have black skin I wasn[']t described as a Afro American male." (Am. Compl. at ECF 6). However, based on plaintiff's exhibit to the amended complaint, the affidavit of service of Communipaw's ten-day notice was signed by non-party Paul Colaluca, not defendants. (Id. at ECF 94). In addition, plaintiff alleges he "believe[s] since, [he is] not a person of the Orthodox faith Living in Rockland County, this is why, I can[']t Live in this community anymore." (Id. at ECF 6).

As relief, plaintiff requests that the Court "Stop the wrongful Eviction process agai[n]st" him, and "Stop the illegal sell of my home with Communipaw." (Am. Compl. at ECF 7).

Plaintiff attaches over 200 pages of exhibits to his amended complaint, including documents and filings from the Foreclosure, Quiet Title, and Holdover Actions, news articles about COVID-19 foreclosure and eviction moratoriums, and

medical documentation about his COVID-19 diagnosis. (See Am. Compl. at ECF 9–210 (attaching exhibits)).

In his opposition, plaintiff adds new allegations, claims, and requested relief. Many of plaintiff's new allegations concern actions that led to the foreclosure of the Property, including claims of misconduct committed by non-parties J.P. Morgan and Steve J. Baum P.C., which seems to have represented J.P. Morgan in the Foreclosure Action, and purported predatory lending by J.P. Morgan against minorities. Plaintiff also newly invokes the Civil Rights Act of 1866, 📙 42 U.S.C. § 1982 ("📙 Section 1982"), and the Fair Debt Collection Practices Act ("FDCPA"), the First, Fifth, and Fourteenth Amendments of the Constitution, and emotional distress. (Opp. at ECF 1, 9).

Although most of plaintiff's new allegations do not concern defendants **Doberman** and Wohlgemuth, those relevant to defendants can be summarized as follows. Plaintiff states he and Donna Este-Green, Esq., his attorney in the Quiet Title Action, are "Afro-Americans; what's traumatizing that Attorney Este Green wrote a letter on July 19, 2021, to Honorable Judge Eisenpress in respect of Attorney **Doberman** threatening for wanting to reply on my behalf and Attorney Wohlgemuth making judgmental comments about me," and "Attorney Wohlgemuth & **Doberman** emotionally traumatizes a woman of color for advocating so unethical." (Opp. at ECF 1). The Court construes this allegation to refer to a letter, appended to the amended complaint, in which **Doberman** wrote to the court presiding over the Quiet Title Action concerning the impropriety of Este-Green's late adjournment request. (Am. Compl. at ECF 58–59). In the letter, **Doberman** laid out the history of plaintiff's various litigations, and stated he believed plaintiff's request for an adjournment—which he noted was plaintiff's second request to adjourn a scheduled hearing on an order to show cause—was "a tactic cynically employed by the Foreclosed Borrower and his counsel in order to defeat the rights of [Communipaw], which are clear." (Id.).

**\*4** In addition, in his opposition, plaintiff alleges "Attorney Wohlgemuth, and Attorney **Doberman**, with a list of other slanders [plaintiff's] name and character, hearsay with no real burden of proof regarding breach of Contract For nonpayment." (Opp. at ECF 3). And, he alleges defendants "never submitted any legal documents of [plaintiff] being in Breach of Contract JP Morgan Chase regarding a dollar

amount and default dates, everything was on the Lines of Hearsay." (Id.).

In support of a purported FDCPA claim against defendants, plaintiff alleges:

> 65. Around June 2021, Attorney **Doberman**, submitted a letter to Rockland Country Supreme to Honorable Judge Eisenpress, presenting a false impression of who I am, professional, and I believed it was slandering my character. 66. I found Attorney **Doberman** to be very discriminatory because what was written in the letter was not 100% accurate regarding what happened with the entire foreclosure process and bankruptcy. 67. The Attorney advised me that I could fight the case in bankruptcy.

> 68. Before the June 2021 court hearing, I was in the process of actively pursuing refinancing and hiring Attorney to have this illegal foreclosure to be removed from my credit report. 69. I believe Attorney **Doberman** persuaded the judge's view of me; I was never offered the opportunity to present to the Court any form of credit support and help that I would have to obtain a fair shot of getting the property back.

(Opp. at ECF 8–9). In support of his FHA and 📙 Section 1982 claims, plaintiff alleges in June 2021, defendants, on behalf of Communipaw, declined plaintiff's offer to pay $400,000 to Communipaw to regain ownership of the Property. (Id. at ECF 10). However, he next alleges "[t]he [f]irst [i]ncident occurred" when defendants represented Lakeside (in 2022). (Id.). Plaintiff also claims a second incident occurred on July 13, 2021:

> [W]hen Attorney Wohlgemuth made some judgmental and discriminatory comments. 82. Attorney **Doberman** began to threaten; Attorney Este Green for waiting to respond to his paper and wanted to defend me. **Exhibit K** 82. Attorney Este Green had wrote a letter in regarding the incident **Exhibit L** 83. On July 22, 2021, Honorable Judge Eisenpress awarded Communipaw Lafayette L.L.C. [plaintiff's] property.

(Id. at ECF 11).

Furthermore, plaintiff's opposition adds new requests for relief: specifically, he "request[s] that the $306K"—i.e., the money levied from his bank account by defendants' client, Lakeside, pursuant to the Renewal of Judgment Action—"be returned to the ba[n]k until the case has been resolved in Federal Court." (Opp. at ECF 14). He also alleges "Since [plaintiff] didn't move off the property in Nov 2021, Attorney Doberman had T.D. Bank Levy My saving account of" $306,000, which plaintiff believes is "an act of retaliation that will affect me From want to repurchase my house." (Id. at ECF 11).

**DISCUSSION**

I. Legal Standard

A. 🚩 Rule 12(b)(1)

"[F]ederal courts are courts of limited jurisdiction and lack the power to disregard such limits as have been imposed by the Constitution or Congress." 🚩 Durant, Nichols, Houston, Hodgson & Cortese-Costa, P.C. v. Dupont, 565 F.3d 56, 62 (2d Cir. 2009). "A case is properly dismissed for lack of subject matter jurisdiction under 🚩 Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." 🚩 Nike, Inc. v. Already, LLC, 663 F.3d 89, 94 (2d Cir. 2011), aff'd, 🚩 568 U.S. 85 (2013). "The party invoking the court's jurisdiction bears the burden of establishing jurisdiction exists." 🚩 Conyers v. Rossides, 558 F.3d 137, 143 (2d Cir. 2009).

**\*5**  When deciding whether subject matter jurisdiction exists at the pleading stage, the Court "must accept as true all material facts alleged in the complaint and draw all reasonable inferences in the plaintiff's favor." 🚩 Conyers v. Rossides, 558 F.3d at 143. "However, argumentative inferences favorable to the party asserting jurisdiction should not be drawn." 🚩 Atl. Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd., 968 F.2d 196, 198 (2d Cir. 1992) (citing 🚩 Norton v. Larney, 266 U.S. 511, 515 (1925)). When a factual challenge to the Court's jurisdiction has been raised, "the court may resolve [any] disputed jurisdictional fact issues by referring to evidence outside of the pleadings, such as affidavits."

🚩 Zappia Middle E. Constr. Co., Ltd. v. Emirate of Abu Dhabi, 215 F.3d 247, 253 (2d Cir. 2000).

Further, federal courts "have an independent obligation to consider the presence or absence of subject matter jurisdiction sua sponte." 🚩 Joseph v. Leavitt, 465 F.3d 87, 89 (2d Cir. 2006). And, when a defendant moves to dismiss for lack of subject matter jurisdiction and on other grounds, the court should consider the 🚩 Rule 12(b)(1) challenge first. 🚩 Rhulen Agency, Inc. v. Alabama Ins. Guar. Ass'n, 896 F.2d 674, 678 (2d Cir. 1990).

B. 🚩 Rule 12(b)(6)

In deciding a 🚩 Rule 12(b)(6) motion, the Court evaluates the sufficiency of the operative complaint under "the two-pronged approach" articulated by the Supreme Court in 🚩 Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009). First, a plaintiff's legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to the assumption of truth and are thus not sufficient to withstand a motion to dismiss. 🚩 Id. at 678; 🚩 Hayden v. Paterson, 594 F.3d 150, 161 (2d Cir. 2010). Second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." 🚩 Ashcroft v. Iqbal, 556 U.S. at 679.

To survive a 🚩 Rule 12(b)(6) motion, the allegations in the complaint must meet a standard of "plausibility." 🚩 Ashcroft v. Iqbal, 556 U.S. at 678; 🚩 Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." 🚩 Ashcroft v. Iqbal, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. (quoting 🚩 Bell Atl. Corp. v. Twombly, 550 U.S. at 556).

The Court must liberally construe submissions of pro se litigants and interpret them "to raise the strongest arguments that they suggest." 🚩 Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 474 (2d Cir. 2006) (per curiam) (collecting

cases). "Even in a pro se case, however, ... threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Chavis v. Chappius, 618 F.3d 162, 170 (2d Cir. 2010). Nor may the Court "invent factual allegations" a plaintiff has not pleaded. Id.

## II. New Allegations and Claims

As an initial matter, in his opposition, plaintiff attempts to add many new allegations and claims that were not included in his amended complaint.

For pro se plaintiffs, "it is appropriate ... to consider factual allegations made in their opposition papers, so long as the allegations are consistent with the complaint." Kelley v. Universal Music Grp., 2016 **WL** 5720766, at *6. Although "a pro se plaintiff may not raise entirely new causes of action for the first time in his opposition papers, ... the Court may consider new claims appearing for the first time in briefing if the claims could have been asserted based on the facts alleged in the complaint." Davila v. Lang, 343 F. Supp. 3d 254, 267 (S.D.N.Y. 2018); see Mathie v. Goord, 267 F. App'x 13, 14 (2d Cir. 2008) (summary order) (affirming dismissal of a pro se plaintiff's new constitutional challenge, first raised in an opposition, because the "complaint did not encompass that claim").

 *6 Therefore, here, the Court may properly consider new factual allegations introduced in plaintiff's opposition that are consistent with the facts and claims in the amended complaint. For example, it is appropriate for the Court to consider plaintiff's allegations elaborating upon defendants' purportedly discriminatory statements made in supreme court and town court proceedings, allegations of FHA violations, and allegations regarding his purportedly improper foreclosure and eviction. However, the amended complaint cannot be construed to allege claims against defendants pursuant to Section 1982, the FDCPA, the First, Fifth, and Fourteenth Amendments, and for "Emotional Damages" (Opp. at ECF 1), and the Court declines to consider them. See Davila v. Lang, 343 F. Supp. 3d at 267.

In addition, the Court declines to consider plaintiff's new request for the return of $306,000 levied from his bank account, because it is newly raised in the opposition without support in the amended complaint and seeks relief only against Lakeside, which was never a named party in this action.

Accordingly, plaintiff's Section 1982, FDCPA, First Amendment, Fifth Amendment, and Fourteenth Amendment, and emotional damages claims, as well as his request to return $306,000 levied from his bank account, are dismissed.

## III. Subject Matter Jurisdiction

Defendants argue the Rooker-Feldman doctrine deprives the Court of subject matter jurisdiction over this action.

The Court agrees it does not have subject matter jurisdiction over plaintiff's request to enjoin the sale of the Property and his eviction based on both (i) the Rooker-Feldman doctrine, which applies to any final state court judgments, including those entered in the Foreclosure and Quiet Title Actions; and (ii) the Younger abstention doctrine, which applies to the extent any proceedings are still pending in state court—such as the Holdover Action, although its current posture is unclear.

### A. Legal Standards

#### 1. Rooker-Feldman Doctrine

The Rooker-Feldman doctrine encapsulates "the principle, expressed by Congress in 28 U.S.C. § 1257, that within the federal judicial system, only the Supreme Court may review state-court decisions." Hoblock v. Albany Cnty. Bd. of Elections, 422 F.3d 77, 85 (2d Cir. 2005). The doctrine bars federal courts from hearing "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." Exxon Mobil Corp. v. Saudi Basic Industr. Corp., 544 U.S. 280, 284 (2005).

Four requirements must be met for the doctrine to apply: (i) the plaintiff must have lost in state court; (ii) the plaintiff must complain of injuries caused by a state court judgment; (iii) the plaintiff must invite federal court review and rejection of that judgment; and (iv) the state court judgment must have been rendered before the federal proceedings commenced. See Hoblock v. Albany Cnty. Bd. of Elections, 422 F.3d at 85. A plaintiff invites federal court review and rejection of a state court judgment when the claims brought in federal court are "inextricably intertwined" with the state court's

determinations. See ⚠ Kropelnicki v. Siegel, 290 F.3d 118, 128 (2d Cir. 2002). "The first and fourth of these requirements may be loosely termed procedural; the second and third may be termed substantive." Id.

Moreover, "it is clear that [p]laintiffs cannot seek to void the state court foreclosure decisions transferring their property," because such claims are "the type of claim that Rooker-Feldman squarely forecloses, both because it addresses an injury caused by the state court judgment and because it would require the district court to review that judgment." 🚩 Dorce v. City of New York, 2 F.4th 82, 104 (2d Cir. 2021); see 🚩 Vossbrinck v. Accredited Home Lenders, Inc., 773 F.3d 423, 427 (2d Cir. 2014) (Rooker-Feldman bars claims when plaintiff "asks the federal court to grant him title to his property because the foreclosure judgment was obtained fraudulently").

## 2. Younger Abstention Doctrine

**\*7** In 🔲 Younger v. Harris, 401 U.S. 37 (1971), the Supreme Court held federal courts are not to enjoin ongoing state court criminal proceedings except in specific, narrow circumstances. 🚩 Hansel v. Town Ct., 56 F.3d 391, 393 (2d Cir. 1995). When Younger applies, abstention is mandatory, and its application deprives the federal court of subject matter jurisdiction. 🚩 Colo. River Water Conservation Dist. v. United States, 424 U.S. 800, 816 n.22 (1976).

The Supreme Court has extended Younger to other exceptional circumstances; as a result, pursuant to Younger, federal court abstention is required for three categories of pending state-court proceedings: (i) parallel state criminal prosecutions; (ii) civil enforcement proceedings "that are akin to criminal prosecutions"; and (iii) civil proceedings "that implicate a State's interest in enforcing the orders and judgments of its courts." 🚩 Sprint Commc'ns, Inc. v. Jacobs, 571 U.S. 69, 72 (2013). With respect to the third category, "federal courts should refrain from interfering with core state court civil administrative processes, powers, and functions that allow the state courts to adjudicate the matters before them and enforce their [orders and] judgments." Cavanaugh v. Geballe, 28 F.4th 428, 434 (2d Cir. 2022).

"Abstention is not in order simply because a pending state-court proceeding involves the same subject matter." 🚩 Sprint Commc'ns, Inc. v. Jacobs, 571 U.S. at 72. Accordingly, when a case presents "none of the circumstances the [Supreme] Court has ranked as exceptional, the general rule governs: "[T]he pendency of an action in [a] state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction." Id. (citing 🚩 Colo. River Water Conservation Dist. v. United States, 424 U.S. at 817).

"When a plaintiff seeks injunctive relief relating to the same property that is the subject matter of the underlying [pending] state court action," federal courts lack subject matter jurisdiction under Younger. Ochei v. Lapes, 2020 **WL** 528705, at \*4 (S.D.N.Y. Jan. 31, 2020) (abstaining from "interfer[ing] in [plaintiff's] ongoing state-court eviction proceeding," when plaintiff did not allege sufficient facts supporting Fair Housing and Civil Rights Acts claims and requested injunctive relief). Accordingly, courts in the Second Circuit have held the Younger abstention doctrine precludes federal district courts from exercising subject matter jurisdiction over federal actions interfering with pending foreclosure or eviction proceedings because they implicate "the disposition of real property ... an important state interest." Magana v. Wells Fargo Bank, N.A., 2018 **WL** 3055782, at \*2 (D. Conn. May 4, 2018).

## B. Application

### 1. Final State Court Judgments

The Court agrees Rooker-Feldman bars the Court from considering plaintiff's claims to enjoin the already effectuated sale of the Property and his eviction from the Property, because doing so would require reviewing and reversing judgments entered in the Foreclosure and Quiet Title Actions.

The first and fourth "procedural" elements are satisfied. Regarding the first, plaintiff lost the Foreclosure Action when the state court issued the Foreclosure Action Judgment in favor of J.P. Morgan on July 2, 2014, and, plaintiff lost the Quiet Title Action when the state court entered the Quiet Title Action Judgment in favor of Communipaw on July 26, 2021. Regarding the fourth, this action was commenced on October 8, 2021, well after both judgments.

**\*8**  As to the second and third "substantive" elements, plaintiff's request that the Court "stop the illegal sell of my home with Communipaw" (Am. Compl. at 6) is an attempt to reverse the Foreclosure Action and Quiet Title Action Judgments, and therefore prohibited by Rooker-Feldman. See Vossbrinck v. Accredited Home Lenders, Inc., 773 F.3d at 427 (barring plaintiff's request for the "federal court to grant him title to his property because the foreclosure judgment was obtained fraudulently" under Rooker-Feldman because it would require the federal court "to determine whether the state judgment was wrongfully issued") Similarly, plaintiff requests that the Court "stop the wrongful Eviction process agai[n]st" him. (Am. Compl. at 6). Because the eviction is an injury suffered as a direct consequence of the state court Foreclosure Action and Quiet Title Action Judgments, plaintiff's claim for such relief is likewise barred.

However, Rooker-Feldman does not prohibit the Court from exercising subject matter jurisdiction over plaintiff's FHA discrimination claim (discussed infra in Part IV). Although plaintiff's claim arises from defendants' alleged conduct during the Quiet Title Action, the Rooker-Feldman "doctrine generally does not affect a federal court's jurisdiction over claims for damages against third parties for alleged misconduct occurring in the course of a state court proceeding, because the adjudication of such claims would not require the federal court to sit in review of the state court judgment." Hansen v. Miller, 52 F. 4th 96, 100 (2d Cir. 2022) (claim for fraud in procurement of state court foreclosure judgment can "be considered independently of the merits of that foreclosure judgment").

Accordingly, plaintiff's claims to enjoin the sale of his home and his eviction are barred by Rooker-Feldman and must be dismissed.

### C. Pending State Court Proceeding

The Court further concludes the Younger abstention doctrine precludes the Court from considering plaintiff's request to stop the Holdover Action, to the extent it is still pending in town court and to the extent such relief is separate from the final judgments in the Foreclosure and Quiet Title Action Judgments.

First, Communipaw served plaintiff with a notice to vacate the Property on August 10, 2021. (Am. Compl. at ECF 93–94). Thereafter, Communipaw and/or defendants verified a petition seeking possession of the Property and to evict

plaintiff on September 15, 2021. (Id. at ECF 16–17). Although the notice of petition for the Holdover Action in Justice Court, Town of Ramapo, is dated October 13, 2021 (id.)—five days after plaintiff initiated this federal action—plaintiff clearly had notice of the Holdover Action in light of his request to "stop the illegal eviction" in the original complaint. (Doc. #1 at ECF 6). Further, the posture of the Holdover Action is unclear, but it appears to remain pending based on the parties' representations.

Second, because the Holdover Action implicates the important state interest of property disposition, and plaintiff "alleges nothing to suggest that there are grounds under ... the Younger abstention doctrine to justify this Court's interference in [his] ongoing state-court eviction proceeding, the Court cannot grant" plaintiff's request to stop the eviction. See Ochei v. Lapes, 2020 **WL** 528705, at \*4.

However, to the extent plaintiff's FHA discrimination claim involves defendants' alleged conduct during the Holdover Action (discussed infra in Part IV), Younger does not preclude the Court from exercising subject-matter jurisdiction. "[B]ecause Younger abstention focuses primarily on federal courts interfering with and disrupting ongoing state proceedings, we have in the past held that abstaining from cases involving efforts only to obtain money damages is inappropriate." Jones v. Cnty. of Westchester, 678 F. App'x 48, 50 (2d Cir. 2017) (summary order). Thus, the Second Circuit has held "Younger abstention is not appropriate" with respect to civil rights claims seeking monetary damages. See, e.g., Kirschner v. Klemons, 225 F.3d 227, 238 (2d Cir. 2000).

**\*9**  Accordingly, to the extent plaintiff's request to enjoin his eviction arises from proceedings in the Holdover Action, and to the extent the Holdover Action remains pending before the town court, such claim must be dismissed.

### IV. Failure to State a Claim

Defendants argue plaintiff does not plausibly allege they violated the FHA, because their alleged conduct does not imply any racially discriminatory intent and because their alleged conduct is unrelated to plaintiff's claimed injuries.

The Court agrees.

The FHA makes it unlawful to "discriminate against any person in the terms, conditions, or privileges of sale or rental

of a dwelling, or in the provision of services or facilities in connection therewith, because of race." *Francis v. Kings Park Manor, Inc.,* 992 F.3d 67, 72–73 (2d Cir. 2021) (rehearing en banc) (citing 42 U.S.C. § 3604(b)).

Here, even drawing all reasonable inferences in plaintiff's favor, plaintiff fails to allege a violation of the FHA because he has not plausibly alleged defendants discriminated against him and he has not alleged defendants' purported conduct occurred in connection with the sale or rental of a dwelling.

First, plaintiff asserts several factual allegations describing conduct by non-parties that are irrelevant to defendants' liability in this action. Plaintiff alleges in his opposition that he believes he and his children "have been deprived of Fair Housing opportunities in Rockland County; discrimination, predatory lending, and retaliation against our family" (Opp. at ECF 4), which is not tied to any conduct by defendants. Plaintiff also adds allegations about J.P. Morgan's alleged predatory lending against minorities and discriminatory conduct by other non-parties, which likewise are inapplicable to defendants, who were not involved in the Foreclosure Action. In addition, plaintiff alleges a non-party described him as having "black skin" rather than as "Afro-American" in an affidavit of service (Am. Compl. at ECF 6), which does not involve defendants.

Second, none of plaintiff's allegations about defendants support an inference of racial discrimination in the sale or rental of a dwelling. Plaintiff claims defendants, on behalf of Communipaw, declined plaintiff's offer to repurchase the Property for $400,000, but this only shows defendants informed plaintiff of a decision made by their non-party client, not that defendants acted with any discriminatory intent. And, plaintiff alleges that during the Quiet Title Action, defendants made judgmental comments about plaintiff, plaintiff's numerous bankruptcies, and plaintiff's request to adjourn a conference. Such statements do not evince discriminatory intent. They do not refer to plaintiff's race and, given the context in which they were allegedly made—*i.e.,* during the Quiet Title Action commenced by defendants' client to quiet title when plaintiff remained a holdover tenant at the Property, and to oppose what defendants describe as a dilatory tactic in state court—the Court cannot reasonably infer that these statements was motivated by plaintiff's race.

In addition, plaintiff's conclusory allegation that defendants made discriminatory statements during the Quiet Title Action, which "persuaded the judge's view of" plaintiff (Opp. at ECF 8–9), is conclusory and "insufficient to state a claim of discrimination under the FHA." *Tasfay v. Ramos,* 2021 **WL** 4443303, at *2 (S.D.N.Y. Sept. 28, 2021); *see Francis v. Kings Park Manor, Inc.,* 992 F.3d at 72–73 (affirming dismissal of complaint that "lacks even minimal support for the proposition that [defendants] were motivated by discriminatory intent").

**\*10** Accordingly, plaintiff's FHA discrimination claim must be dismissed. [5]

V. Leave to Amend

*Rule 15(a)(2) of the Federal Rules of Civil Procedure* provides that courts "should freely grant leave" to amend a complaint "when justice so requires." *Fed. R. Civ. P. 15(a) (2).* A district court ordinarily should not dismiss a pro se complaint "without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu, 222 F.3d 99, 112 (2d Cir. 2000).*

Leave to amend would be futile here because even the most generous reading of plaintiff's amended complaint and opposition does not give any indication he can (i) state a valid claim not precluded by the Rooker-Feldman doctrine or the Younger abstention doctrines; or (ii) plausibly state any federal claim, under the FHA, Section 1982, the FDCPA, or the First, Fifth, or Fourteenth Amendments, against defendants—whose interactions with plaintiff were solely as attorneys representing plaintiff's adversaries in supreme court and town court proceedings. *Cuoco v. Moritsugu, 222 F.3d at 112* ("The problem with [plaintiff's] causes of action is substantive; better pleading will not cure it. Repleading would thus be futile."); *see Ganley v. City of New York, 734 F. App'x 784, 786 (2d Cir. 2018)* (summary order) ("The district court does not abuse its discretion when it denies leave to amend because amendment is unlikely to be productive.").

Accordingly, the Court declines to grant plaintiff leave to amend.

VI. Filing Injunction

Defendants request that the Court bar plaintiff from commencing any future lawsuits against them absent leave of the Court.

The Court agrees a filing injunction is appropriate in this case.

"District courts have the authority to issue filing injunctions to prevent vexatious litigation." Iwachiw v. N.Y.C. Bd. of Elections, 126 F. App'x 27, 29 (2d Cir. 2005) (summary order). Courts consider five factors when deciding whether to grant a filing injunction:

> (1) the litigant's history of litigation and whether it entailed vexatious, harassing, or duplicative lawsuits; (2) whether the litigant has an objective good faith expectation of prevailing; (3) whether the litigant is represented by counsel; (4) whether the litigant has caused needless expense to other parties or an unnecessary burden on the courts and their personnel; and (5) whether other sanctions would be adequate to protect the courts and other parties.

*11  Id. "The question the court ultimately must answer is 'whether a litigant who has a history of vexatious litigation is likely to continue to abuse the judicial process and harass other parties.' " Schafler v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 707 F. App'x 751, 752 (2d Cir. 2018) (summary order).

The Court addresses each factor in turn.

First, plaintiff has a history of filing vexatious, harassing, and duplicative lawsuits related to the Property. For example, plaintiff has filed at least seven bankruptcy petitions in this district in the last nine years alone. (Doc. #23-2 at ECF 2). In plaintiff's most recent bankruptcy proceeding, the U.S. Trustee moved to dismiss, calling plaintiff a "serial filer," arguing plaintiff filed the Chapter 11 case in bad faith, and stating plaintiff filed all his bankruptcy proceedings "solely to stay foreclosure auctions and an eviction proceeding, without complying with basic fiduciary duties." (2022 Bankruptcy, Doc. #20-1 at 2). In response, the Bankruptcy Court dismissed

the 2022 Bankruptcy and barred plaintiff from filing another bankruptcy case for two years. (Doc. #23-7).

Second, the Court agrees plaintiff does not have an objective good faith expectation of prevailing against defendants. Defendants were not involved in the Foreclosure Action, and defendants' only connection to the Property is in their representative capacity as attorneys representing clients adverse to plaintiff. Further, in a prior Order, the Court previously warned plaintiff of the futility of some of his requests, stating: "These requests are all DENIED. The Court does not have the power to grant such relief." (Doc. #9).

Third, plaintiff is pro se and thus is afforded special solicitude. Here, such solicitude is evidenced by the painstaking work defendants and this Court have taken to parse plaintiff's dense, convoluted, and nearly incomprehensible amended complaint, opposition, and exhibits in this case, as well as other filings on the docket.

Fourth, in this case, plaintiff attached over 200 pages of exhibits to his barebones amended complaint and over 260 pages of exhibits to his opposition. These exhibits seem to be a disorganized compilation of filings and documents from various court proceedings, news articles, and medical documentation. Sifting through these papers alone has involved considerable expense for defendants—who have faced a similar predicament in state court proceedings with plaintiff—and an undue burden on the Court. See Pandozy v. Segan, 518 F. Supp. 2d 550, 558 (S.D.N.Y. 2007) (pro se plaintiff with "a long history of filing duplicative and vexatious lawsuits, all arising from the sale of his Apartment" put an undue burden on defendants and the Court because of such "lawsuits, and in particular the multitude of lengthy filings submitted in each"), aff'd, 340 F. App'x 723 (2d Cir. 2009) (summary order).

Fifth, in light of plaintiff's representation that over $300,000 of his funds have been levied based on money owed to a judgment creditor, it is unclear whether plaintiff is solvent and capable of paying any monetary sanctions.

In light of the foregoing factors, including that plaintiff has been deemed a "serial filer" in the Bankruptcy Court for filing seven bankruptcy actions—as well as multiple filings in state court—all seeking the same relief he seeks here, the Court grants defendants' request for a filing injunction barring plaintiff from suing defendants for any conduct related to the

foreclosure or sale of the Property, or his eviction from the Property, without prior leave of Court.

## CONCLUSION

 **\*12** Defendants' motion to dismiss and request for a filing injunction are GRANTED.

To be clear, Plaintiff is **prohibited** from commencing any new lawsuits against defendants Jeremy **Doberman** and March Wohlgemuth, arising from the same facts alleged in the amended complaint and opposition, absent prior permission of the Court.

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore in forma pauperis status is denied for the purposes of an appeal. Cf. Coppedge v. United States, 369 U.S. 438, 444–45 (1962).

The Clerk is instructed to terminate the motion (Doc. #21), and close this case.

Chambers will mail a copy of this Opinion and Order, and all unpublished opinions cited, to plaintiff at the address on the docket.

SO ORDERED:

**All Citations**

Slip Copy, 2023 WL 2480012

## Footnotes

1    Defendants bring the motion pursuant to Rule 12(b)(6). However, their argument that dismissal is warranted pursuant to the Rooker-Feldman doctrine is jurisdictional and thus "the appropriate vehicle for such defenses is in a Rule 12(b)(1) motion." Lewis v. Legal Servicing, LLC, 2022 **WL** 2531817, at \*4 n.8 (S.D.N.Y. Mar. 15, 2022), report and recommendation adopted sub nom. Lewis v. Steward, 2022 **WL** 4592641 (S.D.N.Y. Sept. 30, 2022). Nevertheless, "[d]efendants' failure to invoke Rule 12(b)(1) is immaterial because the court is independently obligated to determine whether it has subject matter jurisdiction." Id.; see Fed. R. Civ. P. 12(h)(3).

Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes, and alterations.

Plaintiff will be provided copies of all unpublished opinions cited in this decision. See Lebron v. Sanders, 557 F.3d 76, 79 (2d Cir. 2009) (per curiam).

2    In deciding a Rule 12(b)(6) motion, the Court "may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010).

3    On October 21, 2022, plaintiff filed an opposition. (Doc. #29). On October 25, 2022, plaintiff filed an amended opposition, which is the operative opposition. (Doc. #30 ("Opp.")).

Because plaintiff is proceeding pro se, the Court considers new allegations in the opposition, to the extent they are consistent with the amended complaint and against persons named as defendants in this action, as explained infra in Part II. See Kelley v. Universal Music Grp., 2016 **WL** 5720766, at \*6 (S.D.N.Y. Sept. 29, 2016).

4    See ⚑ Melendez v. City of New York, 16 F. 4th 992, 996 (2d Cir. 2021) (matters of public record); ⚑ Staehr v. Hartford Fin. Servs. Grp., Inc., 547 F.3d 406, 425 (2d Cir. 2008) (court filings).

5    Even if the Court had opted to consider the ⚑ Section 1982 claim plaintiff newly raised in his opposition, such claim would be dismissed for the same reasons that plaintiff's FHA claim is dismissed. See ⚑ 42 U.S.C. § 1982 ("All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property."). To state a claim under ⚑ Section 1982, a plaintiff must allege sufficient facts to demonstrate, among other factors, "defendant's intent to discriminate on the basis of [plaintiff's] race" and that "the discrimination concerned one or more activities enumerated in ⚑ section 1982, such as the purchase and lease of property." Reyes v. Fairfield Props., 661 F. Supp. 2d 249, 267 (E.D.N.Y. 2009). As discussed with respect to plaintiff's FHA claim, plaintiff has failed to allege defendants had an intent to discriminate, or that defendants' alleged statements caused plaintiff to not be sold or leased property.

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 1966120
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Shirley BURRIS, Plaintiff,
v.
HOUSING AND SERVICES INC., et al., Defendants.

17-CV-9289 (JGK)
|
Signed February 13, 2023

**Attorneys and Law Firms**

Evan Michael Hess, Jonathan Pickhardt, Quinn Emanuel
Urquhart & Sullivan, New York, NY, for Plaintiff.

Alexandra L. Robins, Siobhan Amanda Healy, Kaufman
Dolowich Voluck LLP, White Plains, NY, for Defendant
Housing and Services Inc.

### MEMORANDUM OPINION AND ORDER

JOHN G. KOELTL, District Judge:

 *1  The plaintiff, Shirley Burris, brought this action against
the defendants, Housing and Services, Inc. ("HSI"), Sara
Stolfi, James Dill, and Ethan Jamron, alleging various federal
and state law claims arising out of the plaintiff's eviction
and subsequent related proceedings. The plaintiff initially
proceeded pro se but is now represented by counsel. In a
Memorandum Opinion and Order dated March 18, 2019, this
Court dismissed most of the plaintiff's federal and state law
claims and dismissed two individual defendants, Dill and
Jamron, from this case, but did not dismiss the plaintiff's
claims of discrimination and retaliation against HSI and Stolfi
in violation of the Americans with Disabilities Act ("ADA"),
42 U.S.C. § 12101 et seq., the Fair Housing Act ("FHA"),
42 U.S.C. § 3601 et seq., and the Rehabilitation Act, 29
U.S.C. § 701 et seq. Burris v. Hous. & Servs. Inc., No. 17-
cv-9289, 2019 WL 1244494, at *9 (S.D.N.Y. Mar. 18, 2019).
The defendants now move for summary judgment pursuant to
Federal Rule of Civil Procedure 56 seeking dismissal of those
remaining claims. For the following reasons, the defendants'
motion for summary judgment is **granted in part and denied
in part.**

### I.

The following facts are based on the parties' Local
Civil Rule 56.1 statements and supporting papers and are
undisputed unless otherwise noted. See Defendants' Rule 56.1
Statement, ECF No. 106 ("Defs.' 56.1"); Plaintiff's Rule 56.1
Counterstatement, ECF No. 113 ("Pl.'s 56.1").

HSI is a non-profit agency that provides "scatter-site housing
to individuals and families with an HIV diagnosis." Defs.'
56.1 ¶ 1. Those individuals are referred to HSI by the
New York City Human Resources Administration ("HRA")
through its HIV/AIDS Services Administration ("HASA")
program. Id. HSI contracted with HRA to administer a
"permanent scatter-site supporting housing program for
Persons Living With AIDS (hereinafter "PLWAs") by
operating 100 scatter-site housing units for clients referred by
HASA." Id. ¶ 2. The contract between HSI and HRA "sets
forth the duties and obligations of the parties with respect to
HSI's provision of scatter-site housing services." Id. ¶ 3. HRA
and HASA's Housing Services Unit issue a "Desk Guide for
its Supported Housing Programs" in order to provide further
guidance to housing providers with whom HRA and HASA
have contracted. Id. ¶ 5; see also ECF No. 104-2 ("Desk
Guide").

Stolfi is the Program Manager of HSI's Scatter Site I Housing
Program, and is responsible for "oversight of the program,
supervision of staff, mediat[ion] [of] any issues that may
come up with[in] the program and provi[sion] [of] some direct
services as well." Defs.' 56.1 ¶ 6.

To qualify for an HSI-provided housing unit, individuals
approved for HASA services must apply for housing in
HASA's "Permanent Supported Housing Program." Id. ¶ 7.
The individual must be a client of HRA's HASA Program,
be referred by the HASA Housing Unit, need supportive
housing services, and be able to function independently
and self-sufficiently, both socially and financially. Id. ¶ 8.
Once an individual is approved for the Permanent Supported
Housing Program, the Housing Unit links that individual to
an available housing unit vacancy by referring the client's
application to a contracted housing provider. Id. ¶ 9. HSI,
a contracted provider, leases the apartments that are part of
its scatter-site housing program in its own name to allow
individuals and families to remain anonymous, and "pays the
rent for the units it leases" while seeking reimbursement from
HRA/HASA for its portion of rent paid. Id. ¶ 10-11.

**\*2**  After HSI contracted with HRA/HASA, HSI took over the lease for a New York City apartment (the "132 Street Apartment") "for occupancy by an eligible HASA client." Id. ¶ 12. In June 2012, HASA referred "AB," a program participant, to HSI for housing assistance, and HSI subleased the 132 Street Apartment to AB. Id. ¶¶ 13-14. AB was joined in the apartment by the plaintiff and the plaintiff's minor child. Id. ¶ 15. HSI subleased the apartment to AB from June 2012 to August 2016. Id. ¶ 16. HSI leased three other apartments in the same building during that time period, but in 2016, HSI began vacating all four units that it leased in the building. Id. ¶ 17. The leases were not rent-stabilized, and "over the years, the building raised rents 'very significantly.' " Id. ¶ 18.

On April 10, 2015, HSI "entered its final lease for" the 132 Street Apartment, from June 1, 2015 to May 31, 2016. Id. ¶ 19. The plaintiff disputes this, responding that "after May 31, 2016, HSI continued to lease the apartment ... on a month-to-month basis." Pl.'s 56.1 ¶ 19. HSI contacted AB to discuss relocation options, "including whether [AB, the plaintiff, and the plaintiff's child] were going to move together as a family unit or move separately." Defs.' 56.1 ¶ 20. HSI suggested to AB an apartment in the Bronx that was available for lease under the HASA program and that could house AB, the plaintiff, and the plaintiff's child. The plaintiff wanted HSI to move AB out of the 132 Street Apartment while allowing the plaintiff and her son to remain in that apartment, but was told that HSI could not do so because the plaintiff did not qualify for HASA. Id. ¶¶ 21-22. Neither the plaintiff nor the plaintiff's child are HASA program participants, nor are they eligible to be participants because they are not PLWAs. Id. ¶ 23.

On June 27, 2016, while the plaintiff and her son were still living with AB, the plaintiff filed a complaint ("NYSDHR Complaint") in the New York State Division of Human Rights ("NYSDHR"). Id. ¶ 25. In the NYSDHR Complaint, the plaintiff claimed that HSI "refused to rent, sell or deal with" the plaintiff and therefore "discriminated in the conditions or terms of sale, rental occupancy, or in services or facilities due to her family status." Id. ¶ 29.

The plaintiff requested housing assistance from HSI, claiming that AB's "behavior can get out of control," but was told that HSI could not help her relocate from AB because the plaintiff was not an HASA client. Pl.'s 56.1 ¶ 26. The plaintiff wanted to rent another apartment in the same building, but Jamron, the building's Property Manager, allegedly "did not give her an application and told [the] [p]laintiff she could not have the

keys." Defs.' 56.1 ¶ 27. The plaintiff disputes this, citing her testimony that when she spoke to Jamron, he told the plaintiff that he "was waiting to get the keys back ... for the apartments that were empty downstairs in the basement, and he will get back to me. I left messages after he told me that. He never returned my call." Pl.'s 56.1 ¶ 27.

On July 26, 2015, the plaintiff filed a temporary order of protection against AB. Defs.' 56.1 ¶ 30. After the order was issued, AB told HSI that she wanted to move out of the 132 Street Apartment on her own, without the plaintiff. Id. ¶ 31.

On August 3, 2016, HSI responded to the NYSDHR Complaint, "explaining that AB was in the process of relocating to another unit within HSI's scatter site program," and that because AB "was choosing to separate her public assistance case and move as an individual without" the plaintiff, the plaintiff and her son did not qualify for HASA housing assistance and HSI could not help the plaintiff and her son relocate. Id. ¶ 32.

On August 18, 2016, AB moved out of the 132 Street Apartment. Id. ¶ 33. HSI then relocated AB to another apartment on 139 Street (the "139 Street Apartment"). Id. ¶ 34. The plaintiff and her son remained in the 132 Street Apartment. Id. ¶ 35.

**\*3**  After AB moved out of the 132 Street Apartment, the plaintiff called AB, and AB later returned her call informing the plaintiff that Stolfi "gave [AB] a packet to give to [the plaintiff]." Id. ¶ 36. The packet contained "resources for rental assistance, including information on" several rental assistance programs, and a note to the plaintiff to "Call [Stolfi] if you have any questions." Id. ¶ 37. The plaintiff did not call Stolfi. Id. ¶ 44. The plaintiff alleges that she did not call Stolfi because the plaintiff "was scared of her." Pl.'s 56.1 ¶ 44. The plaintiff claims that she "was scared to speak to the agency because they did nothing to help [her] out" and that when the plaintiff "got the paperwork from the courts, [she] did reach out to [Stolfi]," and left Stolfi a message, but "[Stolfi] never returned [the plaintiff's] call." Id.

HSI contends that it only provides housing assistance for families through its Scatter Site Program under HASA, and because the plaintiff and her son sought housing as a family and were not HASA-eligible, "they did not qualify for any programs administered by HSI." Defs.' 56.1 ¶ 38. The plaintiff disputes this, claiming that "as family members on the budget of a HASA client, [the plaintiff] and her child qualified

for rehousing assistance" as required by the Desk Guide, which provides that HSI must "aggressively work toward rehousing non-HASA eligible individuals" and "must assist individual(s) to move, within six months of client's death/ departure, either by having the lease assigned from [HSI]'s Program to the individual him/herself ... or seeking alternate housing at a rent the individual can afford." Pl.'s 56.1 ¶ 38; ECF No. 104-2.

HSI states that, under its contract with HRA, "its case management services includ[e] providing various referrals as opposed to direct services." Defs.' 56.1 ¶ 39. Because HSI does not have in-house services, such as "mental health counseling, psychiatric treatment, legal services or substance abuse counseling," HSI would instead connect its clients with other community organizations that provide those services. Id. ¶ 40. HSI states that "[t]his is equally true of housing placement services," because "HSI does not have access to housing outside of its programs, nor [does it] have in-house housing search services or access to housing search programs." Id. ¶ 41. Instead, HSI "would refer individuals to community organizations with expertise in the area locating housing," but was not otherwise "familiar with [the] various resources identified in the packet provided to [the] [p]laintiff, rendering HSI unable to provide additional assistance." Id. ¶ 42.

On August 30, 2016, HSI served the plaintiff with a "10-Day Notice to Vacate Premises." Id. ¶ 45. On August 31, 2016, HSI sent HRA/HASA a report stating that AB had relocated from the 132 Street Apartment to the 139 Street Apartment "due to family conflict and landlord issues," that "AB's daughter and grandson remain at the [132 Street Apartment] and were provided referrals to family housing programs," and that "HSI has started an eviction process against [the plaintiff and her son] due to their apparent plan to remain in the" 132 Street Apartment. Id. ¶ 46. The plaintiff did not vacate the apartment after receiving the 10-Day Notice. Id. ¶ 47.

On September 22, 2016, HSI began a "licensee holdover proceeding" by serving on the plaintiff a "Notice of Petition and Petition." Id. ¶ 47. During the holdover proceeding, the plaintiff stated, through an attorney for Manhattan Legal Services, that "she and her son were eligible to remain in the unit" and that she qualified to be in the building. Id. ¶ 48-50. The defendants claim that the plaintiff "never once spoke to the landlord about leasing the [132 Street Apartment] herself," id. ¶ 51, but the plaintiff disputes this, alleging that Jamron "didn't return my call," and Stolfi "told me I could

not be in the unit because I was not a HASA client." Pl.'s 56.1 ¶ 51. Around September or October 2016, Stolfi told the plaintiff by phone that the plaintiff did not qualify to stay in the apartment, which the defendants contend that the plaintiff acknowledged. The plaintiff disputes this, claiming that she had called and left multiple messages for Stolfi, but Stolfi had never returned her calls. Pl.'s 56.1 ¶ 53.

**\*4** In November 2016, the plaintiff applied for Section 8 housing through NYCHA with the assistance of Harlem Independent Living Center, for which the plaintiff is still on the waiting list. Id. ¶¶ 54-56. The plaintiff also applied for an apartment in a building called "The Balton." Defs.' 56.1 ¶ 57.

Unlike HSI, Harlem Independent Living Center "was approved to submit supportive housing applications to HRA." Id. ¶ 58. The plaintiff began "the process of submitting a supportive housing application with Harlem Independent Living Center but could not recall whether she ever completed the process." Id. ¶ 60.

In November 2016, the plaintiff contacted the New York City Department of Health & Mental Hygiene for housing assistance and was put in touch with "Visiting Nurse Services Care Coordination." Id. ¶ 61. On December 2, 2016, the plaintiff enrolled in the "Visiting Nurse Service of New York Health Home" and was assigned a Care Manager who assisted the plaintiff with her housing needs. Id. ¶ 62. The Visiting Nurse Service of New York also helped the plaintiff to complete her supportive housing application. However, the plaintiff "could not recall whether that application was ever completed or submitted." Id. ¶ 63.

The plaintiff also contacted other agencies for assistance. Id. ¶¶ 64-66. While the plaintiff was seeking housing assistance from those other agencies, the plaintiff "was still advocating to remain" in the 132 Street Apartment. Id. ¶ 68.

On April 27, 2017, the parties reached a settlement in the holdover proceeding, which provided that the plaintiff agreed to vacate the 132 Street Apartment by September 30, 2017. Id. ¶ 69. In May 2017, HSI sent the plaintiff a letter with information about "NYC housing assistance resources available for low-income families" and offered "to assist [the plaintiff] with pursuing this resource for rehousing as soon as possible." Id. ¶ 70. The letter included a list of brokers, realtors, and landlords prepared by the HRA to help clients find apartments. On August 9, 2017, HSI sent a second letter

to the plaintiff, which was returned to HSI as "Unclaimed" and "Unable To Forward." Id. ¶ 72.

On May 16, 2017, HRA asked Stolfi about the status of the 132 Street Apartment, including why it was listed as "in transition." Id. ¶ 75. Stolfi responded:

> This apartment was previously occupied by AB, who was transferred to another unit and then to our congregate program because of a potentially violent and volatile situation between her and her adult daughter in the home and her need for a higher level of care. Her adult daughter and grandson remain in the apartment and have refused to move despite our efforts to refer her for family housing. We have been involved in a lengthy housing court case to move them along ever since, which she has fought all along the way. We finally were able to get a stipulation for the family to move out by 9/30/17.

Id. ¶ 76. HRA/HASA then asked about HSI's efforts to relocate the plaintiff and her son, to which HSI responded that "it no longer had a lease for" the 132 Street Apartment and that "the building owner did not want to lease directly to [the plaintiff]." Id. ¶ 77-78. HSI also told HRA/HASA that it had provided the plaintiff with a broker list and sent the plaintiff two letters with information on rental assistance programs. HRA continued to reimburse HSI for the rents that HSI paid on the 132 Street Apartment while the plaintiff and her son lived there, pending their relocation "by eviction or otherwise." Id. ¶ 82. HRA "advised HSI of its expectation" that HSI would evict non-HASA clients after the departure of an HASA client from an apartment if the family members of that client "do not demonstrate an intention to vacate the unit, for example by pursuing the referrals provided by [HSI]." Id. ¶ 83.

**\*5** On November 22, 2017, the plaintiff filed this action. On June 29, 2018, the plaintiff filed an amended complaint. ECF No. 36. The defendants moved to dismiss the amended complaint, which motion was granted in part and denied in part. ECF No. 60. On May 2, 2022, the parties completed

discovery, and the defendants filed the current motion for summary judgment shortly thereafter.

The plaintiff argues that HSI was required to provide her with more substantial relocation assistance, but failed to do so because of her disability, and therefore discriminated against her in violation of the ADA, the Rehabilitation Act, and the FHA. The plaintiff also argues that the defendants retaliated against her for filing a complaint of discrimination with the NYSDHR, in violation of those same statutes.

## II.

The standard for granting summary judgment is well established. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the materials in the record that "it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). [1] At the summary judgment stage, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. See Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty hobby, Inc., 477 U.S. 242, 248 (1986). If the moving party meets its burden, the nonmoving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible." Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993).

## III.

The plaintiff brings claims for discrimination on the basis of disability in violation of the ADA, the Rehabilitation Act, and the FHA. On a motion for summary judgment, claims for intentional discrimination under the ADA, the Rehabilitation Act, and the FHA are analyzed under the familiar McDonnell Douglas burden-shifting framework. See Reg'l Econ. Cmty. Action Program, Inc. v. City of

Middletown, 294 F.3d 35, 48-49 (2d Cir. 2002), superseded by statute on other grounds, ADA Amendments of 2008, Pub. L. No. 110-325, 122 Stat. 3553. Under the McDonnell Douglas framework, the plaintiff must first establish a prima facie case of discrimination. Id.; see also McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). "If the plaintiff[ ] make[s] out a prima facie case, then the burden of production shifts to the defendant to provide a legitimate, nondiscriminatory reason for its decision." Reg'l Econ. Cmty. Action Program, 294 F.3d at 49. If the defendant satisfies this burden, then the burden shifts back to the plaintiff to show that the defendant's "articulated, legitimate, non-discriminatory reasons were pretextual." Id.

### A.

The defendants argue that HSI is not a public entity within the meaning of the ADA and therefore is not subject to the ADA. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. To bring a claim under Title II of the ADA, the plaintiff must show that: (1) she is a qualified individual with a disability, (2) the defendants are subject to the ADA, and (3) she was denied the opportunity to participate in or benefit from the defendants' services or was otherwise discriminated against by the defendants because of her disability. Henrietta D. v. Bloomberg, 331 F.3d 261, 272 (2d Cir. 2003).

**\*6** The plaintiff does not dispute that HSI is not a public entity within the meaning of the ADA. Pl.'s Opp., ECF No. 112, at 3 n.1. Therefore, the plaintiff's ADA claims are **dismissed** because the defendants are not subject to Section 12132 of the ADA.

### B.

The defendants next move for summary judgment on the plaintiff's claim of discrimination under the Rehabilitation Act. Individuals cannot be held liable under the Rehabilitation Act. See J.L. on behalf of J.P. v. N.Y.C. Dep't of Educ., 324 F. Supp. 3d 455, 467 n.4 (S.D.N.Y. 2018). Accordingly,

the plaintiff's Rehabilitation Act claims can only be asserted against HSI.

Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). The standard for Rehabilitation Act claims is "generally the same" as for ADA claims, and requires the plaintiff to show that (1) she is a qualified individual with a disability, (2) the defendant is subject to the Rehabilitation Act, (3) she was denied the opportunity to participate in or benefit from the defendant's services or was otherwise discriminated against by the defendant because of her disability, and (4) the defendant receives federal funding. See Shomo v. City of New York, 579 F.3d 176, 185 (2d Cir. 2009); see also Henrietta D., 331 F.3d at 272 ("[U]nless one of those subtle distinctions [between the ADA and the Rehabilitation Act] is pertinent to a particular case, we treat claims under the same two statutes identically.").[2] On a motion for summary judgment, the plaintiff's burden to establish her prima facie case is de minimis. See Duprey v. Prudential Ins. Co. of Am., 910 F. Supp. 879, 884 (N.D.N.Y. 1996); Schneider v. Wal-Mart Stores, Inc., No. 16-cv-2010, 2019 WL 294309, at \*4 (S.D.N.Y. Jan. 23, 2019). HSI does not claim that it is not subject to the Rehabilitation Act or contest that the plaintiff's mental illness qualifies her as an individual with a disability. The parties contest only whether the plaintiff was denied the opportunity to benefit from HSI's services on the basis of the plaintiff's mental illness.

The plaintiff argues that HSI discriminated against her based on her mental illness by not following an HASA policy, codified in the Desk Guide, that applies to "[a]ny individual who is not a HASA client and continues to reside in the apartment/unit after the HASA client is no longer in residence." Desk Guide, ECF No. 104-2, at 14. The Desk Guide provides:

**\*7** Failure of the Provider to aggressively work toward rehousing non-HASA eligible individuals will result in a disallowance of any further payments on the apartment as of the sixth month following the death/departure of the HASA client.

• All efforts to rehouse individuals in this category must be clearly documented.

Provider must assist individual(s) to move, within six months of client's death/departure, either by

• having the lease assigned from the Provider's Program to the individual him/herself and find other means to pay the rent (e.g., PA shelter allowance); or

• seeking alternate housing at a rent the individual can afford.

Id. HSI argues that it provided the plaintiff with sufficient relocation assistance by providing the plaintiff, through AB, with a packet of information about housing and rental assistance including information on several rental assistance programs, and a note to the plaintiff to "Call [Stolfi] if you have any questions." Defs.' 56.1 ¶ 37. HSI also claims to have sent the plaintiff two letters, one of which contained a list of brokers, realtors, and landlords intended to help the plaintiff find a new apartment, and the other of which was returned as undelivered.

The plaintiff contests the sufficiency of HSI's efforts to provide her with relocation services, as required by the Desk Guide. First, the plaintiff argues that the housing assistance programs recommended by HSI were insufficient because the plaintiff was not eligible for those services. Second, the plaintiff claims that she called Stolfi for further help, but Stolfi did not return the plaintiff's calls nor respond to the plaintiff's voicemails. Pl.'s 56.1 ¶ 44. On a separate occasion, the plaintiff also claims that Stolfi never returned her calls despite the plaintiff's having left "more than five" messages. Pl.'s 56.1 ¶ 53. Finally, the plaintiff challenges the method of delivery of the initial packet provided by HSI, because HSI left the packet with AB to give to the plaintiff despite knowing of the significant tension in the relationship between AB and the plaintiff.

The plaintiff also argues that HSI treated the plaintiff disparately relative to other similarly situated individuals. Specifically, the plaintiff claims that "HSI has failed to identify a single other instance where it began an eviction process against a family member on a HASA client's budget within even two months – let alone two weeks – as occurred here." Pl.'s Opp. at 19. Disparate treatment is an accepted theory of liability for Rehabilitation Act discrimination claims. See Davis v. Shah, 821 F.3d 231, 259-60 (2d Cir. 2016) ("A plaintiff may base her discrimination claim on one

of three theories of liability: disparate treatment, disparate impact, or failure to make a reasonable accommodation."). The plaintiff points to evidence that other individuals who lived with a family member in HSI housing, and who did not otherwise qualify for HSI housing, were given "5 weeks' notice to vacate" and did not have holdover proceedings commenced against them "for five months," whereas the plaintiff was served with an eviction notice just two weeks after AB moved out of the 132 Street Apartment and, within two months of being served with the eviction notice, HSI commenced holdover proceedings against the plaintiff. Pl.'s 56.1 ¶ 139. The factual dispute between the parties as to whether HSI's efforts to re-house the plaintiff were sufficient, compounded by evidence that other similarly situated individuals were not evicted with such rapidity, suffices to state the plaintiff's prima facie case. See Burris, 2019 WL 1244494, at *6 (finding, on the motion to dismiss in this case, that the plaintiff had satisfied her prima facie case by alleging that "she is qualified to receive the benefit of the HASA policy relating to relocation assistance but did not receive it because of her disability," and that "she was not provided a service to which she was entitled - a service that is provided to all individuals, disabled or not - because of her disability").

**\*8** The burden then shifts to HSI to articulate a legitimate, non-discriminatory reason for the plaintiff's eviction and its allegedly insufficient efforts to re-house the plaintiff. The most obvious reason, and the one HSI articulates, is that the plaintiff was not entitled to remain in the 132 Street Apartment because she was not an HASA-eligible individual, and that HSI "provided the services it could" to the plaintiff. See Defs.' Memo. at 16. However, the plaintiff has adduced evidence that HSI accelerated the timeline for eviction in the plaintiff's case relative to other similarly situated non-HASA eligible individuals. Moreover, the plaintiff has contested the sufficiency of HSI's efforts to re-house her, claiming that Stolfi never returned any of the plaintiff's calls, despite Stolfi's invitation, and that Stolfi did not give the initial packet of housing assistance information directly to the plaintiff. Although this evidence comprised the plaintiff's prima facie case of intentional discrimination, the plaintiff does not have to adduce additional information to defeat summary judgment at the pretext stage, and may instead "rely on evidence comprising her prima facie case." See ⚑ Zann Kwan v. Andalex Grp. LLC, 737 F.3d 834, 847 (2d Cir. 2013) (Title VII retaliation). Given this evidence, a reasonable jury could conclude that HSI's stated nondiscriminatory reasons for its decisions were pretextual.

Ultimately, the question of whether HSI intentionally discriminated against the plaintiff by inadequately helping the plaintiff with housing relocation creates a genuine dispute of material fact that precludes summary judgment for the defendants on the plaintiff's Rehabilitation Act discrimination claim. A reasonable jury could conclude that the defendants' efforts did not satisfy sufficiently the requirement of the Desk Guide that the defendants "aggressively work toward re-housing non-HASA eligible individuals," and that the plaintiff was treated disparately on the basis of her mental illness in receiving HSI's rehousing services. Accordingly, HSI's motion for summary judgment on the plaintiff's Rehabilitation Act intentional discrimination claim is **denied.**

### C.

The FHA makes it illegal "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of ... that person." 🚩 42 U.S.C. § 3604(f)(2)(A). The FHA allows for claims to be brought against individuals. See Burris, 2019 WL 1244494, at *7. The defendants argue that the plaintiff's FHA intentional discrimination claim must be dismissed because relocation services do not constitute "terms, conditions, or privileges of rental" within the meaning of the FHA. On a motion for summary judgment, intentional discrimination claims under the FHA are also analyzed under the McDonnell Douglas framework. See 🚩 Mitchell v. Shane, 350 F.3d 39, 47 (2d Cir. 2003).

In its ruling on the defendants' motion to dismiss in this case, the Court considered, and rejected, the defendants' argument that the relocation services provided for in the Desk Guide do not constitute "terms, conditions, or privileges of rental." See Burris, 2019 WL 1244494, at *7.[3] The Court concluded that "[h]olding otherwise ... would contravene Congress's intent to root out discrimination in housing and to foster truly integrated and balanced living patterns." Id. On their motion for summary judgment, the defendants make this argument again, but have not brought any new cases to the Court's attention that call into question the Court's prior determination on this issue. The defendants state that "in no case we could locate has a Court interpreted privileges, services, or facilities to refer to case management services provided as part of a supportive housing program."

Defs.' Memo. at 10-11. But the defendants also do not cite any cases which hold squarely that "terms, conditions, or privileges of rental" do not encompass the relocation services that are provided for by the Desk Guide in this case. Instead, the defendants argue only that "terms, conditions, or privileges of rental" have been interpreted to refer to "services generally provided by governmental units such as police and fire protection or garbage collection," and to "apartment complex facilities, such as the swimming pool, laundry equipment, club house, tennis courts and other recreational areas." Id. at 10. However, nothing about this argument, nor the cases cited by the defendants, precludes "terms, conditions, and privileges of rental" from also encompassing relocation services. Accordingly, the defendants' argument is unpersuasive, and there is no reason to find that housing relocation services are not covered by the FHA because, at the very least, a reasonable jury could conclude that such services are covered under the FHA.

**\*9** The defendants also argue that the plaintiff has not made out a prima facie case for discrimination under the FHA. An FHA claim of intentional discrimination can be brought under one of three theories: disparate treatment, disparate impact, or failure to make a reasonable accommodation. Perricone-Bernovich v. Tohill, 843 F. App'x 419, 420 (2d Cir. 2021). The plaintiff proceeds on a theory of disparate treatment.[4] To state a prima facie case for disparate treatment under the FHA, the plaintiff must show that: (1) she is a member of a protected class; (2) she sought and was qualified to rent or purchase the subject housing; (3) she was rejected; and (4) the housing opportunity remained available to other prospective renters or purchasers. 🚩 Mitchell, 350 F.3d at 47. The defendants agree that, in the context of the plaintiff's claim, the test is modified and the plaintiff must show that: (1) she is a member of a protected class; (2) she sought and was qualified for assistance relocating; (3) she was denied that assistance; and (4) that assistance was available to other individuals after the death or departure of a HASA-client. Defs.' Memo. at 12.

The defendants do not contest the first two factors. See id. at 13 ("Assuming [the] [p]laintiff's mental illness makes her a member of a protected class and that the Desk Guide established that [she] was qualified for assistance relocating, ..."). The defendants argue only that the plaintiff "cannot show [that] she was denied that assistance [relocating] or that the assistance she claims she was denied was available to others." Id.

Whether the defendants' efforts to assist the plaintiff with relocating after AB moved out of the 132 Street Apartment satisfied the requirement set forth in the Desk Guide that HSI "aggressively work toward re-housing non-HASA eligible individuals," Desk Guide at 14, presents a genuine dispute of material fact mirroring the plaintiff's claim for discrimination under the Rehabilitation Act, and precluding summary judgment for the defendants on the plaintiff's FHA claim. The plaintiff has contested the sufficiency of the defendants' efforts to relocate her and has adduced evidence showing that the plaintiff experienced disparate treatment in comparison to HSI's efforts to re-house other non-HASA eligible family members. Moreover, a reasonable jury could conclude that any legitimate, non-discriminatory reason proffered by the defendants' for evicting the plaintiff in this case was pretextual given the evidence adduced by the plaintiff and the genuine issues of material fact created by the plaintiff's adduced evidence. Accordingly, for the same reasons that preclude summary judgment on the plaintiff's Rehabilitation Act discrimination claim, the defendants' motion for summary judgment on the plaintiff's FHA discrimination claim is **denied.**

## IV.

The defendants next move for summary judgment on the plaintiff's claims of retaliation in violation of the Rehabilitation Act and the FHA.

Retaliation claims under the Rehabilitation Act and the FHA are governed by the McDonnell Douglas burden-shifting framework. Dodd v. City Univ. of New York, 489 F. Supp. 3d 219, 246 (S.D.N.Y. 2020) (Rehabilitation Act); Johnson v. YWCA Residence, LLC, No. 12-CV-3301, 2014 WL 12782728, at *4 (S.D.N.Y. 2014) (FHA). The plaintiff bears the initial burden to make her prima facie case by showing that: (1) the plaintiff was engaged in protected activity; (2) the alleged retaliator knew that the plaintiff was involved in protected activity; (3) an adverse decision or course of action was taken against the plaintiff; and (4) a causal connection exists between the protected activity and the adverse action. Natofsky v. City of New York, 921 F.3d 337, 353 (2d Cir. 2019) (Rehabilitation Act); Reg'l Econ. Cmty. Action Program, Inc., 294 F.3d at 53-54 (FHA).[5] A causal connection can be shown either "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial

evidence such as disparate treatment of fellow [individuals] who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." Natofsky, 921 F.3d at 353. The "plaintiff's burden at this prima facie stage is de minimis." Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002).

**\*10** On June 27, 2016, the plaintiff engaged in protected activity by filing the NYSDHR Complaint. HSI responded to the NYSDHR Complaint on August 3, 2016, by which time the defendants must have known of the charge of discrimination against them. Less than a month later, on August 30, 2016, HSI served the plaintiff with a "10-Day Notice to Vacate Premises," commencing eviction proceedings against the plaintiff. Defs.' 56.1 ¶ 45.

The defendants argue that commencing eviction proceedings against the plaintiff did not constitute an adverse action because HSI's conduct did not cause the plaintiff to "change her behavior" nor did it have any "chilling effect on [the] [p]laintiff's willingness to assert" her rights under the FHA or the Rehabilitation Act. Defs.' Memo. at 22. However, for purposes of retaliation, an adverse action is any action that would be sufficiently severe to deter a reasonable person in the plaintiff's position from participating in a protected activity. See Quadir v. N.Y. State Dep't of Labor, 39 F. Supp. 3d 528, 542-43 (S.D.N.Y 2014); see also Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (holding, in the Title VII context, that an adverse action is one that "dissuade[s] a reasonable [individual] from making or supporting a charge of discrimination"). Beginning eviction proceedings within a month of the plaintiff's filing the NYSDHR Complaint is a sufficiently adverse action that would deter a reasonable person from pursuing charges of discrimination. See Reyes v. Fairfield Props., 661 F. Supp. 2d 249, 267 n.10 (E.D.N.Y. 2009) (finding that eviction proceedings constituted adverse actions under the FHA); see also DeSouza v. Park West Apartments, Inc., No. 15-cv-1668, 2018 WL 2990099, at *11 (D. Conn. June 14, 2018) (collecting cases) ("[I]nitiation of eviction proceedings ... constitute[s] [an] adverse action[] under [the FHA]."). At the very least, a reasonable jury could conclude that the eviction constituted an adverse action. Therefore, the argument that commencing eviction proceedings did not constitute an adverse action is unpersuasive.

To establish the causation element of her prima facie case, the plaintiff relies on the temporal proximity between the filing of the NYSDHR Complaint and the service of the 10-Day Notice to Vacate the 132 Street Apartment. "[A] plaintiff can indirectly establish a causal connection to support a ... retaliation claim by showing that the protected activity was closely followed in time by the adverse ...

action." 🚩 Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cnty., 252 F.3d 545, 554 (2d Cir. 2001). In this case, the adverse action occurred less than a month after the plaintiff's participation in a protected activity, which is "sufficient to establish the required causal link for a prima facie case." See 🚩 Treglia, 313 F.3d at 721 (finding that temporal proximity of one month was sufficient); Dodd, 489 F. Supp. 3d at 247 ("Generally, to show causation through temporal proximity alone, courts in this Circuit require no more than two months to have passed between a protected activity and an adverse action."). In this case, the "very close" temporal proximity is sufficient to establish causation for the plaintiff's prima facie case.

Moreover, the defendants commenced eviction proceedings just under two weeks after August 18, 2016, when AB moved out of the 132 Street Apartment. Because the defendants had to wait until AB vacated the apartment before commencing eviction proceedings, the close temporal proximity between AB's departure from the 132 Street Apartment and the commencement of eviction proceedings against the plaintiff could lead a reasonable jury to conclude that "the adverse action occurred at the first actual opportunity to retaliate."

🚩 Summa v. Hofstra Univ., 708 F.3d 115, 128 (2d Cir. 2013).

 **\*11**  The defendants argue that the eviction could not have been retaliatory because the plaintiff was told that she could not remain in the 132 Street Apartment, and that eviction proceedings were the culmination of a series of events that began before the plaintiff engaged in protected activity. In the employment context, "courts have held that, where discipline began before an employee's protected activity and the employee's poor performance continued after the protected activity, the continuation and even gradual escalation of discipline cannot support a retaliation claim." See, e.g., Europe v. Equinox Holdings, Inc., No. 20-cv-7787, 2022 WL 4124763, at \*10 (S.D.N.Y. Sept. 9, 2022). However, this case is not an analogous situation. In this case, the plaintiff had no warning that the defendants would begin eviction proceedings against her just two weeks after AB moved out of the apartment, unlike in Europe where an employee

with a documented record of lateness, and who was formally disciplined several times, was eventually fired. See id.

Given the plaintiff's prima facie case, the burden shifts to the defendants to articulate a legitimate, non-discriminatory reason for commencing eviction. The defendants claim that "HSI and [Stolfi] believed that [the] [p]laintiff was intent on remaining in the unit, and that it was their duty to free up the spot in the HASA scatter-site housing program for a HASA-eligible client." Defs.' Memo. at 20.

While it is true that the plaintiff was not eligible for the 132 Street Apartment, and that HRA "advised HSI of its expectation" that HSI would act to evict non-HASA clients after the departure of an HASA client from an apartment if the family members of that client "do not demonstrate an intention to vacate the unit," Defs. 56.1 ¶ 83, the plaintiff has also adduced evidence that the defendants had not moved to evict other similarly situated individuals with such rapidity. Other similarly situated HASA-ineligible individuals were given "5 weeks' notice to vacate" and did not have holdover proceedings commenced against them "for five months." Pl.'s 56.1 ¶ 139. In contrast, the plaintiff was served with an eviction notice less than a month after she filed the NYSDHR Complaint and just 2 weeks after AB moved out of the 132 Street Apartment, and the defendants commenced holdover proceedings against the plaintiff within two months after serving the eviction notice. Although "temporal proximity alone is insufficient to defeat summary judgment at the pretext stage," 🚩 Zann Kwan, 737 F.3d at 847, the combination of the short temporal proximity and the additional circumstantial evidence of the defendants' not serving notices of eviction on other such similarly situated non-HASA eligible individuals with such rapidity is sufficient to raise a question of pretext that would preclude summary judgment. See 🚩 Graham v. Long Island R.R., 230 F.3d 34, 43 (2d Cir. 2000) (finding, in the employment context, that "[a] showing that similarly situated employees ... received more favorable treatment can also serve as evidence that the employer's proffered legitimate, non-discriminatory reason for the adverse job action was a pretext for ... discrimination"); see also Osekavage v. Sam's East, Inc., No. 19-cv-11778, 2022 WL 3084320, at \*10 (S.D.N.Y. Aug. 3, 2022) ("[The] [p]laintiff has, in addition to establishing temporal proximity, offered evidence of disparate treatment - evidence from which a reasonable jury could infer that the reasons proffered by [the] [d]efendants were a pretext for a retaliatory motivation."). [6]

**\*12** Moreover, there remain factual disputes as to whether the defendants complied sufficiently with their obligations, pursuant to the Desk Guide, to provide the plaintiff with relocation assistance. "The Court's role, at the summary judgment stage, is not to weigh evidence." Dodd, 489 F. Supp. 3d at 261. Instead, "the Court's role is only to determine whether there is a genuine issue for trial." Id. In light of these factual disputes, a reasonable jury could conclude that the defendants' proffered nondiscriminatory reason for evicting the plaintiff was pretextual. Accordingly, the defendants' motion for summary judgment on the plaintiff's retaliation claims under the Rehabilitation Act and the FHA is **denied.**

### CONCLUSION

The Court has considered all the arguments of the parties. To the extent not specifically addressed above, the arguments are either moot or without merit. For the foregoing reasons, the defendant's motion for summary judgment is **granted in part and denied in part.** The Clerk is directed to close all pending motions.

**SO ORDERED.**

**All Citations**

Slip Copy, 2023 WL 1966120

### Footnotes

1    Unless otherwise noted, this Memorandum Opinion and Order omits all internal alterations, citations, footnotes, and quotation marks in quoted text.

2    In this case, although the defendants argue that HSI is not a public entity within the meaning of the ADA, the defendants have not contested that HSI receives federal funding to operate its housing assistance program. Therefore, there is a "subtle distinction" that allows HSI to be held liable under the Rehabilitation Act while it cannot be held liable under the ADA. Henrietta D., 331 F.3d at 272; see also Logan v. Matveevskii, 57 F. Supp. 3d 234, 254 (S.D.N.Y. 2014) ("[O]ne of the primary differences between [the ADA and the Rehabilitation Act] is that the Rehabilitation Act applies only to federally-funded programs.").

3    The opinion on the motion to dismiss in Burris relied on Francis v. Kings Park Manor, Inc. ("Francis I"), 917 F.3d 109, 117-118 (2d Cir. 2019), which held that post-acquisition claims – discrimination occurring after a plaintiff rents a dwelling – are actionable under the FHA. Francis I was later vacated en banc because of a separate issue in that case, distinct from whether the FHA covered post-acquisition claims. See Francis v. Kings Park Manor, Inc. ("Francis III"), 992 F.3d 67 (2d Cir. 2021). In Francis III, the majority opinion did not squarely address whether, in light of the vacatur of Francis I, post-acquisition claims remained actionable under the FHA. In a concurrence in part and a dissent in part, Judge Lohier noted that "[a]lthough the proposition that the FHA bans post-acquisition discriminatory conduct in housing is beyond serious dispute, the majority opinion merely assumes it," and that he "would squarely hold that it does." Francis III, 992 F.3d at 87-89 (Lohier, J., dissenting in part and concurring in part).

4    The plaintiff's FHA claim for failure to make a reasonable accommodation was dismissed in this case on the earlier motion to dismiss. See Burris, 2019 WL 1244494, at *8.

5    Because the two statutes are governed by identical tests, the Court will consider the plaintiff's retaliation claims under both statutes together.

6    Graham and Osekavage both analyzed pretext in the Title VII context. However, the principles underlying a finding of pretext remain consistent, whether under Title VII, the Rehabilitation Act, or the FHA, because

the statutes are analyzed under similar standards. See, e.g., Pistello v. Bd. of Educ. of Canastota Cent. Sch. Dist., 808 F. App'x 19, 21-22 (2d Cir. 2020) (analyzing together retaliation claims under Title VII and the Rehabilitation Act); Reg'l Econ. Cmty. Action Program, 294 F.3d at 53-55 (2d Cir. 2002) (analyzing together retaliation claims under the Rehabilitation Act and the FHA).

---

**End of Document**                                          © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 2440596
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Ileen CAIN, Plaintiff,

v.

Jerome RAMBERT, Kenya Pope, Brian
Mitchell, Karen Ruth, Unika Steele, Jane
Doe and Haaziq Paul Reid, Defendants.

No. 13–CV–5807 (MKB).
|
Signed May 30, 2014.

**Attorneys and Law Firms**

Ileen Cain, Brooklyn, NY, pro se.

***MEMORANDUM & ORDER***

MARGO K. BRODIE, District Judge.

**\*1** Plaintiff Ileen Cain, proceeding *pro se,* commenced this action on October 21, 2013, against her landlord, Jerome Rambert, and two neighbors, Kenya Pope and Brian Mitchell, alleging violations of the Fair Housing Act of 1968, as amended by the Fair Housing Amendments Act of 1988, 42 U.S.C. § 3601 *et seq.* ("FHA"), the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"), Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 *et seq.* (the "Rehabilitation Act"), the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution, the "Equal Justice Under Telecommunications Act," the New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.* ("NYSHRL"), and the New York City Human Rights Law, N.Y.C. Admin. Code § 8–101 *et seq.* ("NYCHRL"), as well as city and state law claims for retaliatory eviction, breach of warranty of habitability and breach of contract. By order dated November 26, 2013, the Court granted Plaintiff's request to proceed *in forma pauperis* pursuant to 28 U.S.C. § 1915(a), and granted Plaintiff leave to file an amended complaint. On January 30, 2014, Plaintiff filed an Amended Complaint against her landlord Jerome Rambert, several tenants including Kenya Pope, Brian Mitchell, Karen Ruth, Unika Steele, and Jane Doe, and New York City Police Officer

Haaziq Paul Reid. (Docket Entry No. 7.) On February 6, 2014, Plaintiff requested the appointment of *pro bono* counsel. For the reasons discussed below, Plaintiff's Amended Complaint is dismissed for failure to state a claim upon which relief may be granted and her request for the appointment of counsel is denied.

**I. Background**

Plaintiff was diagnosed with post-traumatic stress disorder in 2007. (Am.Compl.1.) [1] In March 2012, Plaintiff moved into a Section 8 apartment on Stuyvesant Avenue in Brooklyn, New York. [2] Rambert, the landlord of the building in which Plaintiff lives, disclosed Plaintiff's disability to Ruth, a tenant. (*Id.*) Because Plaintiff did not respond to sexual advances and propositions from Ruth and another tenant, Steele, they organized "the spreading of lies regarding Plaintiff's sexuality and mental capacity, with the aiding and abetting of Defendant Pope [and] Defendant Mitchell," two other tenants in the building. (*Id.*) "Throughout the community ... and the internet Plaintiff is called 'bi coo coo bi too, kook kook ....' " (*Id.*) "The rant is continued by Defendants Ruth and Steele" through the use of an acoustic device that emits disturbing noises "that are harmful to Plaintiff['s] hearing ... and interrupt[ ] sleep," and through "telecommunication tools such as the [I]nternet." [3] (*Id.* at 1–2.) Ruth and Steele yell "coo coo care care care coo kook her kook her" during the night and scream and bang on the walls. (*Id.* at 5.) Ruth and Steele have also gathered personal information about Plaintiff, attempted to make false police reports against Plaintiff and have called Emergency Medical Services ("EMS"), alleging that Plaintiff is an emotionally disturbed person. (*Id.* at 2.) Pope "is aiding and abetting" Steele and Ruth by calling out "koook it coo coo coo coo coo coo coo kook it he care he care kook it kook it," as Pope enters and leaves the building. (*Id.* at 2.) Mitchell has entered and left the building "yelling the same rant," and told Plaintiff that Plaintiff needs medication. (*Id.* at 3.) Reid, a New York City police officer, is "aiding and abetting" the allegations in the Amended Complaint and "put[ting] Plaintiff['s] life in danger ... by not informing Plaintiff he was soliciting sex from Defendants Pope and Steele." (*Id.* at 3.)

**\*2** Plaintiff also alleges that "[t]he foundation of the house is shoddy and this amplifies sound," that her apartment "is unfit for human privacy," and that as a result she is unable to speak on the telephone or have company. (*Id.* at 6, 9.) Plaintiff has filed numerous reports with the New York City Police Department and the Office of the New York

State Attorney General, which she attaches to the Amended Complaint. (*See* Police Reports, annexed to Am. Compl. as Ex. 3; Letter from Attorney General, annexed to Am. Compl. as Ex. 4.) Plaintiff has sent over 400 text messages to Rambert "describing the events taking place on [the] property as they unfold," as well as certified notarized mail which was returned to Plaintiff. (Am. Compl. at 4.) Since Plaintiff made the complaints to the police, Rambert has initiated "frivolous" holdover proceedings against her. (*Id.*) The holdover proceedings initiated by Rambert have been dismissed due to his failure to appear and improper service. (*Id.* at 5.) Plaintiff seeks monetary damages and unspecified injunctive relief, and seeks to have this Court "evict the tenants" who reside in the building. (*Id.* at 10–11.)

## II. Discussion

### a. Standard of Review

A complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the Plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). Although all allegations contained in a complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Id.* In reviewing a *pro se* complaint, the Court must be mindful that the Plaintiff's pleadings should be held "to less stringent standards than formal pleadings drafted by lawyers." *Hughes v. Rowe,* 449 U.S. 5, 9, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980) (internal quotation marks omitted); *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009) (noting that even after *Twombly,* the court "remain[s] obligated to construe a *pro se* complaint liberally"). If a liberal reading of a complaint "gives any indication that a valid claim might be stated," the Court must grant leave to amend the complaint. *See Shabazz v. Bezio,* 511 F. App'x 28, 31 (2d Cir.2013) (quoting *Branum v. Clark,* 927 F.2d 698, 705 (2d Cir.1991)). Nevertheless, the Court is required to dismiss *sua sponte* an *in forma pauperis* action, if it determines the action "(i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B); *Abbas v. Dixon,* 480 F.3d 636, 639 (2d Cir.2007). A court's review of a

complaint is limited to the four corners of the complaint, but it may also review (1) documents attached to the complaint, (2) any documents incorporated in the complaint by reference, (3) documents deemed integral to the complaint, and (4) public records. *See L–7 Designs, Inc. v. Old Navy, LLC,* 647 F.3d 419, 422 (2d Cir.2011) (documents attached to the complaint, those incorporated by reference, and those integral to the complaint); *Global Network Commc'ns, Inc. v. City of New York,* 458 F.3d 150, 156 (2d Cir.2006) (documents integral to the complaint); *Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.,* 369 F.3d 212, 217 (2d Cir.2004) (public records).

**\*3** A plaintiff seeking to bring a lawsuit in federal court must establish that the Court has subject matter jurisdiction over the action. *See, e.g., Monreal v. New York,* 518 F. App'x 11 (2d Cir.2013) (affirming dismissal of *pro se* complaint for failure to establish subject matter jurisdiction); *Zito v. N.Y.C. Office of Payroll Admin.,* 514 F. App'x 26 (2d Cir.2013) (same); *Chestnut v. Wells Fargo Bank, N.A.,* No. 11–CV–5369, 2012 WL 1657362, at \*3 (E.D.N.Y. May 7, 2012) ("Notwithstanding the liberal pleading standard afforded *pro se* litigants, federal courts are courts of limited jurisdiction and may not preside over cases if subject matter jurisdiction is lacking."). A court's lack of subject matter jurisdiction "is not waivable and may be raised at any time by a party or by the court *sua sponte.* If subject matter jurisdiction is lacking, the action must be dismissed." *Lyndonville Sav. Bank & Trust Co. v. Lussier,* 211 F.3d 697, 700–01 (2d Cir.2000). Federal subject matter jurisdiction is available only when a "federal question" is presented, or when plaintiffs and defendants have complete diversity of citizenship and the amount in controversy exceeds $75,000. 28 U.S.C. §§ 1331, 1332. In order to invoke federal question jurisdiction, a plaintiff's claims must arise "under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331.

### b. Plaintiff's Amended Complaint

By Memorandum and Order dated November 26, 2013, Plaintiff was granted leave to amend the Complaint to "provide facts sufficient to allow each named Defendant to have a fair understanding of what the Plaintiff is complaining about and to know whether there is a legal basis for recovery" for housing discrimination under the FHA, the ADA, or Section 504. *Cain v. Rambert,* No. 13–CV–5807, 2013 WL 6194294, at \*4 (E.D.N.Y. Nov.26, 2013) (quoting *Knowles*

*v. Namdor Inc.,* No. 13–CV–3746, 2013 WL 5887039, at *2 (E.D.N.Y. Oct.31, 2013)). Plaintiff's Amended Complaint provides more detailed factual allegations regarding the names and activities of other tenants in the building. However, although the Court is sympathetic to Plaintiff's circumstances, even under the less stringent standards applicable to *pro se* complaints, Plaintiff's Amended Complaint fails to state a plausible housing discrimination claim pursuant to the FHA, the ADA, the Rehabilitation Act or the Equal Protection Clause.

### i. Subject matter jurisdiction

As an initial matter, Plaintiff seeks to have the Court evict other tenants in her building, but the Court has no authority to do so since federal courts, unlike state courts, have no jurisdiction over landlord-tenant matters. *Galland v. Margules,* No. 05–CV–5639, 2005 WL 1981568, at *1 (S.D.N.Y. Aug. 17, 2005) (noting that federal courts do not have federal question subject matter jurisdiction over state residential landlord-tenant matters), *aff'd,* 191 F. App'x 23 (2d Cir.2006); *see also McMillan v. Dep't. of Bldgs.,* No. 12–CV–318, 2012 WL 1450407, at *2 (E.D.N.Y. Apr. 26, 2012) (finding that federal courts lack subject matter jurisdiction over claims concerning eviction); *Rosen v. North Shore Towers Apartments, Inc.,* No. 11–CV–0752, 2011 WL 2550733, at *4 (E.D.N.Y. Jun. 27, 2011) (noting that courts in this Circuit "routinely dismiss for lack of subject matter jurisdiction" claims concerning eviction (collecting cases)).

### ii. FHA claims

**\*4** The FHA makes it unlawful to "discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of ... sex," or because of "a handicap of that buyer or renter." 42 U.S.C. § 3604(a), (f)(1). It also prohibits "discriminat[ion] against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of ... sex," or because of "a handicap of that person." § 3604(b), (f)(2); *see also Taylor v. Harbour Pointe Homeowners Ass'n,* 690 F.3d 44, 49 (2d Cir.2012), *cert. denied,* 568 U.S. ——, 133 S.Ct. 1280, 185 L.Ed.2d 186 (2013). In addition, the FHA prohibits retaliation against individuals who engage in "protected activity" under the statute. *See* 42 U.S.C. § 3617 ("It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or

on account of his having exercised or enjoyed ... any right granted or protected by" the statute.).

Plaintiff appears to allege in the Amended Complaint "sexual harassment, gender discrimination, perceived disability discrimination, [and] discrimination based on ... sexual orientation." (Am.Compl.6.) Plaintiff also alleges that Rambert retaliated against Plaintiff for filing numerous complaints with government agencies "regarding prostitution[,] sexual harassment[,] sexual coercion and cyber stalking." (*Id.* at 5.)

### 1. Discrimination claims

Plaintiff's Amended Complaint does not allege sufficient facts to plausibly state that any of the Defendants may be liable for violations of the FHA. Courts in this Circuit have construed § 3604(b) of the FHA to prohibit the creation of a "hostile environment" by individuals who have control or authority over the "terms, conditions, or privileges of sale or rental of a dwelling," similar to the prohibition imposed by Title VII against the creation of a hostile work environment.[4] *See Ponce v. 480 E. 21st St., LLC,* No. 12–CV–4828, 2013 WL 4543622, at *2 (E.D.N.Y. Aug. 28, 2013) ("The FHA prohibits discrimination 'against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of ... sex.' Sexual harassment constitutes such discrimination." (citing 42 U.S.C. § 3604(b) and *Rich v. Lubin,* No. 02–CV–6786, 2004 WL 1124662, at *4–5 (S.D.N.Y. May 20, 2004))); *Miles v. Gilray,* No. 12–CV–599S, 2012 WL 2572769, at *1 (W.D.N.Y. June 29, 2012) (finding that the FHA makes it unlawful to discriminate against any person "in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin" (quoting 42 U.S.C. § 3604(b) and *Glover v. Jones,* 522 F.Supp.2d 496, 503 (W.D.N.Y.2007))); *Glover,* 522 F.Supp.2d at 503 ("Sexual harassment claims are cognizable under the FHA .... With regard to hostile environment discrimination, 'the legal standard for sexual harassment claims under the FHA has been analogized in the Second Circuit to the standard pertaining to hostile work environment claims under Title VII.' " (alteration omitted) (quoting *Rich,* 2004 WL 1124662, at *4)); *Rich,* 2004 WL 1124662, at *4 ("Sexual harassment constitutes

discrimination in the terms, conditions, or privileges of rental of a dwelling on the basis of sex.”); *Anonymous v. Goddard Riverside Cmty. Ctr., Inc.,* No. 96–CV–9198, 1997 WL 475165, at *4 (S.D.N.Y. July 18, 1997) (“The Second Circuit has repeatedly recognized that Title VII (employment discrimination) cases are relevant to Title VIII (housing discrimination) cases by virtue of the fact that the ‘two statutes are part of a coordinated scheme of federal civil rights laws enacted to end discrimination.’ ” (quoting *Huntington Branch, NAACP v. Town of Huntington,* 844 F.2d 926, 934 (2d Cir.1988))); *People of State of N.Y. by Abrams v. Merlino,* 694 F.Supp. 1101, 1104 (S.D.N.Y.1988) (recognizing sexual harassment claim under the FHA and noting that “plaintiffs, to succeed, must demonstrate ... a relationship between the harassment and housing”); *see also United States v. Hurt,* 676 F.3d 649, 654 (8th Cir.2012) (“Sexual harassment is actionable under the FHA when it creates ‘a hostile housing environment’....”); *Hall v. Meadowood Ltd. P'ship,* 7 F. App'x 687, 689 (9th Cir.2001) (recognizing a sexual harassment claim under the FHA (citing *Gamble v. City of Escondido,* 104 F.3d 300, 305 (9th Cir.1997))); *Krueger v. Cuomo,* 115 F.3d 487, 491 (7th Cir.1997) (“This court has recognized that sexual harassment in the housing context can violate the Fair Housing Act.” (citing *DiCenso v. Cisneros,* 96 F.3d 1004, 1008 (7th Cir.1996))); *Honce v. Vigil,* 1 F.3d 1085, 1090 (10th Cir.1993) (recognizing a hostile housing environment claim for sexual harassment where a defendant's actions are “sufficiently severe or pervasive to alter the conditions of the housing arrangement and the offensive acts would not have happened but for claimant's gender” (alteration, citation and internal quotation marks omitted)); *but see Halprin v. Prairie Single Family Homes of Dearborn Park Ass'n,* 388 F.3d 327, 328–30 (7th Cir.2004) (holding that the Fair Housing Act was only concerned with “access to housing,” and not with discrimination that may take place subsequent to the sale or rental of a housing unit, and therefore declining to recognize claim for religious harassment brought by property owner against a homeowners association and its members).

 **\*5** A plaintiff seeking to establish a hostile housing environment claim must establish that (1) “she was subjected to harassment that was sufficiently pervasive and severe so as to create a hostile [housing] environment,” *Rich,* 2004 WL 1124662, at *4, (2) the harassment was because of the plaintiff's membership in a protected class, *Rivera v.*

*Rochester Genesee Reg'l Transp. Auth.,* 743 F.3d 11, 20 (2d Cir.2014) (Title VII), and (3) “a basis exists for imputing the allegedly harassing conduct to the defendants,” *Rich,* 2004 WL 1124662, at *4. As with any claim asserted pursuant to the FHA, a plaintiff must also show a relationship between the discriminatory conduct and housing. *See Abrams,* 694 F.Supp. at 1104 (“[P]laintiffs, to succeed, must demonstrate ... a relationship between the harassment and housing.”). The Amended Complaint does not state a claim of hostile housing environment against any of the Defendants based on either sexual harassment or disability-based harassment.

### A. Defendants Pope, Mitchell, Ruth, Steele and Reid

Plaintiff's Amended Complaint fails to state a claim that the actions of Pope, Mitchell, Ruth, Steele, or Officer Reid comprise sexual harassment in violation of the Fair Housing Act. Pope, Mitchell, Ruth and Steele are Plaintiff's neighbors, tenants in the building, while Officer Reid is an acquaintance of Pope and Steele. Plaintiff does not allege that these Defendants have any control or authority over the “terms, conditions, or privileges of ... rental of [Plaintiff's] dwelling, or in the provision of services or facilities in connection therewith,” as contemplated by the FHA. *See 42 U.S.C. § 3604(b).*

In the cases recognizing a cause of action for creation of a hostile housing environment under the FHA, the defendants were individuals or entities who own or manage housing and who were alleged to be the source of harassing or hostile actions, or to have an agent who was said source. *See Ponce,* 2013 WL 4543622, at *2 (building superintendent); *Miles,* 2012 WL 2572769, at *1 (owner of a mobile home park); *Glover,* 522 F.Supp.2d at 504 (property manager); *Williams v. Hernandez,* No. 02–CV–4473, 2004 WL 2793198, at *1 (S.D.N.Y. Dec.6, 2004) (employee of New York City Housing Authority (N.Y.CHA) where tenant lived in NYCHA-owned and operated housing); *see also Hurt,* 676 F.3d at 651 (owner of trailer park). In contrast, here, Pope, Mitchell, Ruth, and Steele are Plaintiff's neighbors, who reside in the same building, but have no authority or control over the management of the building. Likewise, Reid is a police officer who does not live in the building or otherwise have a relationship to Plaintiff's housing. [5] Therefore, Plaintiff does not state a claim pursuant to § 3604(b) of the Fair Housing Act for sexual harassment against these Defendants.

Similarly, Plaintiff does not state a claim of disability harassment against Pope, Mitchell, Ruth and Steele, or Officer Reid under the FHA. Although the Second Circuit has not recognized a cause of action under the FHA for harassment based on disability, the Eighth Circuit Court of Appeals has done so. *See ⚑ Neudecker v. Boisclair Corp., 351 F.3d 361, 364–65 (8th Cir.2003)* (recognizing disability harassment claim under the Fair Housing Act where Plaintiff "alleged ... that he suffers from [obsessive-compulsive disorder], that [defendant, a building management company] subjected him to unwelcome harassment based on his [disability], and that this unwelcome harassment was sufficiently severe to deprive him of his right to enjoy his home, as evidenced by his physical problems and ultimate decision to move out"). In *Neudecker,* the tenants in question were the children of the building managers, who "sent letters to Boisclair property manager ... containing false counter-accusations as reprisal" for the plaintiff Neudecker's complaints about harassment, and on one occasion one of these tenants "pinned Neudecker against a wall after Neudecker had made another complaint." *⚑ Neudecker, 351 F.3d at 363.* The property manager "falsely accused Neudecker of 'stalking' another tenant and threatened to evict him, and ... threatened to evict Neudecker 'as reprisal' for his continued complaints about being harassed." *Id.* The plaintiff ultimately surrendered his apartment as a result of the harassment. *Id.* In contrast here, Plaintiff does not allege that Pope, Mitchell, Ruth and Steele, or Officer Reid have a familial or other relationship to the landlord or manager of the building, nor does she allege that her landlord contributed to the harassment. Because these Defendants are not alleged to have influenced the landlord or asserted control over the "terms, conditions, or privileges of ... [the] rental of [Plaintiff's] dwelling, or in the provision of services or facilities in connection therewith," as contemplated by the FHA, *see ⚑ 42 U.S.C. § 3604(b)*, the Amended Complaint does not state a claim of disability harassment against Pope, Mitchell, Ruth and Steele, or Officer Reid. [6]

### B. Defendant Rambert

**\*6** Plaintiff alleges that her landlord, Rambert, "created a hostile living environment by not responding to any of Plaintiff[']s request for intervention." (Am.Compl.8.) These allegations fail to state a claim of hostile housing environment against Rambert, based on either Plaintiff's gender or her disability. Plaintiff does not allege that Rambert harassed her. Plaintiff also does not allege that Pope, Mitchell, Ruth,

Steele or Reid are agents of Rambert. Therefore, because there is no basis for imputing the allegedly harassing conduct by the other tenants to Rambert, Plaintiff has not stated a claim of harassment on the basis of either gender or disability against Rambert. *See ⚑ Rich, 2004 WL 1124662* (noting that a plaintiff alleging a hostile housing environment claim must establish "that a basis exists for imputing the allegedly harassing conduct to the defendants").

Plaintiff alleges that Rambert created a "hostile living environment" by failing to intervene to stop the alleged harassment from her neighbors. (Am.Compl.8.) The Eighth Circuit and some district courts have recognized that a landlord's willful failure to intervene in tenant-on-tenant harassment may be a violation of the FHA. *See ⚑ Neudecker, 351 F.3d at 365* ("While Neudecker does not allege that Boisclair's agents themselves harassed him, he does allege that tenants—including children of Boisclair's management team—constantly harassed and threatened him based on his disability; that he repeatedly complained to Boisclair management about the harassment to no avail; and that he ultimately moved from his apartment out of concerns for his health stemming from the harassment."); *⚑ Fahnbulleh v. GFZ Realty, LLC, 795 F.Supp.2d 360, 364 (D.Md.2011)* ("[C]onduct is imputable to a landlord, if the landlord knew or should have known of the harassment, and took no effectual action to correct the situation.' " (quoting *⚑ Williams v. Poretsky Mgmt., Inc., 955 F.Supp. 490, 496 (D.Md.1996)*)); *⚑ Reeves v. Carrollsburg Condo. Unit Owners Ass'n, No. 96–CV–2495, 1997 WL 1877201, at \*7 (D.D.C. Dec. 18, 1997)* (finding that a defendant condominium association could be held liable for creation of a hostile housing environment where the defendant "knew or should have known of the harassment, and took no effectual action to correct the situation"). Neither the Second Circuit nor district courts in this Circuit have opined on whether a landlord may be held liable under the FHA for failing to intervene in harassment between tenants based on protected status. However, the Court need not resolve whether the FHA permits such a claim because, as discussed above in footnotes 5 and 6, the Amended Complaint fails to state a plausible claim of harassment based on either gender or disability against the other tenants in Rambert's building, and therefore fails to state a claim against Rambert for discrimination pursuant to the FHA.

### 2. Retaliation claim

Plaintiff alleges that "[b]ecause Plaintiff made numerous complaints to various government agencies regarding ... sexual harassment sexual coercion and cyber stalking ... Rambert petitioned Plaintiff to court for holdover proceeding." (Am. Compl. 5; *see also id.* at 7, 9).[7] To establish a *prima facie* case of retaliation under the FHA, a plaintiff must show that she was (1) "engaged in protected activity by opposing conduct prohibited under the FHA; (2) that defendants were aware of that activity; (3) that defendants subsequently took adverse action against plaintiffs; and (4) that a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse action." *Lynn v. Vill. of Pomona,* 373 F.Supp.2d 418, 432 (S.D.N.Y.2005) (citing *Marks v. BLDG Mgmt. Co., Inc.,* No. 99–CV–5733, 2002 WL 764473, at *9 (S.D.N.Y. Apr. 26, 2002), *aff'd,* 56 F. App'x 62, and *Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown,* 294 F.3d 35, 54 (2d Cir.2002)); *cf. Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.,* 716 F.3d 10, 14 (2d Cir.2013) (noting that in order to establish a *prima facie* case of retaliation under Title VII, a plaintiff must establish "(1) she engaged in protected activity; (2) the [defendant] was aware of this activity; (3) the [plaintiff] suffered a materially adverse employment action; and (4) there was a causal connection between the alleged adverse action and the protected activity." (quoting *Lore v. City of Syracuse,* 670 F.3d 127, 157 (2d Cir.2012))). To be actionable, an adverse action "must have some materially adverse effect on the plaintiff." *Joseph's House & Shelter, Inc. v. City of Troy, N.Y.,* 641 F.Supp.2d 154, 159 (N.D.N.Y.2009) (quoting *Marks,* 2002 WL 764473, at *11).

**\*7** Filing a police complaint about sexual harassment is "protected activity," at least where the plaintiff " 'had a good faith, reasonable belief' that she was opposing an unlawful practice." *See Ponce,* 2013 WL 4543622, at *3, 3 n. 4 (quoting *Kelly,* 716 F.3d at 14). "The reasonableness of the plaintiff's belief is to be assessed in light of the totality of the circumstances." *Kelly,* 716 F.3d at 14–15 (discussing Title VII). Plaintiff need not establish that the underlying conduct that was the subject of the police complaint was an actual violation of the FHA, but courts in this Circuit "do require the allegation of factual circumstances that permit the inference that plaintiff was subjected to a hostile ...

environment because of her [protected status]." *Kelly,* 716 F.3d at 15 (discussing Title VII).

Here, the Amended Complaint does not make clear whether Rambert was aware of Plaintiff's police complaints or complaints to other government agencies. Although Plaintiff alleges "[a]fter making complaints to various government agencies Defendant Rambert retaliated against Plaintiff, brought frivolous hold over proceedings," (Am.Compl.4), this establishes only that Rambert initiated the holdover proceedings subsequent to Plaintiff's complaints to government agencies. The Amended Complaint provides insufficient factual assertions to permit the inference that Rambert was aware of the complaints when he initiated the holdover proceedings. While Plaintiff does allege that she sent over 400 text messages to Rambert "describing the events taking place on [the] property as they unfold," (*id.* at 4), Plaintiff has not alleged that she told Rambert of her complaints to the police or other government agencies.[8]

However, even assuming that Rambert was aware of Plaintiff's complaints when he initiated holdover proceedings, the Amended Complaint does not establish that Plaintiff had a reasonable belief that she was opposing a practice made unlawful by the FHA. Plaintiff's complaints to the police, appended to her Amended Complaint, include statements that she "is being harassed by downstairs neighbors [and that f]or a long time they have been trying to get [Plaintiff] in a prostitution business and calling her crazy," (Am. Compl. Ex. 3, Police Complaint # 2013–081–04729, dated August 2, 2013), that "while she is in her apartment she hears the downstairs and upstairs neighbors talking about her calling her a 'cuckoo,' " (Am. Compl. Ex. 3, Police Complaint # 2013–081–04006, dated July 2, 2013), that her neighbors "continue[ ] to annoy and alarm her by posting pictures and contacting her online and sending her emails," (Am. Compl. Ex. 3, Police Complaint # 2013–08–05085, dated August 17, 2013), and "she is being 'harassed' by her neighbors on the 1st floor, [who] was shouting her name and banging on window, calling her 'cuckoo,' " (Police Complaint # 2013–081–02699 dated May 9, 2013, appended to Am. Compl. at 41).

**\*8** As discussed *supra* in part II.b.ii.1.A, nothing in Plaintiff's complaints to the police indicate that she was opposing or complaining about harassment related to availability of her housing, or to the terms and conditions of her housing, other than the fact that the alleged harassers were her neighbors. *Cf. Kelly,* 716 F.3d at 15 (finding

that plaintiff did not have a good faith reasonable belief that the conduct she was complaining about was unlawful discrimination because "[a]lthough Kelly alleges that she repeatedly used the words 'discrimination' and 'harassment' when complaining to her employers, her argument that the [complained-of conduct] constituted gender discrimination because it resulted in an atmosphere demeaning to women is entirely unsupported by the allegations in her complaint"). Similarly, Plaintiff's pleadings are insufficient to plausibly show that she had a reasonable belief that she was being harassed because of her disability, or that her complaints to other government agencies were based on such a belief. Even in light of her complaints to the police that her neighbors were calling her "cuckoo," assessing the "reasonableness of the plaintiff's belief ... in light of the totality of the circumstances," Plaintiff's complaints to the police about her neighbors' name-calling are not sufficient to permit the inference that Plaintiff *reasonably* believed that she was being subjected to a hostile environment because of her disability, in violation of the FHA. *See* *Kelly*, 716 F.3d at 14–15; *Drumm v. Suny Geneseo Coll.,* 486 F. App'x 912, 914 (2d Cir.2012) (finding that "plaintiff's allegations that her supervisor 'berated' her and made other harsh comments ... amount only to general allegations of mistreatment, and do not support an inference that plaintiff had a reasonable good faith belief that she was subject to gender discrimination"). Therefore, the Amended Complaint fails to state a claim of retaliation under the FHA against Rambert.

### iii. Rehabilitation Act claim

Section 504 of the Rehabilitation Act provides in pertinent part that "[n]o otherwise qualified handicapped individual in the United States ... shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance ...." 29 U.S.C. § 794; *Bryant v. N.Y.S. Educ. Dept.,* 692 F.3d 202, 216 (2d Cir.2012). Although Plaintiff alleges that all the Defendants residing in the building "receive some form of Federal Government subsidy," (Am Compl. 8 ¶ 22), this allegation is insufficient to establish liability against Rambert pursuant to the Rehabilitation Act. *See* *Reyes v. Fairfield Properties,* 661 F.Supp.2d 249, 264 (E.D.N.Y.2009) (recognizing that "an entity or person who receives housing assistance payments under a housing assistance payments program or a voucher program is not a 'recipient' of federal financial assistance by virtue of receipt of such

payments" (quoting *Echeverria v. Krystie Manor, LP,* No. 07–CV–1369, 2009 WL 857629, at *7 (E.D.N.Y. Mar. 30, 2009))); 24 C.F.R. § 8.3 ("An entity or person receiving housing assistance payments from a recipient on behalf of eligible families under a housing assistance payments program or a voucher program is not a recipient or subrecipient merely by virtue of receipt of such payments.").

**\*9** This allegation is also insufficient to establish potential liability as to the other tenants in the building or Officer Reid, as the plain language of the Rehabilitation Act and the accompanying regulations make clear that the prohibitions in the Act apply to a "program or activity receiving Federal financial assistance," and not to individual families who are the direct recipients of housing rental assistance. *See* 29 U.S.C. § 794(a)–(b) ("No otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. For the purposes of this section, the term 'program or activity' means all of the operations of a department, agency, special purpose district, or other instrumentality of a State or of a local government ... a college, university, or other postsecondary institution, or a public system of higher education ... a local educational agency ... [or] an entire corporation, partnership, or other private organization, or an entire sole proprietorship."); 24 C.F.R. §§ 8.3–8.4 (same). Accordingly, the Amended Complaint does not state a claim pursuant to Section 504 of the Rehabilitation Act against either Rambert, the other tenants in the building or Officer Reid.

### iv. ADA claim

Title III of the ADA prohibits discrimination on the basis of disability "in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of *public accommodation* by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182 (emphasis added); *see also Kreisler v. Second Ave. Diner Corp.,* No. 10–CV–7592, 2012 WL 3961304, at *6 (S.D.N.Y. Sept.11, 2012).

Here, Plaintiff has not alleged sufficient facts to establish that the residential building is a place of public accommodation. *See* *Reyes,* 661 F.Supp.2d at 264 (finding that "receipt of Section 8 housing vouchers is an insufficient basis

upon which to deem the premises—a private, residential apartment complex—a place of public accommodation"); *accord Hardaway v. Equity Residential Mgmt., LLC,* No. 11–CV–A1924, 2012 WL 3903489, at *5 (D.Md. Sept.6, 2012) (same); *Mitchell v. Walters,* No. 10–CV–A1061, 2010 WL 3614210, at *4 (D.N.J. Sept.8, 2010) (same). As a result, the Amended Complaint does not state a claim under Title III of the ADA.

### v. Equal Protection claim

To state a claim under the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution, "a plaintiff must allege that a government actor intentionally discriminated against him on the basis of his [protected status]." *Brown v. City of Oneonta, New York,* 221 F.3d 329, 337 (2d Cir.2000). Plaintiff has not alleged that any of the Defendants are "government actors," as required to bring a claim pursuant to the Equal Protection Clause, and all Defendants appear to be private citizens. Therefore, the Amended Complaint does not state a claim for violation of the Equal Protection Clause of the United States Constitution.

**\*10** In sum, Plaintiff has not stated a claim under any federal law, and the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims.[9] *See* 28 U.S.C. § 1367(c)(3). ("District courts may decline to exercise supplemental jurisdiction over a claim if the district court has dismissed all claims over which it has original jurisdiction."). Because Plaintiff's Amended Complaint does not contain sufficient facts that may fairly be read to state a claim for housing or disability-based discrimination or violation of

any of Plaintiff's constitutional rights, Plaintiff's Amended Complaint is dismissed. In view of Plaintiff's failure to state a valid claim, Plaintiff's request for the appointment of *pro bono* counsel is denied. *See Johnston v. Maha,* 606 F.3d 39, 41 (2d Cir.2010) (motions for appointment of pro bono counsel considered "by asking first whether the claimant has met a threshold showing of some likelihood of merit" (quoting *Cooper v. A. Sargenti Co.,* 877 F.2d 170, 174 (2d Cir.1989) and *Hodge v. Police Officers,* 802 F.2d 58, 59 (2d Cir.1986))).

### III. Conclusion

Plaintiff's Federal claims in the Amended Complaint are dismissed for failure to state a claim upon which relief may be granted. 28 U.S.C. § 1915(e)(2)(B). Plaintiff's request for the appointment of *pro bono* counsel is denied. The Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims and they are dismissed without prejudice.

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal would not be taken in good faith and therefore *in forma pauperis* status is denied for purpose of an appeal.

*Coppedge v. United States,* 369 U.S. 438, 444–45, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962). The Clerk of Court is directed to close this case.

SO ORDERED.

### All Citations

Not Reported in F.Supp.3d, 2014 WL 2440596

---

### Footnotes

1    The Court has paginated Plaintiff's Amended Complaint for ease of reference and assumes that the factual allegations are true for the purposes of this decision.

2    Section 8 of the Housing Act of 1937, as codified by 42 U.S.C. § 1437f, is a federal housing assistance program that provides, among other things, rental assistance to eligible low-income tenants who reside in units owned by participating landlords. *See* 42 U.S.C. § 1437f; *see also* Frederick K. Grittner, *Assisted housing—Section 8 Housing Assistance Program, in* 2 Fed. Admin. Prac. § 1506, (West, ed., 2013); Department of Housing and Urban Development, *Housing Choice Vouchers Fact Sheet,* http://portal.hud.gov/hudpor tal/HUD?src=/topics/housing_choice_ voucher_program_section_8 (last visited May 27, 2014); New

York City Housing Authority, *Housing Choice Voucher Program—Section 8,* http:// www.nyc.gov/html/nycha/ downloads/pdf/lh_housing_choice.pdf (last visited May 27, 2014).

3    Plaintiff's Amended Complaint reads in part:

> Throughout the community (communities), and the internet Plaintiff is called bi coo coo bi too, kook kook, mock it, coo her, kook and Plaintiff need medication and Plaintiff need to be evaluated. The rant is continued by Defendants Ruth and Steele in the confines of [the building] using an acoustic device (voice changer). Sounds made are clucking duck quack popping shattered glass piercing screeching shrill Defendants constantly tell Plaintiff it does not have to be this way kook kook get down, coo coo move leave moo moo (leave).

   (Am.Compl.1–2.)

4    Although nearly all of the courts in this Circuit recognizing a cause of action for the creation of a hostile housing environment have done so with regard to allegations of sexual harassment, at least one court has recognized such a cause of action based on membership in another protected class, family status. *See Khalil v. Farash Corp.,* 260 F.Supp.2d 582, 583–589 (W.D.N.Y.2003) (denying defendant's motion for summary judgment on plaintiff's claim that, *inter alia,* the defendant, a management company that managed the plaintiff's housing complex, created a "hostile living environment for families with children" by promulgating and enforcing rules that disfavored families with children); *see also* 🚩 *Khalil v. Farash Corp.,* 277 F. App'x 81, 84 (2d Cir.2008) (assuming, without deciding, that a plaintiff may state a FHA claim of discrimination against families with children based on a hostile housing environment theory).

5    Even assuming that Plaintiff could properly state a claim against her neighbors and a police officer pursuant to the FHA, the Amended Complaint fails to state a claim of sexual harassment as to these Defendants. Plaintiff's broad assertion that "the above allegations are taking place because Plaintiff refuse to get down with prostitution [and] Plaintiff refused to get involved with them sexually," and her reference to having made a complaint to various government agencies about, *inter alia,* sexual harassment, (Am.Compl.6–7), are insufficient to state a plausible claim that Defendants created a hostile housing environment through sexual harassment. *See Ponce,* 2013 WL 4543622, at *2 (dismissing Plaintiff's sexual harassment claim under the FHA and finding that "Plaintiff's allegations about [a building superintendent's] unspecified 'unwanted sexual advances' and 'sexually explicit and humiliating comments about her anatomy' are 'naked assertion[s]' devoid of 'further factual enhancement' that do not suffice to establish a plausible claim." (quoting 🚩 *Iqbal,* 556 U.S. at 678)); 🚩 *Rich,* 2004 WL 1124662, at *4 ("Isolated or sporadic sexually inappropriate acts are not sufficiently pervasive and severe to constitute sexual harassment under the FHA.") The conclusory and nonspecific allegations in the Amended Complaint fail to state a claim for sexual harassment against Pope, Mitchell, Ruth, Steele and Reid. *See* 🚩 *Rich,* 2004 WL 1124662, at *4.

6    In addition, Plaintiff's allegation that Pope, Steele and Mitchell harassed her by "yelling the same rant" and telling her that she should be on medication, (Am.Compl.3), is not sufficiently pervasive or severe to create a hostile environment on the basis of Plaintiff's disability or perceived disability. *See* 🚩 *Rich,* 2004 WL 1124662, at *3. While Plaintiff alleges that Ruth and Steele are using an acoustic device that emits harmful noises "lasting throughout the day using different sound effects that are harmful to Plaintiff['s] hearing ... and interrupts sleep," she does not allege that these actions are because of Plaintiff's disability, nor does the Amended Complaint allege facts from which the Court can reasonably infer that Plaintiff's disability is a motivating-factor for Ruth and Steele's actions. Plaintiff's other allegations regarding the use of the Internet to spread defamatory comments about Plaintiff's "mental capacity" do not implicate Plaintiff's housing as

required under the Fair Housing Act. *Cf.* 🔖 *United States v. Weisz,* 914 F.Supp. 1050, 1054 (S.D.N.Y.1996) ("[T]o bring a claim within § 3617 [of the FHA], a plaintiff must allege conduct on the part of a defendant which in some way or other implicates the concerns expressed by Congress in the FHA. If it were otherwise, the FHA would federalize any dispute involving residences and people who live in them.").

7    Plaintiff's Amended Complaint states: "After Plaintiff made several complaints to the 81st. Precinct, United States Attorney General, NYPD Internal Affairs and Brooklyn North Vice regarding the sexual harassment, gender discrimination [and] perceived disability discrimination ..., Defendant Landlord, Jerome Rambert, brought several frivolous housing cases against Plaintiff in Retaliation for making complaints to various government agencies." (Am.Compl.7.)

8    The Amended Complaint also states that "certified notarized mail" sent by Plaintiff to Rambert was refused by Rambert. (Am. Compl. 5 and Ex. 2.)

9    Plaintiff also brings claims pursuant to the "Equal Justice Under Telecommunications Act as amended," which she refers to as the "Law Cyber Stalking." (Am.Compl.4, 11.) The Court is unclear as to the statute Plaintiff is relying on. The Court is aware of a criminal statute which addresses stalking, making it a criminal offense to use "the mail, any interactive computer service or electronic communication service or electronic communication system of interstate commerce, or any other facility of interstate or foreign commerce, [with the intent to kill, injure, harass, intimidate] to engage in a course of conduct that places that person in reasonable fear of the death of or serious bodily injury to [that person, an immediate family member, or a spouse or intimate partner] or causes, attempts to cause, or would be reasonably expected to cause substantial emotional distress to a person." 🔖 18 U.S.C. § 2261A. However, there is no private right of action to enforce this criminal statute, which, as a general matter, is prosecuted by the government and not by private individuals. *See Rock v. BAE Sys., Inc.,* —— F. App'x ——, ——, 2014 WL 715606, at *2 (11th Cir. Feb.26, 2014) (holding that there is no private right of action under 🔖 § 2261A); *Weinstein v. City of New York,* No. 13–CV–06301, 2014 WL 1378129, at *4 (S.D.N.Y. Apr.8, 2014) ("Violations of the Criminal Code do not provide a basis for a civil cause of action, unless the particular provision in question includes an express or implied private right of action."); *Hopson v. Commonwealth Attorney's Office,* No. 12–CV–744, 2013 WL 1411234, at *3 (W.D.Ky. Apr. 8, 2013) ("It is clear that 🔖 § 2261A does not provide for a private cause of action or civil remedies." (collecting cases)); *Jacobus v. Huerta,* No. 12–CV–02032, 2013 WL 673233, at *12 (S.D.W.Va. Feb. 22, 2013) (finding no private right of action under § 🔖 18 U.S.C. § 2261A), *report and recommendation adopted,* No. 12–CV–02032, 2013 WL 1723631 (S.D.W.Va. Apr. 22, 2013); *Dorr v. Ford Motor Co.,* No. 10–CV–13822, 2011 WL 5857886, at *9 (E.D.Mich. Sept.27, 2011) (same), *report and recommendation adopted,* No. 10–CV–13822, 2011 WL 5838582 (E.D.Mich. Nov. 21, 2011). Therefore, to the extent Plaintiff seeks to bring a claim pursuant to 🔖 18 U.S.C. 2261A, the claim is dismissed for failure to state a claim upon which relief may be granted.

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Lachira v. Sutton, Not Reported in F.Supp.2d (2007)

73 Fed. R. Evid. Serv. 536, 34 NDLR P 248

KeyCite Yellow Flag - Negative Treatment

Distinguished by Savage v. Andoh, Conn.Super., April 11, 2008

2007 WL 1346913

United States District Court, D. Connecticut.

Minerva LACHIRA, Plaintiff,

v.

James SUTTON and Stanford Sutton, Defendants.

No. 3:05cv1585 (PCD).

|

May 7, 2007.

**Attorneys and Law Firms**

Dawne Westbrook, Middletown, CT, for Plaintiff.

***RULING ON MOTION TO STRIKE &
MOTION FOR SUMMARY JUDGMENT***

PETER C. DORSEY, U.S. District Judge.

**\*1** Plaintiff's claims are brought pursuant to the federal Fair Housing Act of 1968, 42 U.S.C. § 3601, et seq. ("FHA"), alleging that Defendants discriminated against her based on her race, ethnic origin, disability and familial status. Plaintiff also asserts a state law claim of intentional infliction of emotional distress. Defendants move, pursuant to Federal Rule of Civil Procedure 56, for summary judgment on Plaintiff's Amended Complaint, arguing that they are entitled to judgment as a matter of law on all claims set forth in Plaintiff's Amended Complaint and asserting that there are no genuine material issues of fact remaining for trial. Plaintiff filed an opposition to Defendant's motion, and Defendant subsequently moved to strike Plaintiff's affidavit and the exhibits attached thereto. Plaintiff did not file an opposition to Defendant's Motion to Strike. For the reasons set forth herein, Defendants' Motion for Summary Judgment [Doc. No. 32] is **granted** and their Motion to Strike [Doc. No. 48] is **granted in part** and **denied in part**.

**I. MOTION TO STRIKE**

Defendants move, pursuant to Federal Rule of Civil Procedure 56(e) and Local Rule 56, to strike materials submitted by Plaintiff in support of her Memorandum in Opposition to Defendants' Motion for Summary Judgment.

Specifically, Defendants move to strike Plaintiff's Affidavit and the attached exhibits in their entirety. Alternatively, Defendants move to strike specific statements and exhibits referenced in Plaintiff's Affidavit prior to this Court deciding the pending Motion for Summary Judgment. Plaintiff has not filed an opposition to Defendants' motion to strike. [1]

**A. Plaintiff's Affidavit & Exhibits**

1. *Affidavit*

Rule 56(e) of the Federal Rules of Civil Procedure provides that "[w]hen a motion for summary judgment is made ... an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). When a nonmovant relies on affidavits to oppose a motion for summary judgment, those affidavits must meet the requirements set forth in Rule 56(e):

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.

*Id.* The personal knowledge requirement is mandatory. *United States v. Bosurgi,* 530 F.2d 1105, 1112 (2d Cir.1976). A court may "strike portions of an affidavit that are not based upon the affiant's personal knowledge, contain inadmissible hearsay or make generalized and conclusory statements." *Hollander v. American Cyanamid Co.,* 172 F.3d 192, 198 (2d Cir.), *cert. denied,* 528 U .S. 965, 120 S.Ct. 399, 145 L.Ed.2d 311 (1999). Moreover, "a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." *Raskin v. Wyatt Co.,* 125 F.3d 55, 63 (2d Cir.1997) (quoting *Hayes v. New York City Dep't of Corrections,* 84 F.3d 614, 619 (2d Cir.1996)); *see also Perma Research & Dev. Co. v. Singer Co.,* 410 F.2d 572, 578 (2d Cir.1969) ("If a party who has

73 Fed. R. Evid. Serv. 536, 34 NDLR P 248

been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact."). Finally, conclusory allegations, examination of thoughts, opinions, argument and legal conclusions are all prohibited from affidavits submitted in support of, or opposition to, a summary judgment motion under Rule 56(e). *See* *Paul T. Freund Corp. v. Commonwealth Packing Co.,* 288 F.Supp.2d 357, 369 (W.D.N.Y.2003).

**\*2** The court will hereby strike the following portions of the Lachira Affidavit because they contain inadmissible hearsay, generalized conclusory and argumentative statements, legal conclusions, information which could not be attributed to plaintiff's personal knowledge, and/or because they contradict, either by addition or omission, Plaintiff's previous deposition testimony and/or CHRO (Connecticut Commission on Human Rights and Opportunities) complaint affidavit: the statements in paragraph 5 that "there have never been tenants with children in the defendants' building" and that "[t]he defendants never wanted my child in their home"; paragraph 6; the statements in paragraph 7 that "the defendants continually abused me," that "the defendants came to my home with a screw driver to remove the lock from the front door" and the phrase "take your child away from here"; paragraph 8; the phrase in paragraph 9 "to punish me"; paragraph 11; paragraphs 16–21; the portion of paragraph 22 purporting to testify as to why Defendants decided to install the second railing in the stairwell of 1068 North Street; the statement in paragraph 28 that "[t]he defendants had a scheme to move me to another building om [sic] plaintiffs home"; and paragraphs 29–30.

## 2. *Exhibits*

Defendants first argue that Plaintiff's "blanket authentication" of the exhibits in paragraph 3 of her affidavit is improper and ask the Court to strike all of Plaintiff's exhibits from the record. They contend that Plaintiff failed to provide sufficient foundation for admission of the exhibits at trial, thereby violating Federal Rule of Civil Procedure 56(e).

The proper methods of authentication are not directly addressed in Rule 56(e), however, Federal Rule of Evidence 901(a) provides that the authentication requirement "is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed.R.Evid. 901(a). Therefore, to authenticate a document, a witness with personal knowledge to that effect need only testify "that the

document is what it purports to be." *In re WorldCom, Inc.,* 357 B.R. 223, 228 (S.D.N.Y.2006); *see also* Fed.R.Evid. 901(b)(1) (permitting authentication by testimony of a witness with knowledge "that a matter is what it is claimed to be"); 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 2722 (3d ed. 2005) ("To be admissible, documents must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e) and the affiant must be a person through whom the exhibits could be admitted into evidence."). The witness need not have "personal knowledge of the underlying events described in the document, the substance or accuracy of the document, [or] the methods of calculation." *In re WorldCom, Inc.,* 357 B.R. at 228.

With regard to the evidence that must be produced in order to authenticate a document, "[t]his threshold determination is relatively low, as evidence is admissible as authentic 'if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification.' "
*Bazak Int'l Corp. v. Tarrant Apparel Group,* 378 F.Supp.2d 377, 391–92 (S.D.N.Y.2005) (quoting *United States v. Ruggiero,* 928 F.2d 1289, 1303 (2d Cir.1991)); *see also* *United States v. Pluta,* 176 F.3d 43, 49 (2d Cir.1999) ("The burden of authentication does not require the proponent of the evidence to rule out all possibilities inconsistent with authenticity, or to prove beyond any doubt that the evidence is what it purports to be. Rather, the standard for authentication, and hence for admissibility, is one of reasonable likelihood.") (citation omitted). Once this Court determines that Plaintiff has produced evidence sufficient to show by a "reasonable likelihood" that the documents "in question [are] what its proponent claims," then "the evidence may be admitted and any outstanding issues regarding its authenticity are to be resolved by the fact-finder." *Bazak Int'l Corp.,* 378 F.Supp.2d at 392 (citing *Raskin,* 125 F.3d at 66).

**\*3** In paragraph 3 of her affidavit, Plaintiff states: "Attached to this affidavit are Exhibits a-z. These Exhibits are true and accurate." (Lachira Aff. ¶ 3.) The documents attached as exhibits include numerous letters, a Town of Greenwich Department of Health Inspection Report, the Landlord–Tenant Agreement between the parties, a Greenwich Police Report, Norwalk Superior Court records, among many others. (*See* Exs. A–Z to Lachira Aff.) With regard to the majority of the exhibits, Defendants do not provide specific arguments as to why Plaintiff's blanket authentication is insufficient or state

**Lachira v. Sutton, Not Reported in F.Supp.2d (2007)**
Case 5:22-cv-01202-MAD-ML    Document 8    Filed 03/28/23    Page 235 of 364

73 Fed. R. Evid. Serv. 536, 34 NDLR P 248

why she would not be competent to testify that the documents are what they are claimed to be. In addition to challenging the method of authentication of all of the exhibits, however, Defendants also challenge the authenticity of several specific exhibits, namely, exhibits C, D and E. [2] Because Defendants do not challenge the actual authenticity of all of the exhibits, as opposed to the method of authentication, only those specifically addressed will be dealt with here.

### a. Exhibit C

Exhibit C contains a typewritten, unsigned letter dated April 29, 2000, which purports to summarize a confrontation between Plaintiff and Guy Sutton that Plaintiff claims occurred on April 27, 2000. Defendants dispute the authenticity of the letter, arguing that there is no foundation that the letter was actually mailed or received by anyone.

Authentication of letters, as with other documents, requires a showing that there is a "reasonable likelihood" that the letter is what its proponent claims. A letter need not be signed nor proven to be in Plaintiff's handwriting to be authenticated, *see* 🚩 *United States v. Thompson,* 449 F.3d 267, 274 (1st Cir.2006), however, there must be some indicia of authorship and/or authenticity. *See* ⚠️🚩 *United States v. Bagaric,* 706 F.2d 42, 67 (2d Cir.1983) (authentication may be established entirely with circumstantial evidence, including " 'appearance, contents, substance ... and other distinctive characteristics' of the writing") (quoting Fed.R.Evid. 901(b)(4)). In *Bazak Int'l Corp.,* the Southern District of New York held that a letter was authenticated and admissible where the alleged letter writer and his assistant both attested the letter was handwritten by the alleged letter writer and subsequently typed on the computer and mailed by his assistant. 🚩 378 F.Supp.2d at 392 (noting that "[w]hether the alleged facts are credible in light of [any] evidence to the contrary is a question for the jury and inappropriate to determine on summary judgment").

Although Plaintiff, as the purported author of the letter, qualifies as a "witness with knowledge," she did not specifically reference the letter in her affidavit. Moreover, she does not state whether the letter was actually mailed and does not include a postmarked envelope or any other relevant evidence. Plaintiff also did not attest to the date on which the letter was written. Although the date typed in the upper left-hand corner of the letter is April 29, 2000, there is no evidence to show that the letter was actually written

and/or mailed on or around that date. Finally, as Defendants point out, the contents of the letter contradict Plaintiff's prior deposition testimony and her Local Rule 56(a) 2 Statement, in which she attributed insulting statements to James Sutton, rather than Guy Sutton. Because of the numerous questions surrounding the authenticity of the letter, the Court finds that Plaintiff has not met her burden of authenticating the letter and establishing its credibility as required by Federal Rule of Evidence 901(a). Accordingly, Exhibit C will be stricken from the summary judgment record.

### b. Exhibit D

**\*4** Attached as Plaintiff's Exhibit D are copies of Norwalk Superior Court records. Defendants argue that these records are inadmissible because they are incomplete, unauthenticated and contain hearsay. In order to authenticate public records, Plaintiff must produce "[e]vidence that a writing authorized by law to be recorded or filed and in fact recorded or filed in a public office, or a purported public record ... is from the public office where items of this nature are kept." Fed.R.Evid. 901(b)(7). Federal Rule of Evidence 902 provides that certain types of documents are self-authenticating, such that they do not require extrinsic evidence for authentication. *See* Fed.R.Evid. 902. A domestic public record is self-authenticating if it is submitted under seal or if it is a certified copy. Fed.R.Evid. 902(1), (4). If, as here, a public record does not fall into one of these two categories, it must comply with the requirements of Rule 901(b)(7), as set forth above. Because Plaintiff has presented no evidence that the records contained in Exhibit D are "from the public office where items of this nature are kept," they are not properly authenticated. As such, Exhibit D will be stricken from the summary judgment record.

### c. Exhibit E

Included in Plaintiff's Exhibit E are copies of various letters purported to be written by Plaintiff to Defendants requesting that repairs be made. Defendants again argue that these documents are inadmissible because there is no foundation that the letters were mailed to or received by Defendants, and because they are unauthenticated, self-serving hearsay. The letters were purportedly written over a long period of time, dated September 10, 2003 through April 29, 2006. As with the letter contained in Exhibit C, these letters are type-written and unsigned. Plaintiff also did not specifically reference these letters in her affidavit and fails to state whether the letters were actually mailed. Moreover, there is no outward indicia of authenticity, as the exhibit does not, for example

Lachira v. Sutton, Not Reported in F.Supp.2d (2007)

73 Fed. R. Evid. Serv. 536, 34 NDLR P 248

include a postmarked envelope or any other relevant evidence indicating that the letters were mailed by Plaintiff or received by Defendants. For the same reasons as set forth with regard to Exhibit C, the Court finds that Plaintiff has not met her burden of authenticating the letters and establishing their credibility as required by Federal Rule of Evidence 901(a), and therefore strikes the letters from the summary judgment record.

Exhibit E also contains a letter from a physician addressed to the State of Connecticut Disability Determination Services dated February 28, 2003. Again, Defendants argue that Plaintiff has failed to provide a sufficient foundation for the authenticity and admissibility of this document at trial. Plaintiff failed to provide an affidavit from the physician attesting to the letter's authenticity or any other evidence of authenticity. Accordingly, this letter will be stricken from the record.

### B. Plaintiff's Local Rule 56(a) 2 Statement

**\*5** A party opposing a motion for summary judgment in the District of Connecticut must file a Local Rule 56(a) 2 Statement in response to the material facts set forth in the movant's Local Rule 56(a) 1 Statement. Each denial in the opponent's Local Rule 56(a) 2 Statement must be followed by a specific citation to: "(1) the affidavit of a witness competent to testify as to the facts at trial and/or (2) evidence that would be admissible at trial." D. Conn. L. Civ. R. 56(a)3. Defendants point out that Plaintiff repeatedly fails, in her Local Rule 56(a) 2 Statement, to give "specific citations to evidence in the record" as required by Local Rule 56(a) 3. *See* D. Conn. L. Civ. R. 56(a)3. When a party fails to appropriately deny material facts set forth in the movant's Local Rule 56(a) 1 statement, those facts are deemed admitted. *See Amnesty Am. v. Town of W. Hartford,* 288 F.3d 467, 470 (2d Cir.2002) ("Fed.R.Civ.P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute."); *SEC v. Global Telecom Servs. L.L.C.,* 325 F.Supp.2d 94, 109 (D.Conn.2004) (same); *Root v. Liston,* 363 F.Supp.2d 190, 191 n. 1 (D.Conn.2005); *Martin v. Town of Westport,* 329 F.Supp.2d 318, 323 n. 1 (D.Conn.2004). Moreover, as this Court recognized in *SEC v. Global Telecom Services L.L.C.,* the "failure to provide specific citations to the record ... may result in sanctions, including ... an order granting the motion" for summary judgment." 325 F.Supp.2d 94, 108–109 (D.Conn.2004) (quoting D. Conn. L. Civ. R. 56(a)3).

In paragraphs 7, 8, 14, 21, 25, 26, 27 and 31, Plaintiff denies Defendants' assertions, but does not provide a specific citation to the record. [3] Because these denials fail to meet the requirements of Local Rule 56(a) 2, the facts set forth in Defendants' Local Rule 56(a)(1) Statement at paragraphs 7, 8, 14, 21, 25, 26, 27 and 31 are deemed admitted.

## II. MOTION FOR SUMMARY JUDGMENT

### A. Background

Plaintiff is a residential tenant who occupies a one-bedroom apartment, Apartment Number 3–S, in a building located at 1068 North Street in Greenwich, Connecticut. Plaintiff has lived in this apartment with her sixteen-year-old son since 1999. The building located at 1068 North Street is a three-story building with two small stores on the first floor, two apartments on the second floor and two apartments on the third floor. Defendant Stanford Sutton is the owner of and landlord for the building and the apartment in question. Defendant James Sutton, Stanford Sutton's son, is the property manager and leasing agent for the property. Former defendant Guy Sutton, also Stanford Sutton's son, is an attorney who provides legal services to his father. [4] In October 2003, Plaintiff was granted Section 8 housing choice vouchers by the United States Department of Housing and Urban Development ("HUD"). [5]

Throughout Plaintiff's tenancy, Defendant Stanford Sutton owned a number of residential properties in Greenwich. A number of the tenants occupying these properties were persons of Hispanic ancestry . [6] Also during Plaintiff's tenancy, Stanford Sutton leased an apartment to at least one other single Hispanic woman receiving Section 8 assistance. [7]

**\*6** According to Plaintiff, there are no other tenants with children in Defendants' building at 1068 North Street. (Lachira Aff. ¶ 5.) She contends that Defendants told her that "it has been a mistake to rent to you with a child ... for ... two years," and that they had been telling her, since 1999, that they did not want her child in the building (*Id.* ¶¶ 5, 10.) Plaintiff's affidavit details a contentious relationship between her and Defendants. Notably, she contends that Defendants "screamed cursed and insulted [her,] including saying 'move you stupid Spanish people,' " and screamed and cursed at her child, telling him that he and Plaintiff were "stupid Spanish people" and that there were no children allowed in the building. (*Id.* ¶¶ 7, 12.) James Sutton denies making

Lachira v. Sutton, Not Reported in F.Supp.2d (2007)

73 Fed. R. Evid. Serv. 536, 34 NDLR P 248

these statements. (James Sutton Decl. ¶ 25.) She claims that Defendants have entered her apartment "without notice," and have looked through her child's room and his desk. (Lachira Aff. ¶ 13.) A police report dated April 27, 2000 indicates that the police were dispatched to 1068 North Street on that date for a "landlord tenant disagreement about having son in apartment." (Police Report, Apr. 27, 2000, Pl.'s Ex. C.) Plaintiff claims that Defendants refused to perform repairs in the building, despite her requests to do so, and even after the Health Department and Building Department were contacted. (Lachira Aff. ¶¶ 9, 14.) According to Plaintiff, as her disability worsened, she needed railings installed on the stairway in the building. (*Id.* ¶ 22 .) She requested that Defendants install the railings in 2003 and 2004, with no results. (*Id.*) Plaintiff admitted in her deposition, however, that Defendants fulfilled her reasonable accommodation request for the installation of a second railing at 1068 North Street in 2005. (Lachira Dep. 117:5–7, Aug. 10, 2006, Defs.' App. 3.)

Plaintiff claims that when she was granted Section 8 assistance in October 2003, Defendants refused to sign the application until they were forced to do so by HUD. (Lachira Aff. ¶ 23.) She claims that Defendants refused to do the necessary repairs for HUD inspections and that she had to paint the bathroom and put caulking in the bath tap while she was ill in order to ensure that the apartment passed an inspection. (*Id.* ¶¶ 24–25.)

According to Defendants, Plaintiff approached James Sutton in early 2004 and asked if the landlord, Stanford Sutton, would be willing to rent Plaintiff a second one-bedroom apartment on the same floor in addition to her current apartment. She wanted to combine the two apartments, giving her two bedrooms and additional space.[8] James Sutton signed a Request for Tenancy Approval ("RFTA") which was submitted to the Housing Authority of the Town of Greenwich. The RFTA was denied pursuant to HUD guidelines for the Section 8 program, which require that the Total Tenant Obligation for the tenant's portion of the rent and utilities not exceed forty percent of her adjusted gross income and initial lease up. (*See* Muldoon Decl. ¶¶ 4–5, Mar. 2, 2007, Ex. A to Defs.' Reply.[9]) The proposed monthly rental payment in the RFTA for the combined apartment unit was far in excess of that payment standard. (*Id.* ¶ 5.) As a result, Plaintiff's RFTA was denied. (*Id.* ¶ 6.) After learning of the RFTA denial, James Sutton offered Plaintiff the opportunity to move with her son to a two-bedroom apartment at 418 Putnam Avenue, which Plaintiff would be able to afford under existing Section 8 guidelines. Plaintiff refused the offer.

**\*7** Subsequently, Plaintiff began badgering James Sutton with unjustified complaints about the building and called him repeatedly on the phone asking him to lower the rent for the other one-bedroom apartment at 1068 North Street. Because of this behavior, Stanford Sutton refused to renew Plaintiff's one-year lease when it expired in October 2004. On July 27, 2004, Stanford Sutton sent Plaintiff a letter confirming that he was electing not to renew Plaintiff's Section 8 lease and that he would be notifying the Housing Authority of the Town of Greenwich of that decision.

Plaintiff contends that in May 2004, Defendants locked her out of the basement where the washer and dryer for the building, as well as some of her "personal property," are located. (Lachira Aff. ¶¶ 31–32.) She claims that Defendants took some of her property and left it outside the building. (*Id.* ¶ 33.) Plaintiff further contends that she was denied water for twenty-eight days, and received only five to seven gallons of water during this time. (*Id.* ¶ 34.) In an October 28, 2004 Housing Court proceeding between Plaintiff and Defendants, it was revealed that the washer and dryer had been broken, but that Plaintiff had refused to stop using it while Defendants were waiting to have the repairs finished, forcing them to close off the basement. (Housing Court Trans. 6:10–10:16, Oct. 28, 2004, Pl.'s Ex. K.) The parties agreed at the hearing that Defendants would reopen the basement if Plaintiff would not use the washer and dryer until the repairs had been completed. (*Id.*) It was also revealed that Plaintiff was not denied water for twenty-eight days, but that Defendants had asked the tenants not to drink the water because it was being tested for bacteria. (*Id.* at 11:20–12:11.) Defendants had supplied Plaintiff with seven gallons of water while the testing was proceeding, and the Housing Court ordered them to supply her with "all the water she needs ... for drinking." (*Id.* at 12:25–13:22.)

On September 3, 2004, Plaintiff was served with a notice to quit notifying her that she had to move out when her lease expired in October 2004. On October 5, 2004, after Plaintiff had failed to vacate the apartment, Defendants filed a summary process action against her in the Norwalk Housing Court. Attorney Rick Brody, from Connecticut Legal Services, appeared on Plaintiff's behalf on October 15, 2004 and has represented Plaintiff in the summary process proceedings up to the present time.

On December 21, 2004, Plaintiff filed a *pro se* discrimination complaint with the Connecticut Commission on Human

73 Fed. R. Evid. Serv. 536, 34 NDLR P 248

Rights and Opportunities ("CHRO"). The complaint alleged discrimination based on Plaintiff's ancestry (Hispanic), her national origin (Peruvian), her lawful source of income (Section 8) and included claims of misconduct identical to those claimed here. Plaintiff contends that on February 9, 2005, Defendants came to her apartment and were angry and demanded to know why she had submitted a complaint to the Greenwich Health Department and Building Department. (Lachira Aff. ¶ 43.) She claims that Defendants "kicked [her] plants outside of [her] home," causing her to contact the police. (*Id.* ¶¶ 44–45.)

**\*8** On September 15, 2006, the CHRO issued its "Preliminary Draft of the Final Investigative Report," (the "CHRO Report"), which concluded that there was "no credible evidence to support [Plaintiff's] allegations that [Defendants] adversely treated her due to her protected classes." (CHRO Report 13, Sept. 15, 2006, Ex. E to James Sutton Decl.) With regard to Plaintiff, the CHRO found that she lacked credibility and that there was a "history of [her] being a problematic tenant." (*Id.* at 13–14.) Although Plaintiff did not formally raise a disability discrimination claim in her CHRO complaint, the CHRO Report also considered and disposed of any disability discrimination claim, finding that Defendants had installed railings leading to the third floor of the building, thereby complying with Plaintiff's request for reasonable accommodation. (*Id.* at 13.) Just before the fifteen-day comment period on the CHRO Report was to expire, Plaintiff withdrew her CHRO complaint in favor of filing a complaint in federal court. (James Sutton Decl. ¶ 15.)

The first eviction trial between the parties *("Sutton I")* went to trial on July 21, 2005 while the CHRO proceedings were pending. (James Sutton Decl. ¶ 16.) At trial, Plaintiff asserted various special defenses, including defenses of retaliatory eviction and discrimination, as well as a general defense based on the equitable doctrine against forfeitures. (*Id.; * Am. Ans. & Special Defense, Ex. F to James Sutton Decl.) The housing court in *Sutton I* found that the notice to quit served on Plaintiff by Defendants was valid, that Plaintiff's tenancy had expired and that Plaintiff's special defenses lacked merit. (*Sutton I* Trans. 9–10, July 21, 2005, Defs.' App. 4.) The housing court noted that Plaintiff did not act in good faith and that her testimony was "so exaggerated and so incredulous ... that [the court] can't give much of her testimony any credit at all." (*Id.* at 6, 10.) The court entered judgment for Plaintiff on equitable grounds, however, finding that if Plaintiff were evicted, she would lose her Section 8 status. (*Id.* at 10.)

Following the conclusion of *Sutton I,* Defendants reinstated Plaintiff as a month-to-month tenant in accordance with her prior Section 8 lease. Defendants received additional complaints from tenants in the building with regard to Plaintiff after she was reinstated. Two tenants, Fiaz Arain and Tertulien Thomas, eventually sent letters to James Sutton in which they memorialized their complaints and threatened to move out if the situation was not addressed. (Arain Letter, Sept. 8, 2005, Ex. G to James Sutton Decl.[10]; Thomas Letter, Nov. 28, 2005, Ex. H to James Sutton Decl.[11])

On October 31, 2005, Defendants provided Plaintiff with sixty-days advance notice that her Section 8 lease would not be renewed beyond the month-to-month tern expiring December 31, 2005, and advised Plaintiff that her misconduct constituted a nuisance as well as material non-compliance with the lease. (Termination Letter, Oct. 31, 2005, Ex. I to James Sutton Decl.) On December 6, 2005, Defendants served Plaintiff with another notice to quit and commenced a second eviction action against her on January 30, 2006 *("Sutton II")*. Plaintiff contested Defendants' allegations and alleged special defenses based on equity and res judicata. *Sutton II* went to trial on May 4 and May 11, 2006.

**\*9** Plaintiff contends that on December 19, 2005, Defendant James Sutton and Defendants' handyman, Graham Leavey, came to her apartment to do repairs and as she was closing the door, James Sutton ran into the apartment, apparently hurting her "hand, arm and body" in the process. (Lachira Aff. ¶ 38.) She claims that Defendant took pictures and attempted to enter her bedroom. The police were called, and the report indicates that Plaintiff's "chief complaint was that [James] Sutton was not invited into her apartment and that her left arm and chest hurts. She also felt violated when [James] Sutton brushed into her," however, she did not want to go to the hospital when asked by the police. (Police Report, Dec. 19, 2005, Pl.'s Ex. U.) The police examined Plaintiff's left arm and found "no sign of redness, swelling, contusions, crepitus or deformity to any portion of her arm or wrist." (*Id.*) Plaintiff told the police that James Sutton had not grabbed her. The police talked with James Sutton and Leavey separately, at which point James Sutton told the police about the incident, which apparently started when Plaintiff asked James Sutton to take off his shoes before entering the apartment. James Sutton told the police that when he was in the apartment, Plaintiff threatened him by saying, "I know you have a wife and an 18 month old baby, be careful of the consequences." (*Id.*) James Sutton stated that he was becoming "increasingly alarmed at that comment and began to fear for his family's safety." (*Id.*)

Case 5:22-cv-01202-MAD-ML   Document 8   Filed 03/28/23   Page 239 of 364

**Lachira v. Sutton, Not Reported in F.Supp.2d (2007)**

73 Fed. R. Evid. Serv. 536, 34 NDLR P 248

After finishing their investigation, the police "were unable to substantiate the injury complaints with physical evidence or observations made by the witness," and noted that "[t]he contact made between [James] Sutton and [Plaintiff] could not have been avoided in such a confined space." (*Id.*)

During trial in *Sutton II,* Defendants presented testimony from two tenants—Mr. Arain and Mr. Thomas—who gave testimony regarding Plaintiff's behavior which was similar to the allegations set forth in their letters. (*Sutton II* Trans. 17–50, May 11, 2006, Defs.' App. 5.) Defendants' handyman, Graham Leavey, testified that during the December 19, 2005 incident, detailed above, he heard Plaintiff tell James Sutton, "you have a wife and an eighteen month old daughter and they will have to pay the consequence." (*Id.* at 52.) Before the trial concluded, the parties entered into an agreement settling the matter.

Plaintiff continues to occupy Apartment Number 3–S pursuant to the Stipulated Agreement between Plaintiff and Stanford Sutton entered in *Sutton II.* The Norwalk Housing Court entered judgment in accordance with the Agreement on May 11, 2006. The Agreement provides for a judgment of possession in favor of Stanford Sutton, with a final stay of execution through June 30, 2007. (*See* Stip. Agr., Ex. K to James Sutton Decl.) Plaintiff was assisted by counsel in negotiating and entering into the Stipulated Agreement. The housing court judge canvassed Plaintiff on the Agreement before entering judgment, during which Plaintiff acknowledged that it was a "fair agreement," and that no one forced her to sign it. (*Sutton II* Trans. 88:3–19, May 11, 2006, Defs.' App. 5.)

  **\*10**  Plaintiff admitted in her deposition that she "didn't know" whether certain allegations in her Amended Complaint were accurate and truthful, including allegations that (1) James Sutton asked her to relocate to another building, (Am.Compl.¶ 16); (2) Plaintiff declined the request to move because the rooms were too small, (*id .* ¶ 17); and (3) James Sutton informed Plaintiff that she and her child would be moved and "put on the streets," (id.¶ 18). (*See* Lachira Dep. 174–78.) Plaintiff also admitted that she does not know whether she sustained any damages or actual harm as a result of Defendants' alleged misconduct. (*See id.* at 187:5–17.)

Plaintiff has filed, *pro se,* three new civil actions in the Connecticut Superior Court against James Sutton, Sutton Real Estate Services, Stanford Sutton, Guy Sutton, the Sutton's handyman, Graham Leavey, the Town of Greenwich and the

Connecticut Department of Public Health. The complaints in the first two cases are dated September 26, 2006 and October 20, 2006. (*See* Exs. L & M to James Sutton Decl.) After Defendants filed their summary judgment motion with this Court, Plaintiff filed her third *pro se* suit against Defendants in state court *("Sutton II")*. This new suit also named as defendants Attorney Frederick Brody (Plaintiff's attorney in the housing court proceedings), Statewide Legal Services and Connecticut Legal Services (Attorney Brody's affiliated legal organizations), defense counsel Robert Frost, and the law firm of Zeldes, Needle & Cooper, P.C. (the law firm that represented the Suttons in the housing court proceedings). In that suit, Plaintiff claims, *inter alia,* that Defendants, their lawyer and her lawyer made "calculated misrepresentations" and tricked Plaintiff into signing the May 11, 2006 Stipulated Agreement that mandates her eviction on June 30, 2007. (*See* Guy Sutton Decl. ¶ 13; *Sutton III* Compl., Ex. D to Guy Sutton Decl.)

### B. Standard of Review

Summary judgment is appropriate only when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). No genuine issue of material fact exists and summary judgment is therefore appropriate when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). A material fact is one which "might affect the outcome of the suit under the governing law" and an issue is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Importantly, however, "[c]onclusory allegations will not suffice to create a genuine issue." *Delaware & H.R. Co. v. Conrail,* 902 F.2d 174, 178 (2d Cir.1990).

  **\*11**  The moving party bears the burden of establishing that summary judgment is appropriate. *Anderson,* 477 U.S. at 255. When moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant can satisfy its burden of establishing that there is no genuine issue of material fact in dispute by pointing to an absence of evidence to support an essential element of the non-moving

**Lachira v. Sutton, Not Reported in F.Supp.2d (2007)**

Case 5:22-cv-01202-MAD-ML   Document 8   Filed 03/28/23   Page 240 of 364

73 Fed. R. Evid. Serv. 536, 34 NDLR P 248

party's claim. 🔖 *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "A defendant need not prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial. It need only point to an absence of proof on the plaintiff's part, and, at that point, plaintiff must 'designate specific facts showing that there is a genuine issue for trial.' " 🔖 *Parker v. Sony Pictures Entm't, Inc.,* 260 F.3d 100, 111 (2d Cir.2001) (quoting 🔖 *Celotex,* 477 U.S. at 324); *see also* 🔖 *Gallo v. Prudential Residential Servs. Ltd. P'ship,* 22 F.3d 1219, 1223–24 (2d Cir.1994) ("The moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case." The nonmoving party, in order to defeat summary judgment, must then come forward with "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson,* 477 U.S. at 249. In making this determination, the court draws "all factual inferences in favor of the party against whom summary judgment is sought, viewing the factual assertions in materials such as affidavits, exhibits, and depositions in the light most favorable to the party opposing the motion." 🔖 *Rodriguez v. City of N.Y.,* 72 F.3d 1051, 1060 (2d Cir.1995) (citations omitted). A party opposing summary judgment, however, "may not rest upon the mere allegations or denials of the adverse party's pleading." FED.R.CIV.P. 56(e).

Determinations of the weight to accord evidence or assessments of the credibility of witnesses are improper on a motion for summary judgment as such are within the sole province of the jury. 🔖 *Hayes v. N.Y. City Dep't of Corr.,* 84 F.3d 614, 619 (2d Cir.1996). "If reasonable minds could differ as to the import of the evidence ... and if ... there is any evidence in the record from any source from which a reasonable inference in the nonmoving party's favor may be drawn, the moving party simply cannot obtain a summary judgment." 🔖 *R.B. Ventures, Ltd. v. Shane,* 112 F.3d 54, 59 (2d Cir.1997) (internal citations omitted); *see also Sologub v. City of New York,* 202 F.3d 175, 178 (2d Cir.2000) ("When reasonable persons applying the proper legal standards could differ in their responses to the questions raised on the basis of the evidence presented, the question is best left to the jury.").

### C. Discussion

Plaintiff alleges that Defendants discriminated against her based on "race, ethnic origin, disability and familial status,"

citing three statutory provisions: 🔖 42 U.S.C. §§ 3604(f)(1), 3617 and 🔖 3604(f)(3)(B). (Am.Compl.¶ 1.) Defendants deny discriminating against Plaintiff due to her national origin, ancestry, source of income, alleged disability or any other prohibited basis in the terms and conditions of her rental or by seeking to evict her. (James Sutton Decl. ¶¶ 9–10; Stanford Sutton Decl. ¶¶ 5–6, Dec. 13, 2006, App. 2.)

#### 1. Judicial Estoppel

**\*12** Defendants first argue that Plaintiff's claims are barred by judicial estoppel. Under the doctrine of judicial estoppel, "[w]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." 🔖 *New Hampshire v. Maine,* 532 U.S. 742, 749, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001) (quotation marks and citation omitted); *see also* 18 Moore's Federal Practice § 134.30 (3d ed. 2000) ("The doctrine of judicial estoppel prevents a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding"); 18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4477 (2d ed. 1981) ("Absent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory."). The Supreme Court noted that the purpose of judicial estoppel is "to protect the integrity of the judicial process" by "prohibiting parties from deliberately changing positions according to the exigencies of the moment." 🔖 *New Hampshire v. Maine,* 532 U.S. at 749–50 (citations omitted); *see also* 🔖 *Bates v. Long Island R.R.* Co., 997 F.2d 1028, 1037 (2d Cir.) ("judicial estoppel protects the sanctity of the oath and the integrity of the judicial process"), *cert. denied,* 510 U.S. 992, 114 S.Ct. 550, 126 L.Ed.2d 452 (1993); 🔖 *Scarano v. Central R.R. Co.,* 203 F.2d 510, 512–513 (3d Cir.1953) (judicial estoppel prevents parties from "playing 'fast and loose with the courts' ") (citation omitted).

Although there is no concrete formula for determining when judicial estoppel applies, factors to consider include: (1) whether a party's later position is "clearly inconsistent" with an earlier position; (2) "whether the party has succeeded in persuading a court to accept that party's earlier position,

Case 5:22-cv-01202-MAD-ML    Document 8    Filed 03/28/23    Page 241 of 364

Lachira v. Sutton, Not Reported in F.Supp.2d (2007)

73 Fed. R. Evid. Serv. 536, 34 NDLR P 248

so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled;" and (3) "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *New Hampshire v. Maine,* 532 U.S. at 750–51 (internal quotations and citations omitted). The factors set forth by the Supreme Court are not exclusive; additional considerations may inform the doctrine's application in specific factual contexts.

Defendants argue that Plaintiff's current position, i.e., arguing that Defendants discriminated against her based on race, ethnicity, disability, source of income and familial status in pursuing eviction proceedings, is inconsistent with the position she took before the Housing Court to obtain the May 11, 2006 Stipulated Agreement. The Stipulated Agreement provides for a stay of execution through June 30, 2007. Plaintiff was canvassed on this agreement by the Housing Court and stated that she understood the agreement, accepted its terms, and agreed that it was fair. *(Sutton II* Trans. 88:3–19.) Plaintiff also requested, however, that the Court add a provision ordering James Sutton not to go near her son. *(Id.* at 88:20–26.) [12]

**\*13** Contrary to what Defendants argue, Plaintiff did not agree that her eviction was fair, but only that the parties' settlement agreement was fair. The agreement, as far as this Court is aware, did not speak to the issue of discrimination. Therefore, the position Plaintiff took at the conclusion of *Sutton II* does not estop Plaintiff from arguing here that Defendants discriminated against her during her tenancy.

*See* *Simon v. Safelite Glass Corp.,* 128 F.3d 68, 72–73 (2d Cir.1997) ("There must be a true inconsistency between the statements in the two proceedings. If the statements can be reconciled there is no occasion to apply an estoppel."). Moreover, it has not been shown that the Housing Court adopted Plaintiff's earlier position. *See* *Mulvaney Mechanical, Inc. v. Sheet Metal Workers,* 288 F.3d 491, 504–05 (2d Cir.2002) ("Judicial estoppel is inappropriate without a showing that the prior tribunal adopted the original representations."). Although the Housing Court approved the Stipulated Agreement, it made no findings with regard to the merits of either party's arguments. Accordingly, it cannot be said that Defendants have proved judicial estoppel such that this Court should find that Plaintiff is estopped from arguing that Defendants discriminated against her in violation of the FHA.

### 2. *Collateral Estoppel*

Defendants also argue that state law principles of collateral estoppel bar Plaintiff from relitigating the issue of Defendants' motives in bringing the eviction proceedings. Under the doctrine of collateral estoppel, or issue preclusion, parties or their privies are prevented from "relitigating in a subsequent action an issue of fact or law that was fully and fairly litigated in a prior proceeding." *Marvel Characters, Inc. v. Simon,* 310 F.3d 280, 288 (2d Cir.2002); *see also Cumberland Farms, Inc. v. Groton,* 262 Conn. 45, 58 n. 17, 808 A.2d 1107 (2002) (holding that the doctrine of collateral estoppel "precludes a party from relitigating issues and facts actually and necessarily determined in an earlier proceeding between the same parties or those in privity with them upon a different claim") (citation omitted). Collateral estoppel applies, and an issue cannot be relitigated, when: "(1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits." *Marvel Characters,* 310 F.3d at 288–89 (quoting *Boguslavsky v. Kaplan,* 159 F.3d 715, 720 (2d Cir.1998)); *accord Delahunty v. Mass. Mut. Life Ins. Co.,* 236 Conn. 582, 600, 674 A.2d 1290 (1996). The Connecticut Supreme Court has elaborated on this test, explaining:

'An issue is actually litigated if it is properly raised in the pleadings or otherwise, submitted for determination, and in fact determined.... An issue is necessarily determined if, in the absence of a determination of the issue, the judgment could not have been validly rendered. If an issue has been determined, but the judgment is not dependent upon the determination of the issue, the parties may relitigate the issue in a subsequent action. Findings on nonessential issues usually have the characteristics of dicta.' ... To assert successfully the doctrine of issue preclusion, therefore, a party must establish that the issue sought to be foreclosed actually was litigated and determined in the prior action between the parties or their privies, and that the determination was essential to the decision in the prior case.

**\*14** *Delahunty,* 236 Conn. at 600–01 (quoting *Jackson v. R.G. Whipple, Inc.,* 225 Conn. 705, 714–15, 627 A.2d 374 (1993)) (internal citations omitted).

**Lachira v. Sutton, Not Reported in F.Supp.2d (2007)**
Case 5:22-cv-01202-MAD-ML   Document 8   Filed 03/28/23   Page 242 of 364
73 Fed. R. Evid. Serv. 536, 34 NDLR P 248

In *Sutton I,* Plaintiff's Second and Third Special Defenses stated:

> On or about July 30, 2004 and several occasions prior thereto, [defendant Stanford Sutton] and/or his agent or attorney discriminated against the defendant in the terms, conditions or privileges of rental of a dwelling or in the provision of services in connection therewith by reason of the defendant's national origin, ancestry, source of income and/or familial status.

(Am. Ans. & Special Defense, Second Special Defense ¶ 1, Third Special Defense ¶ 1, Ex. F to James Sutton Decl.) After hearing testimony regarding this allegation and Plaintiff's claim that Defendants retaliated against her for complaining to local agencies, the Housing Court stated:

> I've got a real problem. I don't think [Plaintiff is] acting in good faith.... I've heard her testimony. I don't think she's acted in good faith whatsoever with respect to the complaints. She didn't find a new place to move to. She remains in there. I've heard no evidence that in fact, the place was as bad as she said it was .... the only valid hinge that you have is with respect to the equitable defenses.

(*Sutton I* Trans. 6:20–7:3.) The Housing Court later ruled from the bench, finding:

> I think that there's no good faith exhibited by [Plaintiff] with respect to the complaints that she made.... There's been no evidence satisfactory to the Court. I think her testimony is so exaggerated and so incredulous to

the Court that I can't give much of her testimony any credit at all.

(*Id.* at 10:6–18.) Despite these findings, the Housing Court found that Plaintiff was entitled to judgment based on the equities. [13] (*See id.* at 10:18–23.)

In this case, Plaintiff brings claims of discrimination under the FHA. Contrary to Defendants' assertions, it does not appear that "the identical issue was raised" in the Housing Court proceeding, that "the issue was actually litigated and decided" in the Housing Court proceeding, that Plaintiff had "a full and fair opportunity to litigate the issue" or that "the resolution of the issue was necessary to support a valid and final judgment on the merits." *Marvel Characters,* 310 F.3d at 288–89. The Housing Court found, based on the equities, that Plaintiff was entitled to judgment. Its statements with regard to Plaintiff's good faith, credibility and complaints were not necessary to the judgment, and therefore are more akin to dicta. *See Delahunty,* 236 Conn. at 600 ("Findings on nonessential issues usually have the characteristics of dicta."). Accordingly, *Sutton I* does not collaterally estop Plaintiff from litigating her claims in the instant action.

Defendants also argue that the issue of Defendants' discriminatory motives was "necessarily determined" by agreement of the parties and the Housing Court in connection with the parties' Stipulated Agreement and the entry of judgment in *Sutton II.* Although "[i]t is clear that a dismissal, with prejudice, arising out of a settlement agreement operates as a final judgment for res judicata purposes," *Marvel Characters,* 310 F.3d at 287, this Court still has to evaluate whether the other factors set forth in *Marvel Characters* support a finding of collateral estoppel.

**\*15** In *Sutton II,* Plaintiff did not raise discrimination as a special defense, but instead argued that she was entitled to judgment based on equity and the doctrine of res judicata, in light of the judgment reached in *Sutton I.* After two days of evidence, the parties entered into a Stipulated Agreement providing for judgment of possession in favor of Stanford Sutton with a stay of execution until June 30, 2007. The Housing Court entered judgment in accordance with the Stipulated Agreement. Defendants argue, based on the entry of judgment, that the Housing Court judge necessarily determined that the Stipulated Agreement and anticipated eviction were lawful. This finding does

Lachira v. Sutton, Not Reported in F.Supp.2d (2007)

Case 5:22-cv-01202-MAD-ML    Document 8    Filed 03/28/23    Page 243 of 364

73 Fed. R. Evid. Serv. 536, 34 NDLR P 248

not preclude Plaintiff from now arguing that Defendants' discriminated against her pursuant to the FHA or that they subjected her to intentional infliction of emotional distress. Plaintiff seeks injunctive relief requiring Defendants to cease any harassment, compensatory and punitive damages, and attorneys' fees and costs. She does not seek to disturb the agreement reached in *Sutton II, i.e.,* that Stanford Sutton is entitled to possession of the apartment after June 30,2007 . [14] Accordingly, the doctrine of collateral estoppel does not apply. *See Carnese v. Middleton,* 27 Conn.App. 530, 535, 608 A.2d 700 (1992) ("Because this action is a claim for damages arising out of the relation of landlord and tenant that had to be and was pursued separately from the landlord's claim for possession, the doctrine of res judicata has no application.").

### 3. *Discrimination Claims*

Plaintiff claims that Defendants discriminated against her on the basis of her race, disability and familial status, in violation of Title VIII of the Civil Rights Act of 1968, also known as the Fair Housing Act ("FHA"), as amended by the Fair Housing Amendments Act of 1988, 42 U.S.C. § 3601 *et seq.* ("FHAA"). [15] The FHA forbids discrimination in housing on the basis of race, color, religion, sex, familial status, or national origin and, most recently, handicap. *See* 42 U.S.C. § 3604.

#### a. *Section 3604(f)*

Section 3604(f) makes it unlawful "[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of ... that buyer or renter," or "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of ... that person." 42 U.S.C. § 3604(f)(1)-(2). Discrimination prohibited by the FHA includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." *Id.* § 3604(f)(3)(B).

Ordinarily, a landlord's "duty to make reasonable accommodations is framed by the nature of the particular handicap." *Salute v. Stratford Greens Garden Apts.,* 136 F.3d 293, 301 (2d Cir.1998). "A defendant must incur reasonable costs and take modest, affirmative steps to accommodate the handicapped as long as the accommodations sought do not pose an undue hardship or a substantial burden." *Tsombanidis v. W. Haven Fire Dep't,* 352 F.3d 565, 578 (2d Cir.2003); *see also United States v. California Mobile Home Park Mgmt. Co.,* 29 F.3d 1413, 1418 (9th Cir.1994) (whether a requested accommodation is required under the FHAA is a "highly fact-specific, requiring case-by-case determination").

**\*16** To make out a claim of disability discrimination based on her landlord's duty to reasonably accommodate, Plaintiff must show that: (1) she suffers from a handicap as defined by the FHA; (2) Defendants knew or reasonably should have known of Plaintiff's handicap; (3) accommodation of the handicap "may be necessary" to afford Plaintiff an equal opportunity to use and enjoy the dwelling; and (4) Defendants refused to make such accommodation. *Bentley v. Peace & Quiet Realty 2 LLC,* 367 F.Supp.2d 341 (E.D.N.Y.2005) (citing *United States v. California Mobile Home Park Mgmt. Co.,* 107 F.3d 1374, 1380 (9th Cir.1997)).

Plaintiff's § 3604(f) claim fails because she has failed to establish that she is handicapped. To be considered "handicapped" under the FHA, Plaintiff must show that: (1) she suffers from "a physical or mental impairment which substantially limits one or more of [her] major life activities"; (2) she has "a record of having such an impairment"; or (3) she is "regarded as having such an impairment." 42 U.S.C. § 3602(h). In the first category, an individual is considered disabled if he or she: (1) suffers from a physical or mental impairment that (2) affects a major life activity, and (3) the effect is "substantial." *See Bragdon v. Abbott,* 524 U.S. 624, 631, 141 L.Ed.2d 540, 118 S.Ct. 2196 (1998).

Plaintiff's Amended Complaint states only that she is "disabled." (Am.Compl.¶¶ 5, 11.) In her deposition, Plaintiff testified that she suffers from "nerve damage" or neuropathy, which she claims causes her pain that is strongest in her legs and arms but that "jumps" around, affecting different parts of her body. (Lachira Dep. 10–12.) Plaintiff has not, however, disclosed any expert to testify concerning this medical condition, nor has she proffered any evidence to show that this condition "substantially limits" her major

73 Fed. R. Evid. Serv. 536, 34 NDLR P 248

life activities. *See* Toyota Motor Mfg. v. Williams, 534 U.S. 184, 198, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002) ("It is insufficient for individuals attempting to prove disability status ... to merely submit evidence of a medical diagnosis of an impairment."). Plaintiff's opposition brief discusses her allegations with regard to Defendants' behavior, but does not discuss her alleged disability. On the record before the Court, there is no evidence showing that Plaintiff suffers from a handicap as defined by the FHA. Accordingly, her disability discrimination claim, pursuant to § 3604(f), fails.

### b. Section 3617

Plaintiff alleges that James Sutton made insulting statements to her and her son, refused to make requested repairs, and had a "scheme" to move her into a different building. Defendants do not dispute, for purposes of this motion, that the landlord, Stanford Sutton, can be held vicariously liable for James Sutton's conduct under agency principles. *See* Cabrera v. Jakabovitz, 24 F.3d 372, 385 (2d Cir.1994).

Plaintiff's claim arises under 42 U.S.C. § 3617, which makes it unlawful to

> **\*17** coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by [42 U.S.C. §§ 3603, 3604, 3605, or 3606].

42 U.S.C. § 3617. Section 3617 may be read as making any violation dependent on an underlying substantive violation of §§ 3603 through 3606, however, courts within this circuit have held that § 3617 can, at times, serve as a separate basis for an FHA claim even where there is no predicate for liability under any of the statute's specifically referenced enumerated substantive provisions. *See* Ohana v. 180 Prospect Place Realty Corp., 996 F.Supp. 238, 240–43 (E.D.N.Y.1998); *Marks v. BLDG Mgmt. Co.,* No. 99 Civ. 5733(THK), 2002

U.S. Dist. LEXIS 7506, \*32–33 (S.D.N.Y. Apr. 26, 2002);

*see also* Taal v. Zwirner, No. 02–131–M, 2004 U.S. Dist. LEXIS 4546, \*22 (D.N.H. Mar. 22, 2004) ("Although there is some disagreement among courts that have considered the point, this court will assume that the provisions of 42 U.S.C. § 3617 provide a separate and substantive basis upon which to base liability under the FHA."). [16]

In two recent cases, the Seventh Circuit found that § 3617 provides a cause of action only for plaintiffs who complain about discrimination in acquiring, rather than simply enjoying, property. *See* East–Miller v. Lake County Highway Dep't, 421 F.3d 558, 562 (7th Cir.2005); *Halprin v. Prairie Single Family Homes of Dearborn Park Ass'n,* 388 F.3d 327, 329–30 (7th Cir.2004). In both cases, however, the Seventh Circuit held, based on 24 C.F.R. § 100.400(c)(2)—a regulation issued by HUD—that § 3617 could be violated even if §§ 3603 through 3606 are not implicated. *See* East–Miller, 421 F.3d at 562; Halprin, 388 F.3d at 330. The *East–Miller* and *Halprin* courts both questioned the validity of 24 C.F.R. § 100.400(c)(2), but declined to rule on its validity because the parties in both cases failed to raise the issue. The HUD regulation, which interprets § 3617, provides:

> Conduct made unlawful under [§ 3617] includes ... Threatening, intimidating or interfering with persons in their enjoyment of a dwelling because of the race, color, religion, sex, handicap, familial status, or national origin of such persons, or of visitors or associates of such persons.

24 C.F.R § 100.400(c)(2). Like the *Ohana* court, this Court finds that the reach of § 3617 is not "free from doubt," and therefore, 24 C.F.R. § 100.400(c)(2), which provides a "plausible construction of the statute and is compatible with Congress' expressed broad purpose in enacting the FHA," is entitled to deference. 996 F.Supp. at 242 (citing, among others, Chevron, U.S.A., Inc. v. Natural Resources Defense

Lachira v. Sutton, Not Reported in F.Supp.2d (2007)

73 Fed. R. Evid. Serv. 536, 34 NDLR P 248

*Council, Inc.,* 467 U.S. 837, 842–45, 81 L.Ed.2d 694, 104 S.Ct. 2778 (1984)). [17]

Following the general trend in this circuit as well as 🚩24 C.F.R. § 100.400(c)(2), this Court finds that Plaintiff can assert a stand-alone § 3617 claim, seeking recovery not only for conduct interfering with efforts to acquire property, but also for post-acquisition interference.

**\*18** In order to prevail on her § 3617 claim, Plaintiff must show that: (1) she is a member of a protected class under the FHA, (2) she was engaged in the exercise or enjoyment of her fair housing rights, (3) Defendants were motivated in part by an intent to discriminate, and (4) Defendants coerced, threatened, intimidated or interfered with Plaintiff on account of her protected activity under the FHA. 🚩*East–Miller,* 421 F.3d at 563. [18] It is undisputed that Plaintiff, as a single, Hispanic woman, is a member of a protected class with regard to both race and familial status. Defendants argue that Plaintiff cannot establish the third and fourth elements of her prima facie case, i.e., that Defendants were motivated in part by an intent to discriminate, and that they coerced, threatened or interfered with Plaintiff on account of activity protected by the FHA.

Plaintiff may prove the third element, intentional discrimination, either directly, through direct or circumstantial evidence, or indirectly, through the burden-shifting framework established in 🚩*McDonnell–Douglas Corp. v. Green,* 411 U.S. 792, 802–03, 36 L.Ed.2d 668, 93 S.Ct. 1817 (1973). *See* 🚩*East–Miller,* 421 F.3d at 563; 🚩*Campbell v. Robb,* 162 Fed. Appx. 460, 473–474 (6th Cir.2006); *see also* 🚩*Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown,* 294 F.3d 35, 53–54 (2d Cir.2002) (applying the *McDonnell–Douglas* test to a claim of retaliation under § 3617). Under the *McDonnell–Douglas* test, Plaintiff must first establish a prima facie case of discrimination. In response, Defendants must offer a legitimate nondiscriminatory reason for its conduct. Finally, Plaintiff must show that Defendants' proffered reason is pretext for unlawful discrimination.

Plaintiff alleges that Defendants told her "it has been a mistake to rent to you with a child," that James Sutton screamed, cursed and insulted her and her son by saying, *inter alia,* "move you stupid Spanish people," that they entered

her apartment without notice, refused to perform repairs, refused to sign her HUD application, locked her out of the basement, refused to provide her with an adequate supply of water and retaliated against her for filing a complaint with the CHRO by kicking the plants outside of her home. Plaintiff also sets forth allegations that James Sutton injured her "hand, arm and body" her while attempting to enter her apartment to do repairs in December 2005. Defendants argue that Plaintiff was a difficult, argumentative tenant, and indeed, many of the above complaints have been found, by the state Housing Court, the CHRO, and the police who responded to a complaint, to be without merit. The admissible evidence submitted in support of these allegations consists primarily of Plaintiff's affidavit and her depositions; she offers no corroboration for her claims. The credibility of Plaintiff's allegations is thrown into question by the facts that (1) she was a tenant for more than four years, but did not formally complain about Defendants' conduct until after they filed the first eviction case, and (2) she is seeking to continue living in Defendants' building. Moreover, the record shows that Stanford Sutton had other Hispanic tenants during Plaintiff's tenancy, including another single Hispanic woman receiving Section 8 assistance. There is no evidence that Defendants initiated eviction proceedings against these tenants or had any problems whatsoever with any of these tenants.

**\*19** The FHA was not intended "to convert every quarrel among neighbors in which a racial or religious slur is hurled into a federal case." 🚩*Halprin,* 388 F.3d at 330. A "pattern of harassment" which is "invidiously motivated," however, may be actionable under § 3617. *Id.; see also* 🚩*Ohana,* 996 F.Supp. 238 (finding that the plaintiffs had set forth a cognizable § 3617 claim with allegations that defendants engaged in a pattern of harassment and discriminatory acts which included racial and anti-Jewish slurs and epithets, threats of bodily harm, and noise disturbances). Most of the cases finding a violation of § 3617 involve allegations of force and violence, such as the firebombing of a home or car, physical assaults, vandalism, firing weapons, or other extreme activities designed to drive a person out of his or her home. *See* 🚩*Halprin v. Prairie Single Family Homes of Dearborn Park Ass'n,* 208 F.Supp.2d 896, 903–904 (N.D.Ill.2002) ("Courts have applied § 3617 to threatening, intimidating, or extremely violent discriminatory conduct designed to drive an individual out of his home. These cases involve extreme and overt acts, such as cross-burning, firebombing homes or cars, shooting shotguns, physical assaults, or throwing Molotov cocktails.") (collecting cases);

Case 5:22-cv-01202-MAD-ML    Document 8    Filed 03/28/23    Page 246 of 364

**Lachira v. Sutton, Not Reported in F.Supp.2d (2007)**

73 Fed. R. Evid. Serv. 536, 34 NDLR P 248

*see also* Whisby–Myers v. Kiekenapp, 293 F.Supp.2d 845 (N.D.Ill.2003) (denying motion to dismiss § 3617 claim because the "alleged detonation of an explosive device simulator to intimidate the husband and wife was the kind of threatening and intimidating conduct designed to drive them out of their home"); Byrd v. Brandeburg, 922 F.Supp. 60, 64–65 (N.D.Ohio 1996) (finding in plaintiffs' favor where plaintiffs' produced evidence of racially motivated violence, including a Molotov cocktail thrown onto the plaintiffs' porch); Johnson v. Smith, 810 F.Supp. 235 (N.D.Ill.1992) (cross-burning in the yard outside of the plaintiffs' residence and the related breaking of one of the windows in their home actionable under § 3617); Stirgus v. Benoit, 720 F.Supp. 119 (N.D.Ill.1989) (racially motivated firebombing of plaintiff's home actionable); Seaphus v. Lilly, 691 F.Supp. 127, 139 (N.D.Ill.1988) (finding "various acts of violence and property damage," including alleged physical assaults and attempted arson, designed "to induce plaintiffs to leave their homes because of their race" actionable under § 3617); Stackhouse v. De Sitter, 620 F.Supp. 208, 211 (N.D.Ill.1985) (firebombing of plaintiff's car).

In extreme instances, however, lesser conduct which serves to "coerce, intimidate, threaten, or interfere" may also be actionable. *See, e.g.,* Ohana, 996 F.Supp. at 241–42. In recognition of the First Amendment rights involved, courts have found that "[s]peech can amount to a violation of § 3617 only when it is 'directed to inciting or producing imminent violence and is likely in fact to do so.' " *Taal,* 2004 U.S. Dist. LEXIS 4546 at *22–23 (quoting White v. Lee, 227 F.3d 1214, 1230 (9th Cir.2000)). Because "[t]hreats of violence, coercion, and intimidation directed against individuals ... do not qualify as advocacy," they "may well constitute a violation of § 3617." *Id* . at *23.

**\*20** The evidence presented here is insufficient to show intentional discrimination. The quarrels and fights described by the parties, while certainly undesirable, do not evince a discriminatory intent on the part of Defendants. Aside from allegedly calling Plaintiff a "stupid Spanish person," there is no evidence that any of James' Sutton's conduct, even if wrongful, was motivated by any discriminatory animus.

Even if Plaintiff had adequately shown a genuine issue of material fact regarding intentional race or familial status discrimination, she would have also had to show that "the conduct alleged in the complaint amounts to 'threatening, intimidating or interfering' within the meaning of the statute and the regulation." Halprin, 388 F.3d at 330. In *Taal,* the plaintiffs alleged "disturbing and unacceptable racial bigotry in broad and general terms" and claimed " 'hundreds' of incidents demonstrating racial animosity." 2004 U.S. Dist. LEXIS 4546 at *7, 15. The Court held that the plaintiffs failed to prove a separate § 3617 claim, finding that they "produced almost nothing by way of evidence, or even descriptions of specific events, from which a reasonable jury could find for them on any asserted federal claim." *Id.* at *8. On the record presented, the Court held that the plaintiffs failed to make the showing necessary for their claim:

> While there can be little doubt that the [plaintiffs] and the [defendants] did not get along, and that on at least one occasion defendant's husband ... resorted to racial epithets and lewd gestures, that is not enough to establish an FHA claim under § 3617. Congress did not intend the FHA to provide a remedy for every squabble, even continuing squabbles, between neighbors of different races. Broad-form claims aside, nothing plaintiffs have presented suggests the type of conduct intended to be covered by § 3617.

*Id.* at *27; *see also* Egan v. Schmock, 93 F.Supp.2d 1090, 1093 (N.D.Cal.2000) (the FHA was not intended to "cover any discriminatory conduct which interferes with an individual's enjoyment of his or her home," but only that which "is designed to drive the individual out of his or her home").

As in *Taal,* the evidence presented in this case does not reveal conduct egregious or severe enough to give rise to a § 3617 claim. The conduct alleged and shown in this case seems more akin to a "quarrel" between a tenant and her landlord than the "pattern of harassment" found to be actionable in *Halprin* and *Ohana.* Notwithstanding the broad language used in some of Plaintiff's allegations, nothing presented here establishes the type of conduct intended to be covered by § 3617. For

73 Fed. R. Evid. Serv. 536, 34 NDLR P 248

these reasons, the Court finds that Defendants are entitled to judgment on Plaintiff's § 3617 claim.

#### 4. *Intentional Infliction of Emotional Distress*

Finally, Plaintiff sets forth a claim for intentional infliction of emotional distress under Connecticut law. The allegations that form the basis of this claim are the same as those alleged in support of Plaintiff's FHA claim. To prevail on this claim, Plaintiff must establish four elements: "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." *Appleton v. Board of Educ.,* 254 Conn. 205, 210, 757 A.2d 1059 (2000) (quoting *Petyan v. Ellis,* 200 Conn. 243, 253, 510 A.2d 1337 (1986)); *see also DeLaurentis v. New Haven,* 220 Conn. 225, 597 A.2d 807 (1991) ("it is the intent to cause injury that is the gravamen of the tort").

##### a. Extreme and Outrageous

**\*21** Defendants argue that the evidence submitted by Plaintiff does not support a finding that their conduct was "extreme and outrageous." The question of whether conduct is "reasonably regarded" as extreme and outrageous is initially a question for the court; an intentional infliction of emotional distress claim should be submitted to a jury only when the court finds that "reasonable minds may differ" on this question. *Reed v. Signode Corp.,* 652 F.Supp. 129, 137 (D.Conn.1986). Connecticut state and federal courts have interpreted the extreme and outrageous qualification strictly. *See Golnik v. Amato,* 299 F.Supp.2d 8, 15–17 (D.Conn .2003) (citing cases).

An intentional infliction of emotional distress claim requires conduct that exceeds "all bounds usually tolerated by decent society...." *Petyan,* 200 Conn. 254 n. 5, quoting W. Prosser & W. Keeton, Torts (5th Ed.1984) § 12, p. 60. As discussed in the Restatement:

> The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

Restatement (Second) of Torts § 46 cmt. d (1965). A defendant's conduct that is "merely insulting or displays bad manners or results in hurt feelings" is insufficient to form the basis of an intentional infliction of emotional distress claim. *Appleton,* 254 Conn. at 211 (quoting *Mellaly v. Eastman Kodak Co.,* 42 Conn. Supp. 17, 19, 597 A.2d 846 (1991)).

Connecticut cases involving similar—and even more severe—allegations have generally held that the conduct alleged was not extreme and outrageous. In *Burr v. Howell,* No. CV020464225S, 2003 Conn.Super. LEXIS 1857, 2003 WL 21675848 (Conn.Super. Ct. June 25, 2003), a Connecticut court found that the alleged use of the racial epithet "nigger" was not sufficiently "extreme and outrageous" to state a claim for intentional infliction of emotional distress. *Id.* at *13–14. In *Engle v. Bosco,* No. CV054006996S, 2006 Conn.Super. LEXIS 2792, 2006 WL 2773603 (Conn.Super.Ct. Sept. 14, 2006), the plaintiff alleged that throughout his eight-year term of employment, the president of the company repeatedly "verbally belittled and abused" him and other employees. *Id.* at * 1. Specifically, the president allegedly referred to the plaintiff and his co-workers as "dumb mother fuckers," accused them of being "brain dead" in the presence of other employees, insulted plaintiff with numerous other lewd and offensive comments, spit on plaintiff and threatened to

73 Fed. R. Evid. Serv. 536, 34 NDLR P 248

terminate his employment. *See id.* at *2–3. The court held that these allegations, viewed in the light most favorable to the plaintiff, were not "extreme and outrageous," and therefore were insufficient to state a claim for intentional infliction of emotional distress. *Id.* at *6–7. In *Leone v. New Eng. Communs.,* No. CV010509752S, 2002 Conn.Super. LEXIS 1361, 2002 WL 1008470 (Conn.Super.Ct. Apr. 10, 2002), where the court denied the motion to strike the plaintiff's intentional infliction of emotional distress claim, the allegations were far more severe and specific. Specifically, the plaintiff alleged that his employers "referred to the plaintiff as 'dago, wop, Father Sarducci or Gimabroni,' ... placed sexually offensive comments and pictures on his computer, ... made comments about his penis, his sexual performance, homosexuality and the like. Such comments were also made to him about others who were employed by his company, those with whom the company had contact or who were customers of the defendant." *Id.* at *8.

 *22  The cases cited by Plaintiff are distinguishable. The majority of the cases cited involved a motion to strike or to dismiss, where courts apply a much lower standard of review than that at the summary judgment stage, determining only whether a plaintiff's allegations stated a claim for intentional infliction of emotional distress.[19] *See, e.g., Leone,* 2002 Conn.Super. LEXIS 1361, 2002 WL 1008470; *Whelan v. Whelan,* 41 Conn. Supp. 519, 588 A.2d 251 (1991); *Mellaly v. Eastman Kodak Co.,* 42 Conn. Supp. 17, 597 A.2d 846 (1991); *Centi v. Lexington Health Care Ctr.,* No. CV 960383535, 1997 Conn.Super. LEXIS 1202 (Conn.Super.Ct. May 1, 1997). Indeed, as one of the courts noted, a "more appropriate manner of testing whether the conduct and emotional distress reached the threshold" required for an intentional infliction of emotional distress claim would be by a motion for summary judgment, where the court "is able to consider the *actual* facts rather than those that could be proved under the allegations of the complaint construed in a manner most favorable to the plaintiff." *Mellaly,* 42 Conn. Supp. at 19 n. 3 (emphasis added). The allegations here, although possibly sufficient to state a claim, do not appear to be "extreme and outrageous" in light of the evidence actually presented to the Court.

The other cases cited by Plaintiff, although numerous, do not change this Court's conclusion. First, the facts involved in those cases are very different from those presented here and thus are difficult to analogize to this case. Moreover,

the failure here is not with Plaintiff's allegations, but with the evidence presented. The admissible evidence on record does not indicate that Defendants' conduct was extreme and outrageous, but only that the parties' landlord-tenant relationship has deteriorated to a point where it is routinely contentious.

The comments allegedly made here—i.e., Plaintiff's allegation that James Sutton said "move you stupid Spanish people," and her vague allegation that he screamed, cursed and insulted her and her son—do not appear to rise to the level of conduct that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Restatement (Second) of Torts § 46 cmt. d (1965). There is no evidence to support Plaintiff's allegations that Defendants refused to perform repairs, refused to comply with HUD regulations, or otherwise engaged in conduct that threatened her Section 8 status. In light of Defendants' evidence, Plaintiff's claims regarding being locked out of the basement, deprived of water, Defendants' "scheme" to move her into another building, and her description of the December 19, 2005 incident appear to have no merit. Although "[t]here is no bright line rule to determine what constitutes extreme and outrageous conduct sufficient to maintain an action," courts must distinguish between "the slight hurts which are the price of a complex society and the severe mental disturbances inflicted by intentional acts wholly lacking in social utility." *Burr v. Howell,* 2003 Conn.Super. LEXIS 1857 at *8–9. This case seems to fall into the former category. If in fact Defendants did engage in the conduct described herein, it appears to have been isolated in the context of a heated breakdown of the parties' landlord-tenant relationship, rather than a pattern of racially-motivated conduct. *See id.* at * 12. This Court certainly does not condone the behavior described by Plaintiff, however, it does not appear to be so extreme or outrageous to meet the standard of unacceptability required for the tort of intentional infliction of emotional distress.

### b. Severe Emotional Distress

 *23  Because the Court has found that the alleged conduct was not extreme and outrageous, it is unnecessary to determine whether Plaintiff suffered severe emotional distress, although the Court notes that no evidence was provided to support such a finding. With regard to this prong, Plaintiff states only that she "suffered enormous distress at the hands of the defendants. The plaintiff is able to testify to the emotional distress experienced as medical

Case 5:22-cv-01202-MAD-ML   Document 8   Filed 03/28/23   Page 249 of 364

Lachira v. Sutton, Not Reported in F.Supp.2d (2007)

73 Fed. R. Evid. Serv. 536, 34 NDLR P 248

records are not required to prove emotional distress in the state of Connecticut." (Pl.'s Mem. Opp. 22.) Although it is unclear in Connecticut whether a plaintiff must seek medical treatment in order to maintain a claim of intentional infliction distress under Connecticut law, *see* Almonte v. Coca–Cola Bottling Co., 959 F.Supp. 569, 575 (D.Conn.1997) (*citing* Rosenberg v. Hebrew Home and Hosp., No. CV 33 31 35, 1997 Conn.Super. LEXIS 168, 1997 WL 35808, *2 (Conn.Super.Ct. Jan. 23, 1997) and Reed v. Signode Corp., 652 F.Supp. 129, 137 (D.Conn.1986)), Plaintiff has not shown that any emotional distress suffered was "severe," at a level which "no reasonable person could be expected to endure," or that she experienced her symptoms "to an extraordinary degree." *See* Almonte, 959 F.Supp. at 575 (granting summary judgment on the plaintiff's claim of intentional infliction of emotional distress on the ground that plaintiff failed to set forth any evidence indicating that he suffered his symptoms—i.e., sleeplessness, depression and anxiety—"to an extraordinary degree"); Reed, 652 F.Supp. at 137 (granting summary judgment on the plaintiff's claim of intentional infliction of emotional distress and

noting that "plaintiff was neither treated nor did he seek medical assistance for the distress he allegedly suffered"). Accordingly, Plaintiff's intentional infliction of emotional distress claim fails on this basis as well.

Because Plaintiff has not shown that Defendants' conduct was extreme and outrageous or that she suffered severe emotional distress, Defendants are entitled to judgment on Plaintiff's claim of intentional infliction of emotional distress.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment [Doc. No. 32] is **granted** and their Motion to Strike [Doc. No. 48] is **granted in part** and **denied in part.** The clerk may close the case.

SO ORDERED.

## All Citations

Not Reported in F.Supp.2d, 2007 WL 1346913, 73 Fed. R. Evid. Serv. 536, 34 NDLR P 248

## Footnotes

1    It is noted, in light of Plaintiff's failure to respond to Defendants' Motion to Strike, that the "failure to submit a memorandum in opposition to [the] motion may be deemed sufficient cause to grant the motion." D. Conn. L. Civ. R. 7(a).

2    Defendants also contend that Exhibit U should be stricken, but offer no argument in support of this assertion.

3    Plaintiff either provides no citation at all or cites generally to "plaintiff's affidavit."

4    Plaintiff dismissed Guy Sutton from this lawsuit with prejudice on September 27, 2006.

5    The Section 8 Program is designed "for the purpose of aiding low-income families in obtaining a decent place to live and of promoting economically mixed housing." 42 U.S.C. § 1437f(a). Participants in the Section 8 program receive vouchers from the local Housing Authority, which they may use to rent a unit on the private housing market. The program provides that the tenant will pay approximately thirty-percent of her income toward the monthly rent, with the Housing Authority paying the remainder of the monthly rent directly to the landlord. *See* Salute v. Stratford Greens Garden Apartments, 136 F.3d 293, 296 (2d Cir.1998); *see generally* 42 U.S.C. § 1437f.

73 Fed. R. Evid. Serv. 536, 34 NDLR P 248

6    Specifically, Defendants name the following tenants: Omar Romero, Oswald Travasso, Hector Romano, Frank Rivera, Laura Solis, Jose Forlese and Emma Norvat. (*See* Defs.' Local Rule 56(a)(1) Statement ¶ 3 (citing James Sutton Decl. ¶ 7, Dec. 13, 2006, Defs.'s App. 1; Exs. A & B to James Sutton Decl.).)

7    Defendants identify this tenant as Ann M. Didio, residing at 415 East Putnam Avenue, Apartment Number 2, Greenwich, Connecticut.

8    Plaintiff claims that combining the two apartments was Defendants' idea and that they told her the rent for the two apartments would be the same amount as she had been paying for one apartment. (Lachira Aff. ¶ 27.) She claims that this was part of their "scheme" to move her to another building. (*Id.* ¶ 28.)

9    Patricia Muldoon is the Section 8 Coordinator for the Housing Authority of the Town of Greenwich. (Muldoon Decl. ¶ 3.) She has had direct dealings with both Plaintiff and James Sutton in connection with Plaintiff's Section 8 tenancy, and was responsible for reviewing Plaintiff's RFTA.

10    In his letter to James Sutton, Mr. Arain writes that he has "decided to vacate ... apartment # 2S by the end of the month," despite his initial plan to stay there long-term, due to the fact that Plaintiff "ha[d] been constantly bothering [him]." (Arain Letter.) Mr. Arain goes on to list examples of Plaintiff's conduct which prompted the letter. (*See id.*)

11    In his letter to James Sutton, Mr. Thomas writes that "ever since [he] moved in the tenants upstairs have been extremely annoying." (Thomas Letter.) He lists examples of their behavior and concludes by saying that he "need[s][his] peace" and if Plaintiff's behavior continues, he "will have to move out because [he] just can't take it anymore." (*Id.*)

12    The Court rejected this request. (*See Sutton II* Trans. 88–92.)

13    The Housing Court stated: "The problem is with respect to the equities. [Plaintiff] has a section 8. If she loses this section 8, she'll lose the apartment; she'll lose the section 8. And it's on that base alone that I'm going to issue judgment in favor of [Plaintiff] on that count alone." (*Sutton I* Trans. 10:18–23.)

14    Although Plaintiff does not seek, in this action, to disturb the Stipulated Agreement, she has filed a separate state court action claiming that Defendants, her lawyer and their lawyer, among others, made misrepresentations and deceived her in order to induce her to sign the Stipulated Agreement. (*See Sutton II* Compl., Ex. D to Guy Sutton Decl.) Defendants question Plaintiff's motive in filing this state court action, however, it does complicate the issues of judicial and collateral estoppel. *See* 🚩*Hunnicutt v. Armstrong,* 305 F.Supp.2d 175, 182 (D.Conn.2004) (relying in part on the fact that the plaintiff "has not moved to vacate the settlement" in holding that the plaintiff's claims were barred by collateral estoppel based on a prior settlement agreement).

15    Plaintiff attempts to add, in her opposition brief, a claim that Defendants discriminated against her based on her "source of income." (*See* Pl.'s Mem. Opp. 8.) In addition to the fact that this addition is untimely and improperly raised, the claim fails as a matter of law. The FHA does not include "source of income" or Section 8 tenants in its list of protected classes. *See* 🚩 42 U.S.C. § 3604(b). Moreover, the Second Circuit has made clear that neither economic nor Section 8 status is a basis for a discrimination claim under the FHA. *See* 🚩*Salute v. Stratford Greens Garden Apts.,* 136 F.3d 293, 301 ("Economic discrimination—such as the refusal to accept Section 8 tenants—is not cognizable as a failure to make reasonable accommodations, in violation of 🚩 § 3604(f)(3)(b)."). Because the proposed amendment is futile, it is rejected.

**Lachira v. Sutton, Not Reported in F.Supp.2d (2007)**

73 Fed. R. Evid. Serv. 536, 34 NDLR P 248

16    The Second Circuit found, in *Frazier v. Rominger,* that "Section 3617 prohibits the interference with the exercise of Fair Housing rights only as enumerated in [§§ 3603, 3604, 3605 or 3606], which define the substantive violations of the Act." 27 F.3d 828, 834 (2d Cir.1994). At issue in *Frazier* was the discrete question of whether a landlord's refusal to rent, which would clearly be cognizable under § 3604(a), could serve, simultaneously, as a separate § 3617 claim because it would also constitute "interference" under § 3617. As the Second Circuit pointed out, "under this theory, every allegedly discriminatory denial of housing under § 3604(a) would also constitute a violation of § 3617 in that the denial 'interfered' with the prospective tenant's Fair Housing Act rights." *Id.* Consequently, the Court "declined to believe that Congress ever intended such a statutory overlap" and concluded "that the plaintiffs' sole remedy in this case existed in their § 3604(a) cause of action." *Id.* As the *Ohana* court found, a "careful reading" of *Frazier* suggests that the Second Circuit may agree that, in certain circumstances, § 3617 can serve as a separate basis for an FHA claim even where there is no predicate for liability under §§ 3603 through 3606. 996 F.Supp. at 241.

17    Aside from Defendants' cursory statement that "[t]he HUD regulation is invalid because it strays from what is expressly covered by section 3617 ... and impermissibly expands the scope of section 3617," the parties here do not attack the validity of the HUD regulation.

18    Because Plaintiff does not argue otherwise, the Court will assume, as the *East–Miller* court held, that "a showing of intentional discrimination is an essential element of a § 3617 claim ." 421 F.3d at 563.

19    Although it did not involve a motion to strike or to dismiss, the procedural posture was again different in *Berry v. Loiseau,* 223 Conn. 786, 614 A.2d 414 (1992), with the Connecticut Supreme Court reviewing for abuse of discretion the trial court's refusal to set aside a jury's finding of intentional infliction of emotional distress. Moreover, the evidence presented—i.e., that the plaintiff was subjected to physical abuse and false imprisonment—indicated much more extreme and outrageous conduct than that presented here. *See id.*

---

End of Document    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 1862763
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Valeriy KALASHNIKOV and
Victoria Ledeneva, Plaintiffs,
v.

MYFIELD LANE HOMEOWNERS' ASSOCIATION,
INC., Louis Lindemann, in his official capacity as
Myfield Lane HOA Board Member, President and
individually, Jeffrey Kozo, in his official capacity as
Myfield Lane HOA Board Member, Vice President
and individually, John Winston Fowlkes III, in his
former official capacity as Myfield Lane HOA Board
Member, Treasurer and individually, Kimberly
Lindemann, individually, Maeghan Robidoux,
individually and Amber Leahey, individually, Defendants

No. 3:20cv1018(MPS)
|
Signed February 9, 2023

**Attorneys and Law Firms**

Valeriy Kalashnikov, New Preston, CT, Pro Se.

Victoria Ledeneva, New Preston, CT, Pro Se.

Jeffrey Jerome Cunningham, Goldberg Segalla LLP, White Plains, NY, Reshma Khanna, Kaufman Dolowich & Voluck LLP, White Plains, NY, Joshua Laurence Milrad, Goldberg Segalla LLP, Hartford, CT, for Defendants.

RULING ON MOTION FOR SUMMARY JUDGMENT

Michael P. Shea, United States District Judge

**\*1** The Plaintiffs, Valeriy Kalashnikov and his wife, Victoria Ledeneva, own a home in a planned community called "Myfield Lane" in Washington, Connecticut. After the Myfield Lane Homeowners' Association ("MLHOA") denied the Plaintiffs' request to make changes to their property, the Plaintiffs, proceeding *pro se*,[1] filed suit against the MLHOA, its Executive Board members Louis Lindemann, Jeffrey Kozo, Winston Fowlkes, and MLHOA members Kimberly Lindemann, Maeghan Robidoux, and Amber Leahey, alleging (1) discrimination on the basis of

national origin (Russian), Ledeneva's gender, and their family status in violation of the Fair Housing Act, 🚩42 U.S.C. § 3601 *et seq.* ("FHA") and its Connecticut analog, the Connecticut Fair Housing Act, 🚩Conn. Gen. Stat. § 46a–64c *et seq.* ("CFHA") (counts 1, 8); (2) retaliation in violation of the FHA and CFHA (counts 2-5, 8); (3) quid pro quo and hostile environment harassment in violation of the FHA (count 6); (4) negligence (counts 7, 9); (5) negligent and intentional infliction of emotional distress (counts 10-11); defamation and defamation per se (counts 13-14); perjury (count 15); harassment (count 16); and extortion (count 17).[2] The Defendants move for summary judgment under Fed. R. Civ. P. 56. ECF No. 42. For the reasons set forth below, I grant the Defendants' motion as to all claims except for the retaliation claims in counts 2 – 5 and 8.

**I. Factual Background**
The following facts, which are taken from the verified complaint[3] and the parties' Local Rule 56(a) statements[4] and supporting exhibits, are undisputed unless otherwise indicated.

The Plaintiffs, who are Russian immigrants, have resided in Myfield Lane since 2015. ECF No. 1 at ¶¶ 9-10. Myfield Lane is a planned community in Washington, Connecticut.[5] ECF No. 42 at 43 ¶ 1; ECF No. 49 at 65 ¶ 1. It consists of thirteen single-family home lots. ECF No. 42 at 43 ¶ 3; ECF No. 49 at 65 ¶ 3. Five units have been built.[6] *Id.* The Plaintiffs own Unit 1. ECF No. 42 at 43 ¶ 5; ECF No. 49 at 65 ¶ 5. Except for Winston Fowlkes, the individual Defendants – Louis and Kimberly Lindemann, Jeffrey Kozo, Maeghan Robidoux, and Amber Leahey – own units in Myfield Lane and reside there. *Id.* Fowlkes is the Developer/Declarant of the community. *Id.* All of the units are occupied by families with minor children. ECF No. 42 at 48 ¶ 24; ECF No. 49 at 79 ¶ 24.

MLHOA
**\*2** MLHOA is an association of unit owners that operates Myfield Lane. ECF No 1 at ¶ 12; ECF No. 15 at ¶ 12; ECF No. 42 at 392; ECF No. 49-26 at 78. Under the MLHOA's bylaws, the affairs of the community and association are governed by a three-person Executive Board. ECF No. 49-26 at 82. Plaintiff Ledeneva was President of the MLHOA Executive Board from August 12, 2017 until October 21, 2018. ECF No. 1 at ¶ 11; ECF No. 15 at ¶ 11; ECF No. 42 at 215-16. Fowlkes

and Louis Lindemann [7] also were Board members. ECF No. 1 at ¶¶ 17, 19.

Governing Documents

Myfield Lane is governed by various documents including its certificate of incorporation, bylaws, public offering statement, and declaration. ECF No. 42 at 43 ¶ 2; ECF No. 49 at 65 ¶ 2.

Myfield's "Public Offering Statement" contains the following provision regarding the aesthetics of the community:

Compatibility of Buildings and Improvements Erected under Development Rights to Existing Buildings and Improvements

The general architectural style, structure type, and quality of construction of any buildings and improvements to be created on the property shall be consistent with the architectural style, structure type, and quality of those initially constructed. However, units may be laid out in different configurations or plans. Similar, yet distinct, materials and construction techniques may be used to achieve this standard. No assurances are given that the currently approved site plan will not be amended so that new buildings might not be built in accordance with the currently approved site plan. However, if built, the buildings will conform to the foregoing standard. No other assurances as to architectural style, quality of construction, or size are made in these regards.

ECF No. 42 at 389.

Myfield Lane's "Declaration" contains a provision requiring that unit owners obtain permission before changing the exterior appearance of their unit. Specifically, Article XII, Section 12.1, entitled "Additions, Alterations and Improvements by Unit Owners," states as follows:

(a) A Unit Owner:

(i) May make any improvements or alterations in the Dwelling on his or her Unit that do not impair the structural integrity or mechanical systems of the Dwelling or lessen the support of any portion of the Common Interest Community;

(ii) May not change the appearance of the Common Elements, or the exterior appearance of a Dwelling on a Unit or any other portion of the Common Interest

Community, without written permission of the Executive Board[.]

ECF No. 42 at 411-12.

MLHOA's bylaws provide that the Executive Board may assess fines for violations of the rules. Specifically, Section 5.2 of Article V states: "Fine for Violation. By resolution, following Notice and Hearing, the Executive Board may levy a fine of up to $50 per day for each day that a violation of the Instruments or Rules persists after such Notice and Hearing." ECF No. 42 at 462.

2015

Before the MLHOA Board was formed, the developers of Myfield Lane "allowed certain alterations." ECF No. 42 at 43 ¶ 4; ECF No. 49 at 65 ¶ 4. Ledeneva testified that in 2015, she and her husband asked the developers, Winston Fowlkes and Joseph Gitterman, [8] about making changes to the Plaintiffs' property. ECF No. 49-2 at 32-33. According to the Plaintiffs, they were given permission, among other things, to change their front door, decorate the foundations of their house and garage with "river stones", and pave their driveway and patio with paving bricks. ECF No. 1 at ¶ 26.

*3 Also in 2015, the Plaintiffs asked Fowlkes and Gitterman if the Plaintiffs could install a "playset" on their lot for their children. ECF No. 49-2 at 28. Fowlkes and Gitterman denied the request. *Id.* Defendant Kozo had a trampoline on his property for his children. *Id.* The Plaintiffs asked why Kozo "can have a trampoline for his kids and we cannot, and they said you just cannot, and we agreed, we didn't argue really...." *Id.*

The Plaintiffs planted many trees, bushes, and flowers on their lot and at the entrance of the Myfield Lane community. ECF No. 1 at ¶ 28.

Lindemanns

Louis and Kimberly Lindemann visited the Plaintiffs many times and had dinner with them. ECF No. 49-2 at 39; ECF No. 49-3 at 30. During dinner one evening [9], Kalashnikov commented that he was "happy to be here among people like us" to which Kimberly Lindemann responded "we are people like you?" ECF No. 49-3 at 31. Kalashnikov testified that Kimberly Lindemann

showed me on her phone the video of a Russian person in a Russian hat with the red star dancing, you know, with Russian song and she said those are Russians, we are not. It was computer graphics. It was not in person. It was in graphics, a person dancing a Russian dance, military dance. This video was discriminatory in itself, showing that Russians are stupid people wearing those stupid hats, dancing like crazy.

*Id.*

On a different occasion, [10] the Lindemanns were "talking about nationalities" and remarked that the Plaintiffs should "take a DNA test find out ... like your nationality ... like how many percent of, you know, whatever nationalities you have in your blood[.]" ECF No. 49-2 at 40.

Election Issue

Ledeneva testified that in 2017, Fowlkes spoke to her about the election of the MLHOA Board and said she should vote for Jeffrey Kozo. ECF No. 49-2 at 23-24. According to Ledeneva, she wanted to vote for Kimberly Lindemann, but Fowlkes said he didn't think she was a good fit and told Ledeneva about an incident in which Lindemann entered another homeowner's house uninvited. ECF No. 49-2 at 24. Ledeneva testified that she told Kimberly Lindemann what Fowlkes had said and Lindemann denied it. ECF No. 49-2 at 26. According to Ledeneva, Kimberly Lindemann added that she thought Fowlkes was an "old school gentleman" who didn't think "that females have the same rights as men do." *Id.* Ledeneva testified that she decided to vote for Louis Lindemann and after the votes were tallied, Fowlkes seemed "kind of surprised" at the election result. ECF No. 49-2 at 25. Ledeneva further testified that she believed that Fowlkes "thought that if I'm a female, so he can dictate what I should do ... for whom I should vote." ECF No. 49-2 at 25-26.

2018

Plaintiffs' Driveway

In April 2018, Kalashnikov started removing the sand and gravel from the Plaintiffs' gravel driveway so that he could install brick pavers. ECF No. 49-2 at 35. It took months to remove the sand and gravel. *Id.* In June 2018, Gitterman and Fowlkes told the Plaintiffs that they could not install that type of driveway and to put it "back as it was before." ECF No. 49-2 at 36. Ledeneva complained to Kimberly Lindemann that she didn't understand "why they [were] doing this[.]" ECF No. 49-2 at 38. According to Ledeneva, Kimberly Lindemann responded "maybe they discriminate [against] you because you're Russian." *Id.* On July 1, 2018, the Plaintiffs submitted a request to the Executive Board requesting permission to install brick pavers on their driveway. ECF No. 49-14. The Board approved the request. *Id.*

Plaintiffs' Front Step

**\*4** In July 2018, Kalashnikov began work on the front steps of the Plaintiffs' unit. ECF No. 49-2 at 43. According to the Plaintiffs, the front steps to their house had shifted away from the house so that there was a gap or "hole" between the steps and the front door of the house. ECF No. 49-2 at 47, 48. The Plaintiffs did not submit a written request to the Executive Board before starting the step project. ECF No. 49-2 at 88-89. Ledeneva testified that she did not think the Plaintiffs needed to do so "since this step is a part of the unit and it's not something new[.]" ECF No. 49-2 at 89.

Kalashnikov first laid "metal fittings ... on the ground [because] he thought that maybe th[e] fittings w[ould] help to stop the step from moving." ECF No. 49-2 at 100. In August, he decided to "pour concrete around the step." ECF No. 49-2 at 48, 101. According to Ledeneva, the project "took some time, you know, it was not, like [a] one-day job, it took a pretty long period of time [during which] everybody saw that ... [Kalashnikov] was doing something with the step." ECF No. 49-2 at 101-102. On August 18, 2018, Louis Lindemann, who was on the Board with Ledeneva, visited the Plaintiffs' home and according to Ledeneva, must have seen "the wooden boards and footings ... prepared for the concrete" but did not say anything about it. ECF No. 49-2 at 102.

The Plaintiffs changed the front steps from two steps to three and widened them. Compare ECF No. 49-12 at 2 (photo before work) with ECF No. 49-12 at 3 (photo after). In addition, they cut away some of the siding surrounding the steps and placed river stones against the foundation and the top step. ECF No. 49-12 at 3.

On August 30, 2018, Kimberly Lindemann sent Ledeneva a text message that "Valeriy [Kalashnikov] needs to stop putting the rocks on the front steps. That work needs a request to the board because it is changing the appearance of the structure." ECF No. 49-18 at 2. Ledeneva responded that she had obtained permission from Joe Gitterman in 2015 to "put river stones to our house and our garage foundation[.]" *Id.* She commented that she did not "understand what or who forces you to be so concerned." ECF No. 49-18 at 5. Kimberly Lindemann responded that the Plaintiffs were required to request permission from the Board and referred to Article XII, Section 12.1 of the Declaration. ECF No. 49-18 at 10.

A few days later, MLHOA Board members Louis Lindemann and Fowlkes sent the Plaintiffs a letter notifying them that the "work being done on your property" - "[c]hanges to front steps" and a "cement pad being installed on the back side of your unit garage" - had not been approved by the Executive Board as required. ECF No. 49-21 at 2. While the letter noted Ledeneva's contention that at the time she purchased her home, she had been given permission to make some changes to her unit, the letter stated that Gitterman indicated that he did not have a "written request" from the Plaintiffs "to make any permanent changes" to the unit. *Id.* The letter went on to explain that "[a] written request for Unit Improvements is required to be presented to the Executive Bord prior to any work that would cause permanent structural or facial changes to your Unit and/or Common Element" and cited the text of Article XII, Section 12.1 of the Declaration. *Id.* The letter stated that Ledeneva, as a unit owner and a MLHOA Board member, was "aware of the requirement to submit to the Executive Board a written request." *Id.* at 3. Lindemann and Fowlkes instructed the Plaintiffs "to immediately cease any and all work that would cause a structural change to your Unit and its property. This would include your present work on front steps (which is in violation for adding permanent river stones to the front step fascia without approval) and your garbage can cement pad (which is in violation for adding a permanent fixture to the common element)." *Id.* at 4. The letter instructed the Plaintiffs to submit a written request to the Executive Board "to complete the work." *Id.* Finally, the letter stated that if the Plaintiffs continued work on these projects "without specific written/documented approval from the MLHOA Executive Board," the Board may impose "daily monetary fines" under Article 5.2 of MLHOA's Bylaws. *Id.*

**\*5**  On September 12, 2018, the Plaintiffs filed an application for a building permit with the Town of Washington for a "post

light" and the step work. ECF No. 49-20 at 2-3. The Town approved the application. *Id.*

On September 23, 2018, Kimberly Lindemann sent a lengthy email to Fowlkes and the Myfield Lane unit owners. [11] ECF No. 49-34. She stated that Myfield Lane owners are required to seek written approval from the Executive Board before making permanent changes to a unit or common element and that "when you start cutting through your home's siding and adding river rock with masonry - that is considered a 'permanent' change. When you state that you will create a cement pad for your garba[g]e cans ... that is considered a permanent change." ECF No. 49-34 at 4. Kimberly Lindemann further stated that "[t]he President of **Myfield Lane HOA** [apparently referring to Ledeneva] **does not have unilateral ability to ignore HOA rules – nor make-up rules for his/her own personal gain**." ECF No. 49-34 at 3 (emphasis in original). The text went on to say:

> When you decide to ignore the HOA rules and complete permanent projects without specific approval by the Board, you are acting of your own volition and the Board will have no choice but to respond accordingly. Please note: This may mean that work you complete, outside of Executive Board approval, may be subject to a daily fine and/or you may be requested to restore your unit back to its original build - at the Unit Owner[']s expense.
>
> * * *
>
> If you are not able to conform to the Rules of the HOA, which are very simple standards for such developments, you might want to consider placing your home on the market and moving to another property where you can make changes to your own contentment and satisfaction - without HOA restrictions.

ECF No. 49-34 at 5, 6.

Jeffrey Kozo also sent an email. In a September 25, 2018 email to the association members but directed to the Plaintiffs, he stated in pertinent part:

> It is NOT only Mr. & Mrs. Lindemann who have concerns with your property. IT IS EVERY SINGLE Home owner on Myfield Lane. From the day your family started "Modifying" the exterior of your home and or Property it has raised RED flags in Myfield lane with me immediately. And I'll tell you why. From the day I moved in here as the 1st Home owner to BUY a home, I was told that there were

to be NO exterior modifications of the home or property because the OVERALL look of myfield was to stay as uniform as possible....

[W]hen you began planting plants, trees, shrubs, flowers, bushes ALL OVER your property it raised a RED FLAG. I thought ... hey how come I am not allowed to do that but they are? I NEVER SAID ANYTHING.... BUT THEN to make things even more out of place you then rip up the driveway and start installing a paver driveway. THIS IS WHERE I DECIDED TO SPEAK UP. I called Joe [Gitterman] and asked how this is allowed? Because again you will have a shared driveway with the house "to be built" next to you someday and that's just going to look stupid. Unless your [sic] going to pay and paver everyone's driveway in [M]yfield [L]ane this is just totally unacceptable....

*6          * * *

I don't care if you went to the town hall and have permission to paver your driveway, or build uneven, slanted, multi sized steps out front of your home.... If you have dreams of totally modifying and upgrading your EXTERIOR I don't feel myfield lane is the place you should have bought a home....

ECF No. 49-11 at 1-3.

On September 25, 2018, William Jenks, a Building Inspector for the Town of Washington, emailed Louis Lindemann that "[t]o date there are no Building Code Issues" as to the Plaintiffs' front steps. ECF No. 49-9 at 18; ECF No. 49-22 at 2.

On September 29, 2018, the Plaintiffs submitted a written request to the MLHOA Executive Board for "approval of concrete addition around pre-existing front door steps and use of decorative river stones on the step risers and on the wall below the front door." ECF No. 49-23 at 2. In support, the Plaintiffs submitted the building permit they obtained from the Town of Washington. ECF No. 49-23 at 8. In their request, the Plaintiffs wrote that there is "no provision in the Myfield Declaration which specifically states that units in Myfield Lane community must look the same." ECF No. 49-23 at 3. The Plaintiffs also noted that units 7 and 9 had stone walls and neither "asked for any permission[ ] from the Board." *Id.*

Ledeneva called a Board meeting, which was held on October 10, 2018 in her home. [12] ECF No. 49-9 at 23, 60. She attempted to discuss rule violations by other homeowners, but Fowlkes and Louis Lindemann refused to discuss them. ECF No. 49-2 at 21; ECF No. 49-9 at 23 (Lindemann testified that "You did try to discuss violation of other homes, but we were there to talk about the violation [of] your home.") Lindemann asked the Plaintiffs to return the steps back to their original condition. ECF No. 49-15 at 5. According to Ledeneva, "they constantly interrupted me when I asked them, like, why do you request us to remove the step, why you want to, you know, deny our request for the step repair of work?" ECF No. 49-2 at 74. The Plaintiffs responded they were going to "go to court." ECF No. 49-2 at 60, 105; ECF No. 49-15 at 8. Ledeneva testified that Lindemann threatened to fine the Plaintiffs. ECF No. 49-2 at 60; ECF No. 49-9 at 22. According to Ledeneva, Lindemann "never threatened other people who violated the rules and who still violate the rules, he doesn't threaten them with fines." ECF No. 49-2 at 61.

After the meeting, Ledeneva emailed Lindemann and Fowlkes to schedule a Board meeting to discuss "violations of Myfield Declaration and Rules by homeowners in our community," ECF No. 49-24 at 2, but they did not respond. ECF No. 1 at ¶ 46; ECF No. 49-2 at 22.

Later that evening, Louis Lindemann emailed the Myfield Lane homeowners an agenda for the October 21 MLHOA meeting, which stated in pertinent part:

*7   • 2018-19 Operating Budget

• Clarification of Septic Responsibility for maintenance and repairs by Unit Owners,

• Discussion of Unit Owners requirement to seek Executive Board Approval for any and all changes related to a Unit Owner's desire to alter the exterior appearance or the common element of their unit.

• A clarification of the responsibility of any person who is elected to represent MLHOA as a Board member and/or as an appointed officer, and how these positions relate to the HOA as a whole.

• It has been requested, by unit owners, that a vote of no-confidence be taken to remove Ms. Ledeneva from her position as a Board Member representative of Myfield Lane HOA.

ECF No. 49-29 at 2-3. Ledeneva testified that Lindemann didn't discuss the agenda with her before he sent it out. ECF No. 49-2 at 22. She maintains that Lindemann and Fowlkes did not "invite" her to their discussion of the budget. [13] ECF No. 49-2 at 23. She testified she "believe[s] they treat[ed] [her] this way because [she's] female." *Id.*

Ledeneva emailed Louis Lindemann and Fowlkes, protesting that Lindemann had "violated the Declaration" by "not discussing the agenda with ALL Board members" before sending it out. ECF No. 49-29 at 4. She also asked him to explain "what exactly I have done that I am no longer deemed fit to hold th[e] position [of President]." *Id.*

On October 12, 2018, Ledeneva emailed the Defendants that she had filed "Federal and State Discrimination Complaints with appropriate Federal and State authorities." ECF No. 49-28 at 2.

The Plaintiffs attended the HOA meeting on October 21, 2018. ECF No. 49-2 at 105-06. Ledeneva asked, by a show of hands, who did not like the Plaintiffs' steps. ECF No. 1 at ¶ 100; ECF 49-30 at 21; ECF No. 49 at 32. All the Defendants responded that they did not like the Plaintiffs' steps. ECF No. 1 at ¶ 49. In addition, the MLHOA voted to remove Ledeneva from the Executive Board. [14] ECF No. 49-9 at 26.

After the meeting, Kozo spoke to the Plaintiffs about the situation. ECF No. 1 at ¶ 96; ECF No. 49-2 at 110. The Plaintiffs reiterated their confusion about why their request was denied. ECF No. 49-2 at 111 (Ledeneva testified "Again, we tried to make a point that we don't understand what's going on, why you guys want us to remove the step.") According to Ledeneva, Kozo said, "What is more important for you, your step or your relationship with your neighbors?" *Id.*

**\*8** In a letter to the Plaintiffs dated October 25, 2018, the Board, now comprised of Louis Lindemann, Fowlkes, and Kozo, notified the Plaintiffs that their requests to "[a]dd a post light to your unit," "[m]ake alterations to your front steps," and "[a]dd cosmetic embellishments to [the] front door steps and front fascia of your home" were denied. ECF No. 49-31 at 2. The letter stated:

Reasons for denial of approval of your request are as follows:

1. On 10/10/18, the Executive Board Members held a Meeting/Hearing at your home, at your request, to discuss

alterations to your Unit. It was made clear to you that all other Unit Owners were against the requested alterations and embellishments.

2. On 10/21/18, a Home Owners Meeting was held, whereby all five Unit Owners were counted present. At that meeting, four (4) out of five (5) Unit Owners agreed, by vote confirmation, to deny your requests as outlined, above. Four (4) out of five (5) Unit Owners agreed to uphold the Myfield Lane Public Offering Statement guidelines for seeking the Board's written review and approval for permanent alterations to Units at Myfield Lane.

3. The Myfield Lane Public Offering Statement follows the governing guidelines of the State of Connecticut Common Interest Ownership Act with regard to unit alterations. You received a copy of this guideline, along with a copy of the Myfield Lane Declaration Statement regarding unit alterations, at the Executive Board Meeting/Hearing of 10/10/18 and the HOA meeting of 10/21/18. A third copy is attached hereto.

4. The alterations that you have made to your front step, without Executive Board approval, do not meet state building code requirements and this is a safety hazard that the Myfield Lane HOA is caused to address.

Please be reminded that any and all alterations to your unit and/or common element are required to be reviewed and to receive written approval from the Executive Board prior to any work commencing on your Unit and its property.

Based on the outline above, it is our position that the front entry steps and the front facing exterior of your dwelling be returned to their original condition.

ECF No. 49-31 at 2-3. According to Ledeneva, six months later, another homeowner submitted a request to install an additional light, which was approved by the Board. ECF No. 49-33 at 4. In April 2019, the Board sought bids for additional lighting for all the homes in the Myfield Lane community. ECF No. 49-33 at 2.

## CHRO

On November 13, 2018, the Plaintiffs filed a complaint with the United States Department of Housing and Urban Development alleging national origin and gender discrimination. ECF No. 1 at ¶ 2. Their complaint subsequently was transferred to the Connecticut Commission of Human Rights and Opportunities ("CHRO") *Id.* The

Plaintiffs named as respondents the same parties they sue here. ECF No. 42 at 533. The Defendants' December 14, 2018 Answer to the complaint stated, in pertinent part, "that the [October 10, 2018 board] meeting ended abruptly because Complainant Kalashnikov threatened physical violence against Mr. Lindemann and Mr. Fowlkes and, therefore, the men opted to leave the premises." ECF 49-6 at 20 ¶ 26. The Defendants' "Position Statement" filed in the CHRO proceeding stated the following as to the October 10, 2018 Board meeting:

> Kalashnikov further stated that if the Board did not approve his alterations to his unit, that he "had other ways of taking care of the issue." Lou Lindemann requested he elaborate on that statement. Kalashnikov stated that he had "friends in Russia and, in Russia, we take care of things in different ways. You will see." Given Kalashnikov's aggressive demeanor and thinly veiled threats, Lindemann and Fowlkes ended the meeting and left the property.

**\*9**  ECF No. 49-6 at 7. During a fact-finding investigation in the CHRO proceeding, Louis Lindemann told the CHRO investigator that during the October 10, 2018 Board meeting, Kalashnikov made a statement that Lindemann construed as threatening. ECF No. 49-7 at 11. [15]  According to Lindemann, Kalashnikov said that he knew "billionaires in Russia and, uh, they take care of things our own way. Don't worry. We'll take care of things our way." ECF No. 49-7 at 11. Lindemann stated that "I didn't feel in threat of my life, but a threat of, you know, some kind of reprisal. So, um, Mr. Fowlkes and I, at that time exited." ECF No. 49-7 at 11-12. Fowlkes also met with a CHRO investigator. He testified that during the meeting at the Plaintiffs' house, Kalashnikov "got quite agitated. He was agitated when he came into the room and his voice was raised. And in fact, he was actually waving his arms at us. And, uh, he was saying that generally speaking, that what we were asking was unreasonable. Uh, there's no reason to do it. And lots of other things that have been also mentioned today that this wall, other people built walls and the like, and he also did say that, um, if we insisted on making him take it down, or he had friends in Russia, uh, who could, who could [help] him, wealthy people." ECF No. 49-8 at 14. Kalashnikov denies that he threatened anyone. ECF No. 49-3 at 43, 46 ("They lied that I threatened them with physical violence during this meeting that took place in our house[.]") The CHRO "issued a dismissal and finding of no reasonable cause." ECF No. 42 at 50 ¶ 35; ECF No. 49 at 85 ¶ 35.

## II. Legal Standard

"Summary judgment is appropriate only if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (internal quotation marks and citations omitted). In reviewing the summary judgment record, a court must "construe the facts in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013). "A genuine dispute of material fact exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013). The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). If the moving party carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). "[C]onclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." *Flores v. United States*, 885 F.3d 119, 122 (2d Cir. 2018) (internal quotation marks omitted) (quoting *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996)).

## III. Discussion

### A. Housing discrimination claims under FHA and CFHA

In Counts 1 and 8, the Plaintiffs allege that the Defendants discriminated against them on the basis of national origin, gender, and familial status in violation of the FHA and CFHA.

The FHA makes it unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(b). [16]

**\*10**  Courts evaluate FHA discrimination claims under the "*McDonnell Douglas* burden-shifting framework." *Mitchell v. Shane*, 350 F.3d 39, 47 (2d Cir. 2003). Under

that framework, "once a plaintiff has established a prima facie case of discrimination, the burden shifts to the defendant to assert a legitimate, nondiscriminatory rationale for the challenged decision." *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 702-03 (1973)). "If the defendant makes such a showing, the burden shifts back to the plaintiff to demonstrate that discrimination was the real reason for the defendant's action." *Id.* "Summary judgment is appropriate if no reasonable jury could find that the defendant's actions were motivated by discrimination." *Id.*

To set out a prima facie case of discrimination under the FHA, the Plaintiffs must show that: (1) they are members of a protected class; (2) the Defendants took adverse action against them; and (3) the adverse action took place under circumstances giving rise to an inference of discrimination. *DeSouza v. Park W. Apartments, Inc.*, No. 3:15CV1668(MPS), 2018 WL 2990099, at *7 (D. Conn. June 14, 2018). *See McCulloch v. Town of Milan*, 559 F. App'x 96, 98 (2d Cir. 2014) ("To establish a prima facie case of discrimination under the disparate treatment theory, 'the plaintiff[ ] must present evidence that animus against the protected group was *a* significant factor in the position taken by the [defendants]' ") (internal quotation marks and citations omitted). The Defendants do not address the first two elements. Instead, they argue that the Plaintiffs fail to present any evidence of discrimination against any protected group. ECF No. 42 at 24.

A party may establish an inference of discrimination by demonstrating that she has been treated "less favorably than a similarly situated [party] outside [her] protected group." *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000). A plaintiff may also satisfy "this element of the prima facie case by showing direct evidence of discriminatory animus, such as 'remarks made by decisionmakers that could be viewed as reflecting [such] animus.' " *Henny v. New York State*, 842 F. Supp. 2d 530, 553 (S.D.N.Y. 2012) (construing Title VII [17]) (quoting *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996)). Where a plaintiff presents direct evidence of discrimination, the burden-shifting analysis is inapplicable. *Maziarz v. Hous. Auth. of Town of Vernon*, No. 3:10CV2029(JCH), 2012 WL 13161208, at *5 (D. Conn. Oct. 22, 2012).

### 1. National Origin Discrimination

The Plaintiffs allege that the Defendants denied the Plaintiffs' request concerning their step on the basis of the Plaintiffs' national origin. As evidence, they cite Kimberly Lindemann's alleged statements that "maybe they discriminate [against] you because you're Russian," ECF No. 49-2 at 38, and "you should take a DNA test to find out what is your blood ... so now you can find out ... your nationality through blood ... how many percent of ... whatever nationalities you have in your blood." ECF No. 49-2 at 40. The Plaintiffs also cite the exchange in which Kalashnikov stated that he was "happy to be here among people like us" to which Kimberly Lindemann responded "we are people like you?" and the video she showed Kalashnikov of a person in Russian attire dancing. ECF No. 49-3 at 31.

But Lindemann's comments do not suggest that the Defendants denied the Plaintiffs' request concerning their step based on national origin. Kimberly Lindemann was not a Board member and not a decision maker for the MLHOA, and her comments are thus, at best, "stray remarks." Her observation that "maybe they discriminate against you because you're Russian" is speculative on its face ("maybe"), and the Plaintiffs point to no evidence suggesting she had personal knowledge that "they" were acting in any particular manner. And while Kalashnikov testified that he found the video distasteful, it does not demonstrate national origin discrimination, not least because it bears no connection to any of the disputed decisions by the Board. Courts have routinely held that "stray remarks by [ ] nondecisionmakers are insufficient, without other evidence, to raise an inference of discrimination." *Hasemann v. United Parcel Serv. of Am., Inc.*, No. 3:11CV554(VLB), 2013 WL 696424, at *7 (D. Conn. Feb. 26, 2013). *See Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 56 (2d Cir. 1998) ("[S]tray remarks alone do not support a discrimination suit.").

**\*11** The Plaintiffs also argue that the Court can infer unlawful discriminatory animus because the rules governing Myfield Lane homes were selectively enforced against them and not other homeowners. Specifically, they point to other unit members who, they say, are in violation of the rules:

- Kozo and Robidoux have stone walls on their lots. ECF No. 1 at ¶ 49.

- In 2015, Kozo was permitted to have a trampoline but Plaintiffs were not permitted to have a playset. ECF No. 1 at ¶ 51.

- Kozo operates a repair business in his garage and uses off-road vehicles. ECF No. 1 at page 15.

- Kozo has a hot tub and has parked his boat and trailer outside. *Id.*; ECF No. 49-25 at 17, 19.

- Leahey walked her dog without a leash. ECF No. 49-5 at 16.

- Robidoux has a wooden fence between her house and garage. ECF No. 1 at page 14.

- Other homeowners were not threatened with fines. ECF No. 49-2 at 61.

- Plaintiffs' request to install additional lights was denied but in 2019, Defendants approved a request for additional lights for another homeowner, although Ledeneva was not sure which homeowner it was and further testified that the light had not been installed. ECF No. 49-2 at 132, 134.

See ECF Nos. 49-27, 49-35 (photos). The Plaintiffs' burden to establish a prima facie case of discrimination is "de minimis." *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203-04 (2d Cir. 1995). Even so, the Plaintiffs have failed to provide facts that plausibly support even a minimal inference of discriminatory motivation because the comparators they proffer are not similarly situated. Here, the Plaintiffs made physical changes to the front of their home and distinguished their front step by adorning it with river stones. None of the instances cited above are like that. *See Bentley-Ammonds v. Northwell Health, Inc.*, No. 21-835-cv, 2022 WL 893716, at *2 (2d Cir. Mar. 28, 2022) ("[I]n order to give rise to an inference of discrimination based on disparate treatment, the comparator must be similarly situated to the plaintiff in all material respects.") (internal quotation marks and citation omitted). Even if the alleged instances of noncompliance and/or alterations by other homeowners could be considered similar, there is no information as to when they occurred or the circumstances in which they occurred. [18] The Defendants' approval of additional lights for another homeowner also does not suggest discrimination because the Plaintiffs' own exhibit indicates that in 2019 the MLHOA was considering having *all* homeowners install lights on their garages. ECF No. 49-33 at 4. The Plaintiffs have not put forth evidence to raise a reasonable inference of a connection between the denial of their requests as to the step and light and their national origin, whether through direct or circumstantial evidence.

### a. Defendants' Non-Discriminatory Reasons for their Actions

Even if the Plaintiffs had established a prima facie case of discrimination, the Defendants have advanced legitimate, non-discriminatory reasons for their decision. As set forth in their October 25, 2018 letter, the MLHOA denied the Plaintiffs' request as to their steps on the grounds that the Plaintiffs failed to comply with the rule that they first seek permission from the Board before making alterations to the exterior of their unit and that the steps did not comply with the building code. ECF No. 49-31 at 2-3. Defendants' burden to produce a legitimate, non-discriminatory reason "is one of production, not persuasion; it can involve no credibility assessment." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (internal quotation marks and citation omitted). The Defendants have met this burden of production here.

### b. Plaintiffs' Evidence of Pretext

*12 The burden thus shifts back to the Plaintiffs to "prove that the [Defendants'] articulated reasons for their conduct was pretext for discrimination." *Birch Fam. Servs., Inc. v. Wlody*, No. 21-1553, 2022 WL 1468160, at *2 (2d Cir. May 10, 2022). To do so, they must produce "not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by [the defendants] were false, and that more likely than not discrimination was the real reason for the [defendants'] action." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) (alterations and internal quotation marks omitted). *See Chen v. Stony Brook Univ. Advancement*, No. 20-4250, 2022 WL 289317, at *1 (2d Cir. Feb. 1, 2022) (Plaintiff must establish, not only that the reasons were false, but also that it was "more likely than not [that] discrimination was the real reason" for the adverse actions.); *Zimmermann v. Assocs. First Cap. Corp.*, 251 F.3d 376, 382 (2d Cir. 2001) ("[A] record that include[s] evidence of a prima facie case and evidence permitting a finding of pretext d[oes] not suffice to permit a finding of discrimination."). "[T]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 143 (2000).

Falsity

The Plaintiffs argue that one of the two proffered reasons - that the steps were not in compliance with the building code - was false and point to William Jenks's email to Louis Lindemann – dated before the Board's October 25 letter denying the Plaintiffs' request - that there were no building code issues. ECF No. 49-22 at 2. Ledeneva testified "I believe that all other homeowners voted for removal of our step addition because they thought the step had building code violation, that's it. But in reality, it was a lie, and they knew it. It was [an] intentional lie, not just a mistake[.]" ECF No. 49-2 at 51. Considering the facts in the light most favorable to the Plaintiffs, they have introduced facts into the record upon which a reasonable jury could conclude that one of the two proffered reasons was false. This is sufficient to satisfy this first part of the pretext analysis.

Pretext for Discrimination

As to the second part of the analysis, to defeat summary judgment, a plaintiff must point to evidence sufficient to permit a rational trier of fact to conclude that discrimination was the real reason for the adverse action. But the Plaintiffs have not pointed to any evidence sufficient to permit a rational trier of fact to conclude that the Defendants' adverse actions were more likely than not motivated by unlawful discriminatory animus based on the Plaintiffs' national origin. The record is devoid of any direct evidence of discriminatory animus. Although the record contains evidence of some stray remarks by Kimberly Lindemann, these comments do not support an inference of discrimination because they were not connected to the denial of the Plaintiffs' request and there is no evidence that she was a decisionmaker. As for circumstantial evidence, as noted, the comparators the Plaintiffs cite are not similarly situated, and Plaintiffs point to no other circumstantial evidence of national origin discrimination.

While it might be that the Defendants' denial of the Plaintiffs' request as to their step was unreasonable, that does not mean it was motivated by a discriminatory motive. Here, even when viewed in the light most favorable to the Plaintiffs, the evidence does not support a reasonable inference of discriminatory intent based on national origin.

### 2. Gender Discrimination

The Plaintiffs also allege gender discrimination. Specifically, Ledeneva claims that fellow Board members Fowlkes and Louis Lindemann refused to discuss rule violations by other unit owners and didn't discuss with her the budget and the agenda for the October 21, 2018 HOA meeting. ECF No. 1 at ¶ 46; ECF No. 49 at 30; ECF No. 49-2 at 21-22. As further evidence of gender discrimination, she points to Kimberly Lindemann's alleged statement that Lindemann thought Fowlkes was an "old school gentleman" who didn't think "females have the same rights as men do." ECF No 49-2 at 26. Ledeneva also cites Fowlkes's alleged statement that he wanted her to vote for Kozo. ECF No. 49-2 at 24.

*13  Although this claim is directed at all the Defendants, the proffered evidence involves only Ledeneva's fellow Board members Fowlkes and Lindemann. As indicated, Ledeneva contends that the Defendants prevented her from performing her duties as a Board member. Although it is doubtful that such conduct would fall within the FHA, *see* 42 U.S.C. § 3604(b) (prohibiting discrimination "against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of.... gender"), *Favourite v. 55 Halley St., Inc.*, 381 F. Supp. 3d 266, 279 (S.D.N.Y. 2019) ("to prevail on a claim of discrimination under the FHA, Plaintiff must demonstrate a relationship between the discriminatory conduct and housing"), the parties do not discuss this issue. In any event, the evidence marshalled by the Plaintiffs, even when viewed in the light most favorable to them, fails to establish any gender animus on the part of any of the Defendants. Kimberly Lindemann's comments about the motives or attitudes of others are speculation, as the Plaintiffs point to no evidence that she had personal knowledge of the reasons for Fowlkes's or even her husband's decisions. And although Ledeneva subjectively construed the Defendants' actions as evidence of bias, *see* ECF No. 49-2 at 23 (Ledeneva testified that "I believe they treat me this way because I'm female."), that is not enough to support an inference of discrimination. *See* *DeSouza*, 2018 WL 2990099, at *9.

### 3. Family Status

The Plaintiffs also allege that they were discriminated against based on family status. Specifically, they contend they were denied permission to install a playset in their backyard while another homeowner, Kozo, was permitted to have a trampoline in his backyard for his children.[19] ECF No. 49 at 20-22. *See* ECF No. 49-2 at 38 (When asked the basis of the familial status claim, Ledeneva testified "The only thing was

that Kozo's kids were allowed to have a play set and our kid were not allowed.")

The FHA defines familial status as "one or more individuals (who have not attained the age of 18 years) being domiciled with ... a parent or another person having legal custody."

42 U.S.C. § 3602(k). "Families with children are a protected class under the FHA, and discrimination in the terms, conditions, or privileges of sale or rental of a dwelling on account of familial status is a violation of the FHA." *Kendrick v. Greenburgh Hous. Auth.*, No. 07-CV-5859, 2011 WL 1118664, at *5 (S.D.N.Y. Mar. 22, 2011).

The Plaintiffs' claim of familial status discrimination fails. The fact that the Plaintiffs were not permitted to install a playset for their children while Kozo was allowed to have a trampoline for his children is not evidence that the Plaintiffs were discriminated against on the basis of their familial status. Familial status discrimination entails "discrimination against families with children." *Bischoff v. Brittain*, 183 F. Supp. 3d 1080, 1088 (E.D. Cal. 2016) (quotation marks and citation omitted). To allege a claim of disparate treatment, the Plaintiffs must allege that they were treated differently than other similarly-situated individuals because of their protected status. Because Kozo also had children, the Plaintiffs were not treated differently *because* they had children. See *Kendrick*, 2011 WL 1118664, at *6 (for a prima facie case of familial status discrimination under § 3604(b), Plaintiff must show adverse conduct was taken against him "under circumstances that give rise to a reasonable inference that he was discriminated against on the basis of his familial status.").

### B. Retaliation Claims
The Plaintiffs assert retaliation claims under section 3617 of the FHA (counts 2 – 5) and CFHA, Conn. Gen. Stat. § 46a-64c(a)(9) (ECF No. 1, count 8 ¶ 109). See *Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 54 (2d Cir. 2002) (setting forth elements of retaliation claim under section 3617). They allege that after they told Lindemann and Fowlkes on October 10, 2018 that they were going to "defend their rights in court" and subsequently told all the Defendants on October 12, 2018 that they had filed a discrimination complaint, the Defendants retaliated against them in various ways, including removing Ledeneva from the Board. ECF No. 1 at ¶ 88, ECF No. 49 at 29,

38. The Defendants, as the moving party, bear the burden of establishing that no genuine issue of material fact exists. They failed, however, to address these claims in their initial brief and make a fleeting, conclusory reference in their reply brief to one of the alleged instances of retaliatory conduct, asserting that it is "meritless" and state – without more - that the Plaintiffs have failed to offer any evidence of retaliation. ECF No. 51 at 10. But "[a]rguments may not be made for the first time in a reply brief." *Knipe v. Skinner*, 999 F.2d 708, 711 (2d Cir. 1993). I deny summary judgment as to these claims. See *Anderson v. Waterbury Police Dep't*, No. 14CV829 (VAB), 2017 WL 1157843, at *15 (D. Conn. Mar. 28, 2017) (denying summary judgment as to claim because defendants failed to discuss it).

### C. FHA Quid pro quo and hostile environment harassment claims
**\*14** In Count 6, the Plaintiffs allege both "quid pro quo" and "hostile environment harassment" claims on the basis of their national origin under section 3617 of the FHA and 24 C.F.R. § 100.600, a HUD regulation.

24 C.F.R. § 100.600 provides in pertinent part:

(a) General. Quid pro quo and hostile environment harassment because of race, color, religion, sex, familial status, national origin or handicap may violate sections 804, 805, 806 or 818 of the Act, depending on the conduct. The same conduct may violate one or more of these provisions.

(1) Quid pro quo harassment. Quid pro quo harassment refers to an unwelcome request or demand to engage in conduct where submission to the request or demand, either explicitly or implicitly, is made a condition related to: The sale, rental or availability of a dwelling; the terms, conditions, or privileges of the sale or rental, or the provision of services or facilities in connection therewith; or the availability, terms, or conditions of a residential real estate-related transaction. An unwelcome request or demand may constitute quid pro quo harassment even if a person acquiesces in the unwelcome request or demand.

In support of their quid pro quo claim, the Plaintiffs point to Kozo's email to Kalashnikov about the Plaintiffs' driveway in which Kozo stated "Unless you['re] going to pay and paver everyone's driveway in myfield lane this [paving brick] driveway is just totally unacceptable." ECF No. 49-11 at 3. The Plaintiffs construe this email as a demand "that Plaintiffs

perform free work for the entire Myfield Lane planned development and to cover all expenses associated with the paving work of all driveways in the community," ECF No. 1 at ¶ 94, ECF No. 49 at 41, and argue that "Defendants did not request US-born homeowners to perform free work." ECF No. 49 at 41. No reasonable juror could find that Kozo's driveway comment was a "demand," much less that it was based on or even related to the Plaintiffs' national origin, Plaintiff Ledeneva's gender, or Plaintiffs' family status.

The Plaintiffs also allege a hostile housing environment claim. To state a hostile housing environment claim under section 3617, a plaintiff must allege: "(1) that the plaintiff was subjected to harassment that was sufficiently pervasive and severe; (2) the harassment occurred because of the plaintiff's membership in a protected class; and (3) the defendant is responsible for the allegedly harassing conduct." *Glover v. HPC-Eight, LLC*, No. 3:20CV1535(SALM), 2022 WL 1004572, at *10 (D. Conn. Apr. 4, 2022). *See also A.L.M. by & Through Moore v. Bd. of Managers of Vireum Schoolhouse Condo.*, No. 19-2771-CV, 2021 WL 5121137, at *1 (2d Cir. Nov. 4, 2021). "The harassment must be 'sufficiently severe or pervasive' to alter the conditions of the housing arrangement." *Mohamed v. McLaurin*, 390 F. Supp. 3d 520, 549 (D. Vt. 2019). "Hostile environment claims usually involve a long-lasting pattern of highly offensive behavior." *Id.* (internal quotation marks and citations omitted).

As instances of harassment, in addition to the above-mentioned evidence of other homeowners who Plaintiff allege are not in compliance with MLHOA's rules and Kozo's driveway comment, the Plaintiffs cite:

*15    • the Defendants "falsely stat[ed]" that the step has building code violations;

• the Defendants "falsely accused" Kalashnikov "of committing a crime of threatening them with physical violence" in the CHRO proceeding;

• Lindemann and Fowlkes did not invite Ledeneva to a meeting to discuss the budget and the agenda, which interfered with her ability to perform her duties as a Board member;

• Lindemann and Fowlkes threatened to levy fines against the Plaintiffs;

• Kimberly Lindemann stated that the Plaintiffs could be fined in connection with the step repair project and

"advised the Plaintiffs to put their home on the market and move to another property' ";

• Kozo's statements "If you have dreams of totally modifying and upgrading your EXTERIOR I don't feel myfiled [sic] lane is the place you should have bought a home," and "what is more important for you, your step or your relationship with your neighbors?"

ECF No. 49 at 41-43.

While there can be little doubt that relations between the unit owners in Myfield Lane are antagonistic, "Congress did not intend the FHA to provide a remedy for every squabble, even continuing squabbles, between neighbors...." *Lachira v. Sutton*, No. 305CV1585(PCD), 2007 WL 1346913, at *20 (D. Conn. May 7, 2007) (internal quotation marks omitted). Behavior that is rude or mean-spirited, but not discriminatory, does not fall within the ambit of the FHA. Here, the evidence does not give rise to any inference that the Plaintiffs were harassed because of their national origin or any other protected status. Nor could a reasonable factfinder conclude that the alleged conduct was sufficiently pervasive or severe.

### D. Negligence Claims

In Count 7, the Plaintiffs assert a claim of negligence against MLHOA for "failure to train, monitor, and supervise its officers and Board Members and failure to ensure their compliance" with the FHA and CFHA. [20] ECF No. 1 ¶ 103.

"The essential elements of a cause of action in negligence are well established: duty; breach of that duty; causation; and actual injury.... Duty is a legal conclusion about relationships between individuals, made after the fact, and [is] imperative to a negligence cause of action.... Thus, [t]here can be no actionable negligence ... unless there exists a cognizable duty of care[.]" *Doe v. Saint Francis Hosp. & Med. Ctr.*, 309 Conn. 146, 174 (2013) (internal quotation marks and alterations omitted).

Defendants argue there are no allegations supporting a duty owed to the Plaintiffs to train or supervise the HOA's employees or agents to comply with antidiscrimination housing statutes. In response, the Plaintiffs fail to point to any authority that would establish the presence of a duty to train or supervise employees as to the FHA. Cases that have considered the issue have rejected such claims. *See, e.g. Fair Hous. Ctr. of Cent. Indiana v. Grandville Coop. Inc.*, 2017

WL 75447, at *4 (S.D. Ind. Jan. 9, 2017) (dismissing claim alleging negligence against defendants for failure to train, monitor, and supervise employees and to ensure compliance with the fair housing statutes and applicable regulations and noting absence of authority that would establish the presence of a duty to train or supervise employees under the FHA);

*Fair Hous. Council of Or. v. Brookside Vill. Owners Ass'n*, 2012 WL 8017842, at *27-28 (D. Or. Oct. 19, 2012) (rejecting plaintiff's assertion that the Oregon fair housing statute, which is interpreted consistently with the FHA, "is intended to impose a common law duty on housing developments ... to train their employees in fair housing laws."); *Matarese v. Archstone Pentagon City*, 761 F. Supp. 2d 346, 365 (E.D. Va. 2011) (granting summary judgment on plaintiff's negligence claim predicated on a common law duty to train employees on FHA); *Hand v. Gilbank*, 752 N.Y.S.2d 501, 502 (N.Y. Sup. Ct. 2002) (the FHA "was not intended to create a standard of care in negligence litigation").

**\*16** In Count 9, Plaintiff Kalashnikov asserts a negligence claim against MLHOA, Louis Lindeman, Kozo, and Fowlkes alleging that they "breached their duties by unreasonably denying the Plaintiffs' request for their step work on October 25, 2018." ECF No. 1 ¶ 114. In support, the Plaintiff protests that "Defendants have not established any legitimate reason for denial of Plaintiffs' request for step repair work," ECF No. 49 at 49, and points to *Grovenburg v. Rustle Meadow Assocs., LLC*, 174 Conn. App. 18 (2017) in support of his argument that a "homeowners' association must act reasonably, exercising its powers in a fair and nondiscriminatory manner." ECF No. 49 at 48. *Grovenburg*, however, is inapposite because it did not involve a negligence claim but instead a cause of action under the Common Interest Ownership Act, Conn. Gen. Stat. § 47-278(a), in which the plaintiff alleged that the defendants "failed to approve [the fence proposal] even though all the requirements were met." 174 Conn. App. at 34. That is not the claim set forth in Counts 7 or 9 in this case. Because the Plaintiffs have not set forth facts suggesting the existence of a duty to act reasonably in considering the Plaintiffs' request for the step repair work, I grant the Defendants summary judgment on the negligence claims.

## E. Negligent and Intentional Infliction of Emotional Distress

In Counts 10 and 11, the Plaintiffs assert claims of negligent and intentional infliction of emotional distress against Louis Lindemann, Kozo, and Fowlkes based on their alleged conduct of "falsely accus[ing] Plaintiff Kalashnikov of committing a crime of threatening them with physical violence," ECF No. 1 ¶¶ 117, 122, and/or unreasonably denying Plaintiffs' request to repair and decorate their step with river stones. *Id.* ¶¶ 118, 123.

To show negligent infliction of emotion distress under Connecticut law, the Plaintiffs must prove "(1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's distress."

*Carrol v. Allstate Ins. Co.*, 262 Conn. 433, 444 (2003). "The foreseeability requirement in a negligent infliction of emotional distress claim is more specific than the standard negligence requirement that an actor should have foreseen that his tortious conduct was likely to cause harm." *Stancuna v. Schaffer*, 122 Conn. App. 484, 490 (2010). "In order to state a claim for negligent infliction of emotional distress, the plaintiff must plead that the actor should have foreseen that her behavior would likely cause harm of a specific nature, i.e., emotional distress likely to lead to illness or bodily harm." *Id.*

The Defendants are entitled to summary judgment on the Plaintiffs' negligent infliction of emotional distress claim because no evidence in the record would support a finding that the Defendants should have realized that any of the alleged conduct posed an unreasonable risk of causing emotional distress of the type that would cause illness or bodily harm.

An intentional infliction of emotional distress claim has four elements: "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was a likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." *Carrol*, 262 Conn. at 443 (internal quotation marks and citations omitted). "As for the second element, whether conduct is extreme and outrageous is a question for the court, and becomes a question for the jury only if reasonable minds could differ." *Nielsen v. Van Leuven*, No. 3:15CV1154(MPS), 2017 WL 3401257, at *7 (D. Conn. Aug. 8, 2017). "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a

civilized community." 🚩 *Carrol*, 262 Conn. at 443 (internal quotation marks and citations omitted). Such is the case when "the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, Outrageous!" *Id.* (internal quotation marks and citations omitted). Conduct, however, "that is merely insulting or displays bad manners or results in hurt feelings is insufficient." *Id.*; *see also Turner v. Connecticut Lottery Corp.*, 2021 WL 4133757, at *14 (D. Conn. Sept. 10, 2021) ("There is a high threshold for extreme and outrageous conduct in Connecticut law.").

**\*17** In the recent case of *Burton v. Mason*, 2022 WL 17453123, at *1 (Conn. Super. Ct. Nov. 29, 2022), the plaintiff alleged that: (1) the defendants screamed expletives at her and her guests; (2) kicked the plaintiff's goats; (3) dumped paint onto the stone wall separating their properties; (4) threatened to have the plaintiff arrested; and (5) made threatening remarks regarding the plaintiff's goats, with one of the defendants sending a text message that the plaintiff would "pay with [the goats'] lives" and another informing the plaintiff that he would take pleasure in having the goats slaughtered for human consumption. *Id.* at *4. The Court determined, after surveying the caselaw, that the alleged conduct fell short of "extreme and outrageous." *Id.*; *see also, e.g., Morrissey v. Yale University*, 268 Conn. 426, 428 (2004) (defendant's making disparaging remarks about plaintiff and saying that he would "kick [the plaintiff's] ass" held not to be extreme and outrageous); 🚩 *Cassotto v. Aeschliman*, 130 Conn. App. 230, 235 (2011) (defendant's placing plaintiff at risk of violating work rules, falsely reporting that plaintiff engaged in outbursts and irrational behavior, becoming violently angry at plaintiff, and looking directly at plaintiff and stating "bang bang" held not to be extreme and outrageous). Mindful of these and similar authorities, I find that the alleged conduct the Plaintiff identifies as the basis for this claim does not meet the exacting extreme and outrageous standard.

### F. Defamation and Defamation Per Se

In Counts 13 and 14, Kalashnikov alleges defamation and defamation per se against Louis Lindemann, Kozo, and Fowlkes on the grounds that they defamed him by falsely testifying in the CHRO proceeding that they "commit[ted] a crime of threatening them with physical violence." ECF No. 1 ¶¶ 127, 131. The Plaintiff further alleges that three defendants "communicated" the false statements to "Defendants, Defendants' attorney, and investigator of the

Plaintiff's fair housing claim." *Id.* ¶¶ 128, 132. The Plaintiff identifies the following as the alleged defamatory statements, ECF No. 49 at 53, 57-58:

• The December 14, 2018 Respondents' Position Statement in the CHRO proceeding which states as to the October 10, 2018 meeting:

Kalashnikov further stated that if the Board did not approve his alterations to his unit, that he "had other ways of taking care of the issue." Lou Lindemann requested he elaborate on that statement. Kalashnikov stated that he had "friends in Russia and, in Russia, we take care of things in different ways. You will see." Given Kalashnikov's aggressive demeanor and thinly veiled threats, Lindemann and Fowlkes ended the meeting and left the property. ECF No. 49-6 at 7.

• Louis Lindemann's statement to the CHRO investigator that at the October 10, 2018 meeting that:

Kalashnikov said he knew "billionaires in Russia and, uh, they take care of things our own way. Don't worry. We'll take care of things our way." ECF No. 49-7 at 11. Lindemann further testified that he took the statement as a "threat." *Id.*

• Fowlkes's statement to the CHRO investigator that at the October 10, 2018 meeting:

Kalashnikov stated that "if we insisted on making him take [the step] down, or he had friends in Russia, uh, who could, who could [help] him, wealthy people." ECF No. 49-8 at 14. Fowlkes told the investigator that he took this comment as a veiled threat. *Id.*

As a preliminary matter, none of these statements are attributable to Kozo. Although the complaint alleges that Kozo testified falsely during the CHRO investigation by accusing Kalashnikov of a committing a crime of threatening physical violence,[21] ECF No. 1 at ¶ 127, Kozo denies this and testified in his deposition that he did not "say[ ]anything about physical violence." ECF No. 48-25 at 29. Unlike Lindemann and Fowlkes, the record does not include the transcript of his testimony in the CHRO proceeding. And therefore the record does not include, as it must, the specific statement(s) the Plaintiff attributes to him. *See Stevens v. Helming*, 163 Conn. App. 241, 247 n.3 ("complaint for defamation must, on its face, specifically identify what allegedly defamatory statements were made, by whom, and to whom.") As a result, I grant summary judgment as to Kozo on these counts.

**\*18**  To state a claim for defamation under Connecticut law, a plaintiff must plead facts demonstrating that "(1) the defendant published a defamatory statement; (2) the defamatory statement identified the plaintiff to a third person; (3) the defamatory statement was published to a third person; and (4) the plaintiff's reputation suffered injury as a result of the statement." *Cweklinsky v. Mobil Chem. Co.*, 267 Conn. 210, 217 (2004). "[O]pinion cannot be the basis for a defamation claim." *Moses v. St. Vincent's Special Needs Ctr., Inc.*, No. 3:17-CV-1936 (SRU), 2021 WL 1123851, at \*12 (D. Conn. Mar. 24, 2021).

A claim of defamation *per se* requires a plaintiff to allege a statement whose "defamatory meaning ... is apparent on the face of [it]," and accordingly the statement "is actionable without proof of actual damages." *Battista v. United Illuminating Co.*, 10 Conn. App. 486, 491-92 (1987) (citation omitted). "When the defamatory words are actionable per se, the law conclusively presumes the existence of injury to the plaintiff's reputation." *Id.* at 492 (citation and internal quotation marks omitted). Whether a statement constitutes defamation *per se* "is a question for the court." *Id.* (citation and internal quotation marks omitted). "Connecticut has generally recognized two categories of statements which are actionable as defamatory *per se*: (1) statements charging a plaintiff of a crime, and (2) statements that injure a plaintiff in their profession." *Wynn v. New Haven Bd. of Educ.*, No. 3:21CV925(SVN), 2022 WL 1063732, at \*4 (D. Conn. Apr. 8, 2022) (citations omitted). Here, the Plaintiffs allege that Louis Lindemann and Fowlkes falsely stated that Kalashnikov threatened them and that threatening is a crime under Conn Gen. Stat. § 53a-62. ECF No. 49 at 54. As a result, the Plaintiffs argue, Lindemann and Fowlkes are liable for defamation per se. *Id.* at 55.

The Defendants argue that the Plaintiffs' defamation claims fail because even if defamatory statements were made, they are privileged because they were made during the CHRO proceedings and investigations, which are quasi-judicial in nature. I agree.

> Statements made during judicial proceedings are entitled to immunity from liability for defamation. Connecticut follows the common law rule that communications uttered or published in the course of judicial proceedings are absolutely privileged so long as they are in some way pertinent to the subject of the controversy.... That privilege extends to statements made in quasi-judicial proceedings that have powers of discretion in applying the law to the facts which are regarded as judicial or quasi-judicial, in character.... The CHRO has been recognized as a quasi-judicial body given its discretion to decide facts and apply law, and courts have held that statements made during CHRO proceedings and investigations are therefore absolutely privileged.

*Moses v. St. Vincent's Special Needs Ctr., Inc.*, No. 3:17CV1936(SRU), 2021 WL 1123851, at \*12 (D. Conn. Mar. 24, 2021) (internal quotation marks and citation omitted). *See also Goodwin v. Milot,* 2022 WL 1538703, at \*4 (Conn. Super. Ct. May 16, 2022) (statements made during quasi-judicial proceedings are "absolutely privileged from liability when they are pertinent and material to the controversy, even if such statements are made while the communicator knows of their falsity"); *Raye v. Wesleyan Univ.*, 2003 WL 1962881, at \*3 (Conn. Super. Ct. Apr. 10, 2003) ("Statements that fall under the protection of absolute privilege are completely immune from any defamation liability even if the statements are false and malicious.") Because the statements attributable to Lindemann and Fowlkes are privileged, I grant them summary judgment on the defamation claims.

### G. Perjury, Harassment, and Extortion

**\*19**  In Count 15, the Plaintiff alleges "perjury under federal and state law" as to Lindemann, Kozo, and Fowlkes on the grounds that they testified falsely in the CHRO proceeding. ECF No. 1 at ¶ 135. In Count 16, the Plaintiff allege a claim of harassment as to all Defendants on the basis of "unreasonably denying Plaintiffs' request for step repair work," "falsely accusing Plaintiff Kalashnikov of committing a crime of threatening Defendants with physical violence," "demanding that Plaintiffs perform free work for Defendants," and "discriminating and retaliating Plaintiffs[.]" ECF No. 1 ¶ 139. In Count 17, the Plaintiffs allege a claim of

extortion on the grounds that the Defendants tried to compel the Plaintiffs to install driveways for them. ECF No. 1 ¶ 142.

Perjury is a criminal offense involving the willful act of swearing a false oath or of falsifying an affirmation to tell the truth. *See* 18 U.S.C. § 1621; Conn. Gen. Stat. § 53a-156. There are also criminal statutes governing harassment and extortion. *See* Conn. Gen. Stat. § 53a-183. But none of these statutes create private causes of action. *See Ngo v. Wirtes*, 2019 WL 4322666, at *4 (Conn. Super. Ct. Aug. 20, 2019) ("[P]erjury is not a private cause of action and cannot be brought in civil court."); *Holt v. Safeco Ins. Co. of Am.*, 2016 WL 4744129, at *7 (Conn. Super. Ct. Aug. 8, 2016) ("The court can find no case ... in which any Connecticut court has recognized harassment as a civil cause of action."); *Lenzo v. Gallant*, 2022 WL 6419098, at *5 (Conn. Super. Ct. Sept. 21, 2022) ("[T]here is no recognizable civil cause of action for extortion in Connecticut.") (citing cases). These claims fail as a matter of law.

## IV. Conclusion

For the foregoing reasons, the Defendants' motion for summary judgment is GRANTED as to counts 1, 6-7, and 9-17 and is DENIED as to the FHA and CFHA retaliation claims in counts 2-5 and 8.

IT IS SO ORDERED.

**All Citations**

Slip Copy, 2023 WL 1862763

---

## Footnotes

1    Although she is self-represented, Ledeneva is a licensed attorney. ECF No. 42 at 44 ¶ 9; ECF No. 49 at 69 ¶ 9.

2    The complaint does not include a count 12.

3    The Plaintiffs' verified complaint "is treated as an affidavit for summary judgment purposes and therefore will be considered in determining whether material issues of fact exist, provided that it meets the other requirements for an affidavit under Rule 56(e). *See, e.g.*, Fed.R.Civ.P. 56(e) (requiring affidavits to be made on personal knowledge, to set forth facts that would be admissible in evidence, and to demonstrate the affiant's competency to testify to the matters in the affidavit)". *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

4    Under Local Rule 56(a)2(ii), each statement by a nonmovant in the Statement of Additional Material Facts must be followed by a specific citation to record evidence. Many of the Plaintiffs' Statements of Additional Material Facts fail to comply with this fact-by-fact citation rule because the Plaintiffs have lumped together multiple factual statements, which are not followed by individual citations for each statement. *See S.E.C. v. Glob. Telecom Servs., L.L.C.*, 325 F. Supp. 2d 94, 108 (D. Conn. 2004) (Rule 56 "does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.").

5    As such, Myfield Lane is governed by the Common Interest Ownership Act, Conn. Gen. Stat. § 47-200 *et seq.* ECF No. 42 at 392, 449. "In purchasing units in a common interest community, owners forfeit certain liberties with respect to the use of their property by voluntarily consenting to restrictions imposed thereon, as specified in the declaration of the community. ... Owners of units in a common interest community, in turn, secure the right to enforce those restrictions against others." *Grovenburg v. Rustle Meadow Assocs., LLC*, 174 Conn. App. 18, 43 (2017).

6    In their Rule 56(a)2 Statement, the Plaintiffs denied the Defendants' statement that five units have been built, asserting that six units have been built but they did not cite any supporting evidence. ECF No. 49 at 65 ¶ 3. In any event, this fact is not material to the legal analysis of the Plaintiffs' claims.

7    Because both Louis and Kimberly Lindemann are named defendants, to avoid confusion, they are referred to using their full names.

8    Gitterman is not a defendant.

9    The parties cite no information as to when this took place.

10    Again, no information is provided as to when this took place.

11    It appears that Kimberly Lindemann's email was in response to one sent by the Plaintiffs. ECF No. 49-34 at 2 ("I would like to address the e-mail that you have recently received from Unit #1."). That email is not part of the record.

12    This meeting appears to have been recorded but the recording is not part of the record. The record contains what appears to be an unofficial transcript. ECF No. 49-15. The Defendants do not raise any challenges to it.

13    Ledeneva surmises that Fowlkes and Lindemann held a "meeting" without her. ECF No. 49-2 at 23 (Ledeneva testified "[T]hey prepared [the] budget for the next year, right, so why didn't they invite me for the meeting when they discussed the budget?") It is not, however, clear that a meeting actually took place. See ECF No. 49-9 at 26 (Louis Lindemann testified that Ledeneva never missed any Board meetings.)

14    Section 2.6 of the Bylaws provides: "Removal of Members of the Executive Board. The Unit Owners, by a two-thirds vote of all persons present and entitled to vote at any meeting of the Unit Owners at which a Quorum is present, may remove any member of the Executive Board with or without cause, other than a member appointed by the Declarant." The Plaintiffs do not argue that the procedure used to remove Ledeneva was improper.

15    This testimony appears to have been recorded but the recording is not part of the record. The record contains what appears to be an unofficial transcript. The Defendants do not raise any challenges to it.

16    "The analogous Connecticut statute uses language that is essentially similar in some places and identical in others, *see* Conn. Gen. Stat. § 46a-64c(a)(a), and the Connecticut Supreme Court looks to federal caselaw for guidance when 'addressing claims brought under both federal and state housing laws.' " *Dempsey v. Hous. Operations Mgmt., Inc.*, No. 3:15CV615(SRU), 2016 WL 730702, at *2 (D. Conn. Feb. 23, 2016) (quoting *AvalonBay Communities, Inc. v. Town of Orange*, 256 Conn. 557, 591 (2001)). *See* *Webster Bank v. Oakley*, 265 Conn. 539, 568 (2003) ("Inasmuch as the relevant provisions of the state and federal fair housing statutes in the present case are virtually identical, we apply the analysis [to the state claim] that we utilized in evaluating the defendant's [FHA] claims"). There appears to be no difference between the federal and state statutes that would be material to this case, and neither party argues otherwise. I therefore analyze these claims together.

17    "Courts, including the Second Circuit, have consistently relied on Title VII cases in their analysis of housing discrimination under the FHA." *DeSouza*, 2018 WL 2990099, at *7 n.18 (internal quotation marks omitted).

18    For instance, there is some evidence in the record that the stone walls on Kozo's and Robidoux's lots are retaining walls installed by the Developer/Declarant at the time Myfield Lane was constructed. ECF No. 49-6 at 7; ECF No. 49-7 at 12, 13; ECF No. 49-6 at 20.

19    The Plaintiffs assert this claim against all Defendants, but they attribute the alleged incident only to Fowlkes. ECF No. 49 at 21.

20    I note that with the exception of the retaliation claims, the FHA and CFHA claims are no longer in the case.

21    Kozo did not attend the October 10 board meeting, which was where the contested remarks occurred.

---

**End of Document**    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 1972729
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Lise RUBIN, Plaintiff,

v.

NEW YORK CITY BOARD OF
EDUCATION, et al., Defendants.

20-CV-10208 (LGS) (KHP)

|

Signed January 6, 2023

**Attorneys and Law Firms**

Lise Rubin, Teaneck, NJ, Pro Se.

Audrey Jessie Juarez, Elisheva Leah Rosen, NYC Law Department Labor and Employment, New York, NY, Ryan Nasim, The Law Office of Ryan Nasim, PLLC, Garden City, NY, for Defendants New York City Board of Education, New York City Special Commission of Investigation, Anastasia Coleman, Daniel Schlachet, Susan Epstein, Katherine Witzke, Henry Bluestone Smith, Joseph A. Baranello, Ilene Lees, Michael van Biema, Alexis Lantzounis, Katherine G. Rodi, Esq., and Geraldine A. Cullen.

## REPORT AND RECOMMENDATION
## ON MOTION TO DISMISS

KATHARINE H. PARKER, United States Magistrate Judge

**\*1  TO: THE HONORABLE LORNA G. SCHOFIELD, United States District Judge**

**FROM: KATHARINE H. PARKER, United States Magistrate Judge.**

Before the Court for a Report and Recommendation is Defendants' Motion to Dismiss the Second Amended Complaint ("SAC").[1] The SAC names the following entities and individuals as Defendants: The New York City Board of Education ("BOE");[2] The Special Commissioner of Investigation for the New York City School District ("SCI") (collectively, the "Municipal Defendants"); Susan Epstein, Director of Compliance and Contracts at the DOE Office of Related Services ("ORS"); Michael van Biema, Executive Director at ORS; Alexis Lantzounis, DOE's Supervisor of Occupational Therapy ("OT") for Manhattan District 3;

Katherine Witzke, Principal of P.S. M009 Sarah Anderson School ("PS 9"); Geraldine A. Cullen, teacher at PS 9; Anastasia Coleman, Special Commissioner at SCI; Daniel Schlachet, First Deputy Commissioner at SCI; Ilene Lees, Director of the DOE's Office of Special Investigations ("OSI"); Henry Bluestone Smith, former Chief of Staff at the DOE's Office of General Counsel ("OGC"); Joseph A. Baranello, Deputy Counsel and Chief Privacy Officer at OGC; Julia Busetti, OGC Agency Attorney; and Katherine G. Rodi, Executive Director at DOE's Office of Employee Relations (collectively, "Individual Defendants").[3]

The SAC alleges violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq; Titles II and V of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq.; Sections 504 and 505(a)(2) of the Rehabilitation Act of 1974 ("Rehabilitation Act"), 29 U.S.C. § 794; New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296 et seq.; New York City Human Rights Law ("NYCHRL"), N.Y.C. Administrative Code 8-101 et seq; the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq.; the New York State Labor Law ("NYLL") §§ 740, 741, and 215 and Art. 19, § 650 et seq.; and New York State Civil Service Law ("CSL") § 75-b. It also asserts state common law claims for defamation and fraud.

**\*2**  Defendants moved to dismiss the SAC in its entirety pursuant to Federal Rules of Civil Procedure 8(a), 12(b)(5), and 12(b)(6). For the reasons stated below, I respectfully recommend the Motion to Dismiss be GRANTED.

## BACKGROUND

### 1. Allegations in the SAC[4]

Plaintiff Lise Rubin ("Plaintiff") is an occupational therapist and special educator. (SAC ¶ 13.) From 2012 to 2018, Plaintiff worked as an "Independent Provider" for the DOE. Through this arrangement, Plaintiff provided OT services to special needs students at various public and private schools in New York City. (Id. ¶¶ 12, 17, 239.) Plaintiff worked under Related Services Agreements ("RSAs"), which are vouchers issued by the DOE that allow parents of special needs students to select a qualified Independent Provider to provide services to the child at no cost to the parent. (Id. ¶¶ 27, 345.) The

DOE contracts with vendors pursuant to Related Services Contracts, and the vendors supply the Independent Providers. (*Id.* ¶ 1506.)

Schools seeking the services of an Independent Provider may refer to a registry of qualified providers maintained by the ORS. (*Id.* ¶ 1493.) Providers who wish to appear on this registry must apply for eligibility to work with RSAs or vendors, and this requires, among other things, obtaining security clearance through "PETS." (*Id.* ¶¶ 1502-04.) At some point during or prior to 2012, Plaintiff was placed on the registry. She was then selected from the registry on separate occasions to work as a provider at schools during the period from 2012 to 2018. As discussed below, Plaintiff's services were terminated in 2018.

### a. Misclassification as Independent Contractor, 2012 through 2018

During the time Plaintiff worked as an Independent Provider for the DOE, she was classified as an independent contractor. Plaintiff alleges she should have instead been classified as an employee based on the high degree of control the DOE maintained over her work. (*Id.* ¶¶ 20-28, 342.) In particular, Plaintiff alleges that Defendant Lantzounis, the school district's OT Supervisor, micromanaged her work, including by preventing her from providing services after school hours. (*Id.* ¶¶ 476, 966.) Plaintiff alleges that by virtue of being misclassified as an independent contractor, she was denied numerous rights, including the rights to join a union, file a grievance, and receive overtime pay and other benefits granted to employees. (*Id.* ¶¶ 267-68; 274-83.)

As a result of Plaintiff's alleged misclassification as an independent contractor and the DOE's failure to provide her with adequate pay and benefits, the SAC alleges that all Defendants violated Plaintiff's rights under the FLSA and the NYLL minimum wage law.

### b. Retaliatory Blacklisting in 2014

In 2014, Plaintiff was providing services at Public School M293, City College Academy of the Arts ("M293"). In August 2014, Plaintiff advocated on behalf of students with disabilities by making a formal complaint against M293 to the New York State Education Department ("NYSED") regarding the provision of special education services at

M293 ("2014 NYSED Complaint"). (*Id.* ¶¶ 471-72.) Shortly thereafter, in retaliation for Plaintiff's advocacy, DOE staff made formal complaints against Plaintiff. (*Id.*) The complaints resulted in Plaintiff receiving what the SAC refers to as a "problem code" on her record, which impacted how or whether she appeared on the ORS registry, and Plaintiff was required to reapply for security clearance from PETS. (*Id.* ¶¶ 1504-05.)

**\*3** The SAC asserts that this problematic coding of Plaintiff constituted retaliation for her advocacy on behalf of students with disabilities in violation of the ADA, the Rehabilitation Act, NYSHRL, and NYCHRL. Plaintiff also contends the retaliation violated Title VII.

### c. Underpayment and Hostile Work Environment in 2017-2018

On November 17, 2017, Plaintiff began working as an Independent Provider at PS 9. (*Id.* ¶¶ 437-40.) While at PS 9, Plaintiff was required to spend numerous hours on uncompensated tasks, including coordinating Medicaid Physician Compliance Visits and screening students to determine whether they needed OT services. (*Id.* ¶¶ 284-87, 452, 489-95, 547-87, 891, 899.) Plaintiff also was not compensated for the time she spent "start[ing] the OT program" at PS 9 "from the bottom up." (*Id.* ¶ 946.) Instead, Plaintiff only received pay for time spent providing direct OT services to students. (*Id.* ¶ 898.) Plaintiff also alleges that her hourly rate had not been raised since at least 2012, and therefore she was underpaid. (*Id.* ¶ 270.)

Additionally, Plaintiff alleges that the environment at PS 9 was "hostile" as retaliation for her advocacy on behalf of students. She contends her supervisors, Defendants Lantzounis and Witzke, created this hostile work environment by requiring her to work on uncompensated tasks, to work with more students than Plaintiff's capacity allowed, and to adopt certain "substandard and illegal practices" in her work with the students, such as treating students in groups and modifying students' Individualized Education Programs ("IEPs"). (*Id.* ¶¶ 476, 626-28, 632-58, 929-37, 992-93.) While not entirely clear from the SAC, Plaintiff may be contending that this conduct was retaliation for the 2014 NYSED Complaint or other NYSED complaints she filed in October 2014 and January 2015 in connection with her work at another school.

Although the Court understands these allegations to be part of the alleged retaliation in violation of the ADA, the Rehabilitation Act, NYSHRL, and NYCHRL, Plaintiff also mentions that this hostile work environment violated Title VII and that Defendants violated the FLSA and the NYLL by underpaying her for work performed and/or requiring her to perform tasks for which she received no compensation.

#### d. Retaliation as Result of Providing an Informational Letter in June 2018

On June 21, 2018, Plaintiff gave her PS 9 students a letter for their parents ("2018 Letter"). (*Id.* ¶ 38.) The 2018 Letter stated that because there had been a late start in acquiring OT services at PS 9 that year, students were eligible for "Compensatory Services," and although the school year was ending, Plaintiff was "available to make home visits for sessions" during the summer. (SAC Exh. 2, ECF No. 180-2.) The letter advised parents on how to obtain RSA vouchers that would enable them to use Plaintiff's services during the summer. (*Id.*) The SAC asserts that in handing out this letter, Plaintiff was advocating on behalf of disabled students by ensuring they were aware of the services available to them, and that she was opposing the DOE's practice of not informing parents of their children's rights to obtain compensatory services.

Defendant Cullen, a teacher at PS 9, observed Plaintiff placing the 2018 Letter in students' backpacks and reported the incident to Defendant Witzke. (SAC ¶¶ 165, 167, 190.) On June 22, 2018, Defendant Witzke reported the incident to OSI, which is DOE's internal investigative unit, and to SCI, which is an independent agency that acts as a watchdog for the New York City School District. (*Id.* ¶¶ 777, 783-88, 1662, 1309.) That same day, DOE removed Plaintiff's security clearance, removed Plaintiff from the ORS registry, and placed a problem code on her record. (*Id.* ¶¶ 38, 189, 302-04.) The problem code was entered by Defendant Rodi. (*Id.* ¶ 1115.) These actions effectively terminated Plaintiff's services. (*Id.* ¶¶ 311, 315.) The DOE refused to tell Plaintiff why it had taken these actions. (*Id.* ¶ 163.) The SAC asserts that these actions constituted unlawful retaliation against Plaintiff as a result of her advocacy on behalf of students with disabilities via the 2018 Letter.

**\*4** OSI investigated the incident. In August 2018, an OSI investigator interviewed Defendant Epstein, who told the investigator that in handing out the 2018 Letter, Plaintiff

attempted to bypass DOE's policy for assigning therapists to students whereby DOE employees are given preference over Independent Providers such as Plaintiff, and that Plaintiff was improperly soliciting business from parents without the DOE's approval. (*Id.* ¶¶ 346, 374, 806.) The investigator also interviewed Defendant Witzke, who falsely stated that another provider provided OT services to certain students during the 2017-18 school year. (*Id.* ¶¶ 835-47.) The interviewer also interviewed Defendants Van Biema and Lantzounis who made unspecified false accusations against Plaintiff to the investigator. (*Id.* ¶ 200.) Defendants later "fraudulently" referred to this incident in submissions to the Equal Employment Opportunity Commission ("EEOC"). (*Id.* ¶ 231.)

OSI ultimately found that the complaints against Plaintiff were unsubstantiated, and it directed the DOE to return Plaintiff to service. However, the DOE never informed Plaintiff of this result, never reinstated Plaintiff's security clearance, and never restored Plaintiff's position at PS 9. (*Id.* ¶¶ 190-94, 197.) Moreover, in November 2018, Defendant Witzke refused to provide a professional reference for Plaintiff. (*Id.* ¶¶ 388, 1021.)

The SAC alleges that the actions taken against Plaintiff on June 22, 2018 and thereafter constituted improper retaliation because of her advocacy on behalf of students with disabilities in violation of Title VII, the ADA, the Rehabilitation Act, NYSHRL, and NYCHRL. The SAC further alleges that the false statements made by Defendants to OSI constituted fraud.

#### e. Retaliation in 2019 as a Result of Plaintiff's Whistleblower Complaint

Following Plaintiff's termination in June 2018, Plaintiff conducted research into what was happening to special needs students at PS 9 in her absence. (*Id.* ¶ 1200.) After conducting her research, Plaintiff wrote a 45-page report that "blew the whistle" on how students at PS 9 were, "in Plaintiff's absence ..., being deprived and defrauded of mandated services." (*Id.*) On or about March 7, 2019, Plaintiff filed her report as a State Special Education Complaint with NYSED ("2019 NYSED Complaint"). (*Id.* ¶¶ 212, 1200, 1210; *see also* SAC Exh. 4, ECF No. 180-4.) The 2019 NYSED Complaint alleged that the staff at PS 9 were engaging in billing and Medicaid fraud by "entering false certifications into SESIS" [5] to make it appear that students had received OT services when in fact they had not received services.

(SAC ¶¶ 216-30, 1210, 1214.) The complaint concluded that PS 9 students were being "deprived and defrauded of mandated services." (*Id.* ¶ 1200.) Plaintiff also sent the 2019 NYSED Complaint to the Chancellor's Office, the District 3 Superintendent, OSI, and SCI. (*Id.* ¶¶ 1203-06.) Plaintiff also raised these same concerns with the Office of the Public Advocate and with various members of the NYC Schools Panel for Educational Policy. (*Id.* ¶¶ 1202-03.)

The DOE learned of the 2019 NYSED Complaint on March 20, 2019, and as a result, on that same day, Defendant Epstein filed a complaint about Plaintiff to SCI. (*Id.* ¶¶ 212, 230, 1218.) Defendant Epstein's complaint alleged that despite Plaintiff's security clearance being removed in 2018, the 2019 NYSED Complaint revealed that Plaintiff was continuing to access student records and to contact parents. (SAC Exh. 13B, ECF No. 181-13.) Indeed, Plaintiff accessed student records to research and compile the 2019 NYSED Complaint and contacted parents regarding the contents of that Complaint. (SAC ¶¶ 1287-88, 1297-1304.)

On April 30, 2019, Plaintiff received a notification that Epstein's SCI complaint about her had been referred to OSI and that OSI was investigating the allegations. (SAC Exh. 13B.) An OSI investigator called Plaintiff numerous times to set up an interview, but Plaintiff refused to be interviewed. (*Id.*) Plaintiff found the investigator's conduct to be harassing. (SAC ¶ 230.)

**\*5** The OSI ultimately found the complaint made against Plaintiff to be substantiated and recommended that a problem code be assigned to Plaintiff's record. (SAC Exh. 13B.) Plaintiff received the OSI Investigative Report on July 10, 2019, and she found the Report contained unspecified "false, bogus and defamatory" statements about her regarding the 2018 Letter incident. (SAC ¶¶ 1193, 1196, 1230-31, 1324.) The Report stated that OSI interviewed Defendants Witzke and Lantzounis, as well as a parent of one of Plaintiff's former students, who all stated that Plaintiff had been contacting parents over the summer of 2018—after her termination—to offer OT services and to complain about PS 9. (*Id.*) Defendant Witzke also stated that prior to the June 2018 termination, Witzke had discovered that Plaintiff was improperly modifying students' IEPs. (*Id.* ¶ 1223.) The Report further stated that on May 20, 2019, Plaintiff admitted to an OSI investigator that she accessed SESIS records after her termination, and that Plaintiff's SESIS activity record confirmed that Plaintiff accessed student records after her termination. (SAC Exh. 13B.) Defendants later

"fraudulently" referred to the OSI Report in submissions made to the EEOC. (SAC ¶ 231.)

The SAC alleges that Defendant Epstein's complaint to SCI and the resulting OSI investigation and other conduct thereafter constituted retaliation for the 2019 NYSED Complaint and earlier protected activity in violation of Title VII, the ADA, the Rehabilitation Act, NYSHRL, and NYCHRL, and that these acts constituted violations of state whistleblower protection statutes, specifically NYLL 🟧§§ 215, 🟧740, and 🟧741, and CLS 🟧§ 75-b.

### f. Refusal of OSI, SCI, and OGC to Offer Whistleblower Protection in 2019 and to Provide Adequate FOIL Responses in 2019-2020

In January 2019, Plaintiff began filing FOIL requests seeking her employment records and seeking to learn the cause of the employment actions taken against her in June 2018. (*Id.* ¶ 201.) DOE's Deputy Counsel, Defendant Baranello, did not timely respond to Plaintiff's FOIL requests, used incorrect dates in his responses, produced documents with unnecessary redactions, and falsely claimed certain documents were exempt from FOIL or did not exist. (*Id.* ¶¶ 203-04, 209, 1574-77, 1584-1605.) Defendant Lees, Director at OSI, participated in "document suppression" by informing Defendant Baranello that OSI could not locate certain records that were responsive to the FOIL requests. (*Id.* ¶¶ 1606-27.)

Between March and June 2019, Plaintiff sent a series of emails to individuals at OSI, SCI, and the DOE's OGC requesting whistleblower protection in relation to her 2019 NYSED Complaint and raising concerns regarding the responses to her FOIL requests. (*Id.* ¶ 248; SAC Exh. 11A, ECF No. 181-11; SAC Exh. 14A, ECF No. 181-14.) On May 30, 2019, Defendant Schlachet, First Deputy Commissioner at SCI, informed Plaintiff via email that SCI had received her request for whistleblower protection, but that the whistleblower statutes were not "the appropriate vehicle" for her requested relief. As SCI understood it, Plaintiff's emails complained about adverse employment actions that occurred in June 2018, *before* she filed the 2019 NYSED Complaint, and accordingly there was no causation between the report of wrongdoing and the alleged adverse actions taken. (*Id.*) Plaintiff characterizes the letter as "bogus, defamatory, factually false, retaliatory, intimidating and harassing." (SAC ¶¶ 1194.)

On June 27, 2019, Defendant Smith, Chief of Staff for the DOE's OGC, sent Plaintiff a letter acknowledging receipt of Plaintiff's emails and stating that the OGC found the DOE's responses to Plaintiff's FOIL requests to be appropriate and that Plaintiff had already raised complaints to SCI and OSI regarding the June 2018 retaliation, and both agencies had found Plaintiff's concerns to be unfounded. (*Id.*) Plaintiff states this letter was "bogus, defamatory, factually false, intimidating and harassing." (SAC ¶¶ 1195, 1232, 1473.) Smith sent a second "harassing" letter on September 23, 2019 that advised Plaintiff to file a complaint at the New York City Human Rights Commission. (*Id.* ¶¶ 1547-51.) Plaintiff wrote to Smith to point out the inaccuracies in his letters, but Smith "refused to correct" the letters. (*Id.* ¶¶ 1563-71.)

**\*6** The SAC asserts that Defendants' failure to protect Plaintiff against whistleblower retaliation violates New York State whistleblower protection statutes NYLL § 215, 740, and 741, and CLS § 75-b. The SAC also asserts that the communications Plaintiff received from Defendants constitute defamation and amount to fraud in violation of New York law.

### g. Allegations on Behalf of Students

The SAC alleges that Defendants failed to provide adequate OT services for students at PS 9; that Defendants Witzke and Lantzounis lacked knowledge and experience in special education and used incorrect methodologies; and that Defendant Cullen engaged in "child abuse" by yelling at students and failing to advocate for students. (See, e.g. *id.* ¶¶ 35, 176-83, 383, 744-48, 950-51, 954-66, 988-94, 1020, 1013-17, 1143, 1251-65.)

### 2. Procedural Background

### a. EEOC Charge

On August 1, 2019, Plaintiff completed an online screening with the EEOC, and on September 26, 2019, she participated in a remote intake interview. (*Id.* ¶ 114.) Due to "EEOC administrative problems," Plaintiff's intake interview was "not noticed" by the EEOC, so Plaintiff "delivered the Complaint" to the EEOC on October 31, 2019. (*Id.* ¶ 114-15.) Plaintiff describes October 31, 2019 as the date that the

"EEOC filing" was "finaliz[ed]." (*Id.*; *see also* Pl. Opp. Br. at 14.) On November 26, 2019, at what she understood to be the direction of the EEOC, Plaintiff filed a complaint with the Office of Civil Rights. (SAC ¶ 131.) On February 11, 2020, the Office of Civil Rights dismissed the case because Plaintiff had a case pending at the EEOC. On March 31, 2020, Plaintiff signed the formal EEOC Charge of Discrimination. (ECF No. 188-1.) The EEOC Charge asserts claims for age discrimination and for retaliation in violation of Titles II and V of the ADA. [6] (*Id.*) In April 2020, Plaintiff sent the EEOC Charge to the BOE. (SAC ¶ 121.) Plaintiff alleges that the BOE refused to participate in the EEOC's mediation program. (*Id.* ¶ 155.) The EEOC issued Plaintiff a right to sue letter on September 5, 2020. (*Id.* ¶ 117.)

### b. The Instant Action

Plaintiff initiated this action on December 3, 2020. (ECF No. 1.) On February 24, 2021, the Court granted Plaintiff's request to file a first amended complaint and extended the deadline for Plaintiff to serve Defendants until June 4, 2021. (ECF No. 10.) On June 3, 2021, Plaintiff filed the first amended complaint, which she denoted as a "pre-service amended complaint." (ECF No. 12.) On June 7, 2021, Plaintiff filed a letter stating she had served the Defendants by delivering the summons and complaint to Defendants' places of work, as well as sending the summons and complaint by priority mail. (ECF No. 13.) On June 11, 2021, Plaintiff filed a revised first amended complaint, again styled as a pre-service complaint. (ECF No. 18.) On the same day, Plaintiff filed Summons Returned Executed for all Defendants. (ECF No. 19.) The Summons Returned Executed included Proofs of Service that indicated that individuals named Ben Gonzalez and Daniel Glatt had served the various Individual Defendants at their places of work on June 4, 2021. (*Id.*)

**\*7** On June 23, 2021, the Court granted Defendants' request to extend their time to answer the complaint until August 31, 2021 because a cyber security breach had caused the New York City Law Department to lose all technological access. (ECF Nos. 27, 113.)

On August 15, 2021, Plaintiff filed an affirmation and proposed certificates of default for the Clerk of the Court to issue in contemplation of filing motions for default judgments against the Individual Defendants. (ECF Nos. 60-66, 68, 69, 72-91, 100-105.) The Clerk of the Court entered certificates of default as to the Individual Defendants, but these certificates

were later vacated per the Court's order because Plaintiff indicated she would file an amended complaint. (ECF Nos. 92-96, 107-111, 129, 167.)

The Court held a conference with the parties on September 10, 2021. (ECF No. 128.) At the conference, Plaintiff stated that she had a "good deal of material" to include in the amended complaint. (ECF No. 133, T. 16:20.) The Court advised Plaintiff that a party is not required to attach documents to a complaint and that a complaint only needs to allege facts that support the claims made. (*Id.* 16:22-25.) The Court also stated that a complaint is not the proper document to refute anticipated legal arguments. (*Id.* 17:16-19.) The Court ordered Plaintiff to file the SAC by October 4, 2021, a date Plaintiff identified as one she could meet. (*Id.* 19:6-12.) The Court informed Plaintiff that this would be "the last time to amend" her complaint and it reminded her that she could contact the pro se clinic run by the New York Legal Assistance Group to obtain free legal assistance in drafting the SAC. (*Id.* 5:10-21.) The Court also set the briefing schedule for Defendants' anticipated motion to dismiss. (*Id.* 7:1-15.)

In the months following the September 10 conference, Plaintiff requested, and the Court granted, upward of seven extensions of time for filing the SAC, ultimately extending the deadline to December 26, 2021. (*See* ECF No. 167.) Plaintiff then filed numerous iterations of the SAC in late December and early January, and eventually filed what she deemed to be the final SAC on January 24, 2022. (ECF Nos. 177, 178.) Plaintiff filed a letter stating that she would separately file attachments to the SAC. (ECF No. 178.) On January 25, 2022, the Court issued an order accepting the document at ECF No. 177 as the operative SAC despite the fact that it was filed well after the final deadline. (ECF No. 179.) The order further stated that Plaintiff should not file any attachments, and it reminded Plaintiff that "Federal Rule of Civil Procedure 8 provides that the complaint must contain a short and plain statement of the claim." (*Id.*) The order stated that Plaintiff's filing already "exceeds what is required in the rule" and that "no further filings from Plaintiff" would be necessary until after Defendants filed their motion to dismiss. (*Id.*) On February 2, 2022, Plaintiff disregarded the Court's direction and filed fifteen exhibits to the SAC. (ECF Nos. 180, 181.)

On April 1, 2022, Defendants filed a Motion to Dismiss seeking dismissal of the SAC pursuant to Federal Rules of Civil Procedure 8, 12(b)(5), and 12(b)(6). (ECF No. 186.) Plaintiff requested, and the Court granted, numerous extensions of time to file her opposition brief, which she

ultimately filed on August 31, 2022, after the final deadline for her to do so. (ECF No. 214.) Out of excessive solicitude to Plaintiff, the Court determined on November 29, 2022 that it would accept Plaintiff's late-filed brief and set a deadline for Defendants' reply. (ECF No. 247.) Defendants filed a timely Reply on December 14, 2022. (ECF No. 252.)

## LEGAL STANDARDS

### 1. Federal Rule of Civil Procedure 8(a)(2)

**\*8** Federal Rule 8(a)(2) requires a plaintiff to make "a short and plain statement of the claim showing that the pleader is entitled to relief." As the Second Circuit has explained, the statement should be *short* because "unnecessary prolixity in a pleading places an unjustified burden on the court and the party who must respond to it because they are forced to select the relevant material from a mass of verbiage." *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988). The statement should be *plain* "because the principal function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial." *Id.* A party's pro se status does not excuse her from compliance with Rule 8. *See, e.g.*, *Gonzalez v. Wing*, 113 F.3d 1229, at \*1 (2d Cir. 1997) (affirming dismissal of pro se complaint for failure to comply with Rule 8); *Prezzi v. Schelter*, 469 F.2d 691, 692 (2d Cir. 1972) (same).

"When a complaint does not comply with the requirement that it be short and plain, the court has the power ... to dismiss the complaint." *Salahuddin*, 861 F.2d at 42. A plaintiff should generally be given leave to amend following a Rule 8 dismissal, but dismissal without leave to amend is proper where prior leave to amend was generously extended and the successive pleading remains prolix and unintelligible. *Strunk v. U.S. House of Representatives*, 68 F. App'x 233, 235 (2d Cir. 2003) (citation omitted); *see also* *Jones v. Nat'l Commc'ns & Surveillance Networks*, 266 F. App'x 31, 33 (2d Cir. 2008) (affirming dismissal of pro se complaint with prejudice for failure to comply with Rule 8); *Benzo v. N.Y.S. Div. of Hum. Rts.*, 141 F.3d 1151 (2d Cir. 1998) (same).

### 2. Federal Rule of Civil Procedure 12(b)(5)

Rule 12(b)(5) provides for dismissal of a complaint for insufficient service of process. *Hahn v. Office & Prof'l*

*Emps. Int'l Union, AFL–CIO*, 107 F. Supp. 3d 379, 382 (S.D.N.Y. 2015). In considering a Rule 12(b)(5) motion to dismiss, a court must look to matters outside the complaint to determine whether it has jurisdiction. *Cassano v. Altshuler*, 186 F. Supp. 3d 318, 320 (S.D.N.Y. 2016) (citation omitted). It is the plaintiff's burden to establish that service was sufficient. *Khan v. Khan*, 360 Fed. Appx. 202, 203 (2d Cir. 2010) (citations omitted). However, "where a court has not conducted a full-blown evidentiary hearing on the motion, the plaintiff need make only a prima facie showing of jurisdiction through its own affidavits and supporting materials." *Di Pompo v. Mendelson*, 2022 WL 1093560, at *2 (S.D.N.Y. Apr. 7, 2022) (citations omitted). To make a prima facie showing, "the plaintiff must aver facts that, if credited ..., would suffice to establish jurisdiction over the defendant." *Id.* (citation omitted).

### 3. Federal Rule of Civil Procedure 12(b)(6)

When deciding a motion to dismiss pursuant to Rule 12(b)(6), a court must accept as true all well-pleaded facts and draw all reasonable inferences in the light most favorable to the non-moving party. *See Kassner v. 2nd Ave. Delicatessen, Inc.*, 496 F.3d 229, 237 (2d Cir. 2007). Although factual allegations are afforded a presumption of truth, a court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). To survive a Rule 12(b)(6) motion to dismiss, the complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 555 U.S. at 570). The complaint must set forth factual allegations that are sufficient "to raise a right to relief above the speculative level." *Twombly*, 555 U.S. at 555.

These same standards apply to motions to dismiss complaints filed by pro se plaintiffs. *Jenkins v. N.Y.C. Dep't of Educ.*, 2011 WL 5451711, at *3 (S.D.N.Y. Nov. 9, 2011). However, the court must construe a pro se plaintiff's complaint liberally and interpret it as raising the strongest arguments it suggests. *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (citation omitted).

**\*9** "A district court may dismiss an action sua sponte for failure to state a claim so long as the plaintiff is given notice of the grounds for dismissal and an opportunity to be heard." *Grant v. County of Erie*, 542 F. App'x 21, 24 (2d Cir. 2013) (citation omitted); *see also Komatsu v. NTT Data, Inc.*, 2016 WL 2889064, at *5 (S.D.N.Y. May 17, 2016) (Schofield, J.), *aff'd*, 730 F. App'x 98 (2d Cir. 2018) (sua sponte dismissing certain of pro se plaintiff's claims). A Magistrate Judge's Report and Recommendation recommending that a claim be dismissed constitutes the requisite notice and opportunity to be heard to allow a district court to dismiss a claim sua sponte. *E.A. Sween Co., Inc. v. A & M Deli Express Inc.*, 787 F. App'x 780, 782 (2d Cir. 2019).

### ANALYSIS

**1. The SAC Should Be Dismissed for Failure to Comply with Rule 8**

The SAC is the textbook definition of a pleading that should be dismissed for failure to comply with Rule 8. To start, the SAC is not "short." The SAC and its exhibits total 395 pages, which is so long that Plaintiff alleges she needed to file the pleading in three parts because the Court's filing system could not handle its size. (*See* ECF No. 178.) Although the SAC names numerous defendants and covers an eight-year time period, this case is not so complex or involved to justify such a lengthy complaint. To the contrary, Plaintiff's claims mostly involve allegations of workplace harassment and retaliation, and many of the named Defendants played only minor and discrete roles in the alleged wrongdoing. However, the SAC is not focused on the alleged wrongdoing. Rather, it includes many paragraphs concerning OT generally, the inner workings of the DOE, and Plaintiff's opinions about her students and colleagues. For example, the SAC spends numerous pages discussing Plaintiff's thoughts as to the proper and improper ways to screen for and diagnose dysgraphia. (*See, e.g.*, SAC ¶¶ 879-972.) As another example, the SAC sets out the purported clinical significance of a second grader's artwork and misspelling of a word. (*Id.* ¶¶ 172-77.) Plaintiff also has reproduced pages upon pages of lengthy emails and letters she has sent and received. (*See, e.g.*, *id.* ¶¶ 306-08, 497-502, 513-539, 573-624, 633-46, 659-76, 695-747, 1670.)

Plaintiff counters that the SAC needs to be long in order to respond to "accusations" made by Defense counsel. (Pl. Opp. Br. 26.) However, as the Court already informed Plaintiff when granting her leave to amend, a complaint is not the

proper document to respond to anticipated legal arguments. *See Shetiwy v. Midland Credit Mgmt.*, 980 F. Supp. 2d 461, 467 (S.D.N.Y. 2013) (explaining that "argumentative" complaints are "routinely dismissed" for failure to comply with Rule 8.) Plaintiff also argues that the Court gave her permission to file the complaint in a "nonconforming format." (Pl. Opp. Br. 26) This is not accurate. Although the Court ultimately accepted the filing at ECF No. 177 as the operative SAC despite its size and format, the Court never granted Plaintiff "permission" to violate Rule 8, and in fact, the Court warned Plaintiff that her complaint must comply with the rule.

It is well within the Court's discretion to dismiss the pleading pursuant to Rule 8 for its length alone. *See, e.g. Blakely v. Wells*, 209 Fed. App'x. 18, 20 (2d Cir. 2006) (affirming district court's dismissal of a 57-page complaint for prolixity); *Nygard v. Bacon*, 2021 WL 3721347, at *7 (S.D.N.Y. Aug. 20, 2021) (Schofield, J.) (dismissing "lengthy" 144-page complaint pursuant to Rule 8). Indeed, such a long complaint must be dismissed to avoid placing an "unjustified burden" on Defendants by requiring them to respond to it. *Salahuddin*, 861 F.2d at 42.

 **\*10** In addition to being prolix, the SAC is not "plain." The SAC does not contain simple, concise, and direct allegations, and it does not follow a coherent narrative. Rather, the SAC is rambling and repetitive, jumping back and forth in time and moving from claim to claim in a disjointed fashion. It also contains numerous hyperbolic accusations that have no apparent bearing on Plaintiff's actual claims. For example, the SAC asserts that it would constitute disability discrimination to deny employment to someone for having two left feet without ever alleging that Plaintiff has two left feet or was discriminated against on that basis. (*Id.* ¶¶ 459-61.) The SAC also consistently uses words such as "trauma" and "abuse" to describe things such as receiving denials to her FOIL requests because she disagrees with the outcome. (*See, e.g.*, *id.* ¶¶ 1581, 1675).

Complaints such as this one that "ramble, ... needlessly speculate, accuse and condemn," and that "contain circuitous diatribes far removed from the heart of the claim[s]," do not comport with Rule 8 and "must be dismissed." *Coon v. Benson*, 2010 WL 769226, at *3 (S.D.N.Y. March 8, 2010) (quotation marks and citation omitted); *see also Prezzi*, 469 F.2d at 692 (affirming dismissal of pro se complaint that contained "unrelated and vituperative charges that defied

comprehension"); *Shetiwy*, 980 F. Supp. 2d at 467 n.8 (collecting cases that have dismissed complaints that were "unintelligible" and "disjointed").

The SAC is simply too long and confusing to put Defendants on notice of the claims against them, and it is not clear how Defendants could properly answer such a pleading. *See, Nygard*, 2021 WL 3721347, at *7 (finding complaint was too "lengthy, conclusory, and confusing to put Defendant on notice of the claims against him"). Therefore, I respectfully recommend that the SAC be dismissed in its entirety for failure to comply with Rule 8.

As discussed below, in the event the SAC is not dismissed in its entirety for failure to comply with Rule 8, most claims should be dismissed with prejudice pursuant to Rule 12(b)(6).

### 2. The Complaint Should Not Be Dismissed Pursuant to Rule 12(b)(5)

Before turning to Defendants' Rule 12(b)(6) arguments, I first address Defendants' jurisdictional argument that the Individual Defendants were not properly served and the Court thus lacks jurisdiction over them. Defendants argue that New York law requires that service be effectuated "by any person not a party to the litigation," but the SAC does not allege that someone other than Plaintiff effectuated service. (Def. Br. 7.) This argument is unavailing because the Proofs of Service filed on the docket state that individuals named Ben Gonzalez and Daniel Glatt (i.e. individuals other than Plaintiff) served the Individual Defendants on June 4, 2021. Defendants do not contest that it would be sufficient under New York law for Plaintiff to have served the Individual Defendants in the manner described in the Proofs of Service, nor have Defendants submitted affidavits or other evidence to rebut the assertions made in the Proofs of Service. Plaintiff has therefore made a prima facie showing that service was proper, which is sufficient at this stage. *Di Pompo*, 2022 WL 1093500, at *2.

Therefore, while I recommend that the SAC be dismissed for several reasons, improper service is not one of them.

### 3. Numerous Claims Should Be Dismissed Pursuant to Rule 12(b)(6)

In the event the SAC is not dismissed with prejudice for failure to comply with Rule 8, I recommend that certain claims and Defendants be dismissed with prejudice pursuant to Rule 12(b)(6), as outlined below.

### a. Defendant SCI is a Non-Suable Entity and Should be Dismissed

Under Section 396 of the New York City Charter, "New York City departments, as distinct from the City itself, lack the capacity to be sued." *Ximines v. George Wingate High Sch.*, 516 F.3d 156, 160 (2d Cir. 2008) (citation omitted). Because SCI is "a City agency that is independent of the DOE" it and its employees "lack capacity to be sued." *Smith v. City of New York*, 130 F. Supp. 3d 819, 827-28 (S.D.N.Y. 2015), *aff'd*, 664 F. App'x 45 (2d Cir. 2016) (citing *Ximines*, 516 F.3d at 160). Thus, the Court should dismiss claims against SCI and against SCI Commissioner Coleman and Deputy Commissioner Schlachet, to the extent claims are brought against them in their official capacities.

### b. Plaintiff Failed to State a Claim Pursuant to Title VII

**\*11** Title VII of the Civil Rights Act prohibits employment discrimination against an employee based on the person's "race, color, religion, sex, or national origin." 42 U.S.C.A. § 2000e-2. The protections of Title VII extend only to discrimination based on these five characteristics. The SAC contains no allegations that Plaintiff was discriminated or retaliated against based on her race, color, religion, sex, or national origin, nor because of her association with, or advocacy on behalf of, any person due to that person's race, color, religion, sex, or national origin. None of these categories is discussed in the SAC at all. Rather, Plaintiff's claims for retaliation turn on her advocacy on behalf of students with disabilities. Accordingly, Plaintiff has failed to state a claim pursuant to Title VII. *See Chiesa v. N.Y.S. Dep't of Lab.*, 638 F. Supp. 2d 316, 324 (N.D.N.Y. 2009) (dismissing claims brought pursuant to Title VII for failure to state a claim where the record in the case pertained only to disability).

Although Defendants did not argue that Plaintiff failed to state a Title VII claim, the court may dismiss the claim sua sponte because Plaintiff has been given notice of the ground

for dismissal by way of this Report, and she will have an opportunity to be heard on the issue in her objections to the Report. *See E.A. Sween Co., Inc.*, 787 F. App'x at 782.

Additionally, Plaintiff does not allege that she filed a charge with the EEOC claiming violations of Title VII. A failure to file a charge with the EEOC precludes her from filing a Title VII claim in this Court. *Fowlkes v. Ironworkers Local 40*, 790 F.3d 378, 384 (2d Cir. 2015). Although the burden of proving Title VII exhaustion lies with defendants, *Hardaway v. Hartford Pub. Works Dep't*, 879 F.3d 486, 491 (2d Cir. 2018), non-exhaustion in this instance is clear from the EEOC charge itself, *Holmes v. Fresh Direct*, 2015 WL 4885216, at \*4 (E.D.N.Y. Aug. 5, 2015) (explaining that courts can take judicial notice of "public records and reports of relevant administrative bodies" to determine whether a Title VII claim should be dismissed for lack of exhaustion). Accordingly, any Title VII claims should be dismissed with prejudice.

### c. Plaintiff's ADA and Rehabilitation Act Claims Should by Dismissed Against the Individual Defendants and as to Untimely Allegations

The SAC asserts claims of retaliation pursuant to Titles II and V of the ADA and Section 504 of the Rehabilitation Act. Title II of the ADA and Section 504 of the Rehabilitation Act prohibit discrimination based on disability. 42 U.S.C. § 12132 (ADA); 29 U.S.C. § 794(a) (Rehabilitation Act). Both statutes provide that remedies are available "to any person" alleging such discrimination. 42 U.S.C. § 12133 (ADA); 29 U.S.C. § 794a(a)(2) (Rehabilitation Act). Both statutes also prohibit retaliation against an individual for opposing any act or practice made unlawful by the Act. 42 U.S.C. § 12203(a) (ADA Title V)[7]; 29 U.S.C. § 794(d) (Rehabilitation Act); *see also Dodd v. City Univ. of New York*, 489 F. Supp. 3d 219, 245, 267 (S.D.N.Y. 2020).

As noted above, the gravamen of Plaintiff's complaint is that she engaged in protected activity on behalf of students with disabilities by informing parents of services available to students via the 2018 Letter and by filing NYSED complaints in 2014 and 2019 that raised concerns as to violations regarding the provision of special education services to students and that she was retaliated against because

of this activity. Courts in this Circuit have consistently recognized that advocacy on behalf of special education students constitutes protected activity under the ADA and the Rehabilitation Act. *Lopez v. N.Y.C. Dep't of Educ.*, 2020 WL 4340947, at *11 (S.D.N.Y. July 28, 2020) (collecting cases). Plaintiff alleges that her engagement in this protected activity resulted in Defendants retaliating against her by creating a hostile work environment such as by micromanaging her; terminating her work as an occupational therapist in 2018; preventing her from obtaining work by including problematic codes about her in the computer system used to locate and engage therapists; and filing complaints against her to SCI and OSI; denying her whistleblower protection; and providing inadequate responses to her FOIL requests. [8]

### i. Plaintiff has Standing to Bring Claims Regarding Injuries She Suffered as a Result of Defendants' Retaliation, But Lacks Standing to Assert Claims for Injuries to her Students

**\*12** Article III of the Constitution limits the jurisdiction of the federal courts to the resolution of "cases" and "controversies." *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011). To ensure that Article III is satisfied, a plaintiff must show that she has "standing" to bring suit, that is, that she has directly suffered an injury in fact that is traceable to the defendant and that can be redressed by the court. *Id.* A plaintiff must "demonstrate standing for each claim and form of relief sought." *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011) (citation omitted). Plaintiffs also must comply with prudential limitations on standing, including the rule that a party cannot assert claims "on the legal rights or interests of third parties," but rather "must assert his own legal rights and interests." *Warth v. Seldin*, 422 U.S. 490, 499 (1975).

Defendants argue Plaintiff lacks standing to assert ADA and Rehabilitation Act retaliation claims because she was an independent contractor and not an employee. (Def. Opp. Br. 16.) Defendants are incorrect. The relevant retaliation provisions of the ADA and Rehabilitation Act apply to "any person," and Plaintiff does not need to show that she is an employee to assert claims under those statutes based on alleged protected activity on behalf of disabled students. *Johnson v. S. Conn. State Univ.*, 2004 WL 2377225, at *6 (D. Conn. Sept. 30, 2004) (holding that dismissal of Rehabilitation Act claims would not be appropriate even

assuming the plaintiff was not an employee); *Volpe v. N.Y.C. Dep't of Educ.*, 195 F. Supp. 3d 582, 593 (S.D.N.Y. 2016) (explaining that even though the discrimination occurred in the context of the plaintiff's employment, the ADA Title V retaliation claim was not "one for discrimination in employment" where the plaintiff opposed practices that constituted a violation of Title II of the ADA). Further, and in any event, it is premature at this stage to determine whether Plaintiff was an employee or independent contractor because that determination is fact intensive and turns in large part on the degree of control exercised over her work by the DOE. *See Johnson*, 2004 WL 2377225 at *5.

Defendants also argue that Plaintiff lacks standing to assert claims for retaliation based on her advocacy on behalf of students, because they argue such claims rest on "the legal rights or interests of third parties," i.e. Plaintiff's students. (Def. Br. 17.) This argument is unpersuasive. A plaintiff does not need third-party standing to assert such claims. Because Title II of the ADA and Section 504 of the Rehabilitation Act apply to "any person," the Second Circuit has recognized associational standing for both statutes. *Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 47 (2d Cir. 1997), *recognized as superseded on other grounds by Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 171 n.7 (2d Cir. 2001) (discussing Title II of the ADA); *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 279 (2d Cir. 2009) (Wesley, J., concurring and delivering opinion of the court as to associational standing under Section 504) (discussing Section 504 of the Rehabilitation Act); *see also Doe v. Westport Bd. of Educ.*, 2020 WL 6382639, at *3 (D. Conn. Oct. 30, 2020) (discussing both statutes). Plaintiff thus has standing to assert a claim for any injury she faced based on her engagement in protected activity.

However, to the extent the SAC can be read to assert claims based on injuries suffered by Plaintiff's *students* as opposed to injuries Plaintiff herself suffered, Defendants are correct that Plaintiff lacks standing to bring such claims. This is because a plaintiff "not seeking to remedy any harm to herself" lacks standing. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2206 (2021); *see also Loeffler*, 582 F.3d at 279 (Wesley, J., concurring) (non-disabled parties bringing associational discrimination claims must prove that they suffered an independent injury); *Worrell v. Cortines*, 1995 WL 1079717, at *7 (E.D.N.Y. Mar. 26, 1995) (teacher lacked standing to sue for alleged wrongs inflicted on her students

despite the teacher experiencing "indirect effects" of such injuries). Accordingly, any claims based on injuries to people other than Plaintiff should be dismissed for lack of standing.

**\*13** Defendants also argue that Plaintiff's ADA claims should be dismissed for failure to exhaust administrative remedies because the SAC does not state "with specificity" that Plaintiff brought these claims before the EEOC in advance of bringing this action. (Def. Br. 11-12.) This argument is unpersuasive because Plaintiff's claims under Title II and V of the ADA and her claims under the Rehabilitation Act are not subject to any exhaustion requirement. *See* *Volpe, 195 F. Supp. 3d at 593* (no exhaustion requirement for ADA Title II claims or ADA Title V claims based on opposition to behavior implicated by Title II); *Redman v. N.Y.S. Dep't of Corr. Servs., 2011 WL 5119574, at \*4 (S.D.N.Y. Oct. 12, 2011)* (no exhaustion requirement for Rehabilitation Act claims).

### ii. Plaintiff's ADA and Rehabilitation Act Claims Can Be Brought Only Against the BOE, and Only to the Extent they are not Time-Barred

Although Plaintiff has standing to assert claims of retaliation, her claims should be circumscribed in two significant ways. First, the relevant statutes do not provide for suits against individuals (as opposed to entities). *Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn, 280 F.3d 98, 107 (2d Cir. 2001); see also Goe v. Zucker, 43 F.4th 19, 35 (2d Cir. 2022)* (affirming dismissal of Rehabilitation Act claims against school district officials in their individual capacities; *Darcy v. Lippman, 356 Fed. Appx. 434, 437 (2d Cir. 2009)* (holding that the plaintiff could not maintain ADA or Rehabilitation Act claims against defendants in their individual capacities). Plaintiff argues that she can bring claims against individual defendants because her claims are not "in the employment context." (Pl. Opp. Br. 10). This argument is unavailing because the rule that there is no individual liability under the ADA or the Rehabilitation Act extends beyond the employment context. *See, e.g., Goe, 43 F.4th 35* (dismissing claims brought by students); *Garcia, 280 F.3d at 107* (same). Therefore, the ADA and Rehabilitation Act claims should be dismissed with prejudice as to the Individual Defendants to the extent the claims are brought against them in their individual capacities.

Moreover, to the extent Plaintiff asserts these claims against the Individual Defendants in their official capacities, such claims should be dismissed because they are duplicative of the claims against the BOE, which is the "real party in interest." *A.M. ex rel. J.M. v. NYC Dep't of Educ., 840 F. Supp. 2d 660, 678 (E.D.N.Y. 2012), aff'd sub nom. Moody ex rel. J.M. v. NYC Dep't of Educ., 513 F. App'x 95 (2d Cir. 2013)* (dismissing ADA and Rehabilitation Act claims brought against the school chancellor, district superintendent, and principal in their official capacities, because such claims were "merely duplicative of the claims against the DOE"); *see also Hallett v. N.Y.S. Dep't of Corr. Servs., 109 F. Supp. 2d 190, 200 (S.D.N.Y. 2000)* (dismissing Rehabilitation Act claims against individual defendants in their official capacities because the plaintiff was able to assert those claims against the state entities); *Henrietta D. v. Bloomberg, 331 F.3d 261, 288 (2d Cir. 2003)* ("The real party in interest in an official-capacity suit is the government entity."). Therefore, the ADA and Rehabilitation Act claims should be dismissed with prejudice as to the Individual Defendants in their official capacities as well.

Second, Plaintiff's ADA and Rehabilitation Act claims may only be asserted to the extent they are timely. In New York, claims brought pursuant to Title II and V of the ADA, as well as Rehabilitation Act claims, are subject to a three-year statute of limitations. *See* *Volpe, 195 F. Supp. 3d at 593 (ADA); Harris v. N.Y.C. Hum. Res. Admin., 2022 WL 3100663, at \*5 n.7 (S.D.N.Y. Aug. 4, 2022)* (Rehabilitation Act). Since Plaintiff filed her initial complaint on December 3, 2020, any ADA or Rehabilitation Act claims for retaliatory actions that occurred before December 3, 2017 are untimely. Thus, Plaintiff may only sue for retaliation occurring on or after December 3, 2017 absent an exception.

**\*14** Plaintiff asserts that several exceptions apply that would allow her to assert claims for retaliation occurring before December 3, 2017, but none of her arguments is availing. (*See* Pl. Opp. Br. 9.) To start, the continuing violations doctrine, which applies to "a series of separate acts, some of which occur within the applicable statute of limitations, that collectively constitute one unlawful act," does not apply here. *Am. Council of Blind of N.Y., Inc. v. City of New York, 495 F. Supp. 3d 211, 245-46 (S.D.N.Y. 2020)* (citations omitted). The principle retaliatory action that took place prior to December 3, 2017 was the problem coding in 2014. This is a discrete act that is tied to 2014 protected activity and is

distinct from any conduct that took place three or more years later at a different school at the hands of different individuals.

Tolling also would not apply by virtue of the filing of the EEOC charge, because, as discussed above, the claims of retaliation in violation of the ADA and Rehabilitation Act do not require exhaustion. *See* Volpe, 195 F. Supp. 3d at 593; *Redman*, 2011 WL 5119574, at *4. Similarly, while Plaintiff alleges that the EEOC delayed in issuing a Right to Sue letter, any delay by the EEOC would not warrant equitable tolling of Plaintiff's ADA and Rehabilitation Act claims. Equitable tolling applies where a party was "prevented in some extraordinary way" from exercising her rights. *Iavorski v. U.S. I.N.S.*, 232 F.3d 124, 129 (2d Cir. 2000) (citation omitted). Any delay by the EEOC in issuing a Right to Sue letter did not prevent Plaintiff from commencing this action because Plaintiff did not need a Right to Sue letter to assert her ADA and Rehabilitation Act claims. *See Lee v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 1994 WL 260713, at *2 (S.D.N.Y. June 9, 1994) (holding that the EEOC's year-long delay in providing the Right to Sue letter did not warrant equitable tolling of the limitations period for claims that were "unrelated to any activity (or lack of activity) of the EEOC"). While Plaintiff may have mistakenly believed that she needed to wait for the Right to Sue letter before commencing litigation, her lack of knowledge of the law also does not warrant equitable tolling. *O'Connor v. Pan Am*, 1990 WL 118286, at *5 (S.D.N.Y. May 4, 1990) (citation omitted).

Plaintiff also argues equitable tolling applies because Defendants stonewalled her attempts to learn more information about the adverse actions taken against her, but any such stonewalling would not warrant equitable tolling because a Plaintiff does not need to learn her employer's reasons for taking adverse actions in order to initiate litigation against the employer. *DD v. Lincoln Hall*, 2010 WL 695027, at *7 (S.D.N.Y. Feb. 19, 2010) (defendants' "stonewalling" in pre-litigation discovery did not warrant equitable tolling because the defendants' refusal to provide documents did not prevent plaintiffs from filing a lawsuit).

The untimely claims similarly cannot be rescued by "COVID Time Tolling," (Pl. Opp. Br. 25), because any delays caused by the COVID-19 pandemic, which began in 2020, would not explain Plaintiff's delay in bringing an action for claims accruing prior to the start of the pandemic. Moreover, the Executive Orders signed by the New York Governor in 2020

that tolled deadlines to commence certain state actions had no effect on the statutes of limitations to commence a federal action for federal claims and thus are not relevant here. *Verne v. N.Y.C. Dep't of Educ.*, 2022 WL 4626533, at *6 (S.D.N.Y. Sept. 30, 2022) (citations omitted).

Accordingly, to the extent Plaintiff seeks to assert ADA or Rehabilitation Act claims for any incident occurring prior to December 3, 2017, such claims are untimely and should be dismissed with prejudice.

### d. Plaintiff's FLSA Claims Are Time-Barred

**\*15** The SAC alleges that Defendants violated the FLSA by misclassifying Plaintiff as an independent contractor rather than an employee, and therefore depriving Plaintiff of a regular salary, pay for certain tasks, and benefits such as paid sick time and vacation time. (SAC ¶¶ 50-52.) The SAC also asserts that Plaintiff performed uncompensated tasks and was obstructed from viewing logs showing how much time she spent on uncompensated tasks. (*Id.* ¶¶ 53-55.)

The limitations period for FLSA claims is two years or, if the violation was willful, three years. 29 U.S.C. § 255(a); *Nakahata v. New York-Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192, 199 n. 4 (2d Cir. 2013). A violation of the FLSA is willful if the employer "knew or showed reckless disregard for the matter of whether its conduct was prohibited by" the Act. *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 366 (2d Cir. 2011) (citations omitted). The complaint must allege facts that give rise to a plausible inference that a defendant willfully violated the FLSA for the three-year exception to apply. *Whiteside v. Hover-Davis, Inc.*, 995 F.3d 315, 319-20 (2d Cir. 2021) (affirming dismissal of claims occurring outside the two-year limitations period where the complaint made only conclusory allegations that the FLSA violations were willful).

The SAC does not assert willful FLSA violations because the SAC does not plausibly assert that Defendants knew or should have known that it was impermissible for them to classify Independent Providers as independent contractors. Thus, Plaintiff's FLSA claims are subject to a two-year limitations period, and only claims accruing after December 3, 2018 fall within the limitations period. [9] *See Whiteside*, 995 F.3d at 319-20. Because Plaintiff had already been terminated by that

date, the SAC does not assert any FLSA violations occurring within the limitations period. *See Preacely v. AAA Typing & Resume, Inc.*, 2015 WL 1266852, at *6 (S.D.N.Y. Mar. 18, 2015) (dismissing FLSA claims as time-barred where plaintiff's employment had been terminated more than two years prior to the filing of the action).

Notably, "the statute of limitations is ordinarily an affirmative defense that the defendant must raise at the pleadings stage," *Walters v. Indus. & Com. Bank of China, Ltd.*, 651 F.3d 280, 293 (2d Cir. 2011), and Defendants did not raise this defense in its motion to dismiss papers. However, "district courts may dismiss an action sua sponte on limitations grounds in certain circumstances," including where "the facts supporting the statute of limitations defense are set forth in the papers plaintiff himself submitted." *Id.* (citing *Leonhard v. United States*, 633 F.2d 599, 609 n. 11 (2d Cir.1980)); *see also Gorokhovsky v. Stefantsova*, 2022 WL 17487019, at *3 (S.D.N.Y. Dec. 7, 2022) (dismissing claims sua sponte on statute of limitations grounds). Here, the facts supporting the limitations defense are set forth in the SAC, which alleges that Plaintiff was terminated in June 2018 and was not able to work for the DOE after that date. Plaintiff will have the opportunity to submit objections to this Report, and thus she will have an opportunity to be heard on this issue before any claims are dismissed. *See E.A. Sween Co., Inc.*, 787 F. App'x at 782 (magistrate judge's report recommending dismissal gave the plaintiff notice that the court was considering dismissal and provided plaintiff "an opportunity to be heard on the issue"). Thus, the FLSA claims should be dismissed as time barred.

**\*16** Additionally, liability under the FLSA is limited to "employer[s]." *Fernandez v. HR Parking Inc.*, 407 F. Supp. 3d 445, 450 (S.D.N.Y. 2019) (citing 29 U.S.C. § 216(b), (e)(2)). While the SAC alleges that the BOE was Plaintiff's "employer," it does not plausibly allege that the Individual Defendants—most of whom worked in DOE departments completely unrelated from Plaintiff's work—were Plaintiff's employers for purposes of the FLSA. *See Park v. Sancia Healthcare Inc.*, 2020 WL 3440096, at *4 (S.D.N.Y. June 23, 2020) (deeming allegations insufficient for FLSA liability where the complaint did not indicate that the individual defendants were the plaintiff's employers for FLSA purposes); *Maldonado Juarez v. Butterfield Catering Inc.*, 2020 WL 6945944 (S.D.N.Y. Nov. 25, 2020) (deeming insufficient the "threadbare" allegations that the individual defendants were plaintiff's employers for FLSA purposes).

This is an additional reason to dismiss the FLSA claims against the Individual Defendants.

### e. State and Municipal Law Claims Should Be Dismissed Against the BOE and its Officers for Failure to Provide a Notice of Claims

Plaintiff asserts several causes of action under state and municipal law against all Defendants. Specifically, the SAC alleges violations of the NYSHRL, the NYCHRL, N.Y.C. Administrative Code § 8-101 et seq; the NYLL §§ 740, 741, 215, and 650; and CSL § 75-b, as well as claims for defamation and fraud.

Section 3813(1) of the New York Education Law requires a plaintiff bringing any claim against a school district, board of education, or any officer thereof to present a written notice of the claim to the governing body of the school board within three months of the accrual of the claim. N.Y. Educ. Law § 3813(1). [10] This notice requirement applies to all state and municipal claims, including "to causes of action sounding in discrimination, retaliation, and defamation." *Smith v. N.Y.C. Dep't of Educ.*, 808 F. Supp. 2d 569, 578 (S.D.N.Y. 2011) (collecting cases); *see also United States*, 2017 WL 435940, at *6 (notice of claim requirement applies to "claims against school districts and their officers under the NYSHRL and NYCHRL"). [11] Under Section 3813(1), the presentment of a written claim to the governing body of a school board within three months of the accrual of a claim is a condition precedent to commencement of any action under New York law against that school board or any officer thereof. *Id.* The notice must state "the nature of the claim" and "the time when, the place where and the manner in which the claim arose." *Rettino v. N.Y.C. Dep't of Educ.*, 2020 WL 4735299, at *5 (S.D.N.Y. Aug. 14, 2020). The notice must be "presented to the governing body of said district or school within three months after the accrual of such claim." *Id.* (citing N.Y. Educ. Law § 3813). The requirement does not include federal claims. *Courtemanche v. Enlarged City Sch. Dist. of City of Middletown, N.Y.*, 686 F. Supp. 1025, 1032 (S.D.N.Y. 1988).

Section 3813(1) also does not require that a notice of claim be filed on employees of school districts or boards who are not officers thereof. *Spencer v. City of New York*, 2007 WL 1573871 at *3 (S.D.N.Y. May 30, 2007). The Law not only

requires that the notice of claims be provided, but also that it appear from the face of the complaint that the plaintiff filed a timely notice of claim. *Id.*; 🚩 *Santiago v. Newburgh Enlarged City Sch. Dist.*, 434 F. Supp. 2d 193, 196 (S.D.N.Y. 2006).

**\*17** "An EEOC charge can suffice as a substitute for a notice of claim 'only under the rare and limited circumstance where the EEOC charge puts the school district on notice of the precise claims alleged, is served on the governing board of the district (and not a different arm of the district), and is served within the statutory time period.' " *Rettino*, 2020 WL 4735299, at \*5 (citation omitted).

Here, the SAC does not allege that Plaintiff filed a timely notice of claims. To the contrary, the SAC dismisses the notice requirement as a "scam." (SAC ¶ 98.) The SAC asserts that Plaintiff's EEOC charge fulfilled any notice requirement, (*id.* ¶ 92), but the SAC does not allege that the EEOC charge was sufficient to put the school district on notice of the precise claims alleged. Indeed, none of Plaintiff's state or municipal law causes of action were raised in the EEOC charge, (ECF No. 188-1), and the EEOC charge was thus insufficient to put Defendants on notice of the precise state and municipal claims alleged in the SAC. *See Grenzig v. Sachem Sch. Dist.*, 2014 WL 11191093, at \*3 (E.D.N.Y. Feb. 11, 2014) (finding plaintiff's EEOC charge, which asserted only NYSHRL and NYCHRL claims, did not provide notice as to plaintiff's other claims and could not act as a substitute to the notice of claims as to those claims).

Even if Plaintiff's EEOC charge was sufficient to constitute a notice of claims, it would not constitute a timely notice of claims. The notice must be "presented to the governing body of said district or school within three months after the accrual of such claim." 🚩 N.Y. Educ. Law § 3813(1). It is not sufficient for a litigant to "serve[ ] a notice of claim at some point before filing a lawsuit.... Rather, the test is whether she did so within ninety days of the date when a particular claim accrued." *Williams v. N.Y.C. Dep't of Educ.*, 2019 WL 4393546, at \*18 (S.D.N.Y. Aug. 28, 2019). The SAC asserts that Plaintiff served the BOE with the EEOC charge on or about April 2020. (SAC ¶ 121.) Therefore, if Plaintiff's EEOC charge constituted a substitute for a notice of claims, it would only provide notice for claims accruing in the three months preceding April 2020. In other words, assuming Plaintiff served the BOE on April 1, 2020, the EEOC charge would only constitute notice as to claims accruing on or after January 2, 2020. There are no allegations in the SAC that

could give rise to state or municipal claims accruing on or after January 2, 2020. [12] Therefore, even if the EEOC filing constituted a notice of claims, the notice would be untimely because the charge was filed more than three months after Plaintiff's claims accrued.

**\*18** Because Plaintiff did not present a timely notice of claims as required by state law, Defendants' motion to dismiss Plaintiff's state and municipal claims should be granted as to the BOE and any officers thereof.

The Court must determine which of the Individual Defendants constitute "officers" of a school district or board such that a notice of claims was required as to them. The term "school officer" is defined in the New York Education Law as:

> [A] clerk, collector, or treasurer of any school district; a trustee; a member of a board of education or other body in control of the schools by whatever name known in a ... city school district; a superintendent of schools; a district superintendent; a supervisor of attendance or attendance officer; or other elective or appointive officer in a school district whose duties generally relate to the administration of affairs connected with the public school system."

🚩 N.Y. Educ. Law § 2(13).

Under this definition, Defendants Lantzounis (district-wide OT Supervisor), Lees (OSI Director), Rodi (Director at DOE's Office of Employee Relations), Epstein (Director at DOE's ORS), and Van Biema (Director at DOE's ORS) are clearly "school officers" subject to the notice of claims requirement. *See* 🚩 *Bertuzzi v. Copiague Union Free Sch. Dist.*, 2020 WL 5899949, at \*21 (E.D.N.Y. Mar. 9, 2020), *report and recommendation adopted as modified*, 2020 WL 3989493 (E.D.N.Y. July 15, 2020) (district Foreign Language Coordinator was a "school officer" subject to the notice of claims requirement); *Avgerinos v. Palmyra-Macedon Cent. Sch. Dist.*, 690 F. Supp. 2d 115, 127 (W.D.N.Y. 2010) (Director of Human Resources for the district is "school officer" subject to the notice of claims requirement); *Carlson*

*v. Geneva City Sch. Dist.*, 679 F. Supp. 2d 355 (W.D.N.Y. 2010) (Sexual Harassment Complaint Officer was "school officer" subject to the notice of claims requirement because he held a district-wide position). Accordingly, Plaintiff's state and municipal claims should be dismissed with prejudice against the BOE and Defendants Epstein, Van Biema, Rodi, Lantzounis, and Lees for failure to provide a timely notice of claims.

By contrast, Defendants Witzke (school principal) and Cullen (teacher) are not "school officers" and no notice of claims was required for them. *See*, *Carlson*, 679 F. Supp. 2d at 367 (school principal is not a "school officer.") As to Defendants Smith, Baranello, and Busetti (all within DOE's OGC), and Defendants Coleman and Schlachet (SCI Commissioner and Deputy Commissioner), it is not clear without further information regarding these positions whether they qualify as "school officers." Since the parties have not briefed the issue, the Court assumes without deciding that these individuals are not "school officers" and that no notice of claims was required for them. As to these defendants, Plaintiff's state and municipal claims should not be dismissed for failure to provide a timely notice because no such notice was required. *Id.* However, as discussed below, most of Plaintiff's state and municipal claims should be dismissed as to these defendants for other reasons.

### f. Plaintiff's NYSHRL and NYCHRL Claims Should be Limited to Claims Brought against Non-School Officers for their Actual Participation in Alleged Acts of Retaliation

**\*19** The SAC asserts NYSHRL and NYCHRL claims for retaliation and retaliatory hostile work environment based on the same allegations that form the basis of Plaintiff's ADA and Rehabilitation Act claims, discussed above. Like the ADA and Rehabilitation Act, the NYSHRL and NYCHRL prohibit retaliation against an individual for opposing practices that are forbidden by the statutes. *See* N.Y. Exec. § 296(7) (NYSHRL); N.Y.C. Admin. Code § 8-107(7) (NYCHRL). However, these statutes differ from their federal counterparts in certain ways, and the NYCHRL in particular is construed more broadly in favor of plaintiffs and should be considered separately from state and federal law. *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013). To state a claim for retaliation under either statute, the plaintiff must, at the very least, allege that as a result of

her engagement in protected activity, the defendant engaged in conduct that was reasonably likely to deter a person from engaging in the protected activity. *Id.* (stating the more liberal NYCHRL standard).

The NYSHRL and NYCHRL anti-retaliation provisions impose liability on "any person," not just employers. *Id.*; *see also Malena v. Victoria's Secret Direct, LLC*, 886 F. Supp. 2d 349, 366 (S.D.N.Y. 2012). Accordingly, individuals may be found directly liable under these provisions, but this is true only for acts of retaliation in which the individuals "actually participate[d]." *Malena*, 886 F. Supp. 2d at 366. In addition, individuals may be found liable under a theory of aider-and-abettor liability, but only to the extent that direct liability is first established as to the principal. *Davis-Bell v. Columbia Univ.*, 851 F. Supp. 2d 650, 687-88 (S.D.N.Y. 2012) (citations omitted).

Here, as discussed above, Plaintiff cannot maintain claims under the NYSHRL or NYCHRL against the BOE or its officers because Plaintiff did not file a timely notice of claims as required by state law. As to the non-school officers, Defendants Witzke, Cullen, Smith, Baranello, Busetti, Coleman, and Schlachet, Plaintiff can only maintain claims against these individuals to the extent they "actually participate[d]" in the alleged retaliatory conduct. *Malena*, 886 F. Supp 2d at 366. Plaintiff cannot maintain claims against them on an aider-and-abettor theory because, as discussed above, Plaintiff is not able to establish direct liability as to the principal actor—the BOE. *Davis–Bell*, 851 F. Supp. 2d at 688.

The SAC alleges that Defendants Cullen and Witzke actually participated in retaliation following the 2018 Letter incident because it alleges that Cullen told Plaintiff's supervisors about the 2018 Letter, and that Witzke filed a complaint against Plaintiff as a result. It also alleges Witzke created a hostile work environment during the 2017-2018 school year in retaliation for Plaintiff's past complaints. The SAC additionally alleges that Defendant Witzke actually participated in retaliation by filing a complaint against Plaintiff to SCI in retaliation for Plaintiff's 2019 NYSED Complaint, that Defendants Coleman, Schlachet and Smith retaliated by refusing to provide Plaintiff with whistleblower protection, and that Defendant Baranello obstructed Plaintiff from accessing information through the FOIL process. [13]

Accordingly, to the extent Plaintiff has asserted retaliation claims under the NYSHRL and NYCHRL, such claims should be limited to claims asserted against Defendants Witzke, Cullen, Coleman, Schlachet, Smith, and Baranello.

### g. Plaintiff's Defamation, CLS § 75-b, NYLL §§ 740 and 741, and FOIL-Related Claims are Time Barred as to All Defendants

**\*20** Several of Plaintiff's state law causes of action are limited by a one-year statute of limitations. Specifically, a one-year statute of limitations applies to claims under New York state law for defamation, including libel and slander, *see* N.Y. C.P.L.R. § 215, and for claims brought pursuant to CLS § 75-b, *see Donas v. City of New York*, 62 A.D.3d 504, 505 (1st Dep't. 2009). Claims brought pursuant to NYLL §§ 740 and 741 were subject to a one-year statute of limitations at the time the Complaint was filed. The statutes were amended on January 26, 2022 to, inter alia, increase the limitations period to two years, however the amendments do not state that they should be applied retroactively, and "retroactive operation of statutes is not favored by" New York courts. *Gold v. N.Y. Life Ins. Co.*, 730 F.3d 137, 144 (2d Cir. 2013) (citations omitted). Accordingly, the one-year limitations period applies to Plaintiff's NYLL §§ 740 and 741 claims as well. [14]

Plaintiff initiated this proceeding on December 3, 2020. (ECF No. 1.) Thus, any claims subject to a one-year statute of limitations must have accrued after December 3, 2019 to be timely. [15] Plaintiff has not alleged any facts that occurred after December 3, 2019 that would give rise to claims for defamation or retaliation. The SAC alleges Plaintiff received defamatory letters as late as September 23, 2019, but it does not allege that she received any defamatory letters after that date. The SAC asserts that Defendants used portions of "false" reports made against her in submissions to the EEOC in May, 2020. (SAC ¶ 231.) However, Defendants' EEOC submissions cannot form the basis of a defamation claim, because statements made to the EEOC are made "in the course of a ... quasi-judicial proceeding" and are "under the protection of absolute immunity." *Bernstein*, 593 F. Supp. 2d at 636; *see also Allen*, 2001 WL 286788, at \*6 (dismissing defamation claim based on submission to the

EEOC); *Hinds v. Magna Fabrics, Inc.*, 1997 WL 309378, at \*5 (S.D.N.Y. June 9, 1997) ("It is well settled in New York ... that statements made in quasi-judicial proceedings, including proceedings by agencies such as the EEOC, are protected by an absolute privilege.").

Thus, Plaintiff's claims for defamation, including libel and slander, as well as her claims pursuant to CLS § 75-b and NYLL §§ 740 and 741 should be dismissed against all Defendants as time-barred. [16]

As to Plaintiff's claims regarding the allegedly deficient responses to her FOIL requests, New York law provides a specific procedure for review of such claims: a person seeking review of a FOIL response must first file an appeal with the "head, chief executive, or governing body of" the entity or agency in possession of the documents, and "may then challenge the denial of the FOIL request on further appeal by commencing a proceeding under Article 78 of the New York Civil Practice Law and Rules." *Salahuddin v. N.Y.C. Dep't of Educ.*, 2016 WL 5477739, at \*3 (S.D.N.Y. Sept. 29, 2016) (citing N.Y. Pub. Off. Law. § 89(4)). All Article 78 proceeding must be commenced within four months after the determination to be reviewed becomes final and binding upon the petitioner. N.Y. C.P.L.R. § 217(1). Here, Plaintiff does not appear to have ever brought an Article 78 proceeding, but instead has improperly attempted to assert her FOIL claims for the first time in federal court. Because Plaintiff did not follow the necessary procedure, and because her time to do so has passed, claims challenging the FOIL responses should similarly be dismissed. *See Salahuddin*, 2016 WL 5477739, at \*3; *see also Hayes v. Perotta*, 751 F. Supp. 2d 597, 602 (S.D.N.Y. 2010).

### h. Plaintiff's NYLL Minimum Wage and NYLL § 215 Claims Fail as a Matter of Law

**\*21** Plaintiff purports to assert claims pursuant to NYLL § 651, which is the definition section of New York's Wage Law. NYLL § 652 provides for a minimum wage for employees in the State of New York and incorporates the definitions of Section 651. The Court construes the SAC as asserting a violation of Section 652. Plaintiff asserts that she was a DOE employee, and that DOE did not pay her the minimum wage. This claim fails because NYLL §

651 expressly excludes from the minimum wage law "those people employed 'by a federal, state or municipal government or political subdivision thereof.' " NYLL § 651(5)(n). It is well established that the DOE is a "political subdivision" of New York State. *See, e.g., Rollins v. N.Y.C. Dep't of Educ.*, 2008 WL 2736018, at *7 (S.D.N.Y. July 8, 2008). Accordingly, NYLL's minimum wage law (Section 652) does not apply to Plaintiff, and any claims for wage violations brought pursuant to the NYLL should be dismissed. *See, e.g., Tongring v. Bronx Cmty. Coll. of City Univ. of N.Y. Sys.*, 2014 WL 463616, at *4 (S.D.N.Y. Feb. 4, 2014) (holding that Bronx Community College is a "political subdivision" of the City of New York and thus is exempt from the NYLL's wage requirements, and dismissing plaintiff's claims for wage violations under the NYLL); *Wetzel v. Town of Orangetown*, 2009 WL 690114, at *5 (S.D.N.Y. Mar. 16, 2009) (dismissing plaintiff's claim brought pursuant to NYLL's minimum wage law because plaintiff was employed by the Town of Orangetown, which is a municipal government, and therefore she was not covered by the wage and overtime requirements of the NYLL).

Defendants argue that Plaintiff's claims pursuant to NYLL §§ 215, 740, and 741 should fail for the same reason. (Def. Br. 18.) However, these sections do not have exemptions for "political subdivisions" such as the DOE. *See* NYLL § 215(c), 740, 751; *Humphreys v. N.Y.C. Health & Hosps. Corp.*, 2018 WL 3849836, at *6 (S.D.N.Y. Aug. 10, 2018) (explaining that New York City Health and Hospitals Corporation, which is a "political subdivision" within the meaning of NYLL § 651, is not exempt from liability for claims of retaliation under NYLL § 215). That said, as discussed above, Plaintiff's NYLL §§ 740 and 741 claims are time barred.

As to Plaintiff's NYLL § 215 claims, these fail for a different reason: the SAC has failed to state any such claims. NYLL § 215 provides in pertinent part that employers shall not discriminate or retaliate against any employee because such employee made a complaint "that the employer has engaged in conduct that the employee, reasonably and in good faith, believes violates any provision of [the NYLL]" or violates an order of the Commissioner of Labor. NYLL § 215(1). To state a claim of retaliation under NYLL § 215, a complaint must allege that "while employed by the defendant," the plaintiff "made a complaint

about the employer's violation of [the NYLL] and, as a result, was terminated or otherwise ... discriminated against." *Copantitla v. Fiskardo Estiatorio Inc.*, 788 F. Supp. 2d 253, 302 (S.D.N.Y. 2011).

The SAC does not allege that Plaintiff made a complaint about a violation of the NYLL or an order of the Commissioner of Labor, nor that she was retaliated against for any such complaints. Rather, as discussed at length above, Plaintiff alleges she suffered retaliation based on her advocacy on behalf of special needs students. Such advocacy is not activity that is protected by NYLL § 215. Accordingly, Plaintiff's claims brought pursuant to NYLL § 215 should be dismissed. *HC2, Inc. v. Delaney*, 510 F. Supp. 3d 86, 100 (S.D.N.Y. 2020) (dismissing NYLL § 215 claims because the complaint did not allege that the plaintiff made a complaint about a violation of the NYLL or an order of the Commissioner of Labor); *Robledo v. No. 9 Parfume Leasehold*, 2013 WL 1718917, at *9 (S.D.N.Y. Apr. 9, 2013) (same).

Although Defendants did not argue that Plaintiff failed to state a claim under NYLL § 215, the Court may dismiss the claim sua sponte in light of the fact Plaintiff is given notice of the ground for dismissal by way of this Report and has an opportunity to be heard on the issue through any objection she submits to this Report. *E.A. Sween Co., Inc.*, 787 F. App'x at 782.

### i. Plaintiff Fails to State a Claim for Fraud

The SAC alleges that certain communications Plaintiff received from Defendants constitute fraud. Specifically, Plaintiff considers as fraudulent (1) the letter she received from Defendant Schlachet on May 30, 2019 informing her that she was not eligible for whistleblower protection; (2) the letter she received on June 27, 2019 from Defendant Smith stating her concerns were being addressed or had been addressed; (3) the July 10, 2019 Report by OSI finding the complaint made against Plaintiff to be substantiated; and (4) statements Defendants made to the EEOC in May 2020. (SAC ¶¶ 1322-25.)

**\*22** To state a claim for common law fraud in New York, a plaintiff must plead that the defendant "made a representation as to a material fact" that "was false" and was "intended

to deceive" the plaintiff; that the plaintiff "believed and justifiably relied upon the statement and was induced by it to engage in a certain course of conduct;" and "as a result of such reliance," the plaintiff "sustained pecuniary loss."

🚩 *Stephenson v. PricewaterhouseCoopers, Ltd. Liab. P'ship*, 482 F. App'x 618, 622 (2d Cir. 2012) (citation omitted).

The SAC does not identify any course of conduct Plaintiff took as a result of her reliance on any statement, nor does it allege any pecuniary loss suffered as a result of Plaintiff's reliance on any false statement. Instead, the SAC asserts that various Individual Defendants made false statements about her to SCI and OSI investigators, and that those statements made their way into communications addressed to her. Plaintiff alleges that one letter from Defendant Smith included "improper legal advice," but not that Plaintiff relied on or followed the advice. (SAC ¶¶ 1547-59.) To the contrary, the SAC asserts that Plaintiff did not follow the advice, but rather informed Defendant Smith that his letter was inaccurate. (*Id.* ¶¶ 1560-63.) Such allegations do not give rise to claims for fraud. *Cummings*, 2020 WL 882335, at *13-14 (finding complaint did not state a claim for fraud based on statements the defendants made to OSI); *Karupaiyan v. Experis IT*, 2022 WL 4280529, at *4 (S.D.N.Y. Sept. 15, 2022) (Schofield, J.) (dismissing fraud claim on 🚩 Rule 12(b)(6) motion because the complaint did not allege that the plaintiff relied on the alleged misrepresentations).

Although Defendants did not argue that Plaintiff failed to state a claim for fraud, the court may dismiss the claim sua sponte because Plaintiff is given notice of the ground for dismissal by way of this Report and will have an opportunity to be heard on the issue through any objection she submits to this Report. *E.A. Sween Co., Inc.*, 787 F. App'x at 782. Therefore, Plaintiff's fraud claims should be dismissed for failure to state a claim.

## CONCLUSION

I respectfully recommend that the SAC be dismissed in its entirety for failure to comply with Rule 8. In the alternative, I respectfully recommend that all of Plaintiff's claims be dismissed with prejudice under 🚩 Rule 12(b)(6) except for:

(1) her claims of retaliation under Title II and V of the ADA and Section 504 of the Rehabilitation Act against the BOE for incidents of alleged retaliation that occurred on or after December 3, 2017; and (2) her claims of retaliation under the NYSHRL and NYCHRL against Defendants Witzke, Cullen, Coleman, Schlachet, Smith, and Baranello for incidents of alleged retaliation in which those individuals participated.

## NOTICE

**Defendants shall have fourteen days from this date, and Plaintiff shall have seventeen days from this date, to file written objections pursuant to** 🚩 **28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure.** *See* **Fed. R. Civ. P. 6(a), (d) (adding three additional days when service is made under Fed. R. Civ. P. 5(b)(2)(C) (mail), (D) (leaving with the clerk), or (F) (other means consented to by the parties)).**

**If Defendants file written objections to this Report and Recommendation, Plaintiff may respond to Defendants' objections within seventeen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). If Plaintiff files written objections, Defendants may respond to such objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2);** *see* also **Fed. R. Civ. P. 6(a), (d).**

**\*23 Objections and responses to objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the Hon. Lorna Schofield at 40 Foley Square New York, NY 10007-1312, to the chambers of the undersigned magistrate judge, and to any opposing parties. See** 🚩 **28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any request for an extension of time to file objections must be directed to Judge Schofield. Failure to file timely objections will result in a waiver of those objections for purposes of appeal.** *See* 🚩 **28 U.S.C.§ 636(b)(1); Fed. R.Civ. P. 6(a), 6(d), 72(b);** 🚩 *Thomas v. Arn*, **474 U.S. 140 (1985).**

**All Citations**

Slip Copy, 2023 WL 1972729

## Footnotes

1    The SAC was filed in numerous iterations with the final version at ECF No. 177 and exhibits at ECF Nos. 180-81.

2    The SAC and briefing conflate the BOE and Department of Education ("DOE") as one entity. (*See, e.g.* SAC ¶ 1; Def. Br. 1.) While there is no meaningful distinction between the two entities for purposes of this litigation, the Court notes that the two are "not entirely synonymous": the DOE "is a creation of the BOE" that is comprised of the BOE members and "the Chancellor, superintendents, community and citywide councils, principals, and school leadership teams." *Matson v. Bd. of Educ. of City Sch. Dist. of N.Y.*, 631 F.3d 57, 77 (2d Cir. 2011) (Straub, J. concurring); *see also* Bylaws of the Panel for Educational Policy of the City School District of the City of New York, available at https://www.schools.nyc.gov/about-us/leadership/panel-for-education-policy/pep-bylaws.

3    The Court will refer to the Individual Defendants by their last names.

4    All allegations in the SAC are assumed to be true for the purpose of this Motion to Dismiss. *See Morales v. City of New York*, 752 F.3d 234, 236 (2d Cir. 2014). As discussed below, the SAC is difficult to follow. This recitation of facts represents the Court's best effort at interpreting the allegations liberally in Plaintiff's favor.

5    "SESIS" refers to the Special Education Student Information System, which is an online database that assists DOE staff and service providers in managing the provision of special education services to students.

6    The EEOC Charge did not assert claims under Title I of the ADA, which prohibits employment discrimination based on the employee's disability or her relationship with a person with a disability. 42 U.S.C. § 12112(b)(4). *See Valenti v. Massapequa Union Free Sch. Dist.*, 2006 WL 2570871, at \*13-14 (E.D.N.Y. Sept. 5, 2006) ("Title I of the ADA does not allow relief for a teacher alleging an adverse employment action resulting from 'advocacy' on behalf of his disabled students."). Plaintiff does not assert claims for age discrimination in this litigation.

7    Although Title II of the ADA does not contain a statutory proscription against retaliation, "[Title II] ADA retaliation claims ... are governed by [ADA] Title V." *Warren v. Goord*, 2006 WL 1582385, at \*17 (W.D.N.Y. May 26, 2006), *aff'd*, 2008 WL 5077004 (2d Cir. Nov. 26, 2008).

8    For the sake of clarity, the Court notes that although the SAC and briefing occasionally refer to disability discrimination, as the Court understands the SAC, it does not assert claims for *discrimination*, but rather for *retaliation*. In order to state a claim for disability discrimination, the complaint must at least allege that the plaintiff was discriminated against because of her disability, *Natofsky v. City of New York*, 921 F.3d 337, 344 (2d Cir. 2019), or because of the disability of an individual with whom the plaintiff has a relationship, *Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 432 (2d Cir. 2016). A claim of discrimination based on a plaintiff's relationship with a disabled individual is different in kind than in the context of retaliation for advocacy on behalf of disabled individuals, and in particular, such claims are limited to circumstances where the defendant perceived that the plaintiff's relationship with a disabled person would: (1) be costly to the discriminating party; (2) cause the plaintiff to be predisposed to develop the disability; or (3) cause the plaintiff to be inattentive at work. *Id.* at 432. Associational *discrimination* claims cannot be brought on the basis that the plaintiff is "advocating" on behalf of a disabled person. *Valenti*, 2006 WL 2570871, at \*14 (collecting cases). The SAC does not assert that Plaintiff faced discrimination based on her own disability or based

on any of the limited circumstances that could give rise to a claim for associational disability discrimination. Rather, as discussed above, Plaintiff's ADA and Rehabilitation Act claims are based on alleged *retaliation* for Plaintiff's advocacy on behalf of her students.

9    Plaintiff's filing of a charge at the EEOC did not toll the statute of limitations on the FLSA claim because the FLSA does not contain an exhaustion requirement. *Scott v. City of New York*, 592 F. Supp. 2d 386, 399 (S.D.N.Y. 2008) (quoting *Barrentine v. Arkansas–Best Freight Sys.*, 450 U.S. 728, 740 (1981)).

10   The parties at times conflate the requirements of § 3813(1) with those of § 3813(2). Section 3813(2) provides that the notice of claims requirement also applies to any claims sounding in tort that are brought against teachers and administrative staff of the school board where the tort was committed by that person in the scope of her employment. N.Y. Educ. Law § 3813(2). Section 3813(1) is narrower than section 3813(2) in that it only applies to claims against school districts and their officers, whereas section 3813(2) also applies to teachers and staff; but section 3813(1) is broader than section 3813(2) in that it is not limited to claims founded upon tort. *See United States v. N.Y.C. Dep't of Educ.*, 2017 WL 435940, at *6 (S.D.N.Y. Jan. 31, 2017), *report and recommendation adopted*, 2017 WL 1319695 (S.D.N.Y. Apr. 4, 2017).

11   Plaintiff notes that the New Jersey notice of claims requirement does not apply to civil and human rights actions. (Pl. Opp. Br. at 12.) The New Jersey statute is not at issue here, and it is well settled that the relevant New York provision applies to civil and human rights actions. *Id.* at *6 (collecting cases). Plaintiff also argues that the notice of claims requirement does not apply to claims sounding in tort. This is not correct. *See Smith*, 808 F. Supp. 2d at 578 (collecting cases); *cf.* ⚠ *Tyrrell v. Seaford Union Free Sch. Dist.*, 792 F. Supp. 2d 601, 635-36 (E.D.N.Y. 2011) (holding that tort claims are "excepted from" § 3813(1)'s requirements but must instead comply with the identical notice requirements of N.Y. Gen. Municipal Law § 50–e). Plaintiff also cites *Felder v. Casey*, 487 U.S. 131 (1988) for the proposition that the notice of claims requirement is preempted. However, that case is inapposite because it considered a different law (a Wisconsin notice-of-claim statute) and an entirely different situation (preemption as to Section 1983 actions brought in state court).

12   The only allegation in the SAC occurring after January 2020 is that Defendants used "false" reports in their submissions to the EEOC in May 2020. (*Id.* ¶ 231.) As discussed below, this cannot form the basis of a defamation claim, because statements to the EEOC are made "in the course of a ... quasi-judicial proceeding" and are "under the protection of absolute immunity." *Bernstein v. Seeman*, 593 F. Supp. 2d 630, 636 (S.D.N.Y. 2009); *see also Allen v. St. Cabrini Nursing Home, Inc.*, 2001 WL 286788, at *6 (S.D.N.Y. Mar. 9, 2001). The incident also cannot form the basis of a fraud claim because Plaintiff did not allege that these statements were made to her or that she relied on them. *See Cummings v. City of New York,* 2020 WL 882335, at *13-14 (S.D.N.Y. Feb. 24, 2020) (holding the plaintiff failed to plead a fraud claim as to statements made to OSI).

13   As to Defendant Busetti, the SAC only alleges that she filed a response to Plaintiff's EEOC charge that included references to the allegedly defamatory and fraudulent OSI report about Plaintiff, but not that Busetti participated in any retaliatory acts against Plaintiff. (SAC ¶¶ 1197, 1359) Thus, no claim of retaliation is properly asserted against Busetti.

14    The statute of limitations for state and local claims against the BOE and its officers is also one year. 🚩N.Y. Educ. Law § 3813(2-b).

15    Plaintiff's EEOC filing does not toll the applicable statute of limitations because these claims do not include an exhaustion requirement and they were not raised in the EEOC charge. *See Redman*, 2011 WL 5119574, at *4.

16    Additionally, CLS 🚩§ 75-b claims cannot be brought against individuals and thus should be dismissed against the Individual Defendants. *Roddini v. City Univ. of N.Y.*, 2003 WL 435981, at *5 (S.D.N.Y. Feb. 21, 2003).

---

**End of Document**                                   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 2215261
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Isabelle Onana NDONGO, Plaintiff,

v.

BANK OF CHINA LIMITED, and Dongkun
Chu a/k/a Marvin Chu, individually, Defendants.

No. 22-cv-05896 (RA)
|
Signed February 24, 2023

**Attorneys and Law Firms**

Tracey Lyn Brown, The Cochran Firm, New York, NY, for
Plaintiff.

Tracy Richelle High, Lauren Maisel Goldsmith, Sullivan
and Cromwell, LLP, New York, NY, Shari Debra Leventhal,
Federal Reserve Bank of New York, New York, NY, Julia
M. Jordan, Sullivan & Cromwell LLP, Washington, DC, for
Defendants.

<u>MEMORANDUM OPINION & ORDER</u>

RONNIE ABRAMS, United States District Judge:

 **\*1**  Plaintiff Isabelle Onana Ndongo ("Plaintiff") brings
this action against Defendants Bank of China Limited and
Dongkun Chu (collectively, "Defendants") for employment
discrimination, retaliation, and hostile work environment
under the New York State Human Rights Law ("NYSHRL")
and New York City Human Rights Law ("NYCHRL").
Defendants now move to dismiss the Complaint pursuant to
⚑ Federal Rule of Civil Procedure 12(b)(6). For the reasons
that follow, Defendants' motion is granted, albeit without
prejudice.

**BACKGROUND**

The following facts are drawn from Plaintiff's Complaint,
which, on a motion to dismiss, the Court must assume to be
true. *See* ⚑ *Lynch v. United States*, 952 F.3d 67, 74-75 (2d
Cir. 2020). Plaintiff self-identifies as a "sixty (60) year-old
black/African American woman of Cameroonian descent."

Compl. ¶ 6. In August 2017, she was hired by Defendant
Bank of China Limited ("Bank of China") as an Assistant Vice
President in the Operational Risk Management Department.
*Id.* ¶ 17. She brought over fifteen years of operational risk
management experience to the role, and she was "tasked with
revamping and reengineering the risk assessment tool" used
by Bank of China. *Id.* ¶¶ 17-18. "[L]eading a team of four,"
Plaintiff was "able to successfully develop two prototypes
of a risk assessment tool," and one of those prototypes was
"deemed 'viable' and was scheduled to launch as a program
for use" in January 2020. *Id.* ¶¶ 21, 25.

In August 2019, Defendants hired a "white, younger, male"
named Gregory Leeser, who also occupied an Assistant
Vice President role and allegedly earned more money
than Plaintiff. *Id.* ¶ 26. A month later, while Plaintiff
was on a scheduled vacation, she discovered that Bank
of China "eliminated her entire racially-diverse team in
her absence." *Id.* ¶ 27. Around the same time, Bank of
China appointed Defendant Chu as the new Senior Vice
President of the Operational Risk Management Department.
*Id.* ¶ 28. According to the Complaint, Chu "levelled unfair
and unwarranted criticism at Plaintiff's previous, racially-
diverse team, calling them 'incompetent.' " *Id.* ¶ 30. He
also informed Plaintiff that Defendants "decided to go a
different route" with Plaintiff's risk assessment tool, which
she asserts, "impl[ied] that the said program would no longer
be launched, as scheduled, in January 2020, or at all," even
though "Defendants continued to use the said program that
had been designed and created by Ms. Ndongo and her team."
*Id.* ¶¶ 32-33.

Over the next few months, Plaintiff alleges that she was
subject to various "hostile and offensive" comments made
by Chu. *Id.* ¶ 43. For example, in September 2019, Chu
informed Plaintiff that another employee, an individual
named John Lawrencelle, had complained about Plaintiff
being "rude." When Plaintiff tried to resolve the matter by
requesting a joint meeting, Chu refused to hold the meeting
and "referr[ed] to Ms. Ndongo as too 'assertive.' " *Id.* ¶
37. Plaintiff further alleges that Chu approached Leeser
about Lawrencelle's purported complaint, and when Leeser
"confirmed that Plaintiff had not been rude to [Lawrencelle],"
Chu "advised Leeser to 'decide whose team you are on,'
" while also warning Leeser that Chu had the Human
Resources department "wrapped around his fingers." *Id.* ¶¶
47-48. In another instance, when Plaintiff submitted requested
analytics to Chu, he allegedly "berated her, subjecting her
to a verbal onslaught of false and disparaging [sic] about

her professional reputation." *Id.* ¶ 53. According to Plaintiff, "similarly situated Asian and Chinese employees," "white and Caucasian employees," "male employees," and "younger employees" were not subjected to the same "disparaging accusations and comments." *Id.* ¶¶ 56-59.

**\*2** In early October 2019, Chu promoted Leeser to head of the division over Plaintiff, even though Plaintiff had "more significantly [sic] experience and was more senior than Mr. Leeser." *Id.* ¶ 50. Plaintiff was then informed that "she would be stripped of her leadership role," and that her leadership responsibilities would be transferred to Leeser. *Id.* ¶¶ 67, 69. Chu also hired a "younger, Asian, male" named Henry Quach to serve as Vice President, and "directed Ms. Ndongo to report to him." *Id.* ¶ 70. Plaintiff alleges that she was "never offered the opportunity to apply for the role," and that "Mr. Quach had less experience than Ms. Ndongo and was significantly less qualified for the role." *Id.* Around the same time, Bank of China "gave salary increases," but Plaintiff's salary was not increased. *Id.* ¶ 62.

On October 11, 2019, several days after Plaintiff was allegedly demoted, she met with Chu to "complain about the hostile work environment his discriminatory comments and conduct had created." *Id.* ¶ 71. In this meeting, Chu made "spurious claims that Plaintiff's team was 'afraid of [her]'" and called Plaintiff "abnormal." *Id.* ¶¶ 72, 74. Rather than taking any corrective action, Chu allegedly "began to retaliate against Plaintiff" by "saddling her with disproportionate, excessive additional responsibilities tied to unreasonable deadlines, fabricating reasons for threatened and actual reprimands, disruptions to her work schedule, belittling her in front of colleagues, canceling meetings with her, excluding and alienating her, and unjustified and unwarranted negative evaluations." *Id.* ¶ 78. The Complaint lists the following examples:

- On November 20, 2019, Plaintiff "was accused of violating [Bank of China's] Code of Conduct policy for purportedly making an off-the-cuff joke with Leeser regarding her likely termination." *Id.* ¶ 79. Chu allegedly made these accusations "in the presence of more of Plaintiff's younger white and Asian male co-workers." *Id.* ¶ 80.

- On November 28, 2019, Defendants "scheduled closing at 3PM to allow [Bank of China] employees to leave work early in observance of Thanksgiving holiday celebrations," but they "deliberately prolonged

Plaintiff's workday, causing her to stay until or about 6PM." *Id.* ¶¶ 82-83.

- When Chu went on paternity leave, he instructed Leeser and Quach to "keep Plaintiff under strict observation" while he was away, which "had the purpose and effect of undermining Plaintiff's professional reputation in the eyes of her co-workers." *Id.* ¶¶ 84-85.

- Plaintiff requested a promotion to Vice President, and was told that "she would be in line for the promotion if she was able to produce an effective risk assessment tool." *Id.* ¶ 87. Chu and Quach then allegedly held a meeting with Bank of China's risk partners, where they presented the risk assessment tool that Plaintiff "had already developed and produced," but "deliberately presented Plaintiff's idea as if it were their own and denied Plaintiff any credit or attribution." *Id.* ¶¶ 88-89. Although the risk assessment tool was "rebranded," it included "the same ideas, strategies and proposals" as the tool Plaintiff had developed. *Id.* Plaintiff was present at this meeting and felt "humiliated." *Id.* ¶ 90. She did not receive the requested promotion. *Id.* ¶ 92.

- Defendants assigned Plaintiff "sole responsibility to perform [Bank of China's] quarterly risk control self-assessment," even though that is a task "normally performed by a team of at least four (4) people." *Id.* ¶¶ 93-94. Defendants also assigned Plaintiff to perform the bank's enterprise risk assessment and did not provide Plaintiff with the "necessary procedure manuals," even though Plaintiff normally does not perform that task. *Id.* ¶¶ 95-97. Plaintiff was thus "forced to work late most days in order to autodidactically learn the tools used to complete the said enterprise risk assessment." *Id.* ¶ 98.

**\*3** - In March 2020, when the COVID-19 pandemic began, Defendants "sent a bankwide notification" to everyone except Plaintiff, instructing employees to refrain from traveling to the office. *Id.* ¶¶ 100-01. Plaintiff allegedly traveled to the office and was the only one there. *Id.* ¶ 102.

- Around the same time, Defendants "refused and/or failed to provide Plaintiff with a VPN token," which "was required to login and to access the employee network." *Id.* ¶ 105. Defendants then "deliberately assigned Plaintiff time-sensitive tasks that required access to the employee network in [sic] the knowledge that they did not provide her with the said VPN token." *Id.* ¶ 106.

- "Shortly thereafter," Defendants gave Plaintiff "a bogus and unwarranted negative performance appraisal, drastically lowering her rating from B+ to D." *Id.* ¶ 108.

According to Plaintiff, these events created a "discriminatory, hostile, retaliatory, and intolerable work environment," which led Plaintiff to be "constructively discharged" in May 2020 from Bank of China. *Id.* ¶ 109.

On June 3, 2022, Plaintiff filed a complaint in the Supreme Court of the State of New York, New York County (the "Complaint"), alleging claims of discrimination based on age, gender, race, color, and national origin, in violation of the NYSHRL, N.Y. Exec. Law § 296(1)(a), and NYCHRL, N.Y.C. Admin. Code § 8-107(1)(a); hostile work environment in violation of the NYSHRL, N.Y. Exec. Law § 296(1)(h); retaliation in violation of the NYSHRL, N.Y. Exec. Law § 296(7), and NYCHRL, N.Y.C. Admin. Code § 8-107(1)(e); aiding and abetting in violation of the NYSHRL, N.Y. Exec. Law § 296(6), and NYCHRL, N.Y.C. Admin Code. § 8-107(6); and supervisory liability in violation of the NYCHRL, N.Y.C. Admin. Code § 8-107(13).[1] Defendants removed the case to federal court on July 11, 2022 and now move to dismiss the Complaint for failure to state a claim. This Court has jurisdiction pursuant to 28 U.S.C. § 1332.

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)* (quoting *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)*). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly, 550 U.S. at 556*). The Court must accept as true all factual allegations and draw all reasonable inferences in Plaintiffs' favor, *Goldstein v. Pataki, 516 F.3d 50, 56 (2d Cir. 2008)*, but it need not credit "mere conclusory statements," *Iqbal, 556 U.S. at 678* (citing *Twombly, 550 U.S. at 555*). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly, 550 U.S. at 555* (internal citations and alterations omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but not 'shown'—'that the pleader is entitled to relief,' " and the complaint must be dismissed. *Iqbal, 556 U.S. at 679* (quoting Fed. R. Civ. P. 8(a)(2)).

## DISCUSSION

### I. Discrimination Claims

**\*4** "[C]laims of employment discrimination under the NYCHRL are analyzed under the same *McDonnell Douglas* framework applicable to Title VII, Section 1983, and NYSHRL claims." *Bermudez v. City of New York, 783 F. Supp. 2d 560, 577 (S.D.N.Y. 2011)*. "Under this framework, at the summary judgment stage, a plaintiff must first demonstrate a prima facie case of employment discrimination by showing that: '(1) she was within the protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination.' " *Farmer v. Shake Shack Enterprises, LLC, 473 F. Supp. 3d 309, 324 (S.D.N.Y. 2020)* (quoting *Menaker v. Hofstra Univ., 935 F.3d 20, 30 (2d Cir. 2019)*). "The burden of production then shifts to the defendant to offer a legitimate, non-discriminatory reason for the allegedly discriminatory conduct." *Id.* (citing *Littlejohn v. City of New York, 795 F.3d 297, 307 (2d Cir. 2015)*). "Upon such a showing, the plaintiff must demonstrate that the reasons offered by the defendant are a mere pretext for discrimination." *Id.* (citing *Littlejohn, 795 F.3d at 307-08*).

At the motion-to-dismiss stage, however, "a plaintiff is not required to plead a prima facie case under *McDonnell Douglas ...* to defeat a motion to dismiss." *Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 84 (2d Cir. 2015)*. Rather, "a plaintiff 'need only give plausible support to a minimal inference of discriminatory motivation' " for the case to move forward. *Id.* (quoting *Littlejohn, 795 F.3d at 306*). "An inference of discrimination can arise from circumstances including, but not limited to, the employer's

criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge." *Littlejohn*, 795 F.3d at 312 (internal quotation marks omitted).

Although the NYCHRL and NYSHRL are analyzed under same framework, they are subject to different standards. Under the NYSHRL, the protected characteristic must be the "but-for" cause of the adverse action, *see Marcus v. Leviton Mfg. Co.*, 661 F. App'x 29, 33 (2d Cir. 2016), whereas under the NYCHRL, "a plaintiff need allege only that discrimination was a motivating factor for the adverse employment action," *White v. Bridge Inc.*, 2019 WL 4805896, at *5 (S.D.N.Y. Sept. 30, 2019). However, "[e]ven under the more liberal NYCHRL, a plaintiff must allege facts giving rise to an inference of discrimination based on [a protected characteristic] to prevail." *Moore v. Verizon*, 2016 WL 825001, at *8 (S.D.N.Y. Feb. 5, 2016) (citing *Gorzynski v. Jet Blue Airways Corp.*, 596 F.3d 93, 107 (2d Cir. 2010)).

The Complaint relies on three discernible theories of discrimination: disparate treatment, failure to promote, and ethnically degrading comments. Defendants argue that Plaintiff fails to raise a plausible inference of discrimination under any of these theories. The Court will address each in turn.

### A. Disparate Treatment

"A showing of disparate treatment—that is, a showing that the employer treated [a] plaintiff 'less favorably than a similarly situated employee outside his protected group'—is a recognized method of raising an inference of discrimination." *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003) (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)). In order to succeed on a disparate treatment claim, a plaintiff "must show she was similarly situated in all material respects to the individuals with whom she seeks to compare herself." *Id.* (quoting *Graham*, 230 F.3d at 39). "Employment characteristics which can support a finding that two employees are 'similarly situated' include 'similarities in education, seniority, performance, and specific work duties,' and similar requirements for skill, effort, and

responsibility for jobs performed 'under similar working conditions.' " *Potash v. Fla. Union Free Sch. Dist.*, 972 F. Supp. 2d 557, 580 (S.D.N.Y. 2013) (internal citation and quotation marks omitted); *see also Graham*, 230 F.3d at 40 (observing that "[w]hat constitutes 'all material respects' ... varies somewhat from case to case," but "there should be an objectively identifiable basis for comparability").

**\*5** Plaintiff repeatedly alleges that she was subject to mistreatment not experienced by co-workers who were younger, male, and not African-American or black, but she does so in purely conclusory fashion. *See* Compl. ¶¶ 31, 39-42, 56-59, 63-66, 83, 91. She fails to plead, in particular, any specific factual matter establishing that her co-workers were "similarly situated" to her "in all material respects." In Plaintiff's opposition to the motion to dismiss, she asserts that she "worked under the same supervisor as other Assistant Vice-President [sic] and lower employees within her department." Pl. Opp. 7. It is unclear, however, who these other employees were, what qualifications they had, and what their job responsibilities entailed. Indeed, as Defendants point out, Plaintiff does not even identify her "similarly situated" co-workers by name. The only individuals identified in the Complaint, other than Defendant Chu, are Gregory Leeser, Henry Quach, and John Lawrencelle. But according to the Complaint, Leeser was promoted to "head of the division," and Quach was hired as a Vice President for Plaintiff to "report to," so it is not plausible that either of them had the same supervisor as Plaintiff. Compl. ¶¶ 50, 70. Lawrencelle, moreover, was a "project manager" while Plaintiff was an Assistant Vice President, *id.* ¶ 34, so it is also not plausible that Plaintiff and Lawrencelle were "similarly situated."

In any event, even if this single assertion regarding Plaintiff's supervisor were enough to plausibly allege that she was "similarly situated in all material respects" to her co-workers, this allegation appears nowhere in the Complaint, and thus cannot defeat a motion to dismiss. *See Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991) ("In considering a motion to dismiss for failure to state a claim under [Federal Rule of Civil Procedure] 12(b)(6), a district court must limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference."). Therefore, Plaintiff's conclusory allegations of disparate treatment do not plausibly raise an inference of discrimination.

### B. Failure-to-Promote

To raise an inference of discrimination in a failure-to-promote claim, a plaintiff must allege: "(1) that [s]he is a member of a protected class; (2) that [s]he applied for a promotion to a position for which [s]he was qualified; (3) that [s]he was rejected for the position; and (4) after this rejection, the position was filled by someone outside the protected class who was similarly or less well qualified than the plaintiff." *Brophy v. Chao*, 2019 WL 498251, at *4 (S.D.N.Y. Feb. 7, 2019) (internal quotation marks omitted).

Plaintiff's failure-to-promote theory fails for two reasons. First, she does not clearly allege that she applied for the promotion to Vice President and was formally rejected, only that she "requested" it and was "passed over." *See* Compl. ¶ 86, 92. But a plaintiff relying on a failure-to-promote theory must allege "that she or he applied for a specific position or positions and was rejected therefrom, rather than merely asserting that on several occasions she or he generally requested promotion." 🚩 *Dawson v. N.Y.C. Transit Auth.*, 624 F. App'x 763, 769 (2d Cir. 2015) (quoting 🚩 *Brown v. Coach Stores, Inc.*, 163 F.3d 706, 710 (2d Cir. 1998)). To the extent that Plaintiff's "request" for a promotion counts as an application, she does not allege that "*after* this rejection, the position was filled by someone outside the protected class who was similarly or less well qualified than the plaintiff." *Brophy*, 2019 WL 498251, at *4 (emphasis added). Plaintiff does allege that Leeser, who was promoted to "head of the division," and Quach, who was hired as a Vice President, were both less qualified than her and outside the relevant protected classes. *See* Compl. ¶¶ 26, 50, 70. According to Plaintiff's own timeline, however, Leeser was promoted and Quach was hired before Plaintiff requested a promotion to Vice President. The Complaint contains no allegations as to who was promoted instead of Plaintiff or whether a Vice President position was even open. [2] Thus, Plaintiff's failure-to-promote theory fails to raise an inference of discrimination.

### C. Ethnically Degrading Comments

**\*6** Finally, Plaintiff points to four "harassing and offensive terms" that she claims were used against her—"abnormal," "rude," "too assertive," and "incompetent"—which she argues "feed into cruel and offensive stereotypes about older, black, African American women in the workplace."

Pl. Opp. 6; *see* Compl. ¶¶ 30, 34, 37, 74. But for each of these instances, Plaintiff does not "provide any allegations that would justify an inference that [these] facially neutral comments were actually related to [her] protected characteristics." *Williams v. Victoria's Secret*, 2017 WL 384787, at *8 (S.D.N.Y. Jan. 27, 2017) (alterations omitted) (quoting *Opoku v. Brega*, 2016 WL 5720807, at *8 (S.D.N.Y. Sept. 30, 2016)). For example, she claims that Chu called her "abnormal" in a meeting where she complained about his workplace conduct, but she provides almost no detail as to what was discussed in that meeting, what she said to Chu, how he responded, and how the "abnormal" comment arose. Plaintiff asserts, in conclusory fashion, that "abnormal" is a "clearly racist code word used by Defendants to make black and African American people feel as if they don't belong at [Bank of China] due to their race." Compl. ¶ 74. These allegations do not plausibly raise an inference of discrimination. *See Marseille v. Mount Sinai Hosp.*, 2022 WL 14700981, at *2 (2d Cir. Oct. 26, 2022) (rejecting the plaintiff's argument that "aggressive" alludes to a racial stereotype, because "aggressive" is a "facially race-neutral term, and [the plaintiff] has 'failed to offer evidence that could lead a reasonable jury to conclude that the statement in context actually reflected the speaker's use of this language in a racially coded manner' " (quoting 🚩 *Cadet-Legros v. N.Y. Univ. Hosp. Ctr.*, 21 N.Y.S.3d 221, 228-29 (1st Dep't 2015))).

In summary, Plaintiff does not raise a plausible inference of discrimination, and as a result, fails to plausibly allege that her protected characteristics were the "motivating factor" of any adverse action, as required under the NYCHRL, or the "but-for" cause, as required under the NYSHRL. Plaintiff's discrimination claims are thus dismissed.

### II. Retaliation Claims

"For a retaliation claim to survive a motion to dismiss, 'the plaintiff must plausibly allege that: (1) defendants discriminated—or took an adverse employment action—against her, (2) because she has opposed any unlawful employment practice.' " 🚩 *McHenry v. Fox New Network, LLC*, 510 F. Supp. 3d 51, 67 (S.D.N.Y. 2020) (quoting 🚩 *Duplan v. City of New York*, 888 F.3d 612, 625 (2d Cir. 2018)). "The elements of retaliation under Title VII, the NYSHRL, and NYCHRL are 'identical,' except that the NYCHRL employs a broader standard of an 'adverse employment action' than the federal and state statutes." *Green v. Mount Sinai Health Sys., Inc.*, 2019 WL 4392691, at

*3 (S.D.N.Y. Sept. 12, 2019) (quoting *Nieblas-Lov v. N.Y. City Hous. Auth.*, 165 F. Supp. 3d 51, 70 (S.D.N.Y. 2016)). "Under the NYCHRL, adverse action is any action that would be reasonably likely to deter a person from engaging in a protected activity." *Scott-Robinson v. City of New York*, 2016 WL 7378775, at *4 (citing 🚩*Pilgrim v. McGraw-Hill Cos., Inc.*, 599 F. Supp. 2d 462, 469 (S.D.N.Y. 2009)); *see also* 🚩*Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 112 (2d Cir. 2013). Retaliation claims that fail under the "more lenient" NYCHRL standard necessarily fail under the NYSHRL standard as well. *See Heron v. Medrite Testing, LLC*, 2022 WL 1214179, at *7 (S.D.N.Y. Apr. 25, 2022).

Defendants first argue that Plaintiff fails to plead that she "opposed any unlawful employment practice"—in other words, that she engaged in protected activity. The Court disagrees. Protected activity may include "informal protests of discriminatory employment practices," 🚩*Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990), as long as "such informal complaints [are] sufficiently specific to make it clear that the employee is complaining about conduct prohibited by" an anti-discrimination statute, 🚩*Risco v. McHugh*, 868 F. Supp. 2d 75, 110 (S.D.N.Y. 2012). By contrast, "[g]eneralized complaints about a supervisor's treatment are insufficient." 🚩*Id.* at 110. Plaintiff alleges that "[o]n or about October 11, 2019, Plaintiff met Chu to complain about the hostile work environment his discriminatory comments and conduct had created." Compl. ¶ 71. While this allegation is indeed somewhat vague, it specifically references Chu's "discriminatory comments and conduct," and it is logically referring to the alleged conduct described in the preceding paragraphs. *See id.* ¶¶ 34-70. Therefore, the Court can reasonably infer that Plaintiff's complaint, which was made on a specific date to a specific person, was more than a "generalized complaint about perceived mistreatment" but rather included "a specific connection to discrimination based on membership in a protected class." 🚩*Whitley v. Montefiore Medical Grp.*, 2016 WL 1267788, at *11 (S.D.N.Y. Mar. 30, 2016); *cf., e.g.*, *Kendricks v. Westhab, Inc.*, 163 F. Supp. 2d 263, 271 (S.D.N.Y. 2001) (concluding that the plaintiff failed to plausibly allege protected activity because he referred generally to "protests" and his "outspoken ways," but "[did] not specify what he said or when he said it"). Plaintiff has thus plausibly alleged that she engaged in protected activity when she complained to Chu about his "discriminatory comments and conduct" on October 11, 2019.

*7 Nevertheless, Plaintiff's retaliation claim fails as she does not plausibly allege retaliatory acts that would be "reasonably likely to deter a person" from engaging in protected activity. Even under the NYCHRL's "relatively liberal standard," "petty slights or minor annoyances that often take place at work" are not actionable retaliation. *Scott-Robinson*, 2016 WL 7378775, at *4-5 (quoting 🚩*Burlington N. & Santa Fe Ry., Co. v. White*, 548 U.S. 53, 68 (2006)); *see also* 🚩*Mihalik*, 715 F.3d at 112 ("[T]he NYCHRL is not a general civility code, and a defendant is not liable if the plaintiff fails to prove the conduct is caused at least in part by ... retaliatory motives, or if the defendant proves the conduct was nothing more than 'petty slights or trivial inconveniences.' " (internal citations omitted)). Plaintiff's assertion that she once had to stay at work three hours longer than closing time; was given two tasks she normally did not perform; once traveled to the office when she was unaware others were instructed to stay at home; and was not able to access the virtual network at the start of the COVID-19 pandemic, as alleged, all amount to "petty slights" or "trivial inconveniences" that "often take place at work." *See Dudley v. N.Y.C. Hous. Auth.*, 2014 WL 5003799, at *29 (S.D.N.Y. Sept. 30, 2014) (concluding that the "change in [the plaintiff's] work schedule ... was nothing more than an inconvenience, and such trivial matters do not constitute retaliatory actions even under the NYCHRL's liberal standard, let alone the 'materially adverse' standard of Title VII and the NYSHRL"). [3]

Of course, as the Supreme Court has cautioned, "the significance of any given act of retaliation will often depend upon the particular circumstances"; for example, "[a] supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight. But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination." 🚩*Burlington*, 548 U.S. at 69. Plaintiff has alleged no extenuating circumstances, however, that could transform the minor inconveniences she experienced into retaliatory actions "reasonably likely to deter a person" from engaging in protected activity. *See Dudley*, 2014 WL 5003799, at *29 (quoting 🚩*Seale v. Madison County*, 929 F. Supp. 2d 51, 76 (N.D.N.Y 2013)) ("Although courts have found a change in work schedule to be sufficiently adverse for purposes of plausibly alleging a retaliation claim, there must be some extenuating circumstance, of which the

plaintiff alleges her employer was aware, that transforms such a change from merely inconvenient to materially adverse.").

The only allegation that rises above the level of a trivial harm is the negative performance evaluation that Plaintiff received, which "lower[ed] her rating from B+ to D." Compl. ¶ 108. Defendants argue that with respect to this allegation, Plaintiff fails to establish a causal connection to her protected activity. "A causal connection may be established either directly, through evidence of retaliatory animus directed against the plaintiff by the defendant, or indirectly, by showing that the protected activity was followed closely in time by the adverse action or by other circumstantial evidence." *White v. Dep't of Correctional Servs.*, 814 F. Supp. 2d 374, 389 (S.D.N.Y. 2011) (citing *Johnson v. Palma*, 931 F.2d 203, 207 (2d Cir. 1991)). Plaintiff asserts, again in conclusory fashion, that the negative performance review was "bogus and unwarranted," Compl. ¶ 108, which is plainly insufficient to establish retaliatory animus. In terms of temporal proximity, the protected activity occurred on October 11, 2019, and Plaintiff received the negative performance evaluation sometime between April and May 2020. *See* Compl. ¶¶ 105-109. In the absence of any non-conclusory allegations regarding retaliatory animus, a lapse of six to seven months is too long to establish a causal connection to Plaintiff's protected activity. *See Kraiem v. JonesTrading Institutional Servs. LLC*, 571 F. Supp. 3d 53, 59-60 (S.D.N.Y. 2021) (quoting *De Figueroa v. New York*, 403 F. Supp. 3d 133, 157 (E.D.N.Y. 2019)) ("There is no firm outer limit to the temporal proximity required, but most courts in the Second Circuit has held that a lapse of time beyond two or three months will break the causal inference."); *Dodd v. City Univ. of N.Y.*, 489 F. Supp. 3d 219, 247 (S.D.N.Y. 2020) ("Generally, to show causation through temporal proximity alone, courts in this Circuit require no more than two months to have passed between a protected activity and an adverse action."). [4]

**\*8** Plaintiff thus fails to state a retaliation claim under both the NYCHRL and NYSHRL, and her retaliation claims are dismissed.

### III. Hostile Work Environment Claim

Prior to October 2019, a plaintiff bringing a hostile work environment claim under the NYSHRL needed to show that the "workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Tortorici v. Bus-Tev, LLC*, 2021 WL 4177209, at *12 (S.D.N.Y. Sept. 14, 2021) (quoting *Littlejohn*, 795 F.3d at 320-21). On October 11, 2019, the NYSHRL was amended to eliminate the "severe and pervasive" standard and "adopt instead a more protective standard." *Maiurano v. Cantor Fitzgerald Securities*, 2021 WL 76410, at *3 n.2 (S.D.N.Y. Jan. 8, 2021). Under the amended provision, a plaintiff need only show that she was subjected "to inferior terms, conditions or privileges of employment because of [her] membership in one or more of [the] protected categories." N.Y. Exec. Law § 296(1)(h); *see also Alford v. NFTA-Metro*, 2022 WL 17655868, at *6 (W.D.N.Y. Sept. 6, 2022). "Nevertheless, a NYSHRL hostile work environment 'claim will not succeed if the offending actions are no more than petty slights or trivial inconveniences.'" *Alford*, 2022 WL 17655868, at *6 (quoting *Black v. ESPN, Inc.*, 139 N.Y.S.3d 523 (Table) (Sup. Ct. Feb. 19, 2021)).

The more protective standard applies to the majority of Plaintiff's allegations, which occurred after October 11, 2019. As discussed above, however, most of these allegations amount solely to "petty slights or trivial inconveniences" and thus cannot form the basis of a hostile work environment claim. Even assuming Plaintiff was subjected to "inferior terms, conditions or privileges of employment," she must still plead that these actions were taken "because of" her protected characteristics. N.Y. Exec. Law § 296(1)(h). As discussed, beyond conclusory allegations, Plaintiff offers no specific factual matter that could raise a plausible inference of discriminatory animus. *See Berrie v. Bd. of Educ. of Port Chester-Rye Union Free Sch. Dist.*, 750 F. App'x 41, 48 (2d Cir. 2018) (quoting *Alfano v. Costello*, 294 F.3d 365, 378 (2d Cir. 2002)) ("Although 'facially neutral incidents may be included' in evaluating [a hostile work environment claim,] there must be 'some circumstantial or other basis for inferring that incidents race-neutral on their face are in fact discriminatory.'").

Plaintiff's hostile work environment claim under the NYSHRL is thus dismissed. [5]

### IV. Aiding and Abetting and Supervisory Liability

**\*9** Finally, Plaintiff also brings claims for aiding and abetting under the NYCHRL and NYSHRL, and for supervisory liability under the NYCHRL. In order to state

those claims, however, Plaintiff must first establish an underlying violation. *See Falchenberg v. N.Y. State Dep't of Educ.*, 338 F. App'x 11, 14 (2d Cir. 2009) ("Aiding and abetting is only a viable theory where an underlying violation has taken place."); *Williams v. N.Y.C. Dep't of Educ.*, 2021 WL 1178118, at *12 (S.D.N.Y. Mar. 29, 2021) ("The plain meaning of this language [in N.Y.C. Admin. Code § 8-107(13)(b)] requires that the Plaintiff establish a violation of the NYCHRL by some employee before supervisory liability will attach."). Because the Complaint fails to plead an underlying violation, the aiding and abetting claims and supervisory liability claim are also dismissed.

**CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss is granted. Plaintiff shall have one opportunity to amend the Complaint within thirty days, provided she has a good faith basis to do so.

**All Citations**

Slip Copy, 2023 WL 2215261

**Footnotes**

1    Plaintiff also alleged interference in violation of the NYCHRL, N.Y.C. Admin. Code § 8-107(19), but withdrew that claim in her opposition to Defendants' motion to dismiss. *See* Pl. Opp. 20.

2    According to the Complaint, Plaintiff was told that "she would be in line for the promotion if she was able to produce an effective risk assessment tool." Compl. ¶ 87. The fact that Plaintiff would be "in line" for a promotion does not indicate that a Vice President position was actually open at the time, and Plaintiff makes no allegations to that effect.

3    Similarly, although Plaintiff alleges that Chu "accused" her of violating the Code of Conduct by "making an off-the-cuff joke," Compl. ¶ 79, and instructed Leeser and Quach to "keep [her] under strict observation" while he was away, *id.* ¶ 84, she does not allege that this accusation and instance had any tangible effects that would be "reasonably likely to deter a person" from engaging in protected activity. *See Scott-Robinson*, 2016 WL 7378775, at *5 ("[P]laintiff's subjective belief that she was 'insulted, humiliated, and upset by this obvious discrimination and retaliation,' is insufficient under the NYCHRL's objective standard.").

4    Defendants' alleged failure to promote Plaintiff to Vice President could also constitute a retaliatory act, but Plaintiff does not provide a date for that allegation. Thus, in the absence of direct retaliatory animus, the Court cannot determine whether there is a causal connection between the denied promotion and Plaintiff's protected activity.

5    Plaintiff also alleges that, "[a]s a result of Defendants' purposely [sic] creating a discriminatory, hostile, retaliatory, and intolerable work environment, Plaintiff was unlawfully constructively discharged in or around May 2020, from BOC." Compl. ¶ 109. To the extent Plaintiff is attempting to bring a constructive discharge claim, that claim fails as well, for the same reasons her hostile work environment claim fails. *See Kunik v. N.Y.C. Dep't of Educ.*, 842 F. App'x 668, 671 (2d Cir. 2021) ("The standard for such a constructive discharge is higher than the standard for establishing a hostile work environment.").

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Blue Flag – Appeal Notification

Appeal Filed by PHILLIPS v. FASHION INSTITUTE OF TECHNOLOGY, 2nd Cir., March 16, 2023

2023 WL 2525677
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Marjorie PHILLIPS, Plaintiff,
v.
The FASHION INSTITUTE OF TECHNOLOGY,
Mary Davis and Marilyn Barton, Defendants.

20 Civ. 221 (GBD)
|
Signed March 15, 2023

**Attorneys and Law Firms**

Derek S. Sells, The Cochran Firm, New York, NY, Midwin Charles, Midwin Charles & Associates LLC, New York, NY, for Plaintiff.

Tara Linette Eyer Daub, Nixon Peabody LLP, Melville, NY, Christopher Garth Gegwich, Nicholas Paul Melito, Rose Nankervis, Nixon Peabody LLP, Jericho, NY, Jeniffer Taylor, Nixon Peabody LLP, Rochester, NY, for Defendant Fashion Institute of Technology.

Eric Dranoff, Saretsky Katz Dranoff & Glass, LLP, Elmsford, NY, for Defendant Mary Davis.

Bruce Eric Menken, Raya Saksouk, Menken Simpson & Rozger LLP, New York, NY, for Defendant Marilyn Barton.

<u>MEMORANDUM DECISION AND ORDER</u>

GEORGE B. DANIELS, United States District Judge:

*1 Plaintiff Marjorie Phillips brings this seventeen-count action against her employer the Fashion Institute of Technology, supervisor Mary Davis, and coworker Marilyn Barton for race-based discrimination, disparate treatment, retaliation, hostile work environment and interference with protected rights in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), 42 U.S.C. § 1981, the New York State Human Rights Law, N.Y. Exec. Law § 290 et seq. ("NYSHRL"), and the New York City Administrative Code § 8-107 ("NYCHRL"). (Complaint ("Compl."), ECF No. 5.) Plaintiff also asserts claims of negligent hiring, training, and retention, intentional infliction of emotional distress, and assault. (Id.)

Before this Court are Defendants' motions for summary judgment pursuant to Federal Rule of Civil Procedure 56, seeking dismissal of Plaintiff's claims. (ECF Nos. 79, 80, 81, 86.) Defendants' motions are GRANTED.

**I. FACTUAL BACKGROUND**

The following facts are undisputed unless otherwise indicated. Plaintiff has been employed with Defendant Fashion Institute of Technology ("FIT") since 1995, when she began work in FIT's payroll department as a part-time clerical assistant. (Defs.' Joint Statement of Undisputed Material Facts ("SUMF"), ECF No. 85, ¶ 19.) Between 1995 and 2006, Plaintiff applied for and obtained three "upgrades" within FIT to titles with higher pay. [1] (Id. ¶ 20.) Since her last upgrade in 2005, Plaintiff has been in the position of "office associate." (Id. ¶ 24.)

In July 2017, Plaintiff had a conversation with her supervisor, Defendant Mary Davis, about the possibility of Davis assigning Plaintiff additional duties and supporting a request for an upgrade. (SUMF ¶ 33.) Plaintiff testified that she and Davis "discussed what would be involved in this new position," that Davis asked Plaintiff "to look into a job title that would reflect this new job," and that Plaintiff and Davis ultimately "decided that I was going to go to human resources, because, you know, they could help me with that." (Id. ¶ 38.) In the weeks following, Plaintiff spoke with Human Resources about possible job titles and received the information she needed, (id. ¶¶ 41–47), but she never followed up with Davis, applied for any posted vacancy, or pursued a "reevaluation" of her title under the appropriate procedures, (id. ¶¶ 48–49). Plaintiff admits that she and Davis "didn't finalize" any upgrade, and that Davis and Plaintiff together decided that Plaintiff would first speak with Human Resources "to come up with a title." (Pl.'s Resp. to SUMF, ECF No. 103, at 10.) In November 2019, Plaintiff told her union representative that she "did not ask [ ] Davis to do anything except explain [ ] what additional roles/ responsibilities she had in mind," and that Plaintiff herself later "dropped the upgrade discussion" because she "didn't believe Davis would honor her promise [ ] anymore." (SUMF ¶ 51.)

**\*2** On March 12, 2018, Plaintiff spoke with Davis about unrelated concerns Plaintiff had regarding certain comments that had been made in the workplace. (SUMF ¶ 79.) Davis advised Plaintiff to speak with the appropriate offices within FIT to file a formal complaint, which Plaintiff did on April 20, 2018 (Plaintiff's "Affirmative Action Complaint"). (*Id.* ¶ 88.) In relevant part, the Affirmative Action Complaint concerned four incidents Plaintiff alleged were racist: (1) in 2014, Plaintiff's coworker, Brenda Cowan, invited Plaintiff to join a conversation by saying "come join us at the back of the bus," (*id.* ¶ 89); (2) in 2016, Plaintiff overheard Defendant Marilyn Barton explaining to an aide that African Americans were once considered three-fifths of a human being, (*id.* ¶ 90); (3) in 2017, another of Plaintiff's co-workers, Kyle Farmer, told Plaintiff, "you look like you are going to the hood" after Plaintiff put on her jacket, (*id.* ¶ 101); and (4) on March 9, 2018, Barton told a co-worker that her cousin had referred to himself as a "bastard" after learning he was born out of wedlock, (*id.* ¶ 119). Although Plaintiff never accused Davis of any discriminatory remark, she nevertheless named her as a respondent because she felt that Davis had not adequately responded to her complaints. (*Id.* ¶ 128; Pl.'s Resp. to SUMF, ECF No. 103, at 21, 27.)

After investigating, FIT's Affirmative Action Office concluded that the conduct described did not violate FIT's discrimination policies. (SUMF ¶ 159.) Although the bulk of the Office's investigatory efforts took place in the months immediately following the submission of Plaintiff's Complaint, Plaintiff was only advised of the findings in July 2019. (*Id.* ¶¶ 160, 133–58.) The Office finalized its report regarding its investigation on October 7, 2019. (*Id.* ¶ 161.)

Over a year after Plaintiff filed the Affirmative Action Complaint, on May 16, 2019, Plaintiff and Barton had a disagreement over Barton's handling of an issue involving graduation regalia. (SUMF ¶¶ 164–69.) The disagreement escalated and culminated with Barton shouting at Plaintiff, "I'm tired of your bullshit" and "if you don't shut the fuck up, I'm going to fucking kill you." (*Id.* ¶¶ 170–71.) According to a witness, Barton also "made a gesture as if to push [Plaintiff]" which "caused her to slightly brush [Plaintiff] as [Plaintiff] stood up." (*Id.* ¶ 177.) Barton did not use any racial slurs or refer to Plaintiff's race in any way during the incident. (*Id.* ¶ 179.) Plaintiff filed a report with the Office of Public Safety the same day, (*id.* ¶ 192), and FIT's Human Resources Department investigated, (*id.* ¶ 205). Barton was suspended and required to complete a program recommended by Human

Resources, a racial empathy seminar, and other professional development activities prior to returning to work. (*Id.* ¶¶ 209–10.) Barton was also evaluated by a licensed clinical social worker who determined she was not a threat to others. (*Id.* ¶ 212.) Following the incident, Plaintiff requested that her seat be relocated. (*Id.* ¶ 215.) Plaintiff was transferred to a different building on FIT's campus upon her return to work. (*Id.*)

On August 12, 2019, Plaintiff filed an EEOC Charge of Discrimination concerning her confrontation with Barton. (SUMF ¶¶ 217–18.) The Charge did not refer to the items Plaintiff raised in her Affirmative Action Complaint, her claims of discrimination, or her complaints that she was not upgraded. (*Id.* ¶¶ 219–21.) On October 11, 2019, the EEOC issued a Dismissal and Notice of Rights. (*Id.* ¶ 217.) Plaintiff filed the instant suit three months later. (ECF No. 5.)

## II. LEGAL STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* (quoting *Anderson v. liberty lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute of fact is genuine "if the evidence is such that a jury could return a verdict for the nonmoving party." *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002) (quotation omitted).

The party seeking summary judgment has the burden of demonstrating that no genuine issue of material fact exists. *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002). In turn, to defeat a motion for summary judgment, the opposing party must raise a genuine issue of material fact. *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002). To do so, it "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and it "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (quotation omitted). Rather, the opposing party must produce "hard evidence," *D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998), "from which a reasonable inference in [its] favor may be

drawn," *Binder & Binder PC v. Barnhart*, 481 F.3d 141, 148 (2d Cir. 2007). In this regard, "[t]he mere existence of a scintilla of evidence supporting the non-movant's case is [ ] insufficient to defeat summary judgment." *Niagara Mohawk Power Corp. v. Jones Chem., Inc.*, 315 F.3d 171, 175 (2d Cir. 2003) (quotation omitted). In determining whether a genuine issue of material fact exists, a court must construe the evidence in the light most favorable to the opposing party and draw all inferences in that party's favor. *Id.*

### III. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON ALL CLAIMS

**\*3** Plaintiff's Complaint brings seventeen causes of action under federal, state, and city law for race-based discrimination, retaliation, hostile work environment, interference with protected rights, negligent hiring, intentional infliction of emotional distress, and assault. (Compl. ¶¶ 46–104.) Summary judgment is granted for Defendants on all claims.

### A. Discrimination Under Title VII, Section 1981, the NYSHRL and the NYCHRL

Plaintiff's First, Second and Seventh Causes of Action allege that Defendants discriminated against her on the basis of her race in violation of Title VII and *42 U.S.C. § 1981*.[2] To establish a prima facie case of employment discrimination, a plaintiff must show that (1) she belonged to a protected class; (2) she was qualified for the position she occupied; (3) she was subject to an adverse employment action; and (4) the circumstances surrounding the adverse action give rise to an inference of discrimination. *Menaker v. Hofstra University*, 935 F.3d 20, 30 (2d Cir. 2019). Defendants do not dispute that Plaintiff is a member of a protected class as an African-American woman. Nor do they appear to challenge whether Plaintiff was qualified for her position. The only disputed issues are whether Plaintiff suffered an adverse employment action and, if so, whether it occurred under circumstances giving rise to an inference of discrimination.

The adverse employment actions of which Plaintiff complains are not clearly identified in her submissions. Construing Plaintiff's arguments in the light most favorable to her, Plaintiff complains of four actions: (1) Plaintiff's alleged denial of an "upgrade"; (2) FIT's delay in investigating her Affirmative Action Complaint; (3) FIT's inadequate

discipline of Barton; and (4) Plaintiff's relocation.[3] "An adverse employment action is a materially adverse change in the terms and conditions of employment." *Mathirampuzha v. Potter*, 548 F.3d 70, 78 n. 7 (2d Cir. 2008). Such action must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012) (citation omitted). "Examples of materially adverse employment actions include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004) (citation omitted).

**\*4** Here, none of the conduct identified by Plaintiff constitutes an adverse employment action sufficient to support a *prima facie* case of discrimination. With respect to Plaintiff's desire to advance within FIT, the undisputed facts show that Plaintiff was not, in fact, "denied" an upgrade. In her single discussion with Davis regarding a potential upgrade, Davis asked Plaintiff to take certain steps to further their discussion (*i.e.*, work with Human Resources to identify a job title to which Plaintiff might upgrade) and Plaintiff admits she never followed up. (Pl.'s Resp. to SUMF, ECF No. 103, at 10.) Plaintiff also admits she never asked Davis "to do anything except explain [ ] what additional roles/responsibilities she had in mind so that I was clear," (SUMF ¶ 51), and that it was Plaintiff who "dropped the upgrade discussion." (*Id.*)[4] In *Brown v. Coach Stores, Inc.*, 163 F.3d 706 (2d Cir. 1998), the Circuit held that an individual alleging she was passed over for a promotion must establish that she actually applied for one, because "if generally requesting a promotion in an annual review were sufficient [ ], employers would be unfairly burdened in their promotion efforts." *Id.* at 710. Similarly, the mere fact that Plaintiff expressed an interest in an upgrade does not establish that any adverse employment action was taken against her—particularly here where Defendants have shown that the upgrade process at FIT is applicant-driven rather than automatic, and Plaintiff failed to propel that process.[5]

Nor do Plaintiff's complaints that FIT unduly delayed its investigation into her Affirmative Action Complaint and that FIT did not appropriately discipline Barton following the May 2019 confrontation qualify as adverse employment actions. Neither describes a "materially adverse change in

the terms and conditions" to *Plaintiff's* employment. *See e.g.,* *Fincher v. Depository Trust & Clearing Corp.,* 604 F.3d 712, 721, 724 (2d Cir. 2010) (failure to investigate complaints of discrimination does "not by itself alter the terms and conditions of [a plaintiff's] employment[,]" and, thus, cannot constitute an adverse employment action); *Weinstein v. Garden City Union Free Sch. Dist.,* No. 11 Civ. 2509, 2013 WL 5507153, at *24 (E.D.N.Y. Sept. 30, 2013) (failure to discipline another worker for cursing at plaintiff does not constitute adverse employment action).

Finally, Plaintiff's relocation to a different building cannot rise to the level of an adverse employment action without any corresponding material impact on the terms and conditions of her employment. *Signer v. Tuffey,* 66 F. App'x 232, 236 (2d Cir. 2003) (seat relocation may constitute adverse employment action if paired with reduction in job responsibilities and removal of duties). Plaintiff has not adduced any evidence that her relocation had any material, as opposed to a perceived or speculative, impact on her job, other than an attestation consisting largely of conclusory and vague allegations that her transfer "adversely impacted" her work because her boss "would just do things herself." (Opp. at 49; Aff. ¶ 31.) Even if it was an adverse employment action, Plaintiff has not established any facts suggesting that her relocation was made under circumstances giving rise to an inference of discrimination. [6] To the contrary, Plaintiff was relocated because she requested it. (SUMF ¶ 215.)

**\*5** Because Plaintiff cannot show any adverse employment action, her discrimination claims fail. Plaintiff's Causes of Action One, Two and Seven for Title VII and *Section 1981* discrimination and disparate treatment are therefore dismissed. Because claims under Title VII and the NYSHRL "are analyzed identically," *Hyek v. Field Support Servs., Inc.,* 461 F. App'x. 59, 60 (2d Cir. 2012), and because there can be no aiding and abetting without a predicate act, *Farmer v. Shake Shack Enterprises, LLC,* 473 F.Supp.3d 309, 338 (S.D.N.Y. 2020), Plaintiff's Twelfth Cause of Action for aiding and abetting discrimination under the NYSHRL is also dismissed.

**B. Discrimination Under the NYCHRL**

Plaintiff's Fourteenth Cause of Action alleges that Barton and Davis discriminated against her in violation of the NYCHRL. To establish a discrimination claim under the NYCHRL, Plaintiff must show that her employer treated her less well, at least in part for a discriminatory reason. *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.,* 715 F.3d 102, 110 (2d Cir. 2013).

Plaintiff has not adduced any evidence to support an inference that Davis or Barton treated her "less well" on the basis of her race. She does not identify any derogatory statements about her race by Davis and the lone such statement by Barton is time-barred. (Compl. ¶ 17) (alleging that Barton told a student aide that "African Americans are three-fifths of a human being" in 2016); *Kassner v. 2nd Avenue Delicatessen Inc.,* 496 F.3d 229, 238 (2d Cir. 2007) (three-year statute of limitations to NYCHRL claims). To the extent Plaintiff complains that Davis made an upgrade request for Barton, who is Caucasian, but not for Plaintiff, (*see* Opp. at 61), as noted above, Plaintiff's failure to obtain an upgrade is due to her own inaction, not Davis's. Even if that were not the case, Plaintiff has offered no competent evidence to support her hypothesis that the reason motivating Davis to deny Plaintiff's upgrade was Plaintiff's race. Plaintiff's subjective belief that that is the case, without more, is insufficient to sustain her claim at summary judgment. Finally, as discussed below with respect to Plaintiff's hostile work environment claims, *infra* Section C, there is no indication that the 2019 confrontation with Barton was motivated by Plaintiff's race.

Defendants are therefore entitled to summary judgment on Plaintiff's Fourteenth Cause of Action for discrimination under the NYCHRL, as well as her Sixteenth Cause of Action for aiding and abetting discrimination under the NYCHRL.

**C. Hostile Work Environment**

Plaintiff's Third and Fourth Causes of Action allege that Defendants subjected her to a hostile work environment in violation of Title VII and *Section 1981.* To succeed on a hostile work environment claim, a plaintiff must show that her "workplace is permeated with discriminatory intimidation, ridicule, and insult ... that is sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993). To satisfy this standard, "[a] plaintiff must show not only that she subjectively perceived the environment to be abusive, but also that the environment was objectively hostile and abusive." *Harvin v. Manhattan & Bronx Surface Transit Operating Auth.,* 767 F. App'x 123, 128 (2d Cir. 2019). In analyzing whether a plaintiff has met her burden, "courts should examin[e] the totality of the

circumstances, including: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the victim's [job] performance."

*Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20 (2d Cir. 2014). In doing so, courts have repeatedly held that a "mere utterance of an ... epithet which engenders offensive feelings in an employee, ... does not sufficiently affect the conditions of employment." *Harris*, 510 U.S. at 21. Moreover, "[s]imple teasing, offhand comments, or isolated incidents of offensive conduct (unless extremely serious)" are insufficient. *Petrosino v. Bell Atl.*, 385 F.3d 210, 223 (2d Cir. 2004). To establish a hostile work environment, a plaintiff must also demonstrate that the conduct occurred because of her membership in a protected class. *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002).

*6 After reviewing the entire record and assessing the facts in the light most favorable to Plaintiff, this Court concludes that Plaintiff has not put forth any evidence of any conduct that would rise to the level required to sustain a hostile work environment claim. At most, Plaintiff has established an environment that involved sporadic, unrelated comments and incidents that occurred years apart, one of which (Barton's use of the word "bastard") Plaintiff admits was not directed at her or related to race. Even ignoring that all the incidents grounding Plaintiff's Affirmative Action Complaint are time-barred, this conduct —four isolated comments across a six-year period—falls far short of establishing a workplace "severely permeated with discriminatory intimidation, ridicule, and insult." *Wesley-Dickson v. Warwick Valley Cent. Sch. Dist.*, 586 F. App'x 739, 745 (2d Cir. 2014) (quotation omitted).

Nor does Plaintiff's May 2019 dispute with Barton suffice to establish a hostile work environment, as the record is devoid of any evidence to suggest that it occurred because of Plaintiff's race. Plaintiff's only basis for her belief that Barton acted based on race is that she has "never seen [Barton] act that way with a white person." (Opp. at 10.) That fact, in and of itself, is insufficient to support an inference of race discrimination. *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 456 (2d Cir. 1999) (plaintiff's "feelings and perceptions of being discriminated against are not evidence of discrimination"); *Hill*, 467 F.Supp.2d at 360 ("When a person only makes general allegations that African Americans are treated differently in the workplace,

those allegations are insufficient to support a hostile work environment claim"); *Davis-Bell*, 851 F.Supp.2d at 677 (granting summary judgment to defendants where plaintiff's only evidence of race-based hostile work environment was the fact that "no other non-African American [ ] suffered similar abuse"); *Sharpe*, 684 F.Supp.2d at 400–01 (dismissing hostile work environment claim on summary judgment, in part because "[t]he fact that [plaintiff's supervisor] did not yell at four white employees ... proves nothing."). [7] Nor does Barton's statement that "African-Americans were once considered three-fifths of a human being" afford a sufficient basis for a jury to conclude that the May 2019 incident—which occurred three years later and with no interim misdoings—occurred out of discriminatory animus. Plaintiff's entire case revolves around one discrete, facially neutral event and a three-year-old statement regarding the historical status of African Americans. This single statement does not afford a sufficient basis for the jury to conclude that the May 2019 incident occurred out of discriminatory animus.

*Hill*, 467 F.Supp.2d at 360 (in the context of a hostile work environment claim, prior use of a racial epithet by a supervisor alone was insufficient to establish that a different, facially race-neutral event was the result of racial discrimination).

Accordingly, based on the absence of any evidence to suggest that the circumstances of Plaintiff's work environment were so objectively threatening or harassing as to have adversely altered her working conditions, or that those circumstances were related to her race, no reasonable jury could find that Defendants subjected Plaintiff to a hostile work environment. Defendants are therefore entitled to summary judgment on Plaintiff's Third and Fourth Causes of Action.

## D. Retaliation Under Title VII, Section 1981, the NYSHRL and the NYCHRL

Plaintiff's Fifth, Sixth and Eleventh Causes of Action allege retaliation in violation of Title VII, Section 1981 and the NYSHRL. To establish retaliation under these statutes, a plaintiff "must demonstrate that (1) [she] engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action." *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013). As discussed above, Plaintiff has not shown that she suffered any materially adverse employment action. Defendants are therefore entitled to summary judgment on Plaintiff's Fifth,

Sixth and Eleventh Causes of Action, as well as on her Thirteenth Cause of Action for aiding and abetting retaliation under the NYSHRL.

**\*7** Plaintiff also asserts a retaliation claim against Defendants Davis and Barton pursuant to the NYCHRL. The NYCHRL is slightly more solicitous of retaliation claims than federal and state law because, rather than requiring a plaintiff to show an adverse employment action, it only requires action that was "reasonably likely to deter a person from engaging in protected activity." *Mestecky v. New York City Dep't of Educ.*, 791 F. App'x 236, 239 (2d Cir. 2019) (citation omitted). Otherwise, a *prima facie* case of retaliation faces the same requirements under the NYCHRL as under the NYSHRL. *See id.* In her opposition brief, Plaintiff explains that her retaliation claim against Davis "arises from Davis' conduct in not requesting an upgrade for [Plaintiff]." (Opp. at 52.) As explained above, the undisputed evidence shows that the onus was on Plaintiff to move her upgrade forward, not Davis. This claim therefore fails. *Campbell v. Cellco P'ship*, 860 F.Supp.2d 284, 300 (S.D.N.Y. 2012) (dismissing NYCHRL retaliation claim for failure to promote where plaintiff failed to apply for the position he wanted). Plaintiff's claim against Barton also fails because the May 2019 incident would not, by itself, dissuade a reasonable person from voicing a complaint. Indeed, it did not deter Plaintiff: immediately following the incident, Plaintiff reported Barton's conduct and filed an EEOC charge. Accordingly, Defendants are entitled to summary judgment with respect to Plaintiff's Fifteenth Cause of Action.

### E. Negligent Hiring

Defendants also move for summary judgment on Plaintiff's negligent hiring claim on the grounds that it is prohibited by New York's Workers' Compensation Law ("WCL"). Defendants are correct. It is well-settled that common law negligence claims against employers are barred by the WCL. *See e.g.,* 🚩 *Torres v. Pisano*, 116 F.3d 625 (2d Cir. 1997) (WCL barred negligence claim based on co-worker harassment). Plaintiff's Eighth Cause of Action is therefore dismissed. [8]

### F. Intentional Infliction of Emotional Distress

Plaintiff also asserts a claim of intentional infliction of emotional distress against Barton. [9] To establish intentional infliction of emotional distress ("IIED") under New York law, Plaintiff must prove: (i) extreme and outrageous conduct;

(ii) intent to cause, or disregard of a probability of causing, emotional distress; (iii) a causal connection between the conduct and injury; and (iv) emotional distress. 🚩 *Howell v. New York Post Co., Inc.*, 81 N.Y.2d 115, 121 (N.Y. 1993). The standard for extreme and outrageous conduct is incredibly high. The conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized society." 🚩 *Murphy v. American Home Products Corp.*, 58 N.Y.2d 293, 303 (N.Y. 1983). Due to this very high threshold, IIED claims "generally do not survive dispositive motions." *Allam v. Meyers*, No. 09 Civ. 10580, 2011 WL 721648, at \*6 (S.D.N.Y. Feb. 24, 2011). Indeed, the New York Court of Appeals has rejected every claim for intentional infliction of emotional distress it has considered because the conduct was not sufficiently outrageous or extreme. 🚩 *Howell*, 81 N.Y.2d at 122. The few claims upheld by the Appellate Divisions have involved "longstanding campaign[s] of deliberate, systematic, and malicious harassment." 🚩 *Seltzer v. Bayer*, 272 A.D.2d 263, 264 (1st Dep't 2000).

Barton's actions during the May 2019 incident do not approach the type of egregious conduct necessary to support a claim for intentional infliction of emotional distress. Courts have repeatedly declined to hold behavior and threats such as Barton's to be extreme and outrageous. *See e.g., Walther v. Maricopa Int'l Inv., Corp.*, No. 97 Civ. 4816, 1998 WL 689943, at \*4 (S.D.N.Y. Sept. 30, 1998) (repeated verbal threats such as "\*\*\*\*sucker you're gonna pay" fell short of "extreme and outrageous" threshold); *Torain v. Casey*, No. 16 Civ. 2682, 2016 WL 6780078, at \*2 (S.D.N.Y. Sept. 16, 2016), *report and recommendation adopted*, 2016 WL 6775440 (S.D.N.Y. Nov. 14, 2016) (threat to break plaintiff's jaw insufficient to establish IIED); *Saleh v. United States*, No. 12 Civ. 4598, 2013 WL 5439140, at \*11–12 (S.D.N.Y. Sept. 27, 2013) (defendant's threats and plaintiff's resulting fear "that at any moment he could be attacked physically or harassed[,] ... kidnapped[,] or even killed" did not rise to required level of conduct), *aff'd*, 580 Fed. Appx. 22 (2d Cir. 2014); *Owen v. Leventritt*, 174 A.D.2d 471, 472 (1st Dep't 1991) (threat to kill pregnant plaintiff insufficient to support a cause of action for IIED). It follows that the threats at issue here also fail to constitute "extreme and outrageous" behavior. Defendants' motion as to this claim is therefore granted and Plaintiff's Ninth Cause of Action is dismissed.

## G. Assault

**\*8** Defendants also move for summary judgment on Plaintiff's assault claim on the grounds that Plaintiff cannot demonstrate having suffered any apprehension of an imminent harmful bodily contact—one of the essential elements of a common law assault claim. An assault is "an intentional placing of another person in fear of imminent harmful or offensive contact." *United Nat'l Ins. Co. v. Waterfront N.Y. Realty Corp.*, 994 F.2d 105, 108 (2d Cir. 1993). To succeed on an assault claim, a plaintiff must show that the defendant intended "either to inflict personal injury or to arouse apprehension of harmful or offensive bodily contact." *Rivera v. Puerto Rican Home Attendants Servs., Inc.*, 930 F.Supp.2d 124, 133 (S.D.N.Y. 1996).

No reasonable jury could find that Barton's actions during the May 2019 altercation put Plaintiff in "imminent apprehension" of "harmful or offensive contact." Threatening words, although discourteous, are insufficient to support a claim of assault. *Carroll v. New York Prop. Ins. Underwriting Ass'n*, 88 A.D.2d 527, 527 (1st Dep't 1982); *Joon Song v. MHM Sponsors Co.*, 176 A.D.3d 572, 573 (1st Dep't 2019) ("assault claim based on screaming, threats, and having a door slammed in plaintiff's face failed to allege facts that would establish that physical contact was reasonably imminent"). The complained of physical conduct—Barton's poking or light pushing of Plaintiff—cannot have engendered in Plaintiff the requisite imminent apprehension of harmful conduct. Defendants are therefore entitled to summary judgment with respect to Plaintiff's Tenth Cause of Action.

## H. Interference with Protected Rights

Finally, Plaintiff brings a claim for interference with protected rights under the NYCHRL. The NYCHRL prohibits "any person" from "coerc[ing], intimidat[ing], threaten[ing] or interfer[ing] ... in the exercise or enjoyment of ... any right granted or protected" under the NYCHRL, or attempting to do so. N.Y.C. Admin. Code § 8-107(19). To establish interference, a plaintiff must show that a threat was made against her because of her exercise of a protected right. *Nieblas-Love v. New York City Hous. Auth.*, 165 F.Supp.3d 51, 78 (S.D.N.Y. 2016).

Plaintiff has not shown that Barton's threats in May 2019 were designed to interfere with her exercise of a protected right. Although Plaintiff points to her Affirmative Action Complaint, (*see* Opp. at 70–71) (arguing that the complaint was a motivating factor for the May 2019 incident, and thus, that Barton acted "because of" Plaintiff's protected activity), that Complaint had been fully submitted for over a year by the time of the May 2019 incident. The sequence of events refutes any suggestion that Barton's actions in May 2019 were designed to chill the exercise of Plaintiff's rights a year earlier. *See France v. Touro Coll.*, No. 14 Civ. 4613, 2016 WL 1105400, at \*13 (E.D.N.Y. Feb. 16, 2016), *report and recommendation adopted*, No. 14 Civ. 4613, 2016 WL 1117459 (E.D.N.Y. Mar. 21, 2016) (interference with protected activity requires that "plaintiff's ability to complain was interfered with by the defendant.") Indeed, Plaintiff's attempt to explain her basis for this claim suggests that it is merely duplicative of her retaliation claim. *Cadet v. All. Nursing Staffing of New York, Inc.*, No. 21 Civ. 3994, 2022 WL 4584246, at \*22 (S.D.N.Y. Sept. 29, 2022) (dismissing interference claim because "to hold otherwise ... would make Plaintiff's retaliation claim and interference with protected rights claim entirely duplicative, despite the fact that these are separate provisions of the NYCHRL"); *see also, Rosas v. Baiter Sales Co. Inc.*, No. 12 Civ. 6557 (VSB), 2015 WL 12915807, at \*12 (S.D.N.Y. Mar. 30, 2015) (declining to interpret interference claims as coterminous with retaliation claims). Defendants are therefore entitled to summary judgment with respect to Plaintiff's Seventeenth Cause of Action.

## IV. CONCLUSION

**\*9** Defendants' motions for summary judgment, (ECF Nos. 79, 80, 81, and 86), are GRANTED and this action is dismissed.

**All Citations**

Slip Copy, 2023 WL 2525677

**Footnotes**

1    In FIT terminology, an "upgrade" is synonymous with promotion and means that an employee has moved to a higher job title. (SUMF ¶ 28.)

2    Plaintiff failed to include the 2014–2018 remarks by Cowan, Farmer and Barton in her EEOC Charge. (ECF No. 82–6.) Because they are not reasonably related to the sole incident described in that charge (Plaintiff's 2019 confrontation with Barton), Plaintiff failed to exhaust her administrative remedies with respect to those incidents. Additionally, those earlier remarks are time-barred and the continuing violations doctrine does not apply. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110 (2002) (continuing violations doctrine does not apply to "discrete discriminatory acts"). Insofar as Plaintiff's Title VII claims are premised on those statements, these constitute two additional grounds for dismissal.

3    Plaintiff also claims as one of her adverse employment actions "the hostile work environment itself." (Pl.'s Mem. of Law in Opp. to Defs.' Mots. for Summ. J. ("Opp."), ECF No. 101, at 16.) Because Plaintiff fails to establish a hostile work environment, *see supra* Section C, she cannot rely on it to support her discrimination or retaliation claims.

4    Plaintiff's papers rely heavily on an affidavit Plaintiff submitted in connection with the instant motion that directly contradicts her prior testimony. For example, the affidavit claims that Davis never told Plaintiff that she was waiting for Plaintiff "to supply a new job title," (Pl.'s Aff. ("Aff."), ECF No. 98–21, ¶ 19), even though Plaintiff admitted during her deposition that she and Davis had agreed to table the upgrade discussion until Plaintiff came up with a suitable title, (Pl.'s Resp. to SUMF, ECF No. 103, at 10; SUMF ¶ 51). It is well settled that "a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." *Brown v. Reinauer Transportation Companies*, L.P., 788 F. App'x 47, 49 (2d Cir. 2019). "Thus, factual issues created solely by an affidavit crafted to oppose a summary judgment motion are not genuine issues for trial." *Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996).

5    While Plaintiff is correct that a failure to apply for a position is not a bar to relief when an employer's discriminatory practices deter application or make application a futile endeavor, *Malarkey v. Texaco, Inc.*, 983 F.2d 1204, 1213 (2d Cir. 1993), no reasonable person would interpret the change Plaintiff perceived in Davis's attitude following the filing of her Affirmative Action Complaint to have made application futile. In any event, Plaintiff's conclusory claim that Davis became "cold and brusque," (Opp. at 34), without any supporting facts is not enough to raise a genuine dispute of fact.

6    Plaintiff cannot, as she argues, prove discriminatory animus based on the mere fact that Barton, who was not relocated, is Caucasian. *See Hill v. Rayboy-Brauestein*, 467 F.Supp.2d 336, 360 (S.D.N.Y. 2006) ("allegations that African Americans are treated differently ... are insufficient to support hostile work environment"); *Davis-Bell v. Columbia Univ.*, 851 F.Supp.2d 650, 677 (S.D.N.Y. 2012) (granting summary judgment to defendants where plaintiff's only evidence of race-based hostile work environment was the fact that "no other non-African American [ ] suffered similar abuse"); *Sharpe v. MCI Communications Services, Inc.*, 684 F.Supp.2d 394, 400–01 (S.D.N.Y. 2010) (dismissing hostile work environment claim in part because "[t]he fact that [plaintiff's supervisor] did not yell at four white employees ... proves nothing.").

7    Plaintiff's reliance on *Terry* is misplaced. There, the evidence included testimony from a third-party that Defendant routinely engaged in "race-baiting." *Terry v. Ashcroft*, 336 F.3d 128, 150 (2d Cir. 2003). Such evidence is absent here.

8    Plaintiff's failure to oppose Defendants' motion as to her negligence claim is independent grounds for its dismissal. *Camarda v. Selover*, 673 F. App'x 26, 30 (2d Cir. 2016) ("Where, as here, a counseled non-moving

party submits a partial response arguing that summary judgment should be denied as to some claims while not mentioning others, that response may be deemed an abandonment of the unmentioned claims.") (quotation omitted); *see also Malik v. City of New York,* 841 F. App'x 281, 284 (2d Cir. 2021).

9      Plaintiff also brought claims for intentional infliction of emotional distress and assault against Davis but failed to defend them in her opposition papers. They are thus deemed abandoned and dismissed, but in any event fail for the same reasons as do the claims against Barton. *See infra* Sections F and G.

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 721648
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Miryam ALLAM a/k/a Miryam Meyers, Plaintiff,
v.
Jason MEYERS, Defendant.

No. 09 Civ. 10580(KMW).
|
Feb. 24, 2011.

*Opinion & Order*

WOOD, District Judge.

**\*1** Plaintiff Miryam Allam ("Plaintiff") brings this action against her former husband, Defendant Jason Meyers ("Defendant"), alleging battery, assault, intentional infliction of emotional distress ("IIED"), false imprisonment, and conversion.

Defendant moves to dismiss the action for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure ("Rule 12(b)(1)"). Defendant also moves, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Rule 12(b)(6)"), to dismiss Plaintiff's cause of action sounding in IIED.

For the reasons stated below, Defendant's motion is GRANTED in part and DENIED in part.

I. *Background*
Unless otherwise noted, the following facts are drawn from Plaintiff's First Amended Complaint, and are taken as true for the purposes of Defendant's Rule 12(b)(6) motion. *See Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007).

A. Plaintiff's Allegations
Plaintiff, a citizen of France (First Am. Compl. ¶ 1), married Defendant, a citizen of New York (*id.* ¶ 3), on October 2, 2009. (*Id.* ¶ 102). Their marriage was annulled on April 4, 2010. (*See* Pl. Opp. at 12; Def. Reply Mem. at 2.)

Plaintiff filed her First Amended Complaint in this diversity action [1] on March 23, 2010 (*see* Dkt. Entry No. 7), and makes out five claims for relief. First, Plaintiff alleges that Defendant is liable in battery for

> hitting [Plaintiff], kicking her, pulling her hair, grabbing her, pushing her, throwing glass on her, pulling her in a window, pulling her off a windowsill and allowing her body to crash down onto a toilet, imprisoning her, ejaculating on her face, running cold shower water on her while imprisoning her in the shower, and otherwise physically assaulting her ....

(*Id.* ¶ 140; *see also, e.g., id.* ¶¶ 32, 40, 49, 55, 59, 62, 70, 75, 82, 96, 98, 106, 113–17.) Second, Plaintiff alleges that Defendant "repeatedly" placed Plaintiff "in fear of imminent bodily harm," and is thus liable for assault. (*See, e.g., id.* ¶ 146). Third, Plaintiff claims that Defendant is liable in IIED for orchestrating "a six-month[,] non-stop[,] deliberate and malicious campaign of harassment, intimidation, manipulation, and violence ... against [Plaintiff]." (Pl. Mem. at 19.) This "campaign" allegedly consisted of Defendant's continuous physical and emotional abuse, which included

> slapp[ing Plaintiff], push[ing] and shov[ing] her, verbally assault[ing] her with despicable name calling, threaten[ing] her with deportation and arrest, [forbidding] her through threats of violence from meeting friends or speaking with her mother, mentally and physically control[ling] her against her will, and degrad[ing] her with demeaning sexual acts.

(*Id.; see also, e.g.,* First Am. Compl. ¶¶ 151–57.) Fourth, Plaintiff claims that Defendant falsely imprisoned her by, "among other things, confining her to the bathroom, confining her to the shower, and falsely telling her that she would be arrested if she tried to leave the country." (First Am. Compl. ¶ 159.) Finally, Plaintiff alleges that Defendant is liable in conversion for taking and selling her property. (*Id.* ¶¶ 163–168.)

B. The Instant Motion and Subsequent Procedural History
**\*2**  Defendant filed the instant motion on April 19, 2010.

Defendant first moves, pursuant to Rule 12(b)(1), to dismiss this action for lack of subject matter jurisdiction because "federal courts generally do not have jurisdiction over [domestic relations disputes]." (Def. Mem. at 4) (internal quotations omitted). Alternatively, Defendant contends that, even if federal jurisdiction is proper, the Court "should decline to exercise jurisdiction over this action because the subject of [Plaintiff's] claims is the parties' conduct of their marriage and the events leading up to that marriage and because those claims can be fully and fairly determined in state court." (Def. Mem. at 4–5.)

Defendant also moves, pursuant to Rule 12(b)(6), to dismiss Plaintiff's IIED claim. According to Defendant, Plaintiff's IIED claim "is deficient because the conduct she alleges is not sufficiently outrageous, the claim is duplicative of her other claims and comes within the ambit of other torts, and no claim exists for [IIED] between spouses." (Def. Mem. at 2.)

The matter was transferred to this Court on September 30, 2010.

## II. *Discussion*

### A. Subject Matter Jurisdiction
Defendant contends that this action must be dismissed because the Court lacks subject matter jurisdiction over it. [2]

### 1. Legal Standard
A case is properly dismissed for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) "when the district court lacks the statutory or constitutional power to adjudicate it." *Morrison v. Nat'l Australia Bank Ltd.,* 547 F.3d 167, 170 (2d Cir.2008). The party invoking the jurisdiction of the Court bears the burden, once challenged, of proving that such jurisdiction exists. *Id. See also Dowlah v. Dowlah,* 09 Civ.2020, 2010 WL 889292, at \*1 (E.D.N.Y. Mar. 10, 2010). "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed.R.Civ.P. 12(h)(3).

### 2. Applicable Law
"It is a fundamental precept that federal courts are courts of limited jurisdiction and lack the power to disregard such limits as have been imposed by the Constitution or Congress."

*Durant, Nichols, Houston, Hodgson & Cortese–Costa P.C. v. Dupont,* 565 F.3d 56, 62 (2d Cir.2009) (internal quotations omitted). Plaintiff claims diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(2). (First Am. Compl. ¶ 6.) Section 1332(a)(2) requires that: (a) the amount in controversy exceed \$75,000; and (b) the controversy be between "citizens of a State and citizens or subjects of a foreign state." 28 U.S.C. § 1332(a)(2).

Notwithstanding a plaintiff's satisfaction of the requirements of the diversity statute, federal courts are divested of the power "to issue divorce, alimony, and child custody decrees." *Ankenbrandt v. Richards,* 504 U.S. 689, 703 (1992). This so-called "domestic relations exception" to federal jurisdiction is a judicially created doctrine, which stems from "misty understandings of English legal history," *Marshall v. Marshall,* 547 U.S. 293, 299 (2006); the Supreme Court's long-held construction of the diversity statute, *id. at 307;* and "sound policy considerations." *Ankenbrandt,* 504 U.S. at 703. These policy considerations are to the effect that state courts are best situated to adjudicate marital and child custody disputes. The *Ankenbrandt* Court, for example, explained that the issuance of divorce, alimony, or child custody decrees "not infrequently involves retention of jurisdiction by the court and deployment of social workers to monitor compliance. As a matter of judicial economy, state courts are more eminently suited to work of this type than are federal courts...." *Ankenbrandt,* 504 U.S. at 703–04. "Moreover, as a matter of judicial expertise, it makes far more sense to retain the rule that federal courts lack power to issue these types of decrees because of the special proficiency developed by state tribunals ... in handling issues that arise in the granting of such decrees." *Id.* at 704.

**\*3**  The exception applies to "a narrow range of domestic relations issues." *Id.* at 701; *see also Marshall,* 547 U.S. at 307; *Williams v. Lambert,* 46 F.3d 1275, 1283 (2d Cir.1995). Specifically, the exception "encompasses *only* cases involving the issuance of a divorce, alimony, or child

custody decree." 🚩 *Ankenbrandt,* 504 U.S. at 704 (emphasis added); *see also* 🚩 *Marshall,* 547 U.S. at 308. Accordingly, although state tribunals enjoy a "special proficiency" in handling issues related to the granting of divorce, alimony and child custody decrees, federal courts are "equally equipped to deal with complaints alleging the commission of torts." 🚩 *Marshall,* 547 U.S. at 308. *See also* 🚩 *Ankenbrandt,* 504 U.S. 704, 706–07 (upholding federal diversity jurisdiction where plaintiff alleged that her former husband was liable in tort for the abuse of their children); 🚩 *Schottenstein v. Schottenstein,* No. 04 Civ. 5851, 2004 WL 2534155, at *8 (S.D.N.Y. Nov. 8, 2004); 🚩 *Tilley v. Anixter Inc.,* 283 F.Supp.2d 729, 736 (D.Conn.2003); *Minot v. Eckardt–Minot,* No. 92 Civ. 3334, 1993 WL 106043, at *1 (S.D.N.Y. Apr. 6, 1993).

### 3. Application of Law to Facts

The domestic relations exception to federal jurisdiction is inapplicable to the instant matter. Plaintiff does not request the issuance of a divorce, alimony or child custody decree, but merely seeks monetary damages for claims sounding in tort. (First Am. Compl. ¶¶ 139–168.) Indeed, Defendant (ultimately) concedes as much, stating in his reply memorandum that he "does not now argue [,] nor did he previously[,] that the 'domestic relations exception' mandates the dismissal of this action[, because P]laintiff here clearly does not seek a divorce, custody or child support." (Def. Reply Mem. at 5 n. 2.)

Because it is undisputed that Plaintiff has satisfied the requirements of the diversity statute, 🚩 28 U.S.C. § 1332, and because the domestic relations exception is inapplicable, the Court finds that it has subject matter jurisdiction over this matter.

### B. Abstention

Defendant asks the Court to abstain from exercising jurisdiction over this matter, because "the subject of [Plaintiff's] claims is the parties' conduct of their marriage and the events leading up to that marriage[,] and because those claims can be fully and fairly determined in state court." (Def. Mem. at 4–5; *see also* Def. Reply at 5 n. 2.)

### 1. Applicable Law

Abstention from the exercise of federal jurisdiction is "an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it." 🚩 *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 813 (1976) (internal quotations omitted). It is thus " 'the exception, not the rule.' " 🚩 *Ankenbrandt,* 504 U.S. at 705 (quoting 🚩 *Colorado River Water Conservation Dist.,* 424 U.S. at 813). *See also* 🚩 *CECOS Int'l, Inc. v. Jorling,* 895 F.2d 66, 70 (2d Cir.1990). The Supreme Court has repeatedly counseled that abstention "should rarely be invoked, because the federal courts have a 'virtually unflagging obligation ... to exercise the jurisdiction given them.' " 🚩 *Ankenbrandt,* 504 U.S. at 705 (quoting 🚩 *Colorado River Water Conservation Dist.,* 424 U.S. at 817). *See also* 🚩 *Minot v. Eckardt–Minot,* 13 F.3d 590 (2d Cir.1994) (quoting *Ankenbrandt* ).

**\*4** The Court construes Defendant's motion as raising two related grounds for abstention. First, in dictum, the *Ankenbrandt* Court stated that abstention "might" be appropriate "in a case involving elements of the domestic relationship even when the parties do not seek divorce, alimony, or child custody." 🚩 504 U.S. at 705. *See also* 🚩 *Elk Grove Unified Sch. Dist. v. Newdow,* 542 U.S. 1, 13 (2004). This would be so where a case presents "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar." 🚩 *Ankenbrandt,* 504 U.S. at 705–06 (internal quotations omitted). *See, e.g.,* 🚩 *Minot,* 13 F.3d at 593–94 ("difficult questions of state law" presented where plaintiff sought to recover on a theory of "tortious custodial interference," which had yet to be developed in the New York state courts; "[a] state court should lead the way in developing its law in this area ....")

The *Ankenbrandt* Court also noted that this type of abstention- referred to as *Burford* abstention [3] —"might well" be relevant "if a federal suit were filed prior to effectuation of a divorce, alimony, or child custody decree, and the suit depended on a determination of the status of the parties." 🚩 *Ankenbrandt,* 504 U.S. at 706. *See also* 🚩 *Minot,* 13 F.3d at 595 (where evidence before the district court "plainly suggested that the dispute as to custody was still pending in state court,"

the district court's "decision to abstain ... cannot be deemed an abuse of discretion"); *Melnick v. Adelson–Melnick, 346 F.Supp.2d 499, 505–06 (S.D.N.Y.2004).* By contrast, *Burford* abstention is inappropriate where, as in *Ankenbrandt,* "the status of the domestic relationship has [already] been determined as a matter of state law, and in any event has no bearing on the underlying torts alleged." *Ankenbrandt,* 504 U.S. at 706.

Second, a line of cases which originated in this Circuit prior to *Ankenbrandt* advises courts to abstain from exercising jurisdiction over "issues 'on the verge' of being matrimonial in nature ... so long as there is no obstacle to their full and fair determination in state courts." *American Airlines, Inc. v. Block,* 905 F.2d 12, 14 (2d Cir.1990); *see also Mitchell–Angel v. Cronin,* No. 95–7937, 1996 WL 107300, at *2 (2d Cir.1996). *American Airlines*-type abstention is grounded on principles of comity and deference to the expertise of state courts in domestic relations matters. *See American Airlines, Inc.,* 905 F.2d at 15 (citing *Bossom v. Bossom,* 551 F.2d 474, 475 (2d Cir.1976) (per curiam) (abstention proper where: (a) the action is "on the verge" of being matrimonial in nature; (b) there is no obstacle to a full and fair determination in state court; and (c) "the interests of justice would be served by allowing the determination to be made [in state court] in view of [the state court's] great familiarity with matrimonial disputes and the absence of any such expertise by the federal courts.") & *Phillips, Nizer, Benjamin, Krim & Ballon v. Rosenstiel,* 490 F.2d 509, 515–16 (2d Cir.1973).)

**\*5** Subsequent decisions have limited *American Airlines* abstention to matters truly "on the verge" of being matrimonial in nature. For example, claims have "verged on matrimonial in nature" where a plaintiff alleged malicious prosecution and abuse of process "as part of a conspiracy to deprive her of her children's companionship and affections"; this was because such allegations related "solely to the appropriateness of the child custody decree...." *Mitchell–Angel,* 1996 WL 107300, at *1–2. Similarly, the standard was satisfied, and abstention was thus appropriate, where visitation rights were at issue, *Lomtevas v. Cardozo,* No. 05 Civ. 2779, 2006 WL 229908, at *3 (E.D.N.Y. Jan. 31, 2006), and where a plaintiff sought relief related to the alleged violation of a state court order distributing marital property, *Hamilton v. Hamilton–Grinols,* 363 Fed. Appx. 767, 769 (2d Cir.2010) ("The obligation that [plaintiff] seeks to enforce is ... 'matrimonial in nature' and is best left to the greater

interest and expertise of state courts in this field.") (internal quotation omitted).

2. Application of Law to Facts

The Court finds that neither *Burford*-nor *American Airlines*-type abstention is proper in this case.

*Burford*-type abstention is inapplicable here. *Burford* abstention applies to matters involving elements of the domestic relationship where "difficult questions of state law" bear on "policy problems of substantial public import whose importance transcends the result in the case then at bar." *Ankenbrandt,* 504 U.S. at 705–06 (internal quotations omitted). Plaintiff's common law tort claims for battery, assault, IIED, false imprisonment, and conversion do not satisfy that standard. *Cf. Minot,* 13 F.3d at 593–94. Further, although Plaintiff's First Amended Complaint was filed approximately two weeks before the state court annulled the parties' marriage, the "status of the domestic relationship" "has no bearing on the underlying torts alleged." *Ankenbrandt,* 504 U.S. at 706.

*American Airlines*-type abstention is likewise inappropriate. The *American Airlines* doctrine advises courts to abstain where issues are " 'on the verge' of being matrimonial in nature ... so long as there is no obstacle to their full and fair determination in state courts." *American Airlines, Inc.,* 905 F.2d at 14. The common law torts herein alleged do not "verge" on matrimonial in nature merely because the alleged tortfeasor and victim were once married. The allegations in Plaintiff's First Amended Complaint stand independent of the parties' domestic relationship; they are distinct from allegations implicating the appropriateness of a child custody decree, *Mitchell–Angel,* 1996 WL 107300, at *2, visitation rights, *Lomtevas,* 2006 WL 229908, at *3, and separation agreements, *Melnick,* 346 F.Supp.2d at 505–06, which have been held to satisfy the "verg[ing on] matrimonial in nature" standard. Exercising jurisdiction over the instant matter thus would not lead to this Court's intrusion upon state court expertise. *See Bossom,* 551 F.2d at 475; *Neustein v. Orbach,* 732 F.Supp. 333, 339 (E.D.N.Y.1990). In light of the foregoing, Defendant's contention that Plaintiff's claims "can be fully and fairly determined in state court," (Def. Mem. at 4–5; *see also* Def. Reply at 5 n. 2), is of no moment.

**\*6** The Court thus DENIES Defendant's motion to dismiss for lack of subject matter jurisdiction.

### C. Sufficiency of Plaintiff's IIED Claim

As previously noted, Defendant argues that Plaintiff's claim for IIED is deficient because "the conduct she alleges is not sufficiently outrageous, the claim is duplicative of her other claims and comes within the ambit of other torts, and no claim exists for [IIED] between spouses." (Def. Mem. at 2.)

### 1. Legal Standard

In order to survive a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must plead sufficient factual allegations "to state a claim to relief that is plausible on its face." *Twombly,* 550 U.S. at 570. A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. 1937, 1949 (2009). Where a plaintiff has not "nudged [her] claims across the line from conceivable to plausible, [her] complaint must be dismissed." *Twombly,* 550 U.S. at 547. The Court must accept as true all well-pleaded factual allegations in the complaint, and "draw [ ] all inferences in the plaintiff's favor." *Allaire Corp. v. Okumus,* 433 F.3d 248, 249–50 (2d Cir.2006).

### 2. Applicable Law

New York law applies to this diversity action. *See, e.g.,* *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.,* 375 F.3d 168, 178 n. 23 (2d Cir.2004). In applying New York law, this Court must follow the holdings of the New York Court of Appeals, *Williams v. J.P. Morgan & Co., Inc.,* 199 F.Supp.2d 189, 191 (S.D.N.Y.2002) (citing *Calvin Klein Ltd. v. Trylon Trucking Corp.,* 892 F.2d 191, 195 (2d Cir.1989)), and must reject inconsistent rulings from its lower courts, *Williams,* 199 F.Supp.2d at 191 (citing *Levin v. Tiber Holding Corp.,* 277 F.3d 243, 253 (2d Cir.2002)).

### a. New York's IIED Standard

In order to assert a valid claim for IIED pursuant to New York law, a plaintiff must demonstrate the following elements: "(i) extreme and outrageous conduct, (ii) an intent to cause—or disregard of substantial probability of causing—severe emotional distress, (iii) a causal connection between the conduct and the injury, and (iv) the resultant severe emotional distress." *Lau v.. S & M Enters.,* 898 N.Y.S.2d 42, 43, 898 N.Y.S.2d 42 (1st Dep't 2010). *See also Chukwuka v. City of New York,* No. 08 Civ.2095, 2010 WL 3780214, at \*8 (E.D.N.Y. Sept. 21, 2010); *Daniels v. Health Ins. Plan of Greater New York,* No. 02 Civ. 6054, 2005 WL 1138492, at \*2 (S.D.N.Y. May 12, 2005).

IIED is "a highly disfavored tort under New York law," and such claims generally "do not survive dispositive motions." *Hallgren v. Bell Atlantic Corp.,* No. 99 Civ. 11937, 2000 WL 726496, at \*3 (S.D.N.Y. May 30, 2000). This is because "New York sets a high threshold for conduct that is 'extreme and outrageous' enough to constitute" IIED. *Reyes v. Fairfield Properties,* 661 F.Supp.2d 249, 270 (E.D.N.Y.2009) (quotation omitted); *Bender v. City of N.Y.,* 78 F.3d 787, 790 (2d Cir.1996) (citing *Howell v. N.Y. Post Co.,* 81 N.Y.2d 115, 596 N.Y.S.2d 350, 612 N.E.2d 699, 702 (N.Y.1993)). The conduct alleged must be " 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.' " *Martin v. Citibank, N.A.,* 762 F.2d 212, 220 (2d Cir.1985) (quoting *Fischer v. Maloney,* 43 N.Y.2d 553, 402 N.Y.S.2d 991, 373 N.E.2d 1215, 1217 (1978)); *Reyes,* 661 F.Supp.2d at 270. *See also* Restatement (Second) of Torts § 46, cmt. d ("[L]iability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities."). The outrageousness element may be satisfied where "severe mental pain or anguish is inflicted through a deliberate and malicious campaign of harassment or intimidation." *Nader v. Gen. Motors Corp.,* 25 N.Y.2d 560, 569, 307 N.Y.S.2d 647, 654, 255 N.E.2d 765, 770 (1970). *See also, e.g., Price v. Mount Sinai Hosp.,* No. 07 Civ. 11318, 2010 WL 4910218, at \*9 (S.D.N.Y. Nov. 23, 2010); *Seltzer v. Bayer,* 272 A .D.2d 263, 264–65, 709 N.Y.S.2d 21 (1st Dep't 2000).

**\*7** Although courts have not precisely defined the contours of a "deliberate and malicious campaign of harassment or intimidation," (hereinafter "campaign"), certain attributes are

readily apparent. The Appellate Division has upheld IIED claims where the campaign at issue was "longstanding" and "systematic." *Seltzer,* 272 A.D .2d at 264–65 (citing cases). In *Murphy v. Murphy,* for example, the Appellate Division affirmed the trial court's finding of outrageousness, where defendant cohabitant, conducted a year-long "campaign" against plaintiff-cohabitant, which included: (a) killing plaintiff's pet goose; (b) various threats; (c) "general abusive conduct"; and (d) "wanton destruction of plaintiff's belongings...." 109 A.D.2d 965, 966, 486 N.Y.S.2d 457 (3d Dep't 1985). Similarly, in *Green v. Fischbein Olivieri Rozenholc & Badillo,* the trial court's finding of outrageousness was affirmed where plaintiff-tenant alleged that his landlord (and its counsel) engaged in "a course of conduct designed to harass, intimidate and interfere with plaintiff's tenancy" over a period of three years. 119 A.D.2d 345, 347, 507 N.Y.S.2d 148 N.Y.A.D. (1st Dep't 1986). Specifically, the defendants in *Green* allegedly: (a) brought numerous eviction proceedings and other actions against plaintiff, all without legal cause or justification; (b) interrupted or discontinued certain services, which resulted in "the drastic deterioration of plaintiff's living conditions"; (c) interfered with plaintiff's mail; and (d) verbally abused plaintiff and his guests. *Id.* at 350.

*See also Shannon v. MTA Metro–North Railroad,* 269 A.D.2d 218, 219, 704 N.Y.S.2d 208 (1st Dep't 2000) (pattern of harassment and intimidation conducted over a period of years); *Warner v. Druckier,* 266 A.D.2d 2, 3, 697 N.Y.S.2d 610 (1st Dep't 1999) (same).

Other courts have construed the "campaign" standard to require either allegations of "unrelenting," "day in, day out harassment," or allegations of harassment "accompanied by physical threats ....." *Lawson v. New York Billiards Corp.,* 331 F.Supp.2d 121, 133 (E.D.N.Y.2004) (internal quotations omitted) (citing cases). For example, in *Eves v. Ray,* the court found that an alleged "campaign" satisfied the outrageousness element of IIED where, on at least four occasions during a three-month period,[4] a former husband attempted to intimidate his former wife's attorney by stalking the attorney and threatening him "physically and financially." 42 A.D.3d 481, 483, 840 N.Y.S.2d 105 (2d Dep't 2007). The court in *Cavallaro v. Pozzi* similarly found a triable issue of fact as to outrageousness, where plaintiff alleged that defendant conducted a "constant campaign" which included threatening to kill plaintiff and his children. 28 A.D.3d 1075, 1078, 814 N.Y.S.2d 462 (4th Dep't 2006). *See also Stram v.*

*Farrell,* 223 A.D.2d 260, 262–63, 646 N.Y.S.2d 193 (3d Dep't 1996) (affirming jury's finding of a "campaign," the "most egregious" elements of which "involved vulgar language and outrageous threats directed at plaintiff and his young daughters").

**\*8** Finally, courts applying New York law have found the existence of a "campaign" even absent (a) "unrelenting" harassment directed at a single plaintiff; and (b) physical threats. In *164 Mulberry Street Corp. v. Columbia Univ.,* for example, several plaintiffs-restaurateurs alleged that defendant, a professor at Columbia University, wrote letters to plaintiffs as part of an academic study, which falsely accused plaintiffs of having caused severe food poisoning. 4 A.D.3d 49, 53, 771 N.Y.S.2d 16 (1st Dep't 2004). The court found the defendant's conduct "outrageous," notwithstanding one plaintiff's failure to identify how many letters he received from defendant. *See id.* The court reasoned as follows: "these several letters could be construed in the aggregate as presenting a campaign of harassment, albeit directed against distinct individuals, so it cannot be said as a matter of law that the fact of individual impacts vitiates what seems to have been serial acts perpetrated by a single source." *Id.* at 56. The Appellate Division has also found the existence of a "campaign" where a defendant "made repeated telephone calls to the plaintiff's house only to hang up as soon as someone answered," but where no actual threats appear to have been made. *Flatley v. Hartmann,* 138 A.D.2d 345, 346, 525 N.Y.S.2d 637 (2d Dep't 1988); *see also Gill Farms Inc. v. Darrow,* 256 A.D.2d 995, 997, 682 N.Y.S.2d 306 (3d Dep't 1998).

By contrast, allegations that a defendant affronted plaintiff in various ways, and in a randomized manner, may fall short of establishing a "deliberate and malicious campaign of harassment or intimidation." For instance, a plaintiff failed to demonstrate the existence of a "campaign" where he alleged that defendant dumped a pile of cement on a sidewalk in front of plaintiff's home; tossed lighted cigarettes into plaintiff's yard; threw eggs on his front steps; and once threatened to paint a swastika on his house. *Seltzer,* 272 A.D.2d at 265. According to the court, "three alleged incidents of littering and a particularly nasty remark" could not satisfy the pleading requirements for an IIED claim pursuant to New York law. *See also, e.g., Lawson,* 331 F.Supp.2d at 133 (no "campaign" where plaintiffs, a husband and wife, alleged that defendants: (a) conspired to have husband arrested; (b) made racist remarks about him to his wife; and (c) threatened him);

*Owen v. Leventritt,* 174 A.D.2d 471, 472, 571 N.Y.S.2d 25 (1st Dep't 1991) (no "campaign" where defendant publicly made statements threatening to kill plaintiff).

#### b. Limitations to IIED Claims

Notwithstanding a plaintiff's satisfaction of the IIED pleading requirements, her IIED claims may be dismissed for other reasons.

#### i. Duplicative Claims

The New York Court of Appeals long ago cautioned that "it may be questioned whether the doctrine of liability for [IIED] should be applicable where the conduct complained of falls well within the ambit of other traditional tort liability." *Fischer v. Maloney,* 43 N.Y.2d 553, 557–58, 402 N.Y.S.2d 991, 373 N.E.2d 1215 (1978). Although initially dictum, the *Fischer* limitation on IIED claims "has been consistently applied" to bar claims of IIED in both New York State and federal courts. *Moore v. City of N.Y.,* 219 F.Supp.2d 335, 339 (E.D.N.Y.2002) (Weinstein, J.). *See also Yang Feng Zhao v. City of N.Y.,* 656 F.Supp.2d 375, 404 (S.D.N.Y.2009) (citing cases); *Sylvester v. City of N.Y.,* 385 F.Supp.2d 431, 443 (S.D.N.Y.2005) (citing cases); *Galvin v. Francis,* Nos. 5594/00, 009, 2003 WL 21696740, at *4 (N.Y.Sup.Ct. May 29, 2003) ("Plaintiff testified that ... defendant shoved her into a kitchen wall .... While that conduct supports a claim of battery, it would not be separately actionable as [IIED].").

#### ii. Inter–Spousal Immunity

**\*9** Following the lower courts' recognition of the tort of IIED, the New York Court of Appeals held that "strong policy considerations militate against judicially applying these recent developments ... to the factual context of a dispute arising out of matrimonial differences." *Weicker v. Weicker,* 22 N.Y.2d 8, 11, 237 N.E.2d 876 (N.Y.1968). The *Weicker* Court reasoned as follows: "[t]o sustain the claim for damages would result in a revival of evils not unlike those which prompted the Legislature in 1935 to outlaw actions for alienation of affections and criminal conversation ...." *Id.* Accordingly, the plaintiff in *Weicker* failed to state a claim for IIED; the claim "arose out of matrimonial differences" because it was premised on the emotional distress resulting from her former husband's procuring an *ex parte* Mexican divorce—which plaintiff contended was invalid—and his allegedly illegal remarriage. *Id.* at 8–9.

Subsequent decisions have similarly barred IIED claims "aris[ing] out of the interpersonal relationships in a matrimonial context...." *Nacson v. Semmel,* 292 A.D.2d 432, 433, 738 N.Y .S.2d 888 (2d Dep't 2002); *Eller v. Eller,* 136 A.D.2d 678, 679, 524 N.Y.S.2d 93 (2d Dep't 1988); *Wiener v. Wiener,* 84 A.D.2d 814, 815, 444 N.Y.S.2d 130 (2d Dep't 1981) ("The bounds in marital relationships are obviously circumscribed by the availability of another cause of action (*i.e.,* a matrimonial action)"; where allegations of IIED "cannot be said to be other than garden-variety disputes best resolved by bringing an action under the Domestic Relations Law or Family Court Act," such allegations must be dismissed).

Where "the circumstances do not constitute a mere matrimonial dispute," however, the inter-spousal immunity doctrine may not be applicable. *See Murphy,* 109 A.D.2d at 966. *But see Baron v. Jeffer,* 98 A.D.2d 810, 811, 469 N.Y.S.2d 815 (2d Dep't 1983) (holding that the policy concerns articulated in *Weicker* precluded IIED claim where parties were unmarried, but lived together "as husband and wife for an extended period of time (here, over two years)").

#### 3. Application of Law to Facts

The Court finds that some of Plaintiff's IIED claims are duplicative, and must accordingly be dismissed. The Court also finds that the doctrine of inter-spousal immunity requires dismissal of those IIED claims which are predicated on alleged conduct occurring *after* the parties' marriage. However, Plaintiff's residual allegations are sufficient to state a claim for IIED.

#### a. Duplicative Allegations

Plaintiff appears to concede that her IIED claim is, in part, based upon alleged conduct that falls well within the ambit of other forms of traditional tort liability. In attempting to sustain her IIED claim, Plaintiff argues that Defendant "repeatedly slapped her, pushed and shoved her, ... physically controlled her against her will, and degraded her with demeaning sexual acts." (Pl. Opp. at 19). To the extent that the foregoing alleged conduct is encompassed by the traditional tort theories of battery, assault and false imprisonment, such conduct may not form the basis of an IIED claim under New York law. *See, e.g., Alhovsky v. Ryan,* 658 F.Supp.2d 526, 538 (S.D.N.Y.2009); *Rubio v. County of Suffolk,* No. 01 Civ. 1806, 2007 WL 2993830, at *5 (E.D.N.Y. Oct. 9, 2007) (IIED claim "is duplicative of plaintiffs' State tort claims for false arrest, false

imprisonment, assault and battery, and is hereby dismissed.");
*Galvin,* 2003 WL 21696740, at *4.

**\*10** In light of the foregoing, the Court GRANTS Defendant's motion to dismiss those IIED claims which are encompassed by other tort theories herein alleged. [5]

b. Inter–Spousal Immunity
Those IIED claims which are premised on conduct that occurred *during* the parties' marriage must be dismissed pursuant to the inter-spousal immunity doctrine. *See, e.g., Weicker,* 22 N.Y.2d at 11; *Nacson,* 292 A.D.2d at 432; *Wiener,* 84 A.D.2d at 815. However, those IIED claims which are premised on conduct that occurred *prior to* the parties' marriage are not affected by the inter-spousal immunity doctrine. *See, e.g.,* 📁 *Murphy,* 109 A.D.2d at 966. [6]

c. Residual Allegations and "Outrageousness"
When viewed in the aggregate, Plaintiff's residual allegations depict conduct sufficiently "outrageous" to satisfy New York's IIED pleading requirements.

Accepting Plaintiff's residual allegations as true for the purposes of the instant motion, her First Amended Complaint portrays Defendant as having conducted a five month-long, deliberate and malicious campaign of harassment and intimidation against Plaintiff. This campaign included Defendant's domination of Plaintiff through threats of violence, and his subjection of her to relentless humiliation and emotional abuse. Plaintiff alleges that Defendant threatened her in numerous ways: he threatened to kill her, (First Am. Compl. ¶ 91); he stated that he "would never leave her in peace in this country," (*id.*); and he stated that "even if he were to have sex with five women in front of [Plaintiff], it 'would not be enough,' " (*id.* ¶ 97). Plaintiff also alleges that Defendant controlled and marginalized her by forbidding her from visiting friends; he allegedly stated that "he and only he would find friends for [Plaintiff]." (*Id.* ¶¶ 44–45.)

Plaintiff additionally alleges that Defendant constantly humiliated and demeaned her in public and in private. For example, Defendant—apparently more than once—abandoned Plaintiff in restaurants after they had finished eating, without money, and without knowing her way home. (*Id.* ¶ 57.) On one occasion, Defendant barred Plaintiff from entering their apartment; the concierge escorted Plaintiff to the basement, where Defendant had "dumped [all her

belongings] in garbage bags." (*Id.* ¶¶ 87–89.) Defendant also "call[ed] her nasty names in front of other people," (*id.* ¶ 56); he referred to her as a "dog," (*id.* ¶ 62), and a "bitch" (*id.* ¶ 70). According to Plaintiff, Defendant told her "that it was exciting for him to see [Plaintiff] upset [,] and that seeing her upset turned him on." (*Id.* ¶ 60.)

In the aggregate, the foregoing allegations, if true, would establish that Defendant deliberately orchestrated a malicious campaign of harassment and intimidation against Plaintiff over the course of approximately five months. Defendant's cumulative conduct—including a threat to kill Plaintiff, and other relentlessly abusive and domineering acts—is on par with that which other courts have deemed to satisfy the outrageousness requirement. *See, e.g.,* 📁 *Murphy,* 109 A.D.2d at 966; *Eves,* 42 A.D.3d at 483; 📁 *Cavallaro,* 28 A.D.3d at 1078; *Stram,* 223 A.D.2d at 262–63. Indeed, Defendant's alleged repeated and systematic affronts to Plaintiff far exceed the single "impact" against individual restaurateurs that supported a finding of outrageousness in *164 Mulberry Street Corp.,* 4 A.D.3d at 53. And the noxiousness of Defendant's alleged affronts is far graver than the harassing telephone calls that supported a finding of outrageousness in 📁 *Flately,* 138 A.D.2d at 346.

**\*11** In sum, when examined in the aggregate, Plaintiff's residual allegations, if true, establish a deliberate and malicious campaign of harassment and intimidation, and satisfy the outrageousness requirement of her IIED claim. The Court thus denies Defendant's motion to dismiss those residual IIED claims which are neither duplicative nor arose after the parties' marriage.

### III. *Conclusion*
For the reasons stated above, the Court DENIES Defendant's motion to dismiss for lack of subject matter jurisdiction, and GRANTS in part and DENIES in part Defendant's motion to dismiss Plaintiff's IIED claims. (Dkt. Entry No. 8.)

By no later than March 14, 2011, the parties shall submit via ECF and facsimile a joint status letter detailing how they intend to proceed, and whether they wish to be referred to a magistrate judge for settlement discussions. Failing agreement, the case is deemed ready for trial May 2, 2011.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 721648

## Footnotes

1    Plaintiff claims that federal jurisdiction is proper pursuant to ⚑ 28 U.S.C. § 1332(a)(2), because (a) the amount in controversy exceeds $75,000; and (b) the controversy is between a citizen of France and a citizens of New York. (*See* First Am. Compl. ¶ 6.)

2    Although Defendant raised the jurisdictional objection in his initial moving papers (Def. Mem. at 4), he concedes in his reply memorandum that subject matter jurisdiction is proper (*see* Def. Reply Mem. at 5 n. 2). The Court examines the jurisdictional issue in order to: (a) remove any doubt as to the propriety of jurisdiction; and (b) provide a foundation for the abstention analysis.

3    *See* ⚑ *Burford v. Sun Oil Co.,* 319 U.S. 315 (1943).

4    *See* 🚩 *Eves v. Ray,* 10 Misc.3d 1058(A), No. 20770–99, 2005 WL 3423440, at *1–5 (N.Y.Sup.Ct. Dec. 5, 2005); *see also id.* at *7 ("When taken individually, each of Eves['s] actions may be viewed as crude or boorish behavior insufficient to support the jury's finding. However, Eves ['s] conduct must be viewed in its totality and coupled with Ray's knowledge that, in the past, Eves had made good on his threats of violence and displayed an unrelenting vengeful streak.... [T]he evidence of Eves['s] conduct, in its totality, allowed the jury to reasonably find in favor of Ray's claim for [IIED].").

5    Although Plaintiff cannot recover *in IIED* for conduct that falls within the ambit of traditional tort liability, she may nonetheless be compensated for the emotional distress that resulted from the commission of the "traditional" torts alleged here. It is well settled that a plaintiff alleging, for example, battery, may recover damages for the emotional suffering that flowed from that battery. *See, e.g.,* Restatement (Second) of Torts § 47, cmt. b ("Where [the defendant's] tortious conduct ... results in the invasion of another legally protected interest, as where it inflicts bodily harm, or imposes a confinement, emotional distress caused by the resulting invasion or by the conduct may be a matter to be taken into account in determining the damages recoverable. *In many instances there may be recovery for emotional distress as an additional, or 'parasitic' element of damages in an action for such a tort."* ) (emphasis added). *See also, e.g.,* ⚑ *Bender v. City of N.Y.,* 78 F.3d 787, 793 (2d Cir.1996) (recognizing "emotional pain and suffering" as "part of the injury [plaintiff] suffered from the battery").

6    Neither party referred this Court to ⚑ *Baron v. Jeffer,* 98 A.D.2d at 811, in which the Appellate Division— pursuant to *Wiecker*—barred an IIED claim between persons who had cohabitated for over two years. The Court finds, however, that the Appellate Division's decision in *Baron* is inconsistent with the policy concerns underlying the inter-spousal immunity doctrine. *See Weicker,* 22 N.Y.2d at 11; *Wiener,* 84 A.D.2d at 815 (where allegations of IIED "cannot be said to be other than garden-variety disputes best resolved by bringing an action under the Domestic Relations Law or Family Court Act," such allegations must be dismissed); ⚑ *Murphy,* 109 A.D.2d at 966. In this diversity action, the Court must follow the holdings of the New York Court of Appeals, and reject inconsistent rulings from the lower courts. *See, e.g.,* ⚑ *Levin,* 277 F.3d at 253; *Williams,* 199 F.2d at 191. Accordingly, the Court declines to apply the *Baron* decision.

Even if *Baron* were consistent with *Wiecker,* however, it would not bar Plaintiff's pre-marriage IIED claims. The Appellate Division in *Baron* held that "it would be contrary to public policy to recognize the existence of [IIED] in the context of disputes ... arising out of the differences which occur between persons who, although not married, *have been living together as husband and wife for an extended period of time (here, over two years)."* 🚩 *Baron,* 98 A.D.2d at 811. In the instant matter, the parties apparently lived together for only a few months prior to marriage. (*See* First Am. Compl. ¶¶ 30, 47, 102.) Moreover, from their engagement in early July 2009, (*id.* ¶ 47), through their marriage on October 2, 2009, (*id.* ¶ 102), the parties lived together merely "as fiancées," rather than "as husband and wife," which is a prerequisite to the application of the *Baron* doctrine.

---

**End of Document** © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 5:22-cv-01202-MAD-ML    Document 8    Filed 03/28/23    Page 318 of 364

Walther v. Maricopa Intern. Inv., Corp., Not Reported in F.Supp.2d (1998)

1998 WL 689943
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Thomas WALTHER, Lagonda,
Ltd. and Miura Trust, Plaintiffs,

v.

MARICOPA INTERNATIONAL INVESTMENT,
CORP. et al., George Liebmann, Kenneth Tsang,
and Charles Schwab & Co., Inc., Defendants.

No. 97 Civ. 4816(HB).
|
Sept. 30, 1998.

*OPINION and ORDER*

BAER, J.

**\*1** Plaintiff Thomas Walther moves to dismiss Defendant George Liebmann's defamation, *prima facie* tort and intentional infliction of emotional distress counterclaims. For the reasons discussed below, the motion to dismiss is GRANTED in part and DENIED in part.

## I. Background

Plaintiff commenced this action on June 30, 1997 and amended the Complaint on August 14, 1997. The Amended Complaint asserts three claims against Liebmann: (1) federal securities fraud under § 10(b) of the 1934 Securities Exchange Act; (2) breach of fiduciary duty; and (3) breach of contract. I denied Liebmann's motion to dismiss this past April. *See* Walther v. Maricopa Intern. Inv. Corp., 1998 WL 186736, at \*11 (S.D.N.Y. Apr. 17, 1998). That decision contains a detailed discussion of the facts. *Id.* at \*1–2.

In his Answer, Liebmann alleges that "[o]n a number of occasions since the commencement of this action" Walther published several "false and disparaging statements" to his clients and others. Answer and Counterclaims ¶ 167. These statements included accusations that Liebmann stole Walther's money, provided poor quality business services and engaged in fraudulent or unethical practices. Answer and Counterclaim ¶ 168. For instance, Liebmann contends

that Walther told a social and business acquaintance that the defendant stole $1.65 million from the plaintiff. Answer and Counterclaim ¶ 169. On another occasion, the plaintiff allegedly informed a consulting client of Liebmann's that the defendant "was guilty of fraudulent and dishonest conduct." Answer and Counterclaim ¶ 170. As a result of these alleged statements, the defendant contends that he lost "a number of business opportunities, good will and interest in his services." Answer and Counterclaim ¶ 173.

Liebmann also alleges that Walther engaged in additional harassment and outrageous conduct immediately prior to and after the commencement of this action. According to the defendant, Walther's conduct included repeated verbal threats such as "cocksucker, you're gonna pay," unannounced visits to Liebmann's home at late-night hours, persistent telephone calls to Liebmann's home that resulted in messages such as "darling, buddy boy. I'll catch up with you, ok, bye, bye," several telephone calls to Liebmann's home with "hang-ups just after the phone was answered or ... answering machine was activated," and harassment of Liebmann's doorman at his apartment house. Answer and Counterclaim ¶ 174. Given the alleged conduct and statements made by Walther, Liebmann asserted three counterclaims in his Answer: (1) defamation; (2) *prima facie* tort; and (3) intentional infliction of emotional distress. Answer and Counterclaim ¶¶ 175–84.

## II. Discussion

Plaintiff moves to dismiss Liebmann's counterclaims on the ground that he fails to state a claim upon which relief can be granted. *See* Fed.R.Civ.P. 12(b)(6). A court will only grant a 12(b)(6) motion when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton College,* 128 F.3d 59, 63 (2d Cir.1997) (citation and internal quotations omitted). When deciding a 12(b)(6) motion, a court "must accept as true all the factual allegations in the complaint and must draw all reasonable inferences in favor of the plaintiff." *Id.*

### 1. *Defamation*

**\*2** In general, it is the responsibility of the jury to determine whether statements are defamatory. *See* Levin v. McPhee, 119 F.3d 189, 195 (2d Cir.1997). However, "a threshold issue for resolution by the court is whether the statement alleged

Case 5:22-cv-01202-MAD-ML   Document 8   Filed 03/28/23   Page 319 of 364

Walther v. Maricopa Intern. Inv., Corp., Not Reported in F.Supp.2d (1998)

to have caused plaintiff an injury is reasonably susceptible to the defamatory meaning imputed to it." *Id.* Walther argues that his alleged statements are privileged under New York Civil Rights Law ("NYCRL") 🔖 § 74 as well as the common interest doctrine. Alternatively, the plaintiff contends that the statements attributed to him are not defamatory since they represent his opinion. These arguments, however, fail.

NYCRL 🔖 § 74 provides, in relevant part, that "[a] civil action cannot be maintained against any person ... for the publication of a fair and true report of any judicial proceeding...." N.Y.Civ. Rights L. 🔖 § 74 (McKinney 1992). The shield provided by this statute is not available where the alleged defamatory remarks are privately made to a few select individuals, since NYCRL 🔖 § 74 was enacted to protect the public reporting of judicial proceedings through venues such as newspapers and publications. *See* 🔖 *Halperin v. Salvan,* 117 A.D.2d 544, 499 N.Y.S.2d 55, 547–48 (1 st Dep't 1986) (judicial reporting privilege not applicable because case involved "alleged defamation by pleadings and affidavits" as opposed to "news media reporting"). Here, Walther allegedly uttered the defamatory remarks to a few business and social acquaintances—and not to the public at large through the print or electronic media. Accordingly, I hold that the judicial reporting privilege is not applicable. [1]

As Walther correctly notes, there exists a common law qualified privilege where the alleged defamatory statements are made to persons with some common interest in the subject matter. *See* 🔖 *Foster v. Churchill,* 87 N.Y.2d 744, 642 N.Y.S.2d 583, 587, 665 N.E.2d 153 (1996). The New York Court of Appeals recently noted that courts have found this privilege applicable in the context of statements made between the board of governors in a tenant's association, a college administrator and tenure faculty committee members and among physicians in a health insurance plan. *See id.* (citations omitted). In that same case, the Court of Appeals held that the qualified privilege existed where the allegedly defamatory statements were made between members of a corporate entity's board of directors. 🔖 *Id.* at 588. Here, Walther allegedly made the defamatory statements to business and social acquaintances of the defendant.

The plaintiff argues that the qualified privilege is applicable because Walther and the defendant's business acquaintances have a common interest given their relationships with Liebmann. While this may well prove sufficient for the privilege to constitute a defense, for now, I disagree. In cases where courts have found the privilege operative, the speaker and the listeners were generally members of a group or organization—which undoubtably suggested that a robust common interest existed. *See, e.g.,* 🔖 *Foster,* 642 N.Y.S.2d at 588, 665 N.E.2d 153 (board of directors); *Shapiro v. Health Ins. Plan of Greater New York,* 7 N.Y.2d 56, 194 N.Y.S.2d 509, 514, 163 N.E.2d 333 (1959) (health insurance plan members); 🔖 *Lieberman,* 590 N.Y.S.2d at 862–63, 605 N.E.2d 344 (tenant's association). But in the instant case, Walther simply makes the conclusory assertion that a common interest exists given the business relationships with Liebmann. The plaintiff, however, fails to elaborate on the nature and scope of these relationships. Without more, it would be premature to dismiss the defamation counterclaim on the basis of a qualified privilege. [2]

**\*3** Lastly, the plaintiff argues that the defamation counterclaim should be dismissed since the statements he allegedly made were merely opinions. This argument is equally unavailing. While assertions of fact may form the basis of a defamation claim, expressions of opinion are not actionable. *See* 🔖 *Levin,* 119 F.3d at 196. A statement that contains a factual proposition objectively capable of being proven true or false is not privileged as an opinion. *See Wachtel v. Storm,* 796 F.Supp. 114, 116 (S.D.N.Y.1992).

Here, the plaintiff allegedly defamed Liebmann through accusations of theft and fraud with respect to the $1.65 million in lost investment funds. The alleged defamatory statements, therefore, are capable of being proven true or false. *See Coliniatis v. Dimas,* 848 F.Supp. 462, 467 (S.D.N.Y.1994) (letter did not contain opinion since, among other reasons, "the truth or falsity of the statement that [the plaintiff] expected to receive [an illegal] kickback ... can be factually verified"). Consequently, I reject the argument that the allegedly defamatory statements were mere opinions, and the motion to dismiss counterclaim one is denied.

### 2. Prima Facie *Tort*

In counterclaim two, the defendant alleges that Walther's behavior constitutes a *prima facie* tort. The elements for this claim are: "(1) intentional infliction of harm; (2) resulting in special damages; (3) without excuse or justification; and (4) by an act that would otherwise be lawful." 🔖 *Twin Laboratories, Inc. v. Weider Health & Fitness,* 900 F.2d

Case 5:22-cv-01202-MAD-ML    Document 8    Filed 03/28/23    Page 320 of 364

Walther v. Maricopa Intern. Inv., Corp., Not Reported in F.Supp.2d (1998)

566, 571 (2d Cir.1990). In the instant case, the defendant alleges that Walther's conduct resulted in special damages in the form of lost business opportunities, good will and interest in his services. Answer and Counterclaim ¶ 181. These allegations inadequately allege special damages. *See*

*Procter & Gamble Co. v. Quality King Distributors, Inc.,* 974 F.Supp. 190, 198–99 (E.D.N.Y.1997) (*prima facie* tort claim dismissed for failure to adequately plead special damages where party alleged that it had been damaged approximately $25 million given the loss of "three important customers," but did not itemize its alleged losses or name the customers that left). Given the failure to plead special damages, the motion to dismiss counterclaim two is granted.

3. *Intentional Infliction of Emotional Distress*

To proceed with the intentional infliction of emotional distress counterclaim, the plaintiff's conduct if true must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."

*Murphy v. American Home Products Corp.,* 58 N.Y.2d 293, 461 N.Y.S.2d 232, 236, 448 N.E.2d 86 (1983). As one might divine from this statement of the law, it is difficult to prevail on such a claim. *See Wolff v. City of New York Financial Services Agency (FISA),* 939 F.Supp. 258, 263–64 (S.D.N.Y.1996) (court held that false charge of sexual harassment did not rise to the requisite level of outrageous conduct and observed that it was "hard to prevail" on a claim for intentional infliction of emotional distress).

**\*4** Liebmann argues that Walther's outrageous conduct included repeated verbal threats such as "cocksucker, you're gonna pay," unannounced visits to Liebmann's home at late-night hours, persistent telephone calls to Liebmann's home that resulted in messages such as "darling, buddy boy. I'll catch up with you, ok, bye, bye," several telephone calls to Liebmann's home with "hang-ups just after the phone was answered or ... answering machine was activated," and harassment of Liebmann's doorman at his apartment house. Answer and Counterclaim ¶ 174. In certain circumstances, a pattern of harassment and atrocious conduct may give rise to an intentional infliction of emotional distress claim. Such circumstances, however, are not present here. Certainly,

assuming that all of the conduct allegedly engaged in by Walther is true, the plaintiff subjected Liebmann to a steady diet of annoyances and irritations, as well as one vulgar insult and an ominous threat. Nonetheless, "[m]ere threats, annoyance or other petty oppressions, no matter how upsetting, are insufficient to constitute the tort of intentional infliction of emotional distress." *Owen v. Leventritt,* 174 A.D.2d 471, 571 N.Y.S.2d 25, 26 (1 st Dep't 1991) (allegation that defendant threatened to kill the plaintiff—who happened to be pregnant at the time—should she not discontinue a lawsuit, did not support an intentional infliction of emotional distress claim).

In short, the conduct attributed to Walther does not rise to the level of consistently atrocious and outrageous behavior necessary to give rise to a claim for intentional infliction of emotional distress. *See, e.g., Green v. Fischbein Olivieri Rozenholc & Badillo,* 119 A.D.2d 345, 507 N.Y.S.2d 148, 152 (1 st Dep't 1986) (conduct included baseless eviction proceedings, severe interruptions or discontinuance of services, drastic deterioration of living conditions, interference with mail and verbal abuse); *see also Neufeld v. Neufeld,* 910 F.Supp. 977, 980–81, 984 (S.D.N.Y.1996) (defendant allegedly drugged plaintiff, caused her to be confined at an out-of-state psychiatric institute, repeatedly contacted numerous government agencies to make false claims of abuse and threatened the life of a live-in heath aide hired by the plaintiff to care for her mother). Absent the requisite degree of atrocious behavior, I grant the motion to dismiss counterclaim three.

III. Conclusion

For the reasons discussed above, the motion to dismiss counterclaim one is DENIED and the motion to dismiss counterclaims two and three is GRANTED. The case is scheduled for trial on November 23, 1998.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 1998 WL 689943

Case 5:22-cv-01202-MAD-ML    Document 8    Filed 03/28/23    Page 321 of 364

Walther v. Maricopa Intern. Inv., Corp., Not Reported in F.Supp.2d (1998)

## Footnotes

1    The privilege also does not apply to the alleged statement that Liebmann stole $1.65 million since this assertion does not accurately report on these judicial proceedings, which involve only allegations of securities fraud, breach of contract and breach of fiduciary duty. *See* 🚩 *Procter & Gamble Co. v. Quality King Distributors, Inc.,* 974 F.Supp. 190, 196 (E.D.N.Y.1997) (privilege does not attach as a matter of law where the statement attributes "more serious conduct than that actually suggested in the official proceeding").

2    Even if the qualified privilege applied, it can be overcome where a party demonstrates that the defamatory statements were made with actual malice-defined as personal spite, ill will, culpable recklessness or negligence—which is sufficiently alleged by Liebmann. *See* 🚩 *Misek–Falkoff v. Keller,* 153 A.D.2d 841, 545 N.Y.S.2d 360, 361 (2d Dep't 1989); Answer and Counterclaim ¶¶ 167–72.

**End of Document**                              © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 5:22-cv-01202-MAD-ML   Document 8   Filed 03/28/23   Page 322 of 364

Torain v. Casey, Not Reported in Fed. Supp. (2016)

45 Media L. Rep. 1260

2016 WL 6780078
United States District Court, S.D. New York.

Troi TORAIN, Plaintiff,
v.
Raashaun CASEY, Iheart Media, Inc., and
Revolt Media & TV, LLC, Defendants.

16 Civ. 2682 (VEC) (JCF)
|
Signed 09/16/2016

**Attorneys and Law Firms**

Troi Torain, Saylorsburg, PA, pro se.

Marina Carol Tsatalis, Wilson Sonsini Goodrich & Rosati,
Garrett David Kennedy, DLA Piper US LLP, Timothy Donald
Kevane, Sedgwick LLP, New York, NY, for Defendants.

REPORT AND RECOMMENDATION

JAMES C. FRANCIS IV, UNITED STATES MAGISTRATE
JUDGE

**\*1** TO THE HONORABLE VALERIE CAPRONI, U.S.D.J.
Troi Torain brings this action pro se alleging five state law
claims against the defendants — Raashaun Casey, iHeart
Media, Inc. ("iHeart Media"), and Revolt Media & TV, LLC
("Revolt"). The plaintiff asserts that the defendants used
his name without authorization in violation of section 51
of the New York Civil Rights Law ("NYCRL"). He also
alleges common law claims for emotional distress; negligent
hiring, supervision, and retention; and gross negligence. The
defendants now move to dismiss the complaint pursuant to
Rule 12(b) (6) of the Federal Rules of Civil Procedure. For
the reasons set forth below, I recommend that the defendants'
motions to dismiss be granted but that the plaintiff be given
leave to file an amended complaint.

Background

The facts recited here are derived from the plaintiff's
complaint and the papers he filed in opposition to the
defendants' motions. "Generally, '[i]n adjudicating a Rule
12(b)(6) motion, a district court must confine its consideration
to facts stated on the face of the complaint, in documents

appended or incorporated into the complaint by reference,
and to matters of which judicial notice may be taken.' "
Ceara v. Deacon, 68 F. Supp. 3d 402, 405 (S.D.N.Y.
2014) (alteration in original) (quoting Leonard F. v. Israel
Discount Bank of New York, 199 F.3d 99, 107 (2d Cir.
1999)); see also Chambers v. Time Warner, Inc., 282
F.3d 147, 153 (2d Cir. 2002) ("Even where a document is
not incorporated by reference, the court may nevertheless
consider it where the complaint 'relies heavily upon its terms
and effect,' which renders the document 'integral to the
complaint.' " (quoting International Audiotext Network,
Inc. v. American Telephone and Telegraph Co., 62 F.3d
69, 72 (2d Cir. 1995))). However, "when analyzing the
sufficiency of a pro se pleading, a court may consider factual
allegations contained in a pro se litigant's opposition papers
and other court findings." Rodriguez v. Rodriguez, No. 10
Civ. 00891, 2013 WL 4779639, at \*1 (S.D.N.Y. July 8, 2013).
Because the factual allegations in Mr. Torain's opposition
papers are consistent with those in his complaint, I take
them into consideration in ruling on the present motions. See
Alsaifullah v. Furco, No. 12 Civ. 2907, 2013 WL 3972514 at
\*4 n.3 (S.D.N.Y. Aug. 2, 2013).

The plaintiff is a fifty-one year old hip-hop radio personality
and disk jockey. (Complaint, ¶ 5; Plaintiff's Memorandum
of Law in Support of Opposition to Motion to Defendant's
Motion to Dismiss ("Pl. Memo.") at 1). He was formerly
employed by Clear Channel (now known as iHeart Media),
but was terminated in 2006 due to his on-air comments
regarding Mr. Casey. (Pl. Memo. at 1). The comments were
the result of a feud between Mr. Torain and Mr. Casey. (Pl.
Memo. at 1). The plaintiff currently has his own YouTube
channel called the "Star Chamber." (Pl. Memo. at 1).

In September 2015, Jayceon Taylor (a rapper known as "The
Game") was invited to appear on an iHeart Media morning
show, "The Breakfast Club." (Complaint, ¶ 14; Pl. Memo.
at 1-2). Revolt broadcasts the program nationally on various
radio stations and on YouTube. (Complaint, ¶¶ 14, 17-18;
Pl. Memo. at 1-2). During the interview, which took place
on iHeart Media's property, Mr. Casey (also known as "DJ
Envy") mentioned the plaintiff's moniker, "Star." (Pl. Memo.
at 2, 5). In response, Mr. Taylor "made false, derogatory,
and physically threatening statements with regards to the
plaintiff." (Complaint, ¶ 16; Pl. Memo. at 2). His exact
comments were:

Torain v. Casey, Not Reported in Fed. Supp. (2016)

45 Media L. Rep. 1260

**\*2** You know, back in the day, like, I remember, like — who was the dude on the radio out here? I told him, I was like, "Dude I'll break your jaw dude." Like Envy [Casey] is my dog. I'm still gonna break his jaw when I see him. I don't — like I never seen him since then, but I got you. Because we was fathers at that time, and like, we was really on our parent stuff. And dude was talking. And, you know, Envy's baby girl and all of that. And, you know, I ain't like it.

(Pl. Memo. at 2). [1]

After learning about the interview via Twitter, Mr. Torain filed a police report for aggravated harassment. (Pl. Memo. at 2). The defendants did not take down or redact the interview after they received notice of the police report. (Pl. Memo. at 4). According to the plaintiff, Mr. Taylor has a history of following through on threats he makes, and has implied that he was involved in the death of another person. (Pl. Memo. at 7).

Mr. Torain alleges that he has suffered severe emotional distress, mental anguish, humiliation, embarrassment, and financial losses as a result of the defendants' actions. (Complaint, ¶¶ 24, 30, 37, 47). He contends that the defendants were trying to promote a feud between him and Mr. Casey, an employee of iHeart Media and Revolt, in order to generate more revenue. (Pl. Memo at 4). He further asserts that iHeart Media and Revolt knew or should have known about the animosity between Mr. Casey and himself and that "[Mr.] Casey would be likely to act [in] a negligent and reckless manner." (Complaint, ¶ 41; Pl. Memo. at 5).

The plaintiff originally filed this action in New York state Supreme Court, and the defendants removed it to this court on the basis of diversity jurisdiction.

Legal Standard

To survive a motion to dismiss under Rule 12(b) (6) of the Federal Rules of Civil Procedure, a complaint must include "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007). In other words, it must provide sufficient factual material to "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). While "detailed factual allegations" are not required, it must contain more than mere "labels and conclusions"

or "formulaic recitation[s] of the elements of a cause of action." Id. at 678 (quoting Twombly, 550 U.S. at 555). "Allegations pled on 'information and belief' are proper if 'accompanied by a statement of the facts upon which the belief is founded." Prince v. Madison Square Garden, 427 F. Supp. 2d 372, 385 (S.D.N.Y. 2006) (quoting Shopping Mall Investors, N.V. v. E.G. Frances & Co., No. 84 Civ. 1469, 1985 WL 210 (S.D.N.Y. Jan. 23, 1985)); see also Arista Records, LLC v. Doe 3, 604 F.3d 110, 120 (2d Cir. 2010).

**\*3** In ruling on a motion to dismiss, the court's task "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." GVA Market Neutral Master Ltd. v. Veras Capital Partners Offshore Fund, Ltd., 580 F. Supp. 2d 321, 327 (S.D.N.Y. 2008) (quoting Eternity Global Master Fund Ltd. v. Morgan Guaranty Trust Co. of New York, 375 F.3d 168, 176 (2d Cir. 2004)). Furthermore, a pro se complaint must be considered under a more lenient standard than would be applied to "formal pleadings drafted by lawyers." Bellamy v. Mount Vernon Hospital, No. 07 Civ. 1801, 2009 WL 1835939, \*3 (S.D.N.Y. June 26, 2009) (quoting Haines v. Kerner, 404 U.S. 519, 520 (1972) (per curiam)). Even after Iqbal, a court should construe a pro se complaint "liberally and interpret it 'to raise the strongest arguments that [it] suggest[s].' " Chavis v. Chappius, 618 F.3d 162, 170 (2d Cir. 2010) (alterations in original) (quoting Harris v. City of New York, 607 F.3d 18, 24 (2d Cir. 2010)). Nevertheless, a pro se litigant is not relieved of the minimum pleading requirements. Id.

Analysis

A. New York Civil Rights Law § 51

Although "[t]here is no common law right to privacy ... in New York," Burck v. Mars, Inc., 571 F. Supp. 2d 446, 450 (S.D.N.Y. 2008), a limited statutory protection exists under the New York Civil Rights Law, N.Y. Civ. Rights Law §§ 50, 51. See Chimarev v. TD Waterhouse Investor Services, Inc., 280 F. Supp. 2d 208, 228 (S.D.N.Y. 2003) ("In New York, 'the right to privacy is governed exclusively by sections 50 and 51 of the Civil Rights Law....' " (quoting Howell v. New York Post Co., 81

Case 5:22-cv-01202-MAD-ML    Document 8    Filed 03/28/23    Page 324 of 364

Torain v. Casey, Not Reported in Fed. Supp. (2016)

45 Media L. Rep. 1260

N.Y.2d 115, 123, 596 N.Y.S.2d 350, 354 (1993))), aff'd, 99 Fed.Appx. 259 (2d Cir. 2004). The statute applies to "nonconsensual commercial appropriations" and "prohibit[s] the use of pictures, names or portraits 'for advertising purposes or for the purposes of trade' only, and nothing more." Finer v. Omni Publications International, Ltd., 77 N.Y.2d 138, 141, 564 N.Y.S.2d 1014, 1016 (1990) (quoting Arrington v. New York Times Co., 55 N.Y.2d 433, 439, 449 N.Y.S.2d 941, 943 (1982)); accord Messenger ex rel. Messenger v. Gruner & Jahr Printing & Publishing, 94 N.Y.2d 436, 441, 706 N.Y.S.2d 52, 55 (2000) (per curiam).

Accordingly, to state a claim for a violation of section 51, "a plaintiff must show that the defendant (1) used his name, portrait, picture, or voice, (2) for advertising or trade purposes, (3) without his written consent." Burck, 571 F. Supp. 2d at 451; see also Molina v. Phoenix Sound, Inc., 297 A.D.2d 595, 597, 747 N.Y.S.2d 227, 230 (1st Dep't 2002) (noting that prohibited use must occur "within the state of New York").

Mr. Torain claims that the defendants' used his name[2] during The Breakfast Club for commercial gain, and without his consent. (Complaint, ¶¶ 21-23). Other than a conclusory assertion that the defendants "used [his] name for purpose [sic] of advertising and/or trade" (Complaint, ¶ 20), however, the Complaint contains no facts to suggest that the alleged use fell within the scope of the Civil Rights Law. Nothing in the complaint or Mr. Torain's opposition papers suggest that his moniker was used "in, or as part of, an advertisement or solicitation for patronage of a particular product or service." Beverley v. Choices Women's Medical Center, Inc., 78 N.Y.2d 745, 751, 579 N.Y.S.2d 637, 640 (1991) (defining "advertising purposes" as use of plaintiff's likeness "in a manner directly and professionally related to [defendant's] product" that "cannot be deemed merely incidental to [defendant's] unmistakable commercial message and purpose"); accord Morse v. Studen, 283 A.D.2d 622, 622, 725 N.Y.S.2d 93, 94 (2d Dep't 2001). Even taking as true the plaintiff's allegation that the defendants invoked his name "in order to garner more views by re-igniting an old feud" (Pl. Memo. at 4), an underlying motive to increase viewers and revenue does not establish use for advertising or trade purposes. See Davis v. High Society Magazine, Inc., 90 A.D.2d 374, 379, 457 N.Y.S.2d 308, 313 (2d Dep't 1982) (characterizing use "spurred by [ ] profit motive or [ ] to encourage sales or distribution" as "a necessary, but hardly a sufficient, ingredient in determining the existence of a trade

purpose"); but see Leviston v. Jackson, 43 Misc. 3d 229, 236-37, 980 N.Y.S.2d 716, 721 (N.Y. Sup. Ct. 2013) (denying summary judgment where defendant used video of plaintiff, who was not a public persona, "to generate interest in himself and to attract viewers to his website" because "it [could not] be concluded as a matter of law that there was no trade purpose involved in posting").

**\*4** Furthermore, not every unauthorized use of an individual's name in connection with trade or advertising constitutes a violation of section 51. Damron v. Doubleday, Doran & Co., 133 Misc. 302, 303, 231 N.Y.S. 444, 445 (N.Y. Sup. Ct. 1928), aff'd sub nom. Damron v. Doubleday Doran Book Shops, Inc., 226 A.D. 796, 234 N.Y.S. 773 (1st Dep't 1929) and Damron v. Ferber, 226 A.D. 796, 234 N.Y.S. 774 (1st Dep't 1929). To trigger liability, the use of the name must not only be " 'sufficiently related to a commercial end' or 'mercantile rewards,' " Zoll v. Jordache Enterprises Inc., No. 01 Civ. 1339, 2003 WL 1964054, at *16 (S.D.N.Y. April 24, 2003) (quoting Griffin v. Law Firm of Harris, Beach, Wilcox, Rubin and Levey, 112 A.D.2d 514, 516, 490 N.Y.S.2d 919, 921 (3d Dep't 1985)), but must also play a significant role in "the purpose and subject of the work." Preston v. Martin Bregman Products, Inc., 765 F. Supp. 116, 118-19 (S.D.N.Y. 1991) (noting that because "merely incidental or isolated uses ... are not actionable," there must be a "direct and substantial connection" between plaintiff's name and the work in which it appeared); see also Netzer v. Continuity Graphic Associates, Inc., 963 F. Supp. 1308, 1325-26 (S.D.N.Y. 1997) ("In determining whether a name or likeness is used primarily for advertising or trade in violation of the statute, a court will weigh the circumstances of the use, its extent or degree, and the character of the use.").

The mention of Mr. Torain's nickname once during a thirty-three minute interview about Mr. Taylor, a famous rapper, The Game Interview at The Breakfast Club Power 105Mr. Taylor, a famous rapper, The Game Interview at The Breakfast Club Power 105.1, YouTube (Sept. 18, 2015), https://www.youtube.com/watch?v=YqQEzOXDHjE, constitutes incidental use and is insufficient to establish a claim under section 51. See Lohan v. Perez, 924 F. Supp. 2d 447, 454-56 (E.D.N.Y. 2013) (applying incidental use defense where plaintiff's name was mentioned in a song once, was not used in the title or refrain, and "appear[ed] entirely incidental to [song's] theme"); Candelaria v. Spurlock, No. 08 CV 1830, 2008 WL 2640471,

Case 5:22-cv-01202-MAD-ML   Document 8   Filed 03/28/23   Page 325 of 364

Torain v. Casey, Not Reported in Fed. Supp. (2016)

45 Media L. Rep. 1260

at *5 (E.D.N.Y. July 3, 2008) (granting motion to dismiss based, in part, on incidental use exception where plaintiff appeared in documentary for three to four seconds captured by hidden camera).

Accordingly, because the Complaint fails to state a claim under 🔖 section 51, the plaintiff's first cause of action should be dismissed as against all the defendants.

### B. Intentional Infliction of Emotional Distress

In his second cause of action, the plaintiff contends that the defendants caused him severe emotional distress, mental anguish, humiliation, and injuries when Mr. Casey encouraged Mr. Taylor to make threatening statements and iHeart Media and Revolt broadcast those statements. (Complaint, ¶¶ 28, 30, 37).

Under New York law, a claim of intentional infliction of emotional distress requires a showing of "(1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress." Guan N. v. New York City Department of Education, No. 11 Civ. 4299, 2013 WL 67604, at *25 (S.D.N.Y. Jan. 7, 2013) (quoting 🔖 Bender v. City of New York, 78 F.3d 787, 790 (2d Cir. 1996)); see also 🔖 Howell, 81 N.Y.2d at 121, 596 N.Y.S.2d at 353. To be considered "extreme and outrageous," conduct must be "so outrageous in character, so extreme in degree, as to be regarded as atrocious, and utterly intolerable in a civilized society." 🔖 Stuto v. Fleishman, 164 F.3d 820, 827 (2d Cir. 1999) (quoting 🔖 Howell, 81 N.Y.2d at 122, 596 N.Y.S.2d at 353). Due to this very high threshold, claims for intentional infliction of emotional distress "generally 'do not survive dispositive motions.' " Allam v. Meyers, No. 09 Civ. 10580, 2011 WL 721648, at *6 (S.D.N.Y. Feb. 24, 2011) (quoting Hallgren v. Bell Atlantic Corp., No. 99 Civ. 11937, 2000 WL 726496, at *3 (S.D.N.Y. May 30, 2000)); see also Elmowitz v. Executive Towers at Lido, LLC, 571 F. Supp. 2d 370, 378 (E.D.N.Y. 2008) ("[N]one of the IIED claims considered by the New York Court of Appeals have survived because the conduct was not sufficiently outrageous.").

**\*5** Even accepting the Complaint's allegations as true and according the plaintiff the benefit of every favorable inference, the defendants' actions do not approach the type of egregious conduct necessary to support a claim for intentional infliction of emotional distress. Courts have repeatedly declined to hold threats such as Mr. Taylor's to be extreme and outrageous. See, e.g., Saleh v. United States, No. 12 Civ. 4598, 2013 WL 5439140, at *11-12 (S.D.N.Y. Sept. 27, 2013) (holding that defendant's "indirect threats" and plaintiff's resulting fear "that at any moment he could be attacked physically or harassed[,] ... kidnapped[,] or even killed" did not rise to required level of conduct), aff'd, 580 Fed.Appx. 22 (2d Cir. 2014); Walther v. Maricopa International Investment Corp., No. 97 Civ. 4816, 1998 WL 689943, at *4 (S.D.N.Y. Sept. 1998) (concluding that "repeated verbal threats such as '****sucker you're gonna pay' " fell short of "extreme and outrageous" threshold); Owen v. Leventritt, 174 A.D.2d 471, 472, 571 N.Y.S.2d 25, 25 (1st Dep't 1997) (finding public threat to kill pregnant plaintiff insufficiently outrageous). It follows that broadcasting or encouraging mere threats also fails to constitute "extreme and outrageous" behavior. [3]

Because none of the defendants' alleged conduct was sufficiently "extreme and outrageous" as a matter of law, [4] I recommend that Mr. Torain's claim of intentional emotional infliction of emotional distress be dismissed.

### C. Negligent Infliction of Emotional Distress

The plaintiff also asserts a claim for negligent infliction of emotional distress against all the defendants. A prima facie case of negligence requires a plaintiff to establish (1) the existence of a duty owed by the defendant to the plaintiff, (2) a breach of that duty, and (3) that such breach proximately caused the plaintiff's injury. Alvino v. Lin, 300 A.D.2d 421, 421, 751 N.Y.S.2d 585, 586 (2nd Dep't 2002); see also 🔖 Lerner v. Fleet Bank, N.A., 459 F.3d 273, 286 (2d Cir. 2006). In New York, a plaintiff may recover for purely emotional injuries by advancing one of two theories, both of which "require a threat or danger of physical harm." Kenney v. Clay, No. 6:11-CV-790, 2016 WL 1156747, at *7 (N.D.N.Y. March 23, 2016); see also E.B. v. Liberation Publications, Inc., 7 A.D.3d 566, 567, 777 N.Y.S.2d 133, 135 (2d Dep't 2004). A cause of action arises under the "bystander theory" if the plaintiff is threatened with physical harm as a result of the defendant's negligence and suffers emotional injury from witnessing the death or serious bodily injury of an immediate family member. 🔖 Mortise v. United States, 102 F.3d 693, 696 (2d Cir. 1996). Under the "direct duty theory," the plaintiff's emotional injury must be caused by the defendant's breach of a special duty that unreasonably endangered the plaintiff's own physical safety. Id.

Case 5:22-cv-01202-MAD-ML    Document 8    Filed 03/28/23    Page 326 of 364

Torain v. Casey, Not Reported in Fed. Supp. (2016)

45 Media L. Rep. 1260

**\*6** Mr. Torain has not alleged any facts from which it would be possible to conclude that he was in immediate in physical danger. "[T]he unreasonable endangerment element of a cause of action for negligent infliction of emotional distress involves an objective inquiry turning on whether a plaintiff's physical safety actually was endangered, not a subjective evaluation dependent on the plaintiff's state of mind." St. John v. Rein Teen Tours, Inc., No. 99 Civ. 2537, 2000 WL 977685, at \*3 (S.D.N.Y. July 17, 2000) (stating that "it is not sufficient for a plaintiff merely to posit theoretical potential harms"); see also Saleh, 2013 WL 5439140, at \*12 (concluding that statement to third party of defendant's desire to "make [plaintiff] disappear ... by killing him or putting him in Guantanamo" was insufficient "to show that [d]efendant ever endangered his physical safety").

Additionally, the complaint contains no facts to support a finding that any of the defendants owed the plaintiff a duty of care. See Almeciga v. Center for Investigative Reporting, Inc., 121 F. Supp. 3d 379, 382-83 (S.D.N.Y. 2015) ("The threshold question in any negligence action is whether the alleged tortfeasor owes a duty of care to the injured party, and the existence and scope of that duty is a legal question for the courts to determine." (quoting Sheila C. v. Povich, 11 A.D.3d 120, 125, 781 N.Y.S.2d 342, 347 (1st Dep't 2004))). Mr. Torain's generalized assertions that the defendants owed him a "duty of care not to expose [him] to severe emotional distress, mental anguish, [and] humiliation" and "to stop engaging in the conduct describe herein and/or to intervene to prevent or prohibit said conduct" (Complaint, ¶¶ 35, 45), do not plausibly suggest that the defendants owed a duty to him in any cognizable legal sense, see Palsgraf v. Long Island Rail Road Co., 248 N.Y. 339, 341, 162 N.E. 99, 99 (1928) ("Negligence is not actionable unless it involves the invasion of a legally protected interest, the violation of a right."); see also General Star Indemnity Co. v. Platinum Indemnity Ltd., No. 00 Civ. 4960, 2002 WL 31159106, at \*3 (S.D.N.Y. Sept. 27, 2002) ("A plaintiff must show more than a duty owed to a potentially limitless class of people, but rather a specific duty owed to the plaintiff."), much less the type of special duty required to support a claim for negligent infliction of emotional distress, see Druschke v. Banana Republic, Inc., 359 F. Supp. 2d 308, 315 (S.D.N.Y. 2005) (explaining that a claim of negligent infliction of emotional distress "requires proof of a duty owed by the defendant to the plaintiff that is far more specific than the more generalized duty to avoid negligently injuring another").

Mr. Torain contends that, as his former employer, iHeart Media has a "duty to keep [him] safe from harm" and that iHeart Media and Revolt have a "direct duty to ensure that they do not air and broadcast direct threats to third parties." (Pl. Memo. at 8). However, there is no basis for either assertion. To the contrary, employers do not owe a specific duty to employees or former employees, see, e.g., Day v. City of New York, No. 15 Civ. 4399, 2015 WL 10530081, at \*19 (S.D.N.Y. Nov. 30, 2015) ("Plaintiff has not alleged that defendants owed him any duty separate from their general obligations as an employer ...."); Abdullajeva v. Club Quarters Inc., No. 96 Civ. 0383, 1996 WL 497029, at \*9 (S.D.N.Y. Sept. 23, 1996) (dismissing negligent infliction of emotional distress claim where plaintiffs did not allege duty "above and beyond that which a corporation has to its employees"), and "mass media broadcasters and publishers owe no duty to the general public who may view their broadcasts or read their publications," Brandt v. Weather Channel, Inc., 42 F. Supp. 2d 1344, 1346 (S.D. Fla.) (citing First Equity Corp. of Florida v. Standard & Poor's Corp., 869 F.2d 175 (2d Cir. 1989)), aff'd, 204 F.3d 1123 (11th Cir. 1999); accord Doe v. Gangland Productions, Inc., 730 F.3d 946, 961 (9th Cir. 2013) (dismissing claim of negligent infliction of emotional distress because television producers who failed to conceal former gang member's identity as promised had no legal duty not to reveal private facts about him during broadcast); Tilton v. Playboy Entertainment Group, Inc., No. 8:05 CV 692, 2007 WL 80858, at \*2-3 (M.D. Fla. Jan. 8, 2007) (rejecting "negligence claim based on a breach of 'a duty of reasonable care not to broadcast or to transmit videos ... depicting the minor Plaintiff engaging in sexually-explicit conduct' "); Stancik v. CNBC, 420 F. Supp. 2d 800, 808 (N.D. Ohio 2006) ("[N]ews broadcasters do not owe the general public a heightened duty of care.").

**\*7** Accordingly, I recommend that the plaintiff's third cause of action be dismissed with respect to all defendants. See Curcio v. Roosevelt Union Free School District, No. 10 CV 5612, 2012 WL 3646935, at \*22 (E.D.N.Y. Aug. 22, 2012) ("Not only has plaintiff failed to allege any danger to his physical safety, but he has failed to allege facts to suggest that defendants owed him a specific, unique duty.").

2. Negligent Hiring, Supervision, and Retention

Torain v. Casey, Not Reported in Fed. Supp. (2016)

45 Media L. Rep. 1260

Because the Complaint contains no allegations sufficient to state a claim of ordinary negligence against any of the defendants, it logically follows that the plaintiff's negligent hiring, supervision, and retention claims against iHeart Media and Revolt must also fail. See Abdel-Karim v. EgyptAir Airlines, 116 F. Supp. 3d 389, 410 (S.D.N.Y. 2015) ("Because the plaintiff has not demonstrated any negligent conduct by [defendant's] employees, no rational jury could find [defendant] liable to the plaintiff for [a claim of negligent hiring, supervision, or retention]."), aff'd, ___ Fed.Appx. ____, 2016 WL 2848672 (2d Cir. May 16, 2016).

To state a claim for negligent hiring, retention, or supervision under New York law, a plaintiff must satisfy the standard negligence elements and, additionally, show that (1) the tortfeasor and the defendant were in an employee-employer relationship; (2) the employer knew or should have known of the employee's propensity for the alleged tortious conduct; and (3) the tort was committed on the employer's premises or with the employer's chattels. Ehrens v. Lutheran Church, 385 F.3d 232, 235 (2d Cir. 2004). "[A]n underlying requirement in actions for negligent [hiring or retention] is that the [defendant's] employee is individually liable for a tort ...." Primeau v. Town of Amherst, 303 A.D.2d 1035, 1036, 757 N.Y.S.2d 201, 203 (4th Dep't 2003) (first and second alteration in original) (quoting Campbell v. Colley, 113 Ohio App.3d 14, 22, 680 N.E.2d 201, 206 (4th Dist. 1996)).

Having already determined that Mr. Torain has not alleged a viable tort claim against Mr. Casey, I recommend dismissal of his claim for negligent hiring, supervision, and retention against iHeart Media and Revolt. See Farash v. Continental Airlines, Inc., 574 F. Supp. 2d 356, 368 (S.D.N.Y. 2008) ("Since plaintiff has failed to allege negligence on the part of the [employee], it necessarily follows that plaintiff has failed to allege any facts from which a viable cause of action for negligent hiring, training, or supervision could be gleaned."), aff'd, 337 Fed.Appx. 7 (2d Cir. 2009).

### 3. Gross Negligence

The plaintiff's failure to identify a cognizable duty of care owed to him by any of the defendants is similarly fatal to his claims of gross negligence against iHeart Media and Revolt. See Pasternack v. Laboratory Corp. of America, 892 F. Supp. 2d 540, 552 (S.D.N.Y. 2012) ("Where a claim for ordinary negligence fails, a gross negligence claim necessarily fails.");

Farash, 574 F. Supp. 2d at 368 ("[W]ithout a viable claim of negligence, the plaintiff cannot prove gross negligence.").

Moreover, to recover for gross negligence, a plaintiff must not only show that the defendant owed him a duty, but also that the "defendant failed to exercise 'even slight care' in the discharge of that duty." Dilworth v. Goldberg, 914 F. Supp. 2d 433, 473 (S.D.N.Y. 2012) (quoting Food Pageant, Inc. v. Consolidated Edison Co., 54 N.Y.2d 167, 172, 445 N.Y.S.2d 60, 429 N.E.2d 738 (1981)); see also Farash, 574 F. Supp. 2d at 368 (describing "fourth element" of gross negligence claim as requirement that "defendant's conduct 'evinces a reckless disregard for the rights of others" or "smacks" of intentional wrongdoing.' " (quoting AT & T v. City of New York, 83 F.3d 549, 556 (2d Cir. 1996))). Even assuming that Mr. Torain stated a cause of action for negligence, he has not alleged actions by the defendants so egregious as to rise to the level of gross negligence. Lane v. Fein, Such and Crane, LLP, 767 F. Supp. 2d 382, 392 (E.D.N.Y. 2011); see also Armstrong v. Brookdale University Hospital and Medical Center, No. 98 CV 2416, 2002 WL 13222, at *8 (E.D.N.Y. Jan. 3, 2002) (likening "egregious or conspicuously bad" conduct necessary for gross negligence to "extreme and outrageous" conduct required to advance claim of intentional infliction of emotional distress). I therefore recommend that the plaintiff's claims of gross negligence against iHeart Media and Revolt be dismissed.

### D. Leave to Amend

**\*8** Given Mr. Torain's pro se status, I recommend that he be granted leave to amend his complaint to state a plausible claim consistent with the standards discussed above. See Gomez v. USA Federal Savings Bank, 171 F.3d 794, 796 (2d Cir. 1999) (per curiam) (holding that pro se litigant should be afforded at least one opportunity to amend complaint prior to dismissal for failure to state a claim, "unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would succeed in stating a claim").

Mr. Torain is cautioned, however, that, like all litigants, pro se plaintiffs have an obligation to submit only pleadings that are supported by fact and law, and that a breach of this duty can result in sanctions, including an award of attorneys' fees to the defendants. Fed. R. Civ. P. 11(b), (c).

45 Media L. Rep. 1260

## Conclusion

For the foregoing reasons, I recommend granting the defendants' motions to dismiss (Docket nos. 9 and 13) and dismissing the complaint without prejudice to the plaintiff's filing an amended complaint. Pursuant to ⚑ 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from the date of this order to file written objections to this Report and 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 6780078, 45 Media L. Rep. 1260

## Footnotes

1       The defendants include a link to the interview in their motions to dismiss. (Defendants iHeart Media and Raashaun Casey's Memorandum of Law in Support of their Motion to Dismiss Plaintiff's Complaint ("iHeart Memo.") at 2 n.2; Memorandum of Law in Support of Defendant Revolt Media & TV, LLC's Motion to Dismiss ("Revolt Memo.") at 5 n.4). Because the interview is integral to the Complaint, I may consider the video without converting the motions into motions for summary judgment. See ⚑ Edwards v. Raymond, 22 F. Supp. 3d 293, 297 (S.D.N.Y. 2014) (considering recording not attached to complaint but which plaintiff "clearly relied upon" in filing suit).

2       Although New York courts narrowly interpret what constitutes a "name," see e.g., ⚑ DeClemente v. Columbia Pictures Industries, Inc., 860 F. Supp. 30, 52-53 (E.D.N.Y. 1994) (explaining that privacy and publicity protections do not apply if nickname is known only to a small group of close friends and associates), they have disagreed about the extent to which a nickname may be covered. Compare ⚑ Cerasani v. Sony Corp., 991 F. Supp. 343, 356 (S.D.N.Y. 1998) ("[C]ourts have repeatedly dismissed [⚑ § 51] claims premised on the use of a fictitious rather than actual name."), and ⚑ Geisel v. Poynter Products, Inc., 295 F. Supp. 331, 355 (S.D.N.Y. 1968) (concluding that, as "an assumed name or pseudonym rather than a surname," "Dr. Seuss" was "not a protect[a]ble name within the meaning of ⚑ Section 51"), with Gardella v. Log Cabin Products Co., 89 F.2d 891, 894 (2d Cir. 1937) ("If the stage name has come to be closely and widely identified with the person who bears it, the need for protection [under ⚑ § 51] will be as urgent as in the case of a private name ...."), and ⚑ Ali v. Playgirl, Inc., 447 F. Supp. 723, 726-27 (S.D.N.Y. 1978) (finding image of black boxer to be "clearly recognizable" as Muhammad Ali, in part because figure was described as "The Greatest" and "Ali [ ] regularly claimed that appellation for himself."), and Rosenberg v. Lee's Carpet & Furniture Warehouse Outlet, Inc., 80 Misc. 2d 479, 480-481, 363 N.Y.S.2d 231, 232-233 (N.Y. Sup. Ct. 1974) (describing advertisement with reference to "Jerry" and photo of plaintiff, who was "popularly known to television viewers as 'Jerry,' " as a "clear violation of ⚑ Section 51 of the Civil Rights Law"). However, because Mr. Torain's allegations fail to satisfy the second element of a ⚑ section 51 claim, as discussed below, it is unnecessary to determine whether his alias, "Star," qualifies as a name for purposes of statutory protection.

3       The cases cited by the plaintiff (Pl. Memo. at 6) do not support his position, as they involve conduct far more outrageous than the defendants' threats here. See, e.g., ⚑ Mejia v. City of New York, 119 F. Supp. 2d 232, 285-86 (E.D.N.Y. 2000) (police officer uttered ethnic slurs at pregnant plaintiff, ordered strip search without reasonable belief she had committed crime, and threatened she would have to deliver her child in prison);

45 Media L. Rep. 1260

🚩Bower v. Weisman, 639 F. Supp. 532, 541 (S.D.N.Y. 1986) (defendant placed three armed guards in plaintiff's lobby and changed locks to plaintiff's apartment to enter and remove artwork from it without consent).

4    Citing 🚩Halio v. Lurie, 15 A.D.2d 62, 222 N.Y.S.2d 759 (2d Dep't 1961), the plaintiff appears to argue that his claim should survive because it is exclusively "for the trier of fact to determine whether [the] defendant[s'] conduct went beyond all reasonable bounds of decency." (Pl. Memo. at 6). This is an incorrect statement of law. Halio was decided prior to the New York Court of Appeals' opinion in 🚩Fischer v. Maloney, 43 N.Y.2d 553, 402 N.Y.S.2d 991 (1978), which defined intentional infliction of emotional distress as a tort predicated on conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." 🚩Id. at 557-58, 992-93 (quoting Restatement of Torts (2d), § 46, comment d). Subsequently, courts have consistently held that whether conduct "may reasonably be regarded as so extreme and outrageous as to permit recovery is a matter for the court to determine in the first instance." 🚩Stuto, 164 F.3d at 827; see also Rizzo v. Edison, Inc., 419 F. Supp. 2d 338, 349 (W.D.N.Y. 2005) ("Ordinarily, whether the challenged conduct is sufficiently outrageous will be determined as a matter of law."), aff'd, 🚩172 Fed.Appx. 391 (2d Cir. 2006); 🚩Howell, 81 N.Y.2d at 121, 596 N.Y.S.2d at 353 (identifying "the outrageousness element [as] the one most susceptible to determination as a matter of law").

---

**End of Document**                              © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Torain v. Casey, Not Reported in Fed. Supp. (2016)

Case 5:22-cv-01202-MAD-ML    Document 8    Filed 03/28/23    Page 330 of 364

2016 WL 6775440
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Troi TORAIN, Plaintiff,

v.

Raashuan CASEY, Iheart Media, Inc., and
Revolt Media & TV, LLC, Defendants.

16-CV-2682 (VEC)(JCF)
|
Signed 11/14/2016

**Attorneys and Law Firms**

Troi Torain, Saylorsburg, PA, pro se.

Marina Carol Tsatalis, Wilson Sonsini Goodrich & Rosati,
Garrett David Kennedy, DLA Piper US LLP, Timothy Donald
Kevane, Sedgwick LLP, New York, NY, for Defendants.

ORDER ADOPTING REPORT & RECOMMENDATION

VALERIE CAPRONI, United States District Judge

**\*1** Plaintiff Troi Torain, proceeding *pro se*, alleges that
Defendants used his name without authorization in the
course of a 2015 radio broadcast. Plaintiff asserts claims
under Section 51 of the New York Civil Rights Law
and for common law emotional distress; negligent hiring,
supervision, and retention; and gross negligence. Compl. ¶¶
1-2. In response, Defendants moved to dismiss for failure
to state a claim. Dkts. 8, 12. On April 20, 2016, this Court
referred the action to Magistrate Judge James C. Francis IV
for the preparation of a report and recommendation pursuant
to 28 U.S.C. § 636(b). Dkt. 15. On September 16, 2016,
Judge Francis issued his Report and Recommendation (the
"R&R"), recommending the Court grant Defendants' motions
to dismiss with respect to all claims and provide Plaintiff leave
to amend his complaint. Dkt. 34. Plaintiff has not filed any
objections to the R&R.

DISCUSSION

In reviewing a report and recommendation, a district court
"may accept, reject, or modify, in whole or in part, the

findings or recommendations made by the magistrate judge."
28 U.S.C. § 636(b)(1). When no objections are made to
a magistrate judge's report, a district court may adopt the
report so long as "there is no clear error on the face of the
record." *Phillips v. Reed Grp., Ltd.*, 955 F. Supp. 2d 201, 211
(S.D.N.Y. 2013) (citing *Nelson v. Smith*, 618 F. Supp. 1186,
1189 (S.D.N.Y. 1985)). Failure to file timely objections to
the magistrate judge's report constitutes a waiver of those
objections in the district court and on later appeal to the
United States Court of Appeals. *See Small v. Sec'y of
Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989) (*per
curiam*); *see also Thomas v. Arn*, 474 U.S. 140, 149–50
(1985) (holding that Section 636 does not require review
of a magistrate's findings if no party objects).

Because no objections were filed to the R&R, the Court
reviews for "clear error." *Phillips*, 955 F. Supp. 2d at
211. Upon careful review, the Court finds no clear error
in Magistrate Judge Francis's thoughtful and well-reasoned
decision. Accordingly, the Court adopts the R&R in full.

CONCLUSION

Defendants' motions to dismiss are GRANTED. Plaintiff
is granted permission to file an amended complaint, if he
so chooses, on or before **December 2, 2016**. Plaintiff is
reminded, however, that pro se litigants, like all litigants,
are required to submit only pleadings that are supported by
fact and law. [1] Breach of this duty may result in sanctions,
including an award of attorneys' fees to Defendants. Fed. R.
Civ. P. 11(b), (c). Failure to file an amended complaint will
result in dismissal of this action with prejudice.

**\*2** The Clerk of Court is respectfully requested to close the
open motions at docket entries 8 and 12. The Clerk of Court
is further requested to mail a copy of this Order and the R&R
to Plaintiff and note service on the docket.

**SO ORDERED.**

**Date: November 14, 2016**

**All Citations**

Not Reported in Fed. Supp., 2016 WL 6775440

Torain v. Casey, Not Reported in Fed. Supp. (2016)

Case 5:22-cv-01202-MAD-ML   Document 8   Filed 03/28/23   Page 331 of 364

## Footnotes

1   Should Plaintiff be interested in assistance in this litigation, he may contact the District's pro se clinic, which is available to help pro se litigants such as himself. The Clinic is not a part of, or run by, the Court, it is operated by a private organization, the New York Legal Assistance Group. The Clinic is located in the Thurgood Marshall United States Courthouse, 40 Centre Street, New York, New York, 10007, in Room LL22. The Clinic is open on weekdays from 10 a.m. to 4 p.m., except on days when the Court is closed. An unrepresented party can make an appointment in person or by calling (212) 659-6190.

---

**End of Document** © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 5439140
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Tarek Youssef Hassan SALEH, Plaintiff,
v.
UNITED STATES of America, Defendant.

No. 12 Civ. 4598(KBF).
|
Sept. 27, 2013.

*MEMORANDUM DECISION & ORDER*

KATHERINE B. FORREST, District Judge.

**\*1** Plaintiff *pro se* Tarek Youssef Hassan Saleh, an Egyptian citizen, originally brought an action before this Court on October 29, 2009. (See June 12, 2012 Compl., ECF No. 1.) The Court adopted Magistrate Judge Gorenstein's Report and Recommendation and dismissed Saleh's complaint in its entirety with prejudice and on the merits. *Saleh v. Holder (Saleh II),* No. 09 Civ. 9066(DAB), 2011 WL 797500, at \*2 (S.D.N.Y. Mar. 4, 2011). On May 22, 2012, the Second Circuit agreed with the magistrate judge's report on the merits. The court affirmed the dismissal with prejudice as to all of Saleh's claims except for his unexhausted claims under the Federal Tort Claims Act ("FTCA"), and remanded the case to the district court to enter judgment dismissing Saleh's claims without prejudice in order to allow him to institute a new action with respect to his then-unexhausted FTCA claims. *Saleh v. Holder (Saleh III),* 470 F. App'x 43, 44 (2d Cir.2012).

On June 12, 2012, Plaintiff brought this action against Defendant United States, alleging the same claims as in 2009: that the Federal Bureau of Investigation ("FBI") and U.S. Citizenship and Immigration Services ("CIS") have subjected him to "illegal tactics of intimidation" such as "threats to life, abuse of process, abuse of the authorities, ... [f]raud, spoliation of the evidence and denial of rightful relief under immigration laws of United States," all in an effort to coerce him to become an FBI counterterrorism informant. (Compl. ¶ 22, ECF No. 1.) Accordingly, this is Saleh's second suit based on identical allegations.

Defendant has moved to dismiss the complaint pursuant to Fed. RR. Civ. P. 12(b)(1) and 12(b)(6), arguing that Saleh's civil rights claim is barred by res judicata and that he fails to plausible allege facts to support his only other claims—those arising under the FTCA. (ECF No. 9.)

Rather than repleading only the FTCA claims, Plaintiff has repled his entire action, with identical allegations to those in his 2009 lawsuit. All claims except for those arising under the FTCA are therefore barred by res judicata and are summarily dismissed. For the reasons stated below, Defendant's motion is GRANTED as to both these claims and the FTCA claims, and this case is dismissed.

I. *BACKGROUND*
The facts recited below are taken as true and all factual inferences made in favor of Plaintiff, the non-movant.

A. *Immigration Proceedings*
Saleh is the imam of a Brooklyn mosque and a religious scholar. (Compl.¶¶ 23–24.) A native of Egypt, he was admitted to the United States on October 6, 1998 and had authorization to remain until April 30, 2003. (Decl. of Brandon H. Cowart ("Cowart Decl.") Ex. 1 (2009 Notice to Appear in Removal Proceedings), ECF No. 11.) After Saleh applied for an adjustment of status to become a lawful permanent resident ("LPR") in March 2003 (Compl. ¶ 28; Cowart Decl. Ex. 4), CIS conducted an adjudication interview on October 17, 2007 (Compl. ¶ 32; Cowart Decl. Ex. 4). Saleh claims that, at this time, he disclosed a "previous relationship" with the Muslim Brotherhood and his "relationship with his distant relative the third leader of Al–Qaida in Afghanistan, Mustafa Abual Yazeed." (Compl.¶¶ 26, 32.)

**\*2** CIS ultimately denied Saleh LPR status in February 2009 for failure to disclose that past relationship as well as because of a 1981 arrest in Egypt. (Compl. ¶ 45; Cowart Decl. Ex. 5 (Application to Adjust Status Decision).) An April 1, 2009 letter denying Saleh's motion to reconsider explains that Saleh failed to disclose the information on the I–485 adjustment of status application form as well as at the interview. [1] (Cowart Decl. Ex. 7 (Quarantillo letter to Saleh, Apr. 1, 2009), at 3.) Saleh alleges that this denial was wrongful and on "false pretenses." (Compl.¶ 45.)

On April 2, 2009, Immigration and Customs Enforcement ("ICE") commenced removal proceedings against Saleh. (Cowart Decl. Ex. 1 (2009 Notice to Appear in Removal

Proceedings).) After filing another application for adjustment of status in July 2009 (Cowart Decl. Ex. 9), Saleh made numerous appearances before Immigration Judge Margaret McManus (Decl. of Anne E. Gannon ("Gannon Decl.") ¶ 4, ECF No. 12). At each of Saleh's five hearings in 2012, he claimed that the FBI and CIS have conspired to ensure denial of his permanent residency application in retaliation for his refusal to work for the FBI and that, in doing so, the Government destroyed an audio recording of his 2007 adjudication interview. (*Id.*)

B. *Initial Conversations with FBI Agents*
Shortly after September 11, 2001, four FBI agents interviewed Saleh for over four hours. (Compl.¶ 26.) During this conversation, Saleh disclosed: (1) the fact that he was a "distant relative" to one of the top leaders of Al–Qaeda; (2) his "previous relationship" with the Muslim Brotherhood; and (3) an "illegal arrest" in Egypt in 1981. (*Id.*)

Saleh was next visited in 2004 by two people whom he believes were also FBI agents. (*Id.* ¶ 27.) The two agents asked him if he had sent money overseas to anyone with ties to Al–Qaeda. Saleh stated that he had never done so and reiterated the three statements from 2001. (*Id.*)

After applying for permanent resident status, Saleh met with "Immigration agent" Peter Silvestri in April 2006 and September 2006. (*Id.* ¶ 28.) During these interviews, Saleh once again shared the three disclosures in detail, including "how and why the relationship [with the Muslim Brotherhood] ended in 1985." (*Id.*) On April 4, 2007, Silvestri revisited Saleh with the two alleged FBI agents from 2004 to ask whether Saleh would cooperate with the FBI in Afghanistan to arrest his "distant relative." (*Id.* ¶ 29.) Saleh declined to do so, while adding that he "condemn[ed] Al–Qa[e]da's terrorist and inhumane activities." (*Id.*) Saleh claims that ever since he declined to help, "the FBI has decided to make his life hell." (*Id.* ¶ 31.)

C. *Alleged Conspiracies*

1. *Rape Accusations*
In August 2007, a woman named Cherine Allaithy allegedly threatened to file rape charges against Saleh if he did not "write an apology to her boyfriend whom he had criticized in an article of a local Arabic newspaper." (*Id.* ¶ 31.) The two had a confrontation at Saleh's mosque and she allegedly broke two laptops there. (*Id.*) The *New York Post* published

an article regarding the incident and the ensuing litigation in January 2008. (Cowart Decl. Ex. 16 (Fisher article, Jan. 27, 2008).) Saleh regarded this article as "slanderous." (Compl.¶ 35.) However, Saleh alleges that FBI agent Philip A. Swabsin and two other unidentified agents defended Allaithy in two separate conversations, leading him to believe that they were conspiring with Allaithy "to make his life Hell, since he declined to go to Afghanistan or work for FBI in USA." (*Id.* ¶ 40, 43.)

2. *FBI Informant Mahmoud Elrammal*
**\*3** An alleged FBI informant named Mahmoud Elrammal had been attending Saleh's mosque for about two years when, in late 2007, Elrammal told Saleh that he "plan[ned] to join Al–Qaida in Afghanistan and become a martyr in a suicide operation against American troops." (*Id.* ¶¶ 30, 34.) Saleh stated that he believes that, by sharing those plans with Saleh, Elrammal "expect[ed] to trap an innocent person (plaintiff) as a suspected terrorist." (*Id.* ¶ 34.) Elrammal also began trying to persuade and threaten an active member of the mosque, Yasser Shalaby, to stay away from Saleh and the mosque. (*Id.* ¶ 33.) In late January 2008, Shalaby's father (who was residing in Egypt) allegedly received a phone call from an unidentified caller claiming to be from the "Egyptian foreign affairs ministry" and saying that if Shalaby wanted to get an American green card, he would have to stay away from Saleh and the mosque. (*Id.* ¶ 36.)

In February 2008, Elrammal contacted Shalaby again and allegedly showed him a DVD of Saleh's interview with CIS. (*Id.* ¶ 37.) Elrammal allegedly told Shalaby that "they want[ed] to make sheikh/Tarek Saleh disappear from USA either by killing him or putting him in Guantanamo or delivering him to his home country Egypt." (*Id.*) Shortly after this encounter, on February 28, 2008, Saleh filed an "E–Complaint" against Elrammal with the FBI. (*Id.* ¶ 38.)

3. *Denial of Permanent Resident Status*
On March 13, 2008, Saleh met with FBI agent Swabsin, who told him that "if he wanted a Green Card then he has to work with FBI." (*Id.* ¶ 39.) Saleh once again declined to help. (*Id.*) Five days later, Saleh met with Swabsin and another unidentified agent and was again asked whether he would work for the FBI in order to receive permanent resident status. (*Id.* ¶ 40.) Upon Saleh's reiterated refusal, Swabsin allegedly "described plaintiff as a paranoid" because he had "imagined" Elrammal showing Shalaby the interview video and "imagined" Elrammal threatening Saleh with his life. (*Id.*)

In May 2008, Swabsin contacted Fares Albasir, president of the board of the mosque, to discuss Saleh's complaint against Elrammal. Swabsin allegedly tried to enlist Albasir's help in convincing Saleh to work for the FBI either in Afghanistan or in the United States. Swabsin also told Albasir that they had tested Elrammal's computer and found that Elrammal had never shown the interview video to Shalaby. (*Id.* ¶ 42.)

Saleh was denied permanent resident status in February 2009, and his request for reconsideration was denied in March 2009. (*Id.* ¶¶ 45–46.)

### 4. *Spoliation of Evidence*

In April 2009, after being denied an adjustment of status, Saleh requested a copy of his 2007 adjudication interview video and his I–485 application. (*Id.* ¶ 47.) Although he claims to have been promised both the video and the application, he received only a copy of his I–485 application in September 2009. (*Id.* ¶ 47–48 .) The application showed that the word "None" had been written in as the answer to "part 3 c" of the application, which asks the applicant to list present and past affiliations with "every political organization, association, fund, foundation, party, club, society or similar group in the United States or other places." Saleh claims that the immigration officers wrote in the word "None" as an act of "fraud."[2] (*Id.* ¶ 48.)

**\*4** Saleh finally received a copy of his interview video in late March 2010 and found that there was no mention of Al–Qaeda or the Muslim Brotherhood. (*Id.* ¶ 51.) Saleh then sent the DVD copy for review by an expert, Stuart Allen, who found that the DVD had been "doctored, manipulated and/or edited." (*Id.;* Aff. of Tarek Youssef Hassan Saleh (Saleh Decl.) Ex. 2.) Allen asked for the original hard copy for comparison purposes, but over two years later, "the government's attorney alleged the original hard drive was erased and no longer available." (Compl.¶ 51.)

A government-requested expert also examined the DVD copy that Saleh received. He concluded that the files contained were "true and accurate from start to finish. While throughout the recordings certain errors and anomalies [were] identified, it is not uncommon that these errors may be present," and they "should not be considered edits or alterations." (Pl.'s Answer to Def.'s Mem. of Law in Supp. of Mot. to Dismiss ("PL's Br.") Ex. 4, ECF No. 20.) The expert explained that

any errors seemed to be the product of the process by which the file was converted and saved onto the DVD. (*Id.*)

### D. *Prior Proceedings*

Saleh first brought suit against the FBI, CIS, and their employees in their individual capacities in October 2009, asserting (1) constitutional civil rights claims and (2) FTCA tort claims. The court first ruled that Plaintiff's civil rights claims were barred by sovereign immunity. *See Saleh v. Holder (Saleh I),* No. 09 Civ. 9066, 2010 WL 5376210, at *7 (S.D.N.Y. Dec. 29, 2010) (*quoting King v. Simpson,* 189 F.3d 284, 287 (2d Cir.1999)). The court further dismissed Saleh's FTCA claim because Saleh had not exhausted his administrative remedies prior to filing his district court complaint. *Id.* at *8.[3] Specifically, Plaintiff's FBI "E-complaint" filed February 28, 2008, was defective because it did not state a demand for a sum certain, which was a prerequisite for a valid FTCA administrative complaint. *Id.* (*citing Johnson v. Smithsonian Inst.,* 189 F.3d 180, 190 (2d Cir.1999); *Czetwertynski v. United States,* 514 F.Supp.2d 592, 596 (S.D.N.Y.2007)).

Saleh attempted to cure this error by filing a new complaint with the FBI containing the required sum certain on May 9, 2010. *Id.* However, the Court held that "where a suit is initiated prior to the filing of an administrative complaint, it must be dismissed even where the failure to file the administrative complaint is later cured." *Id.* (*citing McNeil v. United States,* 508 U.S. 106 (1993)).

In 2011, Judge Deborah A. Batts adopted Magistrate Judge Gabriel W. Gorenstein's Report and Recommendation and dismissed Saleh's complaint in its entirety with prejudice and on the merits for failing to exhaust administrative remedies under the FTCA. *Saleh II,* 2011 WL 797500, at *2.

The Second Circuit then affirmed the judgment in every aspect except that regarding Saleh's FTCA claims. *Saleh III,* 470 F. App'x at 44. The court agreed that Saleh's failure to exhaust administrative remedies deprived the district court of subject matter jurisdiction. *Id.* However, it held that "the proper course of action [was] for the district court to dismiss the claims *without* prejudice to allow the litigant to pursue a separate new action once exhaustion has been completed." *Id.* (emphasis added) (citations omitted). It remanded the case to

permit Saleh to refile his FTCA claims should he satisfy the exhaustion requirement.

**\*5** Saleh filed this action on June 12, 2012, with new allegations of administrative exhaustion. (ECF No. 1.) The FTCA's exhaustion requirement provides: "The failure of an agency to make final disposition of a claim within six months after it is filed shall, at the option of the claimant any time thereafter, be deemed a final denial of the claim for purposes of this section." 28 U.S.C. § 2675(a). Saleh now states that he received a "denying letter from FBI for his Administrative Claims" on June 1, 2010, and another letter from the Department of Homeland Security ("DHS") on June 21, 2010, informing him that "his complaint was sent to Office of Internal Audit and [O]ffice of Professional [R]esponsibility ...." (Compl.¶ 54.) When Saleh filed this action on June 12, 2013, more than six months had elapsed without comment since the June 21, 2010, DHS letter. (Compl.¶ 54.)

## II. *STANDARD OF REVIEW*

Under Federal Rule of Civil Procedure 12(b)(1), a case may be dismissed for lack of subject matter jurisdiction when the district court "lacks the statutory or constitutional power to adjudicate it ." *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir.2000) (*citing* Fed.R.Civ.P. 12(b)(1)). To overcome a 12(b)(1) motion to dismiss, Plaintiff has the burden of proving jurisdiction by a preponderance of the evidence. *Id.* (*citing Malik v. Meissner,* 82 F.3d 560, 562 (2d Cir.1996)).

To survive a 12(b)(6) motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (*quoting Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)); *see also Ferranti v. Heinemann,* 468 F. App'x 85, 85 (2d Cir.2012) (applying the *Twombly* standard to a *pro se* FTCA complaint). This is not a "probability requirement"; the standard asks for "enough fact to raise a reasonable expectation that discovery will reveal evidence of [the misconduct]." *Twombly,* 550 U.S. at 556. That is, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* at 555.

"A court may dismiss a claim as 'factually frivolous' if the sufficiently well-pleaded facts are 'clearly baseless'—that is,

if they are 'fanciful,' 'fantastic' or 'delusional.' " *Gallop v. Cheney,* 642 F.3d 364, 368 (2d Cir.2011) (*quoting Denton v. Hernandez,* 504 U.S. 25, 32–33 (1992)). "[A] finding of factual frivolousness is appropriate when the facts alleged rise to the level of the irrational or the wholly incredible, whether or not there are judicially noticeable facts available to contradict them." *Denton,* 504 U.S. at 33. However, the Court must be careful not to dismiss a complaint "simply because the court finds the Plaintiff's allegations unlikely." *Id.* "Some improbable allegations might properly be disposed of on summary judgment, but to dismiss them as frivolous without any factual development is to disregard the age-old insight that many allegations might be strange, but true." *Id.* (internal quotation marks and citation omitted).

**\*6** In reviewing motions made under either Rule 12(b)(1) or Rule 12(b)(6), the Court "must accept all factual allegations in the complaint as true and draw inferences from those allegations in the light most favorable to the plaintiff." *Jaghory v. New York State Dep't of Educ.,* 131 F.3d 326, 329 (2d Cir.1997). Moreover, "[i]t is well established that the submissions of a *pro se* litigant must be construed liberally and interpreted to raise the strongest arguments that they suggest." *Triestman v. Federal Bureau of Prisons,* 470 F.3d 471, 474 (2d Cir.2006) (internal quotation marks and citations omitted). At the same time, the court must "limit itself to a consideration of the facts that appear on the face of the complaint." *Vollinger v. Merrill Lynch & Co., Inc.,* 198 F.Supp.2d 433, 437 (S.D.N.Y.2002) (internal quotation marks omitted) (*quoting Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities Inc.,* 748 F.2d 774, 779 (2d Cir.1984)). A plaintiff cannot amend his or her complaint by alluding to issues raised solely in the briefs opposing a motion to dismiss. *See In re Sanofi–Aventis Sec. Litig.,* 774 F.Supp.2d 549, 562 (S.D.N.Y.2011); *Fadem v. Ford Motor Co.,* 352 F.Supp.2d 501, 516 (S.D.N.Y.2005); *Waldman v. Vill. of Kiryas Joel,* 39 F.Supp.2d 370, 382 (S.D.N.Y.1999).

## III. *DISCUSSION*

Plaintiff's allegations here are virtually identical to those raised in *Saleh I, II,* and *III.* The Court interprets Saleh's factual allegations to allege two sets of claims: (1) violations of the civil rights provisions of the U.S. Constitution, and (2) violations of the FTCA.[4] However, even construing Plaintiff's complaint liberally—as this Court must with a *pro*

*se* litigant—Plaintiff fails to plausibly allege facts to support either cause of action.

### A. *Civil Rights Claims for Declaratory and Injunctive Relief*

First, to the extent that Saleh claims violations of his constitutionally protected civil rights, res judicata precludes those claims.

The doctrine of res judicata provides that "a final judgment on the merits bars a subsequent action between the same parties over the same cause of action." *Channer v. Dep't of Homeland Sec.,* 527 F.3d 275, 279 (2d Cir.2008) (*citing Semtek Int'l Inc. v. Lockheed Martin Corp.,* 531 U.S. 497, 502 (2001)). Therefore, a suit is barred by res judicata if: (1) the previous action involved an adjudication on the merits; (2) the previous action involved the plaintiffs or those in privity with them; and (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action. *Monahan v. New York City Dep't of Corrections,* 214 F.3d 275, 285 (2d Cir.2000) (citations omitted). "Whether or not the first judgment will have preclusive effect depends in part on whether the same transaction or series of transactions is at issue, whether the same evidence is needed to support both claims, and whether the facts essential to the second were present in the first." *Id.* (internal quotation marks and citation omitted); *see also Cieszkowska v. Gray Line New York,* 295 F.3d 204, 206 (2d Cir.2002) (applying res judicata to an *in forma pauperis pro se* plaintiff because "the factual predicates of plaintiff's allegations in the first and second complaints involve the same events").

***7** Here, the District Court's adoption in *Saleh II* of the *Saleh I* Report and Recommendation constituted an adjudication on the merits of the civil rights claims, affirmed by the Second Circuit in *Saleh III.*[5] *Saleh I–III* also involved the same plaintiff and included the United States as a defendant—the same parties as alleged here. Finally, Saleh's civil rights claims and the corresponding requests for relief are identical to those he presented previously.[6] (*See* Cowart Decl. Ex. 12 (*Saleh I* Amended Compl), at 24).) The factual allegations supporting such claims are identical as well. Therefore, res judicata precludes Saleh from receiving a second bite at the apple with regard to his civil rights claims arising under the Constitution. *See Cieszkowska,* 295 F.3d at 206.

### B. *FTCA Claims for Equitable Relief and Compensatory Damages*

Saleh has now adequately pled exhaustion of administrative remedies, curing the defect identified in *Saleh I.* *Saleh I,* 2010 WL 5376210, at *8.

In the instant action, Saleh once again asserts that he filed the May 9, 2010 E-complaint with the FBI, and that on June 1, 2010, he "received denying letter from FBI for his Administrative Claims." (Compl.¶¶ 53–54.) He also alleges that he received another letter from the Department of Homeland Security on June 21, 2010, indicating that his complaint had been forwarded to the "Office of Internal Audit and [O]ffice of Professional [R]esponsibility." (*Id.* ¶ 54.) He has not received any further information regarding his complaint since that date—far more than six months prior to his filing of this Complaint in 2012. (*Id.* ¶ 54.) Because the FTCA deems administrative complaints exhausted when an administrative agency has not responded to a complaint within six months, Saleh has sufficiently pled exhaustion. *See* 28 U.S.C. § 2675(a). The Court will therefore consider the substance of Saleh's FTCA allegations.

The Court construes Saleh's FTCA claims to allege six torts: (1) defamation; (2) intentional infliction of emotional distress; (3) negligent infliction of emotional distress; (4) "failure to train, supervise and discipline" (Compl. 26 (Prayer for Relief (d))); (5) "abuse of process, abuse of the authorities," and (6) "denial of rightful relief under immigration laws of United States to which plaintiff was entitled to, by fabrication of the evidence not by discretion." (Compl.¶ 22.)

Saleh has since clarified that his main FTCA claims are a "failure to train, supervise and investigate" claim and an "abuse of process" claim; he does not allege FTCA claims based on defamation or spoliation of evidence. (Pl.'s Br. at 13–14, ECF No. 20.) The Court therefore focuses its determination on the four remaining torts: (1) failure to train, supervise, and investigate; (2) abuse of process; (3) intentional infliction of emotional distress; and (4) negligent infliction of emotional distress.[7] Saleh fails to assert plausible facts that would entitle him to relief as to any of these torts.

### 1. *The FTCA and its Exceptions*

**\*8** The FTCA is a limited waiver of sovereign immunity against certain tort claims of property damage or personal injury "caused by the negligent or wrongful act or omission" of a government employee "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1); *see also* *B & A Marine Co., Inc. v. Am. Foreign Shipping Co.,* 23 F.3d 709, 712 (2d Cir.1994) (*citing* *United States v. Orleans,* 425 U.S. 807, 813 (1976)). The Government can thus be held liable only if a private person or entity would be held liable for an analogous tort under the law of the forum state. *See* *United States v. Olson,* 546 U.S. 43, 44–46 (2005) ( "[T]he Act requires a court to look to the state-law liability of private entities, not to that of public entities, when assessing the Government's liability under the FTCA [even] in the performance of activities which private persons do not perform.") (internal quotation marks and citation omitted). In general, this waiver will be "strictly construed, in terms of its scope, in favor of the sovereign." *Dolan v. U.S. Postal Service,* 546 U.S. 481, 491 (2006) (*quoting* *Lane v. Peña,* 518 U.S. 187, 192 (1996)).

The FTCA contains various exceptions that limit the Government's liability. First, § 2680(a) provides a "discretionary function" exception, which states that the Government is not liable for

> [a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a). The exception only applies to acts that "involve an element of judgment or choice"; if a federal statute, regulation, or policy specifies a particular course of action for a federal employee to follow, the exception does not apply, because "the employee has no rightful option but to adhere to the directive ." *United States v. Gaubert,* 499 U.S. 315, 322 (1991) (internal quotation marks omitted) (*citing* *Berkovitz v. United States,* 486 U.S. 531 (1988)). Furthermore, even if the act does involve an element of judgment or choice, the exception only applies to governmental actions or decisions that are susceptible to considerations of public policy. *Gaubert,* 499 U.S. at 323–25.

Second, the FTCA excludes claims arising out of certain intentional torts: "assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights[.]" 28 U.S.C. § 2680(h). However, the "law enforcement proviso" in that section nonetheless subjects the Government to claims against investigative or law enforcement officers arising out of "assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution." *Id.* [8]

**\*9** Finally, claims based on acts or omissions arising outside the scope of employment are not available under the FTCA. *See* 28 U.S.C. § 1346(b)(1); *see also* *Hamm v. United States,* 483 F.3d 135, 138 (2d Cir.2007) (dismissing plaintiff's FTCA claim based on a car accident with an Army reservist because the accident occurred during a drive that was "purely on [the reservist's] own time in order to commute to his place of employment" and therefore was not within the scope of employment). Plaintiffs claims must therefore stem from the officers' acts or omissions arising within the scope of their employment—though "regardless of whether the officers are [specifically] ... executing a search, seizing evidence, or making an arrest." *Millbrook v. United States,* 133 S.Ct. 1441, 1446 (2013).

Saleh has failed to allege plausible facts supporting any of his four tort allegations.

### 2. *Abuse of Process and Failure to Supervise*

Plaintiff's core allegation supporting his claims with regard to the first two torts—failure to supervise and abuse of process [9]—is that he was denied a green card and subjected

to other distressing treatment because he refused to work for the FBI. (*See* Compl. ¶¶ 22 (Government failed to "supervise, train, ... investigate [and] discipline the officers of [CIS] and FBI and other law enforcement adequately," resulting in their unauthorized attempts to coerce and threaten him), 29, 39–40, 42–43, 48, 52; Pl.'s Br. 14 ("[T]he government abused the process and still continues abusing of process to force the plaintiff to work for the FBI or to make his life hell or to force him to depart the US.").)

The Court disposes of the failure to supervise and abuse of process claims on the authority of 🚩 *Akutowicz v. United States,* 859 F.2d 1122 (2d Cir.1988). There, the *pro se* plaintiff was a United States citizen who became a naturalized French citizen and had his American citizenship revoked by the Department of State. 🚩 *Id.* at 1123–24. The plaintiff brought an action against the Government for "wrongfully fabricat[ing] and distort[ing] information relevant to his [record], enabling it negligently to deprive him of his citizenship." 🚩 *Id.* at 1124. The Second Circuit found that plaintiff failed to state a cause of action under the FTCA because "the withdrawal of a person's citizenship constitutes a quasi-adjudicative action for which no private analog exists." 🚩 *Id.* at 1126. It further noted that "[e]ven if [the Court] were willing to analogize the relationship between the government and its citizens with that between a private association and its individual members, we would be hard pressed to find 'a cause of action *in tort*' for alleged misconduct by the association." *Id.* (emphasis in original) (citation omitted).

This Court would similarly be "hard pressed" to find a private tort analogue to the actions Saleh challenges—CIS's denial of a green card and the FBI's pressure on Saleh to become an informant. The denial of a green card is an immigration-related action that "has no private analog and thus cannot be redressed under the FTCA." *Omonivi v. Dep't of Homeland Sec.,* No. 10 Civ. 1344(DF), 2012 WL 892197, at *9 (S.D.N.Y. Mar. 13, 2012). Likewise, even if the FBI tortiously attempted to "force [Saleh] to work for the FBI," the Government's unique role as a law enforcer and investigative body means that no private analogue exists. Without analogous private torts, Saleh cannot allege failure to supervise or abuse of process under the FTCA. [10]

**\*10** Even if the Court did find that there existed a tort analogous to the withholding of a green card, Saleh's abuse of process and failure to supervise claims would

nevertheless fail under the Immigration and Nationality Act ("INA"). 🚩 8 U.S.C. § 1101 *et seq* . Under the INA, "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter." 🚩 8 U.S.C. § 1252(g) (2005); *see also* 🚩 *Ajlani v. Chertoff,* 545 F.3d 229, 235 (2d Cir.2008) (finding that "the district court lacked jurisdiction to review [the plaintiff's] constitutional challenges to his removal proceedings"); 🚩 *El Badrawi v. Dep't of Homeland Sec.,* 579 F.Supp.2d 249, 265 (D.Conn.2008). While an exception under 🚩 8 U.S.C. § 1252(a)(2)(D) permits judicial review of certain constitutional challenges to removal proceedings, such jurisdiction is vested exclusively in the Courts of Appeals. *See* 🚩 *Ajlani,* 545 F.3d at 235; *see also* 🚩 *Shabaj v. Holder,* 718 F.3d 48, 51–52 (2d Cir.2013) (holding that such "petitions for review ... must be filed in the appropriate *court of appeals"* ) (emphasis in original). This Court therefore has no jurisdiction over Saleh's abuse of process claims, even to the extent that he alleges that commencing removal proceedings against him was unconstitutional.

Finally, the FBI's alleged attempts to compel Saleh's cooperation are also protected under the discretionary function exception under 🚩 28 U.S.C. § 2680(a). Imposing liability on the FBI for discretionary decisions arising out of its investigative and law enforcement functions "would seriously handicap the FBI and other federal law enforcement agencies in carrying out the important duties assigned to them by Congress." *See* 🚩 *Suter v. United States,* 441 F.3d 306, 311–12 (4th Cir.2006) (citation and internal quotation marks omitted). Similarly, the FBI's attempt to compel Saleh's cooperation with its anti-terrorism efforts is the type of action that is wholly susceptible to policy considerations and thereby protected under the exception. The Attorney General's Guidelines for Domestic FBI Operations state:

> The identification and recruitment of human sources—who may be able to provide or obtain information relating to criminal activities, information relating to terrorism, espionage, or other threats to the national security, or information relating to matters

of foreign intelligence interest— is ... critical to the effectiveness of the FBI's law enforcement, national security, and intelligence programs, and activities undertaken for this purpose are authorized and encouraged.

Dep't of Justice, Attorney General's Guidelines for Domestic FBI Operations 16 (2008). The FBI agents' decision to convince Saleh to work for the FBI was discretionary and in accordance with the FBI's stated purpose and practice. Therefore, even if these claims were not otherwise barred by sovereign immunity and the analogous tort requirement, the discretionary function exception bars the failure to train and supervise and abuse of process claims. [11]

3. *Intentional Infliction of Emotional Distress*
   **\*11** Saleh's two remaining claims under the FTCA allege that Defendant committed the torts of intentional and negligent infliction of emotional distress. Unlike other intentional torts like slander and misrepresentation, neither intentional nor negligent infliction of emotional distress is explicitly listed as an exception to the Government's waiver of sovereign immunity for international torts under § 2680(h). However, the Court need not decide whether such an exclusion is implied, because the conduct Saleh has alleged does not meet the stringent requirements of New York tort law. [12] *See Stuto v. Fleishman,* 164 F.3d 820, 827 (2d Cir.1999) (analyzing plaintiffs FTCA claim for intentional infliction of emotional distress without first determining whether the tort was barred by one of the exceptions to the FTCA).

Under New York Law, intentional infliction of emotional distress (IIED) has four elements: "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial possibility of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress." *Howell v. New York Post Co.,* 81 N.Y.2d 115, 121 (1993). A defendant can only be held liable in limited instances where "the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Id.* (quoting

*Murphy v. Am. Home Prods. Corp.,* 58 N.Y.2d 293, 303 (1983)). "Whether the conduct alleged may reasonably be regarded as so extreme and outrageous as to permit recovery is a matter for the court to determine in the first instance." *Stuto,* 164 F.3d at 827 (citations omitted).

Plaintiff does not plausibly allege conduct that meets this exacting standard. Saleh claims that he "fears that at any moment he could be attacked physically or harassed by the Defendants" to the extent that he fears "being kidnapped or even killed by the Defendants." (Compl.¶ 60.) As support, he cites FBI informant Elrammal's alleged attempt to "trap" Saleh as a suspected terrorist (Compl.¶ 34), Elrammal's indirect threats on Saleh's life (threats made to Shalaby, not to Plaintiff) (Compl.¶ 37), and the FBI's repeated coercion attempts (Compl.¶¶ 39–42.). Plaintiff also states that the rape accusation and accompanying *New York Post* article have caused him "a great deal of discomfort and placed a huge burden on [him]." (*Id.*)

Even construing Saleh's complaint liberally, however, the conduct that Saleh has alleged is not sufficiently "extreme and outrageous" to state a claim under the rigorous New York IIED standard.

First, the most outrageous conduct alleged—the threats to Saleh's life—were made to Shalaby, rather than to Saleh. Thus, Plaintiff fails to allege facts that causally connect the death threat to his distress, or that show that the threat was made with the purpose of inflicting emotional distress. *Cf. Owen v. Leventritt,* 571 N.Y.S.2d 25, 25 (App.Div.1991) (finding that defendant's alleged statement threatening to kill the plaintiff was insufficient to support an IIED claim in part because "the statements were not made directly to plaintiff, but were made in a public meeting").

 **\*12** The most distressing result of Saleh's refusal to aid the FBI that he alleges was denying him an adjustment of status. However, "[m]ere threats, annoyance or other petty oppressions, no matter how upsetting, are insufficient to constitute the tort of intentional infliction of emotional distress." *Id.* at 25–26 (citations omitted). The Court thus finds that the refusal to adjust Saleh's status does not rise to the "outrageous," "extreme," and "atrocious" level of conduct required by New York law. *Howell,* 81 N.Y.2d at 121.

The allegedly defamatory *New York Post* article, even if prompted by the FBI, is similarly insufficiently outrageous

to support an IIED claim. *See McRedmond v. Sutton Place Restaurant & Bar. Inc.,* 851 N.Y.S.2d 478, 479 (App.Div.2008) ("[T]he conduct complained of—making statements to [the *New York Post* ] about this litigation—falls far short of the standard required to sustain such a claim.").

### 4. *Negligent Infliction of Emotional Distress*

Finally, Saleh has not alleged any conduct to plausibly plead a negligent infliction of emotional distress (NIED) claim. Physical injury is not a necessary element of an NIED claim, but NIED "must generally be premised upon conduct that unreasonably endangers a plaintiff's physical safety or causes the plaintiff to fear for his or own safety." *Savva v. Longo.* 779 N.Y.S.2d 129, 130 (App.Div.2004) (internal quotation marks and citations omitted).

A plaintiff may bring an NIED claim under either the "bystander" theory or the "direct duty" theory. *Mortise v. United States,* 102 F.3d 693, 696 (2d Cir.1996). Saleh fails to allege sufficient facts to plead an NIED claim under either theory.

Under the "bystander" theory, a plaintiff must (1) be threatened with physical harm as a result of defendant's negligence, and (2) suffer emotional distress from witnessing the death or serious bodily injury of a member of his or her immediate family. *Id.* (citing *Bovsun v. Sanperi,* 61 N.Y.2d 219 (1984)). As Saleh does not allege that he witnessed the death or serious bodily injury of an immediate family member, he cannot rely upon the bystander theory of NIED.

Under the "direct duty" theory, a plaintiff must suffer from emotional distress because of defendant's breach of a duty which "unreasonably endangered" plaintiff's own physical safety. *Mortise,* 102 F.3d at 696 (citing *Kennedy v. McKesson Co.,* 58 N.Y.2d 500 (1983) and *Green v. Leibowitz,* 500 N.Y.S.2d 146 (App.Div.1986)). The duty must be one owed specifically to the plaintiff, not to society or the public in general. *Id.* (citation omitted); *see also Lauer v. City of New York,* 711 N.Y.S.2d 112, 116 (2000). Saleh has not alleged facts to show that Defendant ever endangered his physical safety, and therefore he cannot assert an NIED claim under the direct duty theory.

Thus, Plaintiff states no plausible facts to support an FTCA claim under any of the four claimed torts.

### IV. *CONCLUSION*

**\*13** Because Plaintiff states no plausible facts to support an FTCA claim under any of the claimed torts, and his remaining claims are barred by res judicata, Defendant's motion to dismiss the Complaint is GRANTED and this case is dismissed with prejudice.

The Clerk of Court is directed to close the motion at ECF No. 9, to terminate all remaining dates, and to close this case.

SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2013 WL 5439140

---

### Footnotes

1    The letter acknowledged that Saleh claimed to have disclosed the information to Immigration and Customs Enforcement ("ICE") agents prior to his denial in 2009. It stated: "If an applicant tells [ICE] pertinent information regarding past association with a group but fails to disclose the same exact information to [CIS], the branch that deals with giving out the benefits of Lawful Permanent Residency and Citizenship, the applicant can and should expect a negative decision on the benefit application." (Cowart Decl. Ex. 7, at 3–4.)

2    Following the briefing on this motion, Saleh filed two affidavits making additional allegations to substantiate his spoliation claim. (ECF Nos. 27, 30.) However, a complaint cannot be amended by materials outside the pleadings for the purposes of a Rule 12(b)(6) motion. *See Friedl v. City of New York,* 210 F.3d 79, 83 (2d Cir.2000) (*quoting Fonte v. Board of Managers of Continental Towers Condominium,* 848 F.2d 24, 25 (2d

Cir.1988)). To the extent the Court may consider such allegations as part of defendant's 12(b)(1) motion for lack of subject matter jurisdiction, plaintiffs affidavits do not substantively alter the facts material to resolve defendant's motion to dismiss. Therefore, the Court does not recite their substance in detail.

3    *See id.* (explaining that a district court lacks jurisdiction to hear an FTCA claim "unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail. The failure of an agency to make final disposition of a claim within six months after it is filed shall ... be deemed a final denial of the claim") (quoting 28 U.S.C. § 2675(a)).

4    Specifically, Saleh seeks declaratory and injunctive relief for "depriving" him of "rights, privileges or immunities secured or protected by the Constitution or laws of the United States [and] N.Y. state law." (Compl. at 25.) He has also renewed his FTCA claims "and common law tort claims of defamation, intentional infliction of emotional distress, negligent infliction of emotional distress, negligence, failure to train, supervise and discipline." (*Id.* at 26.) He accordingly seeks "equitable relief" and $10,000,000 in compensatory damages for his "fear, mental pain, inconvenience, humiliation, [and] emotional distress." (*Id.*)

5    It is not settled in the Second Circuit whether a judgment based on a sovereign immunity defense is an adjudication on the merits for the purposes of res judicata. *See O'Connor v. Pierson,* 568 F.3d 64, 70 (2d Cir.2009). However, Judge Batts made a specific finding in *Saleh II* that the dismissal of plaintiffs' claims was, in fact, a merits dismissal. Even if Saleh's civil rights claims were not barred by res judicata, this Court would reach the same substantive conclusion as the *Saleh I* Report and Recommendation did—that the civil rights claims are barred by sovereign immunity—because neither the facts alleged nor the applicable laws have changed since *Saleh I.*

6    The amended complaint for *Saleh I* asked the Court to "award damages" from the Government for "depriv[ing] plaintiff ... of rights, privileges and immunities secured and protected by the constitution and laws of United States." (*Saleh I* Amended Compl. ¶ 22.) Paragraph 22 in the current Complaint contains this same statement with the same conclusory allegation. Because the same facts are alleged in both Complaints, any possible constitutional claim arising in this action is identical to that which was considered in *Saleh I.*

7    The Court notes that Saleh cannot state FTCA claims based on defamation or spoliation of evidence in any event, because the FTCA's waiver of sovereign immunity does not apply to certain intentional torts, such as "libel, slander, misrepresentation, [and] deceit." 28 U.S.C. § 2680(h); *see also Lipkin v. United States S.E.C.,* 468 F.Supp.2d 614, 624 (S.D.N.Y.2006) (dismissing claims brought under the FTCA for, *inter alia,* "slander, 'conspiracy for libel,' spoliation, and concealment of evidence").

8    An "investigative or law enforcement officer" is "any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law." 28 U.S.C. § 2680(h).

9    The elements of an abuse of process claim under New York law are: (1) a regularly issued legal process compelling the performance or forbearance of some prescribed act; (2) that the person activating the process must have been motivated to do harm without economic or social excuse or justification; and (3) that the person activating the process must be seeking some collateral advantage or corresponding detriment to the plaintiff which is outside the legitimate ends of the process. *Bernard v. United States,* 25 F.3d 98, 104 (2d Cir.1994) (*citing Hornstein v. Wolf,* 67 N.Y.2d 721 (1986)).

10    The Court acknowledges that simply because "the challenged action is one that only the federal government does in fact perforin does not necessarily mean that no private analogue exists." *Liranzo v. United States,*

690 F.3d 78, 94 (2d Cir.2012). However, the *Liranzo* Court was addressing an FTCA claim based on false arrest, whereas Saleh does not allege that he was similarly detained for refusing to cooperate with the FBI.

11   Plaintiff also alleges that "spoliation of the evidence hard drive" and the "manipulat[ion] of his I485" form demonstrate the Government's abuse of process (Compl. ¶ 60; Pl.'s Answer at 16, 27), but, as discussed more fully *supra,* those torts do not fall under the waiver of sovereign immunity provided by the FTCA.

12   The FTCA requires that a claim be brought "in accordance with the law of the place where the act or omission occurred." ⚑ 28 U.S.C. § 1346(b)(1). Thus, New York law applies.

---

**End of Document**                                      © 2023 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Distinguished by Zim American Integrated Shipping Services Co., LLC v. Sportswear Group, LLC,   S.D.N.Y.,   November 18, 2021

2015 WL 9460565
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

OOCL (USA) INC., Plaintiff,

v.

TRANSCO SHIPPING CORP., Defendant.

No. 13-cv-5418(RJS)
|
Signed 12/23/2015

**Attorneys and Law Firms**

Mark L. McKew, The Law Office of Mark McKew, PLLC, New York, NY, for Plaintiff.

Carolyn J. Shields, Ying Liu, Liu & Shields LLP, Flushing, NY, for Defendant.

OPINION AND ORDER

RICHARD J. SULLIVAN, DISTRICT JUDGE.

 *1  Plaintiff OOCL (USA) Inc. brings this action for breach of contract and account stated against Defendant Transco Shipping Corp. to recover demurrage and detention fees that Plaintiff incurred while cargo sat unclaimed on its vessel in the Port of New York. Having presided over a bench trial in this action, the Court issues the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a). For the reasons set forth below, the Court finds Defendant liable for breach of contract, but dismisses Plaintiffs' account stated claim as duplicative of the breach of contract claim. Accordingly, the Court hereby enters judgment for Plaintiff and awards it damages in the amount of $57,473, plus prejudgment interest, reasonable attorney's fees, and costs.

I. PROCEDURAL HISTORY

On November 1, 2010, Plaintiff commenced this action in New York state court, and, on August 2, 2013, this action was removed to federal court. (Doc. No. I.) Subsequently, Plaintiff filed its First Amended Complaint, asserting claims against Defendant and Transco Shipping Logistics Corp. for breach of the three bills of lading [1] at issue in this case, failure to pay an account stated, and unjust enrichment. (Doc. No. 35, Ex. 1 ("FAC").) Plaintiff sought damages in the amount of $58,490, plus prejudgment interest, reasonable attorney's fees, and costs. (Id. ¶¶ 15, 19, 23.)

On July 20, 2014, Defendant moved for summary judgment on all of Plaintiff's claims. (Doc. No. 30.) On August 19, 2014, Plaintiff filed an opposition to Defendant's summary judgment motion and withdrew all of its claims against Transco Shipping Logistics Corp. (Doc. No. 36.) The motion was fully briefed on September 2, 2014. (Doc. No. 43.) On March 11, 2015, the Court denied Defendant's motion as to the breach of contract and account stated claims, finding that genuine issues of material fact remained as to whether Defendant endorsed the third bill of lading and whether it had notice of the terms on the reverse side of each bill of lading. (Doc. No. 51 ("March Opinion").) The Court nevertheless granted Defendant's summary judgment motion as to the unjust enrichment claim and formally dismissed Transco Shipping Logistics Corp. from this action. (Id.)

The Court conducted a bench trial on July 27, 2015 in order to resolve the issues of material fact on the remaining claims. Vincent DiSanto, Plaintiff's Manager of Regulatory and Process, testified on behalf of Plaintiff, and Lihuang Liu, Defendant's President, testified on behalf of Defendant. In addition, each party submitted a post-trial memorandum of law on August 31, 2015. (Doc. No. 83 ("Pl. Post-Trial Mem."); Doc. No. 84 ("Def. Post-Trial Mem.").)

II. LEGAL STANDARD

 *2  To prevail on its claims, Plaintiff must present evidence in support of the allegations set forth in the First Amended Complaint and prove those allegations by a preponderance of the evidence. See Raymond v. Marks, 116 F.3d 466 (2d Cir. 1997). "The burden of showing something by a preponderance of the evidence ... simply requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence." Metro. Stevedore Co. v. Rambo, 521 U.S. 121, 137 n.9 (1997) (internal quotation marks omitted). As the finder of fact, the Court is entitled to make credibility findings of the witnesses and testimony and to

OOCL (USA) Inc. v. Transco Shipping Corp., Not Reported in Fed. Supp. (2015)

Case 5:22-cv-01202-MAD-ML    Document 8    Filed 03/28/23    Page 344 of 364

draw reasonable inferences from the evidence presented. *See* *Merck Eprova AG v. Gnosis S.p.A.*, 901 F. Supp. 2d 436, 448 (S.D.N.Y. 2012), *aff'd*, 760 F.3d 247 (2d Cir. 2014).

### III. FINDINGS OF FACT [2]

In 2008, Orient Star International Ltd. ("Orient Star") provided Plaintiff's agent in China ("OOCL Shenzhen") with four containers of plasterboard that Plaintiff, an ocean carrier, agreed to transport from the port in Shenzhen, China to the Port of New York. (DiSanto Aff. ¶ 8.) Around the same time, Orient Star entered into an agency agreement with Defendant, whereby Defendant agreed to act as Orient Star's agent in the Port of New York to receive the containers. (Stip. ¶ 7.) On July 27, 2008, OOCL Shenzhen issued to Orient Star three original sets of three non-negotiable bills of lading with the numbers "OOLU2007690594" ("First BOL"), "OOLU2007690681" ("Second BOL"), and "OOLU2007690683" ("Third BOL"). (PX 3–4, 23 ("BOL"); Stip. ¶ 1.) [3] Each bill of lading identified Defendant as the "consignee" and "notify party" on the front, and set forth a list of terms and conditions on the back. [4] (Stip. ¶ 4.) The terms and conditions included "consignee" within the definition of "merchant" and noted that all merchants would be held "jointly and severally responsible for all freight and charges due under this Bill of Lading." (BOL cls. 2, 15, 19(4).) In addition, as explained in the bottom left corner on the front side of each bill of lading, the terms and conditions on the reverse side of each bill of lading were also available "at www.oocl.com, in OOCL's published U.S. tariffs, and in pamphlet form." (DiSanto Aff. ¶ 26.)

Once Plaintiff's vessel left China, Orient Star emailed the front side of each bill of lading to Defendant and then subsequently sent the complete original bills of lading to Defendant. (Stip. ¶¶ 8–9.) The cargo eventually arrived in New York on August 25, 2008 and began incurring demurrage charges on August 29, 2008. [5] (DiSanto Aff. ¶¶ 57–58; Tr. at 41:18–24.) On October 8, 2008, Defendant signed and endorsed the First BOL and presented it to Plaintiff. (DiSanto ¶ 24.) In addition, on October 21, 2008, Defendant signed and endorsed two sets of the remaining two bills of lading and presented them to Plaintiff. (DiSanto ¶ 20.) As explained in the Court's March Opinion, by endorsing and presenting each bill of lading, Defendant became a party to each bill of lading, pursuant to clause 28, which stated:

**\*3** NOTICE TO ENDORSEE AND/OR HOLDER AND/OR TRANSFEREE: By taking up this Bill of Lading, whether by endorsement and/or becoming a holder and/or by transfer hereof and/or by presenting this Bill of Lading to obtain delivery of the Goods herein and/or otherwise, *the endorsee/holder/transferee thereupon become[s] a party to a contract of carriage* with the carrier on the basis herein.

(BOL cl. 28 (emphasis added); March Opinion at 5.) After endorsing and presenting each bill of lading, Defendant notified the third-party buyer of the arrival of the cargo. (Liu Aff. ¶ 21.) However, Defendant did not receive a response, likely because the third-party buyer had gone out of business. (*Id.*) As a result, since neither Defendant nor any other entity took physical possession of the cargo, Plaintiff continued to incur demurrage charges for the unclaimed cargo. (Stip ¶ 6; DiSanto Aff. ¶ 54; Liu Aff. ¶¶ 22–23.)

On or about October 14, 2008, Plaintiff transported the unclaimed cargo related to the First BOL to the truck terminal of Plaintiff's salvaging agent, BK Logistics Solutions Inc. ("BK Logistics"), where the cargo incurred reduced detention charges. (DiSanto Aff. ¶ 57.) Subsequently, on October 21, 2008, Plaintiff transported the unclaimed cargo related to the remaining two bills of lading to BK Logistics's truck terminal. (*Id.* ¶ 58; Tr. at 41:25–42:3.) On November 14, 2008, BK Logistics sold the cargo as "sheet rock salvage" to American Excess, a salvage company, for a total of $3,547. (PX 18; Tr. at 42:22–43:3.) As a result, Plaintiff stopped incurring demurrage and detention charges that same day. (DiSanto ¶ 66.) However, prior to the sale to American Excess, Plaintiff had sustained a total of $58,490 in demurrage and detention charges. (*Id.* ¶¶ 60–65; PX 11–17.)

On June 23, 2010, Plaintiff delivered to Defendant an invoice requesting payment of $58,490, which Defendant has not yet paid. (DiSanto Aff. ¶ 65; PX 17.) On May 3, 2013, after deducting costs incurred during the sale of the unclaimed cargo, BK Logistics remitted $1,017 to Plaintiff for the cargo sale, and Plaintiff deposited that amount into its account by applying the invoice across the three bills of lading at issue in

OOCL (USA) Inc. v. Transco Shipping Corp., Not Reported in Fed. Supp. (2015)

Case 5:22-cv-01202-MAD-ML    Document 8    Filed 03/28/23    Page 345 of 364

this case and one other unrelated bill of lading. (PX 25 [6]; Tr. at 23:19–25, 51:5–52:9, 56:12–25.)

## IV. CONCLUSIONS OF LAW

### A. Jurisdiction

**\*4** The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1333(1), which provides district courts with original jurisdiction over "[a]ny civil case of admiralty or maritime jurisdiction." The Court has supplemental jurisdiction over the state law account stated claim pursuant to 28 U.S.C. § 1367(a). Venue in the Southern District of New York is proper under 28 U.S.C. § 1391.

### B. Breach of Contract

Federal courts apply federal common law when interpreting bills of lading for transoceanic shipments like the one here. See Norfolk, 543 U.S. at 22–23 ("When a contract is a maritime one, and the dispute is not inherently local, federal law controls the contract interpretation."). In addition, "contracts for carriage of goods by sea must be construed like any other contracts: by their terms and consistent with the intent of the parties." Id. at 31. Thus, in order to establish a claim for breach of contract, "a plaintiff must prove, by a preponderance of the evidence, (1) the existence of a contract between itself and that defendant; (2) performance of the plaintiff's obligations under the contract; (3) breach of the contract by that defendant; and (4) damages to the plaintiff caused by that defendant's breach." Diesel Props S.r.l. v. Greystone Bus. Credit II LLC, 631 F.3d 42, 52 (2d Cir. 2011). Based on the evidence presented at trial, the Court finds that Plaintiff has proven by a preponderance of the evidence each element of its breach of contract claim.

First, as previously discussed in the Court's March Opinion, Defendant accepted the bills of lading and became a party to each when it signed, endorsed, and presented them to Plaintiff. (March Opinion at 5.) Specifically, Defendant accepted the First BOL on October 8, 2008 and accepted the Second and Third BOLs on October 21, 2008, thereby becoming subject to the terms and conditions on the reverse side of each bill of lading, including that Defendant would

be held "jointly and severally responsible for all freight and charges due under this Bill of Lading," such as demurrage and detention fees. (DiSanto Aff. ¶¶ 20, 24; BOL cls. 15, 19(4).) In making this finding, the Court relies on the express terms of each bill of lading, which stated that, by endorsing or presenting a bill of lading, "the endorsee/holder/transferee thereupon become[s] a party to a contract of carriage." (BOL cl. 28.)

The Court also finds that, despite Defendant's argument to the contrary, Defendant had ample notice of the terms and conditions on the reverse side of each bill of lading. First, as previously discussed, Orient Star sent Defendant the complete bills of lading, and, when the cargo arrived in New York, Defendant signed and endorsed each bill of lading *directly on top of* the terms and conditions. (Stip. ¶¶ 5, 8–9; DiSanto Aff. ¶ 38); see also Hirsch v. Citibank, N.A., 542 F. App'x 35, 37 (2d Cir. 2013) (noting that "receipt of a physical document containing contract terms or notice thereof is frequently deemed, in the world of paper transactions, a sufficient circumstance to place the offeree on" notice); id. ("[A] party cannot avoid the terms of a contract on the ground that he or she failed to read it before signing." (internal quotation marks omitted)). Second, before October 2008, Defendant had endorsed and presented at least 90 bills of lading to Plaintiff that had the same terms and conditions as the bills of lading in the present case. (DiSanto Aff. ¶ 40); see also New Moon Shipping Co. v. MAN B&W Diesel AG, 121 F.3d 24, 31 (2d Cir. 1997) ("Evidence of a prior course of dealing may establish a party's awareness of and consent to intended contractual terms."); Maersk Inc. v. Am. Midwest Commodities Exp. Cos., No. 97-cv-0475 (NRB), 1998 WL 473945, at \*4 (S.D.N.Y. Aug. 10, 1998) (finding that, "based on the prior contractual undertakings" with plaintiff, defendant "has no basis to assert that he had no notice of the terms of the bills of lading"). Third, Defendant's own publicly available tariff contained terms and conditions that were remarkably similar to Plaintiff's bills of lading. (DiSanto Aff. ¶ 50; PX 10.); see Russul Corp. v. Zim Am. Integrated Shipping Servs. Co., No. 06-cv-0037 (JCF), 2009 WL 466149, at \*4 (S.D.N.Y. Feb. 25, 2009) (finding that parties will be bound to a bill of lading when "the terms of the form of bill of lading were concededly known by the parties, and the parties clearly intended to be bound by the carrier's bill of lading form" (internal quotation marks omitted)). For example, Defendant's tariff includes consignee within the definition of merchant. (PX 10 cl. 2(c).) Finally, the

OOCL (USA) Inc. v. Transco Shipping Corp., Not Reported in Fed. Supp. (2015)

Case 5:22-cv-01202-MAD-ML    Document 8    Filed 03/28/23    Page 346 of 364

front of each bill of lading noted that the terms and conditions were available at www.oocl.com. (DiSanto Aff. ¶ 26.)

*5  Defendant attempts to argue that it did not have notice of the terms and conditions because it did not receive a copy of the complete bills of lading until *after* Plaintiff's vessel departed China. (Liu Aff. ¶¶ 15–17.) However, as demonstrated by the evidence described above, Defendant was no stranger to the terms and conditions on the bills of lading, and Defendant had ample opportunity to read those terms before it signed and endorsed each bill of lading. *See* 🚩 *Anvil Knitwear, Inc. v. Crowley Am. Transp., Inc.*, No. 00-cv-3243 (NRB), 2001 WL 856607, at *2 (S.D.N.Y. July 27, 2001) ("It is not unusual to issue a bill of lading after a carrier has taken possession of cargo and courts have regularly held that this does not prevent parties from being bound by its terms."). Accordingly, the Court does not find Liu's testimony that Defendant had no notice of the terms on the reverse side of the bills of lading to be credible.

Similarly, the Court rejects Defendant's argument that it was essentially tricked into signing the bills of lading and becoming a party to each one. Specifically, Liu asserts that Defendant had no right to take delivery of the cargo because Orient Star had not notified Defendant that the cargo could be released. (Liu Aff. ¶ 24.) Liu further contends that Defendant signed and endorsed the bills of lading pursuant to instructions from Orient Star, but only so that Plaintiff could *abandon* the cargo. (*Id.* ¶¶ 28, 30.) As a result, Liu claims that Defendant's endorsement and presentation of the bills of lading was a "surrender" of the bills of lading, rather than acceptance of them, designed to enable Plaintiff to abandon the cargo. (*Id.* ¶ 28.)

However, this argument is contradicted by the evidence, including the clear and express terms of the contract, which indicate that Defendant became a party to the contract by endorsing and presenting each bill of lading to Plaintiff. (*See* Tr. at 80:1–8 (Liu acknowledging that the terms and conditions in the bill of lading "set forth the obligations of the parties in the transaction")); *see also Red Ball Interior Demolition Corp. v. Palmadessa*, 173 F.3d 481, 484 (2d Cir. 1999) ("If a contract is clear, courts must take care not to alter or go beyond the express terms of the agreement, or to impose obligations on the parties that are not mandated by the unambiguous terms of the agreement itself."); *OT Afr. Line Ltd. v. First Class Shipping Corp.*, 124 F. Supp. 2d 817, 821 (S.D.N.Y. 2000) (noting that, under admiralty law, "testimony as to subjective intent" should not "be substituted

for the plain meaning of a contract"). Also relevant is the fact that, prior to October 2008, Defendant had presented at least 90 bills of lading to Plaintiff for the release of cargo. (Tr. at 62:15–63:2.) Liu confirmed that the bills of lading at issue in this case contained the same terms and conditions as those 90 other bills of lading and that Defendant's signature on the bills of lading was the same as well. (*Id.* at 65:4–16.) Therefore, the Court cannot accept Liu's assertion that Defendant's endorsement and presentation of the bills of lading in this case should be treated differently from the 90 other bills of lading that Defendant had previously endorsed. While Defendant insists that there are emails that support its theory that it signed the bill of lading, pursuant to instructions from Orient Star, only to abandon the cargo (*see* Def. Post-Trial Mem. at 15), Defendant has offered no evidence of such emails other than Liu's testimony, and the Court does not credit Liu's testimony in light of the absence of these emails. (Tr. at 63:17–64:4, 90:12–21.)

Finally, Defendant attempts to reargue points made in its summary judgment motion that Defendant cannot become a party to a contract by merely being identified as a consignee on the bill of lading. (Doc. No. 71 at 4–5.) Once again, this argument is foreclosed by the express terms of the bills of lading, which were *endorsed* by Defendant. Defendant's related assertion that it cannot be liable for demurrage and detention fees because it never accepted or demanded delivery of the cargo (*id.* at 7) is equally unavailing. As the Court held in its March Opinion, "whether a party accepted or demanded delivery is irrelevant to an analysis of whether a party is liable for demurrage and detention fees when, as here, a contract expressly provides that a party is liable." (March Opinion at 6); *see also* 🚩 *In re M/V Rickmers Genoa Litig.*, 622 F. Supp. 2d 56, 70 n.17 (S.D.N.Y. 2009) ("[D]etermining whether a third-party buyer or consignee was actually bound to a bill of lading is a matter of contract construction and must be accomplished by examining the terms of bills of lading."), *aff'd sub nom.*, *Chem One, Ltd. v. M/V Rickmers Genoa*, 502 F. App'x 66 (2d Cir. 2012). Accordingly, the Court finds that Plaintiff has proven the first element of its breach of contract claim – the existence of a valid contract between Plaintiff and Defendant – by a preponderance of the evidence.

*6  The Court also holds that Plaintiff has proven by a preponderance of the evidence the remaining three elements of its breach of contract claim. First, Plaintiff has demonstrated that it successfully performed under the contract. As the ocean carrier, Plaintiff was required to timely transport four containers of plasterboard from China

Case 5:22-cv-01202-MAD-ML    Document 8    Filed 03/28/23    Page 347 of 364

OOCL (USA) Inc. v. Transco Shipping Corp., Not Reported in Fed. Supp. (2015)

to New York in "good order and condition," and Defendant has offered no evidence to suggest that Plaintiff failed to successfully complete this task. (BOL preamble; DiSanto ¶ 15.) Second, Plaintiff has proven that Defendant – as a merchant defined under the bills of lading – breached each bill of lading by failing to pay demurrage and detention fees for the unclaimed cargo that sat on Plaintiff's vessel. (BOL cls. 2, 15, 19(4).) Finally, Plaintiff has proven that it incurred damages of more than $58,000 for demurrage and detention fees. (DiSanto Aff. ¶¶ 60–65; PX 11–17.) Accordingly, because Plaintiff has proven by a preponderance of the evidence each element of its breach of contract claim, the Court finds Defendant liable for breaching the three bills of lading.

### C. Account Stated

To assert an account stated claim, a plaintiff must demonstrate the existence of "a promise by a debtor to pay a stated sum of money which the parties had agreed upon as the amount due." *White Diamond Co. v. Castco, Inc.*, 436 F. Supp. 2d 615, 623 (S.D.N.Y. 2006). However, if a plaintiff can prove an enforceable contract and the plaintiff's account stated claim seeks the same relief as its breach of contract claim, the account stated claim may be dismissed as duplicative. *See*

📁 *Prof'l Merch. Advance Capital, LLC v. C Care Servs., LLC*, No. 13-cv-6562 (RJS), 2015 WL 4392081, at *6 (S.D.N.Y. July 15, 2015); *Media Tenor Int'l AG v. Medco Health Solutions, Inc.*, No. 13-cv-7223 (DLC), 2014 WL 2933215, at *8 (S.D.N.Y. June 27, 2014) ("If plaintiff can prove an enforceable contract, then it will be able to recover under that cause of action, and the account stated claim can be dismissed." (internal quotation marks omitted)). Therefore, because the Court has already found that Defendant is liable under Plaintiff's breach of contract claim, and because Plaintiff seeks the same relief in both its account stated claim and its breach of contract claim (FAC ¶¶ 15, 19), the Court dismisses Plaintiff's account stated claim as duplicative.

### D. Damages

In a breach of contract action, an injured party is "entitled to recover damages that are the 'natural and probable consequence of the breach.' " *APL Co. PTE v. Blue Water Shipping U.S. Inc.*, 592 F.3d 108, 111 (2d Cir. 2010). Here, Plaintiff seeks $58,490, plus prejudgment interest, attorney's

fees, and costs for its breach of contract claim. The $58,490 request represents the total detention and demurrages fees that Plaintiff incurred while the unclaimed cargo sat on its vessel in New York. (PX 17.) However, this amount fails to take into account the $1,017 that Plaintiff ultimately received from the sale of the unclaimed cargo. Accordingly, as Plaintiff has acknowledged, its damages award must be reduced by at least $1,017. (Tr. at 37:22–38:2.)

Defendant argues that Plaintiff's damages award should be further reduced as a result of Plaintiff's failure to mitigate its damages. (Liu Aff. ¶ 35; Def. Post-Trial Mem. at 8.) Specifically, Defendant contends that Plaintiff took nearly three months – from August to November 2008 – to finally dispose of the unclaimed cargo, even though it knew that Defendant had been unable to contact the third-party buyer. (*Id.*) However, while a party injured by a breach of contract has "an obligation to make reasonable efforts to mitigate its damages and failure to do so may cause a court to lessen the recovery," *APL*, 592 F.3d at 111, the defendant bears the burden of proving by a preponderance of the evidence that a plaintiff failed to take such action, *see Air Et Chaleur, S.A. v. Janeway*, 757 F.2d 489, 494 (2d Cir. 1985). Here, while Plaintiff waited until November 14, 2008 to dispose of the unclaimed cargo, Defendant has offered no evidence to demonstrate that Plaintiff failed to take reasonable steps in the interim. Indeed, Plaintiff mitigated its damages when it moved the cargo to BK Logistics's truck terminal in October 2008 in order to reduce the detention costs. (DiSanto Aff. ¶¶ 57–58; Tr. at 43:22–44:2 (DiSanto noting that Plaintiff moved the cargo to "stop the bleeding").) Furthermore, as noted in the March Opinion, once Defendant presented the signed and endorsed bills of lading to Plaintiff, Defendant was deemed to have taken delivery of the cargo and therefore had the ability to sell or move the cargo to avoid additional fees. (March Opinion at 8; BOL cl. 13 ("If the Merchant fails to take delivery of the Goods, ... the Goods shall be deemed to have been delivered to the Merchant.").) Therefore, "as the breaching party, [Defendant] was not entitled simply to shift any expenses or costs associated with the cargo disposal delay to [Plaintiff]. If [Defendant] had the same opportunity to avoid such costs, it had an obligation to do so." *APL*, 592 F.3d at 112. Accordingly, the Court finds that Defendant has not satisfied its burden of demonstrating that Plaintiff failed to mitigate its damages.

**\*7** The Court also finds that Plaintiff is entitled to prejudgment interest. The Second Circuit has recognized that prejudgment interest should be awarded in admiralty

OOCL (USA) Inc. v. Transco Shipping Corp., Not Reported in Fed. Supp. (2015)

Case 5:22-cv-01202-MAD-ML    Document 8    Filed 03/28/23    Page 348 of 364

cases absent exceptional circumstances and that calculating prejudgment interest is within "the broad discretion of the district court." *Mentor Ins. Co. (U.K.) v. Brannkasse*, 996 F.2d 506, 520 (2d Cir. 1993); *see also Mitsui & Co. v. Am. Exp. Lines, Inc.*, 636 F.2d 807, 823 (2d Cir. 1981). Because prejudgment interest serves "to fully compensate the wronged party for actual damages suffered," *Wickham Contracting Co. v. Local Union No. 3, Int'l Bhd. of Elec. Workers, AFL-CIO*, 955 F.2d 831, 834 (2d Cir. 1992), it is often "awarded from the time of injury," *Indep. Bulk Transp., Inc. v. Vessel Morania Abaco*, 676 F.2d 23, 25 (2d Cir. 1982). A prejudgment interest rate is usually "measured by interest on short-term, risk-free obligations," such as the average annual rate for a United States Treasury Bill. *N.Y. Marine & Gen. Ins. Co. v. Tradeline (L.L.C.)*, 266 F.3d 112, 131 (2d Cir. 2001).

Here, because Defendant has identified – and the Court is aware of – no exceptional circumstances that would preclude prejudgment interest, the Court finds that an award of prejudgment interest is appropriate to fully compensate Plaintiff. Accordingly, Plaintiff is entitled to prejudgment interest based on the average annual United States Treasury Bill rate, from the date Plaintiff began accruing demurrage and detention charges on August 29, 2008 to the date of this Opinion and Order. *See Man Ferrostaal, Inc. v. M/V Akili*, 763 F. Supp. 2d 599, 614 (S.D.N.Y. 2011) ("Interest is intended as a cure for an actual loss of cash, and so should run from the time that the loss took place."); *see also id.* (noting that "an award of interest based on the average annual United States Treasury Bill rate is becoming more common in this Circuit").

Finally, the Court finds that Plaintiff is entitled to reasonable attorney's fees and costs. In keeping with the basic tenets of contract law, "attorney fees and costs may be awarded where ... the bill of lading provides for the award of attorney fees." *See Maersk Inc. v. Alan Mktg., Inc.*, No. 97-cv-3495

(HB), 1998 WL 167323, at *3 (S.D.N.Y. Apr. 10, 1998). Here, the terms and conditions of each bill of lading expressly state that all merchants shall be liable for "any court costs, expenses and reasonable attorney fees incurred in collecting any sums due to [Plaintiff]." ( BOL cl. 15.) As a result, the Court finds that Defendant, as a merchant, is liable for any court costs, expenses, and reasonable attorney's fees related to this action.

In sum, the Court finds that Plaintiff is entitled to an award of damages in the amount of $57,473, plus prejudgment interest, attorney's fees, and costs.

### V. CONCLUSION

For the reasons stated above, the Court finds in favor of Plaintiff for its breach of contract claim in the amount of $57,473, plus prejudgment interest, reasonable attorney's fees, and costs. The Court nevertheless dismisses Plaintiff's account stated claim as duplicative. IT IS HEREBY ORDERED THAT, no later than January 22, 2016, Plaintiff shall submit a proposed judgment pursuant to Rule 58 of the Federal Rules of Civil Procedure. IT IS FURTHER ORDERED THAT, also by January 22, 2016, Plaintiff shall submit an application for fees and costs to the Court, including a sworn declaration providing counsel's background, experience, and billing rate at the time the work was expended, as well as copies of the attorney's time sheets. IT IS FURTHER ORDERED THAT, also by January 22, 2016, Defendant shall submit a proposal for prejudgment interest in accordance with the guidelines described in this Opinion and Order. Defendant may submit papers opposing Plaintiff's submissions no later than February 5, 2016.

**\*8** SO ORDERED.

### All Citations

Not Reported in Fed. Supp., 2015 WL 9460565

---

### Footnotes

1    A bill of lading is a maritime contract that "records that a carrier has received goods from the party that wishes to ship them, states the terms of carriage, and serves as evidence of the contract for carriage." *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 18–19 (2004).

OOCL (USA) Inc. v. Transco Shipping Corp., Not Reported in Fed. Supp. (2015)

Case 5:22-cv-01202-MAD-ML    Document 8    Filed 03/28/23    Page 349 of 364

2    These factual findings are derived from the Stipulation of Facts listed on page 6 of the parties' Joint Pretrial Order (Doc. No. 57 ("Stip.")), the July 27, 2015 trial transcript ("Tr."), witness affidavits, Plaintiff's exhibits ("PX"), and Defendant's exhibits ("DX"). To the extent that any finding of fact reflects a legal conclusion, it shall to that extent be deemed a conclusion of law, and vice versa.

3    Although Plaintiff found an original of the third bill of lading – identified as Plaintiff's Exhibit 23 – only one day before trial, Defendant agrees that Plaintiff's Exhibit 23 is an original copy of the third bill of lading. (Def. Post-Trial Mem. at 10.) Accordingly, the Court finds this bill of lading and the endorsement to be authentic.

4    The consignee is the receiver of the shipment. *See Black's Law Dictionary* 373 (10th ed. 2014) (defining a consignee as the "person named in a bill to whom or to whose order the bill promises delivery"). A notify party is "the party to be notified when the goods arrive at their destination." *Dynamic Worldwide Logistics, Inc. v. Exclusive Expressions, LLC,* 77 F. Supp. 3d 364, 367 n.3 (S.D.N.Y. 2015) (internal quotation marks omitted).

5    Demurrage and detention fees are essentially liquidated damages that accrue when cargo is not unloaded from a ship at the agreed upon time. *See Black's Law Dictionary* 526; *Evergreen Marine Corp. v. Welgrow Int'l Inc.,* 954 F. Supp. 101, 102 (S.D.N.Y. 1997).

6    Defendant objects to the admissibility of Plaintiff's Exhibit 25, which is a receipt indicating that BK Logistics remitted $1,017 to Plaintiff, on the grounds that it (i) is not authentic since it was presented on the eve of trial and (ii) constitutes inadmissible hearsay that does not fall under the business records exception to hearsay. (Def. Post-Trial Mem. at 6–7.) However, as noted during trial (Tr. at 39:14–24), the Court holds that, through the direct testimony of DiSanto, Plaintiff laid the proper foundation to establish Exhibit 25's authenticity. (*See id.* at 25:17–28:12; *see also* Fed. R. Evid. 901(b)(1) (noting that a document can be authenticated through testimony of a witness with knowledge of the evidence). In addition, even though it took several years for DiSanto to find Exhibit 25, the Court finds that his direct testimony demonstrated that Exhibit 25 satisfied the business records exception to the hearsay rule. (*See, e.g.,* Tr. at 31:6–10 (noting that Exhibit 25 was kept in the regular course of business); *id.* at 34:25–35:8 (noting that the information in Exhibit 25 was inputted contemporaneously with the relevant transactions)); *see also United States v. Reyes,* 157 F.3d 949, 951 (2d Cir. 1998) (stating that the business records exception to hearsay applies to trustworthy, contemporaneous records made in the regular course of business by a person with knowledge, as demonstrated by "the testimony of the custodian or other qualified witness" (citing Fed. R. Evid. 803(6))).

---

**End of Document**                       © 2023 Thomson Reuters. No claim to original U.S. Government Works.

1997 WL 599355

Only the Westlaw citation is currently available.

United States District Court, N.D. New York.

Kenneth BROWN, Plaintiff,

v.

Andrew PETERS, Warden, Watertown Correctional
Facility; Joseph Williams, Warden, Lincoln Work–
Release Center; Francis J. Herman, Senior Parole
Officer Interstate Bureau; T. Stanford, Senior Parole
Officer; Deborah Stewart, Parole Officer; John Doe #
1, Parole Agent, Watertown Correctional Facility; John
Doe # 2, Parole Agent, Lincoln Work Release Center;
Susan Bishop, Director of Interstate Compact, South
Carolina; Cecil Magee, Parole Officer, South Carolina;
Frank Barton, Parole Officer, South Carolina; John
McMahan, Parole Officer, South Carolina, Defendants.

No. Civ.A. 95CV1641RSPDS.
|
Sept. 22, 1997.

## Attorneys and Law Firms

Kenneth Brown, State Court Institute–Greene, Waynesburg,
PA, plaintiff, pro se.

Dennis C. Vacco, New York State Attorney General, The
Capitol Albany, NY, for defendants Peters, Herman Stewart,
Doe # 1, Doe # 2, and Williams, Jeffrey M. Dvorin, Assistant
Attorney General, Carl N. Lundberg, Chief Legal Counsel,
South Carolina Department of Probation, Columbia, SC, for
defendants Bishop, Magee, Barton, McMahan, and Stanford,
Carl N. Lundberg, of Counsel.

## DECISION AND ORDER

POOLER, J.

**\*1** The above matter comes to me following a Report–
Recommendation by Magistrate Judge Daniel Scanlon, Jr.,
duly filed on April 17, 1997. Following ten days from the
service thereof, the Clerk has sent me the entire file, including
any and all objections filed by the parties herein.

Plaintiff Kenneth Brown commenced this Section 1983 civil
rights action on November 17, 1995. On February 12,

1996, Magistrate Judge Scanlon ordered Brown to submit an
amended complaint alleging the specific acts committed by
the individuals named as defendants which Brown claimed
violated his constitutional rights. Brown filed an amended
complaint on March 21, 1996. In his amended complaint,
Brown alleged that defendants violated his rights under the
Eighth and Fourteenth Amendments by failing to process
properly his interstate compact paperwork, resulting in Brown
being imprisoned pursuant to a parole hold when in fact
he had never violated the conditions of his parole. For a
more complete statement of Brown's claims, see his amended
complaint. Dkt. No. 5.

On August 5, 1996, defendants Peters and Williams made
a motion to dismiss for failure to state a claim pursuant to
Fed.R.Civ.P. 12(b)(6). Dkt. No. 13; Dkt. No. 14, at 2.
On August 19, 1996, defendants Bishop, Magee, Barton, and
McMahan made a motion to dismiss the complaint against
them or, in the alternative, for summary judgment. Dkt. No.
20. On October 17, 1996, defendants Herman, Stewart, and
Stanford made a motion to dismiss for failure to state a
claim. Dkt. No 34. On April 17, 1996, Magistrate Judge
Scanlon recommended that all defendants' motions to dismiss
be granted and that the complaint be dismissed. Dkt. No. 50.

On June 9, 1997, Brown filed objections to the
magistrate judge's report-recommendation, having been
granted additional time in which to do so. Dkt. No. 52. In
addition, Brown filed on June 9, 1997, a motion for leave to
file a second amended complaint and a copy of his proposed
amended complaint. Dkt. No. 53. I turn first to the last motion
filed, Brown's motion for leave to amend his complaint a
second time.

Brown seeks to file a second amended complaint "setting
forth in detail the personal involvement of each defendant
and how their acts of commission and omission served to
deprive plaintiff of Constitutionally secured rights." Dkt. No.
53. The district court has discretion whether to grant leave
to amend. Ruffolo v. Oppenheimer & Co., 987 F.2d 129,
131 (2d Cir.1993). In exercising that discretion, the court
should freely grant leave to amend when justice so requires.
Fed.R.Civ.P. 15(a). However, the court need not grant leave
to amend where it appears that amendment would prove to be
unproductive or futile. Ruffolo, 987 F.2d at 131.

Here, Brown moved to amend his complaint to add additional
allegations against the named defendants. However, the

additional allegations fail to cure the deficiency which forms the basis of defendants' motion to dismiss—the absence of defendants' personal involvement in a constitutional deprivation. Section 1983 imposes liability upon an individual only when personal involvement of that individual subjects a person to deprivation of a federal right.

*See* Monell v. Dep't of Soc. Servs., 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A complaint is fatally defective if it fails to allege personal involvement sufficient to establish that a supervisor was "directly and personally responsible for the purported unlawful conduct." Alfaro Motors, Inc. v. Ward, 814 F.2d 883, 886 (2d Cir.1987).

 **2** Brown's proposed amended complaint alleges in conclusory fashion that defendants acted "in a grossly negligent and concerted manner which breached their duties owed to Plaintiff and is the proximate cause of [the violation of plaintiff's constitutional rights]." Proposed Am. Compl., at 3. Brown continues in the same vein, stating that defendants owed duties to plaintiff to carry out their jobs in a professional manner and they failed to carry out those duties appropriately. The complaint states that defendants held specific responsibilities, such as checking for outstanding warrants, which if performed properly should have alerted them to a problem. However, nowhere does the complaint set forth allegations that these defendants either participated directly in any constitutional infraction or that they were even aware of such an infraction. The proposed amended complaint merely alleges that these defendants failed in performing their supervisory and ministerial functions. "These bare assertions do not state a claim under 42 U.S.C. § 1983." Smiley v. Davis, 1988 WL 78306, *2 (S.D.N.Y.).

This plaintiff previously has had the opportunity to amend his complaint for the same reason asserted here, to allege personal involvement on the part of defendants. Brown's first amended complaint failed to accomplish that task, and it appears that even if allowed to amend again Brown would be unable to make the requisite allegations with sufficient specificity to sustain his complaint. Consequently, I find that amendment would be futile, and I deny Brown's motion for leave to amend his complaint.

I turn now to the magistrate judge's report-recommendation and defendants' motions. The magistrate judge recommends that I grant defendants' motions and dismiss the complaint as to all defendants. The report-recommendation clearly describes the grounds on which the magistrate judge

recommends dismissal as to each defendant. Fed.R.Civ.P. 72(b) requires the district judge to make a *de novo* determination on "any portion of the magistrate's disposition to which specific, written objection has been made." Brown's objections fail to address directly any of the analysis. Brown's objections state (1) that he has been deprived of his constitutional rights; (2) that he has stated a cause of action; (3) that the court wrongly refused to appoint an attorney for him and wrongly stayed discovery pending the outcome of these motions; (4) that he seeks to file an amended complaint;

(5) the standard of review for a Fed.R.Civ.P. 12(b)(6) motion; (6) that he disagrees with the magistrate judge's recommendation to grant defendants' motions because the allegations in his complaint, which he repeats, show that his rights were violated; and (7) the text of the Fourteenth and Eighth Amendments.

Even affording the objections the liberal reading required for *pro se* pleadings, I find that these objections fail to state any basis whatsoever, much less a specific one, for the court to adopt the magistrate judge's rulings. They simply re-state the relief sought and the facts on which Brown grounds his complaint and conclude that the magistrate judge's conclusions are wrong. When the parties make only frivolous, conclusive, or general objections, the court reviews the report-recommendation for clear error. *See* Camardo v. General Motors Hourly–Rate Employees Pension Plan, 806 F.Supp. 380, 382 (W.D.N.Y.1992) (court need not consider objections which are frivolous, conclusive, or general and constitute a rehashing of the same arguments and positions taken in original pleadings); Chambrier v. Leonardo, 1991 WL 44838, *1 (S.D.N.Y.) (restatement of allegations already before the court and assertion that valid constitutional claim exists insufficient to form specific objections); Schoolfield v. Dep't of Correction, 1994 WL 119740, *2 (S.D.N.Y.) (objections stating that magistrate judge's decisions are wrong and unjust, and restating relief sought and facts upon which complaint grounded, are conclusory and do not form specific basis for not adopting report-recommendation); Vargas v. Keane, 1994 WL 693885, *1 (S.D.N.Y.) (general objection that report does not address violation of petitioner's constitutional rights is a general plea that report not be adopted and cannot be treated as objection within the meaning of 28 U.S.C. § 636), *aff'd,* 86 F.3d 1273 (2d Cir.), *cert. denied,* 519 U.S. 895, 117 S.Ct. 240, 136 L.Ed.2d 169 (U.S.1996). *See also* Scipio v. Keane, 1997 WL 375601, *1 (1997) (when objections fail to address analysis directly, court reviews report-recommendation for clear error); Fed.R.Civ.P.

Brown v. Peters, Not Reported in F.Supp. (1997)

Case 5:22-cv-01202-MAD-ML    Document 8    Filed 03/28/23    Page 352 of 364

72(b), Advisory Comm. Note (when no specific, written objections filed, "court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation").

 **\*3** Because Brown fails to make specific objections or provide any basis for his general objections, I review the report-recommendation for clear error. After careful review, I conclude that the magistrate judge's report-recommendation is well-reasoned and is not clearly erroneous.[1] The magistrate judge employed the proper standard, accurately recited the facts, and reasonably applied the law to those facts. Consequently, I adopt the report-recommendation.

CONCLUSION

Because plaintiff's proposed amendment demonstrates that amendment would be futile, I deny plaintiff's motion for leave to amend his complaint. I approve the magistrate judge's recommendation and grant defendants' motions to dismiss. Plaintiff's complaint is dismissed in its entirety.

IT IS SO ORDERED.

**ORDER and REPORT–RECOMMENDATION**

This matter was referred to the undersigned for report and recommendation by the Hon. Rosemary S. Pooler, United States District Judge, by Standing Order dated November 12, 1986. Currently before this Court are a number of motions. Defendants Peters and Williams have filed a motion to dismiss (dkt.13); defendants Bishop, Magee, Barton and McMahan have filed a motion for summary judgment, or in the alternative to dismiss (dkt.20); and defendants Herman, Stewart and Stanford also have filed a motion to dismiss (dkt.34). Plaintiff opposes these three motions (dkts.27, 29, 33, 38). Defendants Bishop, Magee and McMahan have filed a motion to stay discovery (dkt.41) and plaintiff has filed a motion to extend time (dkt.44) in which to file opposition to the latter motion for a stay of discovery.

The Court addresses these issues *seriatim*.

**BACKGROUND**

Plaintiff's amended complaint, which he has brought pursuant to 42 U.S.C. § 1983, alleges the following facts. In October, 1991, plaintiff was incarcerated in the Watertown Correctional Facility in Watertown, New York. He applied for an interstate compact because he wanted to return to South Carolina to live with his common law wife, Pamela Reid. During the application process, he was interviewed by the facility's parole officer, identified only as defendant John Doe # 1. After signing the necessary papers, his application was forwarded to defendant Andrew Peters, the facility's superintendent, who reviewed, signed and forwarded the papers to the Interstate Bureau. Amend. Compl. at ¶¶ 1–2; Exs. A, B.

On or about January 15, 1992, while his compact was waiting for review at the Interstate Bureau, plaintiff was approved for work release and sent to the Lincoln Work Release Center in New York City. While at the center, plaintiff spoke to a parole officer, defendant John Doe # 2, and told him that he was seeking a compact that would return him to South Carolina upon his conditional release. Plaintiff claims the parole officer told him that he would handle the necessary paperwork, although the officer had had no experience with an interstate compact. Amend. Compl. at ¶¶ 3, 4.

 **\*4** Plaintiff, meanwhile, asked Reid whether any officials had contacted her in South Carolina regarding his prospective residence in that state. Upon discovering no one had contacted her, plaintiff asked a lawyer he knew, Navron Ponds, to inquire as to his compact status. In March, 1992, the lawyer spoke with defendant Susan Bishop, who is the director of the interstate compact program in South Carolina. Bishop allegedly told Ponds that plaintiff "was disapproved because there was a discrepancy about approving plaintiff['s] compact." The "discrepancy" was the fact that plaintiff owed the state of South Carolina eighty-six days of confinement from a previous sentence. Plaintiff claims Bishop told Ponds to contact defendants Cecil Magee and Frank Barton, who worked for the South Carolina Parole Department. Sometime in March, 1992, Ponds made some calls to Barton and Magee. A verbal agreement was reached, and plaintiff, upon speaking with Barton and Magee was told that his compact had been approved. He also was told that he should report to the South Carolina Department of Parole upon being released. Amend. Compl. at ¶¶ 5–7.

Prior to leaving the Lincoln Work Release Center, plaintiff processed paperwork related to his interstate compact. His paperwork was sent by Doe # 2 to defendant Joseph Williams,

Brown v. Peters, Not Reported in F.Supp. (1997)

Case 5:22-cv-01202-MAD-ML    Document 8    Filed 03/28/23    Page 353 of 364

the superintendent of the center. Williams reviewed, signed and returned the paperwork to plaintiff. On May 1, 1992, upon his release from the center, plaintiff traveled to South Carolina. Three days later, he entered a South Carolina parole office and promptly was arrested because of the eighty-six days of confinement that he owed the state. Plaintiff's paperwork was given to defendant John McMahan, a parole officer. Plaintiff claims that McMahan never returned this paperwork to him. On May 20, 1992, the state of South Carolina revoked plaintiff's parole and plaintiff was returned to prison to serve the eighty-six days that he owed. When he asked McMahan what would happen to his one year of parole from New York, the officer allegedly told him that his New York parole would run concurrently with his South Carolina parole, and that when he finished his South Carolina parole, he would not owe any parole whatsoever. Plaintiff served the eighty-six days he owed and was released on July 31, 1992. Amend. Compl. at ¶¶ 8–10.

In February, 1993, plaintiff was arrested on robbery charges in South Carolina. The charges ultimately were dropped, but he apparently encountered some difficulties regarding this arrest as a result of a parole hold that New York state had placed upon him. Bishop's office told him that it had nothing to do with his parole hold and that any problem that he had was between him and the state of New York. He talked to authorities in Albany, New York regarding the parole hold, but was not successful in his efforts to have the hold removed. On September 30, 1993, after had been extradited to New York as a fugitive from justice, plaintiff was given a preliminary hearing at Riker's Island, New York. The hearing officer found no probable cause that plaintiff had violated any condition of parole. He was released. Amend. Compl. at ¶¶ 11–14; Exs. C–J.

**\*5**  Plaintiff claims that he would not have suffered hardships if his interstate compact had been handled correctly. He alleges that defendant Deborah Stewart failed to follow up and see whether plaintiff had arrived in South Carolina. If she had, he argues, she would have discovered that he had been arrested upon his arrival. He alleges that defendant Francis Herman, a parole officer at the Interstate Bureau failed to do his job by not investigating plaintiff's violation reports. Amend. Compl. at ¶¶ 15–17; Exs. F–I.

Plaintiff asserts that the foregoing amounts violations of his Eighth and Fourteenth Amendment rights, wherefore he both compensatory and declaratory relief.

## DISCUSSION

A. Motion to Dismiss by Williams and Peters.

Williams and Peters have filed a motion to dismiss plaintiff's complaint pursuant to FED.R.CIV.P. 12(b)(6) on the grounds that it fails to state a claim upon which relief may be granted. In a Rule 12(b)(6) motion, all factual allegations in the complaint must be taken and construed in plaintiff's favor. See LaBounty v. Adler, 933 F.2d 121, 122 (2d Cir.1991) (citing Ortiz v. Cornette, 867 F.2d 146, 149 (1989)). The Court's role is not to assess whether plaintiffs have raised questions of fact or demonstrated an entitlement to a judgment as a matter of law, as in a motion made pursuant to FED.R.CIV.P. 56 for summary judgment, but rather to determine whether plaintiff's complaint sufficiently alleges all of the necessary legal elements to state a claim under the law. See Christopher v. Laidlaw Transit, Inc. 899 F.Supp. 1224, 1226 (S.D.N.Y.1995), (citing Ricciuti v. New York City Transit Authority, 941 F.2d 119, 124 (2d Cir.1991)). Factual allegations in brief or memoranda may not be considered. Fonte v. Board of Managers of Continental Towers Condominium, 848 F.2d 24, 25 (2d Cir.1988). The Court now turns to the issues presented.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983. Wright v. Smith, 21 F.3d 496, 501 (2d Cir.1994). As superintendents at New York State Correctional facilities, Williams and Peter may be found personally involved in the alleged deprivation of plaintiff's constitutionally protected rights by a showing that they: (1) directly participated in the infraction; (2) knew of the infraction, but failed to remedy the wrong; (3) created or continued a policy or custom under which unconstitutional practices occurred; or (4) were grossly negligent in managing subordinates who caused unlawful conditions or events. Id., (quoting Williams v. Smith, 781 F.2d 319, 323–24 (2d Cir.1986)). Supervisory liability also may be imposed against Williams or Peters with a showing of gross negligence or deliberate indifference to plaintiff's constitutional rights. Id. Absent some personal involvement by Williams or Peters in the allegedly constitutionally infirm conduct of their subordinates, neither can be held liable under § 1983. Gill v. Mooney, 824 F.2d 192, 196 (2d Cir.1987).

Case 5:22-cv-01202-MAD-ML    Document 8    Filed 03/28/23    Page 354 of 364

Brown v. Peters, Not Reported in F.Supp. (1997)

**\*6** Plaintiff has not provided any evidence linking either Williams or Peters to his alleged constitutional deprivations. All that plaintiff has alleged is that Williams and Peters, as superintendents, have reviewed and signed paperwork relating to plaintiff's compact. Though it has long been held that *pro se* complaints are held to "less stringent standards than formal pleadings drafted by lawyers" for the purpose of a motion to dismiss under 🚩 Rule 12(b)(6), 🚩 *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 595–96, 30 L.Ed.2d 652 (1972), plaintiff has not explained how the ministerial conduct of these two defendants was violative of the Constitution. Their motion to dimiss should be granted.

B. Motion for Summary Judgment or to Dismiss by Bishop, Magee, Barton and McMahan.

Bishop, Magee, Barton and McMahan have filed a motion for summary judgment, or in the alternative a motion to dismiss. The Court will treat their motion as a motion to dismiss. "[C]omplaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning." 🚩 *Barr v. Adams,* 810 F.2d 358, 363 (2d Cir.1987). Plaintiff has not alleged specifically how the conduct of these four defendants infringed upon his constitutional rights. In his amended complaint, he contends that defendants violated the Constitution by "continuously breaching [[[their] duty" to him. This language underscores the defect with the complaint: if it alleges anything at all, it alleges that defendants were negligent in handling plaintiff's interstate compact and parole. To state a cognizable 🚩 § 1983 claim, the prisoner must allege actions or omissions sufficient to demonstrate deliberate indifference; mere negligence will not suffice. 🚩 *Hayes v. New York City Dept. of Corrections,* 84 F.3d 614, 620 (2d Cir.1996); 🚩 *Morales v. New York State Dep't of Corrections,* 842 F.2d 27, 30 (2d Cir.1988) (🚩 section 1983 does not encompass a cause of action sounding in negligence).

The Court finds that the claims against Bishop, Magee, Barton and McMahan should be dismissed.

C. Motion to Dismiss by Herman, Stewart and Stanford.

Plaintiff's claim against Stewart is that she failed to follow up and see whether plaintiff had arrived in South Carolina. Herman, he likewise asserts, failed to do his job because he did not investigate plaintiff's violation reports. Plaintiff has not alleged how these actions run afoul of the Constitution; and again, these claims seem to be grounded in negligence, which is not actionable under 🚩 § 1983. 🚩 *Hayes,* 84 F.3d at 620.

Plaintiff's claim against Stanford must fail because his complaint literally fails to state a claim against that defendant. Aside from naming Stanford as a defendant, and alleging that he was the appointed Senior Parole Officer at plaintiff's September 30, 1993 revocation hearing at Riker's Island, plaintiff does not detail how Stanford violated his constitutional rights. Absent some personal involvement by Stanford in the allegedly constitutionally infirm conduct of his subordinates, he cannot be held liable under 🚩 § 1983. 🚩 *Gill,* 824 F.2d at 196.

**\*7** Accordingly, the Court finds that Stanford, Stewart and Herman's motion to dismiss should be granted.

D. Plaintiff's "John Doe" Claims.

In so far as neither John Doe # 1 nor John Doe # 2 have been identified and served in this matter, the Court does not have jurisdiction over these parties and does not reach the merits of plaintiff's claims against them.

E. Discovery Motions.

Defendants Bishop, Magee and McMahan have filed a motion to stay discovery until the Court has made a ruling on their motion to dismiss. Plaintiff has filed a motion to extend the time in which he may file opposition to defendants' motion. Plaintiff, however, has filed his opposing response (dkt.47), therefore his instant discovery motion is denied as moot. In that the Court recommends granting defendants' motion to dismiss, discovery in this matter would be fruitless. Accordingly, defendants' motion for a stay of discovery pending the resolution of their motion to dismiss is granted.

**CONCLUSION**

WHEREFORE, based upon the foregoing analysis, it is hereby

ORDERED, that plaintiff's motion to extend the time to file an opposing reply (dkt.44) is denied as moot; and it is further

ORDERED, that defendants Bishop, Magee and McMahan's motion to stay discovery until their motion to dismiss is decided (dkt.41) is granted; and it is further

RECOMMENDED, that defendants Peters and Williams' motion to dismiss (dkt.13) be granted; and it is further

RECOMMENDED, that defendants Bishop, Magee, Barton and McMahan's motion to dismiss (dkt.20) be granted; and it is further

RECOMMENDED, that defendants Herman, Stewart and Stanford's motion to dismiss (dkt.34) be granted.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.* *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); FED.R.CIV.P. 6(a), 6(e) and 72.

**All Citations**

Not Reported in F.Supp., 1997 WL 599355

## Footnotes

1    I note, however, that the report-recommendation would survive even *de novo* review.

    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

1995 WL 316935
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Mina POURZANDVAKIL, Plaintiff,

v.

Hubert HUMPHRY, Judisicial Systeam of The State of
Minnesota and Olmested County Court Systeam, and
State of Minnesota, Saint Peter State Hospital, Doctor
Gammel Stephelton, et el Erickson, North West Bank
and Trust, Olmested County Social Service, J.C. Penny
Insurnce, Metmore Finicial, Traveler Insurnce, Comecial
Union Insurnce, Hirman Insurnce, Amrican State
Insurnce, Farmers Insurnce, C. O Brown Insurnce, Msi
Insurnce, Steven Youngquist, Kent Chirstain, Micheal
Benson, United Airline, Kowate Airline, Fordmotor
Cridite, First Bank Rochester, George Restwich,
British Airways, Western Union, Prudenial Insurnce,
T.C.F. Bank, Judge Sandy Kieth, Judge Niergari,
Olmestead County Judgering, Judge Mores, Judge
Jacobson, Judge Challien, Judge Collin, Judge Thomase,
Judge Buttler, Judge Morke, Judge Moweer, Sera
Clayton, Susan Mudhaul, Ray Schmite, Defendants. [1]

Civ. A. No. 94-CV-1594.
|
May 23, 1995.

## Attorneys and Law Firms

Hubert H. Humphrey, III, Atty. Gen. of the State of Minn.,
St. Paul, MN, Jerome L. Getz, Asst. Atty. Gen., of counsel,
for Hubert H. Humphry, III, Judicial System of the State
of Minnesota, St. Peter Regional Treatment Center, Gerald
Gammell, MD, William Erickson, MD, Thomas Stapleton,
MD, the Honorable James L. Mork, Chief Judge Anne
Simonett, Judge Jack Davies, Judge Roger Klaphke, Judge
Dennis Challeen, and Judge Lawrence Collins.

Condon & Forsyth, P.C., New York City, Stephen J. Fearon,
Michael J. Holland, of counsel, for British Airways, P.L.C.
and Kuwait Airways Corp.

Dunlap & Seeger, P.C., Rochester, MN, Gregory J. Griffiths,
of counsel, for Olmsted County, Raymond Schmitz, Susan
Mundahl, Norwest Bank Minnesota, N.A. (the Northwest
Bank & Trust), C.O. Brown Agency, Inc.

Arthur, Chapman, McDonough, Kettering & Smetak, P.A.,
Minneapolis, MN, Eugene C. Shermoen, Jr., of counsel, for
J.C. Penney Ins. Co. and Metropolitan Ins. Co.

Shapiro & Kreisman, Rochester, NY, John A. DiCaro, of
counsel, for Metmor Financial, Inc.

Costello, Cooney & Fearon, Syracuse, Paul G. Ferrara, Robert
J. Smith, of counsel, for Travelers Ins. Companies; Hirman
Ins.; Commercial Union Ins. Companies.

Smith, Sovik, Kendrick & Sugnet, P.C., Syracuse, Thomas
N. Kaufmann, of counsel, for American States Ins. Co. and
Prudential Ins. Co.

Steven C. Youngquist, Rochester, MN, pro se.

Thomas J. Maroney, U. S. Atty., Syracuse, NY, William F.
Larkin, Asst. U. S. Atty., of counsel, for Michael Benson,
Postmaster N. D. of New York.

George F. Restovich & Associates, Rochester, MN, George F.
Restovich, of counsel, for George F. Restovich.

Conboy, McKay, Bachman & Kendall, L.L.P, Watertown, NY,
George K. Myrus, of counsel, for Western Union.

Richard Maki, Rochester, MN, pro se.

## MEMORANDUM-DECISION AND ORDER

POOLER, District Judge.

### INTRODUCTION

 *1  In the four and one-half months since she filed this
action, plaintiff Mina Pourzandvakil has filed three amended
complaints and ten motions. She also has sought and received
entry of default against ten defendants, none of whom she
properly served. She twice has sought and been denied
temporary restraining orders. She has included in her action
defendants with no apparent connection to this forum, that
were vindicated in actions she brought in other forums.

In response, several individual defendants and groups of
defendants have filed a total of twelve motions, some seeking
vacation of the defaults entered against them, some seeking
dismissal and others seeking both. We grant defendants'
motions insofar as they seek vacation of the clerk's entries of
default and dismissal of the complaint. We vacate *sua sponte*

Pourzanvakil v. Humphry, Not Reported in F.Supp. (1995)

Case 5:22-cv-01202-MAD-ML    Document 8    Filed 03/28/23    Page 357 of 364

the entries of default against the non-moving defendants. Finally, we dismiss the complaint in its entirety against all defendants.

BACKGROUND

Pourzandvakil commenced this action by filing a complaint in the Office of the Clerk on December 9, 1994 (Docket No. 1). The complaint named as defendants the Attorney General of the State of Minnesota, the State of Minnesota and Olmsted County, Minnesota judicial systems, various Minnesota judges and prosecutors, St. Peter State Hospital in Minnesota and various doctors who worked at St. Peter's. Without specifying the time or defendant involved, the complaint accused the defendants of kidnapping Pourzandvakil and her daughter, torturing Pourzandvakil in the Mayo Clinic since April 1985, and causing Pourzandvakil and her daughter to suffer physically, financially and emotionally. Pourzandvakil twice requested that we issue a temporary restraining order. We denied both requests. *See* Order entered December 14, 1994 (Docket No. 4) and Memorandum-Decision and Order entered December 22, 1994 (Docket No. 6).

On December 27, 1994, Pourzandvakil filed an amended complaint (the "first amended complaint") (Docket No. 7) that appears to differ from the original complaint by adding British Airways as a defendant without making any allegations against British Airways. The first amended complaint also differs by requesting additional damages for prior cases and adding descriptions of several previous cases. Annexed to the first amended complaint is another document labeled amended complaint (the "annexed amended complaint") (Docket No. 7) whose factual allegations differ substantially from both the original complaint and the first amended complaint. The annexed amended complaint also adds British Airways as a party but specifies only that Pourzandvakil has travelled on that airline and that British Airways, along with other airlines on which Pourzandvakil has travelled, is aware of all the crimes committed against her.

Pourzandvakil filed yet another amended complaint on January 13, 1995 (the "second amended complaint") (Docket No. 11). The second amended complaint adds as defendants several banks, other financial institutions, insurance companies, insurance agents or brokers, attorneys and airlines as well as the Postmaster of Olmsted County and Western Union. The allegations against these defendants defy easy summarization and will be addressed only insofar as they are relevant to the various motions.

**\*2** The Clerk of the Court has entered default against the following defendants: J.C. Penny Insurnce (*sic*) [2] ("J.C. Penney"), British Airways, Kowate (*sic*) Airline ("Kuwait"), MSi Insurnce (*sic*) ("MSI"), Judge Mork, Steven Youngquist ("Youngquist"), Prudncial Insurnce (*sic*) ("Prudential"), Ford Motor Credit ("Ford"), First Bank Rochester, and TCF Bank ("TCF"). Based on the submissions Pourzandvakil made in support of her requests for entry of default, it appears that she served these defendants by certified mail.

The court has received answers from the following defendants: Hubert H. Humphrey III, St. Peter Regional Treatment Center, and Drs. Gerald H. Gammell, William D. Erickson, and Thomas R. Stapleton (joint answer filed January 9, 1995); Olmsted County, Ray Schmitz ("Schmitz"), Susan Mundahl ("Mundahl"), C.O. Brown Agency, Inc. ("C.O. Brown") (answer to amended complaint filed January 23, 1995); George Restovich ("Restovich") (answer to complaint or amended complaint filed January 30, 1995); Norwest Corporation ("Norwest") (answer to amended complaint filed January 31, 1995, amended answer of Norwest Bank Minnesota, N.A. to amended complaint filed February 13, 1995); Travelers Insurance Company ("Travelers") (answer filed February 1, 1995); Michael Benson ("Benson") (answer filed February 6, 1995); Hirman Insurance ("Hirman") (answer filed February 6, 1995); Richard Maki ("Maki") (answer to complaint or amended complaint filed February 17, 1995); Western Union (answer filed February 21, 1995); Steven C. Youngquist ("Youngquist") (answer to complaint or amended complaint filed February 23, 1995); Kuwait (answer filed March 6, 1995); J.C. Penney (answer filed March 22, 1995); Susan E. Cooper [3] (answer to amended complaint filed March 24, 1995); and Chief Judge Anne Simonett, Judge Jack Davies, Judge Roger Klaphke, Judge Dennis Challeen and Judge Lawrence Collins (joint answer filed April 3, 1995).

The court has also received a total of ten motions from Pourzandvakil since February 27, 1995. She moved for a default judgment against defendants J.C. Penney, First Bank Rochester, Prudential, Ford, MSI, British Airways, and TCF. She moved for immediate trial and "venue in a different place" against several defendants and also requested action according to law and criminal charges. Finally, she made motions opposing defendants' motions.

Case 5:22-cv-01202-MAD-ML    Document 8    Filed 03/28/23    Page 358 of 364

Pourzandvakil v. Humphry, Not Reported in F.Supp. (1995)

The court also has received a total of thirteen motions [4] from defendants. Several of the defendants moved for dismissal either under Rule 56 or Rule 12 of the Federal Rules of Civil Procedure. For instance, Commercial Union Insurance Companies ("Commercial") moved for dismissal of Pourzandvakil's complaint pursuant to Fed. R. Civ. P. 12(b) or, in the alternative, for a more definite statement. Commercial argued that Pourzandvakil's complaint against it is barred by *res judicata* and collateral estoppel and that this court does not have subject matter jurisdiction over the complaints against Commercial. American States Insurance Company ("ASI") moved for dismissal based on plaintiff's failure to state a claim upon which relief can be granted. ASI further moved for an order enjoining Pourzandvakil from further litigation against it. Maki moved for summary judgment based on lack of personal jurisdiction, improper venue, plaintiff's failure to state a claim upon which relief can be granted, and lack of subject matter jurisdiction. Hubert H. Humphrey, III, the Judicial System of the State of Minnesota, Judge James L. Mork, St. Peter Regional Treatment Center and Drs. Gammell, Erickson and Stapleton (collectively, the "state defendants") moved for summary judgment alleging lack of personal jurisdiction, improper venue, plaintiff's failure to state a claim on which relief can be granted, lack of subject matter jurisdiction, sovereign immunity, and, on behalf of Judge Mork and the judicial system, absolute judicial immunity. The state defendants also requested costs and attorney's fees. Travelers moved for summary judgment based on *res judicata* and/or collateral estoppel, frivolity, lack of subject matter jurisdiction, and improper venue. Travelers sought a transfer of venue to Minnesota in the alternative. Hirman moved for summary judgment based on frivolity, lack of subject matter jurisdiction, and improper venue. Hirman also sought transfer of venue in the alternative. Olmsted County, Schmitz, Mundahl, C.O. Brown and Norwest sought dismissal based on lack of personal jurisdiction, improper venue, and plaintiff's failure to state a claim upon which relief can be granted. With respect to Schmitz and Mundahl, defendants sought dismissal based on absolute prosecutorial immunity, and with respect to C.O. Brown, defendants sought dismissal on *res judicata* grounds. Metmor Financial, Inc. ("Metmor") sought dismissal based on lack of personal jurisdiction, lack of subject matter jurisdiction, improper venue, and plaintiff's failure to state a claim upon which relief can be granted. Finally, Restovich moved for dismissal based on lack of personal jurisdiction. [5]

**\*3** Four defendants, British Airways, Kuwait, Prudential, and Youngquist, sought vacatur of the defaults entered against them. Prudential coupled its request with a request for an order enjoining plaintiff from filing or intervening in any litigation against it. Youngquist also requested dismissal of the complaint based on lack of personal jurisdiction and lack of subject matter jurisdiction.

ANALYSIS

The Defaults

We vacate the defaults entered in this matter because plaintiff improperly served defendants. Each application for entry of default shows service by certified mail, which is not permitted by relevant federal, New York or Minnesota rules. Under the Federal Rules of Civil Procedure, service on an individual may be made by (1) delivery to the named defendant; or (2) delivery to a person of suitable age and discretion at the defendant's dwelling house or usual place of abode; or (3) delivery to an agent authorized by law or by the defendant to receive service of process. Fed. R. Civ. P. 4(e)(2). Service on an individual can also be accomplished through a method authorized by the state in which the district court sits or in which the individual is located. Fed. R. Civ. P. 4(e)(1). Service on a corporation may be accomplished in a judicial district of the United States (1) pursuant to a method authorized by the law of the state in which the court sits or in which the corporation is located; or (2) by delivering a copy of the summons and complaint to an officer, managing or general agent, or to any other agent authorized by statute to receive service and, if the statute so requires, by also mailing a copy to the defendant. Fed. R. Civ. P. 4(h)(1) and 4(e)(1). Neither New York nor Minnesota law authorizes personal service on an individual or corporation by certified mail. *See* N.Y. Civ. Prac. L. & R. §§ 308, 311 (McKinney Supp. 1995); N.Y. Bus. Corp. Law § 306 (McKinney Supp. 1995); Minn. Stat. § 543.08 (1995); Minn. R. 4.03 (1995). Finally, service on states, municipal corporations or other governmental organizations subject to suit can be effected by (1) delivering a copy of the summons and complaint to the state's chief executive officer; or (2) pursuant to the law of the state in which the defendant is located. Fed. R. Civ. P. 4(j)(2). Minnesota law does not authorize service on a governmental entity by certified mail. *See* Minn. R. 4.03(d) and (e) (1995).

We therefore grant the motions by British Airways, Prudential, Kuwait, and Youngquist to vacate the defaults entered against them based both on the defective service and

Case 5:22-cv-01202-MAD-ML    Document 8    Filed 03/28/23    Page 359 of 364

Pourzancvakil v. Humphry, Not Reported in F.Supp. (1995)

also on the meritorious defenses discussed below. We vacate *sua sponte* the entries of default against MSI, Ford, First Bank Rochester and TCF, all of whom were served improperly and preserved the service issue by raising it or declining to waive it. Concomitantly, we deny Pourzandvakil's motion for a default judgment against J.C. Penney, First Bank Rochester, Prudential, Ford, MSI, British Airways and TCF. We vacate *sua sponte* the entry of default against J. C. Penney, which preserved the issue of service in its answer. By moving to dismiss or for summary judgment without raising the issue of service, Judge Mork may have waived the service issue. However Judge Mork objected to personal jurisdiction as inconsistent with due process and otherwise presented meritorious defenses. We therefore treat his motion for summary judgment as including a motion to vacate the entry of default and accordingly grant it.

## II. The Jurisdictional Arguments

**\*4** In addition to raising various other grounds for dismissal, such as plaintiff's failure to state a claim on which relief can be granted and *res judicata,* most of the moving defendants urge (1) that this court lacks jurisdiction over either their persons or the subject matter of the controversy or (2) that this action is improperly venued. As we must, we examine jurisdiction and venue first.

### A. Personal Jurisdiction

Maki, the state defendants, Olmsted County, Schmitz, Mundahl, C.O. Brown, Norwest, Metmor, Restovich and Youngquist each allege that this court cannot exercise personal jurisdiction over them consistent with due process constraints. In support of their motions, these defendants present affidavits showing that they have had no significant contacts with the state of New York relevant to this lawsuit and that their contacts with Pourzandvakil all occurred in Minnesota. Nothing in plaintiff's voluminous submissions links any of these defendants with New York. Plaintiff's extraterritorial service of process can be effective only under any of the following circumstances: (1) if defendants could be subjected to the jurisdiction of a court of general jurisdiction in New York State; (2) if the defendant is subject to federal interpleader jurisdiction; (3) if the defendant is joined pursuant to Rule 14 or Rule 19 of the Federal Rules of Civil Procedure and is served within a judicial district of the United States and not more than 100 miles from the place from which the summons issues; (4) if a federal statute provides for long-arm jurisdiction; or (5) if plaintiff's claims arise under federal law and the defendants could not be

subject to jurisdiction in the courts of general jurisdiction in any state of the United States. Fed. R. Civ. P. 4(k). Defendants are not subject to federal interpleader jurisdiction and they were not joined pursuant to Rule 14 or Rule 19. In addition, no federal long-arm statute is argued as a basis for jurisdiction, and the moving defendants all would be subject to jurisdiction in Minnesota. Therefore, we must look to New York's long-arm statute to determine whether plaintiff's extraterritorial service of process could be effective under the one ground remaining pursuant to Rule 4(k). *See* N.Y. Civ. Prac. L. & R. § 302 (McKinney Supp. 1995). This rule provides that in order to obtain jurisdiction over a non-domiciliary, the plaintiff must show both certain minimal contacts between the defendant and the state (such as transacting any business in the state) and that the harm plaintiff suffered springs from the act or presence constituting the requisite contact. *Id.* §302(a). The moving defendants have demonstrated that plaintiff does not claim harm stemming from acts or contacts within the purview of Section 302(a). Therefore, we grant these defendants' motions to dismiss the complaint for lack of personal jurisdiction.

### B. Subject Matter Jurisdiction

Pourzandvakil's complaint does not contain the jurisdictional allegations required by Fed. R. Civ. P. 8(a)(1). Several defendants move for dismissal based either on this pleading defect or on an affirmative claim that no subject matter jurisdiction exists. Commercial, Travelers and Hirman (collectively, the "moving insurance companies") moved for dismissal because plaintiff has not pled the complete diversity of citizenship required for subject matter jurisdiction. The state defendants, relying on *District of Columbia Court of Appeals v. Feldman,* argue that we lack subject matter jurisdiction over any issue that was determined in a state court proceeding to which plaintiff was a party.

*District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462, 482 (1983). These issues include plaintiff's hospitalization at St. Peter Regional Treatment Center. Finally, Metmor also moved for dismissal based on lack of subject matter jurisdiction because plaintiff has failed to plead a jurisdictional basis.

**\*5** The moving insurance companies note correctly that insofar as the claims against them can be deciphered, plaintiff states that Traveler's and Commercial did not pay for damages to Pourzandvakil's property, harassed her and cancelled her policy. Pourzandvakil does not mention Hirman in her complaint, but Hirman's attorney states that Pourzandvakil

Case 5:22-cv-01202-MAD-ML    Document 8    Filed 03/28/23    Page 360 of 364

Pourzandvakil v. Humphry, Not Reported in F.Supp. (1995)

informed him in a telephone conversation that her complaint against Hirman stemmed from actions it took as an agent of Travelers in denying Pourzandvakil's 1985 property damage claim.

The moving insurance companies argue that this court has no jurisdiction over the state insurance law claims absent complete diversity of citizenship between plaintiff and the defendants. 28 U.S.C. § 1332. They point out that plaintiff lists a Syracuse, New York address for herself and that Kuwait's address as listed in the complaint is also in New York. Therefore, they argue, there is no complete diversity and this court lacks subject matter jurisdiction absent a basis for pendent jurisdiction under 28 U.S.C. § 1367(a). Section 1367(a) requires a relationship between the state and federal claims so that "they form part of the same case or controversy." *Id.* Because plaintiff's claims of denial of insurance coverage bear no apparent relationship to her other claims of rape, torture, harassment and kidnapping, we do not believe that an adequate basis for supplemental jurisdiction exists. *Id.* Plaintiff's complaint therefore shows no basis for subject matter jurisdiction against the moving insurance companies, and we dismiss as against them. [6]

We also agree with the state defendants that state court decisions may render certain of plaintiff's claims against them unreviewable either because of *res judicata* or lack of subject matter jurisdiction. However, because plaintiff's claims are so generally stated and so lacking in specifics, we are unable to discern at this juncture what parts of her complaint would be outside the jurisdiction of the court. In any case, we already have determined that the state defendants are clearly entitled to dismissal on personal jurisdiction grounds. As for Metmor, we believe that plaintiff may be attempting to state a civil rights claim by alleging a conspiracy to murder in connection with a judge although she fails to articulate an actionable claim. We note that we already have determined, in any case, that Metmor is entitled to dismissal on personal jurisdiction grounds.

### C. Venue

Metmor, Travelers, Maki, Hirman, Norwest, Olmsted County, C.O. Brown, Schmitz and Mundahl also allege that Pourzandvakil's action is not properly venued in this court. Although these defendants are entitled to dismissal on independent grounds, improper venue also would support dismissal as to these defendants. The general venue statute

provides that a diversity action, except as otherwise provided by law, may be brought only in

> (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which the defendants are subject to personal jurisdiction at the time the action is commenced, if there is no district in which the action may otherwise be brought.

*6 28 U.S.C. § 1391(a). Section 1391(b) provides that federal question actions, except as otherwise provided by law, may be brought only in

> (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought.

*Id.* § 1391(b). The majority of the defendants in this action are residents of Minnesota and all of the events of which Pourzandvakil complains occurred in Minnesota. No defendant resides in the Northern District of New York, and none of the conduct plaintiff complains of occurred in this district. Therefore, venue in the Northern District of New York is clearly improper. Where venue is laid in the wrong district, the court "shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." *Id.* § 1406(a). Because, as we will explain below, Pourzandvakil's complaint not only fails

Case 5:22-cv-01202-MAD-ML    Document 8    Filed 03/28/23    Page 361 of 364

Pourzancvakil v. Humphry, Not Reported in F.Supp. (1995)

to state a claim upon which relief can be granted but is also frivolous, we do not deem it to be in the interest of justice to transfer this case to another district. The purpose of the court's discretionary authority to transfer rather than dismiss in cases of improperly laid venue is "to eliminate impediments to the timely disposition of cases and controversies on their merits." *Minnette v. Time Warner,* 997 F.2d 1023, 1027 (2d Cir. 1993) (holding that it was an improper exercise of discretion to dismiss rather than transfer when the statute of limitations on a timely filed complaint ran between filing and dismissal). In this case, as discussed below, a review of the complaint and the plaintiff's submissions on these motions indicates that her claims are frivolous. We therefore dismiss as to the moving defendants both on venue grounds and on the other grounds already identified as applicable. We note also that plaintiff has made claims similar to those in this action against many of the same defendants in the United States District Court for the District of Minnesota. *Pourzandvakil v. Price,* Civ. No. 4-93-207 (D.Minn. 1993). This action was dismissed by Order to Show Cause entered April 12, 1993.

III. Failure to State a Claim on Which Relief Can be Granted and Frivolity

Defendants ASI, Travelers, Hirman, Norwest, C.O. Brown, Olmsted County, Schmitz, Mundahl, Prudential, Metmor, and Youngquist as well as the state defendants have attacked the sufficiency of plaintiff's complaint. Travelers and Hirman urge that the complaint is frivolous while the remaining defendants argue only that the complaint fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b) (6).[7] We already have dismissed against all the moving parties except ASI on jurisdictional grounds and therefore have the power to address the Rule 12(b)(6) issue only on ASI's motion. *See* Bell v. Hood, 327 U.S. 678, 682-83 (1946) (subject matter jurisdiction); Arrowsmith v. United Press Int'l, 320 F.2d 219, 221 (2d Cir. 1963) (personal jurisdiction). We grant ASI's motion and note in passing that were we empowered to reach the merits regarding the remaining moving defendants, we also would dismiss the complaint against them for failure to state a claim upon which relief can be granted. We also dismiss *sua sponte* as frivolous the complaint against all defendants who have not been granted dismissal previously on jurisdictional grounds.

**\*7** Pourzandvakil has not specified a statutory or constitutional basis for her claims against ASI or any of the other defendants. She alleges that certain of the insurance

company defendants denied her claims for damages without alleging that the denial was in any respect wrongful. She also alleges in general terms that the defendants harassed, tortured, kidnapped and raped her and perhaps were involved in a murder plot but does not supply (1) the dates on which these actions occurred, except to say that they began in 1984 and 1985; (2) the names of the specific defendants involved in any particular conduct; or (3) a description of any particular conduct constituting the harassment, torture or kidnapping. She suggests without further detail that ASI was involved in a plot to murder her by placing her in the Mayo Clinic. Although plaintiff does not allege specific constitutional provisions or statutes that defendants have violated, we assume -- largely because many of the defendants involved are state officials or state employees and she appears to complain of certain aspects of various trials -- that she wishes to complain of violations of her civil rights. Complaints that rely on civil rights statutes are insufficient unless "they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning." Barr v. Abrams, 810 F.2d 358, 363 (2d Cir. 1987). A *pro se* plaintiff's complaint must be construed liberally and should be dismissed only "if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Estelle v. Gamble, 429 U.S. 97, 106 (1976) (quotation omitted). Pourzandvakil has not satisfied even this minimal test; her complaint and submissions on this motion demonstrate that she cannot prove any set of facts in support of her claim which would entitle her to relief. Her complaint consists of a "litany of general conclusions" rather than "specific allegations of fact". Barr, 810 F. 2d at 363.

Ordinarily we would allow plaintiff an opportunity to replead to state specific allegations against ASI, but three factors militate against this course of action. First, our December 22, 1994, Memorandum - Decision and Order denying plaintiff's request for a temporary restraining order indicated that she had not shown a likelihood of success on the merits of her claim because she had not pled any specific actionable facts. Despite the fact that plaintiff since has filed three amended complaints, she still fails to set forth specific actionable conduct. Second, the defendants' motions themselves have alerted plaintiff to the need to show specific actionable facts, and yet her voluminous submissions in opposition to the motions contain no specific actionable facts. Finally, plaintiff has asserted similar allegations against many of the same defendants sued in this action -- although not ASI -- as well as

Case 5:22-cv-01202-MAD-ML    Document 8    Filed 03/28/23    Page 362 of 364

Pourzancvakil v. Humphry, Not Reported in F.Supp. (1995)

others in several different jurisdictions. *See Pourzandvakil v. Blackman,* [8] Civ. No. 94-C944 (D.D.C. 1994), *Pourzandvakil v. Doty* (E.D.N.Y. 1993), *Pourzandvakil v. Price,* Civ. No. 7 (D.Minn. 1993). Where the results are known to us these actions resulted in dismissals for failure to state a claim upon which relief can be granted. *Pourzandvakil v. Price,* Civ. No. 4-93-207, Order to Show Cause entered April 12, 1993; *Pourzandvakil v. Blackman,* Civ. No. 94-C-94, Order entered April 28, 1994, *aff'd* Civ. No. 94-5139 (D.C. Cir. 1994) (per curiam). In the Minnesota case, dismissal took place after the district court offered plaintiff an opportunity to amend her pleading and plaintiff still was not able to offer specifics. [9] Even *pro se* complaints must show "some minimum level of factual support for their claims." *Pourzandvakil v. Blackman,* Civ. No. 94-C-94, (quoting *White v. White,* 886 F. 2d 721, 724 (4th Cir. 1989)). We therefore dismiss plaintiff's complaint against ASI for failure to state a claim upon which relief can be granted. *Fed. R. Civ. P. 12(b)(6).*

**\*8** We note that in *Pourzandvakil v. Blackman,* Judge John H. Pratt dismissed plaintiff's *in forma pauperis* complaint *sua sponte* under *28 U.S.C. §1915(d),* holding both that it failed to state a claim on which relief can be granted and that it was frivolous. We consider here whether we have the authority to dismiss *sua sponte* plaintiff's complaint, which was not filed *in forma pauperis,* as frivolous as against all non-moving defendants. The Supreme Court explicitly has acknowledged a district court's power under *Section 1915(d)* to dismiss as frivolous a complaint which "lacks an arguable basis either in law or in fact." *Neitzke v. Williams,* 490 U.S. 319, 325 (1989). The Supreme Court explicitly declined to rule, however, on whether a district court has the authority to dismiss *sua sponte* frivolous complaints filed by non-indigent plaintiffs. *Id.* at 329 n.8. The law in this circuit is that a district court may *sua sponte* dismiss a frivolous complaint even if the plaintiff has paid the filing fee. *See Tyler v. Carter,* 151 F.R.D. 537, 540 (S.D.N.Y. 1993), *aff'd* 41 F.3d 1500 (2d Cir. 1994); *cf. Pillay v. I.N.S.,* 45 F.3d 14, 17 (2d Cir. 1995) (per curiam) (dismissing *sua sponte* appeal for which appellant had paid normal filing fee). We believe that *sua sponte* dismissal is appropriate and necessary here because (1) plaintiff's claims lack an arguable basis in law and fact; (2) plaintiff has repeatedly attempted to replead her claims without being able to articulate actionable conduct; (3) some of plaintiff's claims have been tested in other courts and

found to be without merit; and (4) the issue of frivolity has been presented by at least some of the moving defendants.

We therefore dismiss with prejudice plaintiff's complaint as frivolous as to all defendants -- regardless of whether they have moved for dismissal -- that have not been granted dismissal on jurisdictional grounds. We direct the clerk to return plaintiff's filing fee to her. *Tyler,* 151 F.R.D. at 540.

**IV. Requests for Sanctions, Costs, Attorney's Fees and Injunction Against Filing Further Actions**

Because plaintiff is *pro se* and appears to have a belief in the legitimacy of her complaint, we do not believe that the purpose of Rule 11 would be served by awarding sanctions. *See Carlin v. Gold Hawk Joint Venture,* 778 F. Supp. 686, 694-695 (S.D.N.Y. 1991). Moreover, her litigiousness has not yet reached the point at which courts in this circuit have justified injunctive relief. *See id.* at 694 (and collected cases). We therefore deny the requests of ASI and Prudential for injunctive relief. Our refusal to grant sanctions and injunctive relief, however, is conditioned on this dismissal putting an end to plaintiff's attempts to sue these defendants on these claims in this forum. Any further attempts by plaintiff to revive these claims will result in our revisiting the issue of sanctions. *Id.* at 695.

CONCLUSION

**\*9** All defaults entered by the clerk are vacated. Plaintiff's complaint is dismissed in its entirety against all moving and non-moving defendants. The dismissal of the complaint against Maki, the state defendants, Olmsted County, Schmitz, Mundahl, C.O. Brown, Norwest, Metmor, Restovich, Youngquist, Commercial, Travelers and Hirman is without prejudice as it is premised on this court's lack of power either over the person of the defendant or the subject matter of the controversy. *See Voisin's Oyster House, Inc. v. Guidry,* 799 F.2d 183, 188-9 (5th Cir. 1986) (dismissal for lack of subject matter jurisdiction is not a dismissal on the merits); *John Birch Soc'y. v. National Broadcasting Co.,* 377 F.2d 194, 199 n.3 (2d Cir. 1967) (dismissal for lack of subject matter jurisdiction implies no view of merits); *Orange Theatre Corp. v. Rayherstz Amusement Corp.,* 139 F.2d 871, 875 (3d Cir.) *cert. denied,* 322 U.S. 740 (1944) (dismissal for lack of personal jurisdiction is not a dismissal on the merits). The dismissals against the remaining defendants are

with prejudice. All requests for sanctions and attorney's fees are denied. The requests of defendants ASI and Prudential for an injunction with respect to future litigation is denied. However, plaintiff is cautioned that any litigation in this forum attempting to revive the claims addressed herein may subject her to sanctions. Plaintiff's motions are denied as moot.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp., 1995 WL 316935

## Footnotes

1    Names in the caption are spelled to reflect plaintiff's complaint.

2    Plaintiff's spelling is idiosyncratic, and we preserve the spelling in its original form only where absolutely necessary for accuracy of the record. Otherwise we substitute the word we believe plaintiff intended for the word she actually wrote, e.g., "tortured" for "tureared."

3    Susan E. Cooper is not named as a defendant in the original complaint or any amended complaint filed with this court. From correspondence with Cooper's attorney, it appears that plaintiff sent Cooper a copy of a different version of the complaint. Because the original of this version was not filed with the court, no action against Cooper is pending in this court.

4    The court has also received three additional motions returnable May 22, 1995. The first -- from Judges Davies, Klaphake, Challeen, Collins and Chief Judge Simonett requests summary judgment dismissing the complaint based on lack of personal jurisdiction. The second by Western Union also requests summary judgment based, *inter alia,* on plaintiff's failure to state a claim on which relief can be granted. The third, by British Airways, also requests dismissal based, *inter alia,* on plaintiff's failure to state a claim on which relief can be granted. All three motions are mooted by this memorandum-decision and order which dismisses the complaint in its entirety against non-moving defendants for failure to state a claim on which relief can be granted.

5    The court also received an affidavit and memorandum of law in support of summary judgment from J.C. Penney. However, the documents were not accompanied by a notice of motion.

6    We ordinarily would offer plaintiff an opportunity to amend her complaint because her submissions and Kuwait's answer indicate two bases on which plaintiff might be able to argue diversity of citizenship. First, although plaintiff lists her address in Syracuse, New York, she also has indicated on the civil cover sheet that she is an Iranian Citizen and we are not aware of her residence status. As a permanent resident, she would be deemed a citizen of the state in which she resides. 🚩 28 U.S.C. § 1332(a). However, if she lacks permanent resident status, her citizenship would be considered diverse from that of all the defendants. 🚩 *Id.* § 1332(a)(2). Second, Kuwait has submitted an answer in which it claims to be a foreign state within the meaning of 🚩 28 U.S.C. § 1603. If Kuwait is correct, plaintiff may have an independent basis for jurisdiction over Kuwait. *See* 28 U.S.C. § 1330. If Pourzandvakil could show subject matter jurisdiction over Kuwait without resort to diversity of citizenship, then Kuwait's residence in New York may not be relevant to the issue of whether this court has diversity jurisdiction under 🚩 Section 1332. *Cf.* 🚩 *Hiram Walker & Sons, Inc. v. Kirk Line,* 877 F.2d 1508, 1511-1512 (11th Cir. 1989), *cert. denied,* 115 S.Ct. 1362 (1995) (holding that the joinder of a non-diverse defendant sued under federal question jurisdiction did not destroy diversity as to the remaining defendant). Here, however, plaintiff's complaint is subject to so many other meritorious defenses -- including

complete failure to state a cause of action -- that an amendment would be an exercise in futility. Additionally, plaintiff has not requested permission to amend, proffered an amended pleading, or indeed even supplied an affidavit stating her residency status or alleging a basis of jurisdiction over her claims against Kuwait other than diversity under 🚩 28 U.S.C. § 1332.

7    J.C. Penney also submits an affidavit requesting dismissal on this basis and others, but has not filed or served a notice of motion.

8    Former Supreme Court Justice Harry A. Blackmun.

9    We note also that plaintiff has not requested leave to amend in this action.

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.